LABONI A. HOQ (SBN 224140)
*laboni@hoqlaw.com*
HOQ LAW
P.O. Box 753
South Pasadena, California 91030
Telephone: (213) 973-9004

MICHAEL KAUFMAN (SBN 254575)
*MKaufman@aclusocal.org*
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West Eighth Street
Los Angeles, California 90017
Telephone: (213) 977-9500
Facsimile: (213) 915-0219

Attorneys for Plaintiffs
*(additional counsel information on next page)*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF SOUTHERN CALIFORNIA,<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br><br>*Defendants*. | Case No. 2:22-CV-04760<br><br>**COMPLAINT** |

EUNICE CHO (*pro hac vice* forthcoming)
*echo@aclu.org*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
NATIONAL PRISON PROJECT
915 Fifteenth Street NW, 7th Floor
Washington, DC 20005
Telephone: (202) 548-6616

KYLE VIRGIEN (SBN 278747)
*kvirgien@aclu.org*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
NATIONAL PRISON PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (202) 393-4930

Attorneys for Plaintiffs

## INTRODUCTION

1.     This is a Freedom of Information Action ("FOIA") case seeking public transparency into the United States Immigration and Customs Enforcement's ("ICE") practice of releasing detained people from custody prior to their imminent death.

2.     For years, media reports have documented multiple occasions in which ICE has released detained immigrants from custody on their death beds. ICE, however, has not reported or disclosed the deaths of these individuals. This practice is consistent with reports finding that ICE has a "culture of secrecy" that contributes to a failure to report and disclose deaths and detention conditions leading to those deaths.[1]

3.     ICE claims that the agency takes "very seriously the health, safety and welfare of those in our care," and that "any death that happens in ICE custody is a cause for concern." *See* https://www.ice.gov/detain/detainee-death-reporting. However, ICE has not accounted for the deaths of detained immigrants who pass away shortly after their release from custody, as a result of a fatal illnesses or medical conditions developed while detained by ICE.

4.     As reported in the news media, ICE's practices raise questions of significant public concern regarding its failure to account and take responsibility for deaths of detained immigrants, including those who fall ill in custody and are released from custody upon their imminent death. *See, e.g.,* Andrea Castillo and Jie Jenny Zou, *ICE Rushed to Release a Sick Woman, Avoiding Responsibility for Her Death. She Isn't Alone*, Los Angeles Times (May 13, 2022), available at https://www.latimes.com/world-nation/story/2022-05-13/ice-immigration-detention-

---

[1] Nina Bernstein, *Officials Hid Truth of Immigrant Deaths in Jail*, The New York Times, Jan. 9, 2010, https://www.nytimes.com/2010/01/10/us/10detain.html (describing evidence obtained through FOIA requests showing officials "used their role as overseers to cover up evidence of mistreatment, deflect scrutiny," and "prepare exculpatory public statements after gathering facts that pointed to substandard care or abuse").

deaths-sick-detainees.

5. ICE's failure to fully report and account for the deaths of detained immigrants has taken on heightened importance both for the public and the families of former ICE detainees. In 2020, ICE reported its highest annual death toll in immigration detention in fifteen years. *See, e.g.,* Catherine E. Shoichet, *The Death Toll in ICE Custody Is the Highest It's Been in 15 Years*, CNN (Sep. 20, 2020), available at https://www.cnn.com/2020/09/30/us/ice-deaths-detention-2020/index.html. However, it is likely that this publicly-reported number undercounts the true number of detained immigrants who died as a result of illness contracted while in ICE detention. Dan Glaun, *How ICE Data Undercounts COVID-19 Victims*, PBS FRONTLINE (Aug. 11, 2020), available at https://www.pbs.org/wgbh/frontline/article/how-ice-data-undercounts-covid-19-victims/.

6. In addition to information regarding ICE's policies, procedures and practice of releasing detainees on their death beds, this FOIA request also seeks the medical records of four detainees who suffered illnesses while in ICE custody, who died shortly after they were suddenly and inexplicably released from ICE custody:

> (a) Martin Vargas Arellano, a 55-year-old with diabetes, hypertension, gout, and hepatitis C, was detained at an ICE facility in Adelanto, California in 2020. He contracted COVID-19 and suffered a stroke in ICE detention and was released from custody while hospitalized three days before his death. A federal judge has already noted that ICE's communications regarding his death appeared to "actively conceal" information and raised "significant concerns regarding the Government's actions and lack of candor."[2]

---

[2] Order, *Roman v. Wolf*, ED CV 20-00768 TJH, Dkt. 1031, (C.D. Cal. Mar. 20, 2021). In that case, the federal district court earlier held that ICE violated detainees' constitutional rights at the Adelanto facility based on "detailed factual findings" of

