# EXHIBIT A



**ACLU**

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Southern California

April 29, 2022

**SENT VIA E-MAIL**

U.S. Immigration and Customs Enforcement
Freedom of Information Act Office
500 12th Street SW, Stop 5009
Washington, DC 20536-5009
Email: ICE-FOIA@dhs.gov

DHS Office of Inspector General
Office of Counsel
245 Murray Lane SW
Mail Stop - 0305
Washington, D.C. 20528-0305
Email: FOIA.OIG@oig.dhs.gov

Senior Director of FOIA Operations
The Privacy Office
U.S. Department of Homeland Security
245 Murray Lane SW
STOP-0655
Washington, D.C. 20528-0655
Email: foia@hq.dhs.gov

> **RE:    Request under the Freedom of Information Act**
> *Expedited Processing and Fee Waiver Requested*

Dear Sir or Madam:

This letter constitutes a request for records made pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, on behalf of the ACLU of Southern California (hereinafter "Requestor" or "ACLU SoCal"). The Requestor also seeks a fee waiver, pursuant to 5 U.S.C. § 552(a)(4)(A) and 6 C.F.R. § 5.11(k), and expedited processing, pursuant to 5 U.S.C. § 552(a)(6)(E) and 6 C.F.R. § 5.5(e). The justification for the fee waiver and expedited processing are set out in detail following the Request.

ICE claims that the agency takes "very seriously the health, safety and welfare of those in our  care," and that "any death that happens in ICE custody is a cause for concern." *See*

**EXECUTIVE DIRECTOR** Hector O. Villagra

**CHAIR** Michele Goodwin  **VICE CHAIRS** Rob Hennig and Stacy Horth-Neubert
**CHAIRS EMERITI** Marla Stone  Shari Leinwand  Stephen Rohde  Danny Goldberg  Allan K. Jonas*  Burt Lancaster*  Irving Lichtenstein, MD*
Jarl Mohn  Laurie Ostrow*  Stanley K. Sheinbaum*
*deceased

1313 WEST EIGHTH STREET • SUITE 200 • LOS ANGELES, CA 90017 • T 213.977.9500 • F 213.915.0220 • ACLUSOCAL.ORG

https://www.ice.gov/detain/detainee-death-reporting. According to agency policy, "[u]pon an official report of a detainee death, ICE Enforcement and Removal Operations (ERO) makes official notifications to Congress, non-governmental organization (NGO) stakeholders, and the media and posts a news release with relevant details on the public website, at https://www.ice.gov/newsroom, within two business days." *Id*.

While ICE's news releases concerning individual detainee deaths are publicly available, the agency has not provided public transparency into its policies and procedures for notifications to Congress and the public.

ICE has not explained how it determines whether an individual's death is deemed "in custody" in circumstances in which the individual passes away at a hospital or at home following release, after developing a fatal illness or medical condition at an immigration detention center. As news media have documented, ICE's practices raise questions regarding whether ICE has undercounted the number of deaths for which the agency bears responsibility. *See, e.g.*, Dan Glaun, "How ICE Data Undercounts COVID-19 Victims," PBS FRONTLINE (Aug. 11, 2020), *available at* https://www.pbs.org/wgbh/frontline/article/how-ice-data-undercounts-covid-19-victims/.

ICE's policies and procedures for notifications of detainee deaths are plainly a matter of public concern, as the agency itself has recognized by providing notifying to Congress and the public. This information has taken on a heightened importance due to the troubling increase in deaths in ICE detention in recent years. *See, e.g.*, Catherine E. Shoichet, "The death toll in ICE custody is the highest it's been in 15 years," CNN (Sep. 20, 2020), *available at* https://www.cnn.com/2020/09/30/us/ice-deaths-detention-2020/index.html.

Because ICE's policies and procedures for detainee death notifications concern a critical function of the government on a matter of significant public interest and concern, FOIA mandates their disclosure. *See* 5 U.S.C. § 552.

## I.     REQUESTOR

ACLU SoCal is a non-profit organization dedicated to defending and securing the rights granted by the U.S. Constitution and Bill of Rights. ACLU SoCal's work focuses on immigrants' rights, the First Amendment, equal protection, due process, privacy, and furthering civil rights for disadvantaged groups. As part of its work, ACLU SoCal monitors ICE enforcement practices and detention conditions. ACLU SoCal disseminates information to the public through its website and social media platforms, "Know Your Rights" documents, and other educational and informational materials. The ACLU SoCal regularly submits FOIA requests to DHS and other agencies – including, for example, on ICE's policies and practices for worksite immigration enforcement, and USCIS's policies and practices for the adjudication of naturalization applications – and publicizes the information it obtains through its website, newsletters, reports and "Know Your Rights" presentations and materials.

## II.     REQUEST FOR INFORMATION

The Requestor seeks any and all records that were prepared, received, transmitted, collected, and/or maintained by Immigration and Customs Enforcement ("ICE") or the

April 29, 2022                                                                                    Page 3

Department of Homeland Security that describe, refer, or relate to the release of hospitalized
detainees from custody prior to their death; any records related to release of individual detainees
once hospitalized; and any records related to the death of such detainees after their release from
custody, including any communications or investigations. Unless otherwise noted, we request the
records specified below from January 1, 2016 to the present.

For purposes of this request, the term "communications" means any transmittal of
information from one person or entity to another by any means, including letters,
correspondence, notes, memoranda, records, reports, papers, facsimiles, electronic mail
(whether to, from, copied or blind copied), electronic mail generated from a hand held
personal device including a BlackBerry, iPhone, smart phone, instant messaging,
electronic mail generated from business or personal email accounts, internet relay chat,
news group, group or collaboration servers, electronic bulletin boards, electronic
discussion boards, dictation tapes, video recordings, audio recordings, digital recordings,
memoranda, telegrams, telecopies and telexes, teleconference, collaboration servers
(including share point servers), web-based or software virtual meetings including
Microsoft Teams, Zoom, Web-X and any other meeting software and share point servers,
and oral contact such as face-to-face discussions or meetings, telephone conversations,
and voice mail messages.

For purposes of this request, the term "documents" has the same scope used in Rule
34(a)(1) of the Federal Rules of Civil Procedure and shall encompass every writing or record of
every type and description and every tangible thing that is or has been in the possession, custody,
or control of ICE  and its employees, to which they have access, or of which they have
knowledge, including, but not limited to, newspaper articles, magazine articles, news articles,
correspondence, letters, contracts, files, electronic mail, memoranda, stenographic notes,
handwritten notes, drafts, studies, publications, books, pamphlets, catalogs, purchase orders,
receipts, advertisements, direct mail solicitations, point-of-sale and point-of-purchase materials,
notebooks, diaries, models, devices, pictures, photographs, films, audiotapes, videotapes,
computer records, voice recordings, maps, reports, surveys, agendas, minutes, data compilations,
and statistical compilations, regardless of whether a particular document is privileged or
confidential, and regardless of the form of storage (including, but not limited to, paper,
microfiche, magnetic tape, magnetic disk (hard disk or floppy disk), CD-ROM, DVD, optical
disk, or electronic storage device).

For purposes of this request, "data compilations" has the same scope used in Rule
34(a)(1)(A) of the Federal Rules of Civil Procedure.

For purposes of this request, the term "DHS" means Department of Homeland Security,
and any components, subcomponents, offices, or personnel therein.

For purposes of this request, the term "ICE" means Immigration and Customs
Enforcement, and any components, subcomponents, offices, or personnel therein.

For purposes of this request, the term "ICE-ERO" means Immigration and Customs
Enforcement's Enforcement and Removal Office, and any components, subcomponents, offices,
or personnel therein.

For purposes of this request, "IHSC" means the U.S. Immigration and Customs Enforcement Health Services Corps.

For purposes of this request, "ICE OPR" means the Immigration and Customs Enforcement Office of Professional Responsibility and any components and offices therein including the Office of Detention Oversight.

For purposes of this request, "DHS OIG" means the Department of Homeland Security Office of Inspector General and any component and offices therein.

For purposes of this request, the term "immigration detention facility" means Service Processing Centers, Contract Detention Facilities, Family Residential Facilities, Intergovernmental Service Agreement (IGSA) Facilities, Dedicated Intergovernmental Service Agreement (DIGSA) Facilities, Intergovernmental Agreement (IGA) Facilities, and any other facilities where individuals may be held in ICE custody for 72 hours or more.

For purposes of this request, "detainee" means any person detained or formerly detained in an immigration detention facility or holding facility.

For purposes of this request, "SEN" means the Significant Event Notification system utilized by ICE.

For purposes of this request, "SIR" means the Significant Incident Reports utilized by ICE.

### III.    SPECIFIC RECORDS REQUESTED

1.    Any and all documents, without limitation to date, including any communications, investigatory reports, and any and all exhibits, appendices, or attachments thereto, relating to the hospitalization, death, decision to release from custody, or release from custody of the following individuals.

| Name | Country of Origin | Approximate Date of Death | ICE Detention Facility Prior to Hospitalization and Death | Location at Death |
|------|-------------------|---------------------------|-----------------------------------------------------------|-------------------|
| Teka Gulema | Ethiopia | January 18, 2016 | Etowah County Detention Center, Alabama | Riverview Medical Center, Gadsden, AL |
| Johana Medina Leon | El Salvador | May 23-June 1, 2019 | Otero County Processing Center, New Mexico | Del Sol Medical Center, El Paso, TX |
| Jose Ibarra Bucio | Mexico | March 21, 2019 | Adelanto ICE Processing | Loma Linda University |

| | | | Center, California | Medical Center, Loma Linda, CA |
|---|---|---|---|---|
| Martin Vargas Arellano | Mexico | March 6, 2021 | Adelanto ICE Processing Center, California | St. Jude Medical Center, Fullerton, CA |

2.      Any and all DHS OIG reports of investigation that are identified in any of the records responsive to Request #1. This includes any and all exhibits, appendices, or attachments to the DHS OIG reports of investigation.

3.      Any and all ICE OPR reports of investigation that are identified in any of the records responsive to Request #1. This includes any and all exhibits, appendices, or attachments to the DHS OPR reports of investigation.

4.      Any and all documents and communications, including ICE and IHSC directives, policies, procedures, protocols, or trainings that contain guidance, instructions, or standards about the release from custody of (a) hospitalized detainees; or (b) detainees who at the time of release were patients in the care of external healthcare providers or facilities.  Detainees specified in (a) and (b) above shall include those being treated for COVID-19 during their hospitalization or treatment at external healthcare providers or facilities.

5.      Spreadsheets, emails, documents, communications, databases, lists, and other data compilations in the possession of ICE Leadership, ICE Enforcement and Removal Operations, ICE Health Service Corps, and ICE Office of Professional Responsibility that identify detainees who were released from custody while (a) hospitalized (including for COVID-19 treatment); (b) in the full-time care of external healthcare providers or facilities (including for COVID-19 treatment), or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility.  Requested materials include, but are not limited to, dates of hospitalization of detainees, dates of hospital or external care facility discharge, name of treated detainees' detention facilities, and reasons for detainees' hospitalization or external medical care.  These materials should further include Medical Transfer Summary documents from DHS's eHR System and Alien Medical Records System, and any versions of the Significant Detainee Illness Spreadsheet that identify detainees who were released from custody while (a) hospitalized (including for COVID-19 treatment); (b) in the care of external healthcare providers or facilities (including for COVID-19 treatment); or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility.

6.      Spreadsheets, emails, significant incident reports (SIRs), significant event notification reports (SENs), or documents created by DHS OIG or ICE OPR that

mention the release from custody of (a) hospitalized detainees; (b) detainees who at the time of release were patients in the care of external healthcare providers or facilities; or (c) detainees released from custody immediately prior to transfer to an emergency room, hospital, or external care facility.

7.      Spreadsheets, emails, SIRs, SENs, or documents created by DHS OIG or ICE OPR that mention the death of any detainee who had been previously released from custody while (a) hospitalized; or (b) a patient in the care of an external healthcare provider or facility; or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility.

8.      Any and all documents, communications, and other records, including databases, spreadsheets, lists, and other data compilations, that identify detainees who were hospitalized or transferred from detention for off-site medical care due to COVID-19, and were subsequently released from custody while hospitalized, or detainees who were released from custody immediately prior to transfer to an emergency room, hospital, or external care facility to receive treatment for COVID-19. Requested information includes, but is not limited to, dates of hospitalization, detention facility, medical condition/reason for hospitalization or treatment, name and location of hospital, date of return to detention (if any), date of release from custody or issuance of order of recognizance (if any), and/or reason for release from custody.

9.      Bills, invoices, charges, or records of payment that reflect payments made for healthcare for any detainee who was released from custody while (a) hospitalized; or (b) a patient in the care of an external healthcare provider or facility, and communications about such bills, invoices, charges, or records of payment

        Please construe this as an ongoing FOIA request, so that any records that come within the possession of the agency prior to your final response to this FOIA Request should also be considered within the Request's scope.

        With respect to the form of production, *see* 5 U.S.C. § 552(a)(3)(B), the Requestor requests that responsive electronic records be provided electronically in their native file format, if possible, with all metadata and load files. Alternatively, and only if the native file format production is not possible, the Requestor requests that the records be provided electronically in a text-searchable, static-image format (PDF), in the best image quality in the agency's possession, and that the records be provided in separate, Bates-stamped files. We request that you produce responsive materials in their entirety, including all attachments, appendices, enclosures, and/or exhibits. However, to the extent that a response to this request would require you to provide multiple copies of identical material, the request is limited so that only one copy of the identical material is requested. We request that you produce responsive materials in their entirety, including all attachments, appendices, enclosures, and/or exhibits. Please do not compress images or downsample the resolution, as this interferes with their legibility. To facilitate a speedy response, we ask that records responsive to this request be produced on a rolling basis. The Requestor will accept records and other information that has been redacted pursuant to the

Health Insurance and Portability Accountability Act or other statutes or regulations protecting the privacy of individual detainees.

In the event you determine that materials contain information that falls within the statutory exemptions to mandatory disclosure, we request that such information be reviewed for possible discretionary disclosure. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 293 (1979). *See* Memorandum from Attorney General, to Heads of Executive Departments and Agencies, *Freedom of Information Act Guidelines* (Mar. 15, 2022), https://www.justice.gov/ag/page/file/1483516/download ("Information that might technically fall within an exemption should not be withheld from a FOIA requester unless the agency can identify a foreseeable harm or legal bar to disclosure. In case of doubt, openness should prevail. Moreover, agencies are strongly encouraged to make discretionary disclosures of information where appropriate.").  We also request that, in accordance with 5 U.S.C. § 552(b), any and all reasonably segregable portions of otherwise exempt materials be produced. To the extent the request is denied, we expect to receive notice in writing, including a description of the information withheld, the reasons for denial, and any exemptions relied upon.

## IV.    LIMITATION OR WAIVER OF SEARCH AND REVIEW FEES

We request a limitation of processing fees pursuant to 5 U.S.C. § 552(a)(4)(A)(ii)(II) ("fees shall   be limited to reasonable standard charges for document duplication when records are not sought   for commercial use and the request is made by . . . educational or noncommercial scientific   institution . . . or a representative of the news media") and 6 C.F.R. § 5.11(d)(1) (search fees  shall not be charged to "representatives of the news media").

The information sought in this request is not sought for a commercial purpose. The Requestor is  a non-profit organization that intends to disseminate the information gathered by this request to   the public at no cost, including through the Requestor's website and social media. The ACLU SoCal regularly disseminates information to its members through action alerts, emails and newsletters (the ACLU SoCal has more than 28,000 members). *See* http://www.aclusocal.org/about/. Requestor may also compile   a report or other publication on the government's treatment of immigrants based on information  gathered through this FOIA. Requestor has repeatedly used information gathered through FOIA   to disseminate information to the public through such forums. *See, e.g.*, http://www.aclu.org/immigrants-rights/immigrant-detainee-rights-are-routinely-systematically-violated-new-report-finds (ACLU SoCal report based on documents disclosed through FOIA). *See also* http://www.aclusocal.org/about/report-directory/ (compiling recent ACLU SoCal  reports).

The "term 'a representative of the news media' means any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw  materials into a distinct work, and distributes that work to an audience." 5 U.S.C. § 552(a)(4)(A)(ii). The statutory definition does not require that the requestor be a member of the traditional media. As long as the requestor meets the definition in any aspect of its work, it qualifies for limitation of fees under this section of the statute

Requestor qualifies as a "representative of the news media" under the statutory definition, because it routinely gathers information of interest to the public, uses editorial skills to turn it into distinct work, and distributes that work to the public. *See Electronic Privacy Information*

*Center v. Department of Defense*, 241 F. Supp. 2d 5 (D.D.C. 2003) (non-profit organization that gathered information and published it in newsletters and otherwise for general distribution qualified as representative of news media for purpose of limiting fees). Courts have reaffirmed that non-profit requestors who are not traditional news media outlets can qualify as representatives of the new media for the purposes of the FOIA, including after the 2007 amendments to the FOIA. *See ACLU of Washington v. U.S. Dep't of Justice*, No. C09-0642RSL, 2011 WL 887731, at *18 (D. Wash. Mar. 10, 2011) (finding that the ACLU qualifies as a "representative of the news media"). Accordingly, any fees charged must be limited to duplication costs

## V.       WAIVER OR REDUCTION OF ALL COSTS

We request a waiver or reduction of all costs pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) ("Documents shall be furnished without any charge . . . if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester"); *see also* 6 C.F.R. § 5.11(k).

The public interest fee waiver provision "is to be liberally construed in favor of waivers for  noncommercial requesters." *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282,  1284 (9th Cir. 1987). The Requestor need not demonstrate that the records would contain evidence of misconduct. Instead, the question is whether the requested information is likely to contribute significantly to public understanding of the operations or activities of the government, good or bad. *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1314 (D.C. Cir. 2003).

The requested records will contribute substantially to the public's understanding of ICE's role in this matter of great public concern. For example, ICE has reported that nine detainees have died while in custody as a result of COVID-19 since the start of the pandemic, but has declined to publicly report the number of detainees hospitalized due to the virus, or the number of detainees who were hospitalized for COVID-19, but who died after release from custody while hospitalized.[i] This omission may be instructive: as the *New York Times* recently reported, the official release of hospitalized prisoners from custody has led to an undercount and underreporting of COVID-19 deaths in prison.[ii] In a recent investigation into ICE's management of COVID-19 in detention, the GAO noted that 209 immigrant detainees required hospitalization as a result of COVID-19, but did not provide information as to the number of detainees who were released from custody in the hospital, or the number of detainees who died after release from custody.[iii]

The records related to the four hospitalized immigrant detainees who died shortly after release by ICE named in Requests #1-3 are also of particular interest to the public. In March 2021, ICE hospitalized Martin Vargas Arellano, a 55-year-old man, after he contracted COVID-19 at an ICE detention facility in Adelanto, California. Although his counsel had on several occasions requested Mr. Vargas Arellano's release in prior months due to his medical vulnerability to the virus, ICE had refused to release him from custody. It was not only until Mr. Vargas contracted COVID-19 and was hospitalized that ICE released him from custody, shortly before his death in the hospital. Because Mr. Vargas Arellano was not formally in ICE's custody at the time of his death, ICE avoided mandatory reporting and investigation requirements for the

death. Mr. Vargas Arellano's family and counsel learned of his death weeks later only after filing a missing person's report.[iv]

Mr. Vargas Arellano's case is not an isolated incident. Less than two years before, Jose Ibarra Bucio, a 27-year-old man, suffered a brain hemorrhage while detained at the same Adelanto, California detention center, and fell into a coma. ICE transferred Mr. Ibarra Bucio to a local hospital, where he was placed in an intensive care unit, and soon after released him from custody on an order of recognizance. Mr. Ibarra Bucio never awoke from his coma, and died six weeks later. ICE did not publicly report his death because he was not formally in custody at the time of his death.[v]

Likewise, ICE released Johana Medina Leon, a 25-year-old transgender asylum seeker from El Salvador, from custody the same day that she was hospitalized. Leon had fallen ill in immigration detention at an Otero County, New Mexico facility, after she was repeatedly denied medical care. Although she had been eligible for release on parole for several months, ICE only released her from custody on the same day she was hospitalized, shortly before her death. Because she was not in ICE custody at the time of her death, ICE did not issue a public report or investigatory information regarding the circumstances of her medical care, hospitalization, or death.[vi]

ICE also released Teka Gulema, an immigrant from Ethiopia, from custody at the Etowah County Detention Center in Gadsden, Alabama, shortly before his death. Mr. Gulema became paralyzed from the neck down as a result of an infection that he had contracted at the detention facility, and was transferred to a nearby hospital, where he remained in ICE custody for approximately one year. Weeks before his death, ICE formally released Mr. Gulema from custody, although he remained immobile and confined to his hospital bed. Because Mr. Gulema was not formally in ICE's custody at the time of his death, ICE was not required to publicly report or investigate the causes of his death.[vii]

Given the substantial attention to this issue by legislators, the media, and advocacy groups, the requested records will contribute significantly to the public's understanding of the treatment of detained immigrants, and ICE's decisions to release hospitalized detainees on their deathbeds.

The requested records relate directly to the operations or activities of the government that potentially impact fundamental rights and freedoms. The records are not sought for commercial use, and the Requestor plans to disseminate the information disclosed through print and other media to the public at no cost. As demonstrated above, the Requestor has both the intent and ability to convey any information obtained through this request to the public.

The Requestor states "with reasonable specificity that [their] request pertains to operations of the government," and "the informative value of a request depends not on there being certainty of what the documents will reveal, but rather on the requesting party having explained with reasonable specificity how those documents would increase public knowledge of the functions of the government." *Citizens for Responsibility and Ethics in Washington v. U.S. Dept. of Health and Human Services*, 481 F. Supp. 2d 99, 107-109 (D.D.C. 2006).

In the event a waiver or reduction of costs is denied, please notify me in advance if the anticipated costs exceed $100.

## VI.        EXPEDITED PROCESSING REQUEST

The Requestor requests expedited processing of this Request pursuant to 5 U.S.C. § 552(a)(6)(E) and 6 C.F.R. § 5.5(e). There is a "compelling need" for these records, as defined in the statute, because the information requested is "urgen[tly]" needed by an organization primarily engaged in disseminating information "to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II); see also 6 C.F.R. 5.5(e)(1)(ii).

ACLU SoCal is "primarily engaged in disseminating information" within the meaning of the statute. 5 U.S.C. § 552(a)(6)(E)(v)(II). As detailed *supra*, the ACLU SoCal has the ability and intention to widely disseminate the requested information through a variety of sources, including reports, newsletters, news briefings, right-to-know handbooks, and other materials, to the public at no cost. Indeed, obtaining information about government activity, analyzing that information, and widely publishing and disseminating that information to the press and public are critical and substantial components of the ACLU SoCal's work and are among its primary activities. *See ACLU v. Dep't of Justice*, 321 F. Supp. 2d 24, 29 n.5 (D.D.C. 2004) (finding non-profit public interest group that "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material into a distinct work, and distributes that work to an audience" to be "primarily engaged in disseminating information").  Moreover, as mentioned supra, the ACLU So Cal intends to distribute the information obtained through this FOIA request via its website and/or means available to us.

The requested records are also urgently needed to inform the public about actual or alleged government activity. *See* 5 U.S.C. § 552(a)(6)(E)(v)(II).

Deaths in ICE custody are a matter of widespread media and public interest, and the requested records will inform the public concern this activity by ICE. As mentioned *supra*, the deaths of ICE detainees—including those released from custody shortly before their deaths—have been a significant topic of news media coverage, and continue to receive ongoing public, media, and congressional attention. Members of Congress have expressed serious concerns about medical care and conditions of confinement in detention recently.  Thus, the urgency to inform the public goes beyond the general public interest in government transparency—it responds to ongoing serious concerns from Congress and the public, and will answer specific questions that have very recently been raised regarding ICE's treatment of people in detention, decisions to release people from custody prior to death, and full accountability and investigation of deaths caused by poor medical care or conditions of confinement in detention.

Given the foregoing, the ACLU SoCal has satisfied the requirements for expedited processing of this Request.

I affirm that the information provided supporting the request for expedited processing is true and correct to the best of my knowledge and belief. *See* 5 U.S.C. § 552(a)(6)(E)(vi) and 6 C.F.R. § 5.5(d)(3).

April 29, 2022                                                                 Page 11

### VII.   CONCLUSION

We look forward to your reply to the records request within ten (10) business days, as required under 5 U.S.C. § 552(a)(6)(A)(I).

Please contact Michael Kaufman at (213) 977-5232 with any questions. Please supply all records  to:

> Michael Kaufman
> ACLU of Southern California
> 1313 West 8th Street
> Los Angeles, CA 90017

Or via email to: mkaufman@aclusocal.org.

Thank you for your prompt attention.

Sincerely,

/s/ *Michael Kaufman*

Michael Kaufman
Senior Staff Attorney

---

[i] ICE, *COVID-19 ICE Detainee Statistics by Facility*, https://www.ice.gov/coronavirus#detStat (last visited Jul. 8, 2021).

[ii] Maura Turcotte et al., *The Real Toll from Prison Covid Cases May Be Higher Than Reported*, NY Times, Jul. 7, 2021, https://www.nytimes.com/2021/07/07/us/inmates-incarcerated-covid-deaths.html (noting large number of unreported COVID-19 deaths because hospitalized prisoners were officially released from custody before they died).

[iii] U.S. Government Accountability Office, *Immigration Detention: ICE Efforts to Address Covid-19 in Detention Facilities* 22 (June 2021), https://www.gao.gov/assets/gao-21-414.pdf.

[iv] Alene Tchekmedyian and Andrea Castillo, *ICE Released a Sick Detainee from Adelanto Immigration Facility. He Died Three Days Later*, LA Times, Mar. 20, 2021, https://www.latimes.com/california/story/2021-03-20/adelanto-detainee-death; Joe Nelson, *Detainee Who Pleaded for Release from ICE Immigration Center in Adelanto Dies from COVID-19*, The San Bernardino Sun, Mar. 22, 2021, https://www.sbsun.com/2021/03/22/detainee-who-pleaded-for-release-from-ice-immigration-center-in-adelanto-dies-from-covid-19/; Norma Riberiro, *Man Dies After Contracting COVID-19 While in ICE Custody, Lawsuit Says*, NBC Los Angeles, Mar. 23, 2021, https://www.nbclosangeles.com/news/local/man-dies-after-contracting-covid-19-while-in-ice-custody-lawsuit-says/2556682/; Francisco Castro, *ICE Center Accused of Releasing Critically Ill Detainee So He Doesn't Die in the Facility*, San Fernando Valley Sun, Mar. 24, 2021, https://sanfernandosun.com/2021/03/24/ice-center-accused-of-releasing-critically-ill-detainee-so-he-doesnt-die-in-the-facility/.

[v] Paloma Esquivel, *An Immigration Detainee Fell into a Coma and Died at 27. His Family Wants to Know Why*, LA Times, Apr. 10, 2019, https://www.latimes.com/local/lanow/la-me-ln-adelanto-detainee-death-20190410-story.html; Associated Press, *Family Wants Answers After Immigrant Dies*, Apr. 10, 2019, https://www.citynews1130.com/2019/04/10/the-latest-family-wants-answers-after-immigrant-dies/; Garret Bergthold, *Family Wants Answers in Death After Detention*, Victorville Daily Press, Apr. 10, 2019, https://www.vvdailypress.com/news/20190410/family-wants-answers-in-death-after-detention; Voice of America News, *Family Seeks Answers in Immigrant's Death After Detention*, Apr. 10, 2019, https://www.voanews.com/usa/immigration/family-seeks-answers-immigrants-death-after-detention; Jovana Lara,

*Family Seeking Answers After Man, 27, Dies in ICE Custody in Adelanto*, ABC7 News, Apr. 10, 2019, https://abc7.com/amp/5242925/; Roxana Kopetman, *ICE Set a 27-Year-Old Detainee in a Coma Free, Weeks Before He Died*, Orange County Register, Apr. 11, 2019, https://www.ocregister.com/2019/04/10/ice-released-detainee-while-he-was-in-a-coma-weeks-before-his-death/.

[vi] Robert Moore, *Transgender Woman Migrant Who Had Been in ICE Custody Dies after Falling Ill,* Washington Post, June 2, 2019, https://www.washingtonpost.com/immigration/transgender-woman-migrant-who-had-been-in-ice-custody-dies-after-falling-ill/2019/06/02/d194528a-85a6-11e9-98c1-e945ae5db8fb_story.html; Ben Kesslen, *Transgender Asylum-Seeker After Six Weeks in Custody*, NBC News, June 3, 2019, https://www.nbcnews.com/news/us-news/transgender-asylum-seeker-dies-after-six-weeks-ice-custody-n1012956; Adolfo Flores, *A Transgender Woman Died After Being Held for Weeks in ICE Custody*, Buzz Feed News, Jun. 3, 2019, https://www.buzzfeednews.com/article/adolfoflores/transgender-woman-dies-ice-custody-asylum; Lucy Diavolo, *Transgender Woman Johana Medina Leon Died Shortly After Being Paroled from ICE Custody,* Teen Vogue, June 3, 2019, https://www.teenvogue.com/story/transgender-woman-johana-medina-leon-died-ice-custody; Daniel Borunda, *Transgender Asylum Seeker from El Salvador Held by ICE Dies at El Paso Hospital*, El Paso Times, June 3, 2019, https://www.elpasotimes.com/story/news/immigration/2019/06/03/transgender-migrant-johana-medina-leon-dies-el-paso-hospital/1332236001/; Sam Levin, *Trans Woman Who Died After Illness in U.S. Custody Had Asked to Be Deported, Family Says*, The Guardian, Jun. 12, 2019, https://www.theguardian.com/us-news/2019/jun/12/trans-woman-death-us-custody-ice-deportation.

[vii] William Thornton*, 'One Who Could Have Been You:' Group Protests Former Detainee's Death*, AL.com, Feb. 28, 2016, https://www.al.com/news/anniston-gadsden/2016/02/one_who_could_have_been_you_gr.html; Complaint from CIVIC to John Roth, Inspector General, DHS, et al. (Mar. 31, 2016), http://www.endisolation.org/blog/wp-content/uploads/2016/02/Complaint-Etowah-Medical__1.pdf.

# EXHIBIT B

**Eunice Cho**

| | |
|---|---|
| **From:** | Tursi, Joseph (USACAC) <Joseph.Tursi@usdoj.gov> |
| **Sent:** | Wednesday, February 1, 2023 6:52 PM |
| **To:** | Laboni Hoq; Eunice Cho; Kyle Virgien; Michael Kaufman |
| **Cc:** | Medrano, Alarice (USACAC) |
| **Subject:** | ACLU v. DHS | Search Locations and Terms |

---

**This Message Is From an External Sender**

This message came from outside your organization.

---

All,

Please see the below email providing the information requested during our meet and confer today. Specifically, information related to the search terms and locations used by both OIG and ICE.

I am waiting for updates related to the number of potentially responsive records obtained, whether any additional potentially responsive records have been discovered, and the number of potentially responsive records remaining for processing as well as other information requested during our call. But, since I had this information available, I did not want to delay in sending it to you.

---

**DHS OIG Information**

With respect to the search terms and parameters, ICE was specified as the affected agency; the timeframe was January 1, 2016 to the present, with the following search terms:

- "**detainee**" and one of the following terms:
  - "death" or "died" or "hospitalized" or "hospital" or "emergency room" or "emergency services" or "poor outcome" or "life support" or "coma" or "unconscious" or "ventilator" or "intensive care" or "hospice" or "palliative" or "fatal"
- "**custody**" and one of the following terms:
  - "death" or "died" or "hospitalized" or "hospital" or "emergency room" or "emergency services" or "poor outcome" or "life support" or "coma" or "unconscious" or "ventilator" or "intensive care" or "hospice" or "palliative" or "fatal"
- "**detainee**" and "**release**" and one of the following terms:
  - "medical" or "surgery" or "specialist" or "doctor"
- "**custody**" and "**release**" and one of the following terms:
  - "medical" or "surgery" or "specialist" or "doctor"
- "**detainee**" and "**transfer**" and one of the following terms:
  - "medical" or "surgery" or "specialist" or "doctor"
- "**custody**" and "**transfer**" and one of the following terms:
  - "medical" or "surgery" or "specialist" or "doctor"
- "**detainee**" and "**parole**" and one of the following terms:
  - "medical" or "surgery" or "specialist" or "doctor"
- "**custody**" and "**parole**" and one of the following terms:
  - "medical" or "surgery" or "specialist" or "doctor"

- "**detainee**" and "**alternative detention**" and one of the following terms:
  - "medical" or "surgery" or "specialist" or "doctor"
- "**custody**" and "**alternative detention**" and one of the following terms:
  - "medical" or "surgery" or "specialist" or "doctor"

DHS OIG has also searched for the individuals identified in subpart 1 of the request: Teka Gulema; Johana Medina Leon; Jose Ibarra Bucio; and Martin Vargas Arellano.

The searched location was EDS – the Enforcement Data System. EDS is the official OIG electronic case management system for the Office of Investigations. OIG uses EDS to manage information relating to complaints and investigations of alleged criminal, civil, or administrative violations by DHS employees, contractors, grantees, beneficiaries, and other individuals and entities associated with DHS. OIG uses EDS to manage investigations born from those complaints to facilitate the tracking of the investigation process.

---

**ICE Information**

The ICE FOIA Office has confirmed the search terms in this case are the names of the individuals (including their A numbers) the detention centers, and the medical centers listed in the request. No time or other parameters have been applied. Locations searched were: hard drives, Outlook mailboxes and email messages, and the ENFORCE Alien Removal Module (EARM) database were searched.

Thanks,
-Joe

**Joseph W. Tursi | Assistant United States Attorney**
United States Attorney's Office | Central District of California
300 N. Los Angeles Street, Suite 7516 | Los Angeles, CA 90012
O: 213.894.3989 | C: 213.500.9355 | F: 213.894.7819 | joseph.tursi@usdoj.gov

# EXHIBIT C

February 14, 2023

Joseph Tursi
United States Attorney's Office
Central District of California
300 N. Los Angeles St. Suite 7516
Los Angeles, CA 90012
Joseph.Tursi@usdoj.gov

      Re:     *American Civil Liberties Union Foundation of Southern California v. United States Immigration and Customs Enforcement, et al.*, No. 2:22-cv-4760-SB-AFM (C.D. Cal.)

Dear Counsel:

      Thank you for meeting with us on February 1, 2023, to discuss issues with Defendants Immigration and Customs Enforcement (ICE) and the Department of Homeland Security's Office of Inspector General (OIG) records productions to date in response to Plaintiff's Freedom of Information Act (FOIA) request at issue in this case. The following memorializes and follows up on certain of our February 1 discussions, and also raises additional issues with Defendants' records searches and productions to date.

### A.  Withholding of Information Pursuant to an "Unspecified Statute"

      As discussed at our February 1 teleconference, Plaintiff is following up on OIG's justifications for withholding information pursuant to an "unspecified statute." OIG has produced several documents where Defendants have redacted information, claiming Exemption (b)(3), and stating "Unspecified Statute." *See* **Attachment A** (OIG December 2022 production, pages 66, 67, 68, 75).

      Exemption (b)(3) provides that the FOIA does not apply to matters that are "specifically exempted from disclosure by statute," provided that the statute "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue," or "establishes particular criteria for withholding or refers to particular matters to be withheld." 5 U.S.C. § 552(b)(3).

      During our call, Defendants represented that the Department of Justice could not identify the statute at issue to Plaintiff, nor could it cite to any authority that would permit the government to withhold the redacted information pursuant to this unspecified statute under Exemption (b)(3) or otherwise. OIG's redaction in this manner is not defensible. Without specifying a statute that forms the basis of the exemption, there is no way to determine whether "the statute identified by the agency is a statute of exemption within the meaning of Exemption 3, and then whether the withheld records satisfy the criteria of the exemption statute." *Hamdan v. U.S. Dep't of Justice*, 797 F.3d 759, 775 (9th Cir. 2015) (citing *Sims v. CIA*, 471 U.S. 159, 167 (1985).

      You indicated at the teleconference that you would follow up with OIG to seek further information to justify these withholdings. We ask that you provide us a written response as soon as possible, and in any event before OIG's next production on February 21, 2023, that (1) identifies the statute upon which this exemption is claimed, and (2) includes information about the content of the withheld material sufficient to allow an assessment of whether it falls within the statute's protections.

### B.  Redactions of Email Addresses

As also discussed on the February 1 call, Defendants have redacted entire email addresses, including the username and domain name, in records produced to Plaintiff. Defendants have agreed to produce a new copy of documents without domain names redacted for email addresses, and will ensure that domain names are not redacted in future productions. *Transgender L. Ctr. v. ICE*, 46 F.4th 771, 784 (9th Cir. 2022) ("email domains ... cannot be withheld per Exemption 6"). Defendants also stated they would consider Plaintiff's request to inlcude unique identifiers in place of redacted usernames in emails, in part to provide Plaintiff with information about how many agency individuals have been involved in the hidden detainee death issue at the center of Plaintiff's FOIA request, and the scope of their involvement. *See ACLU v. ICE*, No. 21-1233 (2d. Cir. 2023) (January 26, 2023). To facilitate Defendants' corrections to improper redactions of email addresses to date, herewith please find in **Attachment B** a list of documents where email addresses are improperly redacted.

### C. Incomplete Productions and Failure to Produce Email Attachments

During our February 1 call, Plaintiff also requested that Defendants provide email attachments contemporaneously with the documents that reference them. Defendants represented that ICE's search process results in the production of email attachments that is not contemporaneous, and that such documents would likely be produced in the future. Plaintiff noted that ICE had produced several attachments contemporaneously with emails, while omitting attachments for others. Defendants asked for examples of email attachments that Defendants have produced contemporaneously with the documents that reference them. A list is included in **Attachment C.**

In addition, it appears that some email documents produced are incomplete. For example, the document at 2022-ICLI-0048, page 2648 appears to be the latter portion of an email, of which the main body was not produced. We ask that ICE correct this deficiency as well.

### D. Unsupported Block Redactions

Plaintiff also noted on the February 1 teleconference that Defendants have produced records with significant block redactions, including those withheld under Exemption (b)(5). For example, we discussed ICE's production of November 2022 at 126-28, which includes several block redactions. Defendants represented that the redactions are a result of other litigation, and that Defendants would provide further information. Plaintiff requests and appreciates further information as soon as possible, and in any event before ICE's next production on February 21, 2023.

### E. Inadequate Search

In response to Plaintiff's request, in a February 1, 2023 email, Defendants provided Plaintiff with information regarding ICE's search efforts. Based on this information, ICE seems to be under the misapprehension that it need only search for documents related to the four detainees listed in Plaintiff's FOIA Request #1. Plaintiff's Request is clearly broader than that, as specified below. Please let us know if ICE is willing to correct this deficiency, as well as those listed below.

First, based on the search terms and locations provided, it does not appear that ICE has searched for any records responsive to Requests # 3-9 of Plaintiff's FOIA request. Please inform us whether ICE has conducted any search for records responsive to Requests #3-9. If so, please provide us with specific search terms and locations for those searches. If not, please specify how ICE will correct this search deficiency, including what search terms and locations it will search for responsive records.

Second, with respect to ICE's search of hard drives, Outlook mailboxes and email messages, ICE has failed to specify whose (or which positions/sub agencies) documents were searched from these locations. Please provide us with that information.

Third, with respect to the ENFORCE Alien Removal Module (EARM) database, to ensure it is searching for all responsive documents, including those responsive to requests 3-9, ICE needs to use search terms broader than just the names/A numbers of the four detainees listed in Plaintiff's FOIA request # 1, their detention centers and their medical centers.

We are available further discuss these issues by phone. Please let us know some times you are available to do so.  Plaintiff reserves the right to challenge further redactions, including the improper designation or overbroad use of exemptions, and inadequate search.

Sincerely,

LABONI A. HOQ (SBN 224140)
laboni@hoqlaw.com
HOQ LAW APC
P.O. Box 753
South Pasadena, California 91030
Telephone: (213) 973-9004

EUNICE CHO (pro hac vice)
echo@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
915 Fifteenth Street NW, 7th Floor
Washington, DC 20005
Telephone: (202) 548-6616

MICHAEL KAUFMAN (SBN 254575)
MKaufman@aclusocal.org
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West Eighth Street
Los Angeles, California 90017 Telephone:
(213) 977-9500
Facsimile: (213) 915-0219

KYLE VIRGIEN (SBN 278747)
kvirgien@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (202) 393-4930

*Attorneys for Plaintiff*

*American Civil Liberties Union Foundation of Southern California v. United States Immigration and Customs Enforcement, et al.*, No. 2:22-cv-4760-SB-AFM (C.D. Cal.)

**Attachment A: OIG Redactions Under Exemption (b)(3): "Unspecified Statute"**

OIG December 2022 Production: Pages 67, 68, 75



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

## MEMORANDUM OF ACTIVITY

**Type of Activity**: Personal Contact: Interview of (b)(6):, DO, ICE ERO, Otero, NM

| **Case Number:** I19-ICE ERO-ELP-16066 | **Case Title:** Death of Jonathan Alberto Medina-Leon, Non-Employee, ICE, El Paso, TX |
| --- | --- |

On June 5, 2019, Special Agents (b)(6); (b)(7)(C) Department of Homeland Security (DHS), Office of Inspector General (OIG), El Paso, TX, and (b)(6); (b)(7)(C) Immigration and Customs Enforcement (ICE), Office of Professional Responsibility (OPR), El Paso, TX, interviewed (b)(6):, Deportation Officer (DO), ICE, Enforcement and Removal Operations (ERO), Otero, NM. The interview was in regards to an allegation involving the circumstances surrounding the death of Jonathan Alberto Medina-Leon, Non-DHS Employee, El Paso, TX, prior to her release from the OCPC. (b)(6):agreed to a voluntary interview regarding the aforementioned allegation.

The following is from a Report of Investigation (ROI), provided by (b)(6):, which documented the interview of (b)(6):

"On June 2, 2019, ERO El Paso notified OIG El Paso of the death of Jonathan Medina-Leon, a 25-year-old transgender female, at a local El Paso hospital five days after being released from ICE custody. On June 2, 2019, OIG El Paso notified OPR El Paso of the death of the former ICE detainee.

On June 5, 2019, Senior Special Agent (b)(6); (b)(7)(C), OPR El Paso, and Special Agent (b)(6); (b)(7)(C) OIG El Paso, interviewed DO (b)(6): ERO El Paso, at the Otero County Processing Center, in Chaparral, New Mexico.

DO (b)(6):stated that he was responsible for (b)(6); (b)(7)(C); (b)(3):Unspecified Statute

(b)(6); (b)(7)(C); (b)(3):Unspecified Statute

(b)(6); (b)(7)(C); (b)(3):Unspecified Statute                          DO (b)(6)stated he never met
Medina-Leon (b)(6); (b)(7)(C); (b)(3):Unspecified Statute

(b)(6); (b)(7)(C); (b)(3):Unspecified Statute

DO (b)(6)explained, although Medina was served in person by video conference, local policy

| Name, Title, Signature, and Date: (b)(6) | Reviewing Official Name, Title, Signature, and Date: |
| --- | --- |
| 7·8·2019 | (b)(6); (b)(7)(C)   7-8-19 |
| (b)(6):  Special Agent (b)(7)(C) | (b)(6):  Acting Special Agent in Charge |

**IMPORTANT NOTICE**
This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General, and is disseminated only on a need to know basis. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

## MEMORANDUM OF ACTIVITY

required that Medina-Leon (b)(6); (b)(7)(C); (b)(3):Unspecified Statute before it was filed with the ICE Executive Office of Immigration Review. DO (b)(6): stated that after Medina-Leon's (b)(6); (b)(7)(C); (b)(3):Unspecified Statute (b)(6); (b)(7)(C): USCIS sent Medina-Leon's file to ERO El Paso for processing.

DO (b)(6) advised he was not certain when ERO El Paso received the file after USCIS sent it. DO (b)(6) explained large volumes of cases are adjudicated by USCIS and ERO El Paso processes files as soon as possible after they are received. DO (b)(6) sated that based on Medina-Leon's (b)(6); (b)(7)(C); (b)(3):Unspecified Statute Medina-Leon would likely have been processed for a parole which would allow her to be released from ICE custody while she waited for a hearing before an immigration judge.

DO (b)(6) stated that on May 28, 2019, Supervisory Detention and Deportation Officer (SDDO) (b)(6): ERO El Paso, called him and instructed him to prepare Medina-Leon's Notice to Appear (NTA) paperwork to be served. DO (b)(6) advised that SDDO (b)(6): told him that DO (b)(6): was preparing parole paperwork to release Medina-Leon from ICE custody.

DO (b)(6) stated that sometime during the afternoon of May 28, 2019, SDDO (b)(6): instructed him to go with DO (b)(6); (b)(7)(C) ERO El Paso, to Del Sol Medical Center and serve Medina-Leon with NTA and parole documents.

DO (b)(6) advised that on May 28, 2019, at approximately 5:30 p.m., he and DO (b)(6): served Medina-Leon with NTA and parole paperwork at Del Sol Medical Center, in El Paso, Texas. DO (b)(6): stated that Medina-Leon looked through the documents and signed them in the appropriate locations acknowledging service. DO (b)(6) described Medina-Leon as alert and responsive at the time he and DO (b)(6): served the paperwork.

SSA (b)(6): examined forms contained in MEDINA-Leon's file and observed that the file contained (b)(6); (b)(7)(C); (b)(3):Unspecified Statute

(b)(6); (b)(7)(C); (b)(3):Unspecified Statute

(b)(6); (b)(7)(C); (b)(3):Unspecified Statute                    SSA (b)(6): observed that the file contained a Form I-94, Arrival/Departure record. The Form I-94 was stamped indicating Medina-Leon was issued a parole on May 28, 2019 for humanitarian purposes and the parole was valid until May 28, 2020."

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.



2022-IGEO00158                              Second Interim Response                              75

**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## MEMORANDUM OF ACTIVITY

**Type of Activity**: Personal Contact: Interview of (b)(6);

| *Case Number:* I19-ICE ERO-ELP-16066 | *Case Title:* Death of Jonathan Alberto Medina-Leon, Non-Employee, ICE, El Paso, TX |
|---|---|

On June 6, 2019, Special Agents (b)(6); (b)(7)(C) , Department of Homeland Security (DHS), Office of Inspector General (OIG), El Paso, TX, and (b)(6); (b)(7)(C) Immigration and Customs Enforcement (ICE), Office of Professional Responsibility (OPR), El Paso, TX, interviewed (b)(6); , Supervisory Detention and Deportation Officer (SDDO), ICE, Enforcement and Removal Operations (ERO), Otero, NM.  The interview was in regards to an allegation involving the circumstances surrounding the death of Jonathan Alberto Medina-Leon, Non-DHS Employee, El Paso, TX, prior to her release from the OCPC.  (b)(6); agreed to a voluntary interview regarding the aforementioned allegation.

The following is from a Report of Investigation (ROI), provided by (b)(6); which documented the interview of (b)(6); :

"On June 2, 2019, ERO El Paso notified OIG El Paso of the death of Jonathan Medina-Leon, a 25-year-old transgender female, at Del Sol Medical Center (DSMC) five days after being released from ICE custody. On June 2, 2019, OIG El Paso notified OPR El Paso of the death of the former ICE detainee.

On June 6, 2019, Senior Special Agent (b)(6); (b)(7)(C) , OPR El Paso, and Special Agent (b)(6); (b)(7)(C) OIG El Paso, interviewed SDDO (b)(6); ERO El Paso, at the Otero County Processing Center (OCPC), in Chaparral, New Mexico. The following paragraphs contain a summary of statements made by SDDO (b)(6); during the interview.

(b)(6); (b)(7)(C); (b)(3):Unspecified Statute

(b)(6); (b)(7)(C); (b)(3):Unspecified Statute  SDDO (b)(6); stated that once the documents were received by ERO El Paso, the case would be referred to a docket officer who would personally serve Medina-Leon with the NTA, then file the document with the Executive Office of Immigration Review (EIOR). SDDO (b)(6); stated the EIOR requires an NTA be served in person and does not accept documents served telephonically.

| Name, Title, Signature, and Date: | (b)(6); (b)(7)(C) ) | 8·12·19 | Reviewing Official Name, Title, Signature, and Date: for (b)(6); (b)(7)(C) | 8/12/19 |
| (b)(6); | Special Agent | | (b)(6); , Acting Special Agent in Charge | |

**IMPORTANT NOTICE**
This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General, and is disseminated only on a need-to-know basis.  This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552.  Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

*American Civil Liberties Union Foundation of Southern California v. United States Immigration and Customs Enforcement, et al.*, No. 2:22-cv-4760-SB-AFM (C.D. Cal.)

**Attachment B: Improperly Redacted Email Domains**

Plaintiff requests production of improperly redacted email domains on the following pages:

November 2022 Production: 2022-ICLI-00048 Pages: 11, 25, 27, 32, 40, 48, 55, 56, 63, 66, 67, 69, 72, 75, 79, 87, 95, 98, 107, 113, 119, 122, 129, 246, 248, 258-260, 263, 267, 275, 282, 289, 290-293, 295, 297, 298, 299, 308, 315, 317, 323, 329, 336, 348, 351, 353, 356, 358, 359, 365, 366, 371, 378, 560

December 2022 Production: 2022-ICLI-00048 Pages: 2445-54, 2459-63; 2466; 2468; 2470; 2473, 2475, 2478, 2481, 2483, 2485, 2488, 2490-99, 2502, 2504, 2507, 2510, 2513, 2515, 2517, 2519, 2521, 2523, 2525, 2528, 2530-2829, 2839-2842, 2844-45, 2854-60, 2864-65

January 2023 Production: 2022-ICLI-00048 Pages: 2901, 2903-07, 2909-2926, 2930-2944, 2948-3028, 3031-3106, 3110, 3113-3298, 3301-3381.

*American Civil Liberties Union Foundation of Southern California v. United States Immigration and Customs Enforcement, et al.*, No. 2:22-cv-4760-SB-AFM (C.D. Cal.)

**Attachment C: Failure to Produce Email Attachments**

The following documents are examples of documents where ICE successfully produced email attachments consecutively: 2022-ICLI-00048 Pages 2454-58; 2463-65; 2466-67, 2468-69; 2470-72; 2473-74.

The following documents indicate attached records that were not produced:
2022-ICLI-00048 Page 2757 (noting "surgical report attached"); Page 2828 (noting attachment of "ES").

# EXHIBIT D



# United States Department of Justice

## United States Attorney's Office
## Central District of California

*JOSEPH W. TURSI*
*Assistant United States Attorney*
*Phone:  (213) 894-3989*
*E-mail:  Joseph.Tursi@usdoj.gov*

*Federal Building*
*300 N. Los Angeles Street, Suite 7516*
*Los Angeles, California  90012*

February 24, 2023

**VIA E-MAIL**

Laboni A. Hoq
Hoq Law, APC
P.O. Box 753
South Pasadena, CA 91030

Re:    ACLU of SoCal v. ICE, et al.
        C.D.CA Case No. 2:22-cv-04760-SHK

Dear Ms. Hoq:

Please allow the following to serve as a response to your February 14, 2023 correspondence regarding the above-referenced matter. As an initial matter, I apologize for the delay in responding but was unexpectedly out of the office on military leave.[1]

In your correspondence, you raise your client's concerns following its review of both DHS OIG's and ICE's productions thus far. Your client challenges the basis for certain withholdings, redaction of email addresses, block redactions, and claims that ICE's search with respect to certain of your client's requests is inadequate.

As you know, both ICE and DHS OIG agreed to processing rates beyond their usual rate to expedite your client's FOIA request. As a result, ICE and DHS OIG expect that their review and production will conclude by May 2023. Thus, at this point, your client's concerns are best addressed after both subagencies complete their processing and are able to provide their *Vaughn* indexes and supporting declarations. Otherwise, agency counsel will need to divert their attention from the processing of the potentially responsive materials (thereby risking delays and violation of the Court's Case Management Order) but will also enable the parties to discuss the concerns better informed.

For example, in the case of email addresses, your client asserts that redaction of entire email addresses is inappropriate and that, at a minimum, domain names should not be withheld. As we discussed during our video meet and confer, reviewing a sampling of the produced documents so far reveals that no domain names were withheld. Of course, without the benefit of the *Vaughn* index and declaration, I am merely parroting the information I receive from the agency and based on the records I have seen. Thus, your client is understandably left unsatisfied with the response.

---

[1] I will be out of the office on military leave from February 27 – March 10, 2023 as well.

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
February 24, 2023
Page 2

That said, the parties will be able to address their concerns with the Court at the Summary Judgment stage where both they (and the Court) will have the benefit of full briefing, *Vaughn* indexes, and supporting declarations.

As for your client's concerns over the contemporaneous production of email attachments, I have raised the issue with ICE. Based on my understanding, the ICE FOIA Office does not have any control over the manner in which individual program offices send responsive records for processing. However, the ICE FOIA Office endeavors to upload the records in an orderly, organized way that is easy to follow. I am following up on this issue.

Please let me know if you have any questions, or would like to further discuss any of the matters raised above.

Respectfully,

E. MARTIN ESTRADA
United States Attorney

/s/ *Joseph W. Tursi*

JOSEPH W. TURSI
Assistant United States Attorney

cc: Ms. Eunice Cho (by email)
    Mr. Michael Kaufman (by email)
    Mr. Kyle Virgien (by email)

# EXHIBIT E

March 1, 2023

Joseph Tursi
Alarice Medrano
United States Attorney's Office
Central District of California
300 N. Los Angeles St. Suite 7516
Los Angeles, CA 90012
Joseph.Tursi@usdoj.gov
Alarice.Medrano@usdoj.gov

Re:     *American Civil Liberties Union Foundation of Southern California v. United States
         Immigration and Customs Enforcement, et al.*, No. 2:22-cv-4760-SB-AFM (C.D. Cal.)

Dear Counsel:

   This is in response to your February 24, 2023 letter responding to Plaintiff ACLU of Southern California's February 14, 2023 letter. In that letter, Plaintiff raised apparent deficiencies in Defendants' search for and rolling production of documents in response to Plaintiff's Freedom of Information Act (FOIA) Request at issue in this case.  At the outset, we are disappointed that Defendants appear to be abandoning their commitment to address and potentially correct identified deficiencies in their rolling productions. While we hope there is still room for discussion on resolving our pending disputes so that the parties can avoid or at least narrow the scope of summary judgement motions in the case, Defendants' response raises several concerns and may warrant Court intervention. Defendants' February 24 letter entirely omits a number of the issues raised by Plaintiffs, including Defendants' failure to conduct *any* search for Requests 3 through 9 of the FOIA request.

   Please let us know your availability during the week of March 14, 2023, when Mr. Tursi has returned from his military leave, to discuss these matters. Of particular importance and need for your immediate attention are the following matters:

   **A.  Withholding of Information Pursuant to an "Unspecified Statute"**

   Defendants' February 24 letter is silent as to Defendant DHS Office of Inspector General's ("OIG") withholding of information pursuant to an "unspecified statute." *See* Plaintiff's February 14, 2023 Letter at **Attachment A** (OIG December 2022 production, pages 66, 67, 68, 75). During our February 1, 2023 call, Mr. Tursi indicated that he would follow up with OIG to attempt to provide better justification for these withholdings. Specifically, we asked that OIG identify (1) the statute upon which this exemption is claimed, and (2) information about the content of the withheld material sufficient to allow an assessment of whether it falls within the statute's protections. Please let us know when we can expect this information from OIG, or if we should assume that we will need to move for summary judgement on OIG's withholding of information based on an "unspecified statute."

   **B.  Redactions of Email Addresses**

   Regarding Defendants' apparent redaction of email addresses in the productions thus far, we are confused by your February 24 response. In your letter of that date you both indicate that "reviewing a sampling of the produced documents so far reveals that no domain names were withheld," and that you are "merely parroting the information [Mr. Tursi] receive[d] from the agency and based on the records [he has] seen." To better understand Defendants' position, please identify what "sampling" of documents Mr. Tursi reviewed in determining that no email addresses have been withheld thus far, including whether

1

he has reviewed unredacted versions of all of the emails referenced in the list of documents referenced in **Attachment B** to Plaintiff's February 14 Letter.

### C.  Incomplete Productions and Failure to Produce Email Attachments

Regarding Defendant Immigration and Customs Enforcement's ("ICE") failure to contemporaneously produce email attachments, Defendants' February 24 letter is again largely non-responsive to the specific problems we raised. As referenced in **Exhibit C** of our February 14 letter, ICE clearly has the ability to produce attachments contemporaneously with the emails with which they are associated. Regardless of whether the ICE FOIA Office can "control" the manner in which ICE program offices send it responsive documents for processing, Plaintiff asks that ICE FOIA Office take affirmative steps to try to correct this issue, at least with respect to the upcoming rolling productions. While Defendants' February 24 letter states that Mr. Tursi is "following up on the issue," it is unclear whether ICE FOIA Office is willing to do so.  Please let us know what the nature of your "follow up" with ICE FOIA Office is on this issue.  Please also let us know as requested in our February 14 letter whether it will produce the complete version of the document at 2022-ICLI-0048, page 2648, as well as attachments at 2022-ICLI-0048, Page 2757 and 2828.

### D.  Unsupported Block Redactions

Defendants in their February 24 letter appear to take the position that they will not address Plaintiff's concerns with Defendants' block redactions, including those withheld under Exemption (b)(5), prior to the completion of their document productions and production of *Vaughn* indices and supporting declarations. Again, this position is inconsistent with the representations Defendants made both to Plaintiff as well as the Court when it ordered the rolling production of documents. Specifically, it was our understanding that the parties agreed to use the time between the productions to address potentially resolvable disputes so as to correct similar issues in later productions, and to avoid the need for motion practice.

In any event, regarding the specific document Plaintiff cited during the parties' February 1 conference call, *see* ICE's production of November 2022 at 126-28 referenced in Plaintiff's February 14 letter, Defendants represented they would provide further information regarding their justification for this block redaction. Please let us know whether and when ICE will provide us this information.

### E.  Inadequate Search

As referenced in our February 14 letter, Plaintiff identified a number of deficiencies with ICE's approach based on the information it provided regarding its search terms and methodology. Chief among these deficiencies is ICE's apparent failure to search for *any* records responsive to Requests # 3-9 of Plaintiff's FOIA Request. Defendants' February 24 letter contains no discussion of any of the search adequacy issues Plaintiff raised.  We also specifically request that ICE provide Plaintiffs with search terms and locations for those searches; if a search has not been conducted, we request that ICE specify which search terms and locations it will use in response to Requests #3-9.


Sincerely,


2

LABONI A. HOQ (SBN 224140)
laboni@hoqlaw.com
HOQ LAW APC
P.O. Box 753
South Pasadena, California 91030
Telephone: (213) 973-9004

EUNICE CHO (pro hac vice)
echo@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
915 Fifteenth Street NW, 7th Floor
Washington, DC 20005
Telephone: (202) 548-6616

MICHAEL KAUFMAN (SBN 254575)
MKaufman@aclusocal.org
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West Eighth Street
Los Angeles, California 90017 Telephone:
(213) 977-9500
Facsimile: (213) 915-0219

KYLE VIRGIEN (SBN 278747)
kvirgien@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (202) 393-4930

*Attorneys for Plaintiff*

# EXHIBIT F



# United States Department of Justice

## United States Attorney's Office
## Central District of California

---

*JOSEPH W. TURSI*
*Assistant United States Attorney*
*Phone: (213) 894-3989*
*E-mail: Joseph.Tursi@usdoj.gov*

*Federal Building*
*300 N. Los Angeles Street, Suite 7516*
*Los Angeles, California 90012*

March 29, 2023

**<u>VIA E-MAIL</u>**

Laboni A. Hoq
Hoq Law, APC
P.O. Box 753
South Pasadena, CA 91030

     Re:    ACLU of SoCal v. ICE, et al.
               C.D.CA Case No. 2:22-cv-04760-SHK

Dear Ms. Hoq:

Please allow the following to serve as a follow-up to our March 24, 2023 videoconference meet and confer. Among other things, your client raised concerns over ICE FOIA's search with respect to your client's April 29, 2022 FOIA request – specifically requests 3-9. Those requests include:

    3. Any and all ICE OPR reports of investigation that are identified in any of the records responsive to Request #1. This includes any and all exhibits, appendices, or attachments to the DHS OPR reports of investigation.

    4. Any and all documents and communications, including ICE and IHSC directives, policies, procedures, protocols, or trainings that contain guidance, instructions, or standards about the release from custody of (a) hospitalized detainees; or (b) detainees who at the time of release were patients in the care of external healthcare providers or facilities. Detainees specified in (a) and (b) above shall include those being treated for COVID-19 during their hospitalization or treatment at external healthcare providers or facilities.

    5. Spreadsheets, emails, documents, communications, databases, lists, and other data compilations in the possession of ICE Leadership, ICE Enforcement and Removal Operations, ICE Health Service Corps, and ICE Office of Professional Responsibility that identify detainees who were released from custody while (a) hospitalized (including for COVID-19 treatment); (b) in the full-time care of external healthcare providers or facilities (including for COVID-19 treatment), or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility. Requested materials include, but are not limited to, dates of hospitalization of detainees, dates of hospital or external care facility discharge, name of treated detainees' detention facilities, and reasons for detainees' hospitalization or external medical care. These materials

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
March 29, 2023
Page 2

should further include Medical Transfer Summary documents from DHS's eHR System and Alien Medical Records System, and any versions of the Significant Detainee Illness Spreadsheet that identify detainees who were released from custody while (a) hospitalized (including for COVID-19 treatment); (b) in the care of external healthcare providers or facilities (including for COVID-19 treatment); or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility.

6. Spreadsheets, emails, significant incident reports (SIRs), significant event notification reports (SENs), or documents created by DHS OIG or ICE OPR that mention the release from custody of (a) hospitalized detainees; (b) detainees who at the time of release were patients in the care of external healthcare providers or facilities; or (c) detainees released from custody immediately prior to transfer to an emergency room, hospital, or external care facility.

7. Spreadsheets, emails, SIRs, SENs, or documents created by DHS OIG or ICE OPR that mention the death of any detainee who had been previously released from custody while (a) hospitalized; or (b) a patient in the care of an external healthcare provider or facility; or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility.

8. Any and all documents, communications, and other records, including databases, spreadsheets, lists, and other data compilations, that identify detainees who were hospitalized or transferred from detention for off-site medical care due to COVID-19, and were subsequently released from custody while hospitalized, or detainees who were released from custody immediately prior to transfer to an emergency room, hospital, or external care facility to receive treatment for COVID-19. Requested information includes, but is not limited to, dates of hospitalization, detention facility, medical condition/reason for hospitalization or treatment, name and location of hospital, date of return to detention (if any), date of release from custody or issuance of order of recognizance (if any), and/or reason for release from custody.

9. Bills, invoices, charges, or records of payment that reflect payments made for healthcare for any detainee who was released from custody while (a) hospitalized; or (b) a patient in the care of an external healthcare provider or facility, and communications about such bills, invoices, charges, or records of payment[.]

*See* Dkt. 1, Ex. A.

Plaintiff further defined the scope of the FOIA requests on pages 2 to 4 of its request letter. *Id*. It includes expansive definitions of "communications" and "documents." *Id* at 2.  Plaintiff requests records from "January 1, 2016 to the present." *Id*.  The FOIA requests are not limited to certain individuals, offices, or divisions but encompass all of ICE and DHS OIG if not also DHS. ICE is defined as "Immigration and Customs Enforcement, and any components, subcomponents, offices, or personnel therein." *Id*. at 3.  Similarly, DHS OIG is defined as the "Department of Homeland Security Office of Inspector General and any component and offices therein." *Id*.  Although some requests relate to certain named detainees, most of the requests

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
March 29, 2023
Page 3

seek records regarding detainees more broadly, as "detainee" is defined as "any person detained or formerly detained in an immigration facility or holding facility." *Id*.  In turn, "immigration detention facility" is defined broadly as "Service Processing Centers, Contract Detention Facilities, Family Residential Facilities, Intergovernmental Service Agreement (IGSA) Facilities, Dedicated Intergovernmental Service Agreement (DIGSA) Facilities, Intergovernmental Agreement (lGA) Facilities, and any other facilities where individuals may be held in ICE custody for 72 hours or more." *Id*.

As Defendants have raised, on several occasions, these requests are overbroad and vague.[1]  To begin, requests 3-4 & 8 do not request identifiable records at all but instead request "any and all" documents and communications "relating to", "regarding", or "related to" certain subjects. Courts in this D.C. District hold that requests seeking all records "pertaining to," "relating to," or "regarding" a subject matter are insufficient under FOIA.  *See, e.g., Cable News Network v. FBI*, 271 F. Supp. 3d 108, 112 (D.D.C. 2017) (dismissing as overbroad a request for records that "relate in any way to" certain subject areas); *Freedom Watch v. Dep't of State*, 925 F. Supp. 2d 55, 61 (D.D.C. 2013) (granting motion to dismiss and finding a "relating to" request "overbroad since life, like law, is 'a seamless web,' and all documents 'relate' to all others in some remote fashion") (citation omitted); *Latham v. Dep't of Just.*, 658 F. Supp. 2d 155, 161 (D.D.C. 2009) (a request for records "that pertain in any form or sort to [the plaintiff]" was "overly broad"); *Dale*, 238 F. Supp. 2d at 104 (request for documents "that refer or relate in any way to [the plaintiff]" did not reasonably describe the records sought); *Am. Ctr. for L. & Just. v. Dep't of Homeland Sec.*, Civ. A. No. 21-1364 (TNM), 2021 WL 5231939, at *5 (D.D.C. Nov. 10, 2021) (dismissing as not reasonably described where requests sought documents that "regard[ ] in any way" the eight specified topics).

To illustrate the vagueness of Plaintiff's requests, Request No. 8 seeks "any and all documents, communications, and other records . . . that identify detainees who were hospitalized or transferred for off-site medical care due to COVID-19, and were subsequently released from custody while hospitalized . . . name and location of hospital, date of return to detention (if any), date of release from custody or issuance of order of recognizance (if any), and/or reason for release from custody."  Putting aside the potential applicability of FOIA exemptions, it is unclear whether the search should seek documents limited to records showing that the reason for release was because of or "due to COVID-19" or whether the search should seek documents showing that a detainee was released from custody while in the process of receiving off-site treatment for COVD-19 at the time of release or whether the search should seek documents showing that a

---

[1] Such concerns were raised over a nearly identical FOIA request made by the ACLU in *ACLU v. DHS, et al.*, D.D.C. case no. 21-2627 (TJK).  In that action, the U.S. Department of Homeland Security, U.S. Department of Homeland Security Office of Inspector General, and U.S. Immigration and Customs Enforcement moved to dismiss the complaint. *Id.*, Dkt. 12.  The ACLU opposed the motion and the defendants there replied. *Id.*, Dkt. nos. 14 & 16.  Before the court ruled the motion, the ACLU dismissed without prejudice. *Id.*, Dkt. 17.  Indeed, much of the discussion in this correspondence comes from the Motion to Dismiss in that action.

Ms. Laboni A. Hoq
RE: ACLU of SoCal v. ICE
March 29, 2023
Page 4

detainee was released from custody who had at one point been treated off-site "due to COVID-19." And because the terms of the request seek "any and all" records that "identify" the release of detainees, that would appear to encompass documents about the release (i.e., logistics, notices to appear) that do not themselves reflect a COVID-19 diagnosis or treatment. Plaintiff's broad descriptions do not allow the agency "to determine precisely what records are being requested." *Tax Analysts v. IRS*, 117 F.3d 607, 610 (D.C. Cir. 1997) (quoting *Kowalczyk v. Dep't of Just.*, 73 F.3d 386, 388 (D.C. Cir. 1996)).

Second, the FOIA requests are exceedingly and impermissibly broad. "Even where a request 'identif[ies] the documents requested with sufficient precision to enable the agency to identify them,' the request may still fail to 'reasonably describe[ ]' the records sought if it is 'so broad as to impose an unreasonable burden upon the agency.'" *Nat'l Sec. Couns. v. CIA*, 960 F. Supp. 2d 101, 163 (D.D.C. 2013) (quoting *Am. Fed'n Gov't Emps. ("AFGE") v. Dep't of Com.*, 907 F.2d 203, 209 (D.C. Cir. 1990)). "[I]t is the requester's responsibility to frame requests with sufficient particularity to ensure that searches are not unreasonably burdensome." *Assassination Archives & Rsch. Ctr., Inc. v. CIA*, 720 F. Supp. 217, 219 (D.D.C. 1989), aff'd, No. 89-5414, 1990 WL 123924 (D.C. Cir. Aug. 13, 1990). "Agencies must read FOIA requests as drafted," *Miller v. Casey*, 730 F.2d 773, 777 (D.C. Cir. 1984), and thus are not obligated to construe FOIA requests to be less vague and less burdensome than the text of the requests.

According to the plain language of the FOIA requests here, Plaintiff requests that Defendants search and review the records of any and all employees that might possess records "regarding" the foregoing subjects or "identify" "detainees." Plaintiff "does not try to cabin [its requests] to particular employees at those agencies." *Am. Ctr. for L. & Just.*, 2021 WL 5231939, at *6. ICE alone has approximately 20,000 personnel. *See ICE's Mission*, at https://www.ice.gov/mission. Further, the FOIA requests encompass any "immigration detention facility," which is defined to include not just ICE-run facilities, but "contract detention facilities" run by private companies. The definition also includes "intergovernmental service agreement facilities," which are state, county, and local jails that by agreement with ICE, house detainees. *See Sanchez v. Decker*, Civ. A. No. 19-8354, 2019 WL 6311955, at *5 n.4 (S.D.N.Y. Nov. 25, 2019). Plaintiff has estimated that there are over 200 immigration detention facilities. Plaintiff's requests, therefore, seek in essence "an all-encompassing search of the records of every field office" even though "the FOIA does not mandate that [an agency] comply" with such a request. *Marks v. Dep't of Just.*, 578 F.2d 261, 263 (9th Cir. 1978); *see also AFGE*, 907 F.2d at 208-09 (holding request that "would require the Bureau to locate 'every chronological office file and correspondent file, internal and external, for every branch office, staff office' does not "'reasonably describe[]' a class od documents subject to disclosure"). And almost all the requests—Nos. 1, 4 & 8, —seek "[a]ny and all documents and communications" regarding certain subjects. "The phrase 'any and all' is capacious, involving a huge number of potentially responsive documents." *Am. Ctr. for L. & Just.*, 2021 WL 5231939, at *5; *Dale*, 238 F. Supp. 2d at 104 (D.D.C. 2002) ("FOIA requests for all documents concerning a requester are too broad.").

As drafted then, the requests do not reasonably describe records that can be located without an unreasonable burden. Request No. 8, for example, requests "any and all" documents, communications, and other records that "identify" any "detainees" (and by definition, from any "immigration detention facility") "hospitalized" and "subsequently released from ICE custody

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
March 29, 2023
Page 5

while hospitalized."  Responding to this request would be a "massive undertaking," *see Nat'l Sec. Counselors. v. CIA*, 969 F.3d 406, 410 (D.C. Cir. 2020), made all the more challenging by the fact that it places on the agency the onus of determining what records "regard[]" these detainees.  Layered on top, in Request No. 9, Plaintiffs seek the "bills, invoices, charges, or payment" for all the hospitalizations.

Other requests have separate issues.  Although Request Nos. 5 and 8 do not seek records "identifying" "detainees" and with them certain subjects, they seek "any and all" records that "identify detainees who were hospitalized" along with the dates of departure from detention, discharge from hospital, and return to detention; the date of and reason for release; the detention facility; and the medical condition or reason for hospitalization.  Request No. 8 seeks this and additional information.  These requests have similarities to the request in *Krohn v. Department of Justice*, 628 F.2d 195, 196 (D.C. Cir. 1980), which sought a variety of information with respect to "each and every criminal case" in which judgment was entered pursuant to Fed. R. Crim. P. 32(b).  The D.C. Circuit held that the request was "too vague" and explained that "[a] reasonable description requires the requested record to be reasonably identified as a record not as a general request for data, information and statistics to be gleaned generally from documents which have not been created and which the agency does not generally create or require."  *Id*. at 198.  The Court continued that "the request is so broad and general as to require the agency to review the entire record of 'each and every . . . criminal case' in order to determine whether it contains any evidence of the data, information or statistics that appellant requests. Such request is fatally flawed by lack of a reasonable description."  *Id*.  Likewise here, Plaintiff's requests as drafted would require Defendants to review each and every case and record of a detainee who was hospitalized to effectively compile the requested information.  But "an agency is not required to 'answer questions disguised as a FOIA request,' . . . nor conduct research in response to a FOIA request."  *Hall & Assocs. v. EPA*, 83 F. Supp. 3d 92, 102 (D.D.C. 2015) (citations omitted).

Request Nos. 2 and 3 also do not reasonably describe the records sought and are impermissibly vague.  These requests seek "any and all DHS OIG reports of investigation" or "ICE [Office of Professional Responsibility] reports of investigation" "that are identified in any of the records responsive to Request #1."  One could characterize these as "springing" FOIA requests.  Thus, Plaintiff requests Defendants not only produce records responsive to Request No. 1 but review those records to determine if further searches should be conducted based on the content of those records.  But "FOIA was not intended to reduce government agencies to full-time investigators on behalf of requesters."  *Assassination Archives*, 720 F. Supp. at 219.  Further, the FOIA requests do not define a "report of investigation" or what would constitute "identif[ying]" those reports such that there would be a trigger for Defendants to have to search for and produce them. And again, Request Nos. 2 and 3 are based on the content of "records responsive to Request #1," which ask for records "relating to" the hospitalization, death, decision to release, or release of four named individuals.

The above highlights the issues Defendants have confronted in attempting to respond to the FOIA requests at issue here.  Indeed, an agency employee familiar with the requests' subject matter would not be able to locate the records with a "reasonable amount of effort."

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
March 29, 2023
Page 6

Notwithstanding the above, ICE FOIA has reviewed the remaining potentially responsive records identified through its searches thus far. Based on my understanding, the records related to the specific noncitizens mentioned in the FOIA requests appear to be included in the production. The production also includes potentially responsive records from IHSC, including policies and spreadsheets. ICE OPR did not produce any responsive records, which is not unusual because it does not typically conduct investigations into noncitizen deaths that occur outside of ICE custody.

In reviewing the locations searched in this action, ICE FOIA did determine that it does not appear that ICE's Office of the Chief Financial Officer was tasked. It therefore intends to ask that office to search for records that may be responsive to your client's FOIA request and process them accordingly. To that end, ICE FOIA is amenable to collaborating over any subsequent search terms and parameters your client may like to suggest for that search.

Relatedly, on several occasions, Plaintiff has raised issues with Defendants' efforts thus far, but when invited to provide search terms or locations Plaintiff believes would be sufficient, it has declined to do so. Rather, Plaintiff has repeatedly raised that it is Defendants' burden to conduct the search and then, once completed, Plaintiff will "supplement" if it thinks the search terms or locations are inadequate. However, as highlighted above, the requests themselves are vague and overbroad. Thus, while Defendants have conducted searches, and produced responsive records, it cannot be said that such efforts thus far have been inadequate. Rather, it is the vague and overbroad nature of the requests themselves that have frustrated Defendants' ability to conduct an adequate search. Still, defendants remain open to considering any search terms or locations Plaintiffs may wish to offer.

Finally, with respect to the redactions in ICE FOIA's initial 2,444 page production, those records were determined to be responsive in *Vargas v. DHS, et al.* C.D. Cal. Case No. 22-cv-00287 and were produced in the same format there as they were here, in order to expedite their release. In *Vargas*, the requestor did not challenge the redactions and thus there is not a *Vaughn* index available to provide additional information on the redactions. Thus, if there are specific redactions of concern, please advise so that ICE FOIA may review at least a sampling of the challenged redactions.

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
March 29, 2023
Page 7


Please let me know if you have any questions, or would like to further discuss any of the matters
raised above.

Respectfully,

E. MARTIN ESTRADA
United States Attorney

/s/ *Joseph W. Tursi*

JOSEPH W. TURSI
Assistant United States Attorney



cc: Ms. Eunice Cho (by email)
    Mr. Michael Kaufman (by email)
    Mr. Kyle Virgien (by email)

# EXHIBIT G

April 14, 2023

Joseph Tursi
Alarice Medrano
United States Attorney's Office
Central District of California
300 N. Los Angeles St. Suite 7516
Los Angeles, CA 90012
Joseph.Tursi@usdoj.gov
Alarice.Medrano@usdoj.gov

       Re:     *American Civil Liberties Union Foundation of Southern California v. United States Immigration and Customs Enforcement, et al.*, No. 2:22-cv-4760-SB-AFM (C.D. Cal.); April 29, 2022 FOIA Request*

Dear Counsel,

     This letter responds to Defendants' letter, dated March 29, 2023, regarding Plaintiff's concerns with the adequacy of ICE's search for records responsive to its above-referenced FOIA Request, as well as certain redactions in Defendants ICE and OIG's productions to date. With this letter, among other things, Plaintiff requests that Defendants conduct a search for records responsive to Request Nos. 3-9, and produce them to us by May 2023 per the Court's February 9, 2023 Scheduling Order. We also request to schedule a meet and confer next week to address any issues with our proposed search terms, and any other issues raised herein. Please let us know your availability.

## I.    Plaintiffs' Requests Are Narrowly Tailored and Sufficiently Specific for ICE to Conduct A Search

     ICE has admitted that as of this date, it has not conducted any search at all for records responsive to six of Plaintiff's nine Requests (Request Nos. 3-9). At the outset, Plaintiff fundamentally disagrees with ICE's characterization of Request Nos. 3-9 as "overbroad and vague," which in any event is "not to be used as a method of withholding records" as ICE has done here. *Bristol-Myers Co. v. FTC*, 424 F.2d 935, 938 (D.C. Cir. 1970), *cert. denied*, 400 U.S. 824 (1970). Indeed, ICE never before raised any claim characterizing these Requests as "overbroad and vague" until Plaintiff inquired as to why Defendants had unilaterally omitted Request Nos. 3-9 from their search altogether. "[I]f [ICE] was at all uncertain about the scope of Plaintiff's request, it could have asked [it] what [it] meant … which it did not do." *Leopold v. Dep't of Just.*, 130 F. Supp. 3d 32, 44 (D.D.C. 2015), on reconsideration in part, No. 14-CV-00168 (APM), 2016 WL 7839130 (D.D.C. Apr. 25, 2016).

     Plaintiff's Requests are specific, reasonably described, and sufficient for Defendants to conduct a search. ICE's strained characterizations of Request Nos. 3-9 to justify its failure to conduct a search for responsive records is unsound. Plaintiff's FOIA request easily satisfies the "linchpin inquiry" for a reasonably-described request, which is "whether the agency is able to determine precisely what records (are) being requested." *Yeager v. DEA*, 678 F.2d 315, 326 (D.C. Cir. 1982) (internal quotation marks omitted); *see* 6 C.F.R. § 5.3(b) (description must

allow personnel to locate records "with a reasonable amount of effort" through an "organized, non-random search"). The Requests "precisely define by subject matter" the documents and communications sought. *Pub. Emps. for Envtl. Responsibility v. Envtl. Prot. Agency*, 314 F. Supp. 3d 68, 81 n.5 (D.D.C. 2018). Fundamentally, Plaintiff's Request asks for records on only *one subject*—ill detainees released from custody while hospitalized, at off-site medical facilities, or just before transfer to these facilities.

Each of Request Nos. 3-9 provides ICE with tailored search parameters governing the single subject of the Request, with which "professional employee[s] of the agency … familiar with the subject area of the request [may] locate the [records sought] with a reasonable amount of effort." *Truitt v. Dep't of State*, 897 F.2d 540, 545 n.36 (D.C. Cir. 1990). This is all that is required of Plaintiff, and ICE's claims to the contrary are unsupportable, including as follows:

- Request No. 3 specifically requests that ICE search for and produce "ICE [Office of Professional Responsibility] reports of investigation that are identified in any of the records responsive to Request #1." Request #1 specifically refers to four individual ICE detainees, including Teka Gulema, Johana Medina Leon, Jose Ibarra Bucio, and Martin Vargas Arellano. ICE's claim that Request No. 3 would require it to "reduce" ICE to become a "full-time investigator[]" is belied by the specificity of the Request, which clearly defines "precisely what records are being requested." *Assassination Archives & Rsch. Ctr., Inc. v. C.I.A.*, 720 F. Supp. 217, 219 (D.D.C. 1989), aff'd, No. 89-5414, 1990 WL 123924 (D.C. Cir. Aug. 13, 1990).

- Request No. 4 specifically seeks "documents and communications, including ICE and IHSC directives, policies, procedures, protocols, or trainings that contain guidance, instructions, or standards about the release from custody of (a) hospitalized detainees; or (b) detainees who at the time of release were patients in the care of external healthcare providers or facilities." The Request specifies that detainees in categories (a) and (b) include those "being treated for COVID-19." This request "conveys exactly which records [plaintiff] seeks." *Shapiro v. CIA*, 170 F. Supp. 3d 147, 152, 156 (D.D.C. 2016) (holding that requests seeking any and all records 'mentioning' a subject matter were appropriate under FOIA).

- Request No. 5 specifically seeks "spreadsheets, emails, documents, databases, lists, and other data compilations" "that identify detainees who were released from custody while (a) hospitalized (including for COVID-19 treatment); (b) in the full-time care of external healthcare providers or facilities (including for COVID-19 treatment), or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility. Contrary to Defendants' assertion, Request No. 5 does not seek "any and all" records that identify such detainees. The request further identifies particular offices for the search, including "ICE Leadership, ICE Enforcement and Removal Operations, ICE Health Service Corps, and ICE Office of Professional Responsibility," as well as specific databases and lists, including "Medical Transfer Summary documents from DHS's eHR system and Alien Medical Records System, and any version of the Significant Detainee Illness Spreadsheet."

Request No. 5 also seeks specific information regarding such detainees, including "dates of hospitalization of detainees, dates of hospital or external care facility discharge, name of treated detainees' detention facilities, and reasons for detainees' hospitalization or external medical care." Such "identifying information" is also "sufficiently specific." *Biear v. Att'y Gen. United States*, 905 F.3d 151, 157 (3d Cir. 2018). These specifications hardly transform the Request into "a general request for data" or require ICE to "conduct research in response to the FOIA request." ICE March 29, 2023 Letter at 5. To the contrary, the information sought is reasonably likely to be included in the specific form of documents sought.

- Request No. 6 specifically asks Defendants to produce "spreadsheets, emails, significant incident reports (SIRs), significant event notification reports (SENs), or documents created by DHS OIG or ICE OPR that mention the release from custody of (a) hospitalized detainees; (b) detainees who at the time of release were patients in the care of external healthcare providers or facilities; or (c) detainees released from custody immediately prior to transfer to an emergency room, hospital, or external care facility." Plaintiff has very clearly identified the parameters of the search, and Defendants have raised no specific objection to this Request.

- Request No. 7 specifically asks Defendants to produce "spreadsheets, emails, SIRs, SENs, or documents created by DHS OIG or ICE OPR that mention the death of any detainee who had been previously released from custody while (a) hospitalized; or (b) a patient in the care of an external healthcare provider or facility; or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility." Again, Plaintiff has very clearly identified the parameters of the search, and Defendants have raised no specific objection to this Request.

- Request No. 8 specifically asks Defendants to produce "any and all documents, communications, and other records, including spreadsheets, lists, and other data compilations, that identify detainees who were hospitalized or transferred from detention for off-site medical care due to COVID-19, and were subsequently released from custody while hospitalized, *or* detainees who were released from custody immediately prior to transfer to an emergency room, hospital, or external care facility to receive treatment for COVID-19." Plaintiff also specifically requested that this information include "dates of hospitalization, detention facility, medical condition/reason for hospitalization or treatment, name and location of hospital, date of return to detention (if any), date of release from custody or issuance of order of recognizance (if any), and/or reason for release from custody."

As with Request No. 5, this request for "identifying information" is "sufficiently specific." *Biear*, 905 F.3d at 157, and hardly transforms the Requests into "a general request for data" or requires ICE to "conduct research in response to the FOIA request." ICE March 29, 2023 Letter at 5. To the contrary, the information sought is reasonably likely to be included in the specific form of documents sought, including "[s]preadsheets, emails, documents, communications, databases, lists, and other data compilations." Request Nos. 5, 8.

Regarding ICE's purported confusion over whether and to what extent to search for documents related to the term "Covid-19," suffice it so say Request No. 8 only emphasizes and clarifies that Plaintiff seeks information about detainees whose hospitalizations, transfers to off-site medical care, or release from detention just before being transferred to these facilities was either "due to Covid-19" or "to receive treatment for Covid-19." To the extent that there is any confusion about the term "due to COVID-19," the request is clear: Defendants should produce documents that identify detainees who were hospitalized or transferred from detention for off-site medical care for treatment of COVID-19, and were subsequently released from custody while at these facilities. Defendants should *also* produce documents that identify detainees who were released from custody immediately prior to transfer to an emergency room, hospital, or external care facility to receive treatment for COVID-19. The request does not require production of documents "showing that a detainee was released from custody who at one point been treated off-site 'due to COVID-19.'" ICE March 29, 2023 Letter at 4. Documents about the release itself (*i.e.* logistics, notices to appear) are highly relevant and encompassed in the request, as they provide the public with critical information regarding the terms of release from custody.

- Request No. 9 specifically asks Defendants to produce "bills, invoices, charges, or records of payments made for healthcare for any detainee who was released from custody while (a) hospitalized; or (b) a patient in the care of an external healthcare provider or facility, and communications about such bills, invoices, charges, or records of payment." There can be no doubt as to the specificity of this Request, and ICE appears to acknowledge as such when it acknowledges that it has not, and will now search the Office of the Chief Financial Officer. ICE March 29, 2023 Letter at 6.

In the face of these specific Requests, Defendants cite to boilerplate case law untethered to the relevant language of the Requests. For example, ICE attempts to fault the Requests for including introductory language such as "any and all," as well as connector words like "regarding," "relating to," and "related to," claiming that the Requests are insufficiently clear based solely on the inclusion of those words. However, these phrases do not determine whether records are reasonably described for purposes of FOIA, particularly where, as here, the subject matter of Plaintiff's Request is abundantly clear. *See, e.g., Pub. Emps. For Envtl. Responsibility*, 314 F. Supp. 3d at 71-72 (holding that FOIA request for "any EPA documents that support the conclusions that human activity is not the largest factor driving global climate change" was reasonably described); *Shapiro*, 170 F. Supp. 3d at 155 ("FOIA's reasonable-description requirement does not doom requests that precisely describe the records sought, even if compliance might overwhelm an agency's response team."); *Yeager*, 678 F.2d at 326 ("the number of records requested appears to be irrelevant to the determination whether they have been 'reasonably described.") (internal quotations and citations omitted).

Defendants' argument that the search required is unduly burdensome appears to be an attempt to distract from their independent obligation to search locations "likely to contain responsive materials." *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990); *see also Transgender L. Ctr. v. Immigr. & Customs Enf't*, 33 F.4th 1186, 1194 (9th Cir. 2022) (quoting

*Hamdan v. Dep't of Just.*, 797 F.3d 759, 770 (9th Cir. 2015) (agency bears the burden to "demonstrate [the] adequacy [of its search] . . . 'beyond a material doubt.'"). For example, ICE claims, without any substantiation, or without any attempt to conduct *any* search of custodians likely to possess responsive records, that the Request would require ICE to search the records of "20,000 personnel" and "200 immigration detention facilities." Rather, given the well-defined subject matter at issue, ICE "professional employee[s] … who [are] familiar with the subject area of the request" are well-equipped to identify which of those personnel and facilities are likely to yield responsive records. *Truitt*, 897 F.2d at 545.

## II.  Deficiencies with ICE's Search to Date, and Need for Further Searches

As counsel for Plaintiff discussed during our March 24, 2023 video conference, Plaintiff rejects ICE's representation that its original search limited to Plaintiff's FOIA Request Nos. 1 and 2 somehow satisfies its search obligations for Request Nos. 3-9 on a backward looking basis. That original search admittedly only targeted "the names of the individuals (including their A numbers) the detention centers, and the medical centers listed in the request." Defs.' February 1, 2023 Email. By design, Defendants' search did not target information about the broader subject of the Request.

While Plaintiff appreciates ICE's agreement to reconsider the adequacy of its search to date, and invitation to Plaintiff to identify additional search locations and parameters, we reiterate that it is ICE's obligation to do so in the first instance. Indeed, "[i]t would be counterintuitive in the extreme to require [a FOIA Requestor] to have sufficient knowledge of an agency's organizational units to be able to identify the specific units of an agency that might contain the records sought." *Biear*, 905 F.3d at 157.

Regarding search locations, ICE's search of "hard drives, Outlook mailboxes and email messages, and the ENFORCE Alien Removal Module" also appears to be deficient, as ICE now acknowledges. Defs.' February 1, 2023 Email. Plaintiffs ask Defendants to address the following deficiencies:

- In addition to the ICE's Office of the Chief Financial Officer, which Defendants now plan to task to search, it appears Defendants have failed to search specific locations identities in the Request, including "DHS's eHR System and Alien Medical Records System, and any versions of the Significant Detainee Illness Spreadsheet," as well as "ICE Leadership, ICE Enforcement and Removal Operations, ICE Health Service Corps, and ICE Office of Professional Responsibility." *See, e.g.* Request No. 5.

- Regarding its search of "hard drives, Outlook mailboxes and email messages," ICE should identify the individuals and/or job positions of DHS personnel whose hard drives and communication systems were searched for responsive records, so that Plaintiffs can assess whether others should be searched as well.

In addition, and without waiving any arguments regarding the adequacy of ICE's final searches, or the opportunity to supplement suggested search terms or locations, Plaintiff proposes the following search terms for the records requested and specified in each Request, and ask that

ICE use them to conduct searches of all records systems it has searched this far, as well as the additional locations identified below:

- **Request No. 3**:
  - o **Suggested search terms**: Teka Gulema, Johana Medina Leon, Jonathan Alberto Medina Leon, Jose Ibarra Bucio, and Martin Vargas Arellano

  - o **Suggested search locations**: ICE Office of Professional Responsibility Reports of Investigation

- **Request No. 4**:
  - o **Suggested search terms**:
    - ▪ (policy or policies or protocol or procedure or training or guidance or instruction or standard or detainee or custody) w/25 (death or died or deceased or medical or surgery or specialist or doctor or COVID-19 or hospital! or ambulance or emergency room or emergency services or poor outcome or life support or coma or unconscious or ventilator or intensive care or medical observation or ICU or critical condition or hospice or palliative or fatal)
    - ▪ (release or transfer or benefits or parole or alternative detention or discharge) w/25 (death or died or medical or surgery or specialist or doctor or  COVID-19 or hospital! or ambulance or emergency room or emergency services or poor outcome or life support or coma or unconscious or ventilator or intensive care or medical observation or ICU or critical condition or hospice or palliative or fatal)
    - ▪ humanitarian /25 releas!

  - o **Suggested search locations**: ICE Enforcement and Removal Operations, ICE Health Service Corps

- **Request No. 5:**
  - o **Suggested search terms:**
    - ▪ (detainee or custody) w/25 of (death or died or deceased or medical or surgery or specialist or doctor or COVID-19 or hospital! or ambulance or emergency room or emergency services or  poor outcome or life support or coma or  unconscious or ventilator or intensive care or medical observation or ICU or critical condition or hospice or palliative or fatal)
    - ▪  (release or transfer or benefits or parole or alternative detention or discharge) w/25 (death or died or deceased or medical or surgery or specialist or doctor or COVID-19 or hospital! or ambulance or emergency room or emergency services or poor outcome or life support or coma or unconscious or ventilator or intensive care or medical observation or ICU or critical condition or hospice or palliative or fatal)

  - o **Suggested search locations:** ICE Leadership, ICE Enforcement and Removal Operations, ICE Health Service Corps, and ICE Office of Professional

Responsibility, Medical Transfer Summary documents from DHS's eHR system and Alien Medical Records System, and any version of the Significant Detainee Illness Spreadsheet.

- **Request No. 6:**
  - **Suggested search terms:** (detainee or custody) w/25 (death or died or deceased medical or surgery or specialist or doctor or COVID-19 or hospital! or ambulance or emergency room or emergency services or  poor outcome or life support or coma or  unconscious or ventilator or intensive care or medical observation or ICU or critical condition or hospice or palliative or fatal)

  - **Suggested search locations:** ICE Leadership, ICE Enforcement and Removal Operations, ICE Health Service Corps, ICE personnel responsible for reviewing Significant Incident Reports or Significant Event Notification Reports, ICE OIG, ICE OPR.

- **Request No. 7:**
  - **Suggested search terms:** (detainee or custody) w/5 (death or died or deceased or medical or surgery or specialist or doctor or COVID-19 or hospital! or ambulance or emergency room or emergency services or  poor outcome or life support or coma or  unconscious or ventilator or intensive care or medical observation or ICU or critical condition or hospice or palliative or fatal)

  - **Suggested search locations:** ICE Leadership, ICE Enforcement and Removal Operations, ICE Health Service Corps, ICE personnel responsible for reviewing Significant Incident Reports or Significant Event Notification Reports, ICE OIG, ICE OPR.

- **Request No. 8:**
  - **Suggested search terms:**
    - (detainee or custody) w/25 (COVID-19 or hospital! or ambulance or emergency room or emergency services or coma or unconscious or ventilator or intensive care or ICU or critical condition or fatal)
    - (release or transfer or parole or alternative detention or discharge) w/25 (COVID-19 or hospital! or ambulance or emergency room or emergency services or coma or unconscious or ventilator or intensive care or ICU or critical condition or fatal)

  - **Suggested search locations:** ICE Leadership, ICE Enforcement and Removal Operations, ICE Health Service Corps.

## III.   Lack of Sufficient Information to Support Redactions

As referenced in our February 14, 2023 letter, Plaintiff reiterates its request that ICE provide justification for the block redaction under Exemption (b)(5) contained in pages 126-128 of its November 2022 production (a document previously produced in *Vargas v. DHS* (C.D. Cal.

Case No. 22-cv-00287). Similarly, as referenced in Our March 1, 2023 letter, we are still waiting on your offer to provide further information regarding redactions subject to an "unspecified statute" in OIG's December 2022 production at pages 66, 67, 68 and 75. Plaintiffs' other requests regarding Defendants' redactions remain outstanding.

Sincerely,

# EXHIBIT H



**Laboni Hoq <lhoq@hoqlaw.com>**

---

## ACLU Foundation of SoCal v. ICE et al. 2:22-cv-04760-SHK: REQUEST FOR STATUS CONFERENCE

---

**Axe, Jason (USACAC)** <Jason.Axe@usdoj.gov>                              Tue, May 16, 2023 at 5:22 PM
To: Laboni Hoq <lhoq@hoqlaw.com>
Cc: Eunice Cho <echo@aclu.org>, Michael Kaufman <MKaufman@aclusocal.org>, Kyle Virgien <kvirgien@aclu.org>

Laboni,

Thank you for your email.  I have conferred with ICE counsel and have information from ICE, but I need to speak further with OIG counsel tomorrow morning (she is on the east coast) to answer your questions regarding OIG.  For now, I can provide the following responses:

(1) Thank you for providing Mr. Ibarra Bucio's A#.  Although his name has already been searched through IHSC and the applicable field offices, ICE is proposing to search "204380214" within the ERO Front Office and IHSC, on the chance that any locations previously searched for Mr. Bucio's name will yield documents under his A#.

(2) I have been advised that the May 2023 ICE document release will contain more documents regarding Mr. Gulema.  I am not aware yet whether any of those documents post-date November 6, 2015, but we should know the answer to that question soon. If they do not, we will look into that issue.

(3) As we discussed on the telephone the other day, ICE has been withholding duplicates of documents, but unfortunately, their system does not enable them to automatically remove documents that are part of email threads.  But as you requested, I passed along that suggestion to ICE.  Neither they, you, or our office is interested in processing/reviewing more documents that anyone needs to.

(4) I have reviewed your April 14, 2023 letter, and I now have a greater appreciation for the issue regarding the delay by ICE in responding to your request for search terms.  First, although you have suggested search terms that ask for words "within x" of other words, ICE cannot conduct searches like that.  Additionally, a request that "ICE Enforcement and Removal Operations" search for records could potentially encompass the records of over 7,000 employees in 25 field offices.  Nonetheless, ICE has reviewed your letter and is considering the following search terms and search locations:

**Proposed search terms**:

"humanitarian release"

"intensive care"

"ICU"

"life support"

"hospice"

"palliative"

"fatal"

"critical condition"

"coma"

"unconscious"

"ventilator"

"death"

"died"

"deceased"

"decedent"

"ambulance"

"discharge"

"emergency room"

"emergency services"

**Proposed search locations**:

ERO Front Office

IHSC

ICE has not finalized its views with respect to these search terms and locations, but because you have asked for ICE's thoughts at this point, I am forwarding them to you for your comments.  My understanding is that once ICE has finalized its search terms and locations, it would conduct a search and report back to us how many documents were identified and approximately how long it would take to process them.  Please review these proposed terms and locations and let us know your thoughts so we can engage in further dialogue about them.

As for OIG, I will get back to you with more information tomorrow.

Thank you,

Jason K. Axe

Assistant U.S. Attorney

300 North Los Angeles St., Suite 7516

Los Angeles, CA  90012

(213) 894-8790

(213) 894-7819 (FAX)

-----Original Message-----

From: Laboni Hoq <lhoq@hoqlaw.com>

Sent: Monday, May 15, 2023 9:18 AM

To: Axe, Jason (USACAC) <JAxe@usa.doj.gov>

Cc: Eunice Cho <echo@aclu.org>; Michael Kaufman <MKaufman@aclusocal.org>; Kyle Virgien <kvirgien@aclu.org>;
Tursi, Joseph (USACAC) <JTursi@usa.doj.gov>; Medrano, Alarice (USACAC) <AMedrano@usa.doj.gov>

Subject: [EXTERNAL] Re: ACLU Foundation of SoCal v. ICE et al. 2:22-cv-04760-SHK: REQUEST FOR STATUS
CONFERENCE

Dear Jason,

Based on our meet and confer conversations to date, we plan to identify the following anticipated disputes to the Court:

1. ICE's failure to timely search for records responsive to Plaintiff's FOIA Request Nos. 3-9 consistent with the scheduling
order, including its failure to (a) agree to the search parameters (including search terms and locations) for these requests,
and (b) identify hit counts for this search necessary to allow the parties to reasonably discuss any changes to the
summary judgment briefing schedule set to commence on June 6, 2023. Notably, Plaintiff sent proposed search
parameters to Defendants one month ago, on April 14, 2023, and Defendants have failed to provide any response,
despite Plaintiff's diligent and repeated inquiry.

2. Defendants' failure to timely search for records responsive to Plaintiff's FOIA Request No. 1-3 as to deceased detainee
Jose Ibarra Bucio, consistent with the scheduling order. As discussed on May 12, Defendants have not produced any
documents regarding Mr. Ibarra Bucio, despite plentiful evidence that such records exist, and ICE has represented that its
May 2023 production will not include any documents related to him.

While we appreciate that Defendants are still considering our requests, their failure to provide any response to the
proposed search terms and locations, confer upon and agree to search parameters, and provide hit counts coupled with
an impending summary judgment briefing schedule, warrant court intervention.

If Defendants can commit to providing Plaintiff this information for both of the above-referenced disputes by Tuesday, we
would be open to further meet and confer on Wednesday, May 17 at 9 am or after 2:30 pm ET before seeking a status
conference. If parties cannot come to agreement at that stage, Plaintiff will continue to seek a status conference with the
court.

Thanks.

On Fri, May 12, 2023 at 5:44 PM Axe, Jason (USACAC) <Jason.Axe@usdoj.gov> wrote:

>

> Eunice and Laboni,

>

>

>

> First, it was nice to make your acquaintance today.

>

>

> Second, from the tone of the clerk's email, I think that she is suggesting that before getting the Court involved, the parties should make sure that they have worked out whatever issues they can on their own and only bring to the Court's attention an actual "dispute."  From our call today, I am not aware of any actual disputes between the parties.  I have identified action items for the agencies, as to which I expect to provide you replies next week.  I also did not hear you opposed to continuing the motion filing deadline based on my entry into this case and the remaining action items for Defendants.  Therefore, I would suggest that we hold off on seeking a status conference until we have a bit more information from the agencies answering your questions.

>

>

>

> Thank you,

>

>

>

> Jason K. Axe

>

> Assistant U.S. Attorney

>

> 300 North Los Angeles St., Suite 7516

>

> Los Angeles, CA  90012

>

> (213) 894-8790

>

> (213) 894-7819 (FAX)

>

>

>

> From: SHK Chambers <SHK_Chambers@cacd.uscourts.gov>

> Sent: Friday, May 12, 2023 5:17 PM

> To: Laboni Hoq <lhoq@hoqlaw.com>

> Cc: Michael Kaufman <MKaufman@aclusocal.org>; Eunice Cho

> <echo@aclu.org>; Kyle Virgien <kvirgien@aclu.org>; Tursi, Joseph

> (USACAC) <JTursi@usa.doj.gov>; Medrano, Alarice (USACAC)

> <AMedrano@usa.doj.gov>; Axe, Jason (USACAC) <JAxe@usa.doj.gov>

> Subject: RE: ACLU Foundation of SoCal v. ICE et al. 2:22-cv-04760-SHK:

> REQUEST FOR STATUS CONFERENCE

>

>

>

> Good Evening Counsel,

>

>

>

> Can you let me know if there is a dispute? and if so, a brief description of what the dispute is about?

>

>

>

> Or a brief description on why a status conference is necessary?

>

>

>

>

>

>

>

>

>

> Thank you,

>

> Dana

>

>

>

>

>

>

>

>

>

>

>

> From: Laboni Hoq <lhoq@hoqlaw.com>

> Sent: Friday, May 12, 2023 2:24 PM

> To: SHK Chambers <SHK_Chambers@cacd.uscourts.gov>; Dana Cisneros

> <Danalyn_Castellanos@cacd.uscourts.gov>

> Cc: Michael Kaufman <MKaufman@aclusocal.org>; Eunice Cho

> <echo@aclu.org>; Kyle Virgien <kvirgien@aclu.org>; Tursi, Joseph

> (USACAC) <Joseph.Tursi@usdoj.gov>; Medrano, Alarice (USACAC)

> <Alarice.Medrano@usdoj.gov>; Jason.Axe@usdoj.gov

> Subject: ACLU Foundation of SoCal v. ICE et al. 2:22-cv-04760-SHK:

> REQUEST FOR STATUS CONFERENCE

>

>

>

> CAUTION - EXTERNAL:

>

>

>

> Dear Ms. Castellanos,

>

>

>

> The Parties have been meeting and conferring about various issues in the case, and request a Status Conference with the Court to address various matters.  The Parties propose that each side will file a status report two business days in advance of the status conference to update the Court on the status of the case and identify issues they would like it to address.

>

>

>

> The following are the dates the Parties propose for the Status Conference:

>

>

>

> Mon. 5/22: anytime

>

> Tues. 5/23: 9-12, after 1 pm PT

>

> Wed. 5/24: 9-12, after 3 pm PT

>

> Thurs. 5/25: 10-11 PT

>

>

>

> Please let us know if the Court needs any further information to consider this request.

>

>

>

> Thank you.

>

>

>

> --

>

> Laboni A. Hoq

>

> Hoq Law APC

>

> P.O. Box 753

>

> South Pasadena, CA 91030

>

> Telephone: 213-973-9004

>

> https://protect2.fireeye.com/v1/url?k=80436a26-dfd85371-80444ec3-ac1f6

> b017516-cc611ed7784ea94c&q=1&e=e7c8bd41-1610-40e8-90ee-20f755444698&u=

> http%3A%2F%2Fwww.hoqlaw.com%2F

>

> CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

>

>

# EXHIBIT I



**Laboni Hoq <lhoq@hoqlaw.com>**

---

## ACLU Foundation of SoCal v. ICE et al. 2:22-cv-04760-SHK: REQUEST FOR STATUS CONFERENCE

---

**Axe, Jason (USACAC)** <Jason.Axe@usdoj.gov>                              Thu, May 18, 2023 at 2:50 PM
To: Eunice Cho <echo@aclu.org>, Laboni Hoq <lhoq@hoqlaw.com>
Cc: Michael Kaufman <mkaufman@aclusocal.org>, Kyle Virgien <kvirgien@aclu.org>

Eunice and Laboni,

As we discussed on our call, in response to your questions:

1. ICE is proposing to search the "ERO Front Office," not the "ICE Front Office."  The ERO Front Office consists of ERO's HQ-level management.  Field office staff would be included in the field office search.

2. With respect to Mr. Ibarra Bucio, the search you described below was already conducted for his name.  ICE will conduct a similar search using his A-number.

3. ICE is interested in Plaintiff's opinion as to additional terms and locations if Plaintiff believes the proposed terms would not yield any documents responsive to the request.  Please send me proposed terms and locations that I can share with ICE for their review.

4. Regarding Request #9, I will get back to you when I hear back from agency counsel.  If the agency agreed to specific terms for a search of the Office of the Chief Financial Officer, please let me know.  Was the suggestion to search for the names of the four individuals?

Thank you,

Jason K. Axe

Assistant U.S. Attorney

300 North Los Angeles St., Suite 7516

Los Angeles, CA  90012

(213) 894-8790

(213) 894-7819 (FAX)

[Quoted text hidden]

# EXHIBIT J



**Laboni Hoq <lhoq@hoqlaw.com>**

---

## ACLU Foundation of SoCal v. ICE et al. 2:22-cv-04760-SHK: REQUEST FOR STATUS CONFERENCE

---

**Axe, Jason (USACAC)** <Jason.Axe@usdoj.gov>                                    Fri, May 19, 2023 at 2:26 PM
To: Eunice Cho <echo@aclu.org>, Laboni Hoq <lhoq@hoqlaw.com>
Cc: Michael Kaufman <mkaufman@aclusocal.org>, Kyle Virgien <kvirgien@aclu.org>

Eunice and Laboni,

Following up on my emails below:

1. ICE will conduct a search of the Office of the Chief Financial Officer to see if there are any responsive records related to the four named individuals.

2. Regarding the OIG referred records, it is taking a bit longer than we had hoped to nail down information about them, but ICE and OIG are working together to be able to provide information to you about whether those records were already processed, and if not, how many documents they are and when they will be processed.

3. Regarding a hit count, to be clear, ICE cannot estimate a hit count.  It can only provide numbers once a search has been conducted.  Once we have settled on search terms, I can find out how long it will take to do those searches and get back to you. We will then have a hit count and can have further discussions regarding (a) narrowing the scope of the search, if that is needed, or (b) how many documents ICE can process per month related to that search.

4. ICE's May production is undergoing the last stages of review.  After you receive it, please review it and let me know if you have continuing questions regarding the Gulema records (or any other questions).

5. I will touch base with ICE and OIG to identify exactly what searches they are prepared to do now (e.g., the A# and Office of Chief Financial Officer search) and their estimate as to how long those searches will take and get back to you.

Based on the additional searches to be done, along with the continuing discussions regarding search terms and the need to discuss redactions, this case certainly is not ready to proceed to briefing.  I understand that you would like additional information prior to stipulating to contining the existing dates, but realistically, all remaining tasks will take at least two months, if not longer, to continue working out these issues.  Therefore, I am requesting that your client stipulate to continue the upcoming deadlines as follows:

| **Deadline** | **Current Date** | **Proposed Date** |
|---|---|---|
| Defendant's MSJ Due | 6/6/23 | 8/7/23 |

| | | |
|---|---|---|
| Plaintiff's Opposition and Cross-Motion Due | 6/20/23 | 8/28/23 |
| Defendant's Opposition to Cross-Motion and Reply Due | 7/5/23 | 9/18/23 |
| Plaintiff's Sur-Reply Due | 7/18/23 | 10/9/23 |

For the proposed dates, I suggested three weeks between the deadlines because, at least with respect to the first two, I will be out of the office on annual leave between August 14-25, so I wouldn't be able to look at the brief until I return.  For the remaining two deadlines, if you prefer two weeks rather than three between them, we could move them up to 9/11/23 and 9/25/23.

Please advise whether these dates are acceptable or propose alternative dates.  Obviously, depending on how many documents are identified during the searches, we may need to adjust these dates again.  But for now, it is clear that briefing cannot reasonably commence on June 6th, so we should take steps now to move the dates.

Thank you,

Jason K. Axe

Assistant U.S. Attorney

300 North Los Angeles St., Suite 7516

Los Angeles, CA  90012

(213) 894-8790

(213) 894-7819 (FAX)

[Quoted text hidden]

# EXHIBIT K

May 19, 2023

Jason Axe
Alarice Medrano
United States Attorney's Office
Central District of California
300 N. Los Angeles St. Suite 7516
Los Angeles, CA 90012
Jason.Axe@usdoj.gov
Alarice.Medrano@usdoj.gov

**SENT VIA EMAIL**

Re:     *American Civil Liberties Union Foundation of Southern California v. United States Immigration and Customs Enforcement, et al.,* No. 2:22-cv-4760 (C.D. Cal.)

Dear Counsel:

Thank you for conferring with us via videoconference yesterday, May 18, 2023 and for your follow up emails of May 18 and 19, 2023. As we discussed, Plaintiff ACLU of Southern California again raised the following issues regarding Defendants' deficient response to its FOIA request. Please provide Plaintiff with responses to each item in advance of our next meeting, to take place on Thursday, May 25, 2023 at 10:00 am PT. Regarding issues related to Defendant ICE, we again suggest that ICE counsel and/or any ICE personnel familiar with ICE's records systems be invited to participate in our next meeting, to provide immediate clarification, reduce misunderstanding and delay in response.

**As discussed during yesterday's meeting, please provide a hit count and proposed schedule for Defendants' production of documents responsive to Request Nos. 3-9, and documents related to Mr. Jose Ibarra Bucio prior to our meeting by May 25, reflecting the search terms and locations suggested below.** To be clear, as referenced in Defendants' May 19, 2023 email, we understand that ICE cannot "estimate a hit count" and we are not asking for that. The actual hit counts we are seeking are necessary to determine revisions to the current scheduling order, including a realistic amended summary judgment briefing schedule.

1. **Request Nos. 1-3 for Jose Ibarra Bucio.** Defendants have confirmed that they have not produced any documents regarding Mr. Ibarra Bucio, in response to Request Nos. 1-3, and requested Mr. Ibarra Bucio's A number, which Plaintiff has provided.

   Defendants' May 19, 2023 email appears to indicate that both ICE and OIG will conduct a subsequent search for Mr. Ibarra Bucio's A number, but please confirm that will do so, *as well as search his name and A number in all of the locations identified herein*. In addition to locations already searched (with Mr. Ibarra Bucio's name), please ensure that ICE searches its applicable Field Offices, which, at a minimum, should include the Adelanto and Los Angeles Field Offices (including searches of email accounts of ICE personnel involved in Mr. Bucio's case), as well as any offices responsible for communications with the media, the

1

OIG, the ICE Office of Professional Responsibility, and the Office of Chief Financial Officer, in addition to the "ERO Front Office" and IHSC. *See* Email from Jason Axe, May 18, 2023. Note that the information should include any SENs, SIRs, emails, documents, communications, investigatory reports, and any exhibits, appendices, and attachments, related to his hospitalization, death, decision to release from custody, or release from custody. Please provide a hit count of responsive records for Mr. Ibarra Bucio prior to our meeting on May 25.

2.   **Request No. 1-3 for Martin Vargas Arellano.** Defendants have confirmed that no unique search for records responsive to Plaintiff's FOIA request was conducted for Martin Vargas Arellano, but rather, produced records also provided in response to another requestor in the case *Martin Vargas v. U.S. ICE et al*., No. 5:22-cv-287-JWH-SP (C.D. Cal.).

Please conduct a search for documents responsive to Plaintiff's FOIA request, and outside the scope of the FOIA request in *Martin Vargas v. U.S. ICE et al*., No. 5:22-cv-287-JWH-SP (C.D. Cal.). Among documents that appear to be missing are documents referencing Mr. Vargas Arellano in the case *Hernandez Roman v. Wolf*, 5:20-cv-00768-TJH-PVC (C.D. Cal.), including but not limited to a Special Masters' Report dates July 16, 2021 and documents and information referenced therein. Further, to the extent ICE and OIG have not searched for documents utilizing Mr. Vargas Arellano's A#, please do so. Please provide a hit count of responsive records prior to our meeting on May 25.

Regarding the documents produced to date from the case *Martin Vargas v. U.S. ICE et al*., No. 5:22-cv-287-JWH-SP (C.D. Cal.), ICE indicated it would review the redactions in that case to ensure they do not contain non-exempt material, and would re-produce them accordingly. We asked that ICE do so by the May 2023 production deadline, but it indicated it may not be able to meet this deadline. Please indicate when ICE will do so.

3.   **Request Nos. 1-3.** Regarding the searches conducted for Martin Vargas Arellano, Teka Gulema, and Johana Medina Leon, please identify ICE's search locations and custodians (by name, and if subject to exemption, by title), and whether ICE's search locations included relevant Field Office staff (including a search of their email accounts) prior to our meeting on May 25.

4.   **Request Nos. 3-9.** Defendants have admitted that ICE has not conducted a search for these requests. Email from Joseph Tursi, Feb. 1, 2023, Defendants' March 29, 2023 Letter. Plaintiff has repeatedly asked that they do so. On April 14, 2023, Plaintiffs reiterated ICE's obligation to conduct these searches, and provided a proposed list of search terms and locations to identify records responsive to these requests.  We asked that that Defendants use them to conduct searches of all records systems searched thus far, as well as the additional locations identified. A month later, on May 16, 2023, ICE identified a global set of search terms it was "considering" utilizing to respond to these requests, and also identified two potential search locations including the "ERO Front Office" and IHSC. However, Defendants

indicated that "ICE has not finalized its views with respect to these search terms and locations," and sought Plaintiffs input on them.

As discussed on our call on May 18, 2023, because each request concerns unique types of records and locations, ICE's proposed search terms and locations are not narrowly tailored, fail to review specified sources and databases for search. For that reason, ICE should conduct a tailored search for each request, as detailed below. To the extent ICE does not agree to use the search terms and/or locations identified below, please provide us ICE's specific reasons for declining to do so as to each term and/or location.

**Boolean W/N Search Connector**. Consistent with Defendants' prior practice, Plaintiff has proposed that Defendants use Boolean W/N proximity search terms. On May 16, 2023, Defendants stated via email that "although you have suggested search terms that ask for words 'within x' of other words, ICE cannot conduct searches like that." Email from Jason Axe, May 17, 2023. On our May 18 call, we explained that we have good reason to believe this is not true, and you asked us to provide proof of that. First, Defendants have applied identical Boolean search functions in other FOIA cases, including those litigated by the ACLU. *See, e.g. ACLU v. DHS, ICE,* No. 1:20-cv-3204 (D.D.C.) (applying Boolean w/n search connector to "social w/2 (isolate* or distanc*) for FOIA request related to COVID-19 in ICE detention facilities). ICE uses the Relativity system as part of its review. *See* Exhibit A, Relativity Report for Tae Johnson, Oct. 21, 2021. Second, the Relativity system allows for use of the Boolean W/N proximity search function. *See* Boolean Connectors, https://www.relativity.com/relativity/Portals/0/Documents/7.5%20Documentation%20Help%20Site/Content/Relativity%20Searching/dtSearch/Search%20Syntax%20Options/Boolean%20connectors.htm (last visited May 19, 2023) ("When two expressions are connected by W/N, at least one of them must be a single word or phrase").

a. **Request No. 3.**
   - **Suggested search terms**: Teka Gulema, Johana Medina Leon, Jonathan Alberto Medina Leon, Jose Ibarra Bucio (and A# 204380214), and Martin Vargas Arellano
   - **Suggested search locations**: ICE Office of Professional Responsibility Reports of Investigation, ICE Field Offices in which these individuals were detained (including email accounts of ICE personnel tasked with overseeing these individuals)

b. **Request No. 4.**
   - **Suggested search terms:**
     o (directive or policy or policies or protocol or procedure or training or guidance or instruction or standard or detainee or custody) w/25 (death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency services" or "poor outcome" or "life support" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal)
     o (release or transfer or benefits or parole or alternative detention or discharge) w/25 (death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency services" or "poor outcome" or "life support" or coma or unconscious or ventilator or

"intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal)
  o humanitarian release

- **Suggested search locations**: ICE Enforcement and Removal Operations Front Office, ICE Health Service Corps
- **Please exclude**: Any version of ICE Detention standards (NDS 2000, PBNDS 2008, PBNDS 2011, NDS 2019), or ICE's COVID-19 Pandemic Response Requirements

c. **Request Nos. 5-8.**
  - **Suggested search terms:**
    o (detainee or custody) w/25 (death or died or deceased or surgery or specialist or hospital! or ambulance or "emergency room" or "emergency services" or "poor outcome" or "life support" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal)
    o (release or transfer or benefits or parole or alternative detention or discharge) w/25 (death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency services" or "poor outcome" or "life support" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal)
  - **Suggested search locations:** ICE Enforcement and Removal Operations Front Office, ICE Health Service Corp's Medical Case Management Unit, IHSC Field Medical Coordinators, ICE Office of Professional Responsibility, any staff responsible for creating or reviewing the Significant Detainee Illness Spreadsheet; ICE personnel responsible for reviewing Significant Incident Reports or Significant Event Notification Reports; any version of the Significant Detainee Illness Spreadsheet; Medical Transfer Summary documents from DHS's eHR system; and Alien Medical Records System

d. **Request No. 9:** Thank you for confirming in your May 19, 2023 email that, per Defendants' March 29, 2023 correspondence, that they will task ICE's Office of the Chief Financial Officer to search for responsive records. This search should include bills, invoices, charges, or records of payment that reflect payments made for healthcare for *any* detainee who was released from custody while hospitalized, or in the care of an external healthcare provider or facility, and communications about such bills, invoices, charges, or records of payment. These detainees include Martin Vargas Arellano, Teka Gulema, Jose Ibarra Bucio, and Johana Medina Leon, as well as any other such detainees. In addition to the Office of the Chief Financial Officer, the following is a list of locations ICE should search for documents responsive to this request:
  - **Suggested search locations:** ICE Office of Chief Financial Officer; IHSC (including staff responsible for reviewing medical claims). *See* Exhibit B (Excerpts of transcript of Jennifer Moon, *Coreas v. Bounds*, No. 8:20-cv-780 (D. Md.) (Sept. 15, 2021).

5. **Teka Gulema.** As noted in our May 8, 2023 letter, please inform us as to whether Defendants' scheduled production for May 2023 will include records dated later than November 6, 2015, and related to Mr. Gulema's release from custody.

6. **Email Threading and Production of Multiple Copies of Identical Material**. Plaintiff's FOIA request instructed the government to de-duplicate its search results to avoid producing "multiple copies of identical material." As we raised in our May 8, 2023 letter, ICE has produced at least 1140 pages that are email threads consisting of identical material. Pl. Letter, May 8, 2023. Plaintiff requested that Defendants apply email threading to Defendants' collection before review to eliminate emails that consist entirely of material duplicated in another email in the review set.

   Defendants suggest that *Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Justice*, No. 18-cv-007, No. 2020 WL 2735570 (D.D.C. May 26, 2020) "addresses the question regarding what a record is as that term applies to email threads." Email from Jason Axe, May 19, 2023. However, this misses the point: Plaintiffs do not object to the Defendants' production of entire email threads. Defendants "may not distinguish between responsive and non-responsive portions of a record, but instead must disclose the entirety of a responsive record 'as a unit.'" *Id.* at *3 (citation omitted). Rather, Plaintiff requests that Defendants apply threading and eliminating emails that consist entirely of material duplicated in another email in the review set. This is achievable by Defendants, as ICE uses the Relativity system as part of its review. *See* Exhibit A, Relativity Report for Tae Johnson, Oct. 21, 2021. The Relativity system allows for email threading to identify duplicates. *See* Email Threading, https://help.relativity.com/RelativityOne/Content/Relativity/Analytics/Email_threading.htm (last visited May 19, 2023).

7. **OIG.** As discussed in our September 2, 2022 and May 8, 2023 letters, as well as during our May 18, 2023 conference call, to the extent OIG has referred any responsive documents to ICE to for potential release to Plaintiff, OIG is obligated to identify those documents to Plaintiff.  During the May 18 call, and in Defendants' May 19, 2023 email, Defendants confirmed that OIG has indeed refereed responsive documents to ICE.  We appreciate OIG and ICE's commitment to comply with its obligations regarding those referred documents. However, we are confused by why they are unable to identify them to us at this time. Regardless of information about "whether those records were already processed, and if not, how many documents they are and when they will be processed," information we also ultimately seek, we also ask that OIG identify now the following information: dates OIG referred documents to ICE,  what requests they are responsive to, and how may pages were referred to ICE. This information is necessary to assess OIG and ICE's obligation to account for all responsive documents, timely process referrals and release responsive documents to Plaintiff.

8. **Increased Production Rate.** As discussed on our May 18 call, in light of Defendants numerous failures to meet its obligation to conduct basic searches reasonably likely to identify responsive documents, Plaintiff ask that for subsequent productions each of OIG and ICE increase their rate of production to 2,500 pages per month. Please respond whether Defendants will agree to do so, so that we can conclude this case in a timely manner.

Plaintiffs appreciate Defendants' response regarding these searches. Plaintiff will address other deficiencies in Defendants' production, including redactions, in future communications.

Sincerely,

LABONI A. HOQ (SBN 224140)
laboni@hoqlaw.com
HOQ LAW APC
P.O. Box 753
South Pasadena, California 91030
Telephone: (213) 973-9004

EUNICE CHO (pro hac vice)
echo@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
915 Fifteenth Street NW, 7th Floor
Washington, DC 20005
Telephone: (202) 548-6616

MICHAEL KAUFMAN (SBN 254575)
MKaufman@aclusocal.org
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West Eighth Street
Los Angeles, California 90017 Telephone:
(213) 977-9500
Facsimile: (213) 915-0219

KYLE VIRGIEN (SBN 278747)
kvirgien@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (202) 393-4930

*Attorneys for Plaintiff*

6



Exhibit A

# OPLA - GILD - ACLU Covid 21-00008
## Search Terms Report

**Report Name:** STR - 102121 - Tae Johnson       **Searchable Set:** Docs with Excluded Terms - Tae Johnson



## Results Summary

| Documents in searchable set | Total documents with hits | Total documents with hits, including Relativity Group ID | Total documents without hits |
| --- | --- | --- | --- |
| 144,929 | 3,774 | 9,168 | 135,761 |

EXHIBIT A

# OPLA - GILD - ACLU Covid 21-00008
## Search Terms Report

**Report Name:** STR - 102121 - Tae Johnson

**Searchable Set:** Docs with Excluded Terms - Tae Johnson



EXHIBIT A

## OPLA - GILD - ACLU Covid 21-00008
### Search Terms Report

**Report Name:** STR - 102121 - Tae Johnson

**Searchable Set:** Docs with Excluded Terms - Tae Johnson

## Terms Summary

| Term | Documents with hits | Documents with hits, including Relativity Group ID | Unique hits |
|------|---------------------|---------------------------------------------------|-------------|
| ((detain* OR detention OR facility OR center) W/10 COVID*) AND date(Oct 1 2020 to Oct 21 2021) | 3,774 | 9,168 | 3,774 |

Jennifer Moon - 9/15/2021
Case 2:22-cv-04760-SHK  Document 50-2  Filed 07/25/23  Page 74 of 219  Page ID #:467
Mauricio Coreas, et al. vs. Donna Bounds, et al.
EXHIBIT B

1

2

3              IN THE UNITED STATES DISTRICT COURT

4                 FOR THE DISTRICT OF MARYLAND

5     --------------------------------------------------------

6     MAURICIO COREAS, et al.,

7              Petitioners-Plaintiffs,

8                         Civil Action No. (L)TDC-20-780

9     v.

10    DONNA BOUNDS, et al.,

11             Respondents-Defendants.

12    --------------------------------------------------------

13             REMOTE VIDEOCONFERENCE DEPOSITION

14         The following is the deposition of

15    JENNIFER MOON, taken before Patricia K. Carl, RPR,

16    Notary Public, conducted virtually pursuant to Notice

17    of Taking Deposition, commencing at approximately

18    10:45 a.m., September 15, 2021.

19

20

21

22

23

24

25

Jennifer Moon - 9/15/2021
Case 2:22-cv-04760-SHK   Document 50-2   Filed 07/25/23   Page 75 of 219   Page ID #:1463
Mauricio Corcas, et al. vs. Donna Bounds, et al.                    EXHIBIT B

1          A.       Yeah, that is the report that we

2    mentioned earlier that is actually for public view on

3    the website.

4          Q.       Does that report track hospitalization?

5          A.       I haven't looked -- I am -- I don't

6    think that is on there.  I'm not sure.  I haven't

7    looked at it in a minute, but I don't think so.  I

8    don't think so.  I think the only place where we were

9    actually capturing the hospitalization is on the

10   Fraihat.

11         Q.       Ms. Moon, to the best of your knowledge

12   how many detainees in Maryland facilities have been

13   hospitalized?

14         A.       I don't know.

15         Q.       How many have been hospitalized, how

16   many at the Worcester County Detention Center?

17         A.       I don't know.

18         Q.       Do you know if there is a policy or

19   practice for releasing people from custody while

20   hospitalized?

21         A.       While hospitalized, is there a policy?

22   Not that I'm aware of.

23         Q.       Is there a practice?

24         A.       Has it happened, yes.

25         Q.       How often has that happened?

Jennifer Moon - 9/15/2021
Mauricio Coreas, et al. vs. Donna Bounds, et al.
Case 2:22-cv-04760-SHK   Document 50-2   Filed 07/25/23   Page 76 of 219   Page ID #:1469   B

1          A.      I don't know.

2          Q.      How do you know that has happened?

3          A.      Because we have patients -- because one

4    of the things that is within my preview is medical

5    claims, and so we try to ensure that hospitals and

6    community providers are reimbursed for the services

7    they provide.  And one thing that happens is when an

8    individual is no longer in custody, we are not legally

9    able to pay for their medical care.

10         Q.      You cannot pay for any of their medical

11   care even up to the point that the person was in

12   custody?

13         A.      When they are in custody we can, but

14   the moment that they are no longer in custody, we

15   cannot legally cover their medical care and services.

16         Q.      Even if the medical care was provided

17   during the point at which they were in custody?

18         A.      Correct.

19         Q.      So in that case who would be

20   responsible for the medical bill?

21         A.      Usually the hospitals will make

22   arrangements for them to be able to receive Medicade

23   or some other services that are available.

24         Q.      So it would be the patient?

25         A.      Correct.

Jennifer Moon - 9/15/2021
Mauricio Coreas, et al. vs. Donna Bounds, et al.
Case 2:22-cv-04760-SHK Document 50-2 Filed 07/25/23 Page 77 of 219 Page ID #:1570 EX. 11 B

```
 1          Q.     You said that you are responsible for
 2   medical claims.  How often have you seen the situation
 3   come up?
 4          A.     I don't know.
 5          Q.     More than five?
 6          A.     Over, let's see, in the past three
 7   years, maybe.  Yes.  Less than five maybe.  It doesn't
 8   happen often.
 9          Q.     When it does happen, why does it
10   happen?
11          A.     Again, we don't make custody
12   determinations.  So that would be a question for the
13   custody side for ERO.
14          Q.     Just so I'm clear, if a detainee is
15   admitted to a hospital for COVID 19, who pays that
16   bill?
17          A.     ICE pays the bill as long as they are
18   in ICE custody.
19          Q.     If the person is released, then
20   individual is responsible for the entire hospital
21   bill?
22          A.     Just for the dates that they are not in
23   custody.  We will cover it up until they are no longer
24   in custody.
25          Q.     Okay.  Just so I'm understanding this
```

Jennifer Moon - 9/15/2021
Case 2:22-cv-04760-SHK   Document 50-2   Filed 07/25/23   Page 78 of 219   Page ID #:1471
Mauricio Corcas, et al. vs. Donna Bounds, et al.                                    Ex. 1 B

1   clearly, if I were a patient with COVID-19, a detainee

2   with COVID-19 and was admitted on Sunday, I was

3   hospitalized for a week, but if ICE released me on

4   Wednesday, ICE would cover the bill from Sunday until

5   Wednesday, is that correct?

6          **A.       Correct.**

7          Q.       Then Thursday through Sunday I would be

8   responsible for the bill, is that correct?

9          **A.       Correct.**

10         Q.       Okay.  Let's turn to Page 24 of the

11  document which is Bates number 76.

12         **A.       Okay.**

13         Q.       Do you see the section titled COVID 19

14  Vaccine?

15         **A.       Yes.**

16         Q.       Looking at the line three of that

17  paragraph, you agree that "Detention facility staff

18  should contact their states COVID-19 vaccine resource

19  (i.e., state or county Department of Health) to obtain

20  vaccine," do you agree that is what the PR states?

21         **A.       Yes, that is what it states.**

22         Q.       How does ICE ensure all facilities

23  provide COVID vaccines to detainees?

24         **A.       Since publication of this version of**

25  **the PRR, ICE has made arrangements to obtain vaccine**

# EXHIBIT L



**Laboni Hoq <lhoq@hoqlaw.com>**

---

## ACLU Foundation of SoCal v. ICE et al. 2:22-cv-04760-SHK: REQUEST FOR STATUS CONFERENCE

---

**Axe, Jason (USACAC)** <Jason.Axe@usdoj.gov>                         Thu, May 25, 2023 at 3:41 PM
To: Eunice Cho <echo@aclu.org>, Laboni Hoq <lhoq@hoqlaw.com>
Cc: Michael Kaufman <mkaufman@aclusocal.org>, Kyle Virgien <kvirgien@aclu.org>

Eunice and Laboni,


Here is updated information from ICE responding to some of your inquiries:


1. After reviewing its records, ICE has determined that it already searched ERO Adelanto by name and A-number for records related to Mr. Vargas-Arellano. ICE does not believe any additional searches of field locations for records related to Mr. Vargas-Arellano would reasonably be expected to disclose responsive records. As for its re-review of the Vargas-Arellano records, ICE is working on providing me with an estimate as to how long that will take.


2. After reviewing its records, ICE has determined that it already searched ERO Adelanto by name and A-number for records related to Mr. Ibarra-Bucio. ICE does not believe any additional searches of field locations for records related to Mr. Ibarra-Bucio would reasonably be expected to disclose responsive records.


3. ICE is willing to work with you and your client to come up with agreed-upon search locations and search terms for a subsequent search.  Once we can reach agreement on those search locations and search terms, ICE can begin the subsequent search.  Some of the issues related to the subsequent search are as follows:
   a. Regarding your question about the Gulema records dated after November 6, 2015, ICE has identified another database requiring a search by A-number, which may contain a small amount of potentially responsive records, including records dated after November 6, 2015. A-numbers were not provided as part of the initial FOIA request. However, ICE has identified A-numbers for three of the named individuals and has conducted other searches using those numbers. But ICE has been unable to locate Johana Medina Leon's A-number, so if you have it, please forward it to me so I can share it with ICE. The search of this database can be included in the subsequent search.
   b. The ICE FOIA Office does not have the technology to conduct Boolean searches of records in the first instance.  Relativity is a possible tool utilized to identify responsive documents within a much larger number of hits resulting from a search. So, we will still need to reach agreement as to search terms and locations before ICE can consider whether using Relativity is needed to narrow the scope of the records identified.  Please review your May 19th letter and send us proposed search terms that would be used **prior** to any effort to filter those results in Relativity.


4. Regarding email threading, ICE is also looking into whether that can be done if Relativity is used in filtering the next search for documents. If it can, we would likely want to confirm with you in writing exactly what ICE would do to ensure that we have agreement as to that approach.

Finally, with respect to ICE, unfortunately the agency counsel who has been handling this case is moving to another division in ICE, and the case has been reassigned to a new attorney.  The new attorney has already been briefed on this case, and I am planning to speak with her tomorrow to further bring her up to speed so we can continue to respond to your recent inquiries and continue to move this case forward.


Thank you,


Jason K. Axe

Assistant U.S. Attorney

300 North Los Angeles St., Suite 7516

Los Angeles, CA  90012

(213) 894-8790

(213) 894-7819 (FAX)

---

**From:** Axe, Jason (USACAC)
**Sent:** Thursday, May 25, 2023 12:38 PM
**To:** 'Eunice Cho' <echo@aclu.org>; 'Laboni Hoq' <lhoq@hoqlaw.com>
**Cc:** 'Michael Kaufman' <mkaufman@aclusocal.org>; 'Kyle Virgien' <kvirgien@aclu.org>
**Subject:** RE: [EXTERNAL] Re: ACLU Foundation of SoCal v. ICE et al. 2:22-cv-04760-SHK: REQUEST FOR STATUS CONFERENCE


Eunice and Laboni,


Here is updated information from OIG:


1. OIG is conducting an additional search for records and anticipates completing that search before June 30th.  It intends to process up to 1000 pages per month and produce anything that is responsive based on this search, beginning on June 30th.
2. OIG conducted a search with Mr. Ibarra Bucio's A# but did not locate any records.
3. OIG conducted a search with Mr. Vargas Arellano's A# but did not locate any records.  OIG did locate a few pages of records in a search of his name and those are going to be reviewed.
4. Regarding the documents OIG referred to ICE, as indicated in their response letters to you, OIG originally referred 220 pages in November, 280 pages in December, and 9 pages in March. ICE is still trying to determine whether those documents were already processed, but out of an abundance of caution, OIG resent them to ICE for review to determine whether they were already processed or still need to be processed.


I am still working on getting information from ICE, and I should be able to send you an email either later today or tomorrow.


As for the draft stipulation, I will send it to you later today.  Unfortunately, my laptop issues came back this morning and I had to get another loaner.

Thank you,


Jason K. Axe

Assistant U.S. Attorney

300 North Los Angeles St., Suite 7516

Los Angeles, CA  90012

(213) 894-8790

(213) 894-7819 (FAX)

---

**From:** Axe, Jason (USACAC)
**Sent:** Wednesday, May 24, 2023 11:20 PM
**To:** Eunice Cho <echo@aclu.org>; Laboni Hoq <lhoq@hoqlaw.com>
**Cc:** Michael Kaufman <mkaufman@aclusocal.org>; Kyle Virgien <kvirgien@aclu.org>
**Subject:** RE: [EXTERNAL] Re: ACLU Foundation of SoCal v. ICE et al. 2:22-cv-04760-SHK: REQUEST FOR STATUS CONFERENCE


Laboni and Eunice,


I apologize, but I will not be able to participate in a call tomorrow.  However, I do anticipate providing you with additional information from OIG and ICE via email tomorrow, and I will send you the draft stipulation tomorrow.


Thank you,


Jason K. Axe

Assistant U.S. Attorney

300 North Los Angeles St., Suite 7516

Los Angeles, CA  90012

(213) 894-8790

(213) 894-7819 (FAX)

---

**From:** Eunice Cho <echo@aclu.org>
**Sent:** Tuesday, May 23, 2023 3:52 PM
**To:** Axe, Jason (USACAC) <JAxe@usa.doj.gov>; Laboni Hoq <lhoq@hoqlaw.com>
**Cc:** Michael Kaufman <mkaufman@aclusocal.org>; Kyle Virgien <kvirgien@aclu.org>
**Subject:** RE: [EXTERNAL] Re: ACLU Foundation of SoCal v. ICE et al. 2:22-cv-04760-SHK: REQUEST FOR STATUS CONFERENCE

Jason,

Thanks for alerting us to your computer issues. To the extent that you're unable to connect via zoom for our meeting on Thursday, here is dial-in information via phone.

May 25, 2023, 10:00 AM PT

1-888-788-0099, Access code: 421 378 9345#

Take care,

Eunice

**From:** Axe, Jason (USACAC) <Jason.Axe@usdoj.gov>
**Sent:** Tuesday, May 23, 2023 5:34 PM
**To:** Laboni Hoq <lhoq@hoqlaw.com>
**Cc:** Eunice Cho <echo@aclu.org>; Michael Kaufman <mkaufman@aclusocal.org>; Kyle Virgien <kvirgien@aclu.org>
**Subject:** RE: [EXTERNAL] Re: ACLU Foundation of SoCal v. ICE et al. 2:22-cv-04760-SHK: REQUEST FOR STATUS CONFERENCE

Laboni,

Thank you for agreeing to the briefing schedule.  I will send you a stipulation for your review today or tomorrow.  I am currently experiencing computer issues, and my work laptop is being worked on right now, so there may be a delay in my being able to get the stipulation to you.  As a result of these computer issues, I may not be able to have a call on Thursday.  But to the extent that I receive answers to your questions this week, I will email you with additional information.  I will let you know tomorrow afternoon if I am available for a call.

With respect to the proposed additional searches, we need to determine whether ICE can conduct the searches in the manner you have proposed. I will follow up with my ICE contact to see if he has learned anything further based on the information you provided.  If those searches cannot be done in that manner, we will need to reach an agreement regarding search terms without connectors.

Regarding the documents, you did not have access to that folder, but I have just added you to the folder. Please follow the instructions in the email you received and let me know if that now works for you.

Thank you,

Jason K. Axe

Assistant U.S. Attorney

300 North Los Angeles St., Suite 7516

Los Angeles, CA  90012

(213) 894-8790

(213) 894-7819 (FAX)


-----Original Message-----

From: Laboni Hoq <lhoq@hoqlaw.com>

Sent: Tuesday, May 23, 2023 2:04 PM

To: Axe, Jason (USACAC) <JAxe@usa.doj.gov>

Cc: Eunice Cho <echo@aclu.org>; Michael Kaufman <mkaufman@aclusocal.org>; Kyle Virgien <kvirgien@aclu.org>

Subject: Re: [EXTERNAL] Re: ACLU Foundation of SoCal v. ICE et al. 2:22-cv-04760-SHK: REQUEST FOR STATUS CONFERENCE


Hi Jason,


Thanks for your update regarding the status of Defendants' scheduled May production.  Eunice was able to access the production, but you are correct that I still haven't been able to do so because of various technical issues.  I may follow up with you under separate cover on that issue.


Regarding the briefing schedule, having conferred with our client, we agree to the proposed amended schedule for the parties' summary judgment briefing. Please send us your proposed stipulated amendment to the briefing schedule for our review and comment at your earliest convenience.


Regarding the supplemental search issues, we need to find a way to move this case forward, and work productively together. We are disappointed that you are not amenable to agreeing at this time to firm deadlines for Defendants to conduct a search with the revised, proposed terms and locations that Plaintiff has provided, provide a hit count of that search, and start and complete production of documents. Our efforts to negotiate search and production deadlines are firmly within the spirit of moving this case along.


We hope to continue our efforts to move forward during our scheduled call on Thursday. If we cannot come to an agreement on these deadlines, we think it would be appropriate to request a status conference to help the parties resolve these issues in the most expeditious manner possible.


Thanks.


On Mon, May 22, 2023 at 5:07 PM Axe, Jason (USACAC) <Jason.Axe@usdoj.gov> wrote:

>

> Laboni,

>

>

>

> The documents and cover letter were uploaded into USAFX earlier today.  Is that how you have been receiving them?  I see that Eunice has access to that system and folder, but it doesn't appear that you do.  Would you like me to add you to the system so you also have access?

>

>

>

> As for the stipulation, as I indicated below, if Plaintiff opposes entering into a stipulation, please give me its position as to an ex parte application that we will file this week seeking a continuance of the briefing schedule.

>

>

>

> Regarding Plaintiff's demands, Defendants are not prepared to enter into negotiations over continuing the briefing schedule. As I explained below regarding a hit count, ICE cannot estimate a hit count.  It can only provide numbers once a search has been conducted.  And as of today's date, the parties have not agreed to search terms.  ICE is reviewing your May 19th letter to see if it can conduct searches the way you have requested. However, your request that hit counts be provided by May 25th as to searches that have not yet been conducted before Plaintiff will consider stipulating to continue the upcoming deadlines is unreasonable.  Additionally, there are a number of other issues remaining that certainly will not be resolved by the deadline for Defendants to file their motion.

>

>

>

> To date, Defendants have endeavored to work with Plaintiff in good faith to resolve the issues in this case. In reviewing the history of this case and the D.C. case, with its substantially similar FOIA requests, it appears that Defendants in this litigation opted to attempt to work with your client to respond to the FOIA requests and resolve any outstanding issues rather than challenge with this Court the vague and overbroad nature of those requests.  However, it now appears that Defendants' failure to raise that threshold issue in this litigation has left the parties trying to negotiate search terms and search locations for FOIA requests that are too vague and overbroad to reasonably describe the records sought.

>

>

>

> Defendants remain willing to work with Plaintiff to resolve the issues related to the FOIA requests, as it appears that this Court would like the parties to do.  However, if Plaintiff is unwilling to work with Defendants without attempting to leverage an upcoming deadline to extract unreasonable concessions, it appears to me that Defendants must return to the Court to seek a resolution to what may be a fundamental issue precluding resolution of this action, i.e., that the requests themselves are exceedingly and impermissibly broad, as Defendants argued in the motion to dismiss filed in the D.C. case.  In an ex parte application seeking to continue the briefing schedule, Defendants would advise the Court of their intention to file a motion for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c), challenging the requests themselves, as they did in their motion to dismiss in the D.C. court (see attached).  Such a motion should be heard and resolved before summary judgment briefing because it raises threshold issues that might limit or even eliminate the need for further litigation before this Court. Filing a Rule 12(c) motion is not

my preferred approach.  But if Plaintiff is unwilling to agree to a reasonable request for a continuance of briefing deadlines, then that is the approach that Defendants will take.

>

>

> Therefore, please advise by tomorrow whether Plaintiff will stipulate to continue the briefing deadlines, or in the alternative, what its position is with respect to an ex parte application to continue the briefing deadlines so that Defendants can (a) continue their efforts to try to respond to the FOIA requests and (b) file a Rule 12(c) motion as to the requests that the parties continue to have issues with.

>

>

> Thank you,

>

>

>

> Jason K. Axe

>

> Assistant U.S. Attorney

>

> 300 North Los Angeles St., Suite 7516

>

> Los Angeles, CA  90012

>

> (213) 894-8790

>

> (213) 894-7819 (FAX)

>

>

>

> From: Laboni Hoq <lhoq@hoqlaw.com>

> Sent: Monday, May 22, 2023 2:47 PM

> To: Axe, Jason (USACAC) <JAxe@usa.doj.gov>

> Cc: Eunice Cho <echo@aclu.org>; Michael Kaufman

> <mkaufman@aclusocal.org>; Kyle Virgien <kvirgien@aclu.org>

> Subject: Re: [EXTERNAL] Re: ACLU Foundation of SoCal v. ICE et al.

> 2:22-cv-04760-SHK: REQUEST FOR STATUS CONFERENCE

>

>

>

> Hi Jason,

>

>

>

> Hope you had a good weekend. As an initial matter our co-counsel Kyle Virgien is on vacation until May 30, so he has not been able to weigh in on your proposed amended briefing schedule. However, we understand the need to see if we can come to an agreement on an amended briefing schedule before then.

>

>

>

> As you know, we remain concerned with Defendants' delay in adequately and timely completing their search for and production of documents.  Without a firm commitment to do so, we believe setting an amended briefing schedule would be premature. For this reason, we ask that Defendants at least commit to providing us hit counts for the terms we provided in our May 19, 2023 email by our meeting on May 25, 2023 and agree to commence monthly production from the supplemental searches by June 20, 2023. In light of Defendants' delayed search and production, and Defendants' repeated production of multiple copies of identical material, we also ask that ICE and OIG each agree to a processing rate of 2,500 pages per month. We also ask that Defendants commit to producing their Vaughn indices and search adequacy declarations three weeks prior to the commencement of summary judgement briefing.

>

>

>

> If Defendants agree to do so, we would be amenable to stipulate to the briefing schedule you propose (though we ask that you remain amenable to potential adjustments based on Kyle's schedule if need be. I have a trial starting September 19, which may impact the schedule as well if he is also unavailable).

>

>

>

> Please let us know if you are amenable to a stipulation along these lines.  Please also let us know when we can expect Defendants' May production, which was technically due yesterday I believe (though we appreciate that was a Sunday).

>

>

>

> Thanks.

>

>

>

> On Fri, May 19, 2023 at 3:44 PM Axe, Jason (USACAC) <Jason.Axe@usdoj.gov> wrote:

>

> Laboni,

>

>

>

> Thank you for your letter.  I will forward it to ICE and OIG and work on getting answers for you and your client. In briefly reviewing it, though, I think it is fairly obvious that the additional tasks needed to be accomplished to answer your questions and address Plaintiff's concerns cannot be completed prior to the current briefing deadline.  So, please let me know by Tuesday of next week Plaintiff's position regarding stipulating to the new dates I have proposed below.  If Plaintiff opposes entering into a stipulation, please give me its position as to an ex parte application that we would file seeking the continuance of the briefing schedule set forth below (or a modified one, based on any changes you ask us to make to accommodate your schedule).

>

>

>

> Thanks again, and I wish you a good weekend as well.

>

>

>

> Jason K. Axe

>

> Assistant U.S. Attorney

>

> 300 North Los Angeles St., Suite 7516

>

> Los Angeles, CA  90012

>

> (213) 894-8790

>

> (213) 894-7819 (FAX)

>

>

>

> From: Laboni Hoq <lhoq@hoqlaw.com>

> Sent: Friday, May 19, 2023 3:07 PM

> To: Axe, Jason (USACAC) <JAxe@usa.doj.gov>

> Cc: Eunice Cho <echo@aclu.org>; Michael Kaufman

> <mkaufman@aclusocal.org>; Kyle Virgien <kvirgien@aclu.org>

> Subject: Re: [EXTERNAL] Re: ACLU Foundation of SoCal v. ICE et al.

> 2:22-cv-04760-SHK: REQUEST FOR STATUS CONFERENCE

>

>

>

> Hi Jason,

>

>

>

> Thanks for your follow up emails. Taking them into account, I am attaching the letter we promised to provide you at our meet and confer call yesterday.

>

>

>

> Regarding your proposed amended briefing schedule, a few of our co-counsel are not available to address it today so we will need to get back to you about it early next week.

>

>

>

> Have a good weekend.

>

>

>

> On Fri, May 19, 2023 at 1:27 PM Axe, Jason (USACAC) <Jason.Axe@usdoj.gov> wrote:

>

> Eunice and Laboni,

>

>

>

> Following up on my emails below:

>

>

>

> ICE will conduct a search of the Office of the Chief Financial Officer to see if there are any responsive records related to the four named individuals.

>

>

>

> Regarding the OIG referred records, it is taking a bit longer than we had hoped to nail down information about them, but ICE and OIG are working together to be able to provide information to you about whether those records were already processed, and if not, how many documents they are and when they will be processed.

>

>

>

> Regarding a hit count, to be clear, ICE cannot estimate a hit count.  It can only provide numbers once a search has been conducted.  Once we have settled on search terms, I can find out how long it will take to do those searches and get back to you. We will then have a hit count and can have further discussions regarding (a) narrowing the scope of the search, if that is needed, or (b) how many documents ICE can process per month related to that search.

>

>

>

> ICE's May production is undergoing the last stages of review.  After you receive it, please review it and let me know if you have continuing questions regarding the Gulema records (or any other questions).

>

>

>

> I will touch base with ICE and OIG to identify exactly what searches they are prepared to do now (e.g., the A# and Office of Chief Financial Officer search) and their estimate as to how long those searches will take and get back to you.

>

>

>

> Based on the additional searches to be done, along with the continuing discussions regarding search terms and the need to discuss redactions, this case certainly is not ready to proceed to briefing.  I understand that you would like additional information prior to stipulating to contining the existing dates, but realistically, all remaining tasks will take at least two months, if not longer, to continue working out these issues.  Therefore, I am requesting that your client stipulate to continue the upcoming deadlines as follows:

>

>

>

> Deadline

>

> Current Date

>

> Proposed Date

>

> Defendant's MSJ Due

>

> 6/6/23

>

> 8/7/23

>

> Plaintiff's Opposition and Cross-Motion Due

>

> 6/20/23

>

> 8/28/23

>

> Defendant's Opposition to Cross-Motion and Reply Due

>

> 7/5/23

>

> 9/18/23

>

> Plaintiff's Sur-Reply Due

>

> 7/18/23

>

> 10/9/23

>

>

>

> For the proposed dates, I suggested three weeks between the deadlines because, at least with respect to the first two, I will be out of the office on annual leave between August 14-25, so I wouldn't be able to look at the brief until I return.  For the remaining two deadlines, if you prefer two weeks rather than three between them, we could move them up to 9/11/23 and 9/25/23.

>

>

>

> Please advise whether these dates are acceptable or propose alternative dates.  Obviously, depending on how many documents are identified during the searches, we may need to adjust these dates again.  But for now, it is clear that briefing cannot reasonably commence on June 6th, so we should take steps now to move the dates.

>

>

>

> Thank you,

>

>

>

> Jason K. Axe

>

> Assistant U.S. Attorney

>

> 300 North Los Angeles St., Suite 7516

>

> Los Angeles, CA  90012

>

> (213) 894-8790

>

> (213) 894-7819 (FAX)

>

>

>

> From: Axe, Jason (USACAC)

> Sent: Thursday, May 18, 2023 1:51 PM

> To: Eunice Cho <echo@aclu.org>; Laboni Hoq <lhoq@hoqlaw.com>

> Cc: Michael Kaufman <mkaufman@aclusocal.org>; Kyle Virgien

> <kvirgien@aclu.org>

> Subject: RE: [EXTERNAL] Re: ACLU Foundation of SoCal v. ICE et al.

> 2:22-cv-04760-SHK: REQUEST FOR STATUS CONFERENCE

>

>

>

> Eunice and Laboni,

>

>

>

> As we discussed on our call, in response to your questions:

>

>

>

> ICE is proposing to search the "ERO Front Office," not the "ICE Front Office."  The ERO Front Office consists of ERO's HQ-level management.  Field office staff would be included in the field office search.

>

>

>

> With respect to Mr. Ibarra Bucio, the search you described below was already conducted for his name. ICE will conduct a similar search using his A-number.

>

>

>

> ICE is interested in Plaintiff's opinion as to additional terms and locations if Plaintiff believes the proposed terms would not yield any documents responsive to the request.  Please send me proposed terms and locations that I can share with ICE for their review.

>

>

>

> Regarding Request #9, I will get back to you when I hear back from agency counsel.  If the agency agreed to specific terms for a search of the Office of the Chief Financial Officer, please let me know.  Was the suggestion to search for the names of the four individuals?

>

>

>

> Thank you,

>

>

>

> Jason K. Axe

>

> Assistant U.S. Attorney

>

> 300 North Los Angeles St., Suite 7516

>

> Los Angeles, CA  90012

>

> (213) 894-8790

>

> (213) 894-7819 (FAX)

>

>

>

> From: Eunice Cho <echo@aclu.org>

> Sent: Tuesday, May 16, 2023 5:19 PM

> To: Axe, Jason (USACAC) <JAxe@usa.doj.gov>; Laboni Hoq

> <lhoq@hoqlaw.com>

> Cc: Michael Kaufman <mkaufman@aclusocal.org>; Kyle Virgien

> <kvirgien@aclu.org>

> Subject: RE: [EXTERNAL] Re: ACLU Foundation of SoCal v. ICE et al.

> 2:22-cv-04760-SHK: REQUEST FOR STATUS CONFERENCE

>

>

>

> Hi Jason,

>

> Thank you for your email, and for this information. Let's meet tomorrow, May 17, 2023 at 2:30 pm PT, as previously discussed. A zoom link is: https://urldefense.com/v3/__https://protect2.fireeye.com/v1/url?k=86a89dd5-d933a50c-86afb930-ac1f6b01751a-78d2853c659f22ec&q=1&e=df1ce0cb-4f31-4c4a-a46d-cd493db8b9ec&u=https*3A*2F*2Faclu.zoom.us*2Fj*2F4213789345__;JSUlJSU!!Phyt6w!bqVoHD-KXodc6-Tul1rRVD_d8eqdBKXxfhBGN3dl4AfsPwMY2qM134dC6CWPPrLAl_LWw0QDKML9cBM9$. Please confirm that you will be available.

>

>

>

> We are reviewing the proposed terms and locations from ICE's search below, and have a few initial questions. We will likely have additional items for clarification during our call tomorrow.

>

> What constitutes the "ICE Front Office"? Does it include ICE Field Office staff?

> Jose Ibarra Bucio. Please have the applicable Field Offices (which should, at a minimum, include the Adelanto and Los Angeles Field Offices), as well as any offices responsible for communications with the media, and the ICE Office of Professional Responsibility conduct a search for Mr. Jose Ibarra Bucio and A#204380214, in addition to the "ICE Front Office" and IHSC. Note that the information should include any SENs, SIRs, emails, and documents and communications related to his custody and decision to release him from custody.

> Search Terms and Locations. We appreciate ICE's response to the proposed search terms. We can discuss additional terms and locations, as it appears that the terms that ICE has proposed would not yield any documents responsive to the specific and narrowly-tailored requests we made. For example, the current

suggested terms and locations would not target COVID-related documents, SIRs, SENs, medical transfer summary documents from the eHR system and Alien Medical Records System, or the Significant Detainee Illness Spreadsheet.

> Request #9. Can you report on ICE's promise to search the records of the Office of the Chief Financial Officer? How many documents has this search uncovered, or has the search not yet been conducted?

>

>

>

> Please confirm that you are able to meet tomorrow at 2:30 pm PT.

>

>

>

> Thank you,

>

> Eunice

>

>

>

>

>

> Eunice Hyunhye Cho

>

> Pronouns: she/hers

>

>

>

> Senior Staff Attorney

>

> National Prison Project

>

> American Civil Liberties Union

>

> 915 15th St. NW, Washington, DC 20005

>

> 202.548.6616 | echo@aclu.org

>

> aclu.org

>

>

>

> This message may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply email that this message has been inadvertently transmitted to you and delete this email from your system.

>

>

>

>

>

>

>

> From: Axe, Jason (USACAC) <Jason.Axe@usdoj.gov>

> Sent: Tuesday, May 16, 2023 7:22 PM

> To: Laboni Hoq <lhoq@hoqlaw.com>

> Cc: Eunice Cho <echo@aclu.org>; Michael Kaufman

> <mkaufman@aclusocal.org>; Kyle Virgien <kvirgien@aclu.org>

> Subject: RE: [EXTERNAL] Re: ACLU Foundation of SoCal v. ICE et al.

> 2:22-cv-04760-SHK: REQUEST FOR STATUS CONFERENCE

>

>

>

> Laboni, Thank you for your email. I have conferred with ICE counsel

> and have information from ICE, but I need to speak further with OIG

> counsel tomorrow morning (she is on the east coast) to answer your

> questions regarding OIG. For now, I can

>

>

>

> Laboni,

>

>

>

> Thank you for your email.  I have conferred with ICE counsel and have information from ICE, but I need to speak further with OIG counsel tomorrow morning (she is on the east coast) to answer your questions regarding OIG.  For now, I can provide the following responses:

>

>

>

> (1) Thank you for providing Mr. Ibarra Bucio's A#.  Although his name has already been searched through IHSC and the applicable field offices, ICE is proposing to search "204380214" within the ERO Front Office and IHSC, on the chance that any locations previously searched for Mr. Bucio's name will yield documents under his A#.

>

>

>

> (2) I have been advised that the May 2023 ICE document release will contain more documents regarding Mr. Gulema.  I am not aware yet whether any of those documents post-date November 6, 2015, but we should know the answer to that question soon. If they do not, we will look into that issue.

>

>

>

> (3) As we discussed on the telephone the other day, ICE has been withholding duplicates of documents, but unfortunately, their system does not enable them to automatically remove documents that are part of email threads.  But as you requested, I passed along that suggestion to ICE.  Neither they, you, or our office is interested in processing/reviewing more documents that anyone needs to.

>

>

>

> (4) I have reviewed your April 14, 2023 letter, and I now have a greater appreciation for the issue regarding the delay by ICE in responding to your request for search terms.  First, although you have suggested search terms that ask for words "within x" of other words, ICE cannot conduct searches like that. Additionally, a request that "ICE Enforcement and Removal Operations" search for records could potentially encompass the records of over 7,000 employees in 25 field offices.  Nonetheless, ICE has reviewed your letter and is considering the following search terms and search locations:

>

>

>

> Proposed search terms:

>

> "humanitarian release"

>

> "intensive care"

>

> "ICU"

>

> "life support"

>

> "hospice"

>

> "palliative"

>

> "fatal"

>

> "critical condition"

>

> "coma"

>

> "unconscious"

>

> "ventilator"

>

> "death"

>

> "died"

>

> "deceased"

>

> "decedent"

>

> "ambulance"

>

> "discharge"

>

> "emergency room"

>

> "emergency services"

>

>

>

> Proposed search locations:

>

> ERO Front Office

>

> IHSC

>

>

>

> ICE has not finalized its views with respect to these search terms and locations, but because you have asked for ICE's thoughts at this point, I am forwarding them to you for your comments.  My understanding is that once ICE has finalized its search terms and locations, it would conduct a search and report back to us how many documents were identified and approximately how long it would take to process them.  Please review these proposed terms and locations and let us know your thoughts so we can engage in further dialogue about them.

>

>

>

> As for OIG, I will get back to you with more information tomorrow.

>

>

>

> Thank you,

>

>

>

> Jason K. Axe

>

> Assistant U.S. Attorney

>

> 300 North Los Angeles St., Suite 7516

>

> Los Angeles, CA  90012

>

> (213) 894-8790

>

> (213) 894-7819 (FAX)

>

>

>

> -----Original Message-----

>

> From: Laboni Hoq <lhoq@hoqlaw.com>

>

> Sent: Monday, May 15, 2023 9:18 AM

>

> To: Axe, Jason (USACAC) <JAxe@usa.doj.gov>

>

> Cc: Eunice Cho <echo@aclu.org>; Michael Kaufman

> <MKaufman@aclusocal.org>; Kyle Virgien <kvirgien@aclu.org>; Tursi,

> Joseph (USACAC) <JTursi@usa.doj.gov>; Medrano, Alarice (USACAC)

> <AMedrano@usa.doj.gov>

>

> Subject: [EXTERNAL] Re: ACLU Foundation of SoCal v. ICE et al.

> 2:22-cv-04760-SHK: REQUEST FOR STATUS CONFERENCE

>

>

>

> Dear Jason,

>

>

>

> Based on our meet and confer conversations to date, we plan to identify the following anticipated disputes to the Court:

>

>

>

> 1. ICE's failure to timely search for records responsive to Plaintiff's FOIA Request Nos. 3-9 consistent with the scheduling order, including its failure to (a) agree to the search parameters (including search terms and locations) for these requests, and (b) identify hit counts for this search necessary to allow the parties to reasonably discuss any changes to the summary judgment briefing schedule set to commence on June 6, 2023. Notably, Plaintiff sent proposed search parameters to Defendants one month ago, on April 14, 2023, and Defendants have failed to provide any response, despite Plaintiff's diligent and repeated inquiry.

>

>

>

> 2. Defendants' failure to timely search for records responsive to Plaintiff's FOIA Request No. 1-3 as to deceased detainee Jose Ibarra Bucio, consistent with the scheduling order. As discussed on May 12, Defendants have not produced any documents regarding Mr. Ibarra Bucio, despite plentiful evidence that such records exist, and ICE has represented that its May 2023 production will not include any documents related to him.

>

>

>

> While we appreciate that Defendants are still considering our requests, their failure to provide any response to the proposed search terms and locations, confer upon and agree to search parameters, and provide hit counts coupled with an impending summary judgment briefing schedule, warrant court intervention.

>

>

>

> If Defendants can commit to providing Plaintiff this information for both of the above-referenced disputes by Tuesday, we would be open to further meet and confer on Wednesday, May 17 at 9 am or after 2:30 pm ET before seeking a status conference. If parties cannot come to agreement at that stage, Plaintiff will continue to seek a status conference with the court.

>

>

>

> Thanks.

>

>

>

>

>

> On Fri, May 12, 2023 at 5:44 PM Axe, Jason (USACAC) <Jason.Axe@usdoj.gov> wrote:

>

> >

>

> > Eunice and Laboni,

>

> >

>

> >

>

> >

>

> > First, it was nice to make your acquaintance today.

>

> >

>

> >

>

> > Second, from the tone of the clerk's email, I think that she is suggesting that before getting the Court involved, the parties should make sure that they have worked out whatever issues they can on their own and only bring to the Court's attention an actual "dispute."  From our call today, I am not aware of any actual disputes between the parties.  I have identified action items for the agencies, as to which I expect to provide you replies next week.  I also did not hear you opposed to continuing the motion filing deadline based on my entry into this case and the remaining action items for Defendants.  Therefore, I would suggest that we hold off on seeking a status conference until we have a bit more information from the agencies answering your questions.

>

> >

>

> >

>

> >

>

> > Thank you,

>

> >

>

> >

>

> >

>

> > Jason K. Axe

>

> >

>

> > Assistant U.S. Attorney

>

> >

>

> > 300 North Los Angeles St., Suite 7516

>

> >

>

> > Los Angeles, CA  90012

>

> >

>

> > (213) 894-8790

>

> >

>

> > (213) 894-7819 (FAX)

>

> >

>

> >

>

> >

>

> > From: SHK Chambers <SHK_Chambers@cacd.uscourts.gov>

>

> > Sent: Friday, May 12, 2023 5:17 PM

>

> > To: Laboni Hoq <lhoq@hoqlaw.com>

>

> > Cc: Michael Kaufman <MKaufman@aclusocal.org>; Eunice Cho

>

> > <echo@aclu.org>; Kyle Virgien <kvirgien@aclu.org>; Tursi, Joseph

>

> > (USACAC) <JTursi@usa.doj.gov>; Medrano, Alarice (USACAC)

>

> > <AMedrano@usa.doj.gov>; Axe, Jason (USACAC) <JAxe@usa.doj.gov>

>

> > Subject: RE: ACLU Foundation of SoCal v. ICE et al. 2:22-cv-04760-SHK:

>

> > REQUEST FOR STATUS CONFERENCE

>

> >

>

> >

>

> >

>

> > Good Evening Counsel,

>

> >

>

> >

>

> >

>

> > Can you let me know if there is a dispute? and if so, a brief description of what the dispute is about?

>

> >

>

> >

>

> >

>

> > Or a brief description on why a status conference is necessary?

>

> >

>

> >

>

> >

>

> >

>

> >

>

> >

>

> >

>

> >

>

> >

>

> > Thank you,

>

> >

>

> > Dana

>

> >

>

> >

>

> >

>

> >

>

> >

>

> >

>

> >

>

> >

>

> >

>

> >

>

> >

>

> > From: Laboni Hoq <lhoq@hoqlaw.com>

>

> > Sent: Friday, May 12, 2023 2:24 PM

>

> > To: SHK Chambers <SHK_Chambers@cacd.uscourts.gov>; Dana Cisneros

>

> > <Danalyn_Castellanos@cacd.uscourts.gov>

>

> > Cc: Michael Kaufman <MKaufman@aclusocal.org>; Eunice Cho

>

> > <echo@aclu.org>; Kyle Virgien <kvirgien@aclu.org>; Tursi, Joseph

>

> > (USACAC) <Joseph.Tursi@usdoj.gov>; Medrano, Alarice (USACAC)

>

> > <Alarice.Medrano@usdoj.gov>; Jason.Axe@usdoj.gov

>

> > Subject: ACLU Foundation of SoCal v. ICE et al. 2:22-cv-04760-SHK:

>

> > REQUEST FOR STATUS CONFERENCE

>

> >

>

> >

>

> >

>

> > CAUTION - EXTERNAL:

>

> >

>

> >

> 

> > 

> 

> > Dear Ms. Castellanos,

> 

> > 

> 

> > 

> 

> > 

> 

> > The Parties have been meeting and conferring about various issues in the case, and request a Status Conference with the Court to address various matters.  The Parties propose that each side will file a status report two business days in advance of the status conference to update the Court on the status of the case and identify issues they would like it to address.

> 

> > 

> 

> > 

> 

> > 

> 

> > The following are the dates the Parties propose for the Status Conference:

> 

> > 

> 

> > 

> 

> > 

> 

> > Mon. 5/22: anytime

> 

> > 

> 

> > Tues. 5/23: 9-12, after 1 pm PT

>

> >

>

> > Wed. 5/24: 9-12, after 3 pm PT

>

> >

>

> > Thurs. 5/25: 10-11 PT

>

> >

>

> >

>

> >

>

> > Please let us know if the Court needs any further information to consider this request.

>

> >

>

> >

>

> >

>

> > Thank you.

>

> >

>

> >

>

> >

>

> > --

>

> >

>

> > Laboni A. Hoq

>

> >

>

> > Hoq Law APC

>

> >

>

> > P.O. Box 753

>

> >

>

> > South Pasadena, CA 91030

>

> >

>

> > Telephone: 213-973-9004

>

> >

>

> > https://urldefense.com/v3/__https://protect2.fireeye.com/v1/url?k=80436a26-dfd85371-80444ec3-ac1__;!!Phyt6w!bqVoHD-KXodc6-TuI1rRVD_d8eqdBKXxfhBGN3dl4AfsPwMY2qM13 4dC6CWPPrLAl_LWw0QDKDIskQxv$

> > f6

>

> > b017516-cc611ed7784ea94c&q=1&e=e7c8bd41-1610-40e8-90ee-20f755444698&

> > u=

>

> > http%3A%2F%2Fwww.hoqlaw.com%2F

>

> >

>

> > CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

>

> >

>

> >

EXHIBIT M

June 1, 2023

Jason Axe
Alarice Medrano
United States Attorney's Office
Central District of California
300 N. Los Angeles St. Suite 7516
Los Angeles, CA 90012
Jason.Axe@usdoj.gov
Alarice.Medrano@usdoj.gov

**SENT VIA EMAIL**

> Re:    *ACLU of Southern California v. United States Immigration and Customs Enforcement, et al.,* No. 2:22-cv-4760 (C.D. Cal.)

Dear Jason,

Thank you for the May 25, 2023 follow-up information on the status of OIG and ICE's searches. Related to our May 19, 2023 correspondence, we provide the following responses, including those related to supplemental searches for Defendants.

Further, as discussed below, we remain concerned about the pace of Defendants' responses to the outstanding issues with their FOIA responses to date. Therefore, despite our willingness to continue to work collaboratively with Defendants to overcome these issues, we believe it is time to schedule a status conference with the Court. Among other things, we will ask the Court to address our current disputes about search issues and a reasonable production schedule, including setting a briefing schedule on these issues if necessary.

## I.    **Outstanding Searches**

You have requested that Plaintiff provide Defendants with revised search terms and locations. Regarding additional search locations, we reiterate that the appropriate search locations for ICE's searches should include the terms and locations identified below.

Regarding search terms, thank you for explaining the sequence in which ICE is able to conduct terms and connector searches using a Relativity database. In response to your request that Plaintiff provide initial search terms without terms and connectors to identify that universe of documents that may be imported into Relativity database, Plaintiff has proposed those terms below. Plaintiff has also proposed Boolean search terms to further narrow responsive documents in Relativity. Please conduct a search as specified below, and provide hit counts for each

category of search locations with the Boolean search, so that we may further collaborate on narrowing terms for production.

To the extent Defendants object to these terms, or proposes others/alternatives, we ask that we schedule a call with ICE and/or its IT staff to negotiate the final list of terms, and production schedule.  As we have mentioned previously, this would be the most efficient way to timely complete the supplemental searches. Given the lengthy delays we have experienced in obtaining responsive documents in this case, as documented in our prior correspondence, we believe this approach to the supplemental searches is appropriate.

Regarding the issue of Defendants' production of duplicative emails as a result of email threading, we agree to your proposal that once the universe of documents is loaded into the Relativity database, Defendants will propose an approach to exclude production of duplicate emails, and the parties will agree in writing on how to implement that proposal.

Regarding the timing of ICE's production of records based on these supplemental searches, we reiterate our request that it agree to resume monthly production of documents on June 20, 2023, at a production rate of 2,500 pages per month.  Given the unjustified delays in its searches and productions to date, we believe it is appropriate for ICE to prioritize this case in this way.

**A. OIG:** ***Request No. 2.***

1. Please identify the scope of the additional search OIG is now conducting, including the search terms and locations it is searching.

2. Mr. Ibarra Bucio: Did OIG search his name, in addition to his A#? In which locations did it search for his documents?

3. Mr. Vargas Arellano: Did OIG not initially search his name? In which locations did OIG conduct the search for his records that has now turned up the additional documents mentioned in your May 25, 2023 email?

**B. ICE**

*1. Request No. 1.*

Thank you for your update noting that ICE has identified "another database" requiring a search by A-number, which may include records dated after November 6. 2015. Please identify this database, consistent with the Court's February 9, 2023 order, and whether ICE will search it for both A#s as well as the names of the four decedents referenced in Plaintiff's FOIA request.

Regarding other search locations for Request No. 1, as discussed below, it appears ICE has not searched any of the following locations we specified for each of the four decedents referenced in Plaintiff's FOIA request: ERO Los Angeles Field Office, Office of Public Affairs, ERO's Front Office, ICE Office of Professional Responsibility ("OPR"), and ICE Health Service Corps ("IHSC"). For the reasons discussed below, we again ask that ICE do so.

      a. *Teka Gulema*

Upon review of the documents released by ICE thus far, it is clear that the agency has not conducted an adequate search for records related to Mr. Teka Gulema. Although ICE has provided periodic reports maintained by the agency regarding Mr. Gulema's hospitalization, these conclude at October 19, 2015, well before his release from custody and death. Please provide any Significant Event Notification ("SEN") records and Significant Incident Reports ("SIR") related to Mr. Gulema, specifically those dated after October 19, 2015. We also request all records and communications related to Mr. Gulema from any Significant Detainee Illness ("SDI") meetings, including emails, spreadsheets, and meeting notes. Please also provide any records related to Mr. Gulema's release, including any communications of ICE Health Service Corps ("IHSC") staff, Field Medical Coordinators, ICE Enforcement and Removal Operations ("ERO"), and any agency staff responsible for reviewing the SDI spreadsheet, regarding Mr. Gulema.

      b. *Johana Medina Leon*

You have represented that Defendants are unable to locate Johana Medina Leon's A-number, and have asked Plaintiff to provide it to you. We are not currently in possession of Medina Leon's A number and will provide it to you if we obtain it. However, Defendants are far better equipped to locate the A number, for the reasons stated below. We therefore request that ICE redouble its efforts to locate Medina Leon's A number so that it can complete relevant searches for records.

By way of suggestions as to how best to do so, Defendants should refer to OIG Case Number 119-ICE ERO ELP-16066, which should include Medina Leon's A number in the case file as a matter of course. Indeed, several documents referred to in Defendants' production would provide Medina Leon's A number. *See, e.g.* December 2022 OIG production p. 58-59 (referring to emails and parole documents prepared by ICE in the OIG case file); *Id.* page 68 (referring to Notice to Appear ("NTA") paperwork and Form I-94 for Medina Leon).

We further request that ICE conduct a search for the name "Jonathan Alberto Medina-Leon," Ms. Medina Leon's former name,[1] to locate the A number and associated records, and produce such records to the extent ICE has not done so thus far. In addition, it appears that Medina

---

[1] As previously noted, Ms. Medina Leon was transgender.

Leon's A number is present (although redacted) in documents already produced by Defendants. *See, e.g.* December 2022 OIG Production; page 99; 101. We further note that Defendants have failed to provide emails and parole documents related to Medina Leon's release referred to in these records and request their production. *Id.*

    c.   Mr. Jose Ibarra Bucio

You have represented that ICE has searched only the ERO Adelanto Field Office for records related to Mr. Jose Ibarra Bucio, and have not otherwise located any records. The scope of ICE's search, and this conclusion, are unreasonable, particularly as the Adelanto Detention Center, where Mr. Ibarra Bucio was detained, was under the jurisdiction of the ERO Los Angeles Field Office at the time of his death. Indeed, it is clear that some records must have existed regarding Mr. Ibarra Bucio. For example, USA Today reported that Lori Haley, an employee of the ICE Office of Public Affairs, provided a statement regarding Mr. Ibarra Bucio's death to reporters. The same article noted that DHS left a notice in Mr. Ibarra's hospital room indicating that he had been released on his own recognizance (while comatose), two weeks after he had collapsed at the Adelanto Detention Center.[2]

Plaintiff reiterates its request that Defendants search the ERO Los Angeles Field Office, ICE's Office of Public Affairs (including all records and communications of Ms. Lori Haley), ERO's Front Office, ICE Office of Professional Responsibility ("OPR"), ICE Office of the Chief Financial Officer, and IHSC, including IHSC Medical Case Management Unit Medical Care Coordinators, for records related to Mr. Ibarra Bucio, and his A#, which Plaintiff has provided. Such records should also include all SEN, SIR, and SDI reports, as well as emails, documents, communications, investigatory reports, and exhibits, appendices, and attachments related to Mr. Ibarra Bucio.

If ICE is declining to conduct these searches, please identify the location-specific reasons for Defendants' decision, or please certify to the Court that Defendants have no records related to Mr. Ibarra Bucio in their possession, and the reason why such records no longer exist, including whether or not Defendants have destroyed documents related to Mr. Ibarra Bucio.

    d.   *Mr. Vargas Arellano*:

Regarding ICE's position as referenced in your May 25 email that searching "field locations" other than ERO Adelanto would not "reasonably be expected to disclose responsive records," we ask for further basis for this conclusion.  We also ask that ICE clarify whether or not it will

---

[2] Rebecca Plevin, *Adelanto Moves to Revisit Ending Contract for Troubled Immigration Detention Facility*, USA Today, Apr. 12, 2019, https://www.usatoday.com/story/news/politics/immigration/2019/04/11/adelanto-wants-revisit-decision-ending-immigrant-detention-facility-contract/3437933002/.

search the other locations identified in Plaintiff's May 19, 2023 correspondence, including: ICE's Office of Public Affairs, ERO's Front office ICE OPR, and IHSC.

ICE's apparent refusal to search all relevant field locations and the other locations referenced in our May 19 correspondence is inconsistent with the facts and circumstances of ICE's handing of Mr. Vargas Arellano's case.  As mentioned in the FOIA request, Mr. Vargas Arellano's death garnered much media attention requesting a statement from ICE, which would have resulted in records responsive to Plaintiff's FOIA request. Further, his death was the subject of a Special Master report in *Hernandez-Roman v. Wolf,* No. 5:20-cv-769 (C.D. Cal.), which relied on information in ICE's possession, presumably in the above-referenced locations. However, neither that report nor the underlying information appears to have been produced in this case. Despite these facts, if ICE is declining to search the above-referenced locations, or other locations it is obliged to search to locate and produce such responsive records, please provide location-specific reasons for this position.

Regarding ICE's "re-view" of records withheld from its response to another FOIA request regarding Mr. Vargas Arellano (*Martin Vargas v. U.S. ICE et al.*, No. 5:22-cv-287-JWH-SP (C.D. Cal.), we look forward to your update as to when ICE will complete its review and production.

### 3. Request No. 4

- **Non-Boolean Search Terms, Locations, and Boolean Search Terms in Relativity:**
  - **Search Terms #4**: Plaintiff proposes the following non-case sensitive terms: [3] Directive; Policy or policies; Protocol; Procedure; Training; Guidance; Instruction; Standard; Detainee; Custody; Death; Died; Deceased; Decedent; Discharge; Surgery; Specialist; COVID-19; Hospital; Ambulance; "Emergency Room"; "Emergency Services"; "Poor Outcome"; "Life Support"; "Offsite Referral"; Coma; Unconscious; Ventilator; "Intensive Care"; "Medical Observation"; ICU; "Critical Condition"; Hospice: Palliative; Fatal; "Humanitarian Release".
  - **Search Locations #4**: ICE Enforcement and Removal Operations Front Office; ICE Health Service Corps
  - **Boolean Search in Relativity #4:** After the Search is conducted, please use Relativity to conduct the following Boolean search of the recovered records: (directive or policy or policies or protocol or procedure or training or guidance or

---

[3] Defendants have suggested searching the following terms on May 16, 2023: "humanitarian release"; "intensive care"; "ICU"; "life support"; "hospice"; "palliative"; "fatal"; "critical condition"; "coma"; "unconscious"; "ventilator"; "death"; "died"; "deceased"; "decedent"; "ambulance"; "discharge"; "emergency room"; "emergency services". Email from Jason Axe, May 16, 2023. These terms are incorporated above.

instruction or standard) AND (custody or death or died or deceased or decedent or discharge or surgery or specialist or COVID-19 or hospital or ambulance or "emergency room" or "emergency services" or "poor outcome" or "life support" or "offsite referral"; or coma or "offsite referral" or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal) AND (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian)

o **Please exclude:** Any version of ICE Detention Standards (NDS 2000, PBNDS 2008, PBNDS 2011, NDS 2019), or ICE's COVID-19 Pandemic Response Requirements

4. **Requests Nos. 5-8**

   o **Search Terms #5-8**: Plaintiff proposes the following non-case sensitive terms: death; died; deceased; decedent; surgery; specialist; hospital!; ambulance; "emergency room"; "emergency services"; "poor outcome"; "life support"; "offsite referral"; coma; unconscious; ventilator; "intensive care"; "medical observation"; ICU; "critical condition"; hospice; palliative; fatal; humanitarian release; discharge.

   o **Search locations #5-8**:

- ISHC Medical Case Management Unit Medical Care Coordination Program staff[4]
- Significant Detainee Illness Spreadsheets;
- Records of any and all participants in ICE and/or IHSC's Significant Detainee Illness meetings;
- Medical transfer summary documents from DHS's eHR System;
- Medical transfer summary documents from the Alien Medical Records System:
- Spreadsheets regarding hospitalization or release compiled for or utilized in *Fraihat v. ICE*, No. 5:19-cv-1546;
- ICE ERO staff in communication with IHSC Medical Case Management Unit;
- ICE ERO Significant Event Notifications
- ICE ERO Significant Incident Reports
- ICE Office of Professional Responsibility

---

[4] *See* DHS, *Healthcare Costs for Noncitizens in Detention: FY 2020 Report to Congress* 29 (2022), https://www.dhs.gov/sites/default/files/2022-06/ICE%20-%20Healthcare%20Costs%20for%20Noncitizens%20in%20Detention.pdf (noting that IHSC's Medical Case Management Unit Medical Care Coordination Program oversees care for ICE detainees who are on the Significantly Ill list; and that MCCs "obtain patient care updates from field staff and report SDIs to IHSC leadership, the ICE legal staff, and ICE Enforcement and Removal Operations personnel.").

- o **Boolean Searches in Relativity #5-8:**
  - ▪ (detainee or custody) AND (custody or death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal) AND (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian)
  - ▪ (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian) AND (custody or death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal)
  - o **Specific instructions: Please provide a hit count of responsive documents for each category of search locations**

5. **Request No. 9:**
  - • **Search Terms #9**: bill!; invoice!; charges; payment; benefits; discharge; transfer; release or custody; Medicare; PRUCOL; Martin Vargas Arellano, Teka Gulema, Jose Ibarra Bucio, Johana Medina Leon, Jonathan Alberto Medina Leon
  - • **Search Locations #9**
    - o Resource Management Unit Staff, IHSC: emails and records
    - o ICE Office of the Chief Financial Officer
  - • **Boolean Searches in Relativity #9:**
  - • (bill!; invoice!; charges; payment; benefits) AND (discharge or transfer or custody or release or Medicare or PRUCOL or Martin Vargas Arellano or Teka Gulema or Jose Ibarra Bucio or Johana Medina Leon or Jonathan Alberto Medina Leon)

## II.   <u>Scheduling Conference</u>

While we appreciate your efforts in addressing the issues we have raised regarding the adequacy of Defendants' searches to date, it seems the parties are at an impasse on a few issues.  Again, while we remain willing to work collaboratively with Defendants to narrow these issues, it appears that there is impasse on at least a few issues which need to be resolved now. We therefore plan to seek a status conference with the Court to present the following issues for the Court's intervention and/or guidance to ensure this case moves forward expeditiously.

June 1, 2023
Page 8

As we discussed previously, we will also ask that the parties each be permitted to file a status report two business days before the status conference to update the Court on our respective positions on the following issues:

1. ICE Search parameters: ICE's refusal to conduct a search according to provided search terms and locations;

2. Commencement of production: Defendants' deadline by which they will begin monthly production of documents in response to the supplemental searches;

3. Pace of production: ICE and OIG's refusal to agree to an increased production schedule of 2,500 pages per month;

The following are the dates we plan to propose for the status conference. Please let us know which of these dates work for you by **Monday June 5**.

Tues. June 20: 9, 11, and after 1 pm PT
Wed. June 21: 9, 11, and after 2:30 pm PT
Thurs. June 22: 10-1, after 2 pm PT
Friday, June 23: 9, 11, and after 1pm PT

Sincerely,

LABONI A. HOQ (SBN 224140)
laboni@hoqlaw.com
HOQ LAW APC
P.O. Box 753
South Pasadena, California 91030
Telephone: (213) 973-9004

EUNICE CHO (pro hac vice)
echo@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
NATIONAL PRISON PROJECT
915 Fifteenth Street NW, 7th Floor
Washington, DC 20005
Telephone: (202) 548-6616

MICHAEL KAUFMAN (SBN 254575)
MKaufman@aclusocal.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, California 90017 Telephone:
(213) 977-9500
Facsimile: (213) 915-0219

KYLE VIRGIEN (SBN 278747)
kvirgien@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
NATIONAL PRISON PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (202) 393-4930

*Attorneys for Plaintiff*

# EXHIBIT N



**Laboni Hoq <lhoq@hoqlaw.com>**

---

## ICE Hidden Death FOIA: Correspondence re Defendants' Searches

**Axe, Jason (USACAC)** <Jason.Axe@usdoj.gov>                    Tue, Jun 6, 2023 at 12:51 PM
To: Laboni Hoq <lhoq@hoqlaw.com>
Cc: Michael Kaufman <MKaufman@aclusocal.org>, Eunice Cho <echo@aclu.org>, Kyle Virgien <kvirgien@aclu.org>

Laboni,

Thank you for your June 1st letter.  My agency contacts are reviewing it, and we will get back to you with a detailed response.

Your letter also asks for a response regarding my availability for a status conference with the Court due to what you have described as an impasse on the following three issues:

> 1. ICE Search parameters: ICE's refusal to conduct a search according to provided search terms and locations;

> 2. Commencement of production: Defendants' deadline by which they will begin monthly production of documents in response to the supplemental searches;

> 3. Pace of production: ICE and OIG's refusal to agree to an increased production schedule of 2,500 pages per month;

Defendants' position is that there is not currently a need for a status conference because there is not currently an impasse as to any of these issues.

First, ICE has not **refused** to conduct any searches. ICE is working with you and your client to come up with mutually agreeable search terms to identify documents that may not have already been located during ICE's previous searches. ICE is reviewing the proposed search terms and locations in your June 1st letter.  Therefore, it is confusing why you would be at the end of that same letter assert that the parties are now at an impasse.  ICE will respond to your proposal, and therefore the parties are not at an impasse with respect to the scope of any new search.

Second, Defendants have not **refused** to identify a deadline by which they will begin monthly production of documents. OIG will process 1,000 pages/month, as previously ordered and agreed, and will produce any responsive records on June 30th, and the last day of the month thereafter. OIG currently anticipates completing its production of records by August 31, 2023, although this is an anticipated date, based on the page count as it currently stands. OIG conducted an additional search in EDS of the narrative field for the four individuals, which is in addition to the previous search of the subject/complainant field in EDS. Also, OIG conducted an email search of two additional Special Agents who were the case agents for two investigations that resulted in responsive records. These agents are no longer with the agency which is why they had to be searched separately. As for ICE, its agency counsel was recently informed by the FOIA office that there remain approximately 40,000 pages to be processed.  These documents come from the original search of IHSC, and it appears that they have not been previously processed.  Some of these documents may address your concerns regarding alleged deficiencies in what has been produced to date in that they appear to be responsive to request #1.  ICE will continue processing these documents monthly per the Court's order, with the next production scheduled for June 21st. As to any documents identified in a subsequent search, ICE will process those documents on a monthly basis as well.

Third, in the Joint Report of Conference of Parties, Defendants proposed processing 500-750 pages per month and Plaintiff proposed that Defendants process 3,000 pages per month.  The Joint Report noted that the defendants had "**initially** identified approximately 8,050 pages of potentially responsive records," suggesting that additional pages might be identified. In its Case Management Order, the Court required ICE and OIG to "review and process no less than 1,000 pages per month."  Therefore, the issue of the pace of production has already been considered and determined by the Court, and thus there is no impasse.


Based on the fact that the parties are not currently at an impasse as to any issue, a status conference is not needed, and that is the position Defendants will take with the Court.  To the extent that Plaintiff still wishes to request a status conference, I appreciate your asking about my availability.  I will be on annual leave from June 12-16, so the dates that would work better for me are June 22nd and June 23rd.


Thank you,


Jason K. Axe

Assistant U.S. Attorney

300 North Los Angeles St., Suite 7516

Los Angeles, CA  90012

(213) 894-8790

(213) 894-7819 (FAX)

[Quoted text hidden]

# EXHIBIT O



**Laboni Hoq <lhoq@hoqlaw.com>**

## ICE Hidden Death FOIA: Correspondence re Defendants' Searches

**Axe, Jason (USACAC)** <Jason.Axe@usdoj.gov>                    Fri, Jun 9, 2023 at 11:32 AM
To: Laboni Hoq <lhoq@hoqlaw.com>
Cc: Michael Kaufman <MKaufman@aclusocal.org>, Eunice Cho <echo@aclu.org>, Kyle Virgien <kvirgien@aclu.org>, "Tursi, Joseph (USACAC)" <Joseph.Tursi@usdoj.gov>

Laboni,

I have further information from ICE in response to your June 1st letter.

For Request #1, regarding the additional database requiring a search by A number, ICE will be happy to conduct a search of the A numbers of the four decedents referenced in your FOIA request. (ICE has obtained the A number of Mr. Leon.) Please note that the additional 41,000 pages that remain to be processed will likely contain the information that you are seeking pertaining to the decedents, specifically, SEN records, emails, meeting notes, and communications.

Regarding Requests #4-8, ICE recommends using the same search terms for all these requests for ease of tasking to different program offices. You proposed nearly 40 search terms; however, many of these terms are overly broad and would likely result in producing thousands of non-related records. ICE proposes the following search terms:

1.    "Directive" and "death"

2.    "Emergency Services" and "detainee"

3.    "death" and "protocol"

4.    Death

5.    Died

6.    Deceased

7.    Decedent

8.    "Poor Outcome"

9.    "Life Support"

10.    "Offsite Referral"

11.    Unconscious

12.    Ventilator

13.    "Intensive Care"

14.    Fatal

15.    "Humanitarian Release"

Once ICE obtains the records produced from the search terms, the records can be put into Relativity and the requested Boolean connectors will be run as follows:

-(detainee or custody) AND (custody or death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal) AND (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian)

-(release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian) AND (custody or death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal)

-(directive or policy or policies or protocol or procedure or training or guidance or instruction or standard) AND (custody or death or died or deceased or decedent or discharge or surgery or specialist or COVID-19 or hospital or ambulance or "emergency room" or "emergency services" or "poor outcome" or "life support" or "offsite referral"; or coma or "offsite referral" or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal) AND (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian)

Regarding search locations, ICE will need the specific names and titles of the custodians you wish to conduct the searches within the ERO Front Office, IHSC, and the Los Angeles Field Office.  If Plaintiff does not know that information, ICE can work with ERO to recommend custodians.  It should be noted that OPR would not possess information responsive to #6 and #7 as they do not maintain SIR's or SENs. ERO would have this information and will be tasked accordingly.

Also, regarding #5 and #9, to obtain the requested information, IHSC would need specific names of non-citizens for these inquiries. With specific names, they can request information on anyone detained by ICE that was hospitalized and then they can review custody dates to check for release dates. However, they cannot provide a generalized list nor can they provide any information if the inquiry involves non-citizens who were in CBP, BP, or OFO custody. That information would need to be requested from CBP.

Regarding bills and invoices requested in #9, the Office of Veterans Affairs would maintain this information. The VA runs a query on all claims for ICE before they pay the claims based on custody status or other administrative checks, however they don't keep a comprehensive list on file.

The Office of the Chief Financial Officer has already been tasked to search for records pertaining to the 4 decedents.

As you know, I will be on leave from June 12-16, but I will be checking emails and can forward requests for clarification or responses to ICE to continue our discussions.

Thank you,

Jason K. Axe

Assistant U.S. Attorney

300 North Los Angeles St., Suite 7516

Los Angeles, CA  90012

(213) 894-8790

(213) 894-7819 (FAX)

---

**From:** Laboni Hoq <lhoq@hoqlaw.com>
**Sent:** Thursday, June 1, 2023 3:30 PM
**To:** Axe, Jason (USACAC) <JAxe@usa.doj.gov>
**Cc:** Medrano, Alarice (USACAC) <AMedrano@usa.doj.gov>; Michael Kaufman <MKaufman@aclusocal.org>; Eunice Cho <echo@aclu.org>; Kyle Virgien <kvirgien@aclu.org>
**Subject:** [EXTERNAL] ICE Hidden Death FOIA: Correspondence re Defendants' Searches

Dear Jason,

[Quoted text hidden]

EXHIBIT P



**Laboni Hoq <lhoq@hoqlaw.com>**

---

## RE: [EXTERNAL] Re: ACLU Foundation of SoCal v. ICE et al. 2:22-cv-04760-SHK: REQUEST FOR STATUS CONFERENCE

**Axe, Jason (USACAC)** <Jason.Axe@usdoj.gov>                    Sat, Jun 10, 2023 at 12:07 AM
To: SHK Chambers <SHK_Chambers@cacd.uscourts.gov>
Cc: Michael Kaufman <MKaufman@aclusocal.org>, Laboni Hoq <lhoq@hoqlaw.com>, Eunice Cho <echo@aclu.org>, Kyle Virgien <kvirgien@aclu.org>, "Tursi, Joseph (USACAC)" <Joseph.Tursi@usdoj.gov>, "Medrano, Alarice (USACAC)" <Alarice.Medrano@usdoj.gov>

Ms. Castellanos,

On June 1, 2023, Plaintiff's counsel sent me the attached letter with questions regarding the outstanding searches and requesting my availability for a status conference.

On June 6, 2023, I replied with the attached email advising that a status conference was not needed because the parties were not at an impasse as to any issues, and I would reply with more information after consulting with my agency contacts. I also advised that I would be on annual leave from June 12-16.

On June 9, 2023, after receiving additional information from the agency defendants, I sent the attached email to Plaintiff's counsel addressing, among other things, Plaintiff's proposed search terms.

Plaintiff's counsel did not reply to my email from earlier today regarding ICE's response to Plaintiff's proposed search terms.  Instead, after the close of business today, knowing that I am scheduled for annual leave next week, Plaintiff's counsel sent the email below to you requesting a status conference.

Defendants oppose any request at this point for a status conference as unnecessary and not a reasonable use of the Court's time.   The parties have not reached an impasse, despite Plaintiff's representations to the contrary, including in the attached June 1st letter, which contains Plaintiff's proposed search terms for requests 4-9 and then *within the same letter* concludes that the parties are at an impasse with respect to an agreement as to search terms.

To the extent that Plaintiff believes that the parties are at an impasse, it may be because ICE is struggling to work with Plaintiff's overbroad FOIA requests. In July 2021, the ACLU submitted a FOIA request to ICE and OIG that was substantially similar to the one in this case.  In October 2021, the ACLU filed an action in the District Court for the District of Columbia challenging the failure of ICE and OIG to respond to the FOIA request.  *See ACLU v. DHS, et al.*, 1:21-cv-02627-TJK. In response, the defendants filed a motion to dismiss, arguing in part that the ACLU's FOIA requests were too vague and overbroad to reasonably describe the records sought.  That motion was fully briefed and was pending before the district court when the *ACLU of Southern California*, in April 2022, submitted its substantially similar FOIA request to ICE and OIG. With the D.C. District motion still undecided, the *ACLU* filed a notice of voluntary dismissal on June 28, 2022 and the *ACLU of Southern California* filed this action on July 12, 2022.

In this litigation, despite being presented with virtually the same vague and overbroad requests that were the subject of a motion to dismiss in the D.C. court, Defendants here have worked, and are continuing to work, with Plaintiff to reach an agreement as to search terms that can be utilized to resolve Plaintiff's issues.  While these discussions are ongoing, as Plaintiff notes below, Defendants are continuing to process and review documents for production.  Indeed, to date, Defendants have fully complied with the Court's February 9, 2023 Case Management Order.

If the Court is inclined to set a status conference to try to address the issues in this case, I would request that the status conference occur on or after June 27, 2023.  I would also request that the Court order Plaintiff to first file a status report identifying exactly what impasses exist and allow Defendants to file a response one week later so that I may have sufficient time to confer with my agency counsel after I return from my annual leave.


Thank you,


Jason K. Axe

Assistant U.S. Attorney

300 North Los Angeles St., Suite 7516

Los Angeles, CA  90012

(213) 894-8790

(213) 894-7819 (FAX)

---

**From:** Laboni Hoq <lhoq@hoqlaw.com>
**Sent:** Friday, June 9, 2023 5:09 PM
**To:** SHK Chambers <SHK_Chambers@cacd.uscourts.gov>
**Cc:** Michael Kaufman <MKaufman@aclusocal.org>; Eunice Cho <echo@aclu.org>; Kyle Virgien <kvirgien@aclu.org>; Tursi, Joseph (USACAC) <JTursi@usa.doj.gov>; Medrano, Alarice (USACAC) <AMedrano@usa.doj.gov>; Axe, Jason (USACAC) <JAxe@usa.doj.gov>
**Subject:** [EXTERNAL] Re: ACLU Foundation of SoCal v. ICE et al. 2:22-cv-04760-SHK: REQUEST FOR STATUS CONFERENCE


Dear Ms. Castellanos,


Plaintiff ACLU SoCal is following up on its request that the Court schedule a status conference in this FOIA case. Plaintiff respectfully requests that the Court schedule a status conference, for which all parties are available on June 22 or 23, 2023 at the below-specified times.


In response to the Court's inquiry as to why a status conference is necessary, after conferral with Defendants, Plaintiff identifies the following issues on which it seeks the Court's guidance and/or intervention, so that the parties can prosecute this case in an expeditious manner consistent with the scheduling order and current summary judgment briefing schedule. *See* Dkts. 40, 43. Defendants have indicated that they do not believe a status conference is warranted at this time, and have provided Plaintiff reasons for that position, which they will relay to the Court if needed. Plaintiff has taken Defendants' position into consideration, but believes a status conference is necessary for the reasons set forth below.


**1.       Setting a Deadline for ICE to Complete Search for and Production of Documents Responsive to FOIA Request Nos. 3-9**: Pursuant to the scheduling order in this case, Dkt. 40, Defendants were required to produce responsive documents on a monthly basis, and complete their productions by May 2023.

In the course of reviewing those monthly productions, Plaintiffs determined, and Defendant ICE admitted, that it did not conduct any search for documents responsive to Plaintiff's Request Nos. 3-9.  Over the past four months, Defendant ICE has agreed to conduct supplemental searches. However, the pace of these negotiations has been marred by significant delay on the part of Defendant ICE. Defendant ICE's continued delay in agreeing to search parameters, without any commitment to a deadline to complete these searches, leaves Plaintiffs without any assurance that Defendant ICE will complete the searches expeditiously in time to comply with the continued summary judgment briefing schedule and trial date in the case. Notably, Defendants recently sought an extension to continue summary judgment briefing from June to September 2023.  While Plaintiff agreed to this schedule as a courtesy to Defendants' new counsel who took over the case unexpectedly, Plaintiff believes that the Court's assistance will be necessary to ensure that Defendant ICE conducts its productions on a schedule that will permit the parties to comply with this extended deadline. For these reasons, Plaintiff asks that Defendant ICE be subject to a deadline to conduct a search and complete its supplemental productions in light of the extended deadlines entered by this Court, particularly in light of the impending trial date of January 17, 2024.


**2.** **Increasing Defendants' Rate of Production to Meet Scheduling Deadlines**: At the outset of this case, Defendants informed Plaintiff and the Court that they "initially identified approximately 8,050 pages of potentially responsive records (with ICE FOIA identifying approximately 5,550 pages and DHS-OIG identifying approximately 2,500 pages)." Dkt. 28 at p. 11. On that basis, the parties agreed to a production rate of 1,000 pages per month by each Defendant, which would have allowed for summary judgment briefing beginning in June of 2023. Defendants recently informed Plaintiff that this estimate drastically undercounted the number of documents they located responsive to the FOIA request. For example, ICE recently disclosed on June 6, 2023 that it has inexplicably failed to review and produce responsive documents from another set of 40,000 documents obtained from its initial search for documents responsive to Request Nos. 1-4, despite committing to produce those by May 2023. Dkt. 40. When Defendant ICE rectifies its failure to conduct searches for FOIA requests 3-9, discussed above, this will add an unknown but significant number of documents to the universe for processing.


Plaintiffs will be asking that for documents responsive to Requests # 3-9, Defendants OIG and ICE agree to a supplemental, expedited production schedule of at least 2,500 pages each, per month. Plaintiffs will also request that for all production, prior to processing documents, that Defendants conduct de-duplication and email threading to ensure that Defendants do not continually produce duplicative documents, as has been the case in its earlier production.


While the Court ordered Defendants to process 1,000 pages of documents each per month, Dkt. 40, that production rate was based on a compromise between the parties. *See* Dkt. 36-40. It took into account the anticipated universe of responsive documents Defendants disclosed at that time relative to the summary judgment briefing schedule the parties also agreed to at that time. *Id*. In other words, Plaintiffs agreed to withdraw their request that Defendants produce 3,000 pages each per month, *see* Dkt. 28 at p. 13, in exchange for Defendants' commitment to review at a rate that would permit summary judgment briefing to commence in June 2023. Dkt. 40. Again, without an expedited production schedule, it is highly unlikely ICE will be able to complete its production of these documents in time to commence summary judgment briefing in August 2023. In sum, because of Defendants' admitted failure to conduct adequate searches and timely produce responsive documents without good cause, it is Plaintiff's position that Defendants should be subject to an expedited production schedule for Requests Nos. 3-9 of at least 2,500 pages each per month, with prior de-duplication and threading.

To provide the Court with sufficient information to address these issues, Plaintiff proposes the parties each submit a status report to elaborate on the issues raised above within two business days of the date the Court sets for the status conference, or an earlier date convenient for the Court. Notwithstanding their position that a status conference is not needed at this time, Defendants' counsel has indicated he is available for a status conference on the following dates if the Court decides to set one: June 22, 2023 from 10 am to 1 pm, and after 2 pm; or June 23, 2023, at 9 am, 11 am and after 1 pm.

Please let us know if the Court needs anything further to consider our request for a status conference.

Thank you.

On Mon, May 15, 2023 at 12:22 PM Laboni Hoq <lhoq@hoqlaw.com> wrote:

> Dear Ms. Catellanos,
>
> In response to your request, the Parties are meeting and conferring so we can precisely identify for the Court the issues in dispute and the need for a status conference.  We hope to follow up with this information by tomorrow.
>
> Thank you.
>
> On Fri, May 12, 2023 at 5:16 PM SHK Chambers <SHK_Chambers@cacd.uscourts.gov> wrote:
> > Good Evening Counsel,
> >
> >
> > Can you let me know if there is a dispute? and if so, a brief description of what the dispute is about?
> >
> >
> >
> > Or a brief description on why a status conference is necessary?
> >
> >
> >
> >
> >
> >
> >
> >
> > Thank you,
> >
> > Dana
> >
> >
> >
> >
> >
> >
> >

>

>

> From: Laboni Hoq <lhoq@hoqlaw.com>
> Sent: Friday, May 12, 2023 2:24 PM
> To: SHK Chambers <SHK_Chambers@cacd.uscourts.gov>; Dana Cisneros <Danalyn_Castellanos@cacd.uscourts.gov>
> Cc: Michael Kaufman <MKaufman@aclusocal.org>; Eunice Cho <echo@aclu.org>; Kyle Virgien <kvirgien@aclu.org>; Tursi, Joseph (USACAC) <Joseph.Tursi@usdoj.gov>; Medrano, Alarice (USACAC) <Alarice.Medrano@usdoj.gov>; Jason.Axe@usdoj.gov
> Subject: ACLU Foundation of SoCal v. ICE et al. 2:22-cv-04760-SHK: REQUEST FOR STATUS CONFERENCE

>

>

> CAUTION - EXTERNAL:

>

>

> Dear Ms. Castellanos,

>

>

> The Parties have been meeting and conferring about various issues in the case, and request a Status Conference with the Court to address various matters.  The Parties propose that each side will file a status report two business days in advance of the status conference to update the Court on the status of the case and identify issues they would like it to address.

>

>

> The following are the dates the Parties propose for the Status Conference:

>

>

> Mon. 5/22: anytime

>

> Tues. 5/23: 9-12, after 1 pm PT

>

> Wed. 5/24: 9-12, after 3 pm PT

>

> Thurs. 5/25: 10-11 PT

>

>

> Please let us know if the Court needs any further information to consider this request.

>

>

> Thank you.

>

>

> --

>

> Laboni A. Hoq

>

> Hoq Law APC

>

> P.O. Box 753

>

> South Pasadena, CA 91030

>

> Telephone: 213-973-9004

>

> www.hoqlaw.com

>

> CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening
attachments or clicking on links.
>
>

**3 attachments**

**2023-06-01 Response to Gov 5.25.23 emails re ICE and OIG searches.pdf**
225K

**2023-06-06 Email from Jason Axe.pdf**
163K

**2023-06-09 Email from Jason Axe.pdf**
164K

# EXHIBIT Q



**Laboni Hoq <lhoq@hoqlaw.com>**

---

## RE: [EXTERNAL] Re: ACLU Foundation of SoCal v. ICE et al. 2:22-cv-04760-SHK: REQUEST FOR STATUS CONFERENCE

---

**Axe, Jason (USACAC)** <Jason.Axe@usdoj.gov>                    Sat, Jun 10, 2023 at 12:15 AM
To: Laboni Hoq <lhoq@hoqlaw.com>
Cc: Michael Kaufman <MKaufman@aclusocal.org>, Eunice Cho <echo@aclu.org>, Kyle Virgien <kvirgien@aclu.org>, "Tursi, Joseph (USACAC)" <Joseph.Tursi@usdoj.gov>, "Medrano, Alarice (USACAC)" <Alarice.Medrano@usdoj.gov>

Laboni,


Please let me know when you are available when I return from my annual leave, i.e, on either June 21, 22, or 23, for a Local Rule 7-3 Conference.  Defendants intend to file a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) challenging the requests themselves, as was done in the D.C. court via a motion to dismiss.  We will continue working with you to try to resolve as many issues as we can related to the requests and the documents that have been produced to date.  But in light of your representations to the Court below, it is clear that we will need this Court to rule on whether the requests, as they were presented to Defendants, are too vague and overbroad to reasonably describe the records sought.


Thank you,


Jason K. Axe

Assistant U.S. Attorney

300 North Los Angeles St., Suite 7516

Los Angeles, CA  90012

(213) 894-8790

(213) 894-7819 (FAX)

---

**From:** Laboni Hoq <lhoq@hoqlaw.com>
**Sent:** Friday, June 9, 2023 5:09 PM
**To:** SHK Chambers <SHK_Chambers@cacd.uscourts.gov>
**Cc:** Michael Kaufman <MKaufman@aclusocal.org>; Eunice Cho <echo@aclu.org>; Kyle Virgien <kvirgien@aclu.org>; Tursi, Joseph (USACAC) <JTursi@usa.doj.gov>; Medrano, Alarice (USACAC) <AMedrano@usa.doj.gov>; Axe, Jason (USACAC) <JAxe@usa.doj.gov>
**Subject:** [EXTERNAL] Re: ACLU Foundation of SoCal v. ICE et al. 2:22-cv-04760-SHK: REQUEST FOR STATUS CONFERENCE


Dear Ms. Castellanos,


Plaintiff ACLU SoCal is following up on its request that the Court schedule a status conference in this FOIA case. Plaintiff respectfully requests that the Court schedule a status conference, for which all parties are available on June 22 or 23, 2023 at the below-specified times.

In response to the Court's inquiry as to why a status conference is necessary, after conferral with Defendants, Plaintiff identifies the following issues on which it seeks the Court's guidance and/or intervention, so that the parties can prosecute this case in an expeditious manner consistent with the scheduling order and current summary judgment briefing schedule. *See* Dkts. 40, 43. Defendants have indicated that they do not believe a status conference is warranted at this time, and have provided Plaintiff reasons for that position, which they will relay to the Court if needed. Plaintiff has taken Defendants' position into consideration, but believes a status conference is necessary for the reasons set forth below.

**1.      Setting a Deadline for ICE to Complete Search for and Production of Documents Responsive to FOIA Request Nos. 3-9**: Pursuant to the scheduling order in this case, Dkt. 40, Defendants were required to produce responsive documents on a monthly basis, and complete their productions by May 2023.

In the course of reviewing those monthly productions, Plaintiffs determined, and Defendant ICE admitted, that it did not conduct any search for documents responsive to Plaintiff's Request Nos. 3-9.  Over the past four months, Defendant ICE has agreed to conduct supplemental searches. However, the pace of these negotiations has been marred by significant delay on the part of Defendant ICE. Defendant ICE's continued delay in agreeing to search parameters, without any commitment to a deadline to complete these searches, leaves Plaintiffs without any assurance that Defendant ICE will complete the searches expeditiously in time to comply with the continued summary judgment briefing schedule and trial date in the case. Notably, Defendants recently sought an extension to continue summary judgment briefing from June to September 2023.  While Plaintiff agreed to this schedule as a courtesy to Defendants' new counsel who took over the case unexpectedly, Plaintiff believes that the Court's assistance will be necessary to ensure that Defendant ICE conducts its productions on a schedule that will permit the parties to comply with this extended deadline. For these reasons, Plaintiff asks that Defendant ICE be subject to a deadline to conduct a search and complete its supplemental productions in light of the extended deadlines entered by this Court, particularly in light of the impending trial date of January 17, 2024.

**2.      Increasing Defendants' Rate of Production to Meet Scheduling Deadlines**: At the outset of this case, Defendants informed Plaintiff and the Court that they "initially identified approximately 8,050 pages of potentially responsive records (with ICE FOIA identifying approximately 5,550 pages and DHS-OIG identifying 2,500 pages)." Dkt. 28 at p. 11. On that basis, the parties agreed to a production rate of 1,000 pages per month by each Defendant, which would have allowed for summary judgment briefing beginning in June of 2023. Defendants recently informed Plaintiff that this estimate drastically undercounted the number of documents they located responsive to the FOIA request. For example, ICE recently disclosed on June 6, 2023 that it has inexplicably failed to review and produce responsive documents from another set of 40,000 documents obtained from its initial search for documents responsive to Request Nos. 1-4, despite committing to produce those by May 2023. Dkt. 40. When Defendant ICE rectifies its failure to conduct searches for FOIA requests 3-9, discussed above, this will add an unknown but significant number of documents to the universe for processing.

Plaintiffs will be asking that for documents responsive to Requests # 3-9, Defendants OIG and ICE agree to a supplemental, expedited production schedule of at least 2,500 pages each, per month. Plaintiffs will also request that for all production, prior to processing documents, that Defendants

conduct de-duplication and email threading to ensure that Defendants do not continually produce duplicative documents, as has been the case in its earlier production.

While the Court ordered Defendants to process 1,000 pages of documents each per month, Dkt. 40, that production rate was based on a compromise between the parties. *See* Dkt. 36-40. It took into account the anticipated universe of responsive documents Defendants disclosed at that time relative to the summary judgment briefing schedule the parties also agreed to at that time. *Id*. In other words, Plaintiffs agreed to withdraw their request that Defendants produce 3,000 pages each per month, *see* Dkt. 28 at p. 13, in exchange for Defendants' commitment to review at a rate that would permit summary judgment briefing to commence in June 2023. Dkt. 40. Again, without an expedited production schedule, it is highly unlikely ICE will be able to complete its production of these documents in time to commence summary judgment briefing in August 2023. In sum, because of Defendants' admitted failure to conduct adequate searches and timely produce responsive documents without good cause, it is Plaintiff's position that Defendants should be subject to an expedited production schedule for Requests Nos. 3-9 of at least 2,500 pages each per month, with prior de-duplication and threading.

To provide the Court with sufficient information to address these issues, Plaintiff proposes the parties each submit a status report to elaborate on the issues raised above within two business days of the date the Court sets for the status conference, or an earlier date convenient for the Court. Notwithstanding their position that a status conference is not needed at this time, Defendants' counsel has indicated he is available for a status conference on the following dates if the Court decides to set one: June 22, 2023 from 10 am to 1 pm, and after 2 pm; or June 23, 2023, at 9 am, 11 am and after 1 pm.

Please let us know if the Court needs anything further to consider our request for a status conference.

Thank you.

On Mon, May 15, 2023 at 12:22 PM Laboni Hoq <lhoq@hoqlaw.com> wrote:

> Dear Ms. Catellanos,
>
> In response to your request, the Parties are meeting and conferring so we can precisely identify for the Court the issues in dispute and the need for a status conference. We hope to follow up with this information by tomorrow.
>
> Thank you.
>
> On Fri, May 12, 2023 at 5:16 PM SHK Chambers
> <SHK_Chambers@cacd.uscourts.gov> wrote:
> >
> > Good Evening Counsel,
> >
> >
> >
> > Can you let me know if there is a dispute? and if so, a brief description of what the dispute is about?
> >
> >

> Or a brief description on why a status conference is necessary?
>
>
>
>
>
>
>
> Thank you,
>
> Dana
>
>
>
>
>
>
>
>
>
> From: Laboni Hoq <lhoq@hoqlaw.com>
> Sent: Friday, May 12, 2023 2:24 PM
> To: SHK Chambers <SHK_Chambers@cacd.uscourts.gov>; Dana Cisneros <Danalyn_Castellanos@cacd.uscourts.gov>
> Cc: Michael Kaufman <MKaufman@aclusocal.org>; Eunice Cho <echo@aclu.org>; Kyle Virgien <kvirgien@aclu.org>; Tursi, Joseph (USACAC) <Joseph.Tursi@usdoj.gov>; Medrano, Alarice (USACAC) <Alarice.Medrano@usdoj.gov>; Jason.Axe@usdoj.gov>
> Subject: ACLU Foundation of SoCal v. ICE et al. 2:22-cv-04760-SHK: REQUEST FOR STATUS CONFERENCE
>
>
>
> CAUTION - EXTERNAL:
>
>
>
> Dear Ms. Castellanos,
>
>
>
> The Parties have been meeting and conferring about various issues in the case, and request a Status Conference with the Court to address various matters.  The Parties propose that each side will file a status report two business days in advance of the status conference to update the Court on the status of the case and identify issues they would like it to address.
>
>
>
> The following are the dates the Parties propose for the Status Conference:
>
>
>
> Mon. 5/22: anytime
>
> Tues. 5/23: 9-12, after 1 pm PT
>
> Wed. 5/24: 9-12, after 3 pm PT
>
> Thurs. 5/25: 10-11 PT
>
>
>

> Please let us know if the Court needs any further information to consider this request.
>
>
>
> Thank you.
>
>
>
> --
>
> Laboni A. Hoq
>
> Hoq Law APC
>
> P.O. Box 753
>
> South Pasadena, CA 91030
>
> Telephone: 213-973-9004
>
> www.hoqlaw.com
>
> CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.
>
>

# EXHIBIT R

June 12, 2023

Jason Axe
Alarice Medrano
United States Attorney's Office
Central District of California
300 N. Los Angeles St. Suite 7516
Los Angeles, CA 90012
Jason.Axe@usdoj.gov
Alarice.Medrano@usdoj.gov

**SENT VIA EMAIL**

> Re:     *ACLU of Southern California v. United States Immigration and Customs
> Enforcement, et al.,* No. 2:22-cv-4760 (C.D. Cal.)

Dear Jason,

Thank you for your June 9, 2023 correspondence to Plaintiff, regarding Defendants' response to Plaintiff's June 1, 2023 correspondence discussing the parameters of Defendants' supplemental searches for documents responsive to Plaintiff's FOIA Request. At the outset, we wanted to make clear that our June 9, 2023 request for a status conference with the Court regarding setting deadlines and the pace of Defendants' supplemental searches and productions was not meant to supplant the process the parties have been engaged in to negotiate the parameters of Defendants supplemental searches.  We sincerely hope we can work collaboratively to agree on appropriate parameters for Defendants' supplemental searches to ensure Plaintiff's goal of an expeditious conclusion of this case, and that Defendants conduct appropriate searches as outlined here.

In response to Defendants' June 9, 2023 correspondence to Plaintiff, below, Plaintiff outlines revised parameters for Defendants' supplemental searches. Plaintiff appreciates that "ICE recommends using the same search terms for all these requests for ease of tasking to different program offices," (*see* June 9, 2023 Email from Jason Axe). However, as discussed below, Defendants' approach will be overinclusive for some requests, and underinclusive for others, particularly if it fails to use all of the search terms we propose. As such, it will fail to meet Defendants' burden to conduct an adequate search, "reasonably calculated to uncover all relevant documents" "beyond a material doubt." *Transgender Law Center v. ICE*, 46 F. 4th 771, 779 (9th Cir. 2022).

In addition, Plaintiff's previously suggested search terms and locations that identify specific offices and positions that are likely to yield relevant documents, in an effort to avoid returning non-responsive documents. Defendants now suggest that "ICE will need the specific names and

titles of the custodians you wish to conduct the searches within the ERO Front Office, IHSC, and the Los Angeles Field Office." June 9, 2023 Email from Jason Axe.  Plaintiffs have provide Defendants with specific, descriptive parameters regarding locations, and responsibility of agency staff who would likely possess responsive records. However, given Defendants' (b)(6) and other redactions on documents produced to date, and the asymmetry of information between the parties, Plaintiff is generally unable to provide specific names of custodians. To the extent that Defendants insist on specific names and titles, we ask that Defendants both identify names, departments and job titles of individuals they recommend for the searches, as well as provide Plaintiff with an organizational chart and list of employee names/departments/job titles from which Plaintiff can potentially identify additional custodians to search.

Plaintiff has already faced lengthy delays in receiving documents responsive to Request Nos. 3-9. Plaintiff made these request in April of 2022. From April of 2022 through February of 2023, Defendant ICE left Plaintiff under the impression that ICE had conducted searches for documents responsive to these requests and was processing those search results for production. It was only after Plaintiff inquired into the absence of any responsive documents in ICE's productions in February of 2023 that ICE admitted it had done nothing to search for documents responsive to these requests. During the past four months, Plaintiff has repeatedly attempted to secure ICE's agreement to search for responsive documents, including providing two proposed sets of search terms. In light of this already lengthy delay in ICE's commencement of its supplemental searches, **Plaintiff requests that Defendants commence a search using the search terms and locations identified below, without further delay**. These terms and locations are further streamlined from Plaintiff's June 1 correspondence. Where Defendants may require further clarity or propose other approaches, we are glad to meet and confer. We again reiterate our suggestion that Defendants include ICE's FOIA officer and counsel in our conferrals in order to streamline communication and more quickly resolve any confusion.

## <u>OIG</u>

First, with respect to OIG, please provide a response to Plaintiff's questions in our June 1, 2023 letter, including:

1. Please identify the scope of the additional search OIG is now conducting, including the search terms and locations it is searching.

2. Mr. Ibarra Bucio: Did OIG search his name, in addition to his A#? In which locations did it search for his documents?

3. Mr. Vargas Arellano: Did OIG not initially search his name? In which locations did OIG conduct the search for his records that has now turned up the additional documents mentioned in your May 25, 2023 email?

Further, pursuant to your May 17, 2023 email correspondence, please update us on the status of OIG's search of the Detroit Field Office for responsive records, including the parameters of that search and when we can expect OIG to produce responsive records.

**ICE**

1. **Documents Referred to ICE from OIG**

In your May 17, 2023 email correspondence you stated that OIG had referred records to ICE on November 2022, December 2022, and March 2023, and that you would get back to use as to whether or not ICE had processed those documents for production to Plaintiffs. Please let us know if it has done so, and if so the bates numbers of the documents ICE produced from that referral.  If ICE has not processed the documents referred by OIG, please let us know when ICE intends to do so.

2. **Request Nos. 1 and 3**

With respect to the approximately 40,000 new pages responsive to Request No. 1 regarding the four individuals identified in the FOIA request, we request that the Defendants perform the following to narrow the production:

- Please run a de-duplication analysis of the approximately 40,000 new pages, and provide a revised page count of these new documents. As part of this de-duplication process, please use email thread to ensure that lengthy, duplicate case files are not repeatedly produced as part of the page count. This process is readily available in Relativity. If ICE's FOIA processers have difficulty with this process, Plaintiff's technological consultants are happy to confer with the ICE FOIA office to provide assistance.

- After de-duplication, please provide a page count of documents relevant to each individual (*i.e.* Gulema, Ibarra Bucio, Medina Leon, and Vargas Arellano.

Please provide this analysis before June 20, 2023. At that time, Plaintiff will inform Defendants of which cache of documents should be produced. **Defendants should not use this supplemental production to delay the search and production of documents responsive to Request Nos. 4-9**. Plaintiff again requests that Defendants produce records in response to the specific search terms and locations made on June 1, 2023, with respect to Teka Gulema, Medina Leon, Ibarra Bucio, and Vargas Arellano.

### 3. Request No. 4

Defendants' proposed search terms are underinclusive and proposed locations are overinclusive. Plaintiff suggests the following search terms and locations to ensure a more precise search:

- **Search Locations and Custodians:** ICE Front Office and IHSC staff responsible for compiling agency directives, policies, protocols, procedures, guidance, standards, instructions, and trainings related to detention.
- **Search Terms re Request No. 4:** Directive; Policy; Protocol; Procedure; Training; Guidance; Instruction; Standard; Death; "offsite referral"; "emergency room"; "emergency department"; "life support"; Coma; Ventilator; "intensive care"; Hospice; palliative; release
- **Boolean Search in Relativity re Request No. 4.**

After the Search is conducted, please use Relativity to conduct the following Boolean search of the recovered records:

  - (directive or policy or policies or protocol or procedure or training or guidance or instruction or standard) **AND** (custody or death or died or deceased or decedent or discharge or surgery or specialist or COVID-19 or hospital or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal) **AND** (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian)

- **Please exclude:** Any version of ICE Detention Standards (NDS 2000, PBNDS 2008, PBNDS 2011, NDS 2019), or ICE's COVID-19 Pandemic Response Requirements

### 4. Request Nos. 5 and 7

Defendants' proposed search terms are underinclusive and proposed locations are overinclusive. Plaintiff suggests the following search terms and locations to ensure a more precise search:

- **Search Locations and Custodians re Request Nos. 5 and 7:**
  - ISHC Medical Case Management Unit Medical Care Coordination Program staff[1]
  - Significant Detainee Illness Spreadsheets;
  - Records of any and all participants in ICE and/or IHSC's Significant Detainee Illness meetings;
  - Office of Professional Responsibility staff responsible for investigation of hospitalized and/or deceased ICE detainees

---

[1] *See* DHS, *Healthcare Costs for Noncitizens in Detention: FY 2020 Report to Congress* 29 (2022), https://www.dhs.gov/sites/default/files/2022-06/ICE%20-%20Healthcare%20Costs%20for%20Noncitizens%20in%20Detention.pdf (noting that IHSC's Medical Case Management Unit Medical Care Coordination Program oversees care for ICE detainees who are on the Significantly Ill list; and that MCCs "obtain patient care updates from field staff and report SDIs to IHSC leadership, the ICE legal staff, and ICE Enforcement and Removal Operations personnel.").

- o Spreadsheets regarding hospitalization or release compiled for or utilized in *Fraihat v. ICE*, No. 5:19-cv-1546;
- o ICE ERO staff in communication with IHSC Medical Case Management Unit
- **Search Terms re Request Nos. 5 and 7:** Plaintiff proposes the following non-case sensitive terms:
  1. Death
  2. Died
  3. Deceased
  4. Ambulance
  5. Emergency
  6. "offsite referral"
  7. "life support"
  8. Coma
  9. Ventilator
  10. "intensive care"
  11. "critical condition"
  12. Hospice
  13. Palliative
  14. Release
- **Boolean Search in Relativity re Request Nos. 5 and 7:**
  - o (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian) **AND** (custody or death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal)

5. **Request No. 6**

Defendants' proposed search terms are underinclusive and proposed locations are overinclusive. Plaintiff suggests the following search terms and locations to ensure a more precise search

- **Search Locations re Request No. 6:**
  - o ICE ERO Significant Event Notifications
  - o ICE ERO Significant Incident Reports
- **Search Terms re Request No. 6**
  1. Ambulance
  2. "Emergency" and "detainee"
  3. "offsite referral"
  4. "life support"
  5. Coma
  6. Ventilator

7. "intensive care"
8. "critical condition"
9. Hospice
10. Palliative
11. Release

- **Boolean Search in Relativity re Request No. 6:**
  - (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian) **AND** (custody or death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal)

6. **Request No. 8.** Defendants' proposed search terms are underinclusive and proposed locations are overinclusive. Plaintiff suggests the following search terms and locations to ensure a more precise search:
   - **Search Locations re Request No. 8:**
     - IHSC or ERO staff responsible for compiling records regarding hospitalization utilized in *Fraihat v. ICE*, No. 5:19-cv-1546 (C.D. Cal.);
     - Spreadsheets regarding hospitalization or release compiled for or utilized in *Fraihat v. ICE*, No. 5:19-cv-1546 (C.D. Cal.).
   - **Search Terms re Request No. 8:**
     1. Ambulance
     2. 911
     3. Emergency
     4. "offsite referral"
     5. "life support"
     6. Coma
     7. Ventilator
     8. "intensive care"
     9. "critical condition"
     10. "poor outcome"
     11. Hospice
     12. Palliative
     13. Death
     14. Died
     15. Deceased
   - **Boolean Search in Relativity re Request No. 8:**
     - (detainee or custody) **AND** (death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or

June 12, 2023
Page 7

"offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal) **AND** (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian or "order of recognizance")

7. **Request No. 9.** Thank you for confirming that ICE's Office of the Chief Financial Officer has already been tasked to search for records pertaining to the 4 decedents.

As stated in our May 19, 2023 letter, Defendants' search should include bills, invoices, charges, or records of payment for *any* detainee who was released from custody while hospitalized, and *communications* about such bills, invoices, charges, or records of payment. Thus Defendants should conduct a search of relevant records, including communications from IHSC staff responsible for medical claims, including Ms. Jennifer Moon and others similarly tasked. *See* Plaintiff's May 19, 2023 letter, Exh. B.

We look forward to working with you to ensure Defendants' expeditious production of supplemental responses to Plaintiff's FOIA request in the coming days.
Sincerely,

Sincerely,

LABONI A. HOQ (SBN 224140)
laboni@hoqlaw.com
HOQ LAW APC
P.O. Box 753
South Pasadena, California 91030
Telephone: (213) 973-9004

EUNICE CHO (pro hac vice)
echo@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
915 Fifteenth Street NW, 7th Floor
Washington, DC 20005
Telephone: (202) 548-6616

MICHAEL KAUFMAN (SBN 254575)
MKaufman@aclusocal.org
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West Eighth Street
Los Angeles, California 90017 Telephone:
(213) 977-9500
Facsimile: (213) 915-0219

KYLE VIRGIEN (SBN 278747)
kvirgien@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (202) 393-4930

*Attorneys for Plaintiff*

EXHIBIT S



# United States Department of Justice

## United States Attorney's Office
## Central District of California

---

*JOSEPH W. TURSI*
*JASON K. AXE*
*Assistant United States Attorney*
Phone:  (213) 894-3989/8790
E-mail:  Joseph.Tursi@usdoj.gov
            Jason.Axe@usdoj.gov

*Federal Building*
*300 N. Los Angeles Street, Suite 7516*
*Los Angeles, California 90012*

June 22, 2023

<u>**VIA E-MAIL**</u>

Laboni A. Hoq
Hoq Law, APC
P.O. Box 753
South Pasadena, CA 91030

      Re:     ACLU of SoCal v. ICE, et al.
              C.D.CA Case No. 2:22-cv-04760-SHK

Dear Ms. Hoq:

      Please allow the following to serve as Defendants' response to Plaintiff's June 12, 2023 correspondence.

## <u>Questions Directed to OIG</u>

(1) OIG conducted another search in EDS (the Office of Investigations' investigative case management system) of the narrative field for the four individuals identified in Plaintiff's FOIA request, which is in addition to OIG's previous search of the subject/complainant field in EDS. (The additional search in EDS for the four individuals in the narrative field thus supplemented the initial search in the subject/complainant field.) OIG also conducted an email search of two additional Special Agents who were the case agents for two investigations that resulted in responsive records. (Those agents are no longer with the agency, which required their emails to be searched separately.)

(2) OIG did conduct a search for Mr. Ibarra Bucio's name, in addition to his A#. The search was conducted in EDS, and no records were located.

(3) OIG did conduct a search for Mr. Vargas Arellano's name, in addition to his A#. As explained above, OIG conducted an additional search in EDS for the four individuals in the narrative field which supplemented the original search of the subject/complainant field.

(4) OIG has not located any documents from the Detroit Field Office that are responsive to Plaintiff's request.

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
June 22, 2023
Page 2

## Questions Directed to ICE

1. **Documents Referred to ICE from OIG**

   ICE is currently processing documents referred from OIG. Some, but not all, of the documents were corrupted and thus needed to be resent from OIG for processing. ICE anticipates completing its review of the referred documents by June 30, 2023.

2. **Request Nos. 1 & 3**

   ICE has already run the 40,000 pages through Relativity and deduplicated. Of the remaining documents, 31,170 relate to Teka Gulema. Of the remaining documents, approximately 300 relate to Johana Medina Leon, 1,240 to Jose Ibarra Bucio, and 8,500 to Martin Vargas Arellano. Please note these are estimates only.

   As these documents are already in the processing system, they cannot be threaded. That said, the records are mostly medical records such that email threading would not greatly impact this set of documents. Nonetheless, we will ask that the agency thread emails moving forward as feasible.

3. **Request No. 4**

   With respect to the proposed search locations for Request No. 4, does Plaintiff want the ICE front office or the ERO front office searched? Previously, you indicated the ERO front office, but in your June 12th letter, you identify the ICE front office. Please clarify.

   As for the search terms, ICE will agree to the following requested search terms: (1) Directive; (2) Policy; (3) Protocol; (4) Procedure; (5) Training; (6) Guidance; (7) Instruction; (8) Standard; (9) Death; (10) "offsite referral"; (11) "emergency room"; (12) "emergency department"; (13) "life support"; (14) Coma; (15) Ventilator; (16) "intensive care"; (17) Hospice; (18) palliative; and (19) release.

   ICE will also agree to the following Boolean search in Relativity with respect to Request No. 4: (directive or policy or policies or protocol or procedure or training or guidance or instruction or standard) AND (custody or death or died or deceased or decedent or discharge or surgery or specialist or COVID-19 or hospital or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal) AND (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian).

   Please confirm that ICE's proposed search terms and Boolean search in Relativity are acceptable to Plaintiff.

Ms. Laboni A. Hoq
RE: ACLU of SoCal v. ICE
June 22, 2023
Page 3

4. **Request Nos. 5 & 7**

ICE will agree to search OPR and IHSC and to the following requested search terms: (1) Death; (2) Died; (3) Deceased; (4) Ambulance; (5) Emergency; (6) "offsite referral"; (7) "life support"; (8) Coma; (9) Ventilator; (10) "intensive care"; (11) "critical condition"; (12) Hospice; (13) Palliative; and (14) Release.

ICE will also agree to the following Boolean search in Relativity with respect to Request Nos. 5 & 7: (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian) AND (custody or death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal).

Please confirm that ICE's proposed search terms and Boolean search in Relativity are acceptable to Plaintiff.

Information related to *Fraihat* was not requested in your client's FOIA request and thus ICE will not agree to add it to this search.

5. **Request No. 6**

ICE is still considering the appropriate search locations/custodians, and we will advise of same under separate cover.

As for the search terms, ICE will agree to the following: (1) Ambulance; (2) "Emergency" and "detainee"; (3) "offsite referral"; (4) "life support"; (5) Coma; (6) Ventilator; (7) "intensive care"; (8) "critical condition"; (9) Hospice; (10) Palliative; and (11) Release.

ICE will also agree to the requested Boolean search in Relativity with respect to Request No. 6: release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian) AND (custody or death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal).

6. **Request No. 8**

ICE is still considering the appropriate search locations/custodians and we will advise of same under separate cover.

As for the search terms, ICE will agree to the following: (1) Ambulance; (2) 911; (3) Emergency; (4) "offsite referral"; (5) "life support"; (6) Coma; (7) Ventilator; (8) "intensive

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
June 22, 2023
Page 4

care"; (9) "critical condition"; (10) "poor outcome"; (11) Hospice; (12) Palliative; (13) Death; (14) Died; and (15) Deceased.

ICE will also agree to the requested Boolean search in Relativity with respect to Request No. 8: (detainee or custody) AND (death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal) AND (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian or "order of recognizance").

Finally, as noted above, information related to *Fraihat* was not requested in Plaintiff's FOIA request and thus ICE will not agree to add it to this search.

7. **Request No. 9**

As previously communicated to you by email on June 9th, in order to conduct this search, IHSC would need specific names of non-citizens for these inquiries. With specific names, they can request information on anyone detained by ICE that was hospitalized and then they can review custody dates to check for release dates. They cannot provide a generalized list nor can they provide any information if the inquiry involves non-citizens who were in CBP, BP or OFO custody. That information would need to be requested from CBP.

Regarding bills and invoices, the Office of Veterans Affairs would maintain this information. The VA Financial Service Center is the third-party claims processor for IHSC. The VA runs a query on all claims for ICE before they pay the claims based on custody status or other administrative checks, however they do not keep a comprehensive list on file.

As you were also informed on June 9, 2023, the Office of Chief Financial Officer had no responsive records pertaining to the four individuals identified in your client's FOIA request.

Please let me know if you have any questions or would like to further discuss any of the matters raised above.

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
June 22, 2023
Page 5


Respectfully,

E. MARTIN ESTRADA
United States Attorney

/s/ *Joseph W. Tursi*

JOSEPH W. TURSI
Assistant United States Attorney

cc: Ms. Eunice Cho (by email)
    Mr. Michael Kaufman (by email)
    Mr. Kyle Virgien (by email)

# EXHIBIT T



**Laboni Hoq <lhoq@hoqlaw.com>**

---

## ICE Detainee Death FOIA: Briefing Schedule for Defendants' Anticipated Rule 12c Motion

---

**Axe, Jason (USACAC)** <Jason.Axe@usdoj.gov>                                    Fri, Jun 23, 2023 at 7:36 PM
To: Laboni Hoq <lhoq@hoqlaw.com>
Cc: Michael Kaufman <MKaufman@aclusocal.org>, Eunice Cho <echo@aclu.org>, Kyle Virgien <kvirgien@aclu.org>, "Tursi, Joseph (USACAC)" <Joseph.Tursi@usdoj.gov>

    Hi Laboni,


    For the proposed schedule below, did you intend Plaintiff's opposition to be due on Tuesday, July 18th instead of Wednesday, July 19th?  If so, that would be acceptable.

    Regarding Plaintiff's Opposition, to the extent that you plan to file evidence of the settlement negotiations between the parties, we believe such evidence is inadmissible under Rule 408 of the Federal Rules of Civil Procedure for purposes of the Rule 12(c) motion.  Of course, that would be for the judge to decide.  Regardless, our motion raises the simple issue (as did the D.C. motion) whether the requests themselves are overbroad because they do not "reasonably describe" what Plaintiff is seeking.  The motion will not cite to evidence outside the pleadings, and therefore we do not believe the Court should convert the Rule 12(c) motion into a motion for summary judgment.  But we appreciate your letting us know that Plaintiff intends to make that request.

    Finally, after reaching out to our agency counsel, we were informed that both our ICE and OIG counsel are out of the office the beginning of next week.  So, we may be delayed in providing you Defendants' portion for the email.  But with the Court not available until the week of July 3rd, there is less of a rush to get the submission in.

    Have a good weekend.

    Jason K. Axe

    Assistant U.S. Attorney

    300 North Los Angeles St., Suite 7516

    Los Angeles, CA  90012

    (213) 894-8790

    (213) 894-7819 (FAX)

---

**From:** Laboni Hoq <lhoq@hoqlaw.com>
**Sent:** Friday, June 23, 2023 4:27 PM
**To:** Tursi, Joseph (USACAC) <JTursi@usa.doj.gov>
**Cc:** Axe, Jason (USACAC) <JAxe@usa.doj.gov>; Michael Kaufman <MKaufman@aclusocal.org>; Eunice Cho <echo@aclu.org>; Kyle Virgien <kvirgien@aclu.org>
**Subject:** Re: [EXTERNAL] ICE Detainee Death FOIA: Briefing Schedule for Defendants' Anticipated Rule 12c Motion


Hi Joe,


We could manage an August 8 hearing date, based on the following briefing schedule:

Defendants' Motion due July 5

Plaintiff 's Opposition due July 19

Defendants' Reply due July 25

Regarding Plaintiff's Opposition, we wanted to give you the heads up that we plan to file extrinsic evidence, including the negotiations between the Parties regarding search parameters for ICE's searches for Request Nos. 4-9. As such, pursuant to Rule 12(d), Plaintiff will ask the Court to convert Defendants' Rule 12(c) motion into a motion for summary judgement.  Defendants should have an opportunity in their Reply to respond to that evidence. We'll advise the Court of Plaintiff's plan to include extrinsic evidence in the Parties' stipulated briefing schedule.

Please let us know if the above schedule works for you.

Thanks.

On Wed, Jun 21, 2023 at 5:19 PM Tursi, Joseph (USACAC) <Joseph.Tursi@usdoj.gov> wrote:

Good evening Laboni,

Unfortunately August 15th doesn't work but August 8th does. Would that work on your client's end?

In addition, to ensure that there is sufficient time for the motion to be heard and the Court to issue a ruling, we would also need to push back the dates in the operative scheduling order [Dkt. 43]. With that in mind, it probably makes sense to discuss further with the Court at the status conference.

Thanks,

-Joe

**Joseph W. Tursi | Assistant United States Attorney**
United States Attorney's Office | Central District of California
300 N. Los Angeles Street, Suite 7516 | Los Angeles, CA 90012
O: 213.894.3989 | C: 213.500.9355 | F: 213.894.7819 | joseph.tursi@usdoj.gov

**From:** Laboni Hoq <lhoq@hoqlaw.com>
**Sent:** Wednesday, June 21, 2023 12:39 PM
**To:** Tursi, Joseph (USACAC) <JTursi@usa.doj.gov>; Axe, Jason (USACAC) <JAxe@usa.doj.gov>
**Cc:** Michael Kaufman <MKaufman@aclusocal.org>; Eunice Cho <echo@aclu.org>; Kyle Virgien <kvirgien@aclu.org>
**Subject:** [EXTERNAL] ICE Detainee Death FOIA: Briefing Schedule for Defendants' Anticipated Rule 12c Motion

Dear Joe and Jason,

Thanks for the meet and confer call today on Defendants' anticipated Rule 12(c) motion, and Plaintiffs' June 12 letter. We appreciate Defendants' willingness to continue to negotiate the parameters of their supplemental searches, and look forward to their response to our June 12 letter by COB tomorrow.

Regarding Defendants' anticipated Rule 12(c) motion, we were able to look at our calendars regarding your proposed August 1 heading date and associated briefing schedule.  In light of our vacation schedules in July and the first week of August, we'd like to propose this alternate schedule.

Motion due: July 7, 2023

Opposition due: July 21, 2023

Reply due: July 28, 2023

Hearing date: August 15, 2023

Please let us know if this works for you.

Thanks,

--

**Laboni A. Hoq**

Hoq Law APC

P.O. Box 753

South Pasadena, CA 91030

Telephone: 213-973-9004

www.hoqlaw.com

# EXHIBIT U

June 26, 2023

Jason Axe
Joseph Tursi
Alarice Medrano
United States Attorney's Office
Central District of California
300 N. Los Angeles St. Suite 7516
Los Angeles, CA 90012
Jason.Axe@usdoj.gov
Alarice.Medrano@usdoj.gov

**SENT VIA EMAIL**

    Re:    *ACLU of Southern California v. United States Immigration and Customs
Enforcement, et al.,* No. 2:22-cv-4760 (C.D. Cal.)

Dear Counsel,

Thank you for your June 22, 2023 letter regarding the Parties' continued meet and confer over the status
of Defendants' additional searches in response to Plaintiff's FOIA Request.  Please see Plaintiff's
responses to certain of the outstanding issues. We look forward to agreement on search parameters within
the week, so that Defendants can commence their searches and timely produce responsive documents.

**OIG**

    *1.  Additional Search of Narrative Field of EDS and Two Additional Special Agents*

Regarding OIG's additional searches, including of the EDS narrative field and the two additional Special
Agents, please identify the total number of pages that have yielded from the search. Please identify
whether the additional pages located through these searches are part of the 41,000 additional pages
Defendants identified in their June 9, 2023 correspondence, or whether the additional documents OIG
located are distinct from those documents.

Further, in order for Plaintiff to assess the sufficiency of OIG's search, please identify for which of the
four individuals named in the FOIA request OIG searched two additional Special Agents.  Please also
identify the total number of Special Agents OIG searched for each of the four named individuals
identified in the FOIA request.

    *2.  Mr. Ibarra Bucio*

To the extent Defendants claim that OIG has no responsive documents regarding Mr. Ibarra Bucio, please
confirm that OIG did not conduct an investigation into Mr. Ibarra Bucio's detention and/or death.

    *3.  Mr. Vargas Arellano*

Please identify whether OIG's search of Mr. Vargas Arellano's name and A# yielded any additional
responsive documents.

**ICE**

1. *Request Nos.1 and 3:*

Regarding ICE's representation that it de-duplicated but did not thread the 41,000 pages it located based on its additional search for Requests Nos. 1 and 3, given the large volume of documents at issue Plaintiff asks the ICE take steps to thread those documents prior to production. We again note that threading is possible using Relativity, the program ICE is using to process documents in this case. *See* https://help.relativity.com/RelativityOne/Content/Relativity/Analytics/Email_threading.htm. We understand that, even after documents have been batched out for review or even after a review has been started, it is a straightforward matter to run threading on the unreviewed documents and batch them out again for review. As such, please explain what you mean when you say "these documents are already in the processing system, [and] cannot be threaded."  In addition, we ask that ICE identify the volume of the 41,000 pages that constitute emails, as opposed medical and other documents, to assess where threading should be applied here.

Given that Defendants have consistently produced duplicative documents for lack of threading, if threading is not conducted to deduplicate records, we will request that the court significantly increase the monthly rate of production (not processing) regarding these documents.

With respect to documents responsive to Request Nos. 1 and 3, please produce documents in the following order: Jose Ibarra Bucio, Johanna Medina Leon, Martin Vargas Arellano, and then Teka Guelma.

Regarding Mr. Gulema, please provide a breakdown of the number of responsive pages via month for Mr. Gulema. Please also specify whether these responsive records include SEN and SIR records, communications related to Significant Detainee Illness (SDI) meetings, and communications between IHSC Staff, Field Medical Coordinators, ERO, and agency staff responsible for reviewing the SDI spreadsheet. *See* IHSC Directive: 03-32/ERO Directive Number: 11853.3, *Significant Detainee Illness,* Dec. 1, 2015, attached as Exhibit A.

Finally, in accordance with the Court's February 9, 2023 order, please specify the new locations/databases for the new documents located, and search terms used to locate the records produced with each production. Dkt. 40 at 1.

2. *Request No. 4*

In response to your request for clarification, Plaintiff asks that ICE search the ICE Front Office, and not the ERO Front Office. Plaintiff reiterates that ICE should exclude any version of ICE Detention Standards or ICE's COVID-19 Pandemic Response Requirements, as these are publicly available.

Given that Parties appear to agree on the search parameters for ICE's search of Request No. 4, please confirm that it will commence the search and provide us hit counts within the next week.

3. *Requests Nos. 5 and 7*

Regarding ICE's representation that it will only generally search the Office of Professional Responsibility (OPR) and IHSC in response to Request Nos. 5 and 7, Plaintiff does not agree that limiting its search locations in this way meets ICE's search adequacy requirements. We reiterate our request that ICE specifically search IHSC staff, including Medical Case Management, Unit Medical Care Coordination Program Staff, as well as IHSC participants in Significant Detainee Illness (SDI) Meetings.

It is unreasonable for ICE to refuse to search participants in SDI Illness Meetings, as they possess the authority to determine release. It is highly likely that participants in these meetings will possess responsive records. Plaintiffs thus request that Defendants search the records of all participants in SDI Illness meetings. As ICE ERO Directive No. 11853.3, *Significant Detainee Illness*, states, "the SDI list ensures Enforcement and Removal Operations (ERO) HQ is aware of detainees/residents with significant medical conditions and the potential effect on enforcement actions." The Directive notes that the "SDI meeting is a collaborative effort involving IHSC, ERO Field Operations, and the Office of the Principal Legal Advisor (OPLA). The IHSC Assistant Director, IHSC Medical Director, Associate Medical Director, or Regional CDs may approve the addition of any detainee/resident to the SDI list." The criteria to be included on the SDI list includes cases where there is "significant coordination required to repatriate *or to release* a detainee/resident in the United States due to their medical condition." See Exh. A, ICE ERO Directive No. 11853.3, *Significant Detainee Illness,* Dec. 1, 2015. Indeed, IHSC reported to Congress that in FY 2021 that there were 155 instances of Significant Detainee Illness. DHS, Healthcare Costs for Noncitizens in Detention, Jul. 22, 2022 at 22, https://www.dhs.gov/sites/default/files/2022-09/ICE%20-%20Healthcare%20Costs%20for%20Noncitizens%20in%20Detention.pdf.

It is also unreasonable for Defendants to refuse to search records of ICE ERO staff in communication with IHSC's Medical Case Management Unit. As DHS itself has reported to Congress with respect to individuals on the Significant Detainee Illness list, IHSC's Medical Case Management Unit staff "report SDIs to . . . ICE Enforcement and Removal Operations Personnel." *Id.* Indeed, it is clear from ICE's prior disclosures that these communications include records concerning custodial decisions for detainees on the SDI list. *See, e.g.* 2022-ICLI-48 5604-06 (communication between IHSC Managed Care Coordinator and ICE ERO Detention and Deportation Officer discussing option to release Teka Gulema from custody).

### 4. Request No. 6

Plaintiff appreciates Defendants' agreement to its proposed search terms. Plaintiff reiterates that its search for Request No. 6 should include the locations identified in its June 12, 2023 letter.

### 5. Request No. 8

Plaintiff appreciates Defendants' agreement to its proposed search terms. Plaintiff reiterates that its search for Request No. 8 should include the locations identified in its June 12, 2023 letter. With regard to records related to COVID-19 related hospitalizations and/or releases as documented in case files for *Fraihat v. ICE*, No. 5:19-cv-1546 (C.D. Cal.), we do not agree that ICE should not be required to search for these records simply because *Fraihat* was not mentioned in Plaintiff's FOIA request. The specified records in *Fraihat* are likely to contain responsive documents. *Fraihat* addresses COVID-19 conditions in ICE detention, which led to hospitalizations and releases. As the deposition transcript of Jennifer Moon indicates, ICE compiled records related to COVID-19 hospitalization is in relation to *Fraihat.* ("I think the only place where we were actually capturing the hospitalization is on the Fraihat.") Plaintiff's May 19, 2023 letter, Exh. B (Deposition transcript of Jennifer Moon).

### 6. Request No. 9

Regarding IHSC, Plaintiff reiterates the request in its June 12, 2023 letter that ICE conduct a search of its records systems, for the four individuals (using their names and A#s) named in the FOIA Request, including for billing records and communications, as well as for documents related to billing involving IHSC staff responsible for medical claims, including Ms. Jennifer Moon and others similarly tasked. *See* Plaintiff's May 19, 2023 letter, Exh. B (Deposition transcript of Jennifer Moon).

Plaintiff also reserves the right to request additional specific information at a later date if Defendants' searches for requests 4-8 identify additional people whose records may be responsive to this request.

Sincerely,

LABONI A. HOQ (SBN 224140)
laboni@hoqlaw.com
HOQ LAW APC
P.O. Box 753
South Pasadena, California 91030
Telephone: (213) 973-9004

EUNICE CHO (pro hac vice)
echo@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
915 Fifteenth Street NW, 7th Floor
Washington, DC 20005
Telephone: (202) 548-6616

MICHAEL KAUFMAN (SBN 254575)
MKaufman@aclusocal.org
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West Eighth Street
Los Angeles, California 90017 Telephone:
(213) 977-9500
Facsimile: (213) 915-0219

KYLE VIRGIEN (SBN 278747)
kvirgien@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (202) 393-4930

*Attorneys for Plaintiff*

# EXHIBIT A

**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT**
**ENFORCEMENT AND REMOVAL OPERATIONS**
**ICE HEALTH SERVICE CORPS**

**SIGNIFICANT DETAINEE ILLNESS (SDI)**

**IHSC Directive:  03-32**
**ERO Directive Number: 11853.3**
**Federal Enterprise Architecture Number: 306-112-002b**
**Effective Date: 01 Dec 2015**

_____

**By Order of the Acting Assistant Director**
**Stewart D. Smith, DHSc/s/**
_____

1. **PURPOSE:** The purpose of this issuance is to set forth the policy and procedures for detainees/residents who have significant illnesses while in ICE custody.

2. **APPLICABILITY:** This directive applies to all IHSC personnel, including but not limited to, Public Health Service (PHS) officers and civil service employees supporting health care operations in ICE-owned or contracted detention facilities and to IHSC Headquarters (HQ) staff. This directive applies to contract personnel when supporting IHSC in detention facilities and at HQ.  Federal contractors are responsible for the management and discipline of their employees supporting IHSC.

3. **AUTHORITIES AND REFERENCES:**

   **3-1.** Title 8, Code of Federal Regulations, Section 235.3 (8 CFR 235.3), Inadmissible Aliens and Expedited Removal;

   **3-2.** Section 232 of the Immigration and Nationality Act (8 USC 1222), Detention of Aliens for Physical and Mental Examination;

   **3-3.** Title 8, Code of Federal Regulations, Section 232 (8 CFR 232), Detention of Aliens for Physical and Mental Examination;

   **3-4.** Section 322 of the Public Health Service Act (42 USC 249(a)), Medical  Care and Treatment of Quarantine and Detained Persons; and

   **3-5.** Title 42, U.S. Code, Public Health Service Act, Section 252 (42 USC 252); Medical Examination of Aliens.

4. **POLICY:** The IHSC provides medical care to detainees/residents with illnesses. A significant illness is a serious or potentially life-threatening illness, injury or impairment that may involve inpatient care in a hospital or other extended care

Page **1** of **5**

facility, periods of incapacity due to the illness, or an illness that has continuity of care needs requiring significant coordination with external partners.

**4-1.** The Health Services Administrator (HSA) and the Clinical Director (CD) at IHSC-staffed facilities, and Field Medical Coordinators (FMCs), should request to place any detainee/resident with a significant illness on the significant detainee illness (SDI) list for review. The SDI list ensures Enforcement and Removal Operations (ERO) HQ is aware of detainees/residents with significant medical conditions and the potential effect on enforcement actions.

**4-2.** The SDI meeting is a collaborative effort involving IHSC, ERO Field Operations, and the Office of the Principal Legal Advisor (OPLA). The IHSC Assistant Director (AD), the IHSC Medical Director, Associate Medical Director, or Regional CDs may approve the addition of any detainee/resident to the SDI list.

**4-3. Criteria for placement on the SDI List:** Detainees who meet the SDI criteria may be added to the SDI list based on, but not limited to, the following qualifying conditions:

   a.   Critical illness due to a life-threatening condition (any terminal illness, cardiac arrest, life-threatening cardiac arrhythmias, coma, severe sepsis, severe diabetic ketoacidosis, fulminant hepatitis, brain mass, pulmonary embolus, significant intracranial bleeding, stroke, a condition requiring intubation/mechanical ventilation, terminal cancer, post-surgical complications posing risk to life).

   b.   Anyone who is in intensive care for 24 hours or more.

   c.   Potentially life-threatening  medical condition requiring urgent action to prevent deterioration. This includes a detainee/resident who will need to undergo a medical procedure that poses a significant risk of possible complications (cardiac valve replacement, coronary artery bypass grafting, intracranial surgery, carotid endarterectomy, aortic aneurysm repair, etc.).

   d.   Significant coordination required to repatriate or to release a detainee/resident in the United States due to their medical condition (end-stage liver disease, end-stage congestive heart failure, ongoing cancer treatment, acute infectious disease, unstable/uncontrolled psychiatric conditions, or oxygen-dependent condition).

2018-ICLI-00023   2047

e.    Anyone who has cancer and is requiring or receiving treatment (easily treated cancers like basal cell or squamous cell carcinoma do not necessarily require SDI monitoring).

f.    Extended hunger strike with deteriorating condition.

g.    Current significant complications associated with Acquired Immuno-Deficiency Syndrome (AIDS), severe opportunistic infections, tuberculosis, or failing treatment.

h.    Multi-drug-resistant (MDR) or extensively drug-resistant (XDR) tuberculosis disease.

i.    Severe cognitive impairment where detention poses a significant risk to the detainee's wellbeing (dementia, encephalopathy, moderate to severe mental retardation).

j.    Infirmity requiring continuous or near-continuous medical care (bedbound, status/post (s/p) stroke with permanent deficits rendering the detainee/resident incapable of caring for self).

k.    Mental health conditions that are not controlled and require prolonged ongoing inpatient hospitalization or that present significant detention management concerns. The significant mental illness (SMI) directive further defines the criteria for detainees/residents who have significant mental health conditions.

**4-4.**    Detainees/residents are added and removed from the SDI list as directed by IHSC Managed Care Unit, which collaborates with ICE Field Operations and OPLA.

**4-5.**    **Criteria for detainee/resident removal from the SDI List:** The following reasons may warrant the removal of detainees/residents from the SDI list:

a.    The acute medical condition stabilizes/resolves with treatment.

b.    The detainee/resident is no longer deemed to be critically-ill or to have a life-threatening condition.

c.    The detainee/resident is released from ICE custody.

d.    The detainee/resident is deceased.

**4-6.**    **Significant Historical Physical Findings:** Significant detainee illnesses are brought to the attention of the appropriate medical provider immediately, if an emergent condition exists.

2018-ICLI-00023   2048

**4-7.**   **Entry into the Health record:** The nature of the significant detainee illness is entered in the detainee's/resident's health record. Any detainee/resident with a significant detainee illness must have a Medical/Psychiatric Alert documented in his/her health record. IHSC personnel will document in the health record in Medical/Psychiatric Alert when the detainee/resident is removed from the SDI list.

**4-8.**   **Reporting:** The FMC, HSA, or designee will provide daily updates on detainees/residents with serious medical conditions via email to the Managed Care Coordinator(s) (MCC) managing the SDI list. The FMC, HSA, or designee will provide daily updates of detainees/residents placed on the SDI list by close of business of each duty day. The FMC, HSA, or designee will provide updates twice a day or more often for those detainees/residents on the SDI list in the intensive care unit or in critical condition depending on the condition of the detainee/resident.

5.  **PROCEDURES:** IHSC AD, Deputy Assistant Director for Clinical Services, Associate Medical Director, or Regional CD approves or disapproves the HSA, CD or FMC's request. If the request is approved, the detainee/resident with a significant illness shall be added to the SDI list. The HSA, CD, and/or FMC request(s) will be based on the criteria mentioned in section 4-3 of this directive The MCC will add the detainee/resident to the SDI list upon approval, as noted above. Once a detainee's/resident's name is entered on the SDI list, IHSC shall collaborate with ICE ERO Field Operations and OPLA. Removal of a detainee's/resident's name from the SDI list shall be based on the criteria listed in section 4-5 of this policy.

6.  **HISTORICAL NOTES:** This directive replaces the previous version dated 13 Feb 2015.  It changes the NCCHC reference from 2008 to 2014.

7.  **DEFINITIONS:** See definitions for this policy at IHSC Glossary.

8.  **APPLICABLE STANDARDS:**

**8-1.**   **Performance-Based National Detention Standards (PBNDS) 2011:** 4.3 Medical Care, Section M *Medical/Psychiatric Alerts and Holds.*

**8-2.**   **Family Residential Standards:** 4.3, V. Expected Practices, 17. *Special Needs and Close Medical Supervision.*

**8-3.**   **American Correctional Association (ACA):**

a.  Performance-Based Standards for Adult Local Detention Facilities, 4th edition; 4-ALDF-4C-40 *Special Needs Inmates.*

b.  Standards for Adult Correctional Institutions, 4th edition; 4-4399

2018-ICLI-00023   2049

*Special Needs.*

   c.  Performance-Based Standards for Correctional Health Care in Adult Correctional Institutions; 1-HC-3A-06 *Special Needs.*

**8-4.**  **National Commission on Correctional Health Care (NCCHC):** Standards for Health Services in Jails, 2014: J-A-08 *Communication on Patients' Health Needs.*

**9.**  **RECORDKEEPING.** IHSC maintains detainee/resident health records as provided in the Alien Health Records System of Records Notice, 80 Fed. Reg. 239 (Jan. 5, 2015).

**Protection of Health Records and Sensitive Personally Identifiable Information (PII).**

**9-1.**  Staff must keep all health records, whether electronic or paper, secure with access limited only to those with a need to know. Staff must lock paper records in a secure cabinet or room when not in use or not otherwise under the control of a person with a need to know;

**9-2.**  Staff are trained at orientation and annually on the protection of a patient's health information and Sensitive PII;

**9-3.**  Only authorized individuals with a need to know are permitted to access health records and Sensitive PII; and

**9-4.**  Staff should reference the Department of Homeland Security *Handbook for Safeguarding Sensitive PII* (Handbook) at: (b)(7)(E) when additional information is needed concerning safeguarding sensitive PII.

**10.**  **NO PRIVATE RIGHT STATEMENT.** This directive is an internal statement of IHSC. It is not intended to, and does not create any rights, privileges, or benefits, substantive or procedural, enforceable against the United States; its departments, agencies, or other entities; its officers or employees; or any other person.

# EXHIBIT V

LABONI A. HOQ (SBN 224140)
laboni@hoqlaw.com
HOQ LAW APC
P.O. Box 753
South Pasadena, California 91030
Telephone: (213) 973-9004

MICHAEL KAUFMAN (SBN 254575)
MKaufman@aclusocal.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, California 90017 Telephone: (213) 977-9500
Facsimile: (213) 915-0219
Attorneys for Plaintiff
*(additional counsel information on next page)*

E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section
JOSEPH W. TURSI (Cal. Bar No. 300063)
JASON K. AXE (Cal. Bar No. 187101)
Assistant United States Attorneys
    Federal Building, Suite 7516
    300 North Los Angeles Street
    Los Angeles, California 90012
    Telephone: (213) 894-3989 | 8790
    Facsimile: (213) 894-7819
    E-mail: Joseph.Tursi@usdoj.gov
            Jason.Axe@usdoj.gov
Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF SOUTHERN CALIFORNIA,<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,<br><br>*Defendants*. | Case No. 2:22-CV-04760-SHK<br><br>**JOINT STATUS REPORT FOR JULY 5, 2023 STATUS CONFERENCE**<br><br>Complaint Filed: July 12, 2022<br>Answer Filed: October 18, 2022<br>Trial Date: January 17, 2024<br><br>Conference Date: July 5, 2023<br>Time:   11:00 a.m.<br>Ctrm:   *Via Zoom*<br><br>Hon. Shashi H. Kewalramani |

EUNICE CHO (*pro hac vice*)
*echo@aclu.org*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
NATIONAL PRISON PROJECT
915 Fifteenth Street NW, 7th Floor
Washington, DC 20005
Telephone: (202) 548-6616

KYLE VIRGIEN (SBN 278747)
*kvirgien@aclu.org*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
NATIONAL PRISON PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (202) 393-4930

Attorneys for Plaintiff

On June 26, 2023 the Court set a Status Conference for this case, and ordered the parties to submit a joint report of the issues via email by June 30, 2023. The Parties hereby submit this Joint Status Report. They also attach with this Report the following correspondence related to the issues in dispute, which are referenced herein.

- Defendants' March 29, 2023 letter
- Plaintiffs' April 14, 2023 letter
- Plaintiffs' June 12 letter
- Defendants' June 22 letter
- Plaintiffs' June 26, 2023 letter

## I.      PLAINTIFF'S POSITION

Plaintiff seeks the Court's assistance in resolving three issues related to the expeditious resolution of this case. The Parties and Court initially agreed to a case schedule that would result in completion of Defendants' FOIA production ahead of a June 2 opening summary judgment briefing deadline. Dkt. 40. Not only have Defendants sought to push this deadline back, they admit they failed to complete their searches and production of documents responsive to each of the nine FOIA Requests at issue.

Regarding Request Nos. 1-3, Defendants now contend that they will not complete their production responsive to these Requests until late 2026 in light of the 41,000 additional documents they located in response to these Request assuming a production rate of 1,000 documents per month (Defendants located these additional documents only after Plaintiff pointed out the inadequacies of their original searches); Regarding Request Nos. 4-9, Defendants have yet to even provide Plaintiffs hit counts for searches responsive to these Requests, and productions responsive to those searches will add further time to the schedule.

In order to address these significant delays in the case schedule, Plaintiffs request the Court's assistance in resolving the following issues in dispute:

-1-

(1) ICE's lengthy and continuing delays in negotiating appropriate search parameters for FOIA Request Nos. 4-9 and schedule for producing responsive records;

(2) Defendants ICE and OIG's refusal to increase the rate of production of outstanding responsive records, including for the aforementioned searches for (Requests Nos. 4-9), and 41,000 additional records it recently disclosed as responsive to Request Nos. 1-3, and

(3) Dispute over ICE's refusal to conduct email threading to prevent duplicative production of records in response to Request No. 1.

In addition, with respect to Defendants' forthcoming Motion for Judgment on the Pleadings, Plaintiffs will request that the Court consider materials outside the pleadings, namely subsequent communications between parties regarding Plaintiffs' requests, under Federal Rule of Civil Procedure 12(d). Plaintiffs thus request that the Court provide Defendants the opportunity to respond to the request to include this extrinsic evidence in their Reply.

**Issue No. 1: Impasse Regarding Deadlines on ICE's Delayed Search for and Production of Documents Responsive to FOIA Requests Nos. 4-9**

Plaintiff served its FOIA Request on ICE last year on April 29, 2022, including Request Nos. 4-9, seeking information about ICE's practice of releasing terminally-ill immigration detainees while hospitalized, at off-site medical facilities, or just before transfer to these facilities. *See* Requests Nos. 4-9. In contrast to Requests Nos. 1-3, which focused on four specific people whose deaths shortly after release from ICE custody had been widely reported (which Requests Defendants do not contest as vague or ambiguous), Requests Nos. 4-9 sought information about ICE's policies and attempted to uncover other deaths that were not already publicly known. At the time Plaintiff filed its Complaint on July 12, 2022, ICE had failed to search for or produce any documents responsive to the FOIA Request. After the litigation commenced, ICE agreed to comply with its

FOIA obligations, and the Parties negotiated a rolling production schedule by which ICE would process and produce documents response to the FOIA Request, and began producing documents in November 2022. ICE's commitments to do so are memorialized in the Court's Scheduling Order. *See* Dkt. 40.  At no time in the negotiations leading up to that Scheduling Order did ICE inform Plaintiff it would not conduct searches for Requests Nos. 4-9 and would instead take the position that the searches for the four specific people named in Requests Nos. 1-3 sufficed.

Indeed, up until February of 2023, ICE left Plaintiff under the impression that it had conducted searches for documents responsive to all Requests, and was processing those search results in accordance with the Court's Scheduling Order. It was only after Plaintiff repeatedly inquired into the apparent absence of any documents responsive to Requests Nos. 4-9 in ICE's rolling productions, including in correspondence dated February 14 and March 1, 2023, that ICE admitted that it had done *nothing* to search for documents responsive to those Requests beyond the searches for four specific people it had conducted in response to Requests 1-3.[1]

In a March 29, 2023 letter, ICE claimed for the first time that it did not search for Request Nos. 4-9 on grounds that they are "overbroad and vague." But as Plaintiff explained in its April 14, 2023 letter, not only was ICE's position contrary to legal authority, it was "not to be used as a method of withholding records" as ICE sought to do. *Bristol-Myers Co. v. FTC*, 424 F.2d 935, 938 (D.C. Cir. 1970), *cert. denied*, 400 U.S. 824 (1970). Indeed, ICE never before raised any claim characterizing Requests Nos. 4-9 as "overbroad and vague" until Plaintiff questioned why Defendants had unilaterally omitted Requests Nos. 4-9 from its

---

[1] Defendants' monthly cover letters summarizing the scope of their search and production also confirm that Defendants have searched only for documents related to the four individuals in response to Requests Nos. 1-3. *See* Letters from Meronica Stoney, Deputy FOIA Officer, ICE, to Plaintiffs' Counsel, Nov. 17, 2022, Dec. 16, 2022, Jan. 19, 2023, Feb. 22, 2023, Mar. 10, 2023, Apr. 12, 2023, May 22, 2023, June 8, 2023, and June 20, 2023.

-3-

search altogether. This approach is improper. "[I]f [ICE] was at all uncertain about the scope of Plaintiff's request, it could have asked [it] what [it] meant ... which it did not do." *Leopold v. Dep't of Just.*, 130 F. Supp. 3d 32, 44 (D.D.C. 2015), on reconsideration in part, No. 14-CV- 00168 (APM), 2016 WL 7839130 (D.D.C. Apr. 25, 2016).

Despite its vagueness and overbreadth claims, in April 2023 ICE agreed to negotiate search parameters to meet its FOIA obligations as to Requests Nos. 4-9. Among other things, it invited Plaintiff to provide it with search terms and locations to search for responsive documents.  Over the past three months, Plaintiffs have pressed ICE to negotiate appropriate search parameters, including by identifying appropriate search terms and locations, including in correspondence dated May 19, 2023, June 1, 2023, and June 12, 2023.[2] While ICE has responded to Plaintiffs' proposals, they have unreasonably delayed the process in a manner at odds with its obligations under the Court's scheduling order. The Parties' positions are most recently summarized in the attached June 12, June 22, and June 26, 2023 letters attached here.

Despite the Parties' progress on some search parameters for ICE's searches of Request Nos. 4-9, on June 9, 2023 – the day Plaintiff informed Defendants that it would seek a Status Conference to attempt to set a deadline for those searches – ICE informed Plaintiff that it intended to file a Rule 12(c) motion to attempt to relieve it of its search obligations for Requests Nos. 4-9. In a June 21, 2023 Rule 7-

---

[2] Defendants argue below, in an apparent attempt to shift the blame for delays to Plaintiff, that "Plaintiff routinely maintained the position that the onus was on Defendants to [identify search locations] in the first instance." Plaintiffs' position—that, given the information asymmetry about how Defendants keep their own documents, Defendants should identify search locations in the first instance— is the most efficient way to resolve these issues and is well-supported by case law. *See Biear v. Att'y Gen. U.S.*, 905 F.3d 151, 157 (3d Cir. 2018) ("It would be counterintuitive in the extreme to require [a FOIA Requestor] to have sufficient knowledge of an agency's organizational units to be able to identify the specific units of an agency that might contain the records sought.").

3 meet and confer call on that anticipated motion, ICE revived its "overbroad and vague" claims regarding Requests Nos. 4-9 as the basis for that motion. ICE admitted that bringing such a motion was inconsistent with the Parties' ongoing negotiations to agree on search parameters for Requests Nos. 4-9.  ICE also confirmed that it would not be abandoning those negotiations.

Indeed, after that June 21 meet and confer call, ICE sent Plaintiff a letter the next day in which it agreed to Plaintiff's proposed search terms and locations for Request No. 4, and agreed to search terms for Requests Nos. 5-8. However, Defendants did not provide a clear list of search locations in response to Requests Nos. 6, 8, and 9, and omitted the most critical search locations for Requests Nos. 5 & 7 (locations related to ICE's Significant Detainee Illness lists). *See* ICE's June 22, 2023 letter.  Plaintiff remains committed to the meet and confer process to resolve these remaining disputes, and responded to Defendants on June 26, 2023 by substantiating why the specified search locations it proposed are likely to produce responsive records, in hopes that the Parties can come to agreement on them.

Despite this progress, the Parties remain at an impasse as to when Defendants will complete a supplemental search for records in response to Requests Nos. 4-9, and when Defendants will begin producing documents from the supplemental search.

As discussed above, the pace of these negotiations has been marred by significant delay on the part of Defendants. For example, Defendant ICE's continued delay in agreeing to search parameters, without any commitment to a deadline to complete these searches, leaves Plaintiff without any assurance that ICE will complete the searches expeditiously in time to comply with the continued summary judgment briefing schedule it sought, and the trial date in the case. Regarding the continued summary judgement briefing schedule, which Defendants unilaterally requested to move from June to September 2023, Plaintiff only agreed

to it as a courtesy to Defendants' new counsel who had just joined the case (though prior counsel has now returned). To the extent that this schedule needs to be moved again in light of Defendants' delayed searches for and production of responsive documents, as discussed herein, Plaintiff believes that the Court's assistance will be necessary to both set and ensure Defendants keep to a schedule that ensures expeditious resolution of the case, particularly in light of the impending trial date of January 17, 2024.

**Proposed Resolution to Issue No. 1:**

To resolve the aforementioned disputes, Plaintiff asks that the Court to:

(1) Order ICE to provide Plaintiff with hit counts for the searches set out in Plaintiff's June 12, 2023 letter by July 16, 2023;

(2) Order the Parties to Meet and Confer on narrowing search parameters, if necessary, and agree to a production schedule and amended summary judgment briefing schedule by July 30, 2023;

(3) Schedule monthly Court Status Conferences to address any disputes regarding the aforementioned matters.

**Issue No. 2: Impasse on Designation of a Production Rate for ICE's Supplemental Search of Records Responsive to Requests Nos. 4-9.**

The Court's Scheduling Order required both ICE and OIG to complete their searches for and production of documents responsive to Plaintiff's FOIA Request by May 2023. However, as documented in numerous correspondence between the Parties, both ICE and OIG have admitted that that they have failed to conduct adequate searches for nearly all of the nine FOIA Requests. In addition to the search shortcomings related to Requests Nos. 4-9 listed above, ICE has admittedly failed to adequately search for Requests Nos. 1-3, dealing with specific individuals that ICE released from custody while on their death beds, as reflected in Defendants' June 6 and 9, 2023 emails. The same goes for OIG, as reflected in Defendants' June 6, 2023 email. For example, ICE recently disclosed in a June 9,

1   2023 correspondence that it has inexplicably failed to review and produce

2   responsive documents from a set of 41,000 documents responsive to Requests Nos.

3   1-3, despite committing to produce responsive records by May 2023. Dkt. 40.

4          In light of these admitted search adequacy failures, and the already lengthy

5   delay Plaintiff has had to endure to obtain responsive FOIA documents, this Court

6   should subject Defendants to an increased rate of production, to 2,500 pages per

7   month each for any documents responsive to the supplemental searches in response

8   to Requests Nos. 4-9, and 5,000 pages per month each for the 41,000 outstanding

9   documents responsive to Request Nos. 1-3. *See Long v. IRS*, 693 F.2d 907, 910

10  (9th Cir. 1982) ("unreasonable delays in disclosing non-exempt documents violate

11  the intent and purpose of the FOIA, and the courts have a duty to prevent these

12  abuses."); *Los Angeles Times Commc'ns LLC v. U.S. Dep't of Homeland Sec.,* No.

13  2:20-cv-10911-FLA-MRW, 2020 WL 7055904 (C.D. Cal. 2020), December 3,

14  2021 Minutes Order, Dkt. 35 (ordering production of 3,000 pages per month FOIA

15  case seeking analogous information); *Seavey v. DOJ*, 266 F. Supp. 3d 241, 248

16  (D.D.C. 2017) (ordering production at a rate of "at least 2,850 pages per month"

17  and finding this pace "well within the range of what other courts have ordered,"

18  despite agency's claim that 500 pages would be consistent with its policy);

19  *Clemente v. FBI*, 71 F. Supp. 3d 262, 269 (D.D.C. 2014) (ordering agency to

20  process 5,000 records a month); *Elec. Privacy Info. Ctr. v. FBI*, 933 F. Supp. 2d

21  42, 48-50 (D.D.C. 2013) (rejecting claim that "'exceptionally large number' of

22  FOIA cases involving the agency currently in litigation" justified only processing

23  1,500 pages per month, and ordering significantly higher volume in response to

24  plaintiff's request); *Nat'l Day Laborer Org. Network v. U.S. Immigration &*

25  *Customs Enf't Agency*, 811 F. Supp. 2d 713, 731 (S.D.N.Y. 2011) (ordering ICE to

26  fully respond to an outstanding FOIA request that required producing over 14,000

27  pages in one month); *Judicial Watch, Inc. v. Dep't of Energy*, 191 F. Supp. 2d 138,

28  140-41 (D.D.C. 2002) (ordering agencies to process over 6,000 pages of material

within 60 days). The accelerated production rate Plaintiff seeks is not only warranted based on Defendants' dilatory conduct and the aforementioned authority, but also for the practical reasons discussed below.

This increased rate of production is warranted in light of the changed circumstances in the case since the Court's February 9, 2023 Scheduling Order. Dkt. 40. At the outset of this case, Defendants informed Plaintiff and the Court that they "initially identified approximately 8,050 pages of potentially responsive records (with ICE FOIA identifying approximately 5,550 pages and DHS-OIG identifying 2,500 pages)." Dkt. 28 at p. 11. On that basis, the parties agreed to a production rate of 1,000 pages per month by each Defendant, which would have allowed for summary judgment briefing beginning in June of 2023. As discussed above, Defendants recently informed Plaintiff in early June 2023 that this estimate drastically undercounted the number of documents they located responsive to the FOIA request by as many as 41,000 documents. When Defendant ICE rectifies its failure to conduct searches for Request Nos. 4-9, discussed above, this will add an unknown but significant number of documents to the universe for processing.

While the Court ordered each Defendant to process 1,000 pages of documents each per month, Dkt. 40, that production rate was based on a compromise between the parties. *See* Dkt. 36-40. Plaintiffs considered the anticipated universe of responsive documents Defendants disclosed at that time relative to the summary judgment briefing schedule the parties also agreed to at that time, and found that a production rate of 1,000 pages per month would be sufficient to meet that schedule. *Id*. In so agreeing, Plaintiff agreed to withdraw its request that Defendants produce 3,000 pages each per month, *see* Dkt. 28 at p. 13, in exchange for Defendants' commitment to review at a rate that would permit summary judgment briefing to commence in June 2023. Dkt. 40.

Now, without an expedited production schedule, it is highly unlikely ICE will be able to complete its production of these documents in time to commence

-8-

summary judgment briefing, even in light of the extension of that briefing schedule to August 2023. However, in response to Plaintiff's proposal that they increase their production rates to 2,500 pages for Request Nos. 4-9, Defendants have declined to agree at any increased production rate at this time. Moreover, Defendants informed Plaintiff that they would seek yet another extension of the summary judgment briefing schedule, which Plaintiffs would oppose without a concomitant agreement that they complete outstanding searches and productions expeditiously. Defendants should not be allowed to delay the case in this way without consequence, including in the form of being held to strict deadlines for supplemental searches, as discussed above, and being required to increase their rate of production to 2,500 pages per month for ICE's supplemental searches of Requests Nos. 4-9, and 5,000 pages per month for each of ICE and OIG in connection with the over 41,000 documents responsive to Request Nos. 1-3.

**Proposed Resolution to Issue No. 2:**

To resolve the aforementioned disputes, Plaintiff asks that the Court to:

(1) Order ICE to abide by and expedited production schedule of at least 2,500 pages each, per month, for any records responsive to Requests Nos. 4-9, and ICE and OIG to abide by a production schedule of 5,000 pages, each, per month for any records responsive to Request Nos. 1-3.

(2) Order that for all search results, prior to processing documents for production, that Defendants conduct de-duplication and email threading to ensure that Defendants do not continually produce duplicative documents, as has been the case in its earlier production.

**Issue No. 3: De-Duplicate and Thread Email**
**Records Responsive to Requests Nos. 1-3**

Plaintiff's FOIA request instructed the government to de-duplicate its search results to avoid producing "multiple copies of identical material." ECF No. 1-1 at 7. Despite this instruction, a significant portion of Defendants' production consists

-9-

of emails within the same thread that include hundreds of pages of identical material. For example, as of May 2023, ICE produced 2795 pages related to Mr. Gulema (and withheld 1185 more as "duplicates," but over 40 percent (1140 of 2795 pages) were email threads that consist of identical material (including duplicative medical records). Defendants' rate of production is based on the number of pages they *process*, including pages withheld as duplicative and pages that are produced but contain duplicative material. As a result, this production, which consisted of less than 1700 pages of unique material, took nearly four months to process.

Plaintiff has repeatedly requested that Defendants apply email threading to eliminate the production of records that consist entirely of material duplicated in another email in the review set. This is achievable by Defendants, as ICE has admitted to use of the Relativity document management system as part of its FOIA review and has admitted that it is capable of performing email threading as part of its collection and culling process. The Relativity system allows for email threading to identify duplicates. *See* Relativity.com, Email Threading, https://help.relativity.com/RelativityOne/Content/Relativity/Analytics/Email_threading.htm (last visited June 22, 2023).

In their most recent June 22, 2023 correspondence Defendants admitted they had not attempted to thread the 41,000 outstanding pages responsive to Request Nos. 1-3, but they would do so for new collections going forward. Although they stated that these documents "cannot be threaded" as they "are already in the processing system," they failed to explain why, explaining only that threading "would not greatly impact this set of documents" because they are "mostly medical records." Given the large volume of documents at issue here, this imprecise response is unacceptable.  Defendants should be required to verify the actual number of these documents that are emails, and thread those emails to streamline the production process.

-10-

**Proposed Resolution to Issue No. 3:**

To resolve the aforementioned disputes, Plaintiff asks that the Court to:

(1) Order Defendants to de-duplicate and conduct email threading to documents responsive to Requests Nos. 1-3, and to provide a renewed hit count to Plaintiff;

(2) Order ICE and OIG to de-duplicate and conduct email threading to all documents responsive to the FOIA request that have not already been produced.

/ / /

/ / /

-11-

## I.     DEFENDANTS' POSITION

In July 2021, the ACLU submitted a ten-part FOIA request to ICE and OIG that was substantially similar to the one in this case.  In October 2021, the ACLU filed an action in the District Court for the District of Columbia challenging the failure of ICE and OIG to respond to that FOIA request. *See ACLU v. DHS, et al.,* 1:21-cv-02627-TJK. In response, the government filed a motion to dismiss, arguing, in part, that the ACLU's FOIA request was too vague and overbroad to reasonably describe the records sought. That motion was fully briefed and pending before the district court when, in April 2022, Plaintiff in this case (ACLU of Southern California) submitted its substantially similar nine-part FOIA request to ICE and OIG. On June 28, 2022, with the D.C. District Court motion still undecided, the ACLU filed a notice of voluntary dismissal in that case.  On July 12, 2022, the ACLU of Southern California filed this action.

From the outset of this litigation, based on communications among counsel, it appeared to Defendants that despite the vague and overbroad nature of Plaintiff's FOIA request, the parties might be able to work together to reasonably narrow the scope of Plaintiff's requests.  Indeed, Defendants began to process and produce records deemed responsive to Plaintiff's request in accordance with the Court's February 9, 2023 Case Management Order. Dkt. 40. Almost immediately, Plaintiff took issue with the scope of Defendants' searches as well as their redactions and cited exemptions. Although Defendants have tried to collaborate with Plaintiff, and are committed to continuing to do so, Plaintiff has unreasonably sought to dictate the manner in which Defendants process the FOIA request.

As a result, it has become clear to Defendants that the threshold issue whether the FOIA request is improperly vague and overbroad should have been determined by this Court through a motion to dismiss, as was pending in the D.C. District Court before the ACLU abandoned that case and Plaintiff brought this one. Defendants have met and conferred with Plaintiff and intend to file a Rule 12(c)

-12-

motion for judgment on the pleadings, set for hearing on August 8, 2023, raising substantially similar issues that were raised in the D.C. District Court case.  If granted, the motion will substantially reduce the number of issues remaining for this Court to determine. The basis for that motion is that most of Plaintiff's FOIA request does not "reasonably describe" the records it seeks.  Upon receipt of a FOIA request that "reasonably describes" the records sought, the agency to which the request is directed becomes obligated to release responsive, nonexempt records. Because "an agency is only obligated to release nonexempt records if it receives a request that 'reasonably describes such records[,]'" an agency cannot be found to have "improperly" withheld records if the records have not been reasonably described. *See Evans v. Bureau of Prisons*, 951 F.3d 578, 583 (D.C. Cir. 2020) (quoting 5 U.S.C. § 552(a)(3)(A)).

Nevertheless, out of a desire to attempt to resolve this case without the need for further litigation, Defendants remain committed to trying to resolve this litigation through negotiations, as set forth below.

**A. Issue No. 1: Requests 4-9**

ICE disputes Plaintiff's contention that it has not conducted searches that may locate documents potentially responsive to Requests 4 through 9. Indeed, Defendants' March 29, 2023 letter makes no such statement (and Plaintiff's claims to the contrary were directly rebutted during a March 24, 2023 meet and confer video conference). *See generally* Defendants' March 29, 2023 letter. Instead, the letter illustrates the overbroad nature of the requests. "As Defendants have raised, on several occasions, these requests are overbroad and vague." *Id.* at 3. And, Plaintiff's claim that it was not until March 29, 2023 that ICE took issue with requests 4-9 is false. Indeed, as noted above, ICE moved to dismiss the nearly identical complaint addressing the nearly identical FOIA request in the D.C. District Court case. *See ACLU v. DHS, et al.*, 1:21-cv-02627-TJK, Dkt. 12.

-13-

As Plaintiff concedes, ICE has tried to collaborate over search terms and locations. These efforts were frustrated as Plaintiff routinely maintained the position that the onus was on Defendants to do so in the first instance. *See* Plaintiff's Letter of April 14, 2023 at 5.

In any event, the parties have continued to negotiate over search terms and locations. More recently, on June 22, 2023, ICE proposed search terms and locations for requests 4-5 & 7. It further provided search terms for requests 6 & 8 and has advised that it will provide proposed search locations/custodians under separate cover.

Plaintiff has yet to agree to ICE's proposals. Rather, Plaintiff continues to try and direct the manner and scope of ICE's searches. *See* Plaintiff's June 26, 2023 correspondence. Upon agreement, ICE has no objection to providing Plaintiff with hit counts, but those hit counts cannot be reported until an agreed-upon search is conducted.

With respect to future processing, ICE has already informed Plaintiff that its search in response to Plaintiff's overbroad request has located an additional 40,000 pages of documents. And additional searches and locations will uncover additional documents. Thus, Defendants agree that the current scheduling order, Dkt. 43, will require amendment because their review and production of documents will not be completed before the current deadline to file a summary judgment motion. The parties will be better able to discuss amendment following the supplemental searches.

### Response to Plaintiff's Proposed Resolution to Issue No. 1

(1) ICE has no objection to providing Plaintiff with hit counts after the searches are complete.

(2) ICE has no objection to meeting and conferring with Plaintiff on narrowing search parameters, if necessary, and agreeing to a production schedule and amended summary judgment briefing after the hit counts are produced.

-14-

(3) ICE and OIG disagree with Plaintiff's demand for monthly Court Status Conferences to address any disputes regarding the aforementioned matters. The parties to this litigation are more than capable of engaging in communications to try to resolve their disputes without needlessly using Court resources for matters that do not need judicial resolution.

**B. Issue No. 2: Processing Rate**

Defendants dispute Plaintiff's assertion that the Court's Scheduling Order "required both ICE and OIG to complete their searches for and production of documents responsive to Plaintiff's FOIA Request by May 2023." The Court's Order states, Defendants "anticipate[d]" that their review and production would conclude by May 2023. (Dkt. 40 at 3.) As Defendants originally indicated in their portion of the Rule 26(f) Report, their recommendation was that the case be "administratively stayed while they complete their productions in response to Plaintiff's FOIA request." (Dkt. 28 at 18.) Once the productions were complete, the parties would then "be better able to estimate the time it will take to produce a *Vaughn* Index of any documents that remain at issue, and a realistic briefing schedule." (Dkt. 28 at 18.)  However, on February 9, 2023, this Court issued an order setting a briefing schedule based on Defendants' *anticipated* conclusion of its production and review, based on the number of documents it had identified as of the conferences the parties conducted with the Court.

With more documents to be reviewed, ICE and OIG believe this issue is premature for resolution. As explained above, ICE and Plaintiff have yet to reach agreement over the proposed supplemental search terms and locations.

Regardless, Plaintiff's current demand for an increased production rate is inappropriate. As will be addressed in the upcoming motion for judgment on the pleadings, Plaintiff submitted an overly broad FOIA request that is likely to yield an additional, great number of potentially responsive records. As one court has observed, "nonprofit requesters have little to lose when they file a FOIA lawsuit.

And much to gain. [FOIA's] provisions also encourage broadly worded requests. With no fees forcing a nonprofit to internalize the cost of its request, it would have little reason not to request a broader universe of documents. And the odds of an insufficient agency response—and by extension the odds of prevailing in later litigation—increase as the request expands in scope and the agency risks overlooking responsive documents. The mismatched incentives are clear. Nonprofit litigants like [plaintiff] have everything to gain and little to lose from posing broad, complicated FOIA requests." *Am. Ctr. for L. & Just. ("AMLJ") v. U.S. Dep't of Homeland Sec.*, 573 F. Supp. 3d 78, 84 (D.D.C. 2021). Such is the case here.

Further, with respect to Plaintiff's criticism of the time it will take for ICE to complete its processing of the request here, as the *AMLJ* court remarked, "And many of those [FOIA cases] take years to resolve." *Id.* at 83 (collecting cases). Thus, this case is not an outlier.

### Response to Plaintiff's Proposed Resolution to Issue No. 2

(1) Defendants believe that this Court properly ordered it to review and process 1,000 pages per month based on existing precedent and the nature of Plaintiff's request. To the extent that the Court wishes to consider amending its previous order, it should decline to do so until after (1) Defendants provide Plaintiff with a hit count, as referenced above, and (2) Defendants' Rule 12(c) motion is resolved.

(2) Defendants are willing to consider de-duplication and email threading as appropriate.  However, Defendants have advised Plaintiff that under existing caselaw, Defendants have properly defined "each single email" as a "record" in accordance with OIP guidance permitting such a definition. *See Citizens for Responsibility and Ethics In Washington v. United States Dep't of Justice*, 2020 WL 2735570 at *3 (D.D.C. 2020) ("Here, DOJ's definition of a record, given the language of the request and the documents in question, does not stretch past the

1   bounds of reasonableness."). Plaintiff continues to assert that Defendants somehow

2   desire to provide Plaintiff with duplicative documents, thus creating additional

3   work for themselves.  Nothing could be further from the truth.  Defendants are just

4   as eager as Plaintiff to reduce the number of documents to be reviewed to complete

5   their processing of this FOIA request. Therefore, where appropriate, Defendants

6   have no objection to utilizing software to de-duplicate and thread emails where

7   they are able to do so.

8   ## C. Issue 3: De-Duplicate and Thread Email Records

9       As set forth above, ICE has no objection to de-duplicating and threading

10  email records where appropriate. With respect to the current outstanding

11  documents, as has been explained to Plaintiff, most are medical records so email

12  threading will not greatly impact this set of documents.  To the extent the

13  processing of any emails in this set has not begun, Defendants are amenable to

14  threading where appropriate.

15  ## Response to Plaintiff's Proposed Resolution to Issue No. 3

16      Plaintiff's demand here for a blanket order to "de-duplicate and conduct

17  email threading" is an example of the level of micromanagement of Defendants'

18  processing of their FOIA request that is inappropriate. Defendants ultimately have

19  the burden to justify the adequacy of their searches and any withholdings.  *See,*

20  *e.g.*, *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 88, 91

21  (D.D.C. 2009).  "In general, a FOIA petitioner cannot dictate the search terms for

22  his or her FOIA request. Rather, a federal agency has discretion in crafting a list of

23  search terms that they believe to be reasonably tailored to uncover documents

24  responsive to the FOIA requests. Where the search terms are reasonably calculated

25  to lead to responsive documents, a court should neither micromanage nor second

26  guess the agency's search." *Bigwood v. U.S. Dep't of Defense*, 132 F. Supp. 3d 124,

27  140 (D.D.C. 2015); *see also Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d

28  771, 776 (D.C. Cir. 2002) ("FOIA, requiring as it does both systemic and case-

specific exercises of discretion and administrative judgment and expertise, is hardly an area in which the court should attempt to micro manage the executive branch.").

As indicated herein, Defendants have no objection to de-duplicating and threading email records where appropriate and will continue to do so.

Respectfully submitted,

Dated: June 30, 2023                    HOQ LAW APC

_/s/ Laboni A. Hoq*_
Laboni A. Hoq

ACLU FOUNDATION OF SOUTHERN CALIFORNIA

_/s/ Michael Kaufman_
Michael Kaufman

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

_/s/ Eunice Cho_
Eunice Cho

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

_/s/ Kyle Virgien_
Kyle Virgien

_Attorneys for Plaintiff American Civil Liberties Union of Southern California_

-18-

Dated: June 30, 2023

E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, Complex and Defensive Litigation
Section

/s/ *Joseph W. Tursi*
Joseph W. Tursi
Jason Axe
Assistant United States Attorney

Attorneys for Defendants

\* Pursuant to Local Rule 5-4.3.4(2)(i), the filer attests that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

-19-

# EXHIBIT W



# United States Department of Justice

## United States Attorney's Office
## Central District of California

---

*JOSEPH W. TURSI*
*JASON K. AXE*
*Assistant United States Attorney*
*Phone:  (213) 894-3989/8790*
*E-mail:  Joseph.Tursi@usdoj.gov*
*          Jason.Axe@usdoj.gov*

*Federal Building*
*300 N. Los Angeles Street, Suite 7516*
*Los Angeles, California 90012*

July 11, 2023

**<u>VIA E-MAIL</u>**

Laboni A. Hoq
Hoq Law, APC
P.O. Box 753
South Pasadena, CA 91030

   Re:  ACLU of SoCal v. ICE, et al.
       C.D.CA Case No. 2:22-cv-04760-SHK

Dear Ms. Hoq:

   The following responds to your June 26, 2023 correspondence.

   As an initial matter, Defendants note, as they did in their portion of the Joint Status Report for the July 5, 2023 Status Conference, that the questions you have set forth below represent the level of micromanagement of Defendants' processing of Plaintiff's FOIA request that is inappropriate. "In general, a FOIA petitioner cannot dictate the search terms for his or her FOIA request. Rather, a federal agency has discretion in crafting a list of search terms that they believe to be reasonably tailored to uncover documents responsive to the FOIA requests. Where the search terms are reasonably calculated to lead to responsive documents, a court should neither micromanage nor second guess the agency's search." *Bigwood v. U.S. Dep't of Defense*, 132 F. Supp. 3d 124, 140 (D.D.C. 2015); *see also Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002) ("FOIA, requiring as it does both systemic and case specific exercises of discretion and administrative judgment and expertise, is hardly an area in which the court should attempt to micro manage the executive branch."); *see also Inter-Coop. Exch. v. United States Dep't of Com.,* 36 F.4th 905, 911 (9th Cir. 2022) ("For this reason, a FOIA requestor "cannot dictate the search terms for his or her FOIA request.") (citation and quotations omitted). Nor is a search's adequacy determined by its fruits. *See Hoffman v. U.S. Customs & Border Prot.*, 2023 WL 4237096, at *5 (E.D. Pa. June 28, 2023) (citation omitted).

   Still, we provide responses to your questions below out of a desire to attempt to resolve these inquiries and continue our discussions on these issues.  But we note that Plaintiff's inquiries at this stage of the litigation are overly burdensome for agencies that are attempting to respond to not only your client's FOIA request, but also FOIA requests submitted by others.

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
July 11, 2023
Page 2

## Questions Directed to OIG

### 1.  Additional Search of Narrative Field of EDS and Two Additional Special Agents

In regard to your questions concerning OIG's additional searches, there are 2,825 pages of potentially responsive pages to be processed. Of that number, OIG already processed 1,307 pages for its June production (released on June 30, 2023), so 1,518 pages remain. These pages are not part of the 41,000 pages identified in Defendants' June correspondence; those 41,000 pages relate solely to ICE, **not OIG**.

In regard to your request to link searches related to particular Special Agents to the four individuals named in the FOIA request, the searches can be summarized as follows

- Records of three Special Agents were searched in the El Paso Field Office pertaining to the investigation into the death of Jonathan Alberto Medina-Leon:

- Records of one Special Agent was searched in the Atlanta Field Office pertaining to the investigation into the death of Teka Gulema.

- No records relating to an investigation into the death or detention of either Mr. Ibarra Bucio or Mr. Vargas Arellano were located, thus, searches of any additional Field Offices were unnecessary.

### 2.  Mr. Ibarra Bucio

Your client requests that, to the extent OIG claims it has no documents responsive to Plaintiff's FOIA request as it related to Mr. Ibarra Bucio, OIG confirm that it did not conduct an investigation into his detention and/or death.

Your client's request goes beyond the scope of the FOIA. An agency's responsibility is, upon receiving a request that "reasonably describes" the records requested, to search for, process, and produce non-exempt records that are responsive to the subject of a FOIA request. *See* 5 U.S.C. § 552(a)(3)(A). If a requester has a question pertaining to the search or an exemption applied, the agency will respond to those types of questions, or in the case of litigation, may provide a *Vaughn* index to support the withholdings should they be challenged.

Here, your client's inquiry pertains to neither the search nor the exemptions/redactions applied. Thus, OIG's answer is that a search for records responsive to Plaintiff's FOIA request was conducted, and no responsive records pertaining to the death or detention of Mr. Ibarra Bucio were located.

### 3.  Mr. Vargas Arellano

OIG's search pertaining to Mr. Vargas Arellano yielded 12 pages that were responsive to the request. OIG produced four of those pages on June 29, 2023, and they are currently consulting with another agency on the other 8 pages.

Finally, OIG has two productions remaining and thus anticipates it will no longer have any responsive records to process as of September 2023.

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
July 11, 2023
Page 3

**Questions Directed to ICE**

1. **Request Nos. 1 & 3**

   As noted above, ICE will de-duplicate and thread the 41,000 pages it has located. Still, there is a potential that duplicative documents may be released as will be discussed in the Declaration of Fernando Pineiro, the Director of the ICE FOIA Office. In short, duplication may occur due to a variation on the name or something that the system will not read as a duplicate. For example, if an email header contains typos or extra characters, the operation does not recognize the text as email header fields and the files are not recognized as duplicate email files. If documents have been produced with Bates stamps in the text, this results in extra inclusive flags. If some emails in a thread contain extra text in the bottom segment, most commonly found from confidentiality footers being applied by a server, this results in extra inclusive flags such that the system might not read them as duplicative.

   Turning to responsive documents related to the four-named individuals in the FOIA request, though ICE is not aware of any regulation requiring it to do so, it agrees that it will, to the best of its ability, produce them in your client's requested order (Jose Ibarra Bucio, Johanna Medina Leon, Martin Vargas Arellano, and then Teka Guelma).

   With respect to your request that ICE provide a breakdown of the number of responsive pages via month for Mr. Gulema, it is not required to do so under the FOIA. Thus, it will not dedicate resources to do so now.

   The potentially responsive records related to Mr. Gulema include SEN and SIR records, communications related to Significant Detainee Illness (SDI) meetings, and communications between IHSC Staff, Field Medical Coordinators, the Office of Enforcement and Removal Operations (ERO), and agency staff responsible for reviewing the SDI spreadsheet.

2. **Request No. 4.**

   ICE will commence the search and provide hit counts as soon as practicable.

3. **Requests Nos. 5 & 7**

   ICE has previously agreed to search OPR and IHSC. Please note that it is not possible for ICE to task all IHSC staff.

   With respect to No. 5, ICE believes that, as described, these documents do not exist.  In order to obtain the information sought by Plaintiff, IHSC would need specific information pertaining to detainees. If there is a list of detainees Plaintiff would like ICE to search for with respect to this request, please provide them. However, ICE does not possess such a list. Furthermore, OPR does not create or possess SIRs or SENs. OPR also does not maintain death reports or case notes for detainees who die outside of ICE custody. Nor does OPR maintain any data related to (a) hospitalization, (b) a patient in the care of an external healthcare provider or

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
July 11, 2023
Page 4

facility; nor (c) released from custody immediately prior to transfer to an emergency room, hospital, or extern care facility. OPR is notified only of deaths that occur in-custody.

4. **<u>Request No. 6</u>**

In order for ICE to commence the search with the terms and connectors previously agreed to, ERO needs a date, or an event, or a location, or alien number to search for an SIR or SENs. Also, SIRs and SENs are not generated at the ERO Headquarters level. OPR does not create SIRs or SENs.

5. **<u>Request No. 8</u>**

The parties appear to agree on search terms and connectors. ERO can task IHSC to conduct this search. However, similar to Request No. 6, clarification may be required such as specific names of non-citizens Plaintiff would like ICE to search for. It is not that ERO is not providing records, but, as ICE understands this request, Plaintiff seeks records that do not exist.

ICE will not agree to search for information related to *Fraihat* because that was not requested in your client's FOIA request.

6. **<u>Request No. 9</u>**

ICE has already conducted searches of the four individuals named in the FOIA request. Billing records do not reside with ICE, as was communicated in Defendants' June 22, 2023 correspondence.

**<u>Issues Raised During the July 5, 2023 Status Conference</u>**

To also address issues raised during the July 5, 2023 Status Conference, as indicated above, Defendant ICE intends to submit to the Court a workload declaration from the Director of the ICE FOIA Office. That declaration will include, among other things, recent statistics regarding FOIA requests submitted to ICE. Specifically, it will confirm that the ICE FOIA office is involved in 151 open federal district court cases, of which 69 are in active record production. The declaration will also provide information regarding the increased complexity and volume of FOIA requests that ICE is receiving and why the agency cannot agree to a production rate as opposed to a processing rate. Finally, it will include information specific to this case, including the current processing rate along with confirmation that ICE has agreed to de-duplicate the remaining records, as well as conduct email threading in an attempt to reduce the number of potentially responsive pages which will benefit all concerned.

ICE notes that the processing rate in this case is consistent with those ordered or agreed to in other cases, including the following in the Central District of California:

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
July 11, 2023
Page 5

- *Center For Human Rights and Constitutional Law et al v. Department of State*, 2:16-cv-00899-SVW-SS. *See* Stipulation and agreement to process at a rate of 400 pages/month (ECF 14, at 3:12-17) and Order (ECF 15).

- *Craig Scott Rosebraugh v. DOJ*, 2:16-cv-09003-ODW-MRW. *See* Joint Rule 26(f) Report including FBI agreement to process at a rate of 500 pages/month (ECF 12, at 4:26-28; 5:9-16) and Order (ECF 13), Status Report (ECF 14, at 2:11-3:22) and Order (ECF 15), etc.

- *Jason Leopold, Buzzfeed Inc. v. DOJ, et al.*, 2:17-cv-03747-CBM-JEM. *See* Joint Status Report including FBI agreement to process at a rate of 500 pages/month (ECF 31, at 3:16-4:25) and Order (ECF 32).

- *Grayson Flory v. DHS*, 2:19-cv-09735-PSG-MRW. *See* Stipulation to Stay and CBP agreement to process at a rate of 500 pages/month (ECF 17, at 3:17-18) and Order (ECF 18), Stipulation Continuing Stay (ECF 19 at 3:8-11) and Order (ECF 20), etc. The rolling release is continuing in that case.

- *Al Otro Lado et al. v. DHS, et al.*, 2:20-cv-05191-ODW (MRWx). *See* Minute Order (ECF 35) (ordering 1,000 pages per month; citing cases).

These processing rates are also consistent with other districts (even where the pages at issue span into the six-digits):

- *Ctr. for Repro. Rights v. State*, No. 18-2217-DLF (D.D.C. Apr. 3, 2019) (300 page/month processing rate, despite the plaintiff's request for a higher rate, in a case where there are over 123,000 potentially responsive pages.)

- *Am. Immigration Council v. U.S. Dep't of Homeland Sec.*, 470 F. Supp. 3d 32, 39 (D.D.C. 2020) (ordering 400 pages per month pursuant to a preliminary injunction under FOIA in a COVID-related case)

- *Bacardi v. Treasury*, No. 17-1828-CKK (D.D.C. Dec. 19, 2017) (ordering review rate of 350 pages/month over the plaintiff's objection)

- *Blixseth v. DOJ*, No. 18-2281-JEB (D.D.C. Dec. 17, 2018) (ordering 300 page/month review rate)

- *Chaverra v. U.S. Immigration & Customs Enf't*, 2020 WL 7419670, at *1 (D.D.C. Nov. 5, 2020) (ordering 500 pages/month and collecting similar cases)

- *Citizens United v. State*, No. 16-67-CRC (D.D.C. Aug. 16, 2016) (ordering 300 page/month review rate despite plaintiff's request that agency review 2,000 pages/month)

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
July 11, 2023
Page 6

- *Citizens United v. State*, No. 16-108-RMC (D.D.C. July 27, 2016) (ordering 300 page/month review rate)

- *Citizens United v. State*, No. 18-326-CRC (D.D.C. May 30, 2018 & June 6, 2018) (ordering 300 page/month review rate despite plaintiff's request that agency review almost 8,000 pages/month, "in light of the resource constraints and production orders in other cases.")

- *Daily Caller News Found. v. FBI*, 387 F. Supp. 3d 112, 121 (D.D.C. 2019) (ordering 500 pages/month and rejecting plaintiffs' request for 1,200 pages/month)

- *Documented NY v. U.S. Dept. of State*, 2021 WL 4226239, at \*5 (S.D.N.Y. Sept. 16, 2021) (ordering 400 pages/month and rejecting the plaintiff's request for remaining 2,600 pages to be processed and produced within approximately two-and-a-half months)

- *Jordan v. DOJ*, No. 17-2702-RC (D.D.C. Aug. 28, 2018) (ordering 300 page/month review rate)

- *Judicial Watch v. State*, No. 17-205-CRC (D.D.C. June 30, 2017) (ordering 300 page-per-four-week review rate despite plaintiff's request that agency review on average more than 16,000 pages/month)

- *Middle E. Forum v. DHS*, 297 F. Supp. 3d 183, 185-86 (D.D.C. 2018) (ordering 500 pages/month and rejecting plaintiffs' request for 1,000 pages/month, and collecting similar cases.)

- *Republican Nat'l Comm. v. U.S. Dep't of State*, 2016 WL 9244625, at \*1 (D.D.C. Sept. 16, 2016) (ordering 500 pages/month)


Finally, with respect to Plaintiff's request for a monthly status conference with the Court, we reiterate that such is not a productive use of the parties' or the Court's time. Monthly conferences will necessarily require the agencies to redirect resources from the processing of Plaintiff's FOIA request (and others'), to provide updates that will largely only confirm that a production will occur as ordered. To the extent that Plaintiff envisions that a monthly status conference will be a venue to raise issues over the adequacy of searches, withholdings or redactions, those matters are properly left for adjudication at the summary judgment stage after the agencies have completed their productions.

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
July 11, 2023
Page 7


      Please let me know if you have any questions or would like to further discuss any of the matters raised above ahead of this Thursday's status conference.

Respectfully,

E. MARTIN ESTRADA
United States Attorney

/s/ *Joseph W. Tursi*

JOSEPH W. TURSI
Assistant United States Attorney

cc: Hon. Shashi H. Kewalramani (via CRD email)
    Ms. Eunice Cho (by email)
    Mr. Michael Kaufman (by email)
    Mr. Kyle Virgien (by email)

# EXHIBIT X

July 12, 2023

Joseph Tursi
Jason Axe
Alarice Medrano
United States Attorney's Office
Central District of California
300 N. Los Angeles St. Suite 7516
Los Angeles, CA 90012
Joe.Tursi@usdoj.gov
Jason.Axe@usdoj.gov
Alarice.Medrano@usdoj.gov

**SENT VIA EMAIL**

Re:     *ACLU of Southern California v. United States Immigration and Customs
Enforcement, et al.,* No. 2:22-cv-4760 (C.D. Cal.)

Dear Counsel,

This responds to Defendants' July 11, 2023 letter regarding the Parties' continued meet and
confer over the status of Defendants' searches in response to Plaintiff's FOIA Request.

While we appreciate Defendants' substantive responses, we are disappointed by their attempt to
recast their own proposal that the Parties negotiate search parameters as Plaintiff's
"micromanagement of Defendants' processing of Plaintiff's FOIA request." As a reminder, in a
letter dated March 29, 2023, Defendants *invited* Plaintiff to propose search terms to address
Defendant ICE's admitted failure to search for Request Nos. 4-9. In the following three months,
the Parties made progress on negotiating these search parameters, albeit at a pace that failed to
keep up with the Scheduling Order in the case. Notably, in a June 1, 2022 stipulation which
Defendants asked Plaintiff to enter into to extend the summary judgment briefing schedule, they
represented to the Court that "the parties have worked together to, among other things, try to
clarify search terms for remaining requests, what additional searches Defendants shall undertake,
by what date Defendants shall resume producing responsive documents, and the pace of
Defendants' monthly production. The additional time requested would allow for the parties to
continue their efforts to resolve issues related to the search for records and address issues related
to any records withheld in full or part." Dkt. 42.

Given this record, Defendants' claim of Plaintiff's purported "micromanagement" is baseless,
and appears to be an attempt to distract from Defendants' wholly unjustified delay in conducting
additional searches that meet FOIA's search adequacy requirements. *Transgender Law Center v.
ICE*, 46 F. 4th 771, 779 (9th Cir. 2022) (it is Defendants' burden to conduct an adequate search,
"reasonably calculated to uncover all relevant documents" "beyond a material doubt," which
includes consideration of "positive indications of overlooked materials," and "leads that emerged
during the agencies' inquiry."). Indeed, had Plaintiffs not pressed Defendants as to the adequacy
of their initial searches, Defendants would never have conducted the supplemental searches for

1

Request Nos. 1-3 that resulted in ICE's identification of an additional 41,000 responsive pages, and OIG's identification of an additional 2,825 responsive pages. *See* Defendants' July 11, 2023 letter. Plaintiff's inquiries that led to these results can hardly be characterized as "dictating" or imposing an unwarranted "burden" on Defendants, so much as efforts to hold Defendants to their FOIA obligations.

**Responses from OIG**

We appreciate Defendant OIG's responses to the inquiries posed in our June 26, 2023 letter.  We request that OIG clarify that it will complete its review of the remaining 1,518 pages of responsive records, and produce all non-exempt material by August 2023 per the pace of production required by the Court. Dkt. No. 40, Scheduling Order.

In addition, we specifically request that OIG ensure production of documents received and reviewed by the agency as part of its review of Mr. Teka Gulema's death, listed in the OIG's Memorandum of Activity, produced at p. 144 of the pdf in OIG's June 2023 production. *See* Exh. A, OIG, Memorandum of Activity. These documents include:

- ICE Release Notification to Mr. Gulema, Oct. 22, 2016, with attached checklist
- Email dated Oct. 22,2015, from Gulema's ERO Case Officer, regarding the release notification email for Gulema, as well as the attached email from ICE Management and Program Analyst, with the subject including "Release Notification Email—10-22-15."
- Email dated Oct. 23, 2015, that states that an employee "spoke with the AFOD and Gulema was not to be released at this time."
- Email dated Nov. 9, 2015, characterized as "a continuation on the hold on Gulema's release." This email also included an email dated October 22, 2015, which stated "Please hold on any further actions as we'll need clarification as to the release mechanism, including any continuity of care or alternative placement."
- Document dated Oct. 20, 2015, that relates to guard service and placement of Gulema.
- Two forms dated November 24, 2015, identified as DHS ICE Form I-216, Records of Persons Transferred, which indicated that Gulema was transferred on this date via OSUP. The other form is DHS ICE Form I-203, Order to Release Alien.

**Responses from ICE**

We remain concerned that ICE is continuing to delay completion of searches for Requests Nos. 4-9 without any proper justification. Despite Defendants' stated commitment to "trying to resolve this litigation through negotiations," and their "desire to attempt to resolve this case without the need for further litigation," Defendants' Portion of the Parties' June 30, 2023 Status Report at 13, ICE has yet to commit to any specific timeframe by which it will complete its search for these Requests, even as to those where the Parties have fully negotiated the search parameters. *See* Defendants' July 11, 2023 letter re Request No. 4 ("ICE will commence the search and provide hit counts as soon as practicable."). At the same time, ICE has filed a Rule 12(c) motion to attempt excuse its obligation to search for these Requests altogether. Despite the apparent inconsistency in its words and actions, the one through line is ICE's attempts to draw out and indefinitely delay its search and production obligations for Request Nos. 4-9.

For these reasons, and those discussed below, Plaintiff is fully justified in seeking monthly Status Conferences with the Court. This appears to be the only way that Defendants can be held accountable even to their own stated search and production commitments, and to ensure an expeditious resolution of this case.

1.  *Requests Nos.1 and 3:*

We appreciate the information ICE has provided regarding the de-duplication process, and its commitment to thread the 41,000 addition documents yet to be processed. However, we are confused by its statement in its July 11, 2023 letter that it "will de-duplicate" these 41,000 pages. ICE previously represented to Plaintiff that it had already de-duplicated these records. *See* Defendants' June 22, 2022 Letter at 2. If that representation was not correct, ICE should complete de-duplication and threading, and inform Plaintiff how many pages result after these processes have taken place. The Court made clear at the July 5, 2023 Status Conference that this information would be essential to its determination of the monthly pace of production going forward.

In an effort to further prioritize and potentially narrow the field of the additional 41,000 documents to be processed, Plaintiff again requests that ICE provide a breakdown of the number of responsive pages via month for Mr. Gulema. As Plaintiff has repeatedly documented, ICE has substantially failed to produce documents dated after October 1, 2015 in its current production of documents regarding Mr. Gulema. It appears that the ICE FOIA office is able to sort documents via date. *See* Dkt. No. 48-1, Decl. Fernando Piniero, ¶ 19 ("After completing an email threading process, search terms and date ranges can be applied to further narrow the scope.").

2.  *Request No. 4*

Now that the Parties have fully agreed on the search parameters, as discussed, ICE should commit to a date certain when it will conduct the searches and provide Plaintiff hit counts. It has been over two weeks since Plaintiffs clarified the search locations on June 26, 2023, when ICE had all of the information it needed to commence the searches. We ask that it do so within five days from today.

3.  *Requests Nos. 5 and 7*

Regarding ICE's representation that it will only generally search the Office of Professional Responsibility (OPR) and IHSC in response to Request Nos. 5 and 7, and not key IHSC staff, ICE provides no justification for this position, resulting an inadequate search on its part. Further, Plaintiff is not asking ICE to search "all IHSC staff," but rather key personnel who in its Medical Case Management and Unit Medical Care Coordination Program staff, IHSC participants in Significant Detainee Illness (SDI) Meetings, as well as ICE ERO staff in communication with IHSC's Medical Case Management Unit. Plaintiff's June 26, 2023 letter provided ample reason why these key staff should be searched for responsive records, to which ICE has failed to respond. For these reasons, we maintain our position that omitting these search parameters would result in an inadequate search of Request Nos. 5 and 7.

Defendants have claimed that documents described in Request No. 5 "do not exist" "as described." Plaintiff has requested "spreadsheets, emails, documents, communications, databases, lists, and other data compilations" "that identify detainees who were released from custody while (a) hospitalized (including for COVID-19 treatment); (b) in the full-time care of external healthcare providers or facilities (including for COVID-19 treatment), or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility." Requested custodians include "ICE Leadership, ICE Enforcement and Removal Operations, ICE Health Service Corps, and ICE Office of Professional Responsibility."

Plaintiff does not merely seek a "list" of such individuals, but also seeks spreadsheets, emails, documents, and communications that would identify such detainees. Defendants are clearly in possession of such documents, which would be recoverable using the search terms at the suggested search locations provided. Defendants' production, for example, has indicated that ICE Enforcement and Removal Operations reports the deaths of detainees—even those that took place outside custody. *See, e.g.* Exh. B, OIG June 2023 Production, p. 1-2 (noting that "[o]n June 3, 2019, ICE ERO El Paso reported the death of [Johana Medina-Leon] to DHS OIG El Paso, TX.").

In addition, in order to conduct an adequate search, Defendants are required to "follow 'obvious leads.'" *Transgender Law Center*, 46 F.4th at 780. IHSC monitors detainee hospitalization and offsite medical care treatment, including significantly ill detainees. *See* ICE, IHSC Annual Report for FY 20 (2021), https://www.ice.gov/doclib/ihsc/IHSCFY20AnnualReport.pdf at 24. IHSC's Public Health, Safety, and Preparedness unit monitored and tracked COVID-19 system for ICE detainees across the health system. In addition, in FY 2011, "IHSC developed and piloted the IHSC Unified Patient Tracking System to track and report significant event notifications, significant detainee illness (SDI) . . . within the IHSC healthcare system." *See* DHS, *Healthcare Costs for Noncitizens in Detention, Fiscal Year 2021 Report to Congress* at 6 (Jul. 22, 2022), https://www.dhs.gov/sites/default/files/2022-09/ICE%20-%20Healthcare%20Costs%20for%20Noncitizens%20in%20Detention.pdf.

Despite our disputes as to the parameters for Request Nos. 5 and 7, so as not to further delay the search for these Requests on the parameters on which we agree, Plaintiff asks that ICE commence the agreed-upon search for Request Nos. 5 and 7, and provide Plaintiff hit counts within five days from today. Please provide information as to the terms and locations searched. Plaintiff reserves the right to revisit the dispute over the appropriate parameters of ICE's search, including through Court process.

4. *Request No. 6*

On June 12, 2023, Plaintiff provided a list of search terms, to which Defendant has agreed, for this Request. ICE now states that "ERO needs a date, or an event, or a location, or alien number to search for a SIR or SENs." To the extent that ERO is unable to search the Significant Incident Report (SIR) system in the Significant Event Notification (SEN) system using the agreed-upon search terms, Plaintiff suggests that ICE search the records of the ICE Joint Intelligence Operations Center (JIOC), which "analyzes the SIRS and sends summaries of them to the appropriate . . . field offices." *See* DHS, Privacy Impact Assessment for the Significant

Event Notification (SEN) System 1-2, Oct. 15, 2021,
https://www.dhs.gov/sites/default/files/publications/privacy-pia-ice023a-sen-october2021.pdf
(describing the Significant Incident Report system and those who have access to reports).

In addition, ICE has misread the Request with respect to ICE OPR. Plaintiff also requests any
spreadsheets, emails, or documents in ICE OPR's possession that "mention the death of any
detainee who had been previously released from custody while hospitalized, a patient in the care
of an external healthcare provider or facility, or released from custody immediately prior to
transfer to an emergency room, hospital, or external care facility. Please use the agreed-upon
search terms for such records within OPR's possession.

     5.     *Request No. 8*

Regarding ICE's refusal to search for information related to the *Fraihat* case, ICE provides no
valid justification for this position. There is no requirement that Plaintiff must identify a search
location in its FOIA Request in order for ICE to be required to search it.  Rather, particularly
where, as here, Plaintiff has provided ample basis that records regarding COVID-19
hospitalizations from *Fraihat* is likely to yield responsive records, ICE's failure to search it
would result in an inadequate search.  *See Transgender Law Center v. ICE*, 46 F. 4th at 779 (it is
Defendants' burden to conduct an adequate search, "reasonably calculated to uncover all relevant
documents" "beyond a material doubt"). As set forth in our June 26, 2023 letter, *Fraihat*
addresses COVID-19 conditions in ICE detention, which led to hospitalizations and releases, a
core subject of Plaintiff's FOIA Request. *See also* Plaintiff's May 19, 2023 letter, Exh. B
(Deposition transcript of Jennifer Moon). For these reasons, we maintain our position that unless
ICE searches *Fraihat* for responsive records, its search is inadequate.

Notwithstanding the Parties disputes regarding search parameters, so as not to further delay the
search for these Requests on the parameters on which they agree, Plaintiff asks that ICE
commence its search for Request No. 8 based in the parameters on which the Parties agree, and
provide Plaintiff hit counts within five days from today. Please provide information as to the
terms and locations searched. Plaintiff reserves the right to revisit the dispute over whether ICE
is obligated to search records compiled by ICE for *Fraihat* for records responsive to Request No.
8, including through Court process.

     6.     *Request No. 9*

The Parties appear to be at an impasse on Request No. 9.  Defendants are clearly in possession of
responsive records. As ICE has reported to Congress, "IHSC reimburses independent providers
who provide care in local hospitals and healthcare systems for services rendered." *See* DHS,
*Healthcare Costs for Noncitizens in Detention, Fiscal Year 2021 Report to Congress* at 3 (Jul.
22, 2022), https://www.dhs.gov/sites/default/files/2022-09/ICE%20-
%20Healthcare%20Costs%20for%20Noncitizens%20in%20Detention.pdf. Moreover, it is clear
that IHSC employees, particularly those in the Medical Resources Unit, discuss billing for
hospitalization or external care of detained people who were released from custody. See Exh. C,

ICE Production, 2022-ICLI-48, 5600 (noting hospital bill for Teka Gulema of "$1.6 million dollars").

To help break impasse, Plaintiff suggests that ICE search the following locations and terms for documents in response to Request No. 9:

- **Search Locations re: Request No.9:**
  - ICE Health Service Corps, Resource Management Unit
- **Search Terms re: Request No. 9:**
  - Death
  - Died
  - Deceased
  - Ambulance
  - Emergency
  - Hospital
  - "offsite referral"
  - "life support"
  - Coma
  - Ventilator
  - "Intensive care"
  - "critical condition"
  - Hospice
  - Palliative
  - Release
- **Boolean Search in Relativity re: Request No. 9:**
  - (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian or death or died or deceased or "critical care") AND (bill! or invoice or charge or payment or Medicaid or MedPAR or paid)

Plaintiff also reserves the right to request additional specific information at a later date if Defendants' searches for Request Nos. 4-9 identify additional people whose records may be responsive to this request.

**Increased Processing Rate**

Plaintiff is in receipt of the Pineiro Declaration attesting to ICE's FOIA workload and information specific to this case. Dkt. 48-1. We appreciate ICE's attestation that it will conduct de-duplication and email threading of the 41,000 pages of documents it has yet to review.  As discussed, we await an updated page count to assess the universe of documents subject to ICE review and production, to determine an appropriate processing rate given the circumstances of this case. Depending on the number of pages at issue after de-duplication and threading, Plaintiff is also amenable to proposing additional parameters, including date ranges, to reduce the total number of documents for processing.

While we appreciate that ICE has 69 federal district court cases in active production across the country, and has a "normal processing rate for cases in litigation [of] 750 pages" per month, this hardly justifies ICE's refusal to increase its processing rate for this case, including to Plaintiff's proposal of 5,000 pages/month for Request Nos. 1-3, and 2,500 pages/month for Request Nos. 4-9).

The facts of this case more than warrant ICE being required to increase their "typical" processing rate along the lines Plaintiff seeks. As set forth in Plaintiff's Portion of the June 30, 2023 Status Report, Courts routinely order increased production rates in situations where, as here, the Defendant agency is at fault for failing to timely search for and produce responsive records. *See Long v. IRS*, 693 F.2d 907, 910 (9th Cir. 1982) ("unreasonable delays in disclosing non-exempt documents violate the intent and purpose of the FOIA, and the courts have a duty to prevent these abuses."); *Los Angeles Times Commc'ns LLC v. U.S. Dep't of Homeland Sec.,* No. 2:20-cv-10911-FLA-MRW, 2020 WL 7055904 (C.D. Cal. 2020), December 3, 2021 Minutes Order, Dkt. 35 (ordering production of 3,000 pages per month FOIA case seeking analogous information); *Seavey v. DOJ*, 266 F. Supp. 3d 241, 248 (D.D.C. 2017) (ordering production at a rate of "at least 2,850 pages per month" and finding this pace "well within the range of what other courts have ordered," despite agency's claim that 500 pages would be consistent with its policy); *Clemente v. FBI*, 71 F. Supp. 3d 262, 269 (D.D.C. 2014) (ordering agency to process 5,000 records a month); *Elec. Privacy Info. Ctr. v. FBI*, 933 F. Supp. 2d 42, 48-50 (D.D.C. 2013) (rejecting claim that "'exceptionally large number' of FOIA cases involving the agency currently in litigation" justified only processing 1,500 pages per month, and ordering significantly higher volume in response to plaintiff's request); *Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enf't Agency*, 811 F. Supp. 2d 713, 731 (S.D.N.Y. 2011) (ordering ICE to fully respond to an outstanding FOIA request that required producing over 14,000 pages in one month); *Judicial Watch, Inc. v. Dep't of Energy*, 191 F. Supp. 2d 138, 140-41 (D.D.C. 2002) (ordering agencies to process over 6,000 pages of material within 60 days).

Plaintiff filed its FOIA Request over a year ago on April 29, 2022, and it filed litigation to expedite production of responsive records in July 2022. It simply would not be fair for Plaintiff to have to wait another 3.5 years for ICE to produce responsive records particularly under the circumstances here.  Among the circumstances weighing in favor of Plaintiff's request for an expedited production schedule include: (1) Defendants' failure to de-duplicate the initial universe of approximately 8,000 pages it identified at the time of the Scheduling Order, which would have greatly reduced the volume of pages for review and production; (2) ICE's inexplicable delayed disclosure of the additional 41,000 pages it identified on June 6, 2023, over four months after the Scheduling Order, whose timely disclosure likely would have resulted in an increased production rate and/or other adjustments to the Scheduling Order to ensure more expeditious prosecution of the case, (3) ICE's delay in agreeing to de-duplicate and thread those 41,000 pages, which it apparently still has yet to do a month after their disclosure, thus delaying their production, and (3) ICE's delayed agreement to conduct any search for Request Nos. 4-9, and its related delay in commencing those searches and committing to any date certain when they will be completed, as discussed above.

For all these reasons, the cherry-picked exemplars ICE provides in Defendants' July 11, 2023 letter reflecting other cases where ICE is subject to lower processing rates than what Plaintiff

seeks here are unhelpful, and they do not justify ICE's refusal to increase its production rate here. Defendants do not attest that those cases contain facts like those here. Further, the cases cited in C.D. Cal. appear to be based on stipulations between the parties, without any explanation of the total universe of documents at issue, or the length of time to complete the production and conclude the case. The cases are also anomalous in that they mostly reflect production rates in the 300-500 range per month, which is even below ICE's "normal" processing rate of 750 pages per month, as reflected in the Pineiro declaration.

Finally, it appears that at least some representations in Mr. Pineiro's declaration regarding the ICE FOIA Office's workload are inaccurate or misleading. For example, in paragraph 5, Mr. Piniero attests that:

> *In fiscal year ("FY") 2020, the number of FOIA requests the ICE FOIA Office handled dramatically increased to over 100,000 from approximately 64,000 in FY 2019. Since FY 2020, that number has continued to increase, with the ICE FOIA Office handling approximately 105,000 requests in FY 2021 and over 110,000 requests in FY 2022. This spike in ICE FOIA's workload is attributed to an increase in the number of requests from individuals for documents in their immigration file coupled with increased public interest in the Department's implementation of Presidential and/or Executive Orders.*

ECF No. 48-1 ¶ 9. However, Mr. Pineiro's declaration is inconsistent with Defendants' attestation regarding elimination of this FOIA backlog. In another case regarding ICE's FOIA processing rates, Defendants attested that "ICE eliminated its A-File backlog entirely by the end of the second quarter—a result made possible by the interagency memorandum of agreement between ICE and USCIS signed in 2020 and renewed in subsequent years." *See Nightingale v. USCIS*, No. 19-03512, N.D. Cal., ECF 138 at 4 (Sept. 15, 2022).

We look forward to continuing to discuss these matters with Defendants and the Court at the July 13, 2023 Status Conference.

Sincerely,

LABONI A. HOQ (SBN 224140)
laboni@hoqlaw.com
HOQ LAW APC
P.O. Box 753
South Pasadena, California 91030
Telephone: (213) 973-9004

EUNICE CHO (pro hac vice)
echo@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
915 Fifteenth Street NW, 7th Floor
Washington, DC 20005
Telephone: (202) 548-6616

MICHAEL KAUFMAN (SBN 254575)
MKaufman@aclusocal.org
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA

KYLE VIRGIEN (SBN 278747)
kvirgien@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

1313 West Eighth Street
Los Angeles, California 90017 Telephone:
(213) 977-9500
Facsimile: (213) 915-0219

NATIONAL PRISON PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (202) 393-4930

*Attorneys for Plaintiff*

# EXHIBIT A



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## MEMORANDUM OF ACTIVITY

**Type of Activity**: Personal Contact (b)(6);

| **Case Number:** I16-ICE-ATL-17063 | **Case Title:** Etowah County Detention Center |
|---|---|

On Thursday, September 1, 2016, (b)(6); , Special Agent, and (b)(6); , Lead Criminal Investigator, the Department of Homeland Security (DHS), Office of Inspector General (OIG), Atlanta Field Office, interviewed (b)(6); (b)(7)(C)  Supervisory Deportation and Detention Officer (SDDO), Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO), Gadsden, AL. The interview was in reference to a DHS OIG investigation initiated from a letter dated August 11, 2016, from the office of Zoe Lofgren, Congress of the United States, House of Representatives, Ranking Member, Immigration and Border Security Subcommittee. The Congressional request was made to John Roth, Inspector General, DHS OIG.

The request called for a review of the detainee care and operating policy and procedure at the Etowah County Detention Center (ECDC), Gadsden, AL, specifically in regards to detainee Teka Gulema ( (b)(6); (b)(7)(C)  - Ethiopia). According to the request, Gulema spent over eight years in the physical custody of U.S. Immigration and Customs Enforcement (ICE) (several of those years at ECDC) until February 7, 2015, when he was transported to an emergency room at the Riverview Regional Medical Center (RRMC), Gadsden, AL. Gulema remained hospitalized at RRMC until his death on January 18, 2016. According to the letter, Gulema had been released from ICE custody approximately ten days prior to his death. Because Gulema was not in custody at the time of his death, his death was not reported as an custody death and was not investigated by DHS. The request specifically called for an inquiry into the current health care system at ECDC and if the health care system or lack of heath care contributed to the death of Gulema. The request also called for a review of Gulema's ICE detention records.

On the previous date, the agents met briefly with (b)(6); to discuss some logistics for the investigation. Prior to the interview on the date of this report, the agents again explained the nature of the interview. (b)(6); was advised of DHS OIG warnings not to disclose investigative information. (b)(6); was also advised of his Federal Employee Warnings (Garrity Warnings). (b)(6); read and signed the forms and agreed to be interviewed. During the interviews, (b)(6); stated the following in substance:

(b)(6); stated that he became the SDDO in Gadsden in 2013. (b)(6); had previously been a Supervisory Immigration Enforcement Agent and Detention and Removal Officer with ICE. (b)(6); was also an agent with the U.S. Border Patrol from 1996-2001.

| Name, Title, Signature, and Date: | | Reviewing Official Name, Title, Signature, and Date: | |
|---|---|---|---|
| (b)(6); Special Agent | (b)(6); (b)(7)(C) 09/14/2016 | (b)(6); Lead Criminal Investigator | (b)(6); (b)(7)(C) (b)( 7/30/16 |

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General, and is disseminated only on a need to know basis. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

# MEMORANDUM OF ACTIVITY

On the previous date, (b)(6): advised that Gulema continually refused to cooperate with ICE officials and would not sign required paperwork for removal proceedings. The process includes a Post Order Custody Review (POCR) once paperwork is signed and travel documents are issued. In the case of Gulema, the POCR clock was basically "suspended" because of Gulema's continual refusal to cooperate. (b)(6): stated that detainee can stay in a failure to comply (FTC) status indefinitely, depending on the specifics of a detainee's case.

According to (b)(6): , once Gulema was placed in the hospital, ICE officials were determining if Gulema could be released. Additional attempts were made to obtain travel documents without success. Eventually, ICE headquarters determined that Gulema could be released on an order of supervision (OSUP). (b)(6): commented that he recalled ICE was paying approximately $20,000 a month in guard services at RRMC and ICE had paid at least three million dollars in medical expenses. (b)(6): stated that these costs were not a determining factor in placing Gulema on OSUP.

(b)(6): did not recall Gulema ever filing a writ of habeas corpus seeking removal from detention. (b)(6): stated that only a deputy field officer director or above can place someone in an FTC status. (b)(6): did not recall Gulema ever pushing to be released and did not make any extra efforts to be released.

(b)(6): stated that medical issues concerning Gulema would be documented in the ECDC paperwork and would not be part of Gulema's ICE file. (b)(6): stated that the American Civil Liberties Union had requested information in regards to Gulema and that information was provided in a Freedom of Information Act request. (b)(6): provided DHS OIG with several documents including copies of electronic mail (email) messages. These will be documented below. (b)(6): further stated he would send additional messages to SA (b)(6): . These records will be documented in a separate report.

The documents received are summarized as follows:

The first document was an ICE Release Notification to Gulema from (b)(6): , POCR Unit Chief, ICE HQ. The notification was dated October 22, 2016. There was an HQ POCR checklist attached to the letter. The checklist stated, "Due to alien's medical condition and prognosis, the Embassy of Ethiopia refused to conduct an interview or issue a travel document on his behalf. Therefore, since alien's medical condition is unlikely to improve anytime soon, there is not a significant likelihood of removal in the reasonable foreseeable future."

The next document is an email from (b)(6): to (b)(6); (b)(7)(C) Gulema's ERO Case Officer, dated October 22, 2015, regarding the release notification email for Gulema. (b)(6): advised that they are not to release at this time, the ERO Field Office Director (FOD) was checking with HQ. The email also contained an email from (b)(6): Management and Program Analyst,

**IMPORTANT NOTICE**
This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

## MEMORANDUM OF ACTIVITY

DSH/ICE/ERO/RMD/RIO, Middle East/East Africa, to multiple recipients, including (b)(6);
with the subject "(b)(6);  – Release Notification Email – 10-22-15."

The next document was an email dated October 23, 2105. The email was from (b)(6);  to
(b)(6);  The email stated that (b)(6); spoke with the AFOD and Gulema was not to be
released at this time.

The next document was an email dated November 9, 2015, from (b)(6);  to (b)(6); and
other recipients. It was a continuation of the hold on Gulema's release. Also included in the
email chain was an email from (b)(6);  FOD, ICE ERO, New Orleans, LA. The email was
dated October 22, 2015, and stated, "Please hold on any further actions was we'll need
clarification as to the release mechanism, including any continuity of care or alternate
placement."

Another document was an unrelated to Gulema's release letter dated October 20, 2015. The
email was to (b)(6); and (b)(6);  from (b)(6);  Gulema was the subject of the email and it had to
do with guard service and placement of Gulema. The guard services were identified at $20,000+
per month. The email further stated that ICE Health Service Corp was still seeking placement
for Gulema and HQ was still "deliberating."

(b)(6); provided DHS OIG with a copy of the ICE contract with ECDC. The contract was dated
in October 2009 and was signed by (b)(6);  , Assistant Secretary, ICE, and (b)(6);  ,
Sheriff, ECSO. (b)(6); described the contract as ICE was a rider on the United States Marshal's
Service, Department of Justice, contract with ECDC. The contract did not list any specific
medical requirements, only that the ECDC must meet the applicable ICE National Detention
Standards.

The final documents received were two forms dated November 24, 2015. The first form was
identified as a DHS ICE Form I-216, Records of Persons Transferred. The form indicated that
Gulema was transferred on this date via OSUP. The other form was a DHS ICE Form 1-203,
Order to Release Alien.

ATTACHMENTS

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of
Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in
part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report
will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or
administrative penalties.

# EXHIBIT B

**To:** (b)(6); (b)(7)(C) @oig.dhs.gov]
**From:** (b)(6); (b)(7)(C)
(b)(6); (b)(7)(C)

(b)(6):

**Sent:** Tue 7/14/2020 11:52:51 AM (UTC-04:00)
**Subject:** FW: Enhanced Reporting - I19-ICE ERO-ELP-16066, Death of Jonathan Alberto Medina-Leon/Non-Employee/ICE ERO/El Paso, TX

FYI

(b)(6); (b)(7)(C)

Assistant Special Agent in Charge

DHS Office of Inspector General, Investigations

El Paso Field Office

(b)(6); (b)(7)(C)

---

**From:** EDS Notifications <(b)(7)(E) @oig.dhs.gov>
**Sent:** Tuesday, July 14, 2020 7:20 AM
**To:** (b)(6); (b)(7)(C) @oig.dhs.gov; (b)(6); (b)(7)(C) @oig.dhs.gov; (b)(6); (b)(7)(C) @oig.dhs.gov; (b)(6); (b)(7)(C) @oig.dhs.gov; (b)(6); (b)(7)(C) @OIG.DHS.GOV> (b)(6); (b)(6); @oig.dhs.gov> (b)(6): @oig.dhs.gov; (b)(6); (b)(7)(C) @oig.dhs.gov; (b)(6); @oig.dhs.gov; (b)(6); (b)(7)(C) @oig.dhs.gov; (b)(6); (b)(7)(C) @oig.dhs.gov>
**Subject:** Enhanced Reporting - I19-ICE ERO-ELP-16066, Death of Jonathan Alberto Medina-Leon/Non-Employee/ICE ERO/El Paso, TX

7/14/2020

The case in subject line is no longer marked for enhanced reporting.

Narrative:

On June 3, 2019, the Department of Homeland Security (DHS), Office of Inspector General (OIG), El Paso, TX, became aware of the death of a 25 year old transgender female at an El Paso local hospital five days after being released from Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) custody. It was reported by ICE ERO that on April 11, 2019, Jonathan Alberto Medina-Leon (b)(6); (b)(7)(C) applied for admission into the United States at the Paso Del Norte Port of Entry in El Paso, TX, (b)(6); (b)(7)(C); (b)(3):Unspecified On April 14, 2019, ICE ERO, El Paso, TX, took custody of Medina at placed her at the Otero County Processing Center (OCPC) located in Chaparral, NM. According to ICE ERO, on May 28, 2019, the OCPC conducted an (b)(6); (b)(6); (b)(7)(C) for Medina, at her request, (b)(6); (b)(7)(C) The OCPC referred (b)(6); Medina to a local hospital for further evaluation and subsequently served Medina with a Notice to Appear document and released her from ICE ERO custody on parole prior to her release. On June 2, 2019, ICE ERO Domestic Operations informed ICE ERO El Paso of a Facebook post reporting the death of a transgender female allegedly in ICE custody. ICE ERO El Paso later determined that the Facebook post was referring to Medina. On June 3, 2019, ICE

ERO El Paso reported the death of Medina to DHS OIG El Paso, TX.

EDS

# EXHIBIT C

| From: | (b)(6); (b)(7)(C) |
|---|---|
| Sent: | Mon, 8 Jun 2015 10:53:50 -0400 |
| To: | (b)(6); (b)(7)(C) |
| Subject: | FW: Teka Gulema |

FYI

(b)(6); (b)(7)(C) *RN, BSN, MSHS, CCHP*
CDR, United States Public Health Service
Eastern Regional Field Medical Coordinator

DHS/ICE/IHSC
ERO Miami Field Office
772-419-(b)(6) (Office)
202-321- Mobile)
866-711-8507 (Fax)
email: (b)(6), @ice.dhs.gov

*Warning: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this report should be furnished to the media, either in written or verbal form.*

| From: | (b)(6); (b)(7)(C) |
|---|---|
| Sent: | Friday, June 05, 2015 4:55 PM |
| To: | (b)(6); (b)(7)(C) (CTR) |
| Cc: | (b)(6); (b)(7)(C) |
| Subject: | RE: Teka Gulema |

Thanks so very much. Money is the life's blood for hospitals !!

| From: | (b)(6); (b)(7)(C) (CTR) |
|---|---|
| Sent: | Friday, June 05, 2015 4:52 PM |
| To: | (b)(6); (b)(7)(C) |
| Cc: | |
| Subject: | RE: Teka Gulema |

Dr. (b)(6); (b)(7)(C)

I just spoke with (b)(6); (b)(7)(C) (Billing Director) and (b)(6); (b)(7)(C) (VP) of Riverview Regional Medical Center. According to Ms. (b)(6); (b)(7)(C) Mr. Teka's bill is $1.6 million dollars. I expressed to both ladies IHSC's sincere apology for any miscommunication that has/had taken place regarding Mr. Teka's care. Both Ms. (b)(6); (b)(7)(C) and Ms. (b)(6); (b)(7)(C) expressed how appreciative they were that I contacted them. As of March 1, 2015 this hospital was purchased by Prime Healthcare so they will actually need to pull information from two different billing systems.

I also spoke with CDR [(b)(6); (b)(7)(C)] and advised that I am going to create sub MedPARs in the MedPAR system which simply links the entire admission to one MedPAR number.  All MedPARs will be under MedPAR number 20150604147000 which will represent the first segment (21 day admission) and the subsequent MedPARs will end in 01, 02, 03 etc. until he is discharged.  Once the bills have dropped in their billing system, Ms. [(b)(6); (b)(7)(C)] will send them to me and I will forward them to the VAFSC for expedited processing.   Once the detainee is discharged/transferred the hospital will submit a final bill which will be reviewed by the VAFSC to ensure that the provider has been reimbursed correctly.

I will provide additional information as it is received.

Thanks
[(b)(6); (b)(7)(C)]
Provider Relations Liaison
Resource Management Unit
ICE Health Service Corps
500 12th Street, S.W., [(b)(6); (b)(7)(C)]
Washington, DC  20536
(202)732[(b)(6); (b)(7)(C)] (office)
(866)382-8756 (efax)
(202)689[(b)(6); (b)(7)(C)] (cell)
[(b)(6); (b)(7)(C)] @associates.ice.dhs.gov

**From:** [(b)(6); (b)(7)(C)]
**Sent:** Friday, June 05, 2015 3:58 PM
**To:** [(b)(6); (b)(7)(C)] (CTR)
**Cc:** [(b)(6); (b)(7)(C)]
**Subject:** RE: Teka Gulema

Awesome thx

**From:** [(b)(6); (b)(7)(C)] (CTR)
**Sent:** Friday, June 05, 2015 3:57 PM
**To:** [(b)(6); (b)(7)(C)]
**Cc:**
**Subject:** Teka Gulema
**Importance:** High

Dr. [(b)(6); (b)(7)(C)]

Per our conversation, I did reach out to Riverview Regional Medical Center regarding Teka Gulema.  I spoke with [(b)(6); (b)(7)(C)] in billing and she said that currently no bills have dropped for this detainee because he is still in-house.  I asked if they could provide us with interim bills so that we can begin to pay them for some of the services that have been provided.  [(b)(6); (b)(7)(C)] stated that due to the amount of the bill I would need to speak with the Hospital Financial Manager.  [(b)(6);

provided me with the contact information for (b)(6); (b)(7)(C) however, had had already left the office for the weekend.

I will follow up with Mr. (b)(6); next week with regards to the financial piece to see if they can provide us with bills so that we can begin to pay them for services.  I will keep you posted.

Thanks
(b)(6), (b)(7)(C)
Provider Relations Liaison
Resource Management Unit
ICE Health Service Corps
500 12th Street, S.W. (b)(6); (b)(7)(C)
Washington, DC  20536
(202)732 (b)(6); (b)(7)(C) (office)
(866)382-8756 (efax)
(202)689 (b)(6); (b)(7)(C) cell)
(b)(6), (b)(7)(C)  @associates.ice.dhs.gov