LABONI A. HOQ (SBN 224140)
*laboni@hoqlaw.com*
HOQ LAW APC
P.O. Box 753
South Pasadena, California 91030
Telephone: (213) 973-9004

MICHAEL KAUFMAN (SBN 254575)
*MKaufman@aclusocal.org*
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West Eighth Street
Los Angeles, California 90017
Telephone: (213) 977-9500
Facsimile: (213) 915-0219

Attorneys for Plaintiffs
*(additional counsel information on next page)*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF SOUTHERN CALIFORNIA,<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br><br>*Defendants*. | Case No. 2:22-CV-04760-SB-AFM<br><br>**PLAINTIFF'S BRIEF IN SUPPORT OF REQUEST FOR SCHEDULING ORDER AND FOIA PROCESSING RATE**<br><br>Honorable Shashi H. Kewalramani<br>United States Magistrate Judge |

EUNICE CHO (*pro hac vice*)
echo@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
NATIONAL PRISON PROJECT
915 Fifteenth Street NW, 7th Floor
Washington, DC 20005
Telephone: (202) 548-6616

KYLE VIRGIEN (SBN 278747)
kvirgien@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
NATIONAL PRISON PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (202) 393-4930

Attorneys for Plaintiff

# TABLE OF CONTENTS

I.   Introduction ........................................................................................................ 1

II.  The Current Status of the Case.......................................................................... 2

III. Plaintiff's Proposed Further Case Management Order..................................... 9

    A.   Requiring the Parties to Meet and Confer to Narrow Responsive Records and Set Search Parameters ................................. 9

    B.   Timely Processing and Production of Responsive Records ................ 11

    C.   Further Status Conference................................................................... 13

IV.  Conclusion........................................................................................................ 13

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Long v. IRS*,
   693 F.2d 907 (9th Cir. 1982) .................................................................................. 12

*Los Angeles Times Commc'ns LLC v. U.S. Dep't of Homeland Sec.*,
   No. 2:20-cv-10911-FLA-MRW, 2020 WL 7055904 (C.D. Cal. 2020) .................................................................................................................. 12

*Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enf't Agency*,
   811 F. Supp. 2d 713 (S.D.N.Y. 2011) .................................................................. 13

*Transgender L. Ctr. v. Immigr. & Customs Enf't*,
   46 F.4th 771 (9th Cir. 2022) .................................................................................. 11

*United States v. Nishiie*,
   996 F. 3d 1013 (9th Cir. 2021) ............................................................................... 7

**Statutes**

FOIA ........................................................................................................... *passim*

## I.     Introduction

Plaintiff American Civil Liberties Union of Southern California ("ACLU So-Cal") filed a Freedom of Information Act ("FOIA") Request on April 29, 2022, seeking information about Immigration and Customs Enforcement's ("ICE") practice of releasing from its custody detained immigrants facing imminent death, a practice that allows the agency to evade reporting and accountability requirements for detainee deaths. On July 12, 2022, Plaintiff filed this suit after Defendants failed to timely respond to its Request, in violation of the FOIA.

Throughout this case, ICE has exhibited a pattern of repeatedly delaying its search for any records responsive to Parts 4 to 9 of the Request, which pertain to its policies and practices of deathbed releases. Instead, ICE has produced ballooning numbers of records responsive to Parts 1 to 3, which relate to four specific people, while resisting Plaintiff's attempts to shrink that set of records for production. Further, fourteen months after Plaintiff filed suit, Defendants have yet to produce a single record responsive to Parts 4 to 9.

Regarding Parts 4 to 9, Defendants failed for several months to conduct any searches or timely provide even basic information such as hit counts necessary for parties to confer about a production schedule regarding Parts 4 to 9. Where Defendants have conducted a search in response to Parts 4 to 9, they have ignored Plaintiff's suggestions for narrowly-tailored search terms, and instead conducted overbroad searches resulting in hundreds of thousands of pages likely to contain unresponsive records. At the same time, Defendants have refused to search for categories of records or custodians highly likely to contain responsive records specifically suggested by Plaintiff.

Similarly, regarding Parts 1 to 3, although Plaintiff has proposed a potential avenue to narrow the bulk of the over 10,000 pages that remain of the documents ICE belatedly located in response to Parts 1 to 3, Defendants continue to raise

various excuses—for example, claiming that they cannot perform tasks as basic as sorting documents by date—while refusing to allow Plaintiff's counsel to confer with ICE's FOIA staff to attempt to find a solution to Defendants' technical challenges.

