# EXHIBIT A

**Eunice Cho**

| | |
|---|---|
| **From:** | Tursi, Joseph (USACAC) <Joseph.Tursi@usdoj.gov> |
| **Sent:** | Wednesday, February 1, 2023 6:52 PM |
| **To:** | Laboni Hoq; Eunice Cho; Kyle Virgien; Michael Kaufman |
| **Cc:** | Medrano, Alarice (USACAC) |
| **Subject:** | ACLU v. DHS | Search Locations and Terms |

**This Message Is From an External Sender**
This message came from outside your organization.

All,

Please see the below email providing the information requested during our meet and confer today. Specifically, information related to the search terms and locations used by both OIG and ICE.

I am waiting for updates related to the number of potentially responsive records obtained, whether any additional potentially responsive records have been discovered, and the number of potentially responsive records remaining for processing as well as other information requested during our call. But, since I had this information available, I did not want to delay in sending it to you.

<u>**DHS OIG Information**</u>

With respect to the search terms and parameters, ICE was specified as the affected agency; the timeframe was January 1, 2016 to the present, with the following search terms:

- "**detainee**" and one of the following terms:
  - "death" or "died" or "hospitalized" or "hospital" or "emergency room" or "emergency services" or "poor outcome" or "life support" or "coma" or "unconscious" or "ventilator" or "intensive care" or "hospice" or "palliative" or "fatal"
- "**custody**" and one of the following terms:
  - "death" or "died" or "hospitalized" or "hospital" or "emergency room" or "emergency services" or "poor outcome" or "life support" or "coma" or "unconscious" or "ventilator" or "intensive care" or "hospice" or "palliative" or "fatal"
- "**detainee**" <u>and</u> "**release**" and one of the following terms:
  - "medical" or "surgery" or "specialist" or "doctor"
- "**custody**" <u>and</u> "**release**" and one of the following terms:
  - "medical" or "surgery" or "specialist" or "doctor"
- "**detainee**" <u>and</u> "**transfer**" and one of the following terms:
  - "medical" or "surgery" or "specialist" or "doctor"
- "**custody**" <u>and</u> "**transfer**" and one of the following terms:
  - "medical" or "surgery" or "specialist" or "doctor"
- "**detainee**" <u>and</u> "**parole**" and one of the following terms:
  - "medical" or "surgery" or "specialist" or "doctor"
- "**custody**" <u>and</u> "**parole**" and one of the following terms:
  - "medical" or "surgery" or "specialist" or "doctor"

- "**detainee**" <u>and</u> "**alternative detention**" and one of the following terms:
  - ○ "medical" or "surgery" or "specialist" or "doctor"
- "**custody**" <u>and</u> "**alternative detention**" and one of the following terms:
  - ○ "medical" or "surgery" or "specialist" or "doctor"

DHS OIG has also searched for the individuals identified in subpart 1 of the request: Teka Gulema; Johana Medina Leon; Jose Ibarra Bucio; and Martin Vargas Arellano.

The searched location was EDS – the Enforcement Data System. EDS is the official OIG electronic case management system for the Office of Investigations. OIG uses EDS to manage information relating to complaints and investigations of alleged criminal, civil, or administrative violations by DHS employees, contractors, grantees, beneficiaries, and other individuals and entities associated with DHS. OIG uses EDS to manage investigations born from those complaints to facilitate the tracking of the investigation process.

---

**ICE Information**

 The ICE FOIA Office has confirmed the search terms in this case are the names of the individuals (including their A numbers) the detention centers, and the medical centers listed in the request. No time or other parameters have been applied. Locations searched were: hard drives, Outlook mailboxes and email messages, and the ENFORCE Alien Removal Module (EARM) database were searched.

Thanks,
-Joe

**Joseph W. Tursi** | **Assistant United States Attorney**
United States Attorney's Office | Central District of California
300 N. Los Angeles Street, Suite 7516 | Los Angeles, CA 90012
O: 213.894.3989 | C: 213.500.9355 | F: 213.894.7819 | joseph.tursi@usdoj.gov

# EXHIBIT B



# United States Department of Justice

## United States Attorney's Office
## Central District of California

---

*JOSEPH W. TURSI*
*Assistant United States Attorney*
*Phone:  (213) 894-3989*
*E-mail:  Joseph.Tursi@usdoj.gov*

*Federal Building*
*300 N. Los Angeles Street, Suite 7516*
*Los Angeles, California 90012*

March 29, 2023

**VIA E-MAIL**

Laboni A. Hoq
Hoq Law, APC
P.O. Box 753
South Pasadena, CA 91030

      Re:    ACLU of SoCal v. ICE, et al.
             C.D.CA Case No. 2:22-cv-04760-SHK

Dear Ms. Hoq:

Please allow the following to serve as a follow-up to our March 24, 2023 videoconference meet and confer. Among other things, your client raised concerns over ICE FOIA's search with respect to your client's April 29, 2022 FOIA request – specifically requests 3-9. Those requests include:

      3. Any and all ICE OPR reports of investigation that are identified in any of the records responsive to Request #1. This includes any and all exhibits, appendices, or attachments to the DHS OPR reports of investigation.

      4. Any and all documents and communications, including ICE and IHSC directives, policies, procedures, protocols, or trainings that contain guidance, instructions, or standards about the release from custody of (a) hospitalized detainees; or (b) detainees who at the time of release were patients in the care of external healthcare providers or facilities. Detainees specified in (a) and (b) above shall include those being treated for COVID-19 during their hospitalization or treatment at external healthcare providers or facilities.

      5. Spreadsheets, emails, documents, communications, databases, lists, and other data compilations in the possession of ICE Leadership, ICE Enforcement and Removal Operations, ICE Health Service Corps, and ICE Office of Professional Responsibility that identify detainees who were released from custody while (a) hospitalized (including for COVID-19 treatment); (b) in the full-time care of external healthcare providers or facilities (including for COVID-19 treatment), or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility. Requested materials include, but are not limited to, dates of hospitalization of detainees, dates of hospital or external care facility discharge, name of treated detainees' detention facilities, and reasons for detainees' hospitalization or external medical care. These materials

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
March 29, 2023
Page 2

should further include Medical Transfer Summary documents from DHS's eHR System and Alien Medical Records System, and any versions of the Significant Detainee Illness Spreadsheet that identify detainees who were released from custody while (a) hospitalized (including for COVID-19 treatment); (b) in the care of external healthcare providers or facilities (including for COVID-19 treatment); or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility.

6. Spreadsheets, emails, significant incident reports (SIRs), significant event notification reports (SENs), or documents created by DHS OIG or ICE OPR that mention the release from custody of (a) hospitalized detainees; (b) detainees who at the time of release were patients in the care of external healthcare providers or facilities; or (c) detainees released from custody immediately prior to transfer to an emergency room, hospital, or external care facility.

7. Spreadsheets, emails, SIRs, SENs, or documents created by DHS OIG or ICE OPR that mention the death of any detainee who had been previously released from custody while (a) hospitalized; or (b) a patient in the care of an external healthcare provider or facility; or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility.

8. Any and all documents, communications, and other records, including databases, spreadsheets, lists, and other data compilations, that identify detainees who were hospitalized or transferred from detention for off-site medical care due to COVID-19, and were subsequently released from custody while hospitalized, or detainees who were released from custody immediately prior to transfer to an emergency room, hospital, or external care facility to receive treatment for COVID-19. Requested information includes, but is not limited to, dates of hospitalization, detention facility, medical condition/reason for hospitalization or treatment, name and location of hospital, date of return to detention (if any), date of release from custody or issuance of order of recognizance (if any), and/or reason for release from custody.

9. Bills, invoices, charges, or records of payment that reflect payments made for healthcare for any detainee who was released from custody while (a) hospitalized; or (b) a patient in the care of an external healthcare provider or facility, and communications about such bills, invoices, charges, or records of payment[.]

*See* Dkt. 1, Ex. A.

Plaintiff further defined the scope of the FOIA requests on pages 2 to 4 of its request letter.  *Id*. It includes expansive definitions of "communications" and "documents."  *Id* at 2.  Plaintiff requests records from "January 1, 2016 to the present."  *Id*.  The FOIA requests are not limited to certain individuals, offices, or divisions but encompass all of ICE and DHS OIG if not also DHS. ICE is defined as "Immigration and Customs Enforcement, and any components, subcomponents, offices, or personnel therein."  *Id*. at 3.  Similarly, DHS OIG is defined as the "Department of Homeland Security Office of Inspector General and any component and offices therein."  *Id*.  Although some requests relate to certain named detainees, most of the requests

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
March 29, 2023
Page 3

seek records regarding detainees more broadly, as "detainee" is defined as "any person detained
or formerly detained in an immigration facility or holding facility." *Id*.  In turn, "immigration
detention facility" is defined broadly as "Service Processing Centers, Contract Detention
Facilities, Family Residential Facilities, Intergovernmental Service Agreement (IGSA) Facilities,
Dedicated Intergovernmental Service Agreement (DIGSA) Facilities, Intergovernmental
Agreement (lGA) Facilities, and any other facilities where individuals may be held in ICE
custody for 72 hours or more." *Id*.

As Defendants have raised, on several occasions, these requests are overbroad and vague.[1]  To
begin, requests 3-4 & 8 do not request identifiable records at all but instead request "any and all"
documents and communications "relating to", "regarding", or "related to" certain subjects.
Courts in this D.C. District hold that requests seeking all records "pertaining to," "relating to," or
"regarding" a subject matter are insufficient under FOIA.  *See, e.g., Cable News Network v. FBI*,
271 F. Supp. 3d 108, 112 (D.D.C. 2017) (dismissing as overbroad a request for records that
"relate in any way to" certain subject areas); *Freedom Watch v. Dep't of State*, 925 F. Supp. 2d
55, 61 (D.D.C. 2013) (granting motion to dismiss and finding a "relating to" request "overbroad
since life, like law, is 'a seamless web,' and all documents 'relate' to all others in some remote
fashion") (citation omitted); *Latham v. Dep't of Just.*, 658 F. Supp. 2d 155, 161 (D.D.C. 2009) (a
request for records "that pertain in any form or sort to [the plaintiff]" was "overly broad"); *Dale*,
238 F. Supp. 2d at 104 (request for documents "that refer or relate in any way to [the plaintiff]"
did not reasonably describe the records sought); *Am. Ctr. for L. & Just. v. Dep't of Homeland
Sec.*, Civ. A. No. 21-1364 (TNM), 2021 WL 5231939, at *5 (D.D.C. Nov. 10, 2021) (dismissing
as not reasonably described where requests sought documents that "regard[ ] in any way" the
eight specified topics).

To illustrate the vagueness of Plaintiff's requests, Request No. 8 seeks "any and all documents,
communications, and other records . . . that identify detainees who were hospitalized or
transferred for off-site medical care due to COVID-19, and were subsequently released from
custody while hospitalized . . . name and location of hospital, date of return to detention (if any),
date of release from custody or issuance of order of recognizance (if any), and/or reason for
release from custody."  Putting aside the potential applicability of FOIA exemptions, it is unclear
whether the search should seek documents limited to records showing that the reason for release
was because of or "due to COVID-19" or whether the search should seek documents showing
that a detainee was released from custody while in the process of receiving off-site treatment for
COVD-19 at the time of release or whether the search should seek documents showing that a

---

[1] Such concerns were raised over a nearly identical FOIA request made by the ACLU in
*ACLU v. DHS, et al.*, D.D.C. case no. 21-2627 (TJK).  In that action, the U.S. Department of
Homeland Security, U.S. Department of Homeland Security Office of Inspector General, and
U.S. Immigration and Customs Enforcement moved to dismiss the complaint. *Id.*, Dkt. 12. The
ACLU opposed the motion and the defendants there replied. *Id.*, Dkt. nos. 14 & 16. Before the
court ruled the motion, the ACLU dismissed without prejudice. *Id.*, Dkt. 17. Indeed, much of the
discussion in this correspondence comes from the Motion to Dismiss in that action.

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
March 29, 2023
Page 4

detainee was released from custody who had at one point been treated off-site "due to COVID-19."  And because the terms of the request seek "any and all" records that "identify" the release of detainees, that would appear to encompass documents about the release (i.e., logistics, notices to appear) that do not themselves reflect a COVID-19 diagnosis or treatment.  Plaintiff's broad descriptions do not allow the agency "to determine precisely what records are being requested." *Tax Analysts v. IRS*, 117 F.3d 607, 610 (D.C. Cir. 1997) (quoting *Kowalczyk v. Dep't of Just.*, 73 F.3d 386, 388 (D.C. Cir. 1996)).

Second, the FOIA requests are exceedingly and impermissibly broad.  "Even where a request 'identif[ies] the documents requested with sufficient precision to enable the agency to identify them,' the request may still fail to 'reasonably describe[ ]' the records sought if it is 'so broad as to impose an unreasonable burden upon the agency.'"  *Nat'l Sec. Couns. v. CIA*, 960 F. Supp. 2d 101, 163 (D.D.C. 2013) (quoting *Am. Fed'n Gov't Emps. ("AFGE") v. Dep't of Com.*, 907 F.2d 203, 209 (D.C. Cir. 1990)).  "[I]t is the requester's responsibility to frame requests with sufficient particularity to ensure that searches are not unreasonably burdensome." *Assassination Archives & Rsch. Ctr., Inc. v. CIA*, 720 F. Supp. 217, 219 (D.D.C. 1989), aff'd, No. 89-5414, 1990 WL 123924 (D.C. Cir. Aug. 13, 1990).  "Agencies must read FOIA requests as drafted," *Miller v. Casey*, 730 F.2d 773, 777 (D.C. Cir. 1984), and thus are not obligated to construe FOIA requests to be less vague and less burdensome than the text of the requests.

According to the plain language of the FOIA requests here, Plaintiff requests that Defendants search and review the records of any and all employees that might possess records "regarding" the foregoing subjects or "identify" "detainees."  Plaintiff "does not try to cabin [its requests] to particular employees at those agencies." *Am. Ctr. for L. & Just.*, 2021 WL 5231939, at *6.  ICE alone has approximately 20,000 personnel.  *See ICE's Mission*, at https://www.ice.gov/mission.  Further, the FOIA requests encompass any "immigration detention facility," which is defined to include not just ICE-run facilities, but "contract detention facilities" run by private companies.  The definition also includes "intergovernmental service agreement facilities," which are state, county, and local jails that by agreement with ICE, house detainees. *See Sanchez v. Decker*, Civ. A. No. 19-8354, 2019 WL 6311955, at *5 n.4 (S.D.N.Y. Nov. 25, 2019).  Plaintiff has estimated that there are over 200 immigration detention facilities.  Plaintiff's requests, therefore, seek in essence "an all-encompassing search of the records of every field office" even though "the FOIA does not mandate that [an agency] comply" with such a request. *Marks v. Dep't of Just.*, 578 F.2d 261, 263 (9th Cir. 1978); *see also AFGE*, 907 F.2d at 208-09 (holding request that "would require the Bureau to locate 'every chronological office file and correspondent file, internal and external, for every branch office, staff office' does not "'reasonably describe[]' a class od documents subject to disclosure").  And almost all the requests—Nos. 1, 4 & 8, —seek "[a]ny and all documents and communications" regarding certain subjects.  "The phrase 'any and all' is capacious, involving a huge number of potentially responsive documents." *Am. Ctr. for L. & Just.*, 2021 WL 5231939, at *5; *Dale*, 238 F. Supp. 2d at 104 (D.D.C. 2002) ("FOIA requests for all documents concerning a requester are too broad.").

As drafted then, the requests do not reasonably describe records that can be located without an unreasonable burden.  Request No. 8, for example, requests "any and all" documents, communications, and other records that "identify" any "detainees" (and by definition, from any "immigration detention facility") "hospitalized"  and "subsequently released from ICE custody

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
March 29, 2023
Page 5

while hospitalized."  Responding to this request would be a "massive undertaking," *see Nat'l Sec. Counselors. v. CIA*, 969 F.3d 406, 410 (D.C. Cir. 2020), made all the more challenging by the fact that it places on the agency the onus of determining what records "regard[]" these detainees.  Layered on top, in Request No. 9, Plaintiffs seek the "bills, invoices, charges, or payment" for all the hospitalizations.

Other requests have separate issues.  Although Request Nos. 5 and 8 do not seek records "identifying" "detainees" and with them certain subjects, they seek "any and all" records that "identify detainees who were hospitalized" along with the dates of departure from detention, discharge from hospital, and return to detention; the date of and reason for release; the detention facility; and the medical condition or reason for hospitalization.  Request No. 8 seeks this and additional information.  These requests have similarities to the request in *Krohn v. Department of Justice*, 628 F.2d 195, 196 (D.C. Cir. 1980), which sought a variety of information with respect to "each and every criminal case" in which judgment was entered pursuant to Fed. R. Crim. P. 32(b).  The D.C. Circuit held that the request was "too vague" and explained that "[a] reasonable description requires the requested record to be reasonably identified as a record not as a general request for data, information and statistics to be gleaned generally from documents which have not been created and which the agency does not generally create or require."  *Id.* at 198.  The Court continued that "the request is so broad and general as to require the agency to review the entire record of 'each and every . . . criminal case' in order to determine whether it contains any evidence of the data, information or statistics that appellant requests. Such request is fatally flawed by lack of a reasonable description."  *Id.*  Likewise here, Plaintiff's requests as drafted would require Defendants to review each and every case and record of a detainee who was hospitalized to effectively compile the requested information.  But "an agency is not required to 'answer questions disguised as a FOIA request,' . . . nor conduct research in response to a FOIA request."  *Hall & Assocs. v. EPA*, 83 F. Supp. 3d 92, 102 (D.D.C. 2015) (citations omitted).

Request Nos. 2 and 3 also do not reasonably describe the records sought and are impermissibly vague.  These requests seek "any and all DHS OIG reports of investigation" or "ICE [Office of Professional Responsibility] reports of investigation" "that are identified in any of the records responsive to Request #1."  One could characterize these as "springing" FOIA requests.  Thus, Plaintiff requests Defendants not only produce records responsive to Request No. 1 but review those records to determine if further searches should be conducted based on the content of those records.  But "FOIA was not intended to reduce government agencies to full-time investigators on behalf of requesters."  *Assassination Archives*, 720 F. Supp. at 219.  Further, the FOIA requests do not define a "report of investigation" or what would constitute "identif[ying]" those reports such that there would be a trigger for Defendants to have to search for and produce them.  And again, Request Nos. 2 and 3 are based on the content of "records responsive to Request #1," which ask for records "relating to" the hospitalization, death, decision to release, or release of four named individuals.

The above highlights the issues Defendants have confronted in attempting to respond to the FOIA requests at issue here.  Indeed, an agency employee familiar with the requests' subject matter would not be able to locate the records with a "reasonable amount of effort."

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
March 29, 2023
Page 6

Notwithstanding the above, ICE FOIA has reviewed the remaining potentially responsive records identified through its searches thus far. Based on my understanding, the records related to the specific noncitizens mentioned in the FOIA requests appear to be included in the production. The production also includes potentially responsive records from IHSC, including policies and spreadsheets. ICE OPR did not produce any responsive records, which is not unusual because it does not typically conduct investigations into noncitizen deaths that occur outside of ICE custody.

In reviewing the locations searched in this action, ICE FOIA did determine that it does not appear that ICE's Office of the Chief Financial Officer was tasked. It therefore intends to ask that office to search for records that may be responsive to your client's FOIA request and process them accordingly. To that end, ICE FOIA is amenable to collaborating over any subsequent search terms and parameters your client may like to suggest for that search.

Relatedly, on several occasions, Plaintiff has raised issues with Defendants' efforts thus far, but when invited to provide search terms or locations Plaintiff believes would be sufficient, it has declined to do so. Rather, Plaintiff has repeatedly raised that it is Defendants' burden to conduct the search and then, once completed, Plaintiff will "supplement" if it thinks the search terms or locations are inadequate. However, as highlighted above, the requests themselves are vague and overbroad. Thus, while Defendants have conducted searches, and produced responsive records, it cannot be said that such efforts thus far have been inadequate. Rather, it is the vague and overbroad nature of the requests themselves that have frustrated Defendants' ability to conduct an adequate search. Still, defendants remain open to considering any search terms or locations Plaintiffs may wish to offer.

Finally, with respect to the redactions in ICE FOIA's initial 2,444 page production, those records were determined to be responsive in *Vargas v. DHS, et al.* C.D. Cal. Case No. 22-cv-00287 and were produced in the same format there as they were here, in order to expedite their release. In *Vargas*, the requestor did not challenge the redactions and thus there is not a *Vaughn* index available to provide additional information on the redactions. Thus, if there are specific redactions of concern, please advise so that ICE FOIA may review at least a sampling of the challenged redactions.

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
March 29, 2023
Page 7


Please let me know if you have any questions, or would like to further discuss any of the matters
raised above.

Respectfully,

E. MARTIN ESTRADA
United States Attorney

/s/ *Joseph W. Tursi*

JOSEPH W. TURSI
Assistant United States Attorney



cc: Ms. Eunice Cho (by email)
    Mr. Michael Kaufman (by email)
    Mr. Kyle Virgien (by email)

# EXHIBIT C

April 14, 2023

Joseph Tursi
Alarice Medrano
United States Attorney's Office
Central District of California
300 N. Los Angeles St. Suite 7516
Los Angeles, CA 90012
Joseph.Tursi@usdoj.gov
Alarice.Medrano@usdoj.gov

Re:   *American Civil Liberties Union Foundation of Southern California v. United States Immigration and Customs Enforcement, et al.*, No. 2:22-cv-4760-SB-AFM (C.D. Cal.); April 29, 2022 FOIA Request

Dear Counsel,

This letter responds to Defendants' letter, dated March 29, 2023, regarding Plaintiff's concerns with the adequacy of ICE's search for records responsive to its above-referenced FOIA Request, as well as certain redactions in Defendants ICE and OIG's productions to date. With this letter, among other things, Plaintiff requests that Defendants conduct a search for records responsive to Request Nos. 3-9, and produce them to us by May 2023 per the Court's February 9, 2023 Scheduling Order. We also request to schedule a meet and confer next week to address any issues with our proposed search terms, and any other issues raised herein. Please let us know your availability.

## I.      Plaintiffs' Requests Are Narrowly Tailored and Sufficiently Specific for ICE to Conduct A Search

ICE has admitted that as of this date, it has not conducted any search at all for records responsive to six of Plaintiff's nine Requests (Request Nos. 3-9). At the outset, Plaintiff fundamentally disagrees with ICE's characterization of Request Nos. 3-9 as "overbroad and vague," which in any event is "not to be used as a method of withholding records" as ICE has done here. *Bristol-Myers Co. v. FTC*, 424 F.2d 935, 938 (D.C. Cir. 1970), *cert. denied*, 400 U.S. 824 (1970). Indeed, ICE never before raised any claim characterizing these Requests as "overbroad and vague" until Plaintiff inquired as to why Defendants had unilaterally omitted Request Nos. 3-9 from their search altogether. "[I]f [ICE] was at all uncertain about the scope of Plaintiff's request, it could have asked [it] what [it] meant … which it did not do." *Leopold v. Dep't of Just.*, 130 F. Supp. 3d 32, 44 (D.D.C. 2015), on reconsideration in part, No. 14-CV-00168 (APM), 2016 WL 7839130 (D.D.C. Apr. 25, 2016).

Plaintiff's Requests are specific, reasonably described, and sufficient for Defendants to conduct a search. ICE's strained characterizations of Request Nos. 3-9 to justify its failure to conduct a search for responsive records is unsound. Plaintiff's FOIA request easily satisfies the "linchpin inquiry" for a reasonably-described request, which is "whether the agency is able to determine precisely what records (are) being requested." *Yeager v. DEA*, 678 F.2d 315, 326 (D.C. Cir. 1982) (internal quotation marks omitted); *see* 6 C.F.R. § 5.3(b) (description must

allow personnel to locate records "with a reasonable amount of effort" through an "organized, non-random search"). The Requests "precisely define by subject matter" the documents and communications sought. *Pub. Emps. for Envtl. Responsibility v. Envtl. Prot. Agency*, 314 F. Supp. 3d 68, 81 n.5 (D.D.C. 2018). Fundamentally, Plaintiff's Request asks for records on only *one subject*—ill detainees released from custody while hospitalized, at off-site medical facilities, or just before transfer to these facilities.

Each of Request Nos. 3-9 provides ICE with tailored search parameters governing the single subject of the Request, with which "professional employee[s] of the agency … familiar with the subject area of the request [may] locate the [records sought] with a reasonable amount of effort." *Truitt v. Dep't of State*, 897 F.2d 540, 545 n.36 (D.C. Cir. 1990). This is all that is required of Plaintiff, and ICE's claims to the contrary are unsupportable, including as follows:

- Request No. 3 specifically requests that ICE search for and produce "ICE [Office of Professional Responsibility] reports of investigation that are identified in any of the records responsive to Request #1." Request #1 specifically refers to four individual ICE detainees, including Teka Gulema, Johana Medina Leon, Jose Ibarra Bucio, and Martin Vargas Arellano. ICE's claim that Request No. 3 would require it to "reduce" ICE to become a "full-time investigator[]" is belied by the specificity of the Request, which clearly defines "precisely what records are being requested." *Assassination Archives & Rsch. Ctr., Inc. v. C.I.A.*, 720 F. Supp. 217, 219 (D.D.C. 1989), aff'd, No. 89-5414, 1990 WL 123924 (D.C. Cir. Aug. 13, 1990).

- Request No. 4 specifically seeks "documents and communications, including ICE and IHSC directives, policies, procedures, protocols, or trainings that contain guidance, instructions, or standards about the release from custody of (a) hospitalized detainees; or (b) detainees who at the time of release were patients in the care of external healthcare providers or facilities." The Request specifies that detainees in categories (a) and (b) include those "being treated for COVID-19." This request "conveys exactly which records [plaintiff] seeks." *Shapiro v. CIA*, 170 F. Supp. 3d 147, 152, 156 (D.D.C. 2016) (holding that requests seeking any and all records 'mentioning' a subject matter were appropriate under FOIA).

- Request No. 5 specifically seeks "spreadsheets, emails, documents, databases, lists, and other data compilations" "that identify detainees who were released from custody while (a) hospitalized (including for COVID-19 treatment); (b) in the full-time care of external healthcare providers or facilities (including for COVID-19 treatment), or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility. Contrary to Defendants' assertion, Request No. 5 does not seek "any and all" records that identify such detainees. The request further identifies particular offices for the search, including "ICE Leadership, ICE Enforcement and Removal Operations, ICE Health Service Corps, and ICE Office of Professional Responsibility," as well as specific databases and lists, including "Medical Transfer Summary documents from DHS's eHR system and Alien Medical Records System, and any version of the Significant Detainee Illness Spreadsheet."

Request No. 5 also seeks specific information regarding such detainees, including "dates of hospitalization of detainees, dates of hospital or external care facility discharge, name of treated detainees' detention facilities, and reasons for detainees' hospitalization or external medical care." Such "identifying information" is also "sufficiently specific." *Biear v. Att'y Gen. United States*, 905 F.3d 151, 157 (3d Cir. 2018). These specifications hardly transform the Request into "a general request for data" or require ICE to "conduct research in response to the FOIA request." ICE March 29, 2023 Letter at 5. To the contrary, the information sought is reasonably likely to be included in the specific form of documents sought.

- Request No. 6 specifically asks Defendants to produce "spreadsheets, emails, significant incident reports (SIRs), significant event notification reports (SENs), or documents created by DHS OIG or ICE OPR that mention the release from custody of (a) hospitalized detainees; (b) detainees who at the time of release were patients in the care of external healthcare providers or facilities; or (c) detainees released from custody immediately prior to transfer to an emergency room, hospital, or external care facility." Plaintiff has very clearly identified the parameters of the search, and Defendants have raised no specific objection to this Request.

- Request No. 7 specifically asks Defendants to produce "spreadsheets, emails, SIRs, SENs, or documents created by DHS OIG or ICE OPR that mention the death of any detainee who had been previously released from custody while (a) hospitalized; or (b) a patient in the care of an external healthcare provider or facility; or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility." Again, Plaintiff has very clearly identified the parameters of the search, and Defendants have raised no specific objection to this Request.

- Request No. 8 specifically asks Defendants to produce "any and all documents, communications, and other records, including spreadsheets, lists, and other data compilations, that identify detainees who were hospitalized or transferred from detention for off-site medical care due to COVID-19, and were subsequently released from custody while hospitalized, *or* detainees who were released from custody immediately prior to transfer to an emergency room, hospital, or external care facility to receive treatment for COVID-19." Plaintiff also specifically requested that this information include "dates of hospitalization, detention facility, medical condition/reason for hospitalization or treatment, name and location of hospital, date of return to detention (if any), date of release from custody or issuance of order of recognizance (if any), and/or reason for release from custody."

As with Request No. 5, this request for "identifying information" is "sufficiently specific." *Biear*, 905 F.3d at 157, and hardly transforms the Requests into "a general request for data" or requires ICE to "conduct research in response to the FOIA request." ICE March 29, 2023 Letter at 5. To the contrary, the information sought is reasonably likely to be included in the specific form of documents sought, including "[s]preadsheets, emails, documents, communications, databases, lists, and other data compilations." Request Nos. 5, 8.

Regarding ICE's purported confusion over whether and to what extent to search for documents related to the term "Covid-19," suffice it so say Request No. 8 only emphasizes and clarifies that Plaintiff seeks information about detainees whose hospitalizations, transfers to off-site medical care, or release from detention just before being transferred to these facilities was either "due to Covid-19" or "to receive treatment for Covid-19." To the extent that there is any confusion about the term "due to COVID-19," the request is clear: Defendants should produce documents that identify detainees who were hospitalized or transferred from detention for off-site medical care for treatment of COVID-19, and were subsequently released from custody while at these facilities. Defendants should *also* produce documents that identify detainees who were released from custody immediately prior to transfer to an emergency room, hospital, or external care facility to receive treatment for COVID-19. The request does not require production of documents "showing that a detainee was released from custody who at one point been treated off-site 'due to COVID-19.'" ICE March 29, 2023 Letter at 4. Documents about the release itself (*i.e.* logistics, notices to appear) are highly relevant and encompassed in the request, as they provide the public with critical information regarding the terms of release from custody.

- Request No. 9 specifically asks Defendants to produce "bills, invoices, charges, or records of payments made for healthcare for any detainee who was released from custody while (a) hospitalized; or (b) a patient in the care of an external healthcare provider or facility, and communications about such bills, invoices, charges, or records of payment." There can be no doubt as to the specificity of this Request, and ICE appears to acknowledge as such when it acknowledges that it has not, and will now search the Office of the Chief Financial Officer. ICE March 29, 2023 Letter at 6.

In the face of these specific Requests, Defendants cite to boilerplate case law untethered to the relevant language of the Requests. For example, ICE attempts to fault the Requests for including introductory language such as "any and all," as well as connector words like "regarding," "relating to," and "related to," claiming that the Requests are insufficiently clear based solely on the inclusion of those words. However, these phrases do not determine whether records are reasonably described for purposes of FOIA, particularly where, as here, the subject matter of Plaintiff's Request is abundantly clear. *See, e.g., Pub. Emps. For Envtl. Responsibility*, 314 F. Supp. 3d at 71-72 (holding that FOIA request for "any EPA documents that support the conclusions that human activity is not the largest factor driving global climate change" was reasonably described); *Shapiro*, 170 F. Supp. 3d at 155 ("FOIA's reasonable-description requirement does not doom requests that precisely describe the records sought, even if compliance might overwhelm an agency's response team."); *Yeager*, 678 F.2d at 326 ("the number of records requested appears to be irrelevant to the determination whether they have been 'reasonably described.") (internal quotations and citations omitted).

Defendants' argument that the search required is unduly burdensome appears to be an attempt to distract from their independent obligation to search locations "likely to contain responsive materials." *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990); *see also Transgender L. Ctr. v. Immigr. & Customs Enf't*, 33 F.4th 1186, 1194 (9th Cir. 2022) (quoting

*Hamdan v. Dep't of Just.*, 797 F.3d 759, 770 (9th Cir. 2015) (agency bears the burden to "demonstrate [the] adequacy [of its search] . . . 'beyond a material doubt.'"). For example, ICE claims, without any substantiation, or without any attempt to conduct *any* search of custodians likely to possess responsive records, that the Request would require ICE to search the records of "20,000 personnel" and "200 immigration detention facilities." Rather, given the well-defined subject matter at issue, ICE "professional employee[s] … who [are] familiar with the subject area of the request" are well-equipped to identify which of those personnel and facilities are likely to yield responsive records. *Truitt*, 897 F.2d at 545.

## II.    Deficiencies with ICE's Search to Date, and Need for Further Searches

As counsel for Plaintiff discussed during our March 24, 2023 video conference, Plaintiff rejects ICE's representation that its original search limited to Plaintiff's FOIA Request Nos. 1 and 2 somehow satisfies its search obligations for Request Nos. 3-9 on a backward looking basis. That original search admittedly only targeted "the names of the individuals (including their A numbers) the detention centers, and the medical centers listed in the request." Defs.' February 1, 2023 Email. By design, Defendants' search did not target information about the broader subject of the Request.

While Plaintiff appreciates ICE's agreement to reconsider the adequacy of its search to date, and invitation to Plaintiff to identify additional search locations and parameters, we reiterate that it is ICE's obligation to do so in the first instance. Indeed, "[i]t would be counterintuitive in the extreme to require [a FOIA Requestor] to have sufficient knowledge of an agency's organizational units to be able to identify the specific units of an agency that might contain the records sought." *Biear*, 905 F.3d at 157.

Regarding search locations, ICE's search of "hard drives, Outlook mailboxes and email messages, and the ENFORCE Alien Removal Module" also appears to be deficient, as ICE now acknowledges. Defs.' February 1, 2023 Email. Plaintiffs ask Defendants to address the following deficiencies:

- In addition to the ICE's Office of the Chief Financial Officer, which Defendants now plan to task to search, it appears Defendants have failed to search specific locations identities in the Request, including "DHS's eHR System and Alien Medical Records System, and any versions of the Significant Detainee Illness Spreadsheet," as well as "ICE Leadership, ICE Enforcement and Removal Operations, ICE Health Service Corps, and ICE Office of Professional Responsibility." *See, e.g.* Request No. 5.

- Regarding its search of "hard drives, Outlook mailboxes and email messages," ICE should identify the individuals and/or job positions of DHS personnel whose hard drives and communication systems were searched for responsive records, so that Plaintiffs can assess whether others should be searched as well.

In addition, and without waiving any arguments regarding the adequacy of ICE's final searches, or the opportunity to supplement suggested search terms or locations, Plaintiff proposes the following search terms for the records requested and specified in each Request, and ask that

ICE use them to conduct searches of all records systems it has searched this far, as well as the additional locations identified below:

- **Request No. 3**:
  - o **Suggested search terms**: Teka Gulema, Johana Medina Leon, Jonathan Alberto Medina Leon, Jose Ibarra Bucio, and Martin Vargas Arellano

  - o **Suggested search locations**: ICE Office of Professional Responsibility Reports of Investigation

- **Request No. 4**:
  - o **Suggested search terms**:
    - ▪ (policy or policies or protocol or procedure or training or guidance or instruction or standard or detainee or custody) w/25 (death or died or deceased or medical or surgery or specialist or doctor or COVID-19 or hospital! or ambulance or emergency room or emergency services or poor outcome or life support or coma or unconscious or ventilator or intensive care or medical observation or ICU or critical condition or hospice or palliative or fatal)
    - ▪ (release or transfer or benefits or parole or alternative detention or discharge) w/25 (death or died or medical or surgery or specialist or doctor or  COVID-19 or hospital! or ambulance or emergency room or emergency services or poor outcome or life support or coma or unconscious or ventilator or intensive care or medical observation or ICU or critical condition or hospice or palliative or fatal)
    - ▪ humanitarian /25 releas!

  - o **Suggested search locations**: ICE Enforcement and Removal Operations, ICE Health Service Corps

- **Request No. 5:**
  - o **Suggested search terms:**
    - ▪ (detainee or custody) w/25 of (death or died or deceased or medical or surgery or specialist or doctor or COVID-19 or hospital! or ambulance or emergency room or emergency services or  poor outcome or life support or coma or  unconscious or ventilator or intensive care or medical observation or ICU or critical condition or hospice or palliative or fatal)
    - ▪ (release or transfer or benefits or parole or alternative detention or discharge) w/25 (death or died or deceased or medical or surgery or specialist or doctor or COVID-19 or hospital! or ambulance or emergency room or emergency services or poor outcome or life support or coma or unconscious or ventilator or intensive care or medical observation or ICU or critical condition or hospice or palliative or fatal)

  - o **Suggested search locations:** ICE Leadership, ICE Enforcement and Removal Operations, ICE Health Service Corps, and ICE Office of Professional

Responsibility, Medical Transfer Summary documents from DHS's eHR system and Alien Medical Records System, and any version of the Significant Detainee Illness Spreadsheet.

- **Request No. 6:**
  - **Suggested search terms:** (detainee or custody) w/25 (death or died or deceased medical or surgery or specialist or doctor or COVID-19 or hospital! or ambulance or emergency room or emergency services or  poor outcome or life support or coma or  unconscious or ventilator or intensive care or medical observation or ICU or critical condition or hospice or palliative or fatal)

  - **Suggested search locations:** ICE Leadership, ICE Enforcement and Removal Operations, ICE Health Service Corps, ICE personnel responsible for reviewing Significant Incident Reports or Significant Event Notification Reports, ICE OIG, ICE OPR.

- **Request No. 7:**
  - **Suggested search terms:** (detainee or custody) w/5 (death or died or deceased or medical or surgery or specialist or doctor or COVID-19 or hospital! or ambulance or emergency room or emergency services or  poor outcome or life support or coma or  unconscious or ventilator or intensive care or medical observation or ICU or critical condition or hospice or palliative or fatal)

  - **Suggested search locations:** ICE Leadership, ICE Enforcement and Removal Operations, ICE Health Service Corps, ICE personnel responsible for reviewing Significant Incident Reports or Significant Event Notification Reports, ICE OIG, ICE OPR.

- **Request No. 8:**
  - **Suggested search terms:**
    - (detainee or custody) w/25 (COVID-19 or hospital! or ambulance or emergency room or emergency services or coma or unconscious or ventilator or intensive care or ICU or critical condition or fatal)
    - (release or transfer or parole or alternative detention or discharge) w/25 (COVID-19 or hospital! or ambulance or emergency room or emergency services or coma or unconscious or ventilator or intensive care or ICU or critical condition or fatal)

  - **Suggested search locations:** ICE Leadership, ICE Enforcement and Removal Operations, ICE Health Service Corps.

## III.   Lack of Sufficient Information to Support Redactions

As referenced in our February 14, 2023 letter, Plaintiff reiterates its request that ICE provide justification for the block redaction under Exemption (b)(5) contained in pages 126-128 of its November 2022 production (a document previously produced in *Vargas v. DHS* (C.D. Cal.

Case No. 22-cv-00287). Similarly, as referenced in Our March 1, 2023 letter, we are still waiting on your offer to provide further information regarding redactions subject to an "unspecified statute" in OIG's December 2022 production at pages 66, 67, 68 and 75. Plaintiffs' other requests regarding Defendants' redactions remain outstanding.

Sincerely,

# EXHIBIT D

May 19, 2023

Jason Axe
Alarice Medrano
United States Attorney's Office
Central District of California
300 N. Los Angeles St. Suite 7516
Los Angeles, CA 90012
Jason.Axe@usdoj.gov
Alarice.Medrano@usdoj.gov

**SENT VIA EMAIL**

> Re:     *American Civil Liberties Union Foundation of Southern California v. United
> States Immigration and Customs Enforcement, et al.,* No. 2:22-cv-4760 (C.D.
> Cal.)

Dear Counsel:

Thank you for conferring with us via videoconference yesterday, May 18, 2023 and for your follow up emails of May 18 and 19, 2023. As we discussed, Plaintiff ACLU of Southern California again raised the following issues regarding Defendants' deficient response to its FOIA request. Please provide Plaintiff with responses to each item in advance of our next meeting, to take place on Thursday, May 25, 2023 at 10:00 am PT. Regarding issues related to Defendant ICE, we again suggest that ICE counsel and/or any ICE personnel familiar with ICE's records systems be invited to participate in our next meeting, to provide immediate clarification, reduce misunderstanding and delay in response.

**As discussed during yesterday's meeting, please provide a hit count and proposed schedule for Defendants' production of documents responsive to Request Nos. 3-9, and documents related to Mr. Jose Ibarra Bucio prior to our meeting by May 25, reflecting the search terms and locations suggested below.** To be clear, as referenced in Defendants' May 19, 2023 email, we understand that ICE cannot "estimate a hit count" and we are not asking for that. The actual hit counts we are seeking are necessary to determine revisions to the current scheduling order, including a realistic amended summary judgment briefing schedule.

1. **Request Nos. 1-3 for Jose Ibarra Bucio.** Defendants have confirmed that they have not produced any documents regarding Mr. Ibarra Bucio, in response to Request Nos. 1-3, and requested Mr. Ibarra Bucio's A number, which Plaintiff has provided.

   Defendants' May 19, 2023 email appears to indicate that both ICE and OIG will conduct a subsequent search for Mr. Ibarra Bucio's A number, but please confirm that will do so, *as well as search his name and A number in all of the locations identified herein*. In addition to locations already searched (with Mr. Ibarra Bucio's name), please ensure that ICE searches its applicable Field Offices, which, at a minimum, should include the Adelanto and Los Angeles Field Offices (including searches of email accounts of ICE personnel involved in Mr. Bucio's case), as well as any offices responsible for communications with the media, the

OIG, the ICE Office of Professional Responsibility, and the Office of Chief Financial Officer, in addition to the "ERO Front Office" and IHSC. *See* Email from Jason Axe, May 18, 2023. Note that the information should include any SENs, SIRs, emails, documents, communications, investigatory reports, and any exhibits, appendices, and attachments, related to his hospitalization, death, decision to release from custody, or release from custody. Please provide a hit count of responsive records for Mr. Ibarra Bucio prior to our meeting on May 25.

2. **Request No. 1-3 for Martin Vargas Arellano.** Defendants have confirmed that no unique search for records responsive to Plaintiff's FOIA request was conducted for Martin Vargas Arellano, but rather, produced records also provided in response to another requestor in the case *Martin Vargas v. U.S. ICE et al*., No. 5:22-cv-287-JWH-SP (C.D. Cal.).

   Please conduct a search for documents responsive to Plaintiff's FOIA request, and outside the scope of the FOIA request in *Martin Vargas v. U.S. ICE et al*., No. 5:22-cv-287-JWH-SP (C.D. Cal.). Among documents that appear to be missing are documents referencing Mr. Vargas Arellano in the case *Hernandez Roman v. Wolf*, 5:20-cv-00768-TJH-PVC (C.D. Cal.), including but not limited to a Special Masters' Report dates July 16, 2021 and documents and information referenced therein. Further, to the extent ICE and OIG have not searched for documents utilizing Mr. Vargas Arellano's A#, please do so. Please provide a hit count of responsive records prior to our meeting on May 25.

   Regarding the documents produced to date from the case *Martin Vargas v. U.S. ICE et al*., No. 5:22-cv-287-JWH-SP (C.D. Cal.), ICE indicated it would review the redactions in that case to ensure they do not contain non-exempt material, and would re-produce them accordingly. We asked that ICE do so by the May 2023 production deadline, but it indicated it may not be able to meet this deadline. Please indicate when ICE will do so.

3. **Request Nos. 1-3.** Regarding the searches conducted for Martin Vargas Arellano, Teka Gulema, and Johana Medina Leon, please identify ICE's search locations and custodians (by name, and if subject to exemption, by title), and whether ICE's search locations included relevant Field Office staff (including a search of their email accounts) prior to our meeting on May 25.

4. **Request Nos. 3-9.** Defendants have admitted that ICE has not conducted a search for these requests. Email from Joseph Tursi, Feb. 1, 2023, Defendants' March 29, 2023 Letter. Plaintiff has repeatedly asked that they do so. On April 14, 2023, Plaintiffs reiterated ICE's obligation to conduct these searches, and provided a proposed list of search terms and locations to identify records responsive to these requests.  We asked that that Defendants use them to conduct searches of all records systems searched thus far, as well as the additional locations identified. A month later, on May 16, 2023, ICE identified a global set of search terms it was "considering" utilizing to respond to these requests, and also identified two potential search locations including the "ERO Front Office" and IHSC. However, Defendants

indicated that "ICE has not finalized its views with respect to these search terms and locations," and sought Plaintiffs input on them.

As discussed on our call on May 18, 2023, because each request concerns unique types of records and locations, ICE's proposed search terms and locations are not narrowly tailored, fail to review specified sources and databases for search. For that reason, ICE should conduct a tailored search for each request, as detailed below. To the extent ICE does not agree to use the search terms and/or locations identified below, please provide us ICE's specific reasons for declining to do so as to each term and/or location.

**Boolean W/N Search Connector**. Consistent with Defendants' prior practice, Plaintiff has proposed that Defendants use Boolean W/N proximity search terms. On May 16, 2023, Defendants stated via email that "although you have suggested search terms that ask for words 'within x' of other words, ICE cannot conduct searches like that." Email from Jason Axe, May 17, 2023. On our May 18 call, we explained that we have good reason to believe this is not true, and you asked us to provide proof of that. First, Defendants have applied identical Boolean search functions in other FOIA cases, including those litigated by the ACLU. *See, e.g. ACLU v. DHS, ICE,* No. 1:20-cv-3204 (D.D.C.) (applying Boolean w/n search connector to "social w/2 (isolate* or distanc*) for FOIA request related to COVID-19 in ICE detention facilities). ICE uses the Relativity system as part of its review. *See* Exhibit A, Relativity Report for Tae Johnson, Oct. 21, 2021. Second, the Relativity system allows for use of the Boolean W/N proximity search function. *See* Boolean Connectors, https://www.relativity.com/relativity/Portals/0/Documents/7.5%20Documentation%20Help% 20Site/Content/Relativity%20Searching/dtSearch/Search%20Syntax%20Options/Boolean%2 0connectors.htm (last visited May 19, 2023) ("When two expressions are connected by W/N, at least one of them must be a single word or phrase").

a.  **Request No. 3.**
   - **Suggested search terms**: Teka Gulema, Johana Medina Leon, Jonathan Alberto Medina Leon, Jose Ibarra Bucio (and A# 204380214), and Martin Vargas Arellano
   - **Suggested search locations**: ICE Office of Professional Responsibility Reports of Investigation, ICE Field Offices in which these individuals were detained (including email accounts of ICE personnel tasked with overseeing these individuals)

b.  **Request No. 4.**
   - **Suggested search terms:**
     o  (directive or policy or policies or protocol or procedure or training or guidance or instruction or standard or detainee or custody) w/25 (death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency services" or "poor outcome" or "life support" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal)
     o  (release or transfer or benefits or parole or alternative detention or discharge) w/25 (death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency services" or "poor outcome" or "life support" or coma or unconscious or ventilator or

> "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal)
>> o humanitarian release

- **Suggested search locations**: ICE Enforcement and Removal Operations Front Office, ICE Health Service Corps
- **Please exclude**: Any version of ICE Detention standards (NDS 2000, PBNDS 2008, PBNDS 2011, NDS 2019), or ICE's COVID-19 Pandemic Response Requirements

**c. Request Nos. 5-8.**
- **Suggested search terms:**
  - o **(**detainee or custody) w/25 (death or died or deceased or surgery or specialist or hospital! or ambulance or "emergency room" or "emergency services" or "poor outcome" or "life support" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal)
  - o (release or transfer or benefits or parole or alternative detention or discharge) w/25 (death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency services" or "poor outcome" or "life support" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal)
- **Suggested search locations:** ICE Enforcement and Removal Operations Front Office, ICE Health Service Corp's Medical Case Management Unit, IHSC Field Medical Coordinators, ICE Office of Professional Responsibility, any staff responsible for creating or reviewing the Significant Detainee Illness Spreadsheet; ICE personnel responsible for reviewing Significant Incident Reports or Significant Event Notification Reports; any version of the Significant Detainee Illness Spreadsheet; Medical Transfer Summary documents from DHS's eHR system; and Alien Medical Records System

**d. Request No. 9:** Thank you for confirming in your May 19, 2023 email that, per Defendants' March 29, 2023 correspondence, that they will task ICE's Office of the Chief Financial Officer to search for responsive records. This search should include bills, invoices, charges, or records of payment that reflect payments made for healthcare for *any* detainee who was released from custody while hospitalized, or in the care of an external healthcare provider or facility, and communications about such bills, invoices, charges, or records of payment. These detainees include Martin Vargas Arellano, Teka Gulema, Jose Ibarra Bucio, and Johana Medina Leon, as well as any other such detainees. In addition to the Office of the Chief Financial Officer, the following is a list of locations ICE should search for documents responsive to this request:
- **Suggested search locations:** ICE Office of Chief Financial Officer; IHSC (including staff responsible for reviewing medical claims). *See* Exhibit B (Excerpts of transcript of Jennifer Moon, *Coreas v. Bounds*, No. 8:20-cv-780 (D. Md.) (Sept. 15, 2021).

4

5. **Teka Gulema.** As noted in our May 8, 2023 letter, please inform us as to whether Defendants' scheduled production for May 2023 will include records dated later than November 6, 2015, and related to Mr. Gulema's release from custody.

6. **Email Threading and Production of Multiple Copies of Identical Material**. Plaintiff's FOIA request instructed the government to de-duplicate its search results to avoid producing "multiple copies of identical material." As we raised in our May 8, 2023 letter, ICE has produced at least 1140 pages that are email threads consisting of identical material. Pl. Letter, May 8, 2023. Plaintiff requested that Defendants apply email threading to Defendants' collection before review to eliminate emails that consist entirely of material duplicated in another email in the review set.

   Defendants suggest that *Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Justice*, No. 18-cv-007, No. 2020 WL 2735570 (D.D.C. May 26, 2020) "addresses the question regarding what a record is as that term applies to email threads." Email from Jason Axe, May 19, 2023. However, this misses the point: Plaintiffs do not object to the Defendants' production of entire email threads. Defendants "may not distinguish between responsive and non-responsive portions of a record, but instead must disclose the entirety of a responsive record 'as a unit.'" *Id.* at *3 (citation omitted). Rather, Plaintiff requests that Defendants apply threading and eliminating emails that consist entirely of material duplicated in another email in the review set. This is achievable by Defendants, as ICE uses the Relativity system as part of its review. *See* Exhibit A, Relativity Report for Tae Johnson, Oct. 21, 2021. The Relativity system allows for email threading to identify duplicates. *See* Email Threading, https://help.relativity.com/RelativityOne/Content/Relativity/Analytics/Email_threading.htm (last visited May 19, 2023).

7. **OIG.** As discussed in our September 2, 2022 and May 8, 2023 letters, as well as during our May 18, 2023 conference call, to the extent OIG has referred any responsive documents to ICE to for potential release to Plaintiff, OIG is obligated to identify those documents to Plaintiff.  During the May 18 call, and in Defendants' May 19, 2023 email, Defendants confirmed that OIG has indeed refereed responsive documents to ICE.  We appreciate OIG and ICE's commitment to comply with its obligations regarding those referred documents. However, we are confused by why they are unable to identify them to us at this time. Regardless of information about "whether those records were already processed, and if not, how many documents they are and when they will be processed," information we also ultimately seek, we also ask that OIG identify now the following information: dates OIG referred documents to ICE,  what requests they are responsive to, and how may pages were referred to ICE. This information is necessary to assess OIG and ICE's obligation to account for all responsive documents, timely process referrals and release responsive documents to Plaintiff.

8. **Increased Production Rate.** As discussed on our May 18 call, in light of Defendants numerous failures to meet its obligation to conduct basic searches reasonably likely to identify responsive documents, Plaintiff ask that for subsequent productions each of OIG and ICE increase their rate of production to 2,500 pages per month. Please respond whether Defendants will agree to do so, so that we can conclude this case in a timely manner.

Plaintiffs appreciate Defendants' response regarding these searches. Plaintiff will address other deficiencies in Defendants' production, including redactions, in future communications.

Sincerely,

LABONI A. HOQ (SBN 224140)
laboni@hoqlaw.com
HOQ LAW APC
P.O. Box 753
South Pasadena, California 91030
Telephone: (213) 973-9004

EUNICE CHO (pro hac vice)
echo@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
915 Fifteenth Street NW, 7th Floor
Washington, DC 20005
Telephone: (202) 548-6616

MICHAEL KAUFMAN (SBN 254575)
MKaufman@aclusocal.org
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West Eighth Street
Los Angeles, California 90017 Telephone:
(213) 977-9500
Facsimile: (213) 915-0219

KYLE VIRGIEN (SBN 278747)
kvirgien@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (202) 393-4930

*Attorneys for Plaintiff*



# OPLA - GILD - ACLU Covid 21-00008
## Search Terms Report

**Report Name:** STR - 102121 - Tae Johnson          **Searchable Set:** Docs with Excluded Terms - Tae Johnson



## Results Summary

| Documents in searchable set | Total documents with hits | Total documents with hits, including Relativity Group ID | Total documents without hits |
|---|---|---|---|
| 144,929 | 3,774 | 9,168 | 135,761 |

# OPLA - GILD - ACLU Covid 21-00008
## Search Terms Report

**Report Name:** STR - 102121 - Tae Johnson    **Searchable Set:** Docs with Excluded Terms - Tae Johnson



# OPLA - GILD - ACLU Covid 21-00008

## Search Terms Report

---

**Report Name:** STR - 102121 - Tae Johnson

**Searchable Set:** Docs with Excluded Terms - Tae Johnson

## Terms Summary

| Term | Documents with hits | Documents with hits, including Relativity Group ID | Unique hits |
|---|---|---|---|
| ((detain* OR detention OR facility OR center) W/10 COVID*) AND date(Oct 1 2020 to Oct 21 2021) | 3,774 | 9,168 | 3,774 |

Jennifer Moon - 9/15/2021
Case 2:22-cv-04760-SHK  Document 57-2  Filed 10/23/23  Page 31 of 132  Page ID #:700
Mauricio Coreas, et al. vs. Donna Bounds, et al.
EXHIBIT B

1

2

3               IN THE UNITED STATES DISTRICT COURT

4                 FOR THE DISTRICT OF MARYLAND

5    ---------------------------------------------------------

6    MAURICIO COREAS, et al.,

7                 Petitioners-Plaintiffs,

8                         Civil Action No. (L)TDC-20-780

9    v.

10   DONNA BOUNDS, et al.,

11                Respondents-Defendants.

12   ---------------------------------------------------------

13              REMOTE VIDEOCONFERENCE DEPOSITION

14         The following is the deposition of

15   JENNIFER MOON, taken before Patricia K. Carl, RPR,

16   Notary Public, conducted virtually pursuant to Notice

17   of Taking Deposition, commencing at approximately

18   10:45 a.m., September 15, 2021.

19

20

21

22

23

24

25

Jennifer Moon - 9/15/2021
Case 2:22-cv-04760-SHK   Document 57-2   Filed 10/23/23   Page 32 of 132   Page ID #:701
Mauricio Corcas, et al. vs. Donna Bounds, et al.
EXHIBIT B

1        A.      Yeah, that is the report that we

2   mentioned earlier that is actually for public view on

3   the website.

4        Q.      Does that report track hospitalization?

5        A.      I haven't looked -- I am -- I don't

6   think that is on there.  I'm not sure.  I haven't

7   looked at it in a minute, but I don't think so.  I

8   don't think so.  I think the only place where we were

9   actually capturing the hospitalization is on the

10   Fraihat.

11        Q.      Ms. Moon, to the best of your knowledge

12   how many detainees in Maryland facilities have been

13   hospitalized?

14        A.      I don't know.

15        Q.      How many have been hospitalized, how

16   many at the Worcester County Detention Center?

17        A.      I don't know.

18        Q.      Do you know if there is a policy or

19   practice for releasing people from custody while

20   hospitalized?

21        A.      While hospitalized, is there a policy?

22   Not that I'm aware of.

23        Q.      Is there a practice?

24        A.      Has it happened, yes.

25        Q.      How often has that happened?

Jennifer Moon  -  9/15/2021
Case 2:22-cv-04760-SHK   Document 57-2   Filed 10/23/23   Page 33 of 132   Page ID #:702
Mauricio Corcas, et al. vs. Donna Bounds, et al.
EXHIBIT B

1          A.        I don't know.

2          Q.        How do you know that has happened?

3          A.        Because we have patients -- because one

4    of the things that is within my preview is medical

5    claims, and so we try to ensure that hospitals and

6    community providers are reimbursed for the services

7    they provide.  And one thing that happens is when an

8    individual is no longer in custody, we are not legally

9    able to pay for their medical care.

10         Q.        You cannot pay for any of their medical

11   care even up to the point that the person was in

12   custody?

13         A.        When they are in custody we can, but

14   the moment that they are no longer in custody, we

15   cannot legally cover their medical care and services.

16         Q.        Even if the medical care was provided

17   during the point at which they were in custody?

18         A.        Correct.

19         Q.        So in that case who would be

20   responsible for the medical bill?

21         A.        Usually the hospitals will make

22   arrangements for them to be able to receive Medicade

23   or some other services that are available.

24         Q.        So it would be the patient?

25         A.        Correct.

Jennifer Moon - 9/15/2021
Case 2:22-cv-04760-SHK Document 57-2 Filed 10/23/23 Page 34 of 132 Page ID #:703
Mauricio Corcas, et al. vs. Donna Bounds, et al.
EXHIBIT B

1      Q.      You said that you are responsible for

2   medical claims.   How often have you seen the situation

3   come up?

4      **A.      I don't know.**

5      Q.      More than five?

6      **A.      Over, let's see, in the past three**

7   **years, maybe.  Yes.  Less than five maybe.  It doesn't**

8   **happen often.**

9      Q.      When it does happen, why does it

10  happen?

11     **A.      Again, we don't make custody**

12  **determinations.  So that would be a question for the**

13  **custody side for ERO.**

14     Q.      Just so I'm clear, if a detainee is

15  admitted to a hospital for COVID 19, who pays that

16  bill?

17     **A.      ICE pays the bill as long as they are**

18  **in ICE custody.**

19     Q.      If the person is released, then

20  individual is responsible for the entire hospital

21  bill?

22     **A.      Just for the dates that they are not in**

23  **custody.  We will cover it up until they are no longer**

24  **in custody.**

25     Q.      Okay.  Just so I'm understanding this

Jennifer Moon - 9/15/2021
Case 2:22-cv-04760-SHK   Document 57-2   Filed 10/23/23   Page 35 of 132   Page ID #:704
Mauricio Corcas, et al. vs. Donna Bounds, et al.
EXHIBIT B

```
1   clearly, if I were a patient with COVID-19, a detainee

2   with COVID-19 and was admitted on Sunday, I was

3   hospitalized for a week, but if ICE released me on

4   Wednesday, ICE would cover the bill from Sunday until

5   Wednesday, is that correct?

6        A.      Correct.

7        Q.      Then Thursday through Sunday I would be

8   responsible for the bill, is that correct?

9        A.      Correct.

10       Q.      Okay.  Let's turn to Page 24 of the

11  document which is Bates number 76.

12       A.      Okay.

13       Q.      Do you see the section titled COVID 19

14  Vaccine?

15       A.      Yes.

16       Q.      Looking at the line three of that

17  paragraph, you agree that "Detention facility staff

18  should contact their states COVID-19 vaccine resource

19  (i.e., state or county Department of Health) to obtain

20  vaccine," do you agree that is what the PR states?

21       A.      Yes, that is what it states.

22       Q.      How does ICE ensure all facilities

23  provide COVID vaccines to detainees?

24       A.      Since publication of this version of

25  the PRR, ICE has made arrangements to obtain vaccine
```

# EXHIBIT E

June 1, 2023

Jason Axe
Alarice Medrano
United States Attorney's Office
Central District of California
300 N. Los Angeles St. Suite 7516
Los Angeles, CA 90012
Jason.Axe@usdoj.gov
Alarice.Medrano@usdoj.gov

**SENT VIA EMAIL**

> Re:     *ACLU of Southern California v. United States Immigration and Customs*
>         *Enforcement, et al.,* No. 2:22-cv-4760 (C.D. Cal.)

Dear Jason,

Thank you for the May 25, 2023 follow-up information on the status of OIG and ICE's searches. Related to our May 19, 2023 correspondence, we provide the following responses, including those related to supplemental searches for Defendants.

Further, as discussed below, we remain concerned about the pace of Defendants' responses to the outstanding issues with their FOIA responses to date. Therefore, despite our willingness to continue to work collaboratively with Defendants to overcome these issues, we believe it is time to schedule a status conference with the Court. Among other things, we will ask the Court to address our current disputes about search issues and a reasonable production schedule, including setting a briefing schedule on these issues if necessary.

I.     **Outstanding Searches**

You have requested that Plaintiff provide Defendants with revised search terms and locations. Regarding additional search locations, we reiterate that the appropriate search locations for ICE's searches should include the terms and locations identified below.

Regarding search terms, thank you for explaining the sequence in which ICE is able to conduct terms and connector searches using a Relativity database. In response to your request that Plaintiff provide initial search terms without terms and connectors to identify that universe of documents that may be imported into Relativity database, Plaintiff has proposed those terms below. Plaintiff has also proposed Boolean search terms to further narrow responsive documents in Relativity. Please conduct a search as specified below, and provide hit counts for each

June 1, 2023
Page 2

category of search locations with the Boolean search, so that we may further collaborate on narrowing terms for production.

To the extent Defendants object to these terms, or proposes others/alternatives, we ask that we schedule a call with ICE and/or its IT staff to negotiate the final list of terms, and production schedule.  As we have mentioned previously, this would be the most efficient way to timely complete the supplemental searches. Given the lengthy delays we have experienced in obtaining responsive documents in this case, as documented in our prior correspondence, we believe this approach to the supplemental searches is appropriate.

Regarding the issue of Defendants' production of duplicative emails as a result of email threading, we agree to your proposal that once the universe of documents is loaded into the Relativity database, Defendants will propose an approach to exclude production of duplicate emails, and the parties will agree in writing on how to implement that proposal.

Regarding the timing of ICE's production of records based on these supplemental searches, we reiterate our request that it agree to resume monthly production of documents on June 20, 2023, at a production rate of 2,500 pages per month.  Given the unjustified delays in its searches and productions to date, we believe it is appropriate for ICE to prioritize this case in this way.

**A. OIG:** *Request No. 2.*

1. Please identify the scope of the additional search OIG is now conducting, including the search terms and locations it is searching.

2. Mr. Ibarra Bucio: Did OIG search his name, in addition to his A#? In which locations did it search for his documents?

3. Mr. Vargas Arellano: Did OIG not initially search his name? In which locations did OIG conduct the search for his records that has now turned up the additional documents mentioned in your May 25, 2023 email?

**B. ICE**

*1. Request No. 1.*

Thank you for your update noting that ICE has identified "another database" requiring a search by A-number, which may include records dated after November 6. 2015. Please identify this database, consistent with the Court's February 9, 2023 order, and whether ICE will search it for both A#s as well as the names of the four decedents referenced in Plaintiff's FOIA request.

Regarding other search locations for Request No. 1, as discussed below, it appears ICE has not searched any of the following locations we specified for each of the four decedents referenced in Plaintiff's FOIA request: ERO Los Angeles Field Office, Office of Public Affairs, ERO's Front Office, ICE Office of Professional Responsibility ("OPR"), and ICE Health Service Corps ("IHSC"). For the reasons discussed below, we again ask that ICE do so.

      a.  *Teka Gulema*

Upon review of the documents released by ICE thus far, it is clear that the agency has not conducted an adequate search for records related to Mr. Teka Gulema. Although ICE has provided periodic reports maintained by the agency regarding Mr. Gulema's hospitalization, these conclude at October 19, 2015, well before his release from custody and death. Please provide any Significant Event Notification ("SEN") records and Significant Incident Reports ("SIR") related to Mr. Gulema, specifically those dated after October 19, 2015. We also request all records and communications related to Mr. Gulema from any Significant Detainee Illness ("SDI") meetings, including emails, spreadsheets, and meeting notes. Please also provide any records related to Mr. Gulema's release, including any communications of ICE Health Service Corps ("IHSC") staff, Field Medical Coordinators, ICE Enforcement and Removal Operations ("ERO"), and any agency staff responsible for reviewing the SDI spreadsheet, regarding Mr. Gulema.

      b.  *Johana Medina Leon*

You have represented that Defendants are unable to locate Johana Medina Leon's A-number, and have asked Plaintiff to provide it to you. We are not currently in possession of Medina Leon's A number and will provide it to you if we obtain it. However, Defendants are far better equipped to locate the A number, for the reasons stated below. We therefore request that ICE redouble its efforts to locate Medina Leon's A number so that it can complete relevant searches for records.

By way of suggestions as to how best to do so, Defendants should refer to OIG Case Number 119-ICE ERO ELP-16066, which should include Medina Leon's A number in the case file as a matter of course. Indeed, several documents referred to in Defendants' production would provide Medina Leon's A number. *See, e.g.* December 2022 OIG production p. 58-59 (referring to emails and parole documents prepared by ICE in the OIG case file); *Id.* page 68 (referring to Notice to Appear ("NTA") paperwork and Form I-94 for Medina Leon).

We further request that ICE conduct a search for the name "Jonathan Alberto Medina-Leon," Ms. Medina Leon's former name,[1] to locate the A number and associated records, and produce such records to the extent ICE has not done so thus far. In addition, it appears that Medina

---

[1] As previously noted, Ms. Medina Leon was transgender.

Leon's A number is present (although redacted) in documents already produced by Defendants. *See, e.g.* December 2022 OIG Production; page 99; 101. We further note that Defendants have failed to provide emails and parole documents related to Medina Leon's release referred to in these records and request their production. *Id.*

    c.  Mr. Jose Ibarra Bucio

You have represented that ICE has searched only the ERO Adelanto Field Office for records related to Mr. Jose Ibarra Bucio, and have not otherwise located any records. The scope of ICE's search, and this conclusion, are unreasonable, particularly as the Adelanto Detention Center, where Mr. Ibarra Bucio was detained, was under the jurisdiction of the ERO Los Angeles Field Office at the time of his death. Indeed, it is clear that some records must have existed regarding Mr. Ibarra Bucio. For example, USA Today reported that Lori Haley, an employee of the ICE Office of Public Affairs, provided a statement regarding Mr. Ibarra Bucio's death to reporters. The same article noted that DHS left a notice in Mr. Ibarra's hospital room indicating that he had been released on his own recognizance (while comatose), two weeks after he had collapsed at the Adelanto Detention Center.[2]

Plaintiff reiterates its request that Defendants search the ERO Los Angeles Field Office, ICE's Office of Public Affairs (including all records and communications of Ms. Lori Haley), ERO's Front Office, ICE Office of Professional Responsibility ("OPR"), ICE Office of the Chief Financial Officer, and IHSC, including IHSC Medical Case Management Unit Medical Care Coordinators, for records related to Mr. Ibarra Bucio, and his A#, which Plaintiff has provided. Such records should also include all SEN, SIR, and SDI reports, as well as emails, documents, communications, investigatory reports, and exhibits, appendices, and attachments related to Mr. Ibarra Bucio.

If ICE is declining to conduct these searches, please identify the location-specific reasons for Defendants' decision, or please certify to the Court that Defendants have no records related to Mr. Ibarra Bucio in their possession, and the reason why such records no longer exist, including whether or not Defendants have destroyed documents related to Mr. Ibarra Bucio.

    d.  *Mr. Vargas Arellano*:

Regarding ICE's position as referenced in your May 25 email that searching "field locations" other than ERO Adelanto would not "reasonably be expected to disclose responsive records," we ask for further basis for this conclusion.  We also ask that ICE clarify whether or not it will

---

[2] Rebecca Plevin, *Adelanto Moves to Revisit Ending Contract for Troubled Immigration Detention Facility*, USA Today, Apr. 12, 2019, https://www.usatoday.com/story/news/politics/immigration/2019/04/11/adelanto-wants-revisit-decision-ending-immigrant-detention-facility-contract/3437933002/.

search the other locations identified in Plaintiff's May 19, 2023 correspondence, including: ICE's Office of Public Affairs, ERO's Front office ICE OPR, and IHSC.

ICE's apparent refusal to search all relevant field locations and the other locations referenced in our May 19 correspondence is inconsistent with the facts and circumstances of ICE's handing of Mr. Vargas Arellano's case.  As mentioned in the FOIA request, Mr. Vargas Arellano's death garnered much media attention requesting a statement from ICE, which would have resulted in records responsive to Plaintiff's FOIA request. Further, his death was the subject of a Special Master report in *Hernandez-Roman v. Wolf,* No. 5:20-cv-769 (C.D. Cal.), which relied on information in ICE's possession, presumably in the above-referenced locations. However, neither that report nor the underlying information appears to have been produced in this case. Despite these facts, if ICE is declining to search the above-referenced locations, or other locations it is obliged to search to locate and produce such responsive records, please provide location-specific reasons for this position.

Regarding ICE's "re-view" of records withheld from its response to another FOIA request regarding Mr. Vargas Arellano (*Martin Vargas v. U.S. ICE et al.*, No. 5:22-cv-287-JWH-SP (C.D. Cal.), we look forward to your update as to when ICE will complete its review and production.

**3. Request No. 4**

- **Non-Boolean Search Terms, Locations, and Boolean Search Terms in Relativity:**
  - **Search Terms #4**: Plaintiff proposes the following non-case sensitive terms: [3] Directive; Policy or policies; Protocol; Procedure; Training; Guidance; Instruction; Standard; Detainee; Custody; Death; Died; Deceased; Decedent; Discharge; Surgery; Specialist; COVID-19; Hospital; Ambulance; "Emergency Room"; "Emergency Services"; "Poor Outcome"; "Life Support"; "Offsite Referral"; Coma; Unconscious; Ventilator; "Intensive Care"; "Medical Observation"; ICU; "Critical Condition"; Hospice: Palliative; Fatal; "Humanitarian Release".
  - **Search Locations #4**: ICE Enforcement and Removal Operations Front Office; ICE Health Service Corps
  - **Boolean Search in Relativity #4:** After the Search is conducted, please use Relativity to conduct the following Boolean search of the recovered records: (directive or policy or policies or protocol or procedure or training or guidance or

---

[3] Defendants have suggested searching the following terms on May 16, 2023: "humanitarian release"; "intensive care"; "ICU"; "life support"; "hospice"; "palliative"; "fatal"; "critical condition"; "coma"; "unconscious"; "ventilator"; "death"; "died"; "deceased"; "decedent"; "ambulance"; "discharge"; "emergency room"; "emergency services". Email from Jason Axe, May 16, 2023. These terms are incorporated above.

instruction or standard) AND (custody or death or died or deceased or decedent or discharge or surgery or specialist or COVID-19 or hospital or ambulance or "emergency room" or "emergency services" or "poor outcome" or "life support" or "offsite referral"; or coma or "offsite referral" or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal) AND (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian)

o   **Please exclude:** Any version of ICE Detention Standards (NDS 2000, PBNDS 2008, PBNDS 2011, NDS 2019), or ICE's COVID-19 Pandemic Response Requirements

4. **Requests Nos. 5-8**
   o   **Search Terms #5-8**: Plaintiff proposes the following non-case sensitive terms: death; died; deceased; decedent; surgery; specialist; hospital!; ambulance; "emergency room"; "emergency services"; "poor outcome"; "life support"; "offsite referral"; coma; unconscious; ventilator; "intensive care"; "medical observation"; ICU; "critical condition"; hospice; palliative; fatal; humanitarian release; discharge.
   o   **Search locations #5-8:**
       ▪   ISHC Medical Case Management Unit Medical Care Coordination Program staff[4]
       ▪   Significant Detainee Illness Spreadsheets;
       ▪   Records of any and all participants in ICE and/or IHSC's Significant Detainee Illness meetings;
       ▪   Medical transfer summary documents from DHS's eHR System;
       ▪   Medical transfer summary documents from the Alien Medical Records System:
       ▪   Spreadsheets regarding hospitalization or release compiled for or utilized in *Fraihat v. ICE*, No. 5:19-cv-1546;
       ▪   ICE ERO staff in communication with IHSC Medical Case Management Unit;
       ▪   ICE ERO Significant Event Notifications
       ▪   ICE ERO Significant Incident Reports
       ▪   ICE Office of Professional Responsibility

---

[4] *See* DHS, *Healthcare Costs for Noncitizens in Detention: FY 2020 Report to Congress* 29 (2022), https://www.dhs.gov/sites/default/files/2022-06/ICE%20-%20Healthcare%20Costs%20for%20Noncitizens%20in%20Detention.pdf (noting that IHSC's Medical Care Management Unit Medical Care Coordination Program oversees care for ICE detainees who are on the Significantly Ill list; and that MCCs "obtain patient care updates from field staff and report SDIs to IHSC leadership, the ICE legal staff, and ICE Enforcement and Removal Operations personnel.").

- o **Boolean Searches in Relativity #5-8:**
    - ▪ (detainee or custody) AND (custody or death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal) AND (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian)
    - ▪ (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian) AND (custody or death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal)
- o **Specific instructions: Please provide a hit count of responsive documents for each category of search locations**

5. **Request No. 9:**
- • **Search Terms #9**: bill!; invoice!; charges; payment; benefits; discharge; transfer; release or custody; Medicare; PRUCOL; Martin Vargas Arellano, Teka Gulema, Jose Ibarra Bucio, Johana Medina Leon, Jonathan Alberto Medina Leon
- • **Search Locations #9**
    - o Resource Management Unit Staff, IHSC: emails and records
    - o ICE Office of the Chief Financial Officer
- • **Boolean Searches in Relativity #9:**
- • (bill!; invoice!; charges; payment; benefits) AND (discharge or transfer or custody or release or Medicare or PRUCOL or Martin Vargas Arellano or Teka Gulema or Jose Ibarra Bucio or Johana Medina Leon or Jonathan Alberto Medina Leon)

## II.    <u>Scheduling Conference</u>

While we appreciate your efforts in addressing the issues we have raised regarding the adequacy of Defendants' searches to date, it seems the parties are at an impasse on a few issues.  Again, while we remain willing to work collaboratively with Defendants to narrow these issues, it appears that there is impasse on at least a few issues which need to be resolved now. We therefore plan to seek a status conference with the Court to present the following issues for the Court's intervention and/or guidance to ensure this case moves forward expeditiously.

June 1, 2023
Page 8

As we discussed previously, we will also ask that the parties each be permitted to file a status report two business days before the status conference to update the Court on our respective positions on the following issues:

1.  ICE Search parameters: ICE's refusal to conduct a search according to provided search terms and locations;

2.  Commencement of production: Defendants' deadline by which they will begin monthly production of documents in response to the supplemental searches;

3.  Pace of production: ICE and OIG's refusal to agree to an increased production schedule of 2,500 pages per month;

The following are the dates we plan to propose for the status conference. Please let us know which of these dates work for you by **Monday June 5**.

Tues. June 20: 9, 11, and after 1 pm PT
Wed. June 21: 9, 11, and after 2:30 pm PT
Thurs. June 22: 10-1, after 2 pm PT
Friday, June 23: 9, 11, and after 1pm PT

Sincerely,

LABONI A. HOQ (SBN 224140)
laboni@hoqlaw.com
HOQ LAW APC
P.O. Box 753
South Pasadena, California 91030
Telephone: (213) 973-9004

EUNICE CHO (pro hac vice)
echo@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
NATIONAL PRISON PROJECT
915 Fifteenth Street NW, 7th Floor
Washington, DC 20005
Telephone: (202) 548-6616

MICHAEL KAUFMAN (SBN 254575)
MKaufman@aclusocal.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, California 90017 Telephone: (213) 977-9500
Facsimile: (213) 915-0219

KYLE VIRGIEN (SBN 278747)
kvirgien@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
NATIONAL PRISON PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (202) 393-4930

*Attorneys for Plaintiff*

# EXHIBIT F



Laboni Hoq <lhoq@hoqlaw.com>

---

## ICE Hidden Death FOIA: Correspondence re Defendants' Searches

**Axe, Jason (USACAC)** <Jason.Axe@usdoj.gov>                    Tue, Jun 6, 2023 at 12:51 PM
To: Laboni Hoq <lhoq@hoqlaw.com>
Cc: Michael Kaufman <MKaufman@aclusocal.org>, Eunice Cho <echo@aclu.org>, Kyle Virgien <kvirgien@aclu.org>

Laboni,

Thank you for your June 1st letter.  My agency contacts are reviewing it, and we will get back to you with a detailed response.

Your letter also asks for a response regarding my availability for a status conference with the Court due to what you have described as an impasse on the following three issues:

> 1. ICE Search parameters: ICE's refusal to conduct a search according to provided search terms and locations;

> 2. Commencement of production: Defendants' deadline by which they will begin monthly production of documents in response to the supplemental searches;

> 3. Pace of production: ICE and OIG's refusal to agree to an increased production schedule of 2,500 pages per month;

Defendants' position is that there is not currently a need for a status conference because there is not currently an impasse as to any of these issues.

First, ICE has not **refused** to conduct any searches. ICE is working with you and your client to come up with mutually agreeable search terms to identify documents that may not have already been located during ICE's previous searches. ICE is reviewing the proposed search terms and locations in your June 1st letter.  Therefore, it is confusing why you would at the end of that same letter assert that the parties are now at an impasse.  ICE will respond to your proposal, and therefore the parties are not at an impasse with respect to the scope of any new search.

Second, Defendants have not **refused** to identify a deadline by which they will begin monthly production of documents. OIG will process 1,000 pages/month, as previously ordered and agreed, and will produce any responsive records on June 30th, and the last day of the month thereafter. OIG currently anticipates completing its production of records by August 31, 2023, although this is an anticipated date, based on the page count as it currently stands. OIG conducted an additional search in EDS of the narrative field for the four individuals, which is in addition to the previous search of the subject/complainant field in EDS. Also, OIG conducted an email search of two additional Special Agents who were the case agents for two investigations that resulted in responsive records. These agents are no longer with the agency which is why they had to be searched separately. As for ICE, its agency counsel was recently informed by the FOIA office that there remain approximately 40,000 pages to be processed.  These documents come from the original search of IHSC, and it appears that they have not been previously processed.  Some of these documents may address your concerns regarding alleged deficiencies in what has been produced to date in that they appear to be responsive to request #1.  ICE will continue processing these documents monthly per the Court's order, with the next production scheduled for June 21st. As to any documents identified in a subsequent search, ICE will process those documents on a monthly basis as well.

Third, in the Joint Report of Conference of Parties, Defendants proposed processing 500-750 pages per month and Plaintiff proposed that Defendants process 3,000 pages per month.  The Joint Report noted that the defendants had "**initially** identified approximately 8,050 pages of potentially responsive records," suggesting that additional pages might be identified. In its Case Management Order, the Court required ICE and OIG to "review and process no less than 1,000 pages per month."  Therefore, the issue of the pace of production has already been considered and determined by the Court, and thus there is no impasse.


Based on the fact that the parties are not currently at an impasse as to any issue, a status conference is not needed, and that is the position Defendants will take with the Court.  To the extent that Plaintiff still wishes to request a status conference, I appreciate your asking about my availability.  I will be on annual leave from June 12-16, so the dates that would work better for me are June 22nd and June 23rd.


Thank you,


Jason K. Axe

Assistant U.S. Attorney

300 North Los Angeles St., Suite 7516

Los Angeles, CA  90012

(213) 894-8790

(213) 894-7819 (FAX)

[Quoted text hidden]

# EXHIBIT G

June 12, 2023

Jason Axe
Alarice Medrano
United States Attorney's Office
Central District of California
300 N. Los Angeles St. Suite 7516
Los Angeles, CA 90012
Jason.Axe@usdoj.gov
Alarice.Medrano@usdoj.gov

**SENT VIA EMAIL**

> Re:     *ACLU of Southern California v. United States Immigration and Customs*
>         *Enforcement, et al.,* No. 2:22-cv-4760 (C.D. Cal.)

Dear Jason,

Thank you for your June 9, 2023 correspondence to Plaintiff, regarding Defendants' response to Plaintiff's June 1, 2023 correspondence discussing the parameters of Defendants' supplemental searches for documents responsive to Plaintiff's FOIA Request. At the outset, we wanted to make clear that our June 9, 2023 request for a status conference with the Court regarding setting deadlines and the pace of Defendants' supplemental searches and productions was not meant to supplant the process the parties have been engaged in to negotiate the parameters of Defendants supplemental searches.  We sincerely hope we can work collaboratively to agree on appropriate parameters for Defendants' supplemental searches to ensure Plaintiff's goal of an expeditious conclusion of this case, and that Defendants conduct appropriate searches as outlined here.

In response to Defendants' June 9, 2023 correspondence to Plaintiff, below, Plaintiff outlines revised parameters for Defendants' supplemental searches. Plaintiff appreciates that "ICE recommends using the same search terms for all these requests for ease of tasking to different program offices," (*see* June 9, 2023 Email from Jason Axe). However, as discussed below, Defendants' approach will be overinclusive for some requests, and underinclusive for others, particularly if it fails to use all of the search terms we propose. As such, it will fail to meet Defendants' burden to conduct an adequate search, "reasonably calculated to uncover all relevant documents" "beyond a material doubt." *Transgender Law Center v. ICE*, 46 F. 4th 771, 779 (9th Cir. 2022).

In addition, Plaintiff's previously suggested search terms and locations that identify specific offices and positions that are likely to yield relevant documents, in an effort to avoid returning non-responsive documents. Defendants now suggest that "ICE will need the specific names and

June 12, 2023
Page 2

titles of the custodians you wish to conduct the searches within the ERO Front Office, IHSC, and the Los Angeles Field Office." June 9, 2023 Email from Jason Axe.  Plaintiffs have provide Defendants with specific, descriptive parameters regarding locations, and responsibility of agency staff who would likely possess responsive records. However, given Defendants' (b)(6) and other redactions on documents produced to date, and the asymmetry of information between the parties, Plaintiff is generally unable to provide specific names of custodians. To the extent that Defendants insist on specific names and titles, we ask that Defendants both identify names, departments and job titles of individuals they recommend for the searches, as well as provide Plaintiff with an organizational chart and list of employee names/departments/job titles from which Plaintiff can potentially identify additional custodians to search.

Plaintiff has already faced lengthy delays in receiving documents responsive to Request Nos. 3-9. Plaintiff made these request in April of 2022. From April of 2022 through February of 2023, Defendant ICE left Plaintiff under the impression that ICE had conducted searches for documents responsive to these requests and was processing those search results for production. It was only after Plaintiff inquired into the absence of any responsive documents in ICE's productions in February of 2023 that ICE admitted it had done nothing to search for documents responsive to these requests. During the past four months, Plaintiff has repeatedly attempted to secure ICE's agreement to search for responsive documents, including providing two proposed sets of search terms. In light of this already lengthy delay in ICE's commencement of its supplemental searches, **Plaintiff requests that Defendants commence a search using the search terms and locations identified below, without further delay**. These terms and locations are further streamlined from Plaintiff's June 1 correspondence. Where Defendants may require further clarity or propose other approaches, we are glad to meet and confer. We again reiterate our suggestion that Defendants include ICE's FOIA officer and counsel in our conferrals in order to streamline communication and more quickly resolve any confusion.

## <u>OIG</u>

First, with respect to OIG, please provide a response to Plaintiff's questions in our June 1, 2023 letter, including:

1. Please identify the scope of the additional search OIG is now conducting, including the search terms and locations it is searching.

2. Mr. Ibarra Bucio: Did OIG search his name, in addition to his A#? In which locations did it search for his documents?

3. Mr. Vargas Arellano: Did OIG not initially search his name? In which locations did OIG conduct the search for his records that has now turned up the additional documents mentioned in your May 25, 2023 email?

Further, pursuant to your May 17, 2023 email correspondence, please update us on the status of OIG's search of the Detroit Field Office for responsive records, including the parameters of that search and when we can expect OIG to produce responsive records.

**ICE**

1.  **Documents Referred to ICE from OIG**

In your May 17, 2023 email correspondence you stated that OIG had referred records to ICE on November 2022, December 2022, and March 2023, and that you would get back to use as to whether or not ICE had processed those documents for production to Plaintiffs. Please let us know if it has done so, and if so the bates numbers of the documents ICE produced from that referral.  If ICE has not processed the documents referred by OIG, please let us know when ICE intends to do so.

2.  **Request Nos. 1 and 3**

With respect to the approximately 40,000 new pages responsive to Request No. 1 regarding the four individuals identified in the FOIA request, we request that the Defendants perform the following to narrow the production:

- Please run a de-duplication analysis of the approximately 40,000 new pages, and provide a revised page count of these new documents. As part of this de-duplication process, please use email thread to ensure that lengthy, duplicate case files are not repeatedly produced as part of the page count. This process is readily available in Relativity. If ICE's FOIA processers have difficulty with this process, Plaintiff's technological consultants are happy to confer with the ICE FOIA office to provide assistance.

- After de-duplication, please provide a page count of documents relevant to each individual (*i.e.* Gulema, Ibarra Bucio, Medina Leon, and Vargas Arellano.

Please provide this analysis before June 20, 2023. At that time, Plaintiff will inform Defendants of which cache of documents should be produced. **Defendants should not use this supplemental production to delay the search and production of documents responsive to Request Nos. 4-9**. Plaintiff again requests that Defendants produce records in response to the specific search terms and locations made on June 1, 2023, with respect to Teka Gulema, Medina Leon, Ibarra Bucio, and Vargas Arellano.

### 3. Request No. 4

Defendants' proposed search terms are underinclusive and proposed locations are overinclusive. Plaintiff suggests the following search terms and locations to ensure a more precise search:

- **Search Locations and Custodians:** ICE Front Office and IHSC staff responsible for compiling agency directives, policies, protocols, procedures, guidance, standards, instructions, and trainings related to detention.
- **Search Terms re Request No. 4:** Directive; Policy; Protocol; Procedure; Training; Guidance; Instruction; Standard; Death; "offsite referral"; "emergency room"; "emergency department"; "life support"; Coma; Ventilator; "intensive care"; Hospice; palliative; release
- **Boolean Search in Relativity re Request No. 4.**
  After the Search is conducted, please use Relativity to conduct the following Boolean search of the recovered records:
  - (directive or policy or policies or protocol or procedure or training or guidance or instruction or standard) **AND** (custody or death or died or deceased or decedent or discharge or surgery or specialist or COVID-19 or hospital or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal) **AND** (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian)
- **Please exclude:** Any version of ICE Detention Standards (NDS 2000, PBNDS 2008, PBNDS 2011, NDS 2019), or ICE's COVID-19 Pandemic Response Requirements

### 4. Request Nos. 5 and 7

Defendants' proposed search terms are underinclusive and proposed locations are overinclusive. Plaintiff suggests the following search terms and locations to ensure a more precise search:

- **Search Locations and Custodians re Request Nos. 5 and 7:**
  - ISHC Medical Case Management Unit Medical Care Coordination Program staff[1]
  - Significant Detainee Illness Spreadsheets;
  - Records of any and all participants in ICE and/or IHSC's Significant Detainee Illness meetings;
  - Office of Professional Responsibility staff responsible for investigation of hospitalized and/or deceased ICE detainees

---

[1] *See* DHS, *Healthcare Costs for Noncitizens in Detention: FY 2020 Report to Congress* 29 (2022), https://www.dhs.gov/sites/default/files/2022-06/ICE%20-%20Healthcare%20Costs%20for%20Noncitizens%20in%20Detention.pdf (noting that IHSC's Medical Case Management Unit Medical Care Coordination Program oversees care for ICE detainees who are on the Significantly Ill list; and that MCCs "obtain patient care updates from field staff and report SDIs to IHSC leadership, the ICE legal staff, and ICE Enforcement and Removal Operations personnel.").

June 12, 2023
Page 5

- o Spreadsheets regarding hospitalization or release compiled for or utilized in *Fraihat v. ICE*, No. 5:19-cv-1546;
- o ICE ERO staff in communication with IHSC Medical Case Management Unit
- **Search Terms re Request Nos. 5 and 7:** Plaintiff proposes the following non-case sensitive terms:
  1. Death
  2. Died
  3. Deceased
  4. Ambulance
  5. Emergency
  6. "offsite referral"
  7. "life support"
  8. Coma
  9. Ventilator
  10. "intensive care"
  11. "critical condition"
  12. Hospice
  13. Palliative
  14. Release
- **Boolean Search in Relativity re Request Nos. 5 and 7:**
  - o (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian) **AND** (custody or death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal)

5. **Request No. 6**

Defendants' proposed search terms are underinclusive and proposed locations are overinclusive. Plaintiff suggests the following search terms and locations to ensure a more precise search

- **Search Locations re Request No. 6:**
  - o ICE ERO Significant Event Notifications
  - o ICE ERO Significant Incident Reports
- **Search Terms re Request No. 6**
  1. Ambulance
  2. "Emergency" and "detainee"
  3. "offsite referral"
  4. "life support"
  5. Coma
  6. Ventilator

7. "intensive care"
8. "critical condition"
9. Hospice
10. Palliative
11. Release

- **Boolean Search in Relativity re Request No. 6:**
  - (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian) **AND** (custody or death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal)

6. **Request No. 8.** Defendants' proposed search terms are underinclusive and proposed locations are overinclusive. Plaintiff suggests the following search terms and locations to ensure a more precise search:
   - **Search Locations re Request No. 8:**
     - o IHSC or ERO staff responsible for compiling records regarding hospitalization utilized in *Fraihat v. ICE*, No. 5:19-cv-1546 (C.D. Cal.);
     - o Spreadsheets regarding hospitalization or release compiled for or utilized in *Fraihat v. ICE*, No. 5:19-cv-1546 (C.D. Cal.).
   - **Search Terms re Request No. 8:**
     1. Ambulance
     2. 911
     3. Emergency
     4. "offsite referral"
     5. "life support"
     6. Coma
     7. Ventilator
     8. "intensive care"
     9. "critical condition"
     10. "poor outcome"
     11. Hospice
     12. Palliative
     13. Death
     14. Died
     15. Deceased
   - **Boolean Search in Relativity re Request No. 8:**
     - o (detainee or custody) **AND** (death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or

June 12, 2023
Page 7

       "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal) **AND** (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian or "order of recognizance")

7. **Request No. 9.** Thank you for confirming that ICE's Office of the Chief Financial Officer has already been tasked to search for records pertaining to the 4 decedents.

   As stated in our May 19, 2023 letter, Defendants' search should include bills, invoices, charges, or records of payment for *any* detainee who was released from custody while hospitalized, and *communications* about such bills, invoices, charges, or records of payment. Thus Defendants should conduct a search of relevant records, including communications from IHSC staff responsible for medical claims, including Ms. Jennifer Moon and others similarly tasked. *See* Plaintiff's May 19, 2023 letter, Exh. B.

We look forward to working with you to ensure Defendants' expeditious production of supplemental responses to Plaintiff's FOIA request in the coming days.
Sincerely,

Sincerely,

LABONI A. HOQ (SBN 224140)
laboni@hoqlaw.com
HOQ LAW APC
P.O. Box 753
South Pasadena, California 91030
Telephone: (213) 973-9004

EUNICE CHO (pro hac vice)
echo@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
NATIONAL PRISON PROJECT
915 Fifteenth Street NW, 7th Floor
Washington, DC 20005
Telephone: (202) 548-6616

MICHAEL KAUFMAN (SBN 254575)
MKaufman@aclusocal.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, California 90017 Telephone: (213) 977-9500
Facsimile: (213) 915-0219

KYLE VIRGIEN (SBN 278747)
kvirgien@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
NATIONAL PRISON PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (202) 393-4930

*Attorneys for Plaintiff*

# EXHIBIT H



# United States Department of Justice

## United States Attorney's Office
## Central District of California

---

*JOSEPH W. TURSI*
*JASON K. AXE*
*Assistant United States Attorney*
*Phone: (213) 894-3989/8790*
*E-mail: Joseph.Tursi@usdoj.gov*
*Jason.Axe@usdoj.gov*

*Federal Building*
*300 N. Los Angeles Street, Suite 7516*
*Los Angeles, California 90012*

June 22, 2023

<u>**VIA E-MAIL**</u>

Laboni A. Hoq
Hoq Law, APC
P.O. Box 753
South Pasadena, CA 91030

      Re:    ACLU of SoCal v. ICE, et al.
               C.D.CA Case No. 2:22-cv-04760-SHK

Dear Ms. Hoq:

      Please allow the following to serve as Defendants' response to Plaintiff's June 12, 2023 correspondence.

## <u>Questions Directed to OIG</u>

(1) OIG conducted another search in EDS (the Office of Investigations' investigative case management system) of the narrative field for the four individuals identified in Plaintiff's FOIA request, which is in addition to OIG's previous search of the subject/complainant field in EDS. (The additional search in EDS for the four individuals in the narrative field thus supplemented the initial search in the subject/complainant field.) OIG also conducted an email search of two additional Special Agents who were the case agents for two investigations that resulted in responsive records. (Those agents are no longer with the agency, which required their emails to be searched separately.)

(2) OIG did conduct a search for Mr. Ibarra Bucio's name, in addition to his A#. The search was conducted in EDS, and no records were located.

(3) OIG did conduct a search for Mr. Vargas Arellano's name, in addition to his A#. As explained above, OIG conducted an additional search in EDS for the four individuals in the narrative field which supplemented the original search of the subject/complainant field.

(4) OIG has not located any documents from the Detroit Field Office that are responsive to Plaintiff's request.

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
June 22, 2023
Page 2

**Questions Directed to ICE**

1. **Documents Referred to ICE from OIG**

    ICE is currently processing documents referred from OIG. Some, but not all, of the documents were corrupted and thus needed to be resent from OIG for processing. ICE anticipates completing its review of the referred documents by June 30, 2023.

2. **Request Nos. 1 & 3**

    ICE has already run the 40,000 pages through Relativity and deduplicated. Of the remaining documents, 31,170 relate to Teka Gulema. Of the remaining documents, approximately 300 relate to Johana Medina Leon, 1,240 to Jose Ibarra Bucio, and 8,500 to Martin Vargas Arellano. Please note these are estimates only.

    As these documents are already in the processing system, they cannot be threaded. That said, the records are mostly medical records such that email threading would not greatly impact this set of documents. Nonetheless, we will ask that the agency thread emails moving forward as feasible.

3. **Request No. 4**

    With respect to the proposed search locations for Request No. 4, does Plaintiff want the ICE front office or the ERO front office searched? Previously, you indicated the ERO front office, but in your June 12th letter, you identify the ICE front office. Please clarify.

    As for the search terms, ICE will agree to the following requested search terms: (1) Directive; (2) Policy; (3) Protocol; (4) Procedure; (5) Training; (6) Guidance; (7) Instruction; (8) Standard; (9) Death; (10) "offsite referral"; (11) "emergency room"; (12) "emergency department"; (13) "life support"; (14) Coma; (15) Ventilator; (16) "intensive care"; (17) Hospice; (18) palliative; and (19) release.

    ICE will also agree to the following Boolean search in Relativity with respect to Request No. 4: (directive or policy or policies or protocol or procedure or training or guidance or instruction or standard) AND (custody or death or died or deceased or decedent or discharge or surgery or specialist or COVID-19 or hospital or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal) AND (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian).

    Please confirm that ICE's proposed search terms and Boolean search in Relativity are acceptable to Plaintiff.

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
June 22, 2023
Page 3

4. **Request Nos. 5 & 7**

ICE will agree to search OPR and IHSC and to the following requested search terms:
(1) Death; (2) Died; (3) Deceased; (4) Ambulance; (5) Emergency; (6) "offsite referral"; (7) "life support"; (8) Coma; (9) Ventilator; (10) "intensive care"; (11) "critical condition"; (12) Hospice; (13) Palliative; and (14) Release.

ICE will also agree to the following Boolean search in Relativity with respect to Request Nos. 5 & 7: (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian) AND (custody or death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal).

Please confirm that ICE's proposed search terms and Boolean search in Relativity are acceptable to Plaintiff.

Information related to *Fraihat* was not requested in your client's FOIA request and thus ICE will not agree to add it to this search.

5. **Request No.  6**

ICE is still considering the appropriate search locations/custodians, and we will advise of same under separate cover.

As for the search terms, ICE will agree to the following: (1) Ambulance;
(2) "Emergency" and "detainee"; (3) "offsite referral"; (4) "life support"; (5) Coma; (6) Ventilator; (7) "intensive care"; (8) "critical condition"; (9) Hospice; (10) Palliative; and (11) Release.

ICE will also agree to the requested Boolean search in Relativity with respect to Request No. 6: release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian) AND (custody or death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal).

6. **Request No. 8**

ICE is still considering the appropriate search locations/custodians and we will advise of same under separate cover.

As for the search terms, ICE will agree to the following: (1) Ambulance; (2) 911; (3) Emergency; (4) "offsite referral"; (5) "life support"; (6) Coma; (7) Ventilator; (8) "intensive

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
June 22, 2023
Page 4

care"; (9) "critical condition"; (10) "poor outcome"; (11) Hospice; (12) Palliative; (13) Death; (14) Died; and (15) Deceased.

ICE will also agree to the requested Boolean search in Relativity with respect to Request No. 8: (detainee or custody) AND (death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal) AND (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian or "order of recognizance").

Finally, as noted above, information related to *Fraihat* was not requested in Plaintiff's FOIA request and thus ICE will not agree to add it to this search.

**7.   Request No. 9**

As previously communicated to you by email on June 9th, in order to conduct this search, IHSC would need specific names of non-citizens for these inquiries. With specific names, they can request information on anyone detained by ICE that was hospitalized and then they can review custody dates to check for release dates. They cannot provide a generalized list nor can they provide any information if the inquiry involves non-citizens who were in CBP, BP or OFO custody. That information would need to be requested from CBP.

Regarding bills and invoices, the Office of Veterans Affairs would maintain this information. The VA Financial Service Center is the third-party claims processor for IHSC. The VA runs a query on all claims for ICE before they pay the claims based on custody status or other administrative checks, however they do not keep a comprehensive list on file.

As you were also informed on June 9, 2023, the Office of Chief Financial Officer had no responsive records pertaining to the four individuals identified in your client's FOIA request.

Please let me know if you have any questions or would like to further discuss any of the matters raised above.

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
June 22, 2023
Page 5


Respectfully,

E. MARTIN ESTRADA
United States Attorney

/s/ *Joseph W. Tursi*

JOSEPH W. TURSI
Assistant United States Attorney

cc: Ms. Eunice Cho (by email)
    Mr. Michael Kaufman (by email)
    Mr. Kyle Virgien (by email)

# EXHIBIT I

June 26, 2023

Jason Axe
Joseph Tursi
Alarice Medrano
United States Attorney's Office
Central District of California
300 N. Los Angeles St. Suite 7516
Los Angeles, CA 90012
Jason.Axe@usdoj.gov
Alarice.Medrano@usdoj.gov

**SENT VIA EMAIL**

>   Re:    *ACLU of Southern California v. United States Immigration and Customs
>          Enforcement, et al.,* No. 2:22-cv-4760 (C.D. Cal.)

Dear Counsel,

Thank you for your June 22, 2023 letter regarding the Parties' continued meet and confer over the status of Defendants' additional searches in response to Plaintiff's FOIA Request. Please see Plaintiff's responses to certain of the outstanding issues. We look forward to agreement on search parameters within the week, so that Defendants can commence their searches and timely produce responsive documents.

**OIG**

>   *1.   Additional Search of Narrative Field of EDS and Two Additional Special Agents*

Regarding OIG's additional searches, including of the EDS narrative field and the two additional Special Agents, please identify the total number of pages that have yielded from the search. Please identify whether the additional pages located through these searches are part of the 41,000 additional pages Defendants identified in their June 9, 2023 correspondence, or whether the additional documents OIG located are distinct from those documents.

Further, in order for Plaintiff to assess the sufficiency of OIG's search, please identify for which of the four individuals named in the FOIA request OIG searched two additional Special Agents. Please also identify the total number of Special Agents OIG searched for each of the four named individuals identified in the FOIA request.

>   *2.   Mr. Ibarra Bucio*

To the extent Defendants claim that OIG has no responsive documents regarding Mr. Ibarra Bucio, please confirm that OIG did not conduct an investigation into Mr. Ibarra Bucio's detention and/or death.

>   *3.   Mr. Vargas Arellano*

Please identify whether OIG's search of Mr. Vargas Arellano's name and A# yielded any additional responsive documents.

**ICE**

*1. Request Nos.1 and 3:*

Regarding ICE's representation that it de-duplicated but did not thread the 41,000 pages it located based on its additional search for Requests Nos. 1 and 3, given the large volume of documents at issue Plaintiff asks the ICE take steps to thread those documents prior to production. We again note that threading is possible using Relativity, the program ICE is using to process documents in this case. *See* https://help.relativity.com/RelativityOne/Content/Relativity/Analytics/Email_threading.htm. We understand that, even after documents have been batched out for review or even after a review has been started, it is a straightforward matter to run threading on the unreviewed documents and batch them out again for review. As such, please explain what you mean when you say "these documents are already in the processing system, [and] cannot be threaded." In addition, we ask that ICE identify the volume of the 41,000 pages that constitute emails, as opposed medical and other documents, to assess where threading should be applied here.

Given that Defendants have consistently produced duplicative documents for lack of threading, if threading is not conducted to deduplicate records, we will request that the court significantly increase the monthly rate of production (not processing) regarding these documents.

With respect to documents responsive to Request Nos. 1 and 3, please produce documents in the following order: Jose Ibarra Bucio, Johanna Medina Leon, Martin Vargas Arellano, and then Teka Guelma.

Regarding Mr. Gulema, please provide a breakdown of the number of responsive pages via month for Mr. Gulema. Please also specify whether these responsive records include SEN and SIR records, communications related to Significant Detainee Illness (SDI) meetings, and communications between IHSC Staff, Field Medical Coordinators, ERO, and agency staff responsible for reviewing the SDI spreadsheet. *See* IHSC Directive: 03-32/ERO Directive Number: 11853.3, *Significant Detainee Illness,* Dec. 1, 2015, attached as Exhibit A.

Finally, in accordance with the Court's February 9, 2023 order, please specify the new locations/databases for the new documents located, and search terms used to locate the records produced with each production. Dkt. 40 at 1.

*2. Request No. 4*

In response to your request for clarification, Plaintiff asks that ICE search the ICE Front Office, and not the ERO Front Office. Plaintiff reiterates that ICE should exclude any version of ICE Detention Standards or ICE's COVID-19 Pandemic Response Requirements, as these are publicly available.

Given that Parties appear to agree on the search parameters for ICE's search of Request No. 4, please confirm that it will commence the search and provide us hit counts within the next week.

*3. Requests Nos. 5 and 7*

Regarding ICE's representation that it will only generally search the Office of Professional Responsibility (OPR) and IHSC in response to Request Nos. 5 and 7, Plaintiff does not agree that limiting its search locations in this way meets ICE's search adequacy requirements. We reiterate our request that ICE specifically search IHSC staff, including Medical Case Management, Unit Medical Care Coordination Program Staff, as well as IHSC participants in Significant Detainee Illness (SDI) Meetings.

It is unreasonable for ICE to refuse to search participants in SDI Illness Meetings, as they possess the authority to determine release. It is highly likely that participants in these meetings will possess responsive records. Plaintiffs thus request that Defendants search the records of all participants in SDI Illness meetings. As ICE ERO Directive No. 11853.3, *Significant Detainee Illness*, states, "the SDI list ensures Enforcement and Removal Operations (ERO) HQ is aware of detainees/residents with significant medical conditions and the potential effect on enforcement actions." The Directive notes that the "SDI meeting is a collaborative effort involving IHSC, ERO Field Operations, and the Office of the Principal Legal Advisor (OPLA). The IHSC Assistant Director, IHSC Medical Director, Associate Medical Director, or Regional CDs may approve the addition of any detainee/resident to the SDI list." The criteria to be included on the SDI list includes cases where there is "significant coordination required to repatriate *or to release* a detainee/resident in the United States due to their medical condition." See Exh. A, ICE ERO Directive No. 11853.3, *Significant Detainee Illness,* Dec. 1, 2015. Indeed, IHSC reported to Congress that in FY 2021 that there were 155 instances of Significant Detainee Illness. DHS, Healthcare Costs for Noncitizens in Detention, Jul. 22, 2022 at 22, https://www.dhs.gov/sites/default/files/2022-09/ICE%20-%20Healthcare%20Costs%20for%20Noncitizens%20in%20Detention.pdf.

It is also unreasonable for Defendants to refuse to search records of ICE ERO staff in communication with IHSC's Medical Case Management Unit. As DHS itself has reported to Congress with respect to individuals on the Significant Detainee Illness list, IHSC's Medical Case Management Unit staff "report SDIs to . . . ICE Enforcement and Removal Operations Personnel." *Id.* Indeed, it is clear from ICE's prior disclosures that these communications include records concerning custodial decisions for detainees on the SDI list. *See, e.g.* 2022-ICLI-48 5604-06 (communication between IHSC Managed Care Coordinator and ICE ERO Detention and Deportation Officer discussing option to release Teka Gulema from custody).

> 4.   *Request No. 6*

Plaintiff appreciates Defendants' agreement to its proposed search terms.  Plaintiff reiterates that its search for Request No. 6 should include the locations identified in its June 12, 2023 letter.

> 5.   *Request No. 8*

Plaintiff appreciates Defendants' agreement to its proposed search terms.  Plaintiff reiterates that its search for Request No. 8 should include the locations identified in its June 12, 2023 letter. With regard to records related to COVID-19 related hospitalizations and/or releases as documented in case files for *Fraihat v. ICE*, No. 5:19-cv-1546 (C.D. Cal.), we do not agree that ICE should not be required to search for these records simply because *Fraihat* was not mentioned in Plaintiff's FOIA request.  The specified records in *Fraihat* are likely to contain responsive documents.  *Fraihat* addresses COVID-19 conditions in ICE detention, which led to hospitalizations and releases. As the deposition transcript of Jennifer Moon indicates, ICE compiled records related to COVID-19 hospitalization is in relation to *Fraihat.* ("I think the only place where we were actually capturing the hospitalization is on the Fraihat.") Plaintiff's May 19, 2023 letter, Exh. B (Deposition transcript of Jennifer Moon).

> 6.   *Request No. 9*

Regarding IHSC, Plaintiff reiterates the request in its June 12, 2023 letter that ICE conduct a search of its records systems, for the four individuals (using their names and A#s) named in the FOIA Request, including for billing records and communications, as well as for documents related to billing involving IHSC staff responsible for medical claims, including Ms. Jennifer Moon and others similarly tasked. *See* Plaintiff's May 19, 2023 letter, Exh. B (Deposition transcript of Jennifer Moon).

Plaintiff also reserves the right to request additional specific information at a later date if Defendants' searches for requests 4-8 identify additional people whose records may be responsive to this request.

Sincerely,

LABONI A. HOQ (SBN 224140)
laboni@hoqlaw.com
HOQ LAW APC
P.O. Box 753
South Pasadena, California 91030
Telephone: (213) 973-9004

EUNICE CHO (pro hac vice)
echo@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
915 Fifteenth Street NW, 7th Floor
Washington, DC 20005
Telephone: (202) 548-6616

MICHAEL KAUFMAN (SBN 254575)
MKaufman@aclusocal.org
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West Eighth Street
Los Angeles, California 90017 Telephone:
(213) 977-9500
Facsimile: (213) 915-0219

KYLE VIRGIEN (SBN 278747)
kvirgien@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (202) 393-4930

*Attorneys for Plaintiff*

# EXHIBIT A

**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
ENFORCEMENT AND REMOVAL OPERATIONS
ICE HEALTH SERVICE CORPS**

**SIGNIFICANT DETAINEE ILLNESS (SDI)**

**IHSC Directive:  03-32
ERO Directive Number: 11853.3
Federal Enterprise Architecture Number: 306-112-002b
Effective Date: 01 Dec 2015**

_____

**By Order of the Acting Assistant Director
Stewart D. Smith, DHSc/s/**
_____

1. **PURPOSE:** The purpose of this issuance is to set forth the policy and procedures for detainees/residents who have significant illnesses while in ICE custody.

2. **APPLICABILITY:** This directive applies to all IHSC personnel, including but not limited to, Public Health Service (PHS) officers and civil service employees supporting health care operations in ICE-owned or contracted detention facilities and to IHSC Headquarters (HQ) staff. This directive applies to contract personnel when supporting IHSC in detention facilities and at HQ.  Federal contractors are responsible for the management and discipline of their employees supporting IHSC.

3. **AUTHORITIES AND REFERENCES:**

   **3-1.** Title 8, Code of Federal Regulations, Section 235.3 (8 CFR 235.3), Inadmissible Aliens and Expedited Removal;

   **3-2.** Section 232 of the Immigration and Nationality Act (8 USC 1222), Detention of Aliens for Physical and Mental Examination;

   **3-3.** Title 8, Code of Federal Regulations, Section 232 (8 CFR 232), Detention of Aliens for Physical and Mental Examination;

   **3-4.** Section 322 of the Public Health Service Act (42 USC 249(a)), Medical  Care and Treatment of Quarantined and Detained Persons; and

   **3-5.** Title 42, U.S. Code, Public Health Service Act, Section 252 (42 USC 252); Medical Examination of Aliens.

4. **POLICY:** The IHSC provides medical care to detainees/residents with illnesses. A significant illness is a serious or potentially life-threatening illness, injury or impairment that may involve inpatient care in a hospital or other extended care

2018-ICLI-00023   2046

facility, periods of incapacity due to the illness, or an illness that has continuity of care needs requiring significant coordination with external partners.

**4-1.**   The Health Services Administrator (HSA) and the Clinical Director (CD) at IHSC-staffed facilities, and Field Medical Coordinators (FMCs), should request to place any detainee/resident with a significant illness on the significant detainee illness (SDI) list for review. The SDI list ensures Enforcement and Removal Operations (ERO) HQ is aware of detainees/residents with significant medical conditions and the potential effect on enforcement actions.

**4-2.**   The SDI meeting is a collaborative effort involving IHSC, ERO Field Operations, and the Office of the Principal Legal Advisor (OPLA). The IHSC Assistant Director (AD), the IHSC Medical Director, Associate Medical Director, or Regional CDs may approve the addition of any detainee/resident to the SDI list.

**4-3.**   **Criteria for placement on the SDI List:** Detainees who meet the SDI criteria may be added to the SDI list based on, but not limited to, the following qualifying conditions:

   a.   Critical illness due to a life-threatening condition (any terminal illness, cardiac arrest, life-threatening cardiac arrhythmias, coma, severe sepsis, severe diabetic ketoacidosis, fulminant hepatitis, brain mass, pulmonary embolus, significant intracranial bleeding, stroke, a condition requiring intubation/mechanical ventilation, terminal cancer, post-surgical complications posing risk to life).

   b.   Anyone who is in intensive care for 24 hours or more.

   c.   Potentially life-threatening  medical condition requiring urgent action to prevent deterioration. This includes a detainee/resident who will need to undergo a medical procedure that poses a significant risk of possible complications (cardiac valve replacement, coronary artery bypass grafting, intracranial surgery, carotid endarterectomy, aortic aneurysm repair, etc.).

   d.   Significant coordination required to repatriate or to release a detainee/resident in the United States due to their medical condition (end-stage liver disease, end-stage congestive heart failure, ongoing cancer treatment, acute infectious disease, unstable/uncontrolled psychiatric conditions, or oxygen-dependent condition).

e.   Anyone who has cancer and is requiring or receiving treatment (easily treated cancers like basal cell or squamous cell carcinoma do not necessarily require SDI monitoring).

f.   Extended hunger strike with deteriorating condition.

g.   Current significant complications associated with Acquired Immuno-Deficiency Syndrome (AIDS), severe opportunistic infections, tuberculosis, or failing treatment.

h.   Multi-drug-resistant (MDR) or extensively drug-resistant (XDR) tuberculosis disease.

i.   Severe cognitive impairment where detention poses a significant risk to the detainee's wellbeing (dementia, encephalopathy, moderate to severe mental retardation).

j.   Infirmity requiring continuous or near-continuous medical care (bedbound, status/post (s/p) stroke with permanent deficits rendering the detainee/resident incapable of caring for self).

k.   Mental health conditions that are not controlled and require prolonged ongoing inpatient hospitalization or that present significant detention management concerns. The significant mental illness (SMI) directive further defines the criteria for detainees/residents who have significant mental health conditions.

**4-4.**   Detainees/residents are added and removed from the SDI list as directed by IHSC Managed Care Unit, which collaborates with ICE Field Operations and OPLA.

**4-5.**   **Criteria for detainee/resident removal from the SDI List:** The following reasons may warrant the removal of detainees/residents from the SDI list:

a. The acute medical condition stabilizes/resolves with treatment.

b. The detainee/resident is no longer deemed to be critically-ill or to have a life-threatening condition.

c. The detainee/resident is released from ICE custody.

d. The detainee/resident is deceased.

**4-6.**   **Significant Historical Physical Findings:** Significant detainee illnesses are brought to the attention of the appropriate medical provider immediately, if an emergent condition exists.

2018-ICLI-00023   2048

**4-7.    Entry into the Health record:** The nature of the significant detainee illness is entered in the detainee's/resident's health record. Any detainee/resident with a significant detainee illness must have a Medical/Psychiatric Alert documented in his/her health record. IHSC personnel will document in the health record in Medical/Psychiatric Alert when the detainee/resident is removed from the SDI list.

**4-8.    Reporting:** The FMC, HSA, or designee will provide daily updates on detainees/residents with serious medical conditions via email to the Managed Care Coordinator(s) (MCC) managing the SDI list. The FMC, HSA, or designee will provide daily updates of detainees/residents placed on the SDI list by close of business of each duty day. The FMC, HSA, or designee will provide updates twice a day or more often for those detainees/residents on the SDI list in the intensive care unit or in critical condition depending on the condition of the detainee/resident.

5.    **PROCEDURES:** IHSC AD, Deputy Assistant Director for Clinical Services, Associate Medical Director, or Regional CD approves or disapproves the HSA, CD or FMC's request. If the request is approved, the detainee/resident with a significant illness shall be added to the SDI list. The HSA, CD, and/or FMC request(s) will be based on the criteria mentioned in section 4-3 of this directive The MCC will add the detainee/resident to the SDI list upon approval, as noted above. Once a detainee's/resident's name is entered on the SDI list, IHSC shall collaborate with ICE ERO Field Operations and OPLA. Removal of a detainee's/resident's name from the SDI list shall be based on the criteria listed in section 4-5 of this policy.

6.    **HISTORICAL NOTES:** This directive replaces the previous version dated 13 Feb 2015.  It changes the NCCHC reference from 2008 to 2014.

7.    **DEFINITIONS:** See definitions for this policy at IHSC Glossary.

8.    **APPLICABLE STANDARDS:**

**8-1.    Performance-Based National Detention Standards (PBNDS) 2011:** 4.3 Medical Care, Section M *Medical/Psychiatric Alerts and Holds.*

**8-2.    Family Residential Standards:** 4.3, V. Expected Practices, 17. *Special Needs and Close Medical Supervision.*

**8-3.    American Correctional Association (ACA):**

a.    Performance-Based Standards for Adult Local Detention Facilities, 4th edition; 4-ALDF-4C-40 *Special Needs Inmates.*

b.    Standards for Adult Correctional Institutions, 4th edition; 4-4399

*Special Needs.*

    c. Performance-Based Standards for Correctional Health Care in Adult Correctional Institutions; 1-HC-3A-06 *Special Needs.*

**8-4.**   **National Commission on Correctional Health Care (NCCHC):** Standards for Health Services in Jails, 2014: J-A-08 *Communication on Patients' Health Needs.*

**9.**   **RECORDKEEPING.** IHSC maintains detainee/resident health records as provided in the Alien Health Records System of Records Notice, 80 Fed. Reg. 239 (Jan. 5, 2015).

**Protection of Health Records and Sensitive Personally Identifiable Information (PII).**

**9-1.**   Staff must keep all health records, whether electronic or paper, secure with access limited only to those with a need to know. Staff must lock paper records in a secure cabinet or room when not in use or not otherwise under the control of a person with a need to know;

**9-2.**   Staff are trained at orientation and annually on the protection of a patient's health information and Sensitive PII;

**9-3.**   Only authorized individuals with a need to know are permitted to access health records and Sensitive PII; and

**9-4.**   Staff should reference the Department of Homeland Security *Handbook for Safeguarding Sensitive PII* (Handbook) at:
(b)(7)(E)
when additional information is needed concerning safeguarding sensitive PII.

**10.** **NO PRIVATE RIGHT STATEMENT.** This directive is an internal statement of IHSC. It is not intended to, and does not create any rights, privileges, or benefits, substantive or procedural, enforceable against the United States; its departments, agencies, or other entities; its officers or employees; or any other person.

# EXHIBIT J



# United States Department of Justice

## United States Attorney's Office
## Central District of California

*JOSEPH W. TURSI*
*JASON K. AXE*
*Assistant United States Attorney*
*Phone: (213) 894-3989/8790*
*E-mail: Joseph.Tursi@usdoj.gov*
  *Jason.Axe@usdoj.gov*

*Federal Building*
*300 N. Los Angeles Street, Suite 7516*
*Los Angeles, California 90012*

July 11, 2023

<u>**VIA E-MAIL**</u>

Laboni A. Hoq
Hoq Law, APC
P.O. Box 753
South Pasadena, CA 91030

Re:     ACLU of SoCal v. ICE, et al.
          C.D.CA Case No. 2:22-cv-04760-SHK

Dear Ms. Hoq:

The following responds to your June 26, 2023 correspondence.

As an initial matter, Defendants note, as they did in their portion of the Joint Status Report for the July 5, 2023 Status Conference, that the questions you have set forth below represent the level of micromanagement of Defendants' processing of Plaintiff's FOIA request that is inappropriate. "In general, a FOIA petitioner cannot dictate the search terms for his or her FOIA request. Rather, a federal agency has discretion in crafting a list of search terms that they believe to be reasonably tailored to uncover documents responsive to the FOIA requests. Where the search terms are reasonably calculated to lead to responsive documents, a court should neither micromanage nor second guess the agency's search." *Bigwood v. U.S. Dep't of Defense*, 132 F. Supp. 3d 124, 140 (D.D.C. 2015); *see also Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002) ("FOIA, requiring as it does both systemic and case specific exercises of discretion and administrative judgment and expertise, is hardly an area in which the court should attempt to micro manage the executive branch."); *see also Inter-Coop. Exch. v. United States Dep't of Com.*, 36 F.4th 905, 911 (9th Cir. 2022) ("For this reason, a FOIA requestor "cannot dictate the search terms for his or her FOIA request.") (citation and quotations omitted). Nor is a search's adequacy determined by its fruits. *See Hoffman v. U.S. Customs & Border Prot.*, 2023 WL 4237096, at *5 (E.D. Pa. June 28, 2023) (citation omitted).

Still, we provide responses to your questions below out of a desire to attempt to resolve these inquiries and continue our discussions on these issues.  But we note that Plaintiff's inquiries at this stage of the litigation are overly burdensome for agencies that are attempting to respond to not only your client's FOIA request, but also FOIA requests submitted by others.

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
July 11, 2023
Page 2

## Questions Directed to OIG

### 1. Additional Search of Narrative Field of EDS and Two Additional Special Agents

In regard to your questions concerning OIG's additional searches, there are 2,825 pages of potentially responsive pages to be processed. Of that number, OIG already processed 1,307 pages for its June production (released on June 30, 2023), so 1,518 pages remain. These pages are not part of the 41,000 pages identified in Defendants' June correspondence; those 41,000 pages relate solely to ICE, **not OIG**.

In regard to your request to link searches related to particular Special Agents to the four individuals named in the FOIA request, the searches can be summarized as follows

- Records of three Special Agents were searched in the El Paso Field Office pertaining to the investigation into the death of Jonathan Alberto Medina-Leon:

- Records of one Special Agent was searched in the Atlanta Field Office pertaining to the investigation into the death of Teka Gulema.

- No records relating to an investigation into the death or detention of either Mr. Ibarra Bucio or Mr. Vargas Arellano were located, thus, searches of any additional Field Offices were unnecessary.

### 2. Mr. Ibarra Bucio

Your client requests that, to the extent OIG claims it has no documents responsive to Plaintiff's FOIA request as it related to Mr. Ibarra Bucio, OIG confirm that it did not conduct an investigation into his detention and/or death.

Your client's request goes beyond the scope of the FOIA. An agency's responsibility is, upon receiving a request that "reasonably describes" the records requested, to search for, process, and produce non-exempt records that are responsive to the subject of a FOIA request. *See* 5 U.S.C. § 552(a)(3)(A). If a requester has a question pertaining to the search or an exemption applied, the agency will respond to those types of questions, or in the case of litigation, may provide a *Vaughn* index to support the withholdings should they be challenged.

Here, your client's inquiry pertains to neither the search nor the exemptions/redactions applied. Thus, OIG's answer is that a search for records responsive to Plaintiff's FOIA request was conducted, and no responsive records pertaining to the death or detention of Mr. Ibarra Bucio were located.

### 3. Mr. Vargas Arellano

OIG's search pertaining to Mr. Vargas Arellano yielded 12 pages that were responsive to the request. OIG produced four of those pages on June 29, 2023, and they are currently consulting with another agency on the other 8 pages.

Finally, OIG has two productions remaining and thus anticipates it will no longer have any responsive records to process as of September 2023.

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
July 11, 2023
Page 3

**Questions Directed to ICE**

1. **Request Nos. 1 & 3**

    As noted above, ICE will de-duplicate and thread the 41,000 pages it has located. Still, there is a potential that duplicative documents may be released as will be discussed in the Declaration of Fernando Pineiro, the Director of the ICE FOIA Office. In short, duplication may occur due to a variation on the name or something that the system will not read as a duplicate. For example, if an email header contains typos or extra characters, the operation does not recognize the text as email header fields and the files are not recognized as duplicate email files. If documents have been produced with Bates stamps in the text, this results in extra inclusive flags. If some emails in a thread contain extra text in the bottom segment, most commonly found from confidentiality footers being applied by a server, this results in extra inclusive flags such that the system might not read them as duplicative.

    Turning to responsive documents related to the four-named individuals in the FOIA request, though ICE is not aware of any regulation requiring it to do so, it agrees that it will, to the best of its ability, produce them in your client's requested order (Jose Ibarra Bucio, Johanna Medina Leon, Martin Vargas Arellano, and then Teka Guelma).

    With respect to your request that ICE provide a breakdown of the number of responsive pages via month for Mr. Gulema, it is not required to do so under the FOIA. Thus, it will not dedicate resources to do so now.

    The potentially responsive records related to Mr. Gulema include SEN and SIR records, communications related to Significant Detainee Illness (SDI) meetings, and communications between IHSC Staff, Field Medical Coordinators, the Office of Enforcement and Removal Operations (ERO), and agency staff responsible for reviewing the SDI spreadsheet.

2. **Request No. 4.**

    ICE will commence the search and provide hit counts as soon as practicable.

3. **Requests Nos. 5 & 7**

    ICE has previously agreed to search OPR and IHSC. Please note that it is not possible for ICE to task all IHSC staff.

    With respect to No. 5, ICE believes that, as described, these documents do not exist.  In order to obtain the information sought by Plaintiff, IHSC would need specific information pertaining to detainees. If there is a list of detainees Plaintiff would like ICE to search for with respect to this request, please provide them. However, ICE does not possess such a list. Furthermore, OPR does not create or possess SIRs or SENs. OPR also does not maintain death reports or case notes for detainees who die outside of ICE custody. Nor does OPR maintain any data related to (a) hospitalization, (b) a patient in the care of an external healthcare provider or

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
July 11, 2023
Page 4

facility; nor (c) released from custody immediately prior to transfer to an emergency room, hospital, or extern care facility. OPR is notified only of deaths that occur in-custody.

4.  **Request No. 6**

In order for ICE to commence the search with the terms and connectors previously agreed to, ERO needs a date, or an event, or a location, or alien number to search for an SIR or SENs. Also, SIRs and SENs are not generated at the ERO Headquarters level. OPR does not create SIRs or SENs.

5.  **Request No. 8**

The parties appear to agree on search terms and connectors. ERO can task IHSC to conduct this search. However, similar to Request No. 6, clarification may be required such as specific names of non-citizens Plaintiff would like ICE to search for. It is not that ERO is not providing records, but, as ICE understands this request, Plaintiff seeks records that do not exist.

ICE will not agree to search for information related to *Fraihat* because that was not requested in your client's FOIA request.

6.  **Request No. 9**

ICE has already conducted searches of the four individuals named in the FOIA request. Billing records do not reside with ICE, as was communicated in Defendants' June 22, 2023 correspondence.

**Issues Raised During the July 5, 2023 Status Conference**

To also address issues raised during the July 5, 2023 Status Conference, as indicated above, Defendant ICE intends to submit to the Court a workload declaration from the Director of the ICE FOIA Office. That declaration will include, among other things, recent statistics regarding FOIA requests submitted to ICE. Specifically, it will confirm that the ICE FOIA office is involved in 151 open federal district court cases, of which 69 are in active record production. The declaration will also provide information regarding the increased complexity and volume of FOIA requests that ICE is receiving and why the agency cannot agree to a production rate as opposed to a processing rate. Finally, it will include information specific to this case, including the current processing rate along with confirmation that ICE has agreed to de-duplicate the remaining records, as well as conduct email threading in an attempt to reduce the number of potentially responsive pages which will benefit all concerned.

ICE notes that the processing rate in this case is consistent with those ordered or agreed to in other cases, including the following in the Central District of California:

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
July 11, 2023
Page 5

- *Center For Human Rights and Constitutional Law et al v. Department of State*, 2:16-cv-00899-SVW-SS. *See* Stipulation and agreement to process at a rate of 400 pages/month (ECF 14, at 3:12-17) and Order (ECF 15).

- *Craig Scott Rosebraugh v. DOJ*, 2:16-cv-09003-ODW-MRW. *See* Joint Rule 26(f) Report including FBI agreement to process at a rate of 500 pages/month (ECF 12, at 4:26-28; 5:9-16) and Order (ECF 13), Status Report (ECF 14, at 2:11-3:22) and Order (ECF 15), etc.

- *Jason Leopold, Buzzfeed Inc. v. DOJ, et al.*, 2:17-cv-03747-CBM-JEM. *See* Joint Status Report including FBI agreement to process at a rate of 500 pages/month (ECF 31, at 3:16-4:25) and Order (ECF 32).

- *Grayson Flory v. DHS*, 2:19-cv-09735-PSG-MRW. *See* Stipulation to Stay and CBP agreement to process at a rate of 500 pages/month (ECF 17, at 3:17-18) and Order (ECF 18), Stipulation Continuing Stay (ECF 19 at 3:8-11) and Order (ECF 20), etc. The rolling release is continuing in that case.

- *Al Otro Lado et al. v. DHS, et al.*, 2:20-cv-05191-ODW (MRWx). *See* Minute Order (ECF 35) (ordering 1,000 pages per month; citing cases).

These processing rates are also consistent with other districts (even where the pages at issue span into the six-digits):

- *Ctr. for Repro. Rights v. State*, No. 18-2217-DLF (D.D.C. Apr. 3, 2019) (300 page/month processing rate, despite the plaintiff's request for a higher rate, in a case where there are over 123,000 potentially responsive pages.)

- *Am. Immigration Council v. U.S. Dep't of Homeland Sec.*, 470 F. Supp. 3d 32, 39 (D.D.C. 2020) (ordering 400 pages per month pursuant to a preliminary injunction under FOIA in a COVID-related case)

- *Bacardi v. Treasury*, No. 17-1828-CKK (D.D.C. Dec. 19, 2017) (ordering review rate of 350 pages/month over the plaintiff's objection)

- *Blixseth v. DOJ*, No. 18-2281-JEB (D.D.C. Dec. 17, 2018) (ordering 300 page/month review rate)

- *Chaverra v. U.S. Immigration & Customs Enf't*, 2020 WL 7419670, at *1 (D.D.C. Nov. 5, 2020) (ordering 500 pages/month and collecting similar cases)

- *Citizens United v. State*, No. 16-67-CRC (D.D.C. Aug. 16, 2016) (ordering 300 page/month review rate despite plaintiff's request that agency review 2,000 pages/month)

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
July 11, 2023
Page 6

- *Citizens United v. State*, No. 16-108-RMC (D.D.C. July 27, 2016) (ordering 300 page/month review rate)

- *Citizens United v. State*, No. 18-326-CRC (D.D.C. May 30, 2018 & June 6, 2018) (ordering 300 page/month review rate despite plaintiff's request that agency review almost 8,000 pages/month, "in light of the resource constraints and production orders in other cases.")

- *Daily Caller News Found. v. FBI*, 387 F. Supp. 3d 112, 121 (D.D.C. 2019) (ordering 500 pages/month and rejecting plaintiffs' request for 1,200 pages/month)

- *Documented NY v. U.S. Dept. of State*, 2021 WL 4226239, at *5 (S.D.N.Y. Sept. 16, 2021) (ordering 400 pages/month and rejecting the plaintiff's request for remaining 2,600 pages to be processed and produced within approximately two-and-a-half months)

- *Jordan v. DOJ*, No. 17-2702-RC (D.D.C. Aug. 28, 2018) (ordering 300 page/month review rate)

- *Judicial Watch v. State*, No. 17-205-CRC (D.D.C. June 30, 2017) (ordering 300 page-per-four-week review rate despite plaintiff's request that agency review on average more than 16,000 pages/month)

- *Middle E. Forum v. DHS*, 297 F. Supp. 3d 183, 185-86 (D.D.C. 2018) (ordering 500 pages/month and rejecting plaintiffs' request for 1,000 pages/month, and collecting similar cases.)

- *Republican Nat'l Comm. v. U.S. Dep't of State*, 2016 WL 9244625, at *1 (D.D.C. Sept. 16, 2016) (ordering 500 pages/month)


Finally, with respect to Plaintiff's request for a monthly status conference with the Court, we reiterate that such is not a productive use of the parties' or the Court's time. Monthly conferences will necessarily require the agencies to redirect resources from the processing of Plaintiff's FOIA request (and others'), to provide updates that will largely only confirm that a production will occur as ordered. To the extent that Plaintiff envisions that a monthly status conference will be a venue to raise issues over the adequacy of searches, withholdings or redactions, those matters are properly left for adjudication at the summary judgment stage after the agencies have completed their productions.

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
July 11, 2023
Page 7


   Please let me know if you have any questions or would like to further discuss any of the matters raised above ahead of this Thursday's status conference.

Respectfully,

E. MARTIN ESTRADA
United States Attorney

/s/ *Joseph W. Tursi*

JOSEPH W. TURSI
Assistant United States Attorney

cc: Hon. Shashi H. Kewalramani (via CRD email)
  Ms. Eunice Cho (by email)
  Mr. Michael Kaufman (by email)
  Mr. Kyle Virgien (by email)

# EXHIBIT K

July 12, 2023

Joseph Tursi
Jason Axe
Alarice Medrano
United States Attorney's Office
Central District of California
300 N. Los Angeles St. Suite 7516
Los Angeles, CA 90012
Joe.Tursi@usdoj.gov
Jason.Axe@usdoj.gov
Alarice.Medrano@usdoj.gov

**SENT VIA EMAIL**

     Re:    *ACLU of Southern California v. United States Immigration and Customs Enforcement, et al.,* No. 2:22-cv-4760 (C.D. Cal.)

Dear Counsel,

This responds to Defendants' July 11, 2023 letter regarding the Parties' continued meet and confer over the status of Defendants' searches in response to Plaintiff's FOIA Request.

While we appreciate Defendants' substantive responses, we are disappointed by their attempt to recast their own proposal that the Parties negotiate search parameters as Plaintiff's "micromanagement of Defendants' processing of Plaintiff's FOIA request." As a reminder, in a letter dated March 29, 2023, Defendants *invited* Plaintiff to propose search terms to address Defendant ICE's admitted failure to search for Request Nos. 4-9. In the following three months, the Parties made progress on negotiating these search parameters, albeit at a pace that failed to keep up with the Scheduling Order in the case. Notably, in a June 1, 2022 stipulation which Defendants asked Plaintiff to enter into to extend the summary judgment briefing schedule, they represented to the Court that "the parties have worked together to, among other things, try to clarify search terms for remaining requests, what additional searches Defendants shall undertake, by what date Defendants shall resume producing responsive documents, and the pace of Defendants' monthly production. The additional time requested would allow for the parties to continue their efforts to resolve issues related to the search for records and address issues related to any records withheld in full or part." Dkt. 42.

Given this record, Defendants' claim of Plaintiff's purported "micromanagement" is baseless, and appears to be an attempt to distract from Defendants' wholly unjustified delay in conducting additional searches that meet FOIA's search adequacy requirements. *Transgender Law Center v. ICE*, 46 F. 4th 771, 779 (9th Cir. 2022) (it is Defendants' burden to conduct an adequate search, "reasonably calculated to uncover all relevant documents" "beyond a material doubt," which includes consideration of "positive indications of overlooked materials," and "leads that emerged during the agencies' inquiry."). Indeed, had Plaintiffs not pressed Defendants as to the adequacy of their initial searches, Defendants would never have conducted the supplemental searches for

1

Request Nos. 1-3 that resulted in ICE's identification of an additional 41,000 responsive pages, and OIG's identification of an additional 2,825 responsive pages. *See* Defendants' July 11, 2023 letter. Plaintiff's inquiries that led to these results can hardly be characterized as "dictating" or imposing an unwarranted "burden" on Defendants, so much as efforts to hold Defendants to their FOIA obligations.

**Responses from OIG**

We appreciate Defendant OIG's responses to the inquiries posed in our June 26, 2023 letter.  We request that OIG clarify that it will complete its review of the remaining 1,518 pages of responsive records, and produce all non-exempt material by August 2023 per the pace of production required by the Court. Dkt. No. 40, Scheduling Order.

In addition, we specifically request that OIG ensure production of documents received and reviewed by the agency as part of its review of Mr. Teka Gulema's death, listed in the OIG's Memorandum of Activity, produced at p. 144 of the pdf in OIG's June 2023 production. *See* Exh. A, OIG, Memorandum of Activity. These documents include:
- ICE Release Notification to Mr. Gulema, Oct. 22, 2016, with attached checklist
- Email dated Oct. 22,2015, from Gulema's ERO Case Officer, regarding the release notification email for Gulema, as well as the attached email from ICE Management and Program Analyst, with the subject including "Release Notification Email—10-22-15."
- Email dated Oct. 23, 2015, that states that an employee "spoke with the AFOD and Gulema was not to be released at this time."
- Email dated Nov. 9, 2015, characterized as "a continuation on the hold on Gulema's release." This email also included an email dated October 22, 2015, which stated "Please hold on any further actions as we'll need clarification as to the release mechanism, including any continuity of care or alternative placement."
- Document dated Oct. 20, 2015, that relates to guard service and placement of Gulema.
- Two forms dated November 24, 2015, identified as DHS ICE Form I-216, Records of Persons Transferred, which indicated that Gulema was transferred on this date via OSUP. The other form is DHS ICE Form I-203, Order to Release Alien.

**Responses from ICE**

We remain concerned that ICE is continuing to delay completion of searches for Requests Nos. 4-9 without any proper justification. Despite Defendants' stated commitment to "trying to resolve this litigation through negotiations," and their "desire to attempt to resolve this case without the need for further litigation," Defendants' Portion of the Parties' June 30, 2023 Status Report at 13, ICE has yet to commit to any specific timeframe by which it will complete its search for these Requests, even as to those where the Parties have fully negotiated the search parameters. *See* Defendants' July 11, 2023 letter re Request No. 4 ("ICE will commence the search and provide hit counts as soon as practicable."). At the same time, ICE has filed a Rule 12(c) motion to attempt excuse its obligation to search for these Requests altogether. Despite the apparent inconsistency in its words and actions, the one through line is ICE's attempts to draw out and indefinitely delay its search and production obligations for Request Nos. 4-9.

2

For these reasons, and those discussed below, Plaintiff is fully justified in seeking monthly Status Conferences with the Court. This appears to be the only way that Defendants can be held accountable even to their own stated search and production commitments, and to ensure an expeditious resolution of this case.

1. *Requests Nos.1 and 3:*

We appreciate the information ICE has provided regarding the de-duplication process, and its commitment to thread the 41,000 addition documents yet to be processed. However, we are confused by its statement in its July 11, 2023 letter that it "will de-duplicate" these 41,000 pages. ICE previously represented to Plaintiff that it had already de-duplicated these records. *See* Defendants' June 22, 2022 Letter at 2. If that representation was not correct, ICE should complete de-duplication and threading, and inform Plaintiff how many pages result after these processes have taken place. The Court made clear at the July 5, 2023 Status Conference that this information would be essential to its determination of the monthly pace of production going forward.

In an effort to further prioritize and potentially narrow the field of the additional 41,000 documents to be processed, Plaintiff again requests that ICE provide a breakdown of the number of responsive pages via month for Mr. Gulema. As Plaintiff has repeatedly documented, ICE has substantially failed to produce documents dated after October 1, 2015 in its current production of documents regarding Mr. Gulema. It appears that the ICE FOIA office is able to sort documents via date. *See* Dkt. No. 48-1, Decl. Fernando Piniero, ¶ 19 ("After completing an email threading process, search terms and date ranges can be applied to further narrow the scope.").

2. *Request No. 4*

Now that the Parties have fully agreed on the search parameters, as discussed, ICE should commit to a date certain when it will conduct the searches and provide Plaintiff hit counts. It has been over two weeks since Plaintiffs clarified the search locations on June 26, 2023, when ICE had all of the information it needed to commence the searches. We ask that it do so within five days from today.

3. *Requests Nos. 5 and 7*

Regarding ICE's representation that it will only generally search the Office of Professional Responsibility (OPR) and IHSC in response to Request Nos. 5 and 7, and not key IHSC staff, ICE provides no justification for this position, resulting an inadequate search on its part. Further, Plaintiff is not asking ICE to search "all IHSC staff," but rather key personnel who in its Medical Case Management and Unit Medical Care Coordination Program staff, IHSC participants in Significant Detainee Illness (SDI) Meetings, as well as ICE ERO staff in communication with IHSC's Medical Case Management Unit. Plaintiff's June 26, 2023 letter provided ample reason why these key staff should be searched for responsive records, to which ICE has failed to respond. For these reasons, we maintain our position that omitting these search parameters would result in an inadequate search of Request Nos. 5 and 7.

Defendants have claimed that documents described in Request No. 5 "do not exist" "as described." Plaintiff has requested "spreadsheets, emails, documents, communications, databases, lists, and other data compilations" "that identify detainees who were released from custody while (a) hospitalized (including for COVID-19 treatment); (b) in the full-time care of external healthcare providers or facilities (including for COVID-19 treatment), or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility." Requested custodians include "ICE Leadership, ICE Enforcement and Removal Operations, ICE Health Service Corps, and ICE Office of Professional Responsibility."

Plaintiff does not merely seek a "list" of such individuals, but also seeks spreadsheets, emails, documents, and communications that would identify such detainees. Defendants are clearly in possession of such documents, which would be recoverable using the search terms at the suggested search locations provided. Defendants' production, for example, has indicated that ICE Enforcement and Removal Operations reports the deaths of detainees—even those that took place outside custody. *See, e.g.* Exh. B, OIG June 2023 Production, p. 1-2 (noting that "[o]n June 3, 2019, ICE ERO El Paso reported the death of [Johana Medina-Leon] to DHS OIG El Paso, TX.").

In addition, in order to conduct an adequate search, Defendants are required to "follow 'obvious leads.'" *Transgender Law Center*, 46 F.4th at 780. IHSC monitors detainee hospitalization and offsite medical care treatment, including significantly ill detainees. *See* ICE, IHSC Annual Report for FY 20 (2021), https://www.ice.gov/doclib/ihsc/IHSCFY20AnnualReport.pdf at 24. IHSC's Public Health, Safety, and Preparedness unit monitored and tracked COVID-19 system for ICE detainees across the health care system. In addition, in FY 2011, "IHSC developed and piloted the IHSC Unified Patient Tracking System to track and report significant event notifications, significant detainee illness (SDI) . . . within the IHSC healthcare system." *See* DHS, *Healthcare Costs for Noncitizens in Detention, Fiscal Year 2021 Report to Congress* at 6 (Jul. 22, 2022), https://www.dhs.gov/sites/default/files/2022-09/ICE%20-%20Healthcare%20Costs%20for%20Noncitizens%20in%20Detention.pdf.

Despite our disputes as to the parameters for Request Nos. 5 and 7, so as not to further delay the search for these Requests on the parameters on which we agree, Plaintiff asks that ICE commence the agreed-upon search for Request Nos. 5 and 7, and provide Plaintiff hit counts within five days from today. Please provide information as to the terms and locations searched. Plaintiff reserves the right to revisit the dispute over the appropriate parameters of ICE's search, including through Court process.

4. *Request No. 6*

On June 12, 2023, Plaintiff provided a list of search terms, to which Defendant has agreed, for this Request. ICE now states that "ERO needs a date, or an event, or a location, or alien number to search for a SIR or SENs." To the extent that ERO is unable to search the Significant Incident Report (SIR) system in the Significant Event Notification (SEN) system using the agreed-upon search terms, Plaintiff suggests that ICE search the records of the ICE Joint Intelligence Operations Center (JIOC), which "analyzes the SIRS and sends summaries of them to the appropriate . . . field offices." *See* DHS, Privacy Impact Assessment for the Significant

Event Notification (SEN) System 1-2, Oct. 15, 2021,
https://www.dhs.gov/sites/default/files/publications/privacy-pia-ice023a-sen-october2021.pdf
(describing the Significant Incident Report system and those who have access to reports).

In addition, ICE has misread the Request with respect to ICE OPR. Plaintiff also requests any
spreadsheets, emails, or documents in ICE OPR's possession that "mention the death of any
detainee who had been previously released from custody while hospitalized, a patient in the care
of an external healthcare provider or facility, or released from custody immediately prior to
transfer to an emergency room, hospital, or external care facility. Please use the agreed-upon
search terms for such records within OPR's possession.

   5.   *Request No. 8*

Regarding ICE's refusal to search for information related to the *Fraihat* case, ICE provides no
valid justification for this position. There is no requirement that Plaintiff must identify a search
location in its FOIA Request in order for ICE to be required to search it.  Rather, particularly
where, as here, Plaintiff has provided ample basis that records regarding COVID-19
hospitalizations from *Fraihat* is likely to yield responsive records, ICE's failure to search it
would result in an inadequate search.  *See Transgender Law Center v. ICE*, 46 F. 4th at 779 (it is
Defendants' burden to conduct an adequate search, "reasonably calculated to uncover all relevant
documents" "beyond a material doubt"). As set forth in our June 26, 2023 letter, *Fraihat*
addresses COVID-19 conditions in ICE detention, which led to hospitalizations and releases, a
core subject of Plaintiff's FOIA Request. *See also* Plaintiff's May 19, 2023 letter, Exh. B
(Deposition transcript of Jennifer Moon). For these reasons, we maintain our position that unless
ICE searches *Fraihat* for responsive records, its search is inadequate.

Notwithstanding the Parties disputes regarding search parameters, so as not to further delay the
search for these Requests on the parameters on which they agree, Plaintiff asks that ICE
commence its search for Request No. 8 based in the parameters on which the Parties agree, and
provide Plaintiff hit counts within five days from today. Please provide information as to the
terms and locations searched. Plaintiff reserves the right to revisit the dispute over whether ICE
is obligated to search records compiled by ICE for *Fraihat* for records responsive to Request No.
8, including through Court process.

   6.   *Request No. 9*

The Parties appear to be at an impasse on Request No. 9.  Defendants are clearly in possession of
responsive records. As ICE has reported to Congress, "IHSC reimburses independent providers
who provide care in local hospitals and healthcare systems for services rendered." *See* DHS,
*Healthcare Costs for Noncitizens in Detention, Fiscal Year 2021 Report to Congress* at 3 (Jul.
22, 2022), https://www.dhs.gov/sites/default/files/2022-09/ICE%20-
%20Healthcare%20Costs%20for%20Noncitizens%20in%20Detention.pdf. Moreover, it is clear
that IHSC employees, particularly those in the Medical Resources Unit, discuss billing for
hospitalization or external care of detained people who were released from custody. See Exh. C,

5

ICE Production, 2022-ICLI-48, 5600 (noting hospital bill for Teka Gulema of "$1.6 million dollars").

To help break impasse, Plaintiff suggests that ICE search the following locations and terms for documents in response to Request No. 9:

- **Search Locations re: Request No.9:**
    - ICE Health Service Corps, Resource Management Unit
- **Search Terms re: Request No. 9:**
    - Death
    - Died
    - Deceased
    - Ambulance
    - Emergency
    - Hospital
    - "offsite referral"
    - "life support"
    - Coma
    - Ventilator
    - "Intensive care"
    - "critical condition"
    - Hospice
    - Palliative
    - Release
- **Boolean Search in Relativity re: Request No. 9:**
    - (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian or death or died or deceased or "critical care") AND (bill! or invoice or charge or payment or Medicaid or MedPAR or paid)

Plaintiff also reserves the right to request additional specific information at a later date if Defendants' searches for Request Nos. 4-9 identify additional people whose records may be responsive to this request.

**Increased Processing Rate**

Plaintiff is in receipt of the Pineiro Declaration attesting to ICE's FOIA workload and information specific to this case. Dkt. 48-1. We appreciate ICE's attestation that it will conduct de-duplication and email threading of the 41,000 pages of documents it has yet to review.  As discussed, we await an updated page count to assess the universe of documents subject to ICE review and production, to determine an appropriate processing rate given the circumstances of this case. Depending on the number of pages at issue after de-duplication and threading, Plaintiff is also amenable to proposing additional parameters, including date ranges, to reduce the total number of documents for processing.

While we appreciate that ICE has 69 federal district court cases in active production across the country, and has a "normal processing rate for cases in litigation [of] 750 pages" per month, this hardly justifies ICE's refusal to increase its processing rate for this case, including to Plaintiff's proposal of 5,000 pages/month for Request Nos. 1-3, and 2,500 pages/month for Request Nos. 4-9).

The facts of this case more than warrant ICE being required to increase their "typical" processing rate along the lines Plaintiff seeks. As set forth in Plaintiff's Portion of the June 30, 2023 Status Report, Courts routinely order increased production rates in situations where, as here, the Defendant agency is at fault for failing to timely search for and produce responsive records. *See Long v. IRS*, 693 F.2d 907, 910 (9th Cir. 1982) ("unreasonable delays in disclosing non-exempt documents violate the intent and purpose of the FOIA, and the courts have a duty to prevent these abuses."); *Los Angeles Times Commc'ns LLC v. U.S. Dep't of Homeland Sec.,* No. 2:20-cv-10911-FLA-MRW, 2020 WL 7055904 (C.D. Cal. 2020), December 3, 2021 Minutes Order, Dkt. 35 (ordering production of 3,000 pages per month FOIA case seeking analogous information); *Seavey v. DOJ*, 266 F. Supp. 3d 241, 248 (D.D.C. 2017) (ordering production at a rate of "at least 2,850 pages per month" and finding this pace "well within the range of what other courts have ordered," despite agency's claim that 500 pages would be consistent with its policy); *Clemente v. FBI*, 71 F. Supp. 3d 262, 269 (D.D.C. 2014) (ordering agency to process 5,000 records a month); *Elec. Privacy Info. Ctr. v. FBI*, 933 F. Supp. 2d 42, 48-50 (D.D.C. 2013) (rejecting claim that "'exceptionally large number' of FOIA cases involving the agency currently in litigation" justified only processing 1,500 pages per month, and ordering significantly higher volume in response to plaintiff's request); *Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enf't Agency*, 811 F. Supp. 2d 713, 731 (S.D.N.Y. 2011) (ordering ICE to fully respond to an outstanding FOIA request that required producing over 14,000 pages in one month); *Judicial Watch, Inc. v. Dep't of Energy*, 191 F. Supp. 2d 138, 140-41 (D.D.C. 2002) (ordering agencies to process over 6,000 pages of material within 60 days).

Plaintiff filed its FOIA Request over a year ago on April 29, 2022, and it filed litigation to expedite production of responsive records in July 2022. It simply would not be fair for Plaintiff to have to wait another 3.5 years for ICE to produce responsive records particularly under the circumstances here.  Among the circumstances weighing in favor of Plaintiff's request for an expedited production schedule include: (1) Defendants' failure to de-duplicate the initial universe of approximately 8,000 pages it identified at the time of the Scheduling Order, which would have greatly reduced the volume of pages for review and production; (2) ICE's inexplicable delayed disclosure of the additional 41,000 pages it identified on June 6, 2023, over four months after the Scheduling Order, whose timely disclosure likely would have resulted in an increased production rate and/or other adjustments to the Scheduling Order to ensure more expeditious prosecution of the case, (3) ICE's delay in agreeing to de-duplicate and thread those 41,000 pages, which it apparently still has yet to do a month after their disclosure, thus delaying their production, and (3) ICE's delayed agreement to conduct any search for Request Nos. 4-9, and its related delay in commencing those searches and committing to any date certain when they will be completed, as discussed above.

For all these reasons, the cherry-picked exemplars ICE provides in Defendants' July 11, 2023 letter reflecting other cases where ICE is subject to lower processing rates than what Plaintiff

seeks here are unhelpful, and they do not justify ICE's refusal to increase its production rate here. Defendants do not attest that those cases contain facts like those here.  Further, the cases cited in C.D. Cal. appear to be based on stipulations between the parties, without any explanation of the total universe of documents at issue, or the length of time to complete the production and conclude the case.  The cases are also anomalous in that they mostly reflect production rates in the 300-500 range per month, which is even below ICE's "normal" processing rate of 750 pages per month, as reflected in the Pineiro declaration.

Finally, it appears that at least some representations in Mr. Pineiro's declaration regarding the ICE FOIA Office's workload are inaccurate or misleading. For example, in paragraph 5, Mr. Piniero attests that:

> In fiscal year ("FY") 2020, the number of FOIA requests the ICE FOIA Office handled dramatically increased to over 100,000 from approximately 64,000 in FY 2019. Since FY 2020, that number has continued to increase, with the ICE FOIA Office handling approximately 105,000 requests in FY 2021 and over 110,000 requests in FY 2022. This spike in ICE FOIA's workload is attributed to an increase in the number of requests from individuals for documents in their immigration file coupled with increased public interest in the Department's implementation of Presidential and/or Executive Orders.

ECF No. 48-1 ¶ 9. However, Mr. Pineiro's declaration is inconsistent with Defendants' attestation regarding elimination of this FOIA backlog. In another case regarding ICE's FOIA processing rates, Defendants attested that "ICE eliminated its A-File backlog entirely by the end of the second quarter—a result made possible by the interagency memorandum of agreement between ICE and USCIS signed in 2020 and renewed in subsequent years." *See Nightingale v. USCIS*, No. 19-03512, N.D. Cal., ECF 138 at 4 (Sept. 15, 2022).

We look forward to continuing to discuss these matters with Defendants and the Court at the July 13, 2023 Status Conference.

Sincerely,

LABONI A. HOQ (SBN 224140)
laboni@hoqlaw.com
HOQ LAW APC
P.O. Box 753
South Pasadena, California 91030
Telephone: (213) 973-9004

EUNICE CHO (pro hac vice)
echo@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
915 Fifteenth Street NW, 7th Floor
Washington, DC 20005
Telephone: (202) 548-6616

MICHAEL KAUFMAN (SBN 254575)
MKaufman@aclusocal.org
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA

KYLE VIRGIEN (SBN 278747)
kvirgien@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

1313 West Eighth Street
Los Angeles, California 90017 Telephone:
(213) 977-9500
Facsimile: (213) 915-0219

NATIONAL PRISON PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (202) 393-4930

*Attorneys for Plaintiff*

# EXHIBIT A



**OFFICE OF INSPECTOR GENERAL**

Department of Homeland Security

## MEMORANDUM OF ACTIVITY

**Type of Activity**: Personal Contact (b)(6);

| *Case Number:* I16-ICE-ATL-17063 | *Case Title:* Etowah County Detention Center |
|---|---|

On Thursday, September 1, 2016, (b)(6);    , Special Agent, and (b)(6);  , Lead Criminal Investigator, the Department of Homeland Security (DHS), Office of Inspector General (OIG), Atlanta Field Office, interviewed (b)(6); (b)(7)(C)  Supervisory Deportation and Detention Officer (SDDO), Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO), Gadsden, AL.  The interview was in reference to a DHS OIG investigation initiated from a letter dated August 11, 2016, from the office of Zoe Lofgren, Congress of the United States, House of Representatives, Ranking Member, Immigration and Border Security Subcommittee.  The Congressional request was made to John Roth, Inspector General, DHS OIG.

The request called for a review of the detainee care and operating policy and procedure at the Etowah County Detention Center (ECDC), Gadsden, AL, specifically in regards to detainee Teka Gulema ( (b)(6); (b)(7)(C) - Ethiopia).  According to the request, Gulema spent over eight years in the physical custody of U.S. Immigration and Customs Enforcement (ICE) (several of those years at ECDC) until February 7, 2015, when he was transported to an emergency room at the Riverview Regional Medical Center (RRMC), Gadsden, AL.  Gulema remained hospitalized at RRMC until his death on January 18, 2016.  According to the letter, Gulema had been released from ICE custody approximately ten days prior to his death.  Because Gulema was not in custody at the time of his death, his death was not reported as an custody death and was not investigated by DHS.  The request specifically called for an inquiry into the current health care system at ECDC and if the health care system or lack of heath care contributed to the death of Gulema.  The request also called for a review of Gulema's ICE detention records.

On the previous date, the agents met briefly with (b)(6); to discuss some logistics for the investigation.  Prior to the interview on the date of this report, the agents again explained the nature of the interview.  (b)(6); was advised of DHS OIG warnings not to disclose investigative information. (b)(6); (b)(7)(C) was also advised of his Federal Employee Warnings (Garrity Warnings). (b)(6); read and signed the forms and agreed to be interviewed.  During the interviews, (b)(6); stated the following in substance:

(b)(6); stated that he became the SDDO in Gadsden in 2013. (b)(6); had previously been a Supervisory Immigration Enforcement Agent and Detention and Removal Officer with ICE. (b)(6); was also an agent with the U.S. Border Patrol from 1996-2001.

| Name, Title, Signature, and Date: | | Reviewing Official Name, Title, Signature, and Date: | |
|---|---|---|---|
| (b)(6); (b)(6); (b)(7)(C) Special Agent | 09/14/2016 | (b)(6); (b)(6); (b)(7)(C) Lead Criminal Investigator | 7/30/16 |
| | | (b)( | |

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General, and is disseminated only on a need to know basis.  This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General.  Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552.  Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

## MEMORANDUM OF ACTIVITY

On the previous date, (b)(6); advised that Gulema continually refused to cooperate with ICE officials and would not sign required paperwork for removal proceedings. The process includes a Post Order Custody Review (POCR) once paperwork is signed and travel documents are issued. In the case of Gulema, the POCR clock was basically "suspended" because of Gulema's continual refusal to cooperate. (b)(6); stated that detainee can stay in a failure to comply (FTC) status indefinitely, depending on the specifics of a detainee's case.

According to (b)(6);, once Gulema was placed in the hospital, ICE officials were determining if Gulema could be released. Additional attempts were made to obtain travel documents without success. Eventually, ICE headquarters determined that Gulema could be released on an order of supervision (OSUP). (b)(6); commented that he recalled ICE was paying approximately $20,000 a month in guard services at RRMC and ICE had paid at least three million dollars in medical expenses. (b)(6); stated that these costs were not a determining factor in placing Gulema on OSUP.

(b)(6); did not recall Gulema ever filing a writ of habeas corpus seeking removal from detention. (b)(6); stated that only a deputy field officer director or above can place someone in an FTC status. (b)(6); did not recall Gulema ever pushing to be released and did not make any extra efforts to be released.

(b)(6); stated that medical issues concerning Gulema would be documented in the ECDC paperwork and would not be part of Gulema's ICE file. (b)(6); stated that the American Civil Liberties Union had requested information in regards to Gulema and that information was provided in a Freedom of Information Act request. (b)(6); provided DHS OIG with several documents including copies of electronic mail (email) messages. These will be documented below. (b)(6); further stated he would send additional messages to SA (b)(6);. These records will be documented in a separate report.

The documents received are summarized as follows:

The first document was an ICE Release Notification to Gulema from (b)(6);, POCR Unit Chief, ICE HQ. The notification was dated October 22, 2016. There was an HQ POCR checklist attached to the letter. The checklist stated, "Due to alien's medical condition and prognosis, the Embassy of Ethiopia refused to conduct an interview or issue a travel document on his behalf. Therefore, since alien's medical condition is unlikely to improve anytime soon, there is not a significant likelihood of removal in the reasonable foreseeable future."

The next document is an email from (b)(6); to (b)(6); (b)(7)(C) Gulema's ERO Case Officer, dated October 22, 2015, regarding the release notification email for Gulema. (b)(6); advised that they are not to release at this time, the ERO Field Office Director (FOD) was checking with HQ. The email also contained an email from (b)(6); Management and Program Analyst,

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

## MEMORANDUM OF ACTIVITY

DSH/ICE/ERO/RMD/RIO, Middle East/East Africa, to multiple recipients, including (b)(6); with the subject "(b)(6);   – Release Notification Email – 10-22-15."

The next document was an email dated October 23, 2105. The email was from (b)(6); to (b)(6);   The email stated that (b)(6); spoke with the AFOD and Gulema was not to be released at this time.

The next document was an email dated November 9, 2015, from (b)(6);   to (b)(6); and other recipients. It was a continuation of the hold on Gulema's release. Also included in the email chain was an email from (b)(6);   FOD, ICE ERO, New Orleans, LA. The email was dated October 22, 2015, and stated, "Please hold on any further actions was we'll need clarification as to the release mechanism, including any continuity of care or alternate placement."

Another document was an unrelated to Gulema's release letter dated October 20, 2015. The email was to (b)(6); and (b)(6); from (b)(6);   Gulema was the subject of the email and it had to do with guard service and placement of Gulema. The guard services were identified at $20,000+ per month. The email further stated that ICE Health Service Corp was still seeking placement for Gulema and HQ was still "deliberating."

(b)(6); provided DHS OIG with a copy of the ICE contract with ECDC. The contract was dated in October 2009 and was signed by (b)(6);   , Assistant Secretary, ICE, and (b)(6);   , Sheriff, ECSO. (b)(6); described the contract as ICE was a rider on the United States Marshal's Service, Department of Justice, contract with ECDC. The contract did not list any specific medical requirements, only that the ECDC must meet the applicable ICE National Detention Standards.

The final documents received were two forms dated November 24, 2015. The first form was identified as a DHS ICE Form I-216, Records of Persons Transferred. The form indicated that Gulema was transferred on this date via OSUP. The other form was a DHS ICE Form 1-203, Order to Release Alien.

ATTACHMENTS

**IMPORTANT NOTICE**
This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

# EXHIBIT B

**To:** (b)(6); (b)(7)(C) @oig.dhs.gov]
**From:** (b)(6); (b)(7)(C)
(b)(6); (b)(7)(C)                                                    (b)(6);
**Sent:** Tue 7/14/2020 11:52:51 AM (UTC-04:00)
**Subject:** FW: Enhanced Reporting - I19-ICE ERO-ELP-16066, Death of Jonathan Alberto Medina-Leon/Non-Employee/ICE ERO/El Paso, TX

FYI

(b)(6); (b)(7)(C)

Assistant Special Agent in Charge

DHS Office of Inspector General, Investigations

El Paso Field Office

(b)(6); (b)(7)(C)

---

**From:** EDS Notifications <(b)(7)(E) @oig.dhs.gov>
**Sent:** Tuesday, July 14, 2020 7:20 AM
**To:** (b)(6); (b)(7)(C) @oig.dhs.gov; (b)(6); (b)(7)(C) @oig.dhs.gov; (b)(6); (b)(7)(C) @oig.dhs.gov; (b)(6); (b)(7)(C) @oig.dhs.gov; (b)(6); (b)(7)(C) @OIG.DHS.GOV> (b)(6); (b)(6); @oig.dhs.gov> (b)(6); @oig.dhs.gov; (b)(6); (b)(7)(C) @oig.dhs.gov>; (b)(6); @oig.dhs.gov; (b)(6); (b)(7)(C) @oig.dhs.gov; (b)(6); (b)(7)(C) @oig.dhs.gov>
**Subject:** Enhanced Reporting - I19-ICE ERO-ELP-16066, Death of Jonathan Alberto Medina-Leon/Non-Employee/ICE ERO/El Paso, TX

7/14/2020

The case in subject line is no longer marked for enhanced reporting.

Narrative:

On June 3, 2019, the Department of Homeland Security (DHS), Office of Inspector General (OIG), El Paso, TX, became aware of the death of a 25 year old transgender female at an El Paso local hospital five days after being released from Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) custody. It was reported by ICE ERO that on April 11, 2019, Jonathan Alberto Medina-Leon (b)(6); (b)(7)(C) applied for admission into the United States at the Paso Del Norte Port of Entry in El Paso, TX, (b)(6); (b)(7)(C); (b)(3):Unspecified On April 14, 2019, ICE ERO, El Paso, TX, took custody of Medina at placed her at the Otero County Processing Center (OCPC) located in Chaparral, NM. According to ICE ERO, on May 28, 2019, the OCPC conducted an (b)(6); (b)(7)(C) (b)(6); (b)(7)(C) for Medina, at her request, (b)(6); (b)(7)(C) The OCPC referred Medina to a local hospital for further evaluation and subsequently served Medina with a Notice to Appear document and released her from ICE ERO custody on parole prior to her release. On June 2, 2019, ICE ERO Domestic Operations informed ICE ERO El Paso of a Facebook post reporting the death of a transgender female allegedly in ICE custody. ICE ERO El Paso later determined that the Facebook post was referring to Medina. On June 3, 2019, ICE

EDS

# EXHIBIT C

**From:** (b)(6); (b)(7)(C)
**Sent:** Mon, 8 Jun 2015 10:53:50 -0400
**To:** (b)(6); (b)(7)(C)
**Subject:** FW: Teka Gulema

FYI

(b)(6); (b)(7)(C) *RN, BSN, MSHS, CCHP*
CDR, United States Public Health Service
Eastern Regional Field Medical Coordinator

DHS/ICE/IHSC
ERO Miami Field Office
772-419-(b)(6) (Office)
202-321- (Mobile)
866-711-8507 (Fax)
email:(b)(6), @ice.dhs.gov

*Warning: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this report should be furnished to the media, either in written or verbal form.*

**From:** (b)(6); (b)(7)(C)
**Sent:** Friday, June 05, 2015 4:55 PM
**To:** (b)(6); (b)(7)(C) (CTR)
**Cc:** (b)(6); (b)(7)(C)
**Subject:** RE: Teka Gulema

Thanks so very much. Money is the life's blood for hospitals !!

**From:** (b)(6); (b)(7)(C) (CTR)
**Sent:** Friday, June 05, 2015 4:52 PM
**To:** (b)(6); (b)(7)(C)
**Cc:**
**Subject:** RE: Teka Gulema

Dr. (b)(6); (b)(7)(C)

I just spoke with (b)(6); (b)(7)(C) (Billing Director) and (b)(6); (b)(7)(C) (VP) of Riverview Regional Medical Center. According to Ms. (b)(6); (b)(7)(C) Mr. Teka's bill is $1.6 million dollars. I expressed to both ladies IHSC's sincere apology for any miscommunication that has/had taken place regarding Mr. Teka's care. Both Ms (b)(6); (b)(7)(C) and Ms. (b)(6); (b)(7)(C) expressed how appreciative they were that I contacted them. As of March 1, 2015 this hospital was purchased by Prime Healthcare so they will actually need to pull information from two different billing systems.

I also spoke with CDR [(b)(6); (b)(7)(C)] and advised that I am going to create sub MedPARs in the MedPAR system which simply links the entire admission to one MedPAR number.  All MedPARs will be under MedPAR number 20150604147000 which will represent the first segment (21 day admission) and the subsequent MedPARs will end in 01, 02, 03 etc. until he is discharged.  Once the bills have dropped in their billing system, Ms. [(b)(6); (b)(7)(C)] will send them to me and I will forward them to the VAFSC for expedited processing.   Once the detainee is discharged/transferred the hospital will submit a final bill which will be reviewed by the VAFSC to ensure that the provider has been reimbursed correctly.

I will provide additional information as it is received.


Thanks
[(b)(6); (b)(7)(C)]
Provider Relations Liaison
Resource Management Unit
ICE Health Service Corps
500 12th Street, S.W., [(b)(6); (b)(7)(C)]
Washington, DC  20536
(202)732 [(b)(6); (b)(7)(C)] (office)
(866)382-8756 (efax)
(202)689 [(b)(6); (b)(7)(C)] (cell)
[(b)(6); (b)(7)(C)] @associates.ice.dhs.gov

**From:** [(b)(6); (b)(7)(C)]
**Sent:** Friday, June 05, 2015 3:58 PM
**To:** [(b)(6); (b)(7)(C)] (CTR)
**Cc:** [(b)(6); (b)(7)(C)]
**Subject:** RE: Teka Gulema

Awesome thx

**From:** [(b)(6); (b)(7)(C)] (CTR)
**Sent:** Friday, June 05, 2015 3:57 PM
**To:** [(b)(6); (b)(7)(C)]
**Cc:**
**Subject:** Teka Gulema
**Importance:** High

Dr. [(b)(6); (b)(7)(C)]:

Per our conversation, I did reach out to Riverview Regional Medical Center regarding Teka Gulema.  I spoke with [(b)(6); (b)(7)(C)] in billing and she said that currently no bills have dropped for this detainee because he is still in-house.  I asked if they could provide us with interim bills so that we can begin to pay them for some of the services that have been provided.  [(b)(6); (b)(7)(C)] stated that due to the amount of the bill I would need to speak with the Hospital Financial Manager.  [(b)(6);

provided me with the contact information for [(b)(6); (b)(7)(C)] however, had had already left the office for the weekend.

I will follow up with Mr. [(b)(6);] next week with regards to the financial piece to see if they can provide us with bills so that we can begin to pay them for services.  I will keep you posted.

Thanks
[(b)(6), (b)(7)(C)]
Provider Relations Liaison
Resource Management Unit
ICE Health Service Corps
500 12th Street, S.W. [(b)(6); (b)(7)(C)]
Washington, DC  20536
(202)732[(b)(6); (b)(7)(C)] (office)
(866)382-8756 (efax)
(202)689[(b)(6); (b)(7)(C)] cell)
[(b)(6), (b)(7)(C)] @associates.ice.dhs.gov

# EXHIBIT L

**Eunice Cho**

| | |
|---|---|
| **From:** | Tursi, Joseph (USACAC) <Joseph.Tursi@usdoj.gov> |
| **Sent:** | Wednesday, August 23, 2023 6:54 PM |
| **To:** | Laboni Hoq |
| **Cc:** | Eunice Cho; Michael Kaufman; Kyle Virgien; Axe, Jason (USACAC) |
| **Subject:** | RE: [EXTERNAL] Re: ACLU SoCal v. DHS | August Production |

**This Message Is From an External Sender**
This message came from outside your organization.

Hi Laboni,

As was communicated at the status conference, Jason is out of the office through the end of the week. I am also preparing for an upcoming trial. As we also explained at the hearing, DHS recently transitioned to a new system which has resulted in unforeseen delays across the agency. However, as seen by Monday's production, ICE has taken steps to ensure that it continue to meet its Court ordered obligations in this matter. In any event, we will have a substantive response to your client's letter by the end of next week, which will also include the matters discussed at the status conference. In the interim, I can provide the following information:

- ICE's August production came from the approximate 12,000 pages of documents remaining.
- With respect to Teka Gulema, there are 250 pages of documents that were created after October 15, 2015.

Thanks,
-Joe


**Joseph W. Tursi | Assistant United States Attorney**
United States Attorney's Office | Central District of California
300 N. Los Angeles Street, Suite 7516 | Los Angeles, CA 90012
O: 213.894.3989 | C: 213.500.9355 | F: 213.894.7819 | joseph.tursi@usdoj.gov


**From:** Laboni Hoq <lhoq@hoqlaw.com>
**Sent:** Tuesday, August 22, 2023 1:06 PM
**To:** Tursi, Joseph (USACAC) <JTursi@usa.doj.gov>
**Cc:** echo@aclu.org; Michael Kaufman <MKaufman@aclusocal.org>; kvirgien@aclu.org; Axe, Jason (USACAC) <JAxe@usa.doj.gov>
**Subject:** [EXTERNAL] Re: ACLU SoCal v. DHS | August Production

Hi Joe,

In light of the Minute Order today confirming Defendants' obligation to do their searches and for the Parties to continue to meet and confer about rate of production issues, we ask that Defendants respond to Plaintiff's outstanding inquiries by the end of the week. For your convenience I am attaching a copy of Plaintiff's July 12, 2023 letter referenced in my prior email of today, which further elaborates on the outstanding issues on which Plaintiff has been awaiting a response from Defendants for over five weeks.

Absent the requested response by the end of the week, we will seek a Status Conference with the Court to address the matter. We are also available to discuss these matters by video conference if that is helpful - just let us know when this week would work for you.

Thanks.

On Tue, Aug 22, 2023 at 8:45 AM Laboni Hoq <lhoq@hoqlaw.com> wrote:

Thanks Joe.  Yes, we'll follow up if there are any issues with accessing ICE's documents.

Can you clarify whether this production by ICE is from the 12,000 additional documents you referenced at the August 11, 2023 Status Conference that resulted from ICE's de-duplication and threading of the larger batch of approximately 41,000 additional documents it referenced in prior correspondence?

We also wanted to follow up on the status of a few other outstanding items that Defendants agreed to get back to us about at the August 11 Status Conference.

First, regarding ICE, please update us on when we will receive the hit count results of the additional searches ICE committed to conducting in its July 11, 2023 letter, and clarify the search parameters it will be using for those additional searches as we also requested in Plaintiff's July 12, 2023 letter.

Second, regarding OIG, please let us know if OIG will search for and produce the specific documents we identified in our July 11, 2023 letter related to Mr. Teka Gulema that appear missing from OIG's production to date, and when Plaintiff can expect production of those documents.

Thanks.

On Mon, Aug 21, 2023 at 4:50 PM Tursi, Joseph (USACAC) <Joseph.Tursi@usdoj.gov> wrote:

All,


ICE has uploaded its August production to the USAfx folder. Please let me know if you have difficulty accessing it.


Thanks,

-Joe


**Joseph W. Tursi** | **Assistant United States Attorney**
United States Attorney's Office | Central District of California
300 N. Los Angeles Street, Suite 7516 | Los Angeles, CA 90012
O: 213.894.3989 | C: 213.500.9355 | F: 213.894.7819 | joseph.tursi@usdoj.gov

# EXHIBIT M

**Eunice Cho**

| | |
|---|---|
| **From:** | Laboni Hoq <lhoq@hoqlaw.com> |
| **Sent:** | Thursday, August 24, 2023 8:14 PM |
| **To:** | Tursi, Joseph (USACAC) |
| **Cc:** | Eunice Cho; Michael Kaufman; Kyle Virgien; Axe, Jason (USACAC) |
| **Subject:** | Re: [EXTERNAL] Re: ACLU SoCal v. DHS | August Production |

**This Message Is From an External Sender**
This message came from outside your organization.

Hi Joe,

Thank you for your preliminary responses to our outstanding inquiries. As we discussed at the recent Status Conference, this information is helpful in allowing us to propose ways to streamline Defendants' processing of the remaining records responsive to Request Nos. 1-3.

To that end, thank you for letting us know that there are 250 records related to Mr. Gulema dated after October 15, 2015. However, we requested records dated after October 1, 2015. *See* ECF No. 50-2, Ex. X (Plaintiff's July 12, 2023 letter, specifying Oct. 1, 2015). Please provide us a revised hit count for records on or after October 1, 2015 regarding Mr. Gulema.

Regarding any Gulema records dated on or after October 1, 2015, we ask that Defendants prioritize review and production of records you identify in that time period. We also ask that Defendants identify the total volume of Gulema records dated before October 1, 2015, hold off processing those records in connection with their September production, and instead process the other remaining records.

Regarding the pre October 1, 2015 Gulema records, once we have reviewed the proposed composition of  Defendants' September production we hope to be in a position to determine if we can forego Defendants' processing of the other Gulema records.

Please let us know if you need clarification on this proposal, and whether Defendants will agree to it.

Thanks.

1

On Wed, Aug 23, 2023 at 3:53 PM Tursi, Joseph (USACAC) <Joseph.Tursi@usdoj.gov> wrote:

Hi Laboni,


As was communicated at the status conference, Jason is out of the office through the end of the week. I am also preparing for an upcoming trial. As we also explained at the hearing, DHS recently transitioned to a new system which has resulted in unforeseen delays across the agency. However, as seen by Monday's production, ICE has taken steps to ensure that it continue to meet its Court ordered obligations in this matter. In any event, we will have a substantive response to your client's letter by the end of next week, which will also include the matters discussed at the status conference. In the interim, I can provide the following information:


- ICE's August production came from the approximate 12,000 pages of documents remaining.
- With respect to Teka Gulema, there are 250 pages of documents that were created after October 15, 2015.


Thanks,

-Joe




**Joseph W. Tursi** | **Assistant United States Attorney**
United States Attorney's Office | Central District of California
300 N. Los Angeles Street, Suite 7516 | Los Angeles, CA 90012
O: 213.894.3989 | C: 213.500.9355 | F: 213.894.7819 | joseph.tursi@usdoj.gov




---

**From:** Laboni Hoq <lhoq@hoqlaw.com>
**Sent:** Tuesday, August 22, 2023 1:06 PM
**To:** Tursi, Joseph (USACAC) <JTursi@usa.doj.gov>
**Cc:** echo@aclu.org; Michael Kaufman <MKaufman@aclusocal.org>; kvirgien@aclu.org; Axe, Jason (USACAC) <JAxe@usa.doj.gov>
**Subject:** [EXTERNAL] Re: ACLU SoCal v. DHS | August Production


Hi Joe,

In light of the Minute Order today confirming Defendants' obligation to do their searches and for the Parties to continue to meet and confer about rate of production issues, we ask that Defendants respond to Plaintiff's outstanding inquiries by the end of the week. For your convenience I am attaching a copy of Plaintiff's July 12, 2023 letter referenced in my prior email of today, which further elaborates on the outstanding issues on which Plaintiff has been awaiting a response from Defendants for over five weeks.

Absent the requested response by the end of the week, we will seek a Status Conference with the Court to address the matter. We are also available to discuss these matters by video conference if that is helpful - just let us know when this week would work for you.

Thanks.

On Tue, Aug 22, 2023 at 8:45 AM Laboni Hoq <lhoq@hoqlaw.com> wrote:

Thanks Joe.  Yes, we'll follow up if there are any issues with accessing ICE's documents.

Can you clarify whether this production by ICE is from the 12,000 additional documents you referenced at the August 11, 2023 Status Conference that resulted from ICE's de-duplication and threading of the larger batch of approximately 41,000 additional documents it referenced in prior correspondence?

We also wanted to follow up on the status of a few other outstanding items that Defendants agreed to get back to us about at the August 11 Status Conference.

First, regarding ICE, please update us on when we will receive the hit count results of the additional searches ICE committed to conducting in its July 11, 2023 letter, and clarify the search parameters it will be using for those additional searches as we also requested in Plaintiff's July 12, 2023 letter.

Second, regarding OIG, please let us know if OIG will search for and produce the specific documents we identified in our July 11, 2023 letter related to Mr. Teka Gulema that appear missing from OIG's production to date, and when Plaintiff can expect production of those documents.

Thanks.

On Mon, Aug 21, 2023 at 4:50 PM Tursi, Joseph (USACAC) <Joseph.Tursi@usdoj.gov> wrote:

All,

ICE has uploaded its August production to the USAfx folder. Please let me know if you have difficulty accessing it.

Thanks,

-Joe


**Joseph W. Tursi | Assistant United States Attorney**
United States Attorney's Office | Central District of California
300 N. Los Angeles Street, Suite 7516 | Los Angeles, CA 90012
O: 213.894.3989 | C: 213.500.9355 | F: 213.894.7819 | joseph.tursi@usdoj.gov

# EXHIBIT N



# United States Department of Justice

### United States Attorney's Office
### Central District of California

---

*JOSEPH W. TURSI*
*JASON K. AXE*
*Assistant United States Attorney*
*Phone:  (213) 894-3989/8790*
*E-mail:  Joseph.Tursi@usdoj.gov*
*        Jason.Axe@usdoj.gov*

*Federal Building*
*300 N. Los Angeles Street, Suite 7516*
*Los Angeles, California 90012*

September 1, 2023

**VIA E-MAIL**

Laboni A. Hoq
Hoq Law, APC
P.O. Box 753
South Pasadena, CA 91030

      Re:    ACLU of SoCal v. ICE, et al.
               C.D.CA Case No. 2:22-cv-04760-SHK

Dear Ms. Hoq:

The following responds to your client's July 12, 2023 correspondence as well as matters raised during the August 11, 2023 status conference.

Defendants remain open to engaging in discussions over the narrowing of the scope of Plaintiff's FOIA request. However, please note that regarding search terms, the agencies enjoy "discretion in crafting a list of search terms that they believe[ ] to be reasonably tailored to uncover documents responsive to the FOIA request." *Agility Pub. Warehousing Co. K.S.C. v. NSA*, 113 F. Supp. 3d 313, 339 (D.D.C. 2015) (internal quotation marks omitted). That is because agencies ultimately bear the burden of proving the adequacy of their searches and that they may withhold documents under one of the exemptions. 5 U.S.C. § 552 (a)(4)(B); *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991).

**OIG**

As communicated in OIG's second supplemental response dated July 31, 2023, and its final supplemental response dated August 2, 2023, it has finished its search and processing of all records responsive to Plaintiff's FOIA request. With respect to the documents noted on page 2 of your July 12, 2023 correspondence, OIG has confirmed that those records were referred to ICE for processing as documented in its June 30th letter.

**ICE**

As mentioned at the August 11, 2023 status conference, the Department of Homeland Security recently migrated to a new processing system. This has resulted in unforeseen delays across FOIA offices, including ICE's. Nonetheless, pursuant to the Court's February 9, 2023 Case Management Order, Dkt. 40, it has continued to make its monthly productions by the 21st of each month, including most recently in productions described in letters dated July 19, 2023 and August 18, 2023.

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
September 1, 2023
Page 2

1. **Request Nos. 1 & 3**

Consistent with our representations during the August 11, 2023 status conference, ICE has de-duplicated and threaded emails as requested. As we have previously informed you, that process reduced the page count from 41,000 pages to 12,000 pages of records for processing.

With respect to records related to Teka Gulema, ICE originally believed that there were 250 pages of documents created on or after October 15, 2015 remaining to be processed. However, after review of the specific documents identified, it became apparent that although Relativity marked them as being created after October 1, 2015, they were actually from earlier than October 1, 2015. Thus, the previously communicated figure was inaccurate. The ICE employee who is responsible for running the Relativity searches in this case is out of the office until September 6, 2023. When he returns, ICE will work with him to get clarity on the Gulema records.

In response to your August 24, 2023 email requesting that ICE now prioritize the processing of Gulema records, we note that Plaintiff previously requested that ICE process records in the following order: "Jose Ibarra Bucio, Johanna Medina Leon, Martin Vargas Arellano, *and then* Teka Gulema." *See* Plaintiff's June 26, 2023 Letter at 2 (emphasis added). ICE agreed to do so, and yet now, Plaintiff seeks to have ICE prioritize the *Gulema* records from October 1, 2015 on, as soon as its September production. ICE is unable to change its review order for its September production, but it will consider Plaintiff's request for future productions in the event it is able to identify the records created on October 1, 2015 and beyond. We will provide an update accordingly.

2. **Request No. 4.**

The initial search for responsive records has been completed using the agreed-upon search parameters. The requested custodians were Tae Johnson, Deborah Fleischaker, and Scott Shuchart. The records are being loaded into Relativity. When the ICE employee handling the Relativity searches returns to the office next week, he will conduct the Boolean connector search for this request. Upon our receipt of the "hit count" after the connector search, we will provide that number to you as indicated previously.

3. **Requests Nos. 5 & 7**

With respect to Request No. 5, the initial search for responsive records has been completed using the agreed-upon search parameters. The requested custodian was Stewart Smith, the Director of IHSC. The records are being loaded into Relativity. When the ICE employee handling the Relativity searches returns to the office next week, he will conduct the Boolean connector search for this request. Upon our receipt of the "hit count" after the connector search, we will provide that number to you as indicated previously.

As for Request No. 7, OPR has completed its search and it does not have responsive records.

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
September 1, 2023
Page 3

4.  **Request No. 6**

OPR has completed its search and it does not have responsive records.

5.  **Request No. 8**

The initial search for responsive records has been completed using the agreed-upon search parameters. The requested custodian was Stewart Smith, the Director of IHSC. The records are being loaded into Relativity. When the ICE employee handling the Relativity searches returns to the office next week, he will conduct the Boolean connector search for this request. Upon our receipt of the "hit count" after the connector search, we will provide that number to you as indicated previously.

6.  **Request No. 9**

Based on the proposal in your July 12th letter, this search was tasked to the IHSC Resource Management Unit in July 2023 utilizing the fifteen search terms provided in that letter.

In response, the Resource Management Unit advised that it is not involved with "Bills, invoices, charges, or records of payment that reflect payments made for healthcare for any detainee who was released from custody while (a) hospitalized; or (b) a patient in the care of an external healthcare provider or facility, and communications about such bills, invoices, charges, or records of payment." However, the Unit Chief recommended that this request be delegated to the IHSC Health Plan Management Unit (HPMU), which manages medical claims (i.e., payments for healthcare for detainees). Based on that recommendation, a request was then sent to the HPMU. In response, the HPMU stated that the search terms were too broad and that they would not have anything responsive unless they were provided a list of detainee names. Nonetheless, they suggested tasking the request to the Regional Field Medical Coordinators within the Medical Case Management Unit and the Regional Health Service Administrators within the Health Operations Unit. ICE FOIA then tasked those two divisions, but a preliminary search by just one of the Health Service Administrators yielded 16,000 emails (not pages), most of which appeared not to be related (or only peripherally related) to one of the terms.

Based on the preliminary results of its search, ICE requests clarification from Plaintiff regarding the specific types of records it seeks so it can adequately craft a search that will result in fewer initial hits. Alternatively, ICE proposes adding a second term such as "bill," "invoice," etc. to the preliminary search to reduce the number of records initially identified. Another approach would be to pair search terms, e.g., "Death + record," "Ambulance + invoice," and "Hospital + bills." Please let us know if Plaintiff has a revised proposal for this search based on the information presented here.

*     *     *

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
September 1, 2023
Page 4


Respectfully,

E. MARTIN ESTRADA
United States Attorney

/s/ *Joseph W. Tursi*

JOSEPH W. TURSI
Assistant United States Attorney

cc: Ms. Eunice Cho (by email)
     Mr. Michael Kaufman (by email)
     Mr. Kyle Virgien (by email)

# EXHIBIT O

**Eunice Cho**

| | |
|---|---|
| **From:** | Tursi, Joseph (USACAC) <Joseph.Tursi@usdoj.gov> |
| **Sent:** | Tuesday, September 12, 2023 5:45 PM |
| **To:** | Laboni Hoq; Eunice Cho; Kyle Virgien; Michael Kaufman |
| **Cc:** | Axe, Jason (USACAC) |
| **Subject:** | ACLU SoCal v. ICE |

**This Message Is From an External Sender**
This message came from outside your organization.

Hi Laboni,

ICE has run the preliminary search consisting of 19 terms for Request #4. The hit count for the search resulted in over 530,000 records. Regarding the proposed Boolean connector search, we have been informed that the proposed search exceeds the allowable number of characters.  ICE proposes amending the Boolean connector search as follows:

(custody OR death OR died OR deceased OR decedent OR discharge OR surgery OR specialist OR COVID-19 OR hospital OR ambulance OR "emergency services" OR "poor outcome" OR "offsite referral" OR unconscious OR "medical observation" OR ICU OR "critical condition" OR fatal) AND (release OR transfer OR benefits OR parole OR "alternative detention" OR discharge OR OSUP OR "order of supervision" OR humanitarian).

Please advise if this Boolean connector search is acceptable to Plaintiff as the next step, and if so, we will ask it to be run and report back to you with the updated hit count.

As a gentle reminder, I am set to be in trial next week so I may not be overly responsive to emails.

Thanks,
-Joe

**Joseph W. Tursi** | **Assistant United States Attorney**
United States Attorney's Office | Central District of California
300 N. Los Angeles Street, Suite 7516 | Los Angeles, CA 90012
O: 213.894.3989 | C: 213.500.9355 | F: 213.894.7819 | joseph.tursi@usdoj.gov

# EXHIBIT P

September 14, 2023

Joseph Tursi
Jason Axe
Alarice Medrano
United States Attorney's Office
Central District of California
300 N. Los Angeles St. Suite 7516
Los Angeles, CA 90012
Joe.Tursi@usdoj.gov
Jason.Axe@usdoj.gov
Alarice.Medrano@usdoj.gov

***SENT VIA EMAIL***

       Re:    *ACLU of Southern California v. United States Immigration and Customs Enforcement, et al.,* No. 2:22-cv-4760 (C.D. Cal.)

Dear Joe:

We write in response to Defendants' September 1, 2023 letter and September 12, 2023 email regarding the Parties' ongoing efforts to address the adequacy of Defendants' searches for and production of records in response to Plaintiff's FOIA Request. We appreciate Defendants' openness to trying to reach agreement on the search and production parameters so the Parties can narrow the issues in dispute and avoid potential motion practice.

To that end, in addition to responding to the issues in Defendants' September 1 letter and September 12 email, we reiterate here issues Plaintiff has raised in prior correspondence to which Defendants have yet to respond. While we appreciate Defendants may not agree to all of Plaintiff's proposed search parameters, we need to know Defendants' positions relating to them to assess whether Plaintiff will need to move the Court to address the adequacy of Defendants' searches and productions. We therefore ask that Defendants respond to each of the outstanding issues below within two weeks of this date, by September 28, 2023

## I.    OIG

Thank you for confirming that with its August 2, 2023 correspondence, OIG has completed its searches for and production of records responsive to Plaintiff's FOIA Request.

Based on OIG's accounting of its productions to date, Plaintiff has the following remaining issues with OIG's productions, as also referenced in prior correspondence as indicated below for your reference.

September 14, 2023

## A.      Basis for OIG's Referral of Records to Other DHS Components/Agencies

By our account, OIG has made the following referrals to ICE, other DHS components and other agencies, but has not established a proper basis for doing so.

- November 2022: 220 records to ICE; 233 records to DOJ/EOUSA
- December 2022: 280 records to ICE; 185 records to DOJ/EOUSA
- March 2023: 9 records to ICE; 32 records to CBP
- June 2023: 8 records to an Unidentified Agency (later produced by OIG in August 2023); 328 records to ICE; 1 record to DHS Office of Civil Rights
- July 2023: 583 records to ICE

OIG must establish a proper basis to refer records in its possession to another agency, particularly because such referrals necessarily impede the government's obligation under FOIA to promptly produce records to requesters. We raised this issue with OIG in a letter dated September 2, 2022, and again in an email dated January 9, 2023.

As referenced in Plaintiff's September 2, 2022 letter, to justify these referrals OIG must determine whether the agency to whom OIG referred records had the "intention ... [to] retain the authority to decide if and when materials are released to the public ... by either (i) explicit indications to that effect on the face of each document or (ii) the circumstances surrounding the creation and transfer of the documents." *McGehee v. C.I.A.*, 697 F.2d 1095, 1111 (D.C. Cir. 1983), on *reh'g sub nom. McGehee v. Cent. Intel. Agency*, 711 F.2d 1076 (D.C. Cir. 1983). Furthermore, assuming another agency or component did maintain an "intent to control" specific records responsive to Plaintiff's request, OIG's process of referring the records to another agency or component would have to be "prompt and public." *Id.* As such, we again ask that OIG justify the above-referenced referrals, or process the records itself and promptly produce them to Plaintiff.

Furthermore, it is apparent that other DHS components possess responsive records that have not been searched or produced, as OIG possesses, but has not produced, responsive documents originating from other DHS components. Plaintiff thus requests that DHS search for and produce responsive records of these component agencies. *See Lawyers' Comm. for C.R. Under L. v. United States Dep't of Just.*, No. 18-CV-167 (EGS/GMH), 2020 WL 7319365, at *10 (D.D.C. Oct. 16, 2020) (finding that an agency's obligation to follow leads includes searches of other components). These components include the "Unidentified" component or agency referenced in OIG's June 29, 2023 production letter, as well as the DHS Office of Civil Rights and Customs and Border Protection (CBP), as referenced above. Please inform us whether Defendants will agree to conduct independent searches of these DHS components. If so, we would be open to collaborating with Defendants on appropriate search parameters.

September 14, 2023

Regarding the Unidentified DHS component referenced in its June 29, 2023 letter, OIG cited 6 C.F.R. section 5.4(d)(1) as the basis for its consultation with it.  However, 6 CFR section 5.4(d)(1) does not provide that OIG can withhold the identity of the component or agency, and doing so violates its obligation to ensure that the referral is "public." *McGehee*, 697 F.2d at 1111. We therefore ask that OIG identify the unidentified component to Plaintiff.

Finally, we specifically request the following documents, referred to in OIG's production of documents to date:

- December 2022 OIG production, pages 80-82, regarding Johana Medina Leon: Please provide the documents referenced in the report, where "copies of the final executive summary and emails documenting Medina's [sic] decision to release her from ICE ERO custody. Copies of the aforementioned documents will be placed in the case file."
- December 2022 OIG production, pages 83-85, regarding Johana Medina Leon. Please provide the documents referenced in the report, where "[a] copy of [REDACTED] emails between the MTC and ICE ERO management, the executive summary, and the OCPC final report of findings will be placed into the case file."
- March 2023 OIG production, page 48, regarding a question about the number of OIG's investigations into out-of-custody deaths, to which the El Paso ICE Field Office, responded, "approximately five investigations." Please provide documents related to these five investigations.
- June 2023 OIG production, page 180, regarding OIG's investigation into Teka Gulema's death, where OIG noted review of "an email dated November 24, 2015 from [REDACTED], Field Office Director, ICE, New Orleans, LA. The email was to [REDACTED], Field Medical coordinator, IHSC, New Orleans, LA. The email stated "FYI, HQ has directed we serve a release letter on Dr. [REDACTED] and release Gulema from ICE custody today." Please provide the document referenced here.

### B.      Unidentified Statue Redaction

In our February 14, 2023 letter, Plaintiff raised the impropriety of withholding information in responsive records based on an "unspecified" statute. See Plaintiff's February 10, 2023 letter. Despite meeting and conferring about this issue, Defendants have yet to provide a valid justification for this withholding, including by: (1) identifying the statute upon which this exemption is claimed, and (2) providing information about the content of the withheld material sufficient to allow an assessment of whether it falls within the statute's protections. Please provide that to us, or reproduce the records to us without the unjustified redactions.

### C.      Total Number of Documents Reviewed

3

September 14, 2023

In its November 2022 and August 2023 productions, OIG appears to have failed to identify the total number of documents it processed at those times. *See* OIG November 11, 2023 letter; August 2, 2023 letter. We imagine this was simply an oversight on the part of OIG, and ask that it provide this information to us now so we have a proper accounting of its final response to the Request.

## II.     ICE

### A.       Production Rate

Thank you for confirming that ICE has completed the de-duplication and threading process, and that it has approximately 12,000 additional pages responsive to Parts 1-3 in its processing queue. Please also let us know with ICE's next production in September how many of these 12,000 pages remain in its processing queue at that time.

As we have discussed, 12,000 pages for just Request Nos. 1-3 is a large number of pages that brings the total page count to be processed well above the count that Defendants initially provided to Plaintiff and the Court when the parties negotiated a production rate and case schedule. We have discussed several ways to speed ICE's completion of this production, each of which will need to be undertaken to ensure timely completion.

First, regarding documents related to Teka Gulema, we appreciate ICE's willingness to provide clarity on the number of those documents created after October 1, 2015, and to consider prioritizing them in ICE's October production. Please let us know the page count for these documents and confirm that you will prioritize documents related to Mr. Gulema created after October 1, 2015 in your October production. This will allow us to determine whether we can waive production of documents related to Mr. Gulema that were created before October 1, 2015, which we hope would significantly reduce the number of pages ICE must process. A lower page count would benefit all parties.

Second, while we appreciate Defendants commitment to conduct additional searches for Parts 4-9 of the Request, there has been undue delay in ICE's processing of these searches, including providing Plaintiff any hit counts so it can assist in streamlining the production. Please provide a hit count for records responsive to Parts 4-9, to enable the parties and the court to establish a production rate for these records and set the calendar for this case.

Finally, we would also appreciate Defendants' position on Plaintiff's proposal for an expedited processing rate, as we have discussed with the Court at the August 11, 2023 Status Conference.

Please provide the above-referenced information to Plaintiff by September 28, 2023.

4

September 14, 2023

B.      Parts 1-3

We look forward to the continued production of documents responsive to Parts 1-3 of the Request. We raise a few immediate issues with documents that have been produced that we hope that ICE can remedy:

- ICE's December 2022 Production, page 2648: This email appears to be only partially produced. The sender is a commander in the U.S. Public Health Service, responding to an email sent on July 29, 2015, with the subject line: Re: Follow-Up Requested RE: SDI update: Teka Gulema.

- ICE's July 2023 Production, pages 7197-7200. This document, titled "ERO New Orleans-Teka GULEMA, A28021556" is dated "November 10, 2022." However, it appears that this date is incorrect, perhaps an inadvertent automatic update of the processing date, as the document references a recommendation that ERO release Mr. Gulema on a letter of supervision, and because Mr. Gulema died in 2016. Please reprocess this document with the original date of the document.

- ICE's August 2023 Production, page 7504. This document appears to be a partial scan. Please provide the complete document.

- ICE's August 2023 Production, page 8313. This document, which appears to be an email between a Deputy Medical Director and another ICE employee, sent on June 3, 2019, with the subject line "RE: ES – Medina Leon 209378, El Paso AOR, Otero Processing, Detainee Death after ICE Release," appears to be incomplete, as the email produced is cut off at the top. In one part of the email chain, the employee states, "Agreed, several delays and missed opportunities to intervene appropriately. Since she passed away while not in custody then IIU will not investigate-correct?" Please produce the complete document.

- We are glad that ICE has been able to locate and produce documents related to Mr. Ibarra Bucio. However, it appears that all of the documents produced thus far are from staff of the GEO Group, Inc., which operates the Adelanto Detention Center, where Mr. Ibarra Bucio was detained prior to his death. None of the documents produced thus far regarding Mr. Ibarra Bucio originate from ICE. It is clear from the documents produced thus far that ICE employees, including the Assistant Field Office Director, received email updates, discussed custodial decisions, and ultimately decided to release Mr. Ibarra Bucio on February 22, 2019. *See e.g.* page 7848 (ICE's order to release Ibarra-Bucio from custody, Feb. 22, 2019); page 7500 (GEO memo noting "2/22/19 PER THE AFOD

5

September 14, 2023

DETAINEE IBARRA IS NO LONGER IN OUR CUSTODY"). For that reason, please ensure that ICE conducts a search of ICE employees, including the Field Office Director, Assistant Field Office Director, Supervisory Detention and Deportation Officer, and any ICE officers who worked on Ibarra-Bucio's case.

**C.      Parts 4-9**

**1.      Part 4**

In response to Defendants' September 12, 2023 email, regarding ICE's determination that Plaintiff's proposed Boolean search "exceeds the allowable number of characters," please clarify whether ICE is using Relativity software to conduct the search. If so, we believe there are ways to address this technical issue, and ask that the Defendants arrange a call with ICE's FOIA staff who has been responsible for setting up the Boolean search so we can suggest ways to address the technical issues without compromising the agreed upon parameters. Alternatively, we would be glad to request that ICE's FOIA staff be present on a status conference with the court to help resolve the issue.

Importantly, ICE's proposed amendments to the Boolean search as set forth in your September 12 email excludes keywords that are core to the content of Request No. 4, including those that are tailored to locate policies, procedures, protocols, or trainings associated with release from custody of ill detainees. As such, we cannot agree to the proposed amendments, but remain open to working with ICE and its IT staff to fashion an appropriate search consistent with its technological capabilities.

Regarding Defendants' September 1, 2023 letter, we appreciate that you have identified relevant custodians for this search.  While we believe former Acting ICE Director Tae Johnson, Deborah Fleischaker, and Scott Shuchart are appropriate custodians for the search, given that the request specifically seeks documents from ICE Health Service Corps (IHSC), the search should, at minimum, also include a custodian from IHSC. In addition, given the relevant time period of the Request, we believe ICE should also include Tae Johnson's predecessors and successors in this list. Please let us know if ICE is willing to do so.

**2.      Parts 5 and 7**

Regarding the search parameters ICE represents in its September 1, 2023 that it used for Parts 5 and 7, we do not agree that the parameters are adequate. Although the parties have agreed on search terms, as stated in our July 12, 2023 letter, in order to conduct an adequate search, ICE should conduct a search of custodians that include key personnel in its Medical Case Management and Unit Medical Care Coordination Program staff, IHSC participants in

6

September 14, 2023

Significant Detainee Illness (SDI) Meetings, as well as ICE ERO staff in communication with IHSC's Medical Case Management Unit. Plaintiff's June 26, 2023 letter provides further basis why a search of these custodians is necessary for an adequate search. Please confirm whether or not ICE will include these custodians in its search.

### 3.     Part 6

In their September 1, 2023 letter, Defendants claim simply that "OPR has completed its search and it does not have responsive records." However, a search by OPR alone does not constitute an adequate search. We remind Defendants that Part 6 of the Request also seeks spreadsheets, Significant Incident Reports (SIRs), Significant Event Notification (SEN) system, emails and other communications that would identify individuals subject to Defendants' policies and practices related to releasing ill detainees on their deathbeds. As discussed in the Plaintiff's July 12, 2023 letter, Defendants are clearly in possession of such documents, which would be recoverable using the search terms at the suggested search locations provided.

Defendants' production, for example, has indicated that ICE Enforcement and Removal Operations reports the deaths of detainees—even those that took place outside custody. See, e.g. Exh. B, OIG June 2023 Production, p. 1-2 (noting that "[o]n June 3, 2019, ICE ERO El Paso reported the death of [Johana Medina-Leon] to DHS OIG El Paso, TX."). Thus, ICE's search of only OPR, and not ERO is improper. Please let us know if ICE will rectify this issue and conduct the proposed searches.

Again, to the extent that ERO is unable to search the SIR system or the SEN system using the agreed-upon search terms, Plaintiff suggests that ICE search the records of the ICE Joint Intelligence Operations Center (JIOC), which "analyzes the SIRS and sends summaries of them to the appropriate . . . field offices." DHS, Privacy Impact Assessment for the Significant Significant Event Notification (SEN) System 1-2, Oct. 15, 2021, https://www.dhs.gov/sites/default/files/publications/privacy-pia-ice023a-sen-october2021.pdf.

### 3.     Part 8

Regarding the search parameters ICE represents in its September 1, 2023 that it used for Part 8, namely a search of records of Stewart Smith, we do not agree that the parameters are adequate, particularly because it appears ICE will exclude from its search any responsive records that it deems related to the *Fraihat v. ICE* litigation. It appears that ICE has used the *Fraihat* class definition for its internal recordkeeping purposes and labels documents related to COVID risk factors as related to this "*Fraihat*" class definition. However, ICE has cited no exemption—and can point to no basis—that would permit it to withhold documents simply because they involve the class definition in the *Fraihat* litigation. Plaintiff explained in its July 12, 2023, July 26, 2023

September 14, 2023

and May 19, 2023 letters that the available evidence indicates that ICE keeps responsive information in its "*Fraihat*" records. Please confirm whether or not ICE will search these *Fraihat* files for responsive records. If ICE will not search these files, please identify any exemption that you contend allows it not to produce responsive records in these files.

**4.      Part 9**

We appreciate ICE's further efforts to search for records responsive to Request No. 9. However, we are confused by ICE's approach to these searches, including whether it conducted the Boolean searches Plaintiff suggested. To facilitate the work ICE has done, and to narrow the results, we ask that ICE provide us the hit counts by search term that resulted in its retrieval of 16,000 emails from the Regional Field Medical Coordinators within the Medical Case Management Unit and the Regional Health Service Administrators within the Health Operations Unit. Without this information, Plaintiff does not know which of its search terms to narrow. Once ICE provides this information Plaintiff can suggest further limiting search terms and other means to narrow the results.

Notwithstanding our disagreements over the parameters of ICE's searches for Request Nos. 4-9, as discussed above we ask that ICE provide hit counts for the searches it has conducted to date by September 28, 2023, two weeks from this date. We appreciate your informing us in your September 12 email that you will be in trial next week and have taken that into account in proposing this schedule, together with our understanding that your co-counsel Mr. Jason Axe will be able to assist in timely securing this information from ICE so we can avoid further delay in completion of the searches. Absent complete receipt of this information by the requested timeframe, Plaintiff will seek a Status Conference with the Court to address the delay.

**III.      Removal of Password Restrictions on PDF Documents**

In recent months, Defendants have begun to produce FOIA records to Plaintiff in pdf files that require the use of a password to access the document. *See, e.g.* OIG productions dated July 2023, August 2023, and March 2023 (provided in September 2023). Password restrictions on pdf documents released under FOIA are unnecessarily burdensome, and restricts anyone, including the media or members of the public from viewing the files without the password. Password-restricted files also hamper the Plaintiff's ability to share excerpts of the pdf documents as exhibits with the Court on the CM/ECF system, which does not allow filing of such documents. *See* U.S. District Court, Central District of California, *Technical PDF Related Questions*, https://www.cacd.uscourts.gov/e-filing/faq/pdf-related%20questions ("PDFs with the following content will be rejected . . . encrypted or password-protected").

September 14, 2023

As referenced in our September 6, 2023 email, Plaintiff requests that Defendants provide the password-restricted pdf documents in a format that does not require the use of a password to open the file, and to ensure continued production of documents without password restrictions. Alternatively, Plaintiff can request the Court's guidance as to how parties should share FOIA documents with password restrictions with the Court in future filings.

<div align="center">***</div>

Please do not hesitate to contact me if you would like to address any of these matters by teleconference.

Sincerely,

LABONI A. HOQ (SBN 224140)
laboni@hoqlaw.com
HOQ LAW APC
P.O. Box 753
South Pasadena, California 91030
Telephone: (213) 973-9004

EUNICE CHO (pro hac vice)
echo@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
NATIONAL PRISON PROJECT
915 Fifteenth Street NW, 7th Floor
Washington, DC 20005
Telephone: (202) 548-6616

MICHAEL KAUFMAN (SBN 254575)
MKaufman@aclusocal.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, California 90017 Telephone: (213) 977-9500
Facsimile: (213) 915-0219

KYLE VIRGIEN (SBN 278747)
kvirgien@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
NATIONAL PRISON PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (202) 393-4930

*Attorneys for Plaintiff*

# EXHIBIT Q



# United States Department of Justice

## United States Attorney's Office
## Central District of California

*JOSEPH W. TURSI*
*JASON K. AXE*
*Assistant United States Attorney*
*Phone:  (213) 894-3989/8790*
*E-mail:  Joseph.Tursi@usdoj.gov*
*        Jason.Axe@usdoj.gov*

*Federal Building*
*300 N. Los Angeles Street, Suite 7516*
*Los Angeles, California 90012*

October 10, 2023

**VIA E-MAIL**

Laboni A. Hoq
Hoq Law, APC
P.O. Box 753
South Pasadena, CA 91030

      Re:    ACLU of SoCal v. ICE, et al.
              C.D.CA Case No. 2:22-cv-04760-SHK

Dear Ms. Hoq:

The following responds to your September 14, 2023 correspondence regarding Plaintiff's FOIA request directed to ICE. It also follows our letter dated October 2, 2023, providing responses with the portion of the FOIA request directed to OIG.

### A.  Production Rate

As of today's date, with respect to Parts 1-3 of Plaintiff's FOIA request, there are approximately 10,200 pages remaining to be processed out of the approximately 12,000 initially determined to be potentially responsive. Please note that this page number is subject to change as ICE works to ensure that all of Mr. Bucio's records have been located and processed.

Regarding the documents related to Teka Gulema, as noted in our September 1st correspondence, ICE sought to gain further clarity on the remaining Gulema records. However, after further review, ICE is unable to separate out pages for Mr. Gulema created after October 1, 2015. ICE attempted to do so by using the "date created" function, but it did not obtain accurate results. ICE will therefore continue to process the records, which include those related to Mr. Gulema. If your client wishes to waive production of documents related to Mr. Gulema that were created before October 1, 2015, please let us know. It is still not clear to us why the number of documents created after October 1, 2015 is relevant to that determination. Regardless, unless ICE hears otherwise, it will continue processing all records pursuant to the terms of the request.

As set forth in our September 12th email, ICE has obtained a hit count of over 530,000 documents using the terms Plaintiff identified for Part 4 of the FOIA request. As described more fully below, ICE's search for documents responsive to Part 5 resulted in 122 documents (551 pages), and its search for documents responsive to Part 8 resulted in 64 documents (1,711 pages).

Ms. Laboni A. Hoq
RE: ACLU of SoCal v. ICE
October 10, 2023
Page 2

Regarding an "expedited processing rate," although the number of potentially responsive documents is greater now than what ICE initially anticipated, that number has no relation to the processing rate that ICE should be required to undertake. Plaintiff's broad search requests, resulting in potentially large numbers of documents to review, do not take precedence over requests (many of which are more narrowly tailored) submitted by other FOIA requesters. There is a finite limit as to the number of documents that ICE staff can review each month, and every page reviewed with respect to Plaintiff's FOIA request means a page responsive to another person's request that cannot be reviewed. Once again, ICE asks that your client work to narrow and focus its requests to bring the total number of potentially responsive documents down to a more reasonable number. But to the extent that your client is unwilling or unable to do so, that decision does not entitle it to priority over other FOIA requesters, including those who are receiving monthly productions without filing lawsuits and those who have court ordered production rates. As explained in the previously filed declaration from ICE's FOIA Director (Dkt. 48-1), the processing rate in this case of 1,000 pages per month *exceeds* the normal rate. Therefore, Plaintiff is already receiving an "expedited processing rate," and an even greater processing rate is neither appropriate nor warranted.

**B.  Parts 1-3**

ICE's response to your questions regarding documents that have already been produced is as follows:

- ICE's December 2022 Production, page 2648: ICE will attempt to locate the complete email.

- ICE's July 2023 Production, pages 7197-7200: There appears to be some confusion. These pages are not what consistent with Plaintiff's characterization. Please confirm the Bates Stamp range or provide the three pages of documents you are referring to.

- Bates Stamp 7504: ICE will attempt to locate the complete document.

- Bates Stamp 8313: ICE will attempt to locate the complete email.

- ICE employees, including the AFOD, conducted searches for Mr. Bucio and found records. They will be processed in due course.

**C.  Parts 4-9**

**1.  Part 4**

In response to your inquiry, ICE is using Relativity software to conduct the second part of the search involving the Boolean connectors. On September 12, 2023, we explained by email that the first part of the search resulted in over 530,000 potentially responsive documents.

Ms. Laboni A. Hoq
RE: ACLU of SoCal v. ICE
October 10, 2023
Page 3

However, Plaintiff's proposed Boolean connector search could not be run because it exceeds the allowable number of characters. ICE proposed using the following connector terms, essentially removing the terms that were *already* included in the initial search: custody OR death OR died OR deceased OR decedent OR discharge OR surgery OR specialist OR COVID-19 OR hospital OR ambulance OR "emergency services" OR "poor outcome" OR "offsite referral" OR unconscious OR "medical observation" OR ICU OR "critical condition" OR fatal) AND (release OR transfer OR benefits OR parole OR "alternative detention" OR discharge OR OSUP OR "order of supervision" OR humanitarian). Please advise if that is acceptable, and if not, please provide alternative connector terms and identify exactly what your client's concerns are with the proposed connectors. Furthermore, if you have any "ways to address . . . technical issues," please provide them to us in writing. ICE declines your request to speak directly with its IT staff on this issue.

ICE does not agree at this time that a search of the predecessors or successors of Tae Johnson is necessary. ICE will reevaluate that position as its search for records responsive to Part 4 progresses. As for your request that a custodian from IHSC conduct a search, such a search was undertaken by Stewart Smith, the Assistant Director of IHSC, who ran a search of his entire email archive, with no date restriction for Parts 5 and 8 using many of the same search terms as in Part 4. As a result, a further search of IHSC is not necessary.

### 2.  Parts 5 and 7

With respect to Part 5, the Boolean connector search was run and resulted in 122 documents (551 pages). They will be placed in queue for processing. As for your suggestion that ICE "conduct a search of custodians that include key personnel in its Medical Case Management and Unit Medical Care Coordination Program staff, IHSC participants in Significant Detainee Illness (SDI) Meetings, as well as ICE ERO staff in communication with IHSC's Medical Case Management Unit," such a search would be overly burdensome because it would encompass <u>nearly</u> every staff member in the referenced locations.

### 3.  Part 6

This part specifically seeks documents *created by* DHS OIG or ICE OPR. Your characterization of the request as seeking "spreadsheets, Significant Incident Reports (SIRs), Significant Event Notification (SEN) system, emails and other communications that would identify individuals subject to Defendants' policies and practices related to releasing ill detainees on their deathbeds" omits the qualifying language in the request itself, "***created by DHS OIG or ICE OPR***." ICE OPR was tasked with a search and did not find any responsive records. Plaintiff's attempt to amend its request to seek additional information is inappropriate. If Plaintiff would like to obtain information on specific detainees, it can submit a FOIA request providing the identifying information to ICE, and the specific records will be searched for.

Ms. Laboni A. Hoq
RE: ACLU of SoCal v. ICE
October 10, 2023
Page 4

### 4.  Part 8

The Boolean connector search has now been run for this request, and the resulting hit count is 64 documents, consisting of 1,711 total pages (375 pages if excel files are excluded). These documents will be placed in queue for processing.

The initial search was conducted by Stewart Smith, the Assistant Director of IHSC. Mr. Smith searched the following agreed upon search terms: (1) Ambulance; (2) 911; (3) Emergency; (4) "offsite referral"; (5) "life support"; (6) Coma; (7) Ventilator; (8) "intensive care"; (9) "critical condition"; (10) "poor outcome"; (11) Hospice; (12) Palliative; (13) Death; (14) Died; and (15) Deceased. Once his emails were obtained, the following agreed upon Boolean connectors were used to obtain the final results: (detainee or custody) AND (death or died or deceased or surgery or specialist or COVID19 or hospital! or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal) AND (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian or "order of recognizance").

Your September 14th correspondence appears to misinterpret ICE's intentions with respect to this part. ICE does not intend to exclude from its production *any* records related to the *Fraihat v. ICE* litigation. Should records related to *Fraihat* appear in the search results to this request, and if those records are deemed responsive to Plaintiff's original FOIA request, ICE will process them accordingly. What ICE will not agree to is specifically searching for documents from the *Fraihat* litigation as Plaintiff did not request these documents in its original FOIA request.

### 5.  Part 9

In our September 1, 2023 letter, we explained that a preliminary search by just *one* of ICE's Regional Health Service Administrators using the search terms your client proposed ("Death," "Died," "Deceased," "Ambulance," "Emergency," "Hospital," "offsite referral," "life support," "Coma," "Ventilator," "Intensive care," "critical condition," "Hospice," "Palliative," or "Release") yielded 16,000 emails (not pages), most of which appeared not to be related (or only peripherally related) to one of the proposed search terms.

As a result, we wrote that ICE requested clarification from you regarding the specific types of records your client seeks so ICE can adequately craft a search that will result in fewer initial hits. Alternatively, ICE proposed (a) adding a second term such as "bill," "invoice," etc. to the preliminary search to reduce the number of records initially identified, or (2) pairing search terms, e.g., "Death + record," "Ambulance + invoice," and "Hospital + bills."

In your September 14, 2023 letter, you did not respond to ICE's inquiry regarding what specific types of records your client is seeking. That failure makes it harder for ICE to undertake

Ms. Laboni A. Hoq
RE: ACLU of SoCal v. ICE
October 10, 2023
Page 5

a search for records. Therefore, we again ask that you clarify what specific types of records your client is seeking here. Your letter also failed to accept either of ICE's proposals to help narrow the search. Instead, you asked ICE to provide hit counts for each separate search term. Part 9 requests "Bills, invoices, charges, or records of payment." Please explain why ICE's proposal to add a second term, such as "bill," "invoice," etc. to the search terms is not acceptable to Plaintiff to help narrow the initial search for records, which yielded 16,000 emails. Alternatively, please explain why ICE's proposal to pair search terms is also not acceptable. Should we not receive a response, ICE will proceed with your request to put the 16,000 emails in Relativity and run the Boolean search. It will thereafter process those records.

### 6.  Referred Documents

In an attempt to clarify some confusion with respect to documents referred to ICE from OIG, ICE has received and is processing the 328 pages from June 2023. ICE will then process the final referral of 583 pages.

### D.  Removal of Password Restrictions

In your September 14th email, you ask that Defendants not produce FOIA records in pdf files that require the use of a password to access. The only records that have been provided that have been password restricted are those sent via email from OIG, as that is their protocol. But OIG has now completed its search and production, so this issue appears to be moot. Regardless, once you receive a PDF that is password protected, you are free to take whatever action you like with that document to remove any password protection, including printing it using, for example, the Microsoft Print to PDF function. We suggest you consult with your IT professionals for further assistance with that process.


Respectfully,

E. MARTIN ESTRADA
United States Attorney

/s/ *Joseph W. Tursi*

JOSEPH W. TURSI
Assistant United States Attorney

cc: Ms. Eunice Cho (by email)
   Mr. Michael Kaufman (by email)
   Mr. Kyle Virgien (by email)