E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section
JOSEPH W. TURSI (Cal. Bar No. 300063)
JASON K. AXE (Cal. Bar No. 187101)
Assistant United States Attorneys
     Federal Building, Suite 7516
     300 North Los Angeles Street
     Los Angeles, California 90012
     Telephone: (213) 894-3989 | 8790
     Facsimile: (213) 894-7819
     E-mail: Joseph.Tursi@usdoj.gov
          Jason.Axe@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF SOUTHERN CALIFORNIA, <br><br>     Plaintiff, <br><br> v. <br><br> UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, et al. <br><br>     Defendants. | No. 2:22-cv-04760-SHK <br><br> **DECLARATION OF FERNANDO PINEIRO** <br><br><br> Honorable Shashi H. Kewalramani <br> United States Magistrate Judge |

1

## DECLARATION OF FERNANDO PINEIRO

I, Fernando Pineiro, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am the FOIA Director of the U.S. Immigration and Customs Enforcement ("ICE") Freedom of Information Act Office (the "ICE FOIA Office"). The ICE FOIA Office is responsible for processing and responding to all Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and Privacy Act, 5 U.S.C. § 552a, requests received at ICE. I have held this position since August 14, 2022, and I am the ICE official immediately responsible for supervising ICE responses to requests for records under the Freedom of Information Act, 5 U.S.C § 552 (the FOIA), the Privacy Act, 5 U.S.C. § 552a (the Privacy Act), and other applicable records access statutes and regulations. Prior to this position, I was the Deputy FOIA Officer of the ICE FOIA Office from December 29, 2013, to August 13, 2022, and prior to that I was the FOIA Officer for three years at the Office for Civil Rights and Civil Liberties ("CRCL") at the U.S. Department of Homeland Security ("DHS").

2.      As the FOIA Director, my official duties and responsibilities include the general management, oversight, and supervision of the ICE FOIA Office regarding the processing of FOIA, 5 U.S.C. § 552, and Privacy Act, 5 U.S.C. § 552a, requests received at ICE. In connection with my official duties and responsibilities, I am familiar with ICE's procedures for responding to requests for information pursuant to the FOIA and the Privacy Act.

3.      I make this declaration in my official capacity in support of Defendants' Opposition to Plaintiff's Request for Scheduling Order and FOIA Processing Rate in the above-captioned action. I make this based on my personal knowledge, my review of records kept by ICE in the ordinary course of business, and information provided to me by other ICE employees in the course of my official duties.

**RECENT STATISTICS REGARDING FOIA REQUESTS SUBMITTED TO ICE**

4.      As of October 2023, the ICE FOIA Office is processing approximately 32,456 open FOIA requests addressing a backlog of 29,398 FOIA requests. There are approximately 161 open federal district court cases, and 69 cases in active record production. For cases in litigation, the processing of those FOIA requests is handled by the ICE FOIA Litigation Processing Unit.

5.      In fiscal year ("FY") 2020, the number of FOIA requests the ICE FOIA Office handled dramatically increased to over 100,000 from approximately 64,000 in FY 2019. Since FY 2020, that number has continued to increase, with the ICE FOIA Office handling approximately 105,000 requests in FY 2021 and over 110,000 requests in FY 2022. This spike in ICE FOIA's workload is attributed to an increase in the number of requests from individuals for documents in their immigration file coupled with increased public interest in the Department's implementation of Presidential and/or Executive Orders.[1]

**COMPLEXITY AND VOLUME OF FOIA REQUESTS RECEIVED BY ICE**

6.      In addition to the increasing volume of FOIA requests, ICE has also experienced an increase in the complexity of FOIA requests, both in terms of volume and substance. For example, the ICE FOIA Office frequently receives requests with multiple sub-parts comprising several pages, requests requiring searches of numerous program offices, and requests with searches that yield a universe of records containing thousands of pages to review and process. These FOIA requests take considerably longer to process due to extensive searches and the intricacy of the documents and/or data produced.

7.      In response to the increasingly heavy workload, the ICE FOIA Office has adopted the court-sanctioned practice of generally handling backlogged requests on a

---

[1] The FOIA Project Freeing Information through Public Accountability (December 14, 2021) http://foiaproject.org/2021/12/14/november-2021-foia-litigation-with-five-year-monthly-trends/.

3

"first-in, first-out basis," which ensures fairness to all FOIA requestors by not prioritizing one request over another. *See, e.g., Open America v. Watergate Special Prosecution Force*, 547 F.2d 605, 614-16 (D.C. Cir. 1976) ("As a general rule, agencies process FOIA requests on a 'first-in, first-out' basis, according to the other in which they are received."); *see also* Dep't of Just. Guide to the Freedom of Information Act, Procedural Requirements at 37 *available at* https://www.justice.gov/media/1162791/dl?inline. This practice applies to requests that are in litigation. The reason for this is that the principle of fairness to all requestors would be jeopardized were a requestor permitted to "jump the line" simply by virtue of filing a case in U.S. District Court. Generally, the only exception to this is where a court orders processing at rates above the ICE FOIA Office's current processing rate for all cases.

## CURRENT WORKLOAD OF THE ICE FOIA LITIGATION PROCESSING UNIT

8.     The ICE FOIA Litigation Processing Unit's workload has increased such that as of October 2023, it is handling 161 active FOIA litigations, of which, 69 litigations have monthly rolling productions. ICE's normal processing rate for cases in litigation is 750 pages or 7.5 minutes of media files, per month, per case. This means, on average, the ICE FOIA Litigation Unit is currently processing approximately 51,000 pages of potentially responsive records each month.

9.     The ICE FOIA Litigation Processing Unit also drafts, assigns, and tracks any and all searches for responsive documents concerning FOIA litigations. The FOIA litigation search taskings frequently span dozens of ICE program and field offices and require the Unit to keep track of hundreds of thousands of responsive records, as well as the documentation from searches of the program offices and field offices.

10.     The ICE FOIA Litigation Processing Unit has collateral duties, in addition to processing documents pursuant to litigation. For example, the processing unit prepares various reports for statistical tracking, responds to Congressional inquiries and requests

for records, redacts Prison Rape Elimination Act reports, sends out FOIA Exemption (b)(4) submitter notices, and manages litigation consults and referrals from other agencies. Additionally, the processing unit supports attorneys in the ICE Office of the Principal Legal Advisor with federal FOIA litigation, by assisting in the creation of *Vaughn* indexes, reviewing declarations, and coordinating on joint status reports to the court. These collateral duties are within the scope of the FOIA and are required.

11.     To meet its obligations for all cases in litigation by ensuring that all of the FOIA matters progress, and to ensure that each requester receives a response, the ICE FOIA Office typically cannot process more than 750 pages or 7.5 minutes of media files per month per case. Any increase in production for one case will inevitably hinder ICE FOIA's ability to process records for production in other matters.

12.     Moreover, the ICE FOIA Office typically cannot *produce* a set number of pages per month. Depending on the volume of records located in the search tasking phase of the administrative stage and/or FOIA litigation, if the Court were to order ICE FOIA to *produce rather than a review/process* a certain number of pages per month, it is entirely plausible that the processors would have to review hundreds, or even thousands, of additional pages on top of the 750 pages that are attainable, in order to get to the requisite *production* number. ICE FOIA is incapable of achieving this outcome based on finite resources competing priorities, litigation and non-litigation deadlines, and the sheer volume of overall work.

13.     Due to the FOIA Office's limited resources, requiring ICE to process significantly more pages per month in this case would divert resources to Plaintiff's FOIA requests at the expense of other FOIA requesters. Therefore, ICE respectfully requests that the Court keep in place the current scheduling order that is consistent with the approach outlined above and was previously agreed to by the parties in this case.

## PROGRESS ON THE INSTANT CASE

14.     In the instant case, Plaintiff's FOIA request is complex. The request is extremely broad and contains many subparts.  Despite this, ICE has conducted multiple

searches in response to Plaintiff's FOIA requests and has gathered over 48,000 potentially responsive pages to date.

15.     The following information contains a summary of the status of some of the searches.  It is not intended to serve as a comprehensive declaration setting forth the searches conducted to date, nor is it intended to demonstrate the adequacy of the search, as required in an action brought pursuant to FOIA.  Instead, the information provided below is merely intended to respond to Plaintiff's Request and to provide the Court with greater context regarding the status of Plaintiff's FOIA requests.

16.     Although ICE initially estimated that the number of responsive pages was far less than the approximately 48,000 pages that have been identified to date, it is common in FOIA cases that estimates made regarding the total number of responsive records at the beginning of litigation often change drastically once a search is initiated.

17.     With respect to Request Nos. 1-3, the search resulted in over 41,000 pages of potentially responsive documents. ICE was able to de-duplicate the records and conduct email threading to reduce the number to approximately 12,000 pages. There are currently approximately 9,000 pages remaining to be processed for Request Nos. 1-3.

18.     Plaintiff then requested that the records of one of the decedents mentioned in Request No. 1, Teka Gulema, be sorted by date, specifically seeking records dated October 1, 2015 and after. After initially determining that it was unable to satisfy that request, ICE has now determined that it is able to perform this task, and it has identified approximately 318 pages of records dated October 1, 2015 and after that remain to be processed for Mr. Gulema. ICE was able to identify these records, after previously not having success, by using the *entire* set of responsive records, rather than just the records that had been "email threaded."

19.     With respect to Request No. 4, ICE agreed to search the emails of Tae Johnson (former Acting Director of ICE), Deborah Fleischaker (Assistant Director for Regulatory Affairs and Policy at ICE), and Scott Shuchart (Senior Advisor to the ICE Director) for the following agreed upon search terms:

6

(1) Directive; (2) Policy; (3) Protocol; (4) Procedure; (5) Training; (6) Guidance; (7) Instruction; (8) Standard; (9) Death; (10) "offsite referral"; (11) "emergency room"; (12) "emergency department"; (13) "life support"; (14) Coma; (15) Ventilator; (16) "intensive care"; (17) Hospice; (18) palliative; and (19) release.

20.     The search resulted in approximately 530,000 documents (not pages). The parties agreed that the second part of the search would involve using Relativity software to search for Boolean connectors. The agreed upon Boolean connectors were as follows:

(directive or policy or policies or protocol or procedure or training or guidance or instruction or standard) AND (custody or death or died or deceased or decedent or discharge or surgery or specialist or COVID-19 or hospital or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal) AND (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian).

21.     ICE attempted to run the Boolean connector search, however, the search could not be run as it exceeded the allowable number of characters. In an effort to work with Plaintiff to complete the search, ICE proposed using the following connector terms, essentially removing the terms that were already included in the initial search:

custody OR death OR died OR deceased OR decedent OR discharge OR surgery OR specialist OR COVID-19 OR hospital OR ambulance OR "emergency services" OR "poor outcome" OR "offsite referral" OR unconscious OR "medical observation" OR ICU OR "critical condition" OR fatal) AND (release OR transfer OR benefits OR parole OR "alternative detention" OR discharge OR OSUP OR "order of supervision" OR humanitarian).

22.     Plaintiff rejected ICE's suggestions and instead suggested in their October 19, 2023 correspondence that ICE run the Boolean search in two separate parts. Defendant has no objection to this and has run the search in the manner suggested by Plaintiff. The search resulted in over 142,000 documents (not pages).

23.     For Request No. 4, Plaintiff has also requested that the emails of the Directors of ICE prior to Tae Johnson from 2016 through 2021 be searched. This

includes emails of five additional individuals. ICE has no objection to running these searches, although obtaining and searching their archived emails could take several weeks.

24.     As noted in ICE's correspondence dated October 10, 2023, Dkt. 57-2 at 128-132, regarding Request No. 5, ICE ran a search of the emails of Dr. Stewart Smith, Assistant Director for IHSC. The search was made using agreed upon search terms. After obtaining the search results, the records were then searched using agreed upon Boolean connectors. The search resulted in 551 pages of potentially responsive documents, and the records will be processed in due course.

25.     Plaintiff has requested that, in response to Request No. 5, ICE conduct a search of *all* ICE officials who participate in the Significant Detainee Illness process, *all* of ICE's Medical Case Management Unit, and *all* Medical Care Coordination staff. There are 233 IHSC employees who participated in the Signification Detainee Illness process from 216 to present. The number of ICE employees that have been a part of ICE's Medical Case Management Unit from 2016 to present is 376. The number of ICE employees that have been part of the Medical Care Coordination staff (i.e., managed care coordinators) from 2016 to present is 35. As a result. this request is overly broad and unduly burdensome. It is ICE's position that this search is complete, and the records will be processed in due course.

26.     Regarding Request No. 6, ICE reads this request as specifically seeking documents *created by* DHS OIG or ICE OPR. As such, ICE OPR was tasked with a search and did not find any responsive records. Plaintiff claims that ICE is reading the request too narrowly and that it is not only seeking documents created by DHS OIG and ICE OPR, but also requesting spreadsheets, emails, SIRs and SENs within the possession of ICE. As Plaintiff has been made aware, SIRs and SENs are generated at the field office level. There are 25 field offices. In order to conduct a search for SIRs and SENs that mention the release from custody of (a) hospitalized detainees; (b) detainees who at the time of release were patients in the care of external healthcare providers or

8

facilities; or (c) detainees released from custody immediately prior to transfer to an emergency room, hospital, or external care facility, each ERO field office would need some type of identifying information, such as name, date of event or alien number.

27.    For Request No. 7, ICE agreed to ask OPR to run a search of agreed upon search terms. OPR found no responsive records. Just as in Request No. 6, if Plaintiff would like SIRs and SENs from a specific field office that mention the death of any detainee who had been previously released from custody while (a) hospitalized; or (b) a patient in the care of an external healthcare provider or facility; or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility, then they need to provide identifying information, such as name, date of event or alien number.

28.    For Request No. 8, a search was run of the emails of Dr. Stewart Smith using agreed upon search terms. A secondary search was run using agreed upon Boolean connectors. The search resulted in 1,711 pages of potentially responsive documents. This search is complete and these records will be processed in due course.

29.    For Request No. 9, ICE tasked nine Regional Field Medical Coordinators (FMCs) and Regional Health Service Administrators (HSAs) to search their emails for search terms that were agreed upon with the Plaintiff. A preliminary search by just one of ICE's HSAs yielded over 16,000 emails (not pages), most of which appeared not to be related (or only peripherally related) to one of the proposed search terms.

30.    As a result, ICE requested clarification from Plaintiff regarding the specific types of records Plaintiff was seeking so that ICE could adequately craft a search that would result in fewer initial hits. Alternatively, ICE proposed (a) adding a second term such as "bill," "invoice," etc. to the preliminary search to reduce the number of records initially identified, or (2) pairing search terms, e.g., "Death + record," "Ambulance + invoice," and "Hospital + bills." In their October 19, 2023 correspondence, Plaintiff suggests using different search terms and Boolean connectors. Plaintiff further requests that ICE search the Resource Management Unit Staff and the ICE Office of the Chief

Financial Officer. Individuals at ICE who are subject matter experts on the information requested believe that the custodians most likely to possess responsive records are the Regional Field Medical Coordinators and the Regional Health Service Administrators within IHSC. If Plaintiff is agreeable, ICE will task these nine individuals with conducting searches using the search terms and connectors suggested by Plaintiff.

31.    The current processing rate in this case is 1,000 pages per month, as ordered by the Court. ICE has routinely processed 1,000 or more pages each month and provided each production timely, if not early.

32.    Due to the FOIA Office's limited resources, requiring ICE to process significantly more pages per month in this case would divert resources to Plaintiffs' FOIA requests at the expense of other FOIA requesters.

33.    Plaintiff's request to begin processing records prior to searches being completed is contrary to how the ICE FOIA Office typically operates and would result in increased workload, duplication of records and inefficiency in processing.

34.    ICE is processing the records in the order they were requested, as is its custom and practice.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.


Executed on _____, at Washington, D.C.



_____
Fernando Pineiro FOIA Director
Freedom of Information Act Office
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
500 12th Street, S.W., Stop 5009
Washington, D.C. 20536-5009