2

(b) Jose Ibarra Bucio, a 27-year-old man was also detained at the ICE facility in Adelanto, California, where he suffered a brain hemorrhage while detained and fell into a coma in ICE detention. He was transferred to a local hospital and was formally released from ICE's custody two weeks later. He died four weeks after his release from custody, when his family removed him from life support.[3]

(c) Johana Medina Leon, 25-year-old transgender asylum seeker detained at an ICE facility in Otero County, New Mexico in 2019. While in custody she complained of health issues for a month and tested positive for HIV. After seven weeks in custody, she complained of chest pains and was taken to the hospital, where ICE released her from custody. She died four days later of pneumonia.[4]

(d) Teka Gulema, an Ethiopian man detained at an ICE facility in Gadsden, Alabama between 2012 and 2015, where he was paralyzed following a bacterial infection and transferred to a hospital, but remained in ICE custody for a year. But when he fell into a coma in the hospital, he was released from custody, and died weeks later.[5]

---

the facility and staff taking inadequate precautions to protect detainees from the coronavirus. *Roman v. Wolf*, No. 20-55436, 2020 WL 5683233, at *4 (9th Cir. Sept. 23, 2020).

[3] Amy Taxin, *Family Seeks Answers in Immigrant's Death after Detention*, AP News, Apr. 10, 2019, https://apnews.com/article/immigration-us-news-ap-top-news-caribbean-california-8775303f79ee4d44a5959c34a8f3d99d.

[4] Adolfo Flores, *A Transgender Woman Died After Being Held For Weeks In ICE Custody*, BuzzFeed News, June 3, 2019, https://www.buzzfeednews.com/article/adolfoflores/transgender-woman-dies-ice-custody-asylum; Sam Levin, *Trans Woman Who Died after Illness in US Custody Had Asked to Be Deported, family says*, The Guardian, June 12, 2019, https://www.theguardian.com/us-news/2019/jun/12/trans-woman-death-us-custody-ice-deportation.

[5] Amy Yurkanin, *No Natural Light, No Healthy Food, Detained Immigrants in the South Face Harsh Conditions*, New Orleans Advocate, Nov. 24, 2016, https://www.nola.com/news/crime_police/article_1e6b877a-2528-53b7-b75b-ce155189c194.html; William Thornton, *"One Who Could Have Been You": Group Protests Former Detainee's Death*, Advance Local, Feb. 28, 2016 (updated Jan. 13, 2019), https://www.al.com/news/anniston-

3

7.     Plaintiff American Civil Liberties Union of Southern California ("ACLU SoCal") brings this action against ICE and the United States Department of Homeland Security ("DHS") under 5 U.S.C. § 552, and the Declaratory Judgment Act, 28 U.S.C. § 2201 and 2202, seeking declaratory and injunctive relief to compel compliance with the requirements of FOIA to immediately release improperly withheld agency records.

## JURISDICTION AND VENUE

8.     This Court has both subject matter jurisdiction over the FOIA claims asserted here and personal jurisdiction over the parties to this action pursuant to 5 U.S.C. § 552(a)(4)(B) and § 552(a)(6)(E)(iii). This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§ 701-06, and authority to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

9.     Venue lies in this district under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e).

## PARTIES

10.     Petitioner ACLU SoCal is a nonprofit, nonpartisan organization under the laws of the state of California with over 120,000 members. As an affiliate of the national American Civil Liberties Union, ACLU SoCal is dedicated to the principles of liberty and equality embodied in the both the United States and California constitutions and our nations' civil rights laws. ACLU SoCal is committed to principles of transparency and accountability and uses state and federal public records laws to ensure that the public is informed about the conduct of government officials. ACLU SoCal uses such records to compile information for publication in reports published in hard copy and distributed electronically through its website, in amicus briefs, in legislative and public advocacy efforts, and in litigation. ACLU

gadsden/2016/02/one_who_could_have_been_you_gr.html; Complaint from CIVIC to John Roth, Inspector General, DHS, et al. (Mar. 31, 2016), http://www.endisolation.org/blog/wp-content/uploads/2016/02/Complaint-Etowah-Medical__1.pdf.

SoCal advocates to advance the rights of immigrants, with a focus on the health and safety of detained noncitizens. On multiple occasions, ACLU SoCal has publicly raised its concerns about the health, safety and other rights of immigrants in immigration detention, including ICE's concealment of the tragic death of Martin Vargas Arellano in 2020.

11.    Defendant ICE is a component of DHS and an agency of the U.S. government within the meaning of 5 U.S.C. § 551, 5 U.S.C. § 552(f), and 5 U.S.C. § 702. ICE has a field office in Los Angeles, and has possession, custody, and control of the records that the ACLU seeks.

12.    Defendant DHS is an agency of the U.S. government within the meaning of 5 U.S.C. § 551, 5 U.S.C. § 552(f), and 5 U.S.C. § 702. DHS has possession, custody, and control of the records that the ACLU seeks, including through its component office ICE.

## STATUTORY FRAMEWORK

13.    The Freedom of Information Act, 5 U.S.C. § 552, mandates disclosure of records held by a federal agency in response to a request for such records by a member of the public, unless those records fall within one of nine narrow statutory exemptions.

14.    The basic purpose of FOIA is to enable the public to hold the government accountable for its actions, through transparency and public scrutiny of governmental operations and activities. By providing access to government information, FOIA helps the public better understand the government, thereby enabling a vibrant and functioning democracy.

15.    Any member of the public may make a request under FOIA for records to an agency of the United States. An agency that receives a FOIA request must notify the requestor within twenty business days after the receipt of the request. 5 U.S.C. § 552(a)(6)(A)(i). In its response, the agency must inform the requestor whether or not it intends to comply with the request, provide reasons for its

determination, and inform the requestor of his or her right to appeal the determination. *Id*.

16.    FOIA requires an agency to make an adequate search for responsive records that is "reasonably calculated to uncover all relevant documents." *Transgender L. Ctr. v. Immigr. & Customs Enf't*, 33 F.4th 1186, 1194 (9th Cir. 2022) (quoting *Hamdan v. Dep't of Just.*, 797 F.3d 759, 770 (9th Cir. 2015)). "[A]gencies must demonstrate adequacy … 'beyond a material doubt.'" *Id*.

17.    FOIA requires an agency to timely disclose all records responsive to a FOIA request that do not fall within one of nine narrowly construed statutory exemptions. 5 U.S.C. §§ 552(a)(3)(A), 552(b)(1)-(9).

18.    A FOIA requestor is deemed to have exhausted his or her administrative remedies if the agency fails to comply with the statutory time limits for responding to a request. 5 U.S.C. § 552(a)(6)(C)(i). At that point, the requestor may immediately file suit in federal court to obtain the requested documents. *Kelly v. U.S. Census Bureau*, 540 F. App'x 749, 750 (9th Cir. 2013) *as amended on denial of reh'g* (noting that "person is deemed to exhaust administrative remedies if the agency fails to respond to a request under applicable time limits").

19.    A district court has jurisdiction to enjoin the agency from withholding records, to order production of records that are subject to disclosure, and to grant a public interest fee waiver of any costs associated with the production of such records. 5 U.S.C. §§ 552(a)(4)(B), 552(a)(4)(A)(iii).

20.    Documents shall be furnished without charge or at a reduced charge if disclosure of the information is in the public interest because it "is likely to contribute significantly to public understanding of the operations or activities of the government" and is "not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii). Requests for fee waivers are to be "liberally construed in favor of waivers for noncommercial requesters." *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 432 F.3d 945, 947 (9th Cir. 2005) (citations omitted).

21.   A requestor may also seek a waiver of search and review fees on the grounds that the requestor is a "representative of the news media" and the records are not sought for a commercial purpose. See 5 U.S.C. § 552(a)(4)(A)(ii). A representative of the news media is "any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." *Id*.

22.   A FOIA requestor who has been denied records or a waiver of fees associated with the search and production of records may appeal such denials to the agency. The agency must make a determination on the appeal within twenty business days of receipt of the appeal. 5 U.S.C. § 552(a)(6)(A)(ii).

23.   FOIA also requires an agency to produce records on an expedited basis when there is a "compelling need" for expedition. 5 U.S.C. § 552(a)(6)(E)(i). A compelling need is established if a person "primarily engaged in disseminating information" shows an "urgency to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II); accord 28 C.F.R. § 16.5(e)(1)(ii) (DOJ regulations); 6 C.F.R. § 5.5(e)(1)(ii) (DHS regulations).

24.   A FOIA requestor may also be entitled to expedited processing on the grounds that the records sought relate to a "(i) Circumstances in which the lack of expedited processing could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; (ii) An urgency to inform the public about an actual or alleged federal government activity, if made by a person who is primarily engaged in disseminating information; (iii) The loss of substantial due process rights; or (iv) A matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 6 C.F.R. § 5.5(e)(1)(i), (ii), (iii), (iv) (DHS regulations).

## FACTUAL AND PROCEDURAL BACKGROUND

### Background Facts

25.   To date, the COVID-19 pandemic, including the disease's resurgences

in the form of the Delta and Omicron variants, has killed more than 1,016,293 people in the United States.[6]

26.    Defendants hold thousands of immigrants in detention facilities across the United States.[7] Individuals detained in those facilities are particularly at risk of contracting and falling ill, or dying from, the coronavirus. As a recent DHS Inspector General report found, in "congregate environments" like ICE facilities, the coronavirus "can spread easily," and some detention facilities have "not consistently manage[d] medical sick calls" or conducted adequate testing.[8] For example, the New York Times reported that in June 2020, ICE detention facilities "had an average infection rate five times that of prisons and 20 times that of the general population."[9] In September 2021 the New York Times reported that ICE centers "are reporting major surges in coronavirus infections among detainees" as public health officials noted that "increasingly crowded facilities can be fertile ground for outbreaks."[10]

27.    In 2020, during the peak of the first wave of the coronavirus, ICE reported its highest annual death toll in immigration detention in fifteen years. In the

---

[6] Ctrs. for Disease Control and Prevention, COVID Data Tracker, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last updated July 11, 2022).

[7] U.S. Immigrations & Customs Enf't, Detention Management (Detention FY 21 YTD), https://www.ice.gov/detention-management#tab2 (last updated Sept. 16, 2021).

[8] *See* Dep't of Homeland Sec., Office of Inspector General, ICE's Management of COVID-19 in Its Detention Facilities Provides Lessons Learned for Future Pandemic Responses, (Sept. 7, 2021), https://www.oig.dhs.gov/sites/default/files/assets/2021-09/OIG-21-58-Sep21.pdf.

[9] Isabelle Niu and Emily Rhyne, *4 Takeaways From Our Investigation Into ICE's Mishandling of Covid-19*, The New York Times, Apr. 25, 2021, https://www.nytimes.com/2021/04/25/video/immigration-detention-covid-takeaways.html.

[10] Maura Turcotte, *Virus Cases Are Surging at Crowded Immigration Detention Centers in the U.S.*, The New York Times, July 6, 2021 (updated Sept. 6, 2021), https://www.nytimes.com/2021/07/06/us/covid-immigration-detention.html.

few years prior to 2020, though, dozens of individuals were also reported as dying while in ICE custody.[11]

28.   The number of total deaths of detainees is likely much higher than reported by ICE. For years, media reports have noted that on multiple occasions ICE has released individuals from custody on their death beds. The deaths of these individuals are not reported by ICE.[12] This practice is consistent with reports finding that ICE has a "culture of secrecy" that contributes to a failure to report and disclose deaths and detention conditions leading to those deaths.[13]

29.   ICE's practice is widespread and not limited to particular detention facilities. Four cases of ICE's practice of releasing detainees on their death beds, spanning from facilities in Alabama to California, show the serious nature of the problem:

(a)   Martin Vargas Arellano, a 55-year-old with diabetes, hypertension, gout, and hepatitis C, was detained at an ICE facility in Adelanto, California in 2020. He repeatedly asked to be released from detention because his health conditions placed him at serious risk of life-threatening illness or death should he contract COVID-19. Mr. Vargas Arellano, however, contracted COVID-19 in March 2021, suffered a

---

[11] Kendall Taggart et al., *More Than 40 Immigrants Have Died in ICE Custody In The Past Four Years. Here Are Thousands of Records About What Happened*, BuzzFeed News, Oct. 29, 2020, https://www.buzzfeednews.com/article/kendalltaggart/here-are-thousands-of-documents-about-immigrants-who-died.

[12] *E.g.*, Dan Glaun, *How ICE Data Undercounts COVID-19 Victims*, Frontline, Aug. 11, 2020, https://www.pbs.org/wgbh/frontline/article/how-ice-data-undercounts-covid-19-victims/ ("This has been a problem, with ICE hospitalizing people, releasing them, and then they die"); Amy Taxin and Krista Larson, *Questions arise after US frees asylum-seeker on life support*, AP News, Nov. 30, 2017, https://apnews.com/article/immigration-health-brazil-united-states-africa-7c272f12e314453f86c20a6ec69c88fd ("It isn't the first time immigrant advocates have raised concerns about the release of ill detainees.").

[13] Nina Bernstein, *Officials Hid Truth of Immigrant Deaths in Jail*, The New York Times, Jan. 9, 2010, https://www.nytimes.com/2010/01/10/us/10detain.html (describing evidence obtained through FOIA requests showing officials "used their role as overseers to cover up evidence of mistreatment, deflect scrutiny," and "prepare exculpatory public statements after gathering facts that pointed to substandard care or abuse").

9

stroke in ICE detention, and was admitted to a local hospital, where he remained in ICE custody. ICE formally released Mr. Vargas Arellano from its custody three days before his death at the hospital. ICE did not inform his family or attorney of his hospitalization or death.[14] His attorney pieced together that he had passed away ten days after the fact by filing a missing person's report and calling the coroner's office.[15] According to a federal district court judge overseeing a class-action in which Mr. Vargas Arellano was a party, the Government's statement that Mr. Vargas Arellano had been released from detention appeared to "actively conceal" from the court, his attorneys, and his family his progressive illness and death and raised "significant concerns regarding the Government's actions and lack of candor."[16]

(b) Jose Ibarra Bucio, a 27-year-old, was also detained in Adelanto, California. In 2019, he suffered a brain hemorrhage while detained and fell into a coma. He was transferred to a local hospital and was formally released from ICE's custody two weeks later. He died four weeks after his release from custody, when his family decided to take him off life support.[17]

(c) Johana Medina Leon was a 25-year-old transgender asylum seeker held at an immigration detention facility in Otero County, New Mexico in

---

[14] *See* Joe Nelson, *Detainee Who Pleaded for Release from ICE Immigration Center in Adelanto Dies from COVID-19*, The Sun, Mar. 22, 2021, https://www.sbsun.com/2021/03/22/detainee-who-pleaded-for-release-from-ice-immigration-center-in-adelanto-dies-from-covid-19/.

[15] *Id*.

[16] Order, *Roman v. Wolf*, ED CV 20-00768 TJH, Dkt. 1031, (C.D. Cal. Mar. 20, 2021). In that case, the federal district court earlier held that ICE violated detainees' constitutional rights at the Adelanto facility based on "detailed factual findings" of the facility and staff taking inadequate precautions to protect detainees from the coronavirus. *Roman v. Wolf*, No. 20-55436, 2020 WL 5683233, at *4 (9th Cir. Sept. 23, 2020).

[17] Amy Taxin, *Family Seeks Answers in Immigrant's Death after Detention*, AP News, Apr. 10, 2019, https://apnews.com/article/immigration-us-news-ap-top-news-caribbean-california-8775303f79ee4d44a5959c34a8f3d99d.

2019. While in custody she complained of health issues for over a month and tested positive for HIV. She was routinely denied medical care, including the provision of basic equipment such as an IV-drip so she could treat herself using her nursing skills. After seven weeks in custody, she complained of chest pains and was taken to the hospital, where ICE released her from custody. She died four days later of pneumonia.[18]

(d)  Teka Gulema was an Ethiopian man detained at an ICE facility in Gadsden, Alabama between 2012 and 2015. While in custody, he was paralyzed following a bacterial infection and transferred to a hospital, where he remained under ICE custody for a year. But when he fell into a coma in the hospital, he was released from custody, and died weeks later.[19]

30.  ICE's underreporting of detainees who would have died under ICE's custody but-for their twelfth-hour release has dire consequences. ICE is required to report all in-custody deaths to the public and release investigatory reports of all in-custody detainee deaths within 90 days of the person's death.[20] By releasing

---

[18] Adolfo Flores, *A Transgender Woman Died After Being Held For Weeks In ICE Custody*, BuzzFeed News, June 3, 2019, https://www.buzzfeednews.com/article/adolfoflores/transgender-woman-dies-ice-custody-asylum; Sam Levin, *Trans Woman Who Died After Illness in US Custody Had Asked to Be Deported, Family Says*, The Guardian, June 12, 2019, https://www.theguardian.com/us-news/2019/jun/12/trans-woman-death-us-custody-ice-deportation.

[19] Amy Yurkanin, *No Natural Light, No Healthy Food, Detained Immigrants in the South Face Harsh Conditions*, New Orleans Advocate, Nov. 24, 2016, https://www.nola.com/news/crime_police/article_1e6b877a-2528-53b7-b75b-ce155189c194.html; William Thornton, *"One Who Could Have Been You": Group Protests Former Detainee's Death*, Advance Local, Feb. 28, 2016 (updated Jan. 13, 2019), https://www.al.com/news/anniston-gadsden/2016/02/one_who_could_have_been_you_gr.html; Complaint from CIVIC to John Roth, Inspector General, DHS, et al. (Mar. 31, 2016), http://www.endisolation.org/blog/wp-content/uploads/2016/02/Complaint-Etowah-Medical__1.pdf.

[20] ICE, Directive: Notification and Reporting of Detainee Deaths, Oct. 1, 2012, https://www.ice.gov/doclib/dro/pdf/notification_and_reporting_of_detainee_deaths.

detainees at the last minute, ICE avoids reporting their deaths to the public, investigating the circumstances of their deaths, and paying for their medical costs.[21] This practice reinforces ICE's culture of secrecy and denies families and the public at large their rights to know what passes for medical care in ICE facilities.

31.   ICE investigations into detainee deaths and the information ICE maintains on detainee health prior to death is critical to understand how ICE operates and to keep ICE accountable. Prior investigations into detainee deaths—including investigations at the Adelanto Processing Center from where Mr. Ibarra Bucio and Mr. Vargas Arellano were released prior to their deaths—revealed that guards "falsified records to hide apparent dereliction of duty" and committed "other failures that point to serious lack of care."[22] A report published jointly by the ACLU and other immigrant rights groups analyzed records obtained through FOIA requests for deaths in immigration detention between December 2015 and April 2017 and found that "substandard medical care contributed or led to" a majority of the deaths reported during that time. The report further found that the "healthcare and oversight failures" identified in the report "point to larger, systemic deficits in immigration detention facility health care" that must be addressed by Congress, ICE, and state and local governments.[23]

---

pdf; Staff Report, The Trump Administration's Mistreatment of Detained Immigrants: Deaths and Deficient Medical Care by For-Profit Detention Contractors, Comm. on Oversight and Reform, U.S. House of Representatives, Sept. 2020, at 4 ("Staff Report").

[21] Catalina Villegas, *'ICE Does This to Avoid Liability': Families, Lawyer Question Releases of Detainees Near Death*, Spectrum News, May 16, 2021, https://spectrumnews1.com/ca/la-west/immigration/2021/05/16/families--advocates-question-ice-releases-of-detainees-near-death; *see* Dan Glaun, *How ICE Data Undercounts COVID-19 Victims*, *supra* note 7.

[22] Kendall Taggart et al., *More Than 40 Immigrants Have Died in ICE Custody In The Past Four Years. Here Are Thousands Of Records About What Happened*, *supra* note 6.

[23] Human Rights Watch et. al., Code Red: The Fatal Consequences of Dangerously Substandard Medical Care in Immigration Detention, at 1-2 (June 2018), available at https://www.hrw.org/report/2018/06/20/code-red/fatal-consequences-dangerously-substandard-medical-care-immigration.

32.     Subsequent Congressional investigation by the U.S. House of Representatives' Committee on Oversight and Reform ("the House Committee") into detainee deaths at ICE facilities corroborated the ACLU's report, finding that "private prison contractors have let known problems fester into a full-blown crisis" that became "far worse during the coronavirus pandemic."[24] The House Committee also found that ICE failed to release investigative reports on detainee deaths in custody in violation of federal law.[25]

33.     The public, detainees in ICE custody, and families of detainees who have been, are, or will be in ICE custody deserve to know the full extent of ICE's treatment of ill and dying detainees.

## ACLU SoCal's Request

34.     On April 29, 2022, ACLU SoCal submitted a FOIA request to ICE, DHS, and DHS's Office of Inspector General ("DHS OIG") (Exhibit ("Exh.") A) (the "Request") seeking records relating to Defendants' treatment of hospitalized detainees and detainees released from custody prior to their death. Despite reports that Defendants' improper treatment of detainees continues to date, and acknowledgment by DHS OIG that the Request is entitled to expedited processing, Defendants have yet to date produced any records in response to the Request. As Defendants keep these invaluable records from the public view, detainees continue to face negative health consequences while in detention.

35.     The specific records ACLU SoCal seek in its Request include the following:

 (1)     Any and all documents, without limitation to date, including any communications, investigatory reports, and any and all exhibits, appendices, or attachments thereto, relating to the hospitalization, death,

---

[24] Hamed Aleaziz, *A Congressional Oversight Committee Found That ICE Detainees Died After Receiving Poor Medical Care*, BuzzFeed News, Sept. 24, 2020, https://www.buzzfeednews.com/article/hamedaleaziz/ice-detainees-medical-care-congressional-report; *see* Staff Report at 1.

[25] Staff Report, at 3.

13

decision to release from custody, or release from custody of the following individuals.

| Name | Country of Origin | Approximate Date of Death | ICE Detention Facility Prior to Hospitalization and Death | Location at Death |
|---|---|---|---|---|
| Teka Gulema | Ethiopia | January 18, 2016 | Etowah County Detention Center, Alabama | Riverview Medical Center, Gadsden, AL |
| Johana Medina Leon[26] | El Salvador | May 23-June 1, 2019 | Otero County Processing Center, New Mexico | Del Sol Medical Center, El Paso, TX |
| Jose Ibarra Bucio | Mexico | March 21, 2019 | Adelanto ICE Processing Center, California | Loma Linda University Medical Center, Loma Linda, CA |
| Martin Vargas Arellano[27] | Mexico | March 6, 2021 | Adelanto ICE Processing Center, California | St. Judge Medical Center, Fullerton, CA |

(2)   Any and all DHS OIG reports of investigation that are identified in any of the records responsive to Request #1. This includes any and all exhibits, appendices, or attachments to the DHS OIG reports of investigation.

(3)   Any and all ICE OPR reports of investigation that are identified in any of the records responsive to Request #1. This includes any and all

---

[26] Upon information and belief, ICE has produced documents related to Johana Medina Leon and her death under FOIA to other Requestors. *See Los Angeles Times Communications LLC v. U.S. Dep't of Homeland Security*, No. 2:20-cv-10911-FLA-MRW (C.D. Cal.); Andrea Castillo and Jie Jenny Zou, *L.A. Times Files Lawsuit Seeking Records on Abuse Claims at U.S. Immigration Detention Centers*, L.A. Times, Dec. 1, 2020, https://www.latimes.com/politics/story/2020-12-01/la-times-sues-for-federal-records-on-abuse-claims-ice-centers; Andrea Castllo and Jie Jenny Zou, *ICE Rushed to Release a Sick Woman, Avoiding Responsibility for Her Death. She Isn't Alone*, L.A. Times, May 13, 2022, https://www.latimes.com/world-nation/story/2022-05-13/ice-immigration-detention-deaths-sick-detainees.
[27] Upon information and belief, ICE has produced some documents under FOIA related to Martin Vargas Arellano to other Requestors. *Martin Vargas v. U.S. ICE et al.*, No. 5:22-cv-287-JWH-SP (C.D. Cal.).

exhibits, appendices, or attachments to the DHS OPR reports of investigation.

(4) Any and all documents and communications, including ICE and IHSC directives, policies, procedures, protocols, or trainings that contain guidance, instructions, or standards about the release from custody of (a) hospitalized detainees; or (b) detainees who at the time of release were patients in the care of external healthcare providers or facilities. Detainees specified in (a) and (b) above shall include those being treated for COVID-19 during their hospitalization or treatment at external healthcare providers or facilities.

(5) Spreadsheets, emails, documents, communications, databases, lists, and other data compilations in the possession of ICE Leadership, ICE Enforcement and Removal Operations, ICE Health Service Corps, and ICE Office of Professional Responsibility that identify detainees who were released from custody while (a) hospitalized (including for COVID-19 treatment); (b) in the full-time care of external healthcare providers or facilities (including for COVID-19 treatment), or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility. Requested materials include, but are not limited to, dates of hospitalization of detainees, dates of hospital or external care facility discharge, name of treated detainees' detention facilities, and reasons for detainees' hospitalization or external medical care. These materials should further include Medical Transfer Summary documents from DHS's eHR System and Alien Medical Records System, and any versions of the Significant Detainee Illness Spreadsheet that identify detainees who were released from custody while (a) hospitalized (including for COVID-19 treatment); (b) in the care of external healthcare providers or facilities (including for COVID-19

treatment); or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility.

(6) Spreadsheets, emails, significant incident reports (SIRs), significant event notification reports (SENs), or documents created by DHS OIG or ICE OPR that mention the release from custody of (a) hospitalized detainees; (b) detainees who at the time of release were patients in the care of external healthcare providers or facilities; or (c) detainees released from custody immediately prior to transfer to an emergency room, hospital, or external care facility.

(7) Spreadsheets, emails, SIRs, SENs, or documents created by DHS OIG or ICE OPR that mention the death of any detainee who had been previously released from custody while (a) hospitalized; or (b) a patient in the care of an external healthcare provider or facility; or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility.

(8) Any and all documents, communications, and other records, including databases, spreadsheets, lists, and other data compilations, that identify detainees who were hospitalized or transferred from detention for off-site medical care due to COVID-19, and were subsequently released from custody while hospitalized, or detainees who were released from custody immediately prior to transfer to an emergency room, hospital, or external care facility to receive treatment for COVID-19. Requested information includes, but is not limited to, dates of hospitalization, detention facility, medical condition/reason for hospitalization or treatment, name and location of hospital, date of return to detention (if any), date of release from custody or issuance of order of recognizance (if any), and/or reason for release from custody.

(9)   Bills, invoices, charges, or records of payment that reflect payments made for healthcare for any detainee who was released from custody while (a) hospitalized; or (b) a patient in the care of an external healthcare provider or facility, and communications about such bills, invoices, charges, or records of payment.

36.   The Request sought all responsive records "from January 1, 2016 to the present."

37.   The Request sought a fee waiver or reduction of all costs pursuant to 5 U.S.C. § 552(a)(4)(A)(iii), citing the fact that the "requested records relate directly to the operations or activities of the government that potentially impact rights and freedoms," and "will contribute substantially to the public's understanding of ICE's role in this matter of great public concern," namely  "the treatment of detained immigrants, and ICE's decisions to release hospitalized detainees on their deathbeds."

38.   The Request also sought expedited processing, citing the urgent need to inform the public about ICE's treatment of people in detention, ICE's decisions to release people from custody prior to death, and the ACLU So Cal's activities as an organization "primarily engaged in disseminating information" within the meaning of FOIA.

**Administrative Exhaustion**

39.   On May 16, 2021, ICE acknowledged receipt of the Request and assigned it a tracking number, 2021-ICFO-38388 (Exh. B). ICE granted ACLU SoCal's request for a fee waiver, stating that it met the six-factor test set forth in DHS FOIA regulations. ICE denied ACLU SoCal's request for expedited processing, stating that it failed to meet either of the standards set forth in 6 C.F.R. §5.5(e)(1).

40.   On May 16, 2022 DHS OIG acknowledged receipt of the Request and assigned it a tracking number, 2022-IGFO-00158 (Exh. C). DHS OIG granted

ACLU SoCal's request for a fee waiver, stating that it "has met the statutory standard" set forth in 5 U.S.C. § 552(a)(4)(A)(iii). *Id*. DHS OIG also granted the ACLU's request for expedited processing, stating that the Request "does establish the requirements under 6 C.F.R. § 5.5(e)(1) and 6 C.F.R. § 5.5 (e)(3)." *Id*. ACLU SoCal is conferring with DHS OIG regarding the parameters of its release of documents, but it has yet to produce any documents responsive to the Request.

41.   To date, Defendant DHS has failed to respond to the Request.

42.   To date, each of ICE, DHS, and DHS OIG have failed to produce a single document.  Each day, Defendants are further in breach of their requirement to respond to the Request. Immigrants detained in ICE facilities, their families, and the general public have an urgent need for this information.

## CLAIMS FOR RELIEF

### First Claim

### Violation of FOIA, 5 U.S.C. § 552

### Wrongful Withholding of Non-Exempt Responsive Records

### (All Defendants)

43.   ACLU SoCal properly requested records within the possession, custody, and control of Defendants.

44.   Defendants are agencies and components thereof subject to FOIA, and they must therefore release in response to a FOIA request any non-exempt records and provide a lawful reason for withholding any materials.

45.   Defendants are wrongfully withholding non-exempt agency records requested by the ACLU SoCal by failing to produce non-exempt records responsive to its FOIA requests.

46.   Defendants are wrongfully withholding non-exempt agency records requested by the ACLU SoCal by failing to segregate exempt information in otherwise non-exempt records responsive to the Request.

18

47.   Defendants' failure to provide all non-exempt responsive records violates FOIA and applicable regulations.

48.   Because Defendants failed to comply with the applicable time-limit provisions of FOIA, the ACLU SoCal has constructively exhausted its administrative remedies pursuant to 5 U.S.C. § 552(a)(6)(C)(i).

49.   ACLU SoCal is therefore entitled to declaratory and injunctive relief requiring Defendants to promptly produce all non-exempt records responsive to its FOIA requests and provide indexes justifying the withholding of any responsive records withheld under claim of exemption.

## Second Claim

### Violation of FOIA, 5 U.S.C. § 552

### Failure to Conduct Adequate Searches for Responsive Records

### (All Defendants)

50.   ACLU SoCal properly requested records within the possession, custody, and control of Defendants.

51.   Defendants are agencies subject to and within the meaning of FOIA, and they must therefore make reasonable efforts to search for requested records.

52.   Defendants have failed to promptly review agency records for the purpose of locating those records that are responsive to the Request.

53.   Defendants' failure to conduct adequate searches for responsive records violates FOIA and applicable regulations.

54.    Because Defendants failed to comply with the applicable time-limit provisions of FOIA, the ACLU SoCal has constructively exhausted its administrative remedies pursuant to 5 U.S.C. § 552(a)(6)(C)(i).

55.   The ACLU SoCal is therefore entitled to injunctive and declaratory relief requiring Defendants to promptly make reasonable efforts to search for records responsive to the Request.

## **PRAYER FOR RELIEF**

56.     WHEREFORE, ACLU SoCal respectfully requests the Court to:

(a)     Declare unlawful the Defendants' failure to comply with FOIA;

(b)     Declare that ACLU SoCal is entitled to disclosure of the requested records;

(c)     Order Defendants to immediately process the Request and to disclose, in their entirety, unredacted versions of all records responsive to the Request that are not specifically exempt from disclosure under FOIA, including any non-identical copies of any such records;

(d)     Enjoin Defendants from charging ACLU SoCal search, review, or duplication fees of the processing of the requests;

(e)     Enjoin Defendants from continuing to withhold any and all non-exempt records responsive to the Request;

(f)     Retain jurisdiction of this action to ensure that no agency records are wrongfully withheld;

(g)     Award ACLU SoCal its reasonable attorney's fees and litigation costs incurred in this action, pursuant to 5 U.S.C. § 552(a)(4)(E); and

(h)     Grant such other relief as the Court may deem just and proper.

Date:  July 12, 2022                              Respectfully submitted,

HOQ LAW

*/s/ Laboni A. Hoq*\*
Laboni A. Hoq

ACLU FOUNDATION OF
SOUTHERN CALIFORNIA

*/s/ Michael Kaufman*
Michael Kaufman

20

1

2

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

3

*/s/ Eunice Cho*
Eunice Cho

4

5

6

*/s/ Kyle Virgien*
Kyle Virgien

7

8

*Attorneys for Plaintiffs American
Civil Liberties Union of Southern
California*

9

\* Filer attests that all signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

21