For these and the reasons discussed below, and along the lines set forth in Plaintiff's attached Proposed Order, the Plaintiff respectfully requests that the Court set specific timetables for the Parties to confer and for Defendants to conduct searches. Plaintiff also requests that the Court set revised processing and production requirements that will realign the Parties' incentives towards prompt resolution of the case. Plaintiff finally requests that the Court set a Status Conference in December 2023, to re-set deadlines for Defendants to produce search adequacy declarations, *Vaughn* indices, a summary judgment briefing deadline, and to re-set the trial date.

## II.     The Current Status of the Case

The portion of this case related to Defendant ICE is far behind schedule. The parties agreed on a document production schedule in January 2023, which they submitted to the Court in a joint proposed order the following month. Dkt. 39-1. Defendants represented at that time that they "currently anticipate[d]" production of records potentially responsive to Plaintiff's FOIA request to conclude in "May 2023." *Id.* at 2, 3.

Defendant Department of Homeland Security Office of Inspector General ("DHS-OIG") completed its production three months behind schedule. Applying search terms negotiated with Plaintiff, DHS-OIG searched for terms related to the specific people identified as well as the subject matter of Parts 4 to 9. It completed its production in response to Parts 1 to 9 in March 2023, and it made a supplemental production in June through August 2023. Plaintiff and DHS-OIG

have some remaining disagreements, but they are now ready to address those issues either informally or through summary judgment.

Defendant ICE, in contrast, is far behind this schedule. In February of 2023, ICE revealed that, unlike DHS-OIG, it had only searched for "the names of the individuals (including their A numbers) the detention centers, and the medical centers listed in the request." Ex. A. In other words, ICE had searched only for the four people listed in Parts 1 to 3 of Plaintiff's Request, and it had done nothing at all to search for Parts 4 to 9. Moreover, on June 6, 2023, the date on which Defendants' motion for summary judgment had been due, *see* Dkt. 40 at 3, ICE announced that it had not completed production in response to Parts 1 to 3 as anticipated but instead had newly located approximately 40,000 more pages to process. Ex. F (Email from Jason Axe, June 6, 2023). At the parties' negotiated processing rate, this would have extended the production schedule for three more years, to October of 2026, just for Parts 1 to 3, at which point ICE would have **begun** processing records responsive to Parts 4 to 9.

Plaintiff has worked diligently to encourage ICE to cut this additional 40,000 page count with some success, including the omission of duplicative records,[1] but more work on ICE's part can and should be done to further reduce

---

[1] ICE misstated its own technical capabilities regarding de-duplication of records, which it had to retract, causing further delay in its processing of records responsive to Parts 1 to 3. When ICE identified 40,000 additional pages responsive to Parts 1-3 in June 2023, Plaintiff proposed that ICE decrease this page count through "a de-duplication analysis," including using "email thread[ing]." Ex. G at 3 (Plaintiff's June 12, 2023 Letter). ICE rejected this request. ICE explained that it could not deduplicate because it "has already run the 40,000 pages through Relativity and deduplicated." Ex. H at 2 (Defendants' June 22, 2023 Letter). It declined to thread them, stating that the documents were "already in the processing system" and "cannot be threaded," and that they were "mostly medical records such that email threading would not greatly impact this set of documents." *Id.* Plaintiff responded on June 26 with technical assistance to help ICE use its Relativity processing platform to conduct threading, explaining: "even after documents have been

(cont'd)

this number to hasten resolution of the case. ICE currently has 10,000 pages to process for Parts 1 to 3, which means it will complete production for those parts in August of 2024. Under the current processing schedule, ICE's processing of records responsive to Parts 4 to 9 will only lead to further delay.

ICE's progress has been significantly hampered by ICE's refusal to engage with Plaintiff's good faith efforts to streamline the production process and address ICE's technical issues. For example, Plaintiff first proposed search terms for Part 4 on April 14. Ex. C at 6 (Plaintiff's Apr. 14, 2023 Letter). ICE agreed to run Plaintiff's proposed search on June 12. Ex. H (Defendants' June 22, 2023 Letter). It was not until September 12 that ICE informed Plaintiff that it ***could not*** run this search because it exceeds the 450-character limit that ICE's system imposes for search strings. Ex. O (Email from Joseph Tursi, Sept. 12, 2023). Plaintiff has since requested to speak with ICE's technical staff to explain how to work around this character limitation, Ex. P at 6 (Plaintiff's Sept. 14, 2023 Letter), and it has explained how to do so in writing. Ex. R at 4-5 (Plaintiff's Oct. 19, 2023 Letter). ICE has refused Plaintiff's request to meet with its technical staff, Ex. Q at 3 (Defendant's Oct. 10, 2023 Letter), and has yet to respond to the written instructions. Thus, even though ICE agreed to the search that Plaintiff proposed in April, over eight months have passed with no progress.

---

batched out for review or even after a review has been started, it is a straightforward matter to run threading on the unreviewed documents and batch them out again for review." Ex. I at 2 (Plaintiff's June 26, 2023 Letter). Only after Plaintiff explicitly spelled out how ICE should use its own processing system did ICE agree to run email threading on its production. Ex. J at 3 (Defendants' July 11, 2023 Letter). Contrary to ICE's representation that "email threading would not greatly impact this set of documents," Ex. H at 2, this threading significantly decreased the number of pages to be processed, from around 40,000 to around 12,000. Ex. L.

4

This delay is due to ICE's failure to fully utilize its own search capabilities, and its refusal to accept Plaintiff's technical help. As another example, to decrease the large number of pages responsive to Parts 1 to 3, Plaintiff proposed in June that Defendant date-filter the responsive pages for Mr. Gulema. Ex. I at 2 (Plaintiff's June 26, 2023 Letter). DHS OIG's production indicates that highly responsive records created after October 1, 2015, which ICE has not yet produced, are in ICE's possession, so Plaintiff hopes to use this date-filtering to obtain those records and narrow the set of documents for production. Ex. K at 2 (Plaintiff's Jul. 12, 2023 Letter). One month later, ICE rejected Plaintiff's proposal, stating that it could not separate the records by date. Ex. J at 3 (Defendants' Jul. 11, 2023 Letter). Plaintiff responded the following day, pointing ICE to Defendants' declaration explaining that ICE has the capability to narrow a document set using date filters. Ex. K at 3 (citing Dkt. No. 48-1, Decl. Fernando Piniero, ¶ 19). Once Plaintiff pointed ICE to its own declaration about its own capabilities, ICE agreed to perform this filtering, and on August 23 it identified 250 pages of Mr. Gulema's documents that were created after October 15, 2015. *See* Ex. L (Email from Joseph Tursi, Aug. 23, 2023).

However, the following week, ICE replied by informing Plaintiff that its count "was inaccurate," stating that "after review of the specific documents identified, it became apparent that although Relativity marked them as being created after October 1, 2015, they were actually from earlier than October 1, 2015." Ex. N at 2 (Defendants' Sept. 1, 2023 Letter). ICE provided another update on October 10, explaining that it would be "unable to separate out pages for Mr. Gulema created after October 1, 2015" and would not be able to limit its page count through date-filtering. Ex. Q at 1. Plaintiff has explained to ICE that this inability to filter by date appears to be a result of a document-collection issue that

5

1 ICE could readily fix. Ex. R at 2-3 (Plaintiff's October 19, 2023 Letter).[2] Plaintiff has offered to work with ICE's technical staff to assist them in these efforts to process the documents again. Ex. R at 3 (Plaintiff's October 19, 2023 Letter). ICE has not responded further.

    ICE's delay in finalizing search locations for records responsive to Parts 4 to 9, and its refusal in the first instance to use suggested tailored search terms, and search in locations and custodians obviously likely to have responsive records, has also unreasonably prolonged efficient resolution of the case. For example, ICE informed Plaintiff that its search for Part 9 of the Request "yielded 16,000 emails," "most of which appeared not to be related (or only peripherally related) to one of the proposed search terms." Ex. Q at 4. Defendants, however, did not actually run a search using Plaintiff's suggested Boolean search terms, designed to narrow the search. Compare Ex. E at 7 (Plaintiff's June 1, 2023 Letter) (suggesting search terms); Ex. Q at 4-5 (Defendant's search terms); Ex. R at 7 (Plaintiff's response). Plaintiff has again requested that Defendants conduct a search according to the terms it has suggested. Ex. R at 7. ICE has not responded.[3]

---

[2] As Plaintiff explained in its letter, there is a straightforward solution to ICE's technical issue. ICE has made clear that it ***can*** filter by date, representing in a declaration that "date ranges can be applied to further narrow the scope" of documents after they have been collected and threaded. Dkt. 38-1 at ¶ 19; *see also id.* at ¶ 18.c (explaining that ICE's email collection and processing system is able to use "Email From, Email To, ***Email Date***, and Email Subject headers" for processing) (emphasis added). Rather, ICE represented that this filtering "did not obtain accurate results" because the documents' metadata was incorrect. Ex. Q at 1. It thus appears that ICE collected the documents in a way that altered their metadata, and that ICE could remedy this issue by simply processing the documents again in a forensically proper way.

[3] Similarly, ICE reports that its current search for Part 4 has resulted in over 520,000 documents. ICE's search, however, omitted Plaintiff's suggested Boolean search terms through keywords such as "policy," "protocol," "training," and "guidance," all of which were specified in the request. Ex. P at 6. As discussed

(cont'd)

As another example, ICE waited several months to inform Plaintiff that it is refusing to search for Significant Incident Reports (referred to as "SIRs") and Significant Event Notification reports (referred to as "SENs") of individuals released from custody on their death beds, which Plaintiff explicitly included in Part 6 (and 7) of its Request. It has also inexplicably changed its rationale for failing to conduct this search. When Plaintiff proposed searches in April, it included as a search location the records of "ICE personnel responsible for reviewing Significant Incident Reports or Significant Event Notification Reports…." Ex. C at 7 (Plaintiff's April 14, 2023 Letter). ICE responded in June that it was "still considering the appropriate search locations/custodians." Ex. H at 3. The following month, ICE claimed that it needed "a date, or an event, or a location, or alien number to search for an SIR or SENs." Ex. J at 3-4 (Defendants' July 11, 2023 Letter). In response, Plaintiff pointed ICE to its own technical documentation explaining that it has a Joint intelligence Operations Center ("JIOC"), where it could run the search terms and obtain responsive records. Ex. K at 4-5 (Plaintiff's July 12, 2023 Letter). ICE never responded to this suggestion. Instead, on October 10, 2023, ICE changed its rationale for failing to search for SIR and SEN information, claiming that Part 6 of the Request did not seek them, and is now refusing to search for this information. Ex. Q at 3.[4] Plaintiff questioned

---

above, *supra* at 4, Plaintiff believes that Defendants' technical challenges in performing this Boolean search can be overcome.

[4] ICE is wrong that these records do not fall within Part 6 (or 7). ICE argued that Part 6 only sought records "created by DHS OIG or ICE OPR" which SIRs and SENs are not. Ex. Q at 3. In its October 19, 2023 letter, Plaintiff responded that Part 6 seeks "Significant Incident Reports, significant event notification reports **or** documents created by DHS OIG or ICE OPR") (emphasis added)). Ex. R at 6. The word "or" stands for the disjunctive, which "indicates alternatives and requires that they be treated separately." *United States v. Nishiie*, 996 F. 3d 1013, 1023 (9th Cir. 2021). Thus "documents created by DHS OIG or ICE OPR" does not limit the request for "Significant Incident Reports" and "significant event notifications."

this about-face, and reiterated its suggestion that ICE search its JIOC. ICE has not responded.

ICE has taken a similar approach with its refusal to search appropriate custodians in the first instance, which will likely cause additional delays. For example, in response to Plaintiff's request that ICE search the predecessors of and successors of Tae Johnson, the Director of ICE from January 2021 to July 2023, to ensure that ICE complies with the timeframe specified in Plaintiff's FOIA Request, Defendants refused. However, Defendants stated "ICE will reevaluate that position as its search for records responsive to Part 4 progresses." Ex. Q at 3. This approach will only prolong the search and production process, make it impossible to set a summary judgment schedule, and predicate deadlines including dates by which Defendants must complete production and produce search adequacy declarations and *Vaughn* indices.

In another example, Defendants have refused to search ICE personnel highly likely to have responsive records to Part 5, including ICE officials who participate in the Significant Detainee Illness ("SDI") process, and the ICE's Medical Case Management and Unit Medical Care Coordination Program staff. ICE has specified in its own policy that the SDI list includes cases where ICE requires "significant coordination . . . to release a detainee . . . due to their medical condition." Ex. I at 3. Plaintiff has also substantiated which ICE medical offices are known to handle such cases. Ex. R at 3, Ex. I at 3. ICE, however, has refused to identify which custodian(s) they have searched for Part 5, hampering the Parties' ability to address Defendants' concerns with conducting an "overly burdensome" search. Ex. Q at 3. Thus, between ICE's delays in responding, inconsistent responses, and inexplicable failure to search locations obviously likely to yield responsive records, it is now five months past the date when ICE originally expected to complete its production. Plaintiff now finds itself—due in significant part to ICE's own refusal

to utilize its technical capabilities—without any concrete indication of what searches ICE will run or when it will complete its production.

### III. Plaintiff's Proposed Further Case Management Order

Plaintiff seeks the Court's assistance to ensure efficient prosecution of this case, and ensure that it will be resolved on a reasonable timeframe. Plaintiff proposes that the Court do so by entering an order with three components: (a) requiring the parties to meet and confer with ICE's technical staff present, (b) modifying the production schedule to align the parties' incentives around narrowly tailoring the universe of responsive records for production in order to expedite the resolution of the case, and (c) requiring a status conference for the parties to report their progress on these efforts, and set a summary judgment schedule to resolve any outstanding disputes as to the claims and defenses in the case.[5] Plaintiff discusses each component below.

#### A. Requiring the Parties to Meet and Confer to Narrow Responsive Records and Set Search Parameters

Plaintiff first proposes that the Court order the parties to meet and confer to narrow responsive records and set search parameters, including with ICE's technical staff present, with specific deadlines to do so. These orders are necessary to both ensure Plaintiff's prompt access to FOIA records, and to set summary judgment and other predicate deadlines in the case.

Regarding the need for ICE's technical staff present at meet and confer discussions, Plaintiff provided several examples above regarding miscommunications and misunderstandings internal to ICE that has delayed the efficient resolution of the case. The meet and confer process Plaintiff proposes would allow Plaintiff to talk directly with ICE's technical staff, preventing

---

[5] To encourage the Parties to productively engage in the meet and confer process, nothing in Plaintiff's proposal seeks to waive any issues either Party may be entitled to raise as to the claims and defenses in the case.

9

instances where, for example, ICE agrees to run a search and then claims the search violates its own character limit, or agrees to date-filtering and then explains that date-filtering would be inaccurate. This process will also allow Parties to directly identify and address technical search issues, rather than ICE's current practice of "declin[ing]" Plaintiff's offer to speak directly with technical staff and instead making Plaintiff "provide [this information] in writing," which has significantly delayed progress. Ex. Q at 3 (Defendants' October 10, 2023 Letter). Finally, this process would take place on a fixed timeframe that would guarantee timely responses.

For these reasons, and as set forth in the attached Proposed Order, the Court should order the following meet and confer process:

- The Parties shall meet and confer via telephone or video conference within two weeks of the Court's Order. Defendants shall make available for this meet and confer process the staff from the ICE FOIA Office responsible for this Request. This meet and confer shall address:
  - For Parts 1 to 3, disaggregation of records regarding Mr. Teka Gulema by date, including records generated by ICE after October 1, 2015;
  - For Parts 4 to 9, a revised set of search terms and locations (including custodians), including resolution of the following issues:
    - For Part 4, the technical feasibility of the search string Plaintiff proposed in April 2023 and Defendant agreed to run in July 2023;
    - For Part 6, the technical feasibility of a search of ICE's JIOC, as Plaintiff proposed in July 2023;
- Based on the agreed-upon parameters, Defendants shall provide the following information within four weeks of the Court's Order:
  - For Parts 1 to 3, the total number of pages of documents yet to be produced by ICE, disaggregated by individual;

- o For Parts 1 to 3, the total number of pages of documents yet to be produced by ICE regarding Mr. Teka Gulema dated on or after October 1, 2015. If ICE is unable to accurately disaggregate such records by date, ICE shall provide the Court with an explanation as to why it is unable to do so, and steps it can take to identify documents regarding Mr. Gulema dated on or after October 1, 2015;
- o For Parts 4 to 9, a hit count, broken down by Part, for each of the agreed-to searches;
- By six weeks after the date of the Court's Order, Plaintiff will inform ICE whether it waives ICE's general production of documents related to Mr. Teka Gulema dated before October 1, 2015 (without waiving Plaintiff's right to later provide "positive indications of overlooked materials" under *Transgender L. Ctr. v. Immigr. & Customs Enf't*, 46 F.4th 771, 780 (9th Cir. 2022)). By this date, Plaintiff will also inform ICE the order in which ICE should process these four individuals' records.
- Between four weeks and eight weeks after the Court's order, the Parties shall work cooperatively to narrow the search results for Parts 4 to 9, as needed.

### B. Timely Processing and Production of Responsive Records

Plaintiff also proposes that the Court revise the production schedule to realign the parties' incentives towards efficient resolution of the case. ICE's approach to this case suggests that the current production rate of 1,000 pages per month, Dkt. 50, does not incentivize ICE to engage meaningfully in efforts to finalize appropriate search parameters to identify responsive documents and narrow the set of documents in its production queue. It has been eight months since Plaintiff first proposed concrete search terms and locations for Parts 4 to 9, and ICE still has not agreed to a concrete set of locations to run each of the proposed searches. *Supra* at 3-6. And, counterintuitively, ICE has resisted Plaintiff's efforts

to shrink the set of documents ICE will need to review for Parts 1 to 3. *Supra* at 3-5. Plaintiff proposes that the Court order the following schedule, which will realign the parties' incentives towards prompt resolution of this case:

- Pursuant to the Court's February 29, 2022 Order, Dkt. 39-1, ICE shall continue to process FOIA Records at a rate of 1,000 pages per month for the first eight weeks following this Order.
- Eight weeks after this Order, Defendants' rate of production shall increase, such that production of documents responsive to the FOIA Request shall be completed within six months. To accomplish this, each month, ICE shall process documents at a rate equal to the total page count for Parts 1 to 9 divided by six, rounding up to the nearest whole page, not to exceed 5,000 pages per month.
- Defendants shall ensure that it has conducted email threading and de-duplication of records prior to processing to reduce the number of records to be processed and produced.

Under this schedule, after the meet-and-confer process described above has concluded, ICE's production rate will depend on the total number of responsive pages for each of Part 1 to 9 of the Request, providing ICE a significant additional incentive to cooperate meaningfully, with clear internal communication and adequate application of its own technology, in efforts to reduce the page count. It is well within reason for the Court to enter an order providing ICE this incentive. *See Long v. IRS*, 693 F.2d 907, 910 (9th Cir. 1982) ("unreasonable delays in disclosing non-exempt documents violate the intent and purpose of the FOIA, and the courts have a duty to prevent these abuses."); *Los Angeles Times Commc'ns LLC v. U.S. Dep't of Homeland Sec.,* No. 2:20-cv-10911-FLA-MRW, 2020 WL 7055904 (C.D. Cal. 2020), December 3, 2021 Minutes Order, Dkt. 35 (ordering production of 3,000 pages per month in a FOIA case seeking similar information to that sought in

this case); *Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enf't Agency*, 811 F. Supp. 2d 713, 731 (S.D.N.Y. 2011) (ordering ICE to fully respond to an outstanding FOIA request that required producing over 14,000 pages in one month).

Plaintiff's proposal also caps Defendants' monthly processing rate at 5,000 pages. The intent of this cap is to maintain an incentive on Plaintiff to work with ICE to significantly cut the number of pages in ICE's production queue. ICE has identified hundreds of thousands of documents responsive to searches for Parts 4 to 9, and this cap will incentivize Plaintiff to work with ICE to cull out the vast majority of those responsive documents in order to ensure timely processing. This monthly cap also ensures that the Court does not burden ICE with an unduly high processing rate.

### C.  Further Status Conference

Finally, to address any further adjustments to the search, processing and production schedules, to set a summary judgment briefing schedule together with prior deadlines for Defendants to produce search adequacy and *Vaughn* indices, and to re-set the trial date, Plaintiff requests that the Court set a further Status Conference in December 2023. The Court should also order a briefing schedule to address outstanding issues for the Court's intervention, with Plaintiff's brief due two weeks before, and Defendants' brief due one week before the December 2023 Status Conference.

## IV.  Conclusion

For these reasons, the Court should enter a further Scheduling Order as set forth in Plaintiff's Proposed Order, attached hereto.

//
//
//

Respectfully submitted this 23rd of October, 2023.

 /s/ Laboni Hoq
LABONI A. HOQ (SBN 224140)
laboni@hoqlaw.com
HOQ LAW APC
P.O. Box 753
South Pasadena, California 91030
Telephone: (213) 973-9004

MICHAEL KAUFMAN (SBN 254575)
MKaufman@aclusocal.org
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, California 90017
Telephone: (213) 977-9500
Facsimile: (213) 915-0219

EUNICE CHO (pro hac vice)
echo@aclu.org
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
NATIONAL PRISON PROJECT
915 Fifteenth Street NW, 7th Floor
Washington, DC 20005
Telephone: (202) 548-6616

KYLE VIRGIEN (SBN 278747)
kvirgien@aclu.org
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
NATIONAL PRISON PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (202) 393-4930

*Attorneys for Plaintiff*