October 19, 2023

Joseph Tursi
Jason Axe
Alarice Medrano
United States Attorney's Office
Central District of California
300 N. Los Angeles St. Suite 7516
Los Angeles, CA 90012
Joe.Tursi@usdoj.gov
Jason.Axe@usdoj.gov
Alarice.Medrano@usdoj.gov

*SENT VIA EMAIL*

Re: *ACLU of Southern California v. United States Immigration and Customs Enforcement, et al.,* No. 2:22-cv-4760 (C.D. Cal.)

Dear Counsel:

We write in response to Defendants' October 10, 2023 letter regarding the Parties' ongoing efforts to address the adequacy of Defendants' searches for and production of records in response to Plaintiff's FOIA Request.

To ensure Defendants' completion of the remaining searches for responsive records, and Plaintiff's prompt receipt of them, we ask that Defendants respond to each of the outstanding issues below within two weeks of this date, by November 2, 2023.

## I. Processing Rate

Plaintiff initially agreed to a processing rate of 1,000 pages per month by each Defendant based on Defendants' representation that, based on their hit counts, they "currently anticipate[d]" production of all documents responsive to all nine parts of Plaintiff's FOIA request to conclude in "May 2023." Dkt. 39-1 at 3. It is now apparent that Defendants' hit counts significantly undercounted the universe of responsive documents. Based on the current number of pages to be processed, ICE will complete its production in response to Parts 1 to 3 in August of 2024, at which point it will begin processing an as-yet-unknown number of documents for Parts 4 to 9.

ICE has indicated an unwillingness to consider any deviation from the existing processing rate. Thus, in order to remedy this significant delay in the resolution of this case, Plaintiff will request that the court modify the production rates it ordered. Plaintiff will first request that the Court require Defendants to process records responsive to Parts 1 to 3 in parallel with records responsive to Parts 4 to 9. Plaintiff will not request any increase in the rate as to Parts 1 to 3 at

EXHIBIT 2
13

October 19, 2023<br>2

this time. It will thus request that the Court order each Defendant with remaining records to process them at a rate of 1,000 pages per month for records responsive to Parts 1 to 3.

For Parts 4 to 9, Plaintiff will request a rate calculated to result in completion of Defendants' production responsive to Parts 4 to 9 by June 11, 2024. That is, Plaintiff will request that the Court order each Defendant with remaining records process them at a rate equal to that Defendant's total page count for Parts 4 to 9 divided by six, rounding up to the nearest whole page, not to exceed 5,000 pages per month. *See, e.g., Clemente v. FBI*, 71 F. Supp. 3d 262, 269 (D.D.C. 2014) (ordering agency to process 5,000 records a month); *Elec. Privacy Info. Ctr. v. FBI*, 933 F. Supp. 2d 42, 48-50 (D.D.C. 2013) (rejecting claim that "'exceptionally large number' of FOIA cases involving the agency currently in litigation" justified only processing 1,500 pages per month, and ordering significantly higher volume in response to plaintiff's request); *Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enf't Agency*, 811 F. Supp. 2d 713, 731 (S.D.N.Y. 2011) (ordering ICE to fully respond to an outstanding FOIA request that required producing over 14,000 pages in one month).

## II. DHS-OIG Production

With respect to documents located by OIG, but referred to ICE, Defendants have informed us that ICE has received and is processing 328 pages received from OIG from June 2023, and will also process the final referral of 583 pages. Plaintiff requests that after ICE processes these documents, that they be produced by OIG such that Plaintiff can understand which documents were reviewed by OIG as part of its investigation into Mr. Gulema, Mr. Vargas Arellano, Mr. Ibarra Bucio, or Ms. Medina Leon.

For the records OIG referred to DHS components other than ICE, Defendants have not responded to our request that they conduct a search for responsive records in those components, including the DHS Privacy Office, the DHS Office of Civil Rights and Customs and Border Protection (CBP). Please inform us whether Defendants will agree to conduct independent searches of these DHS components.

## III. Parts 1 to 3: Ordering and Narrowing of Production and Rate of Production

Plaintiff addresses the several issues the parties have discussed related to Parts 1 to 3.

*First*, Plaintiff reiterates its request that ICE provide a hit count for the number of pages remaining to be processed for Parts 1 to 3 that relate to each of the four people Plaintiff identified in its Request. **Please provide those page counts by November 2, 2023.**

*Second*, Plaintiff also reiterates its request that ICE provide a count of the number of pages of documents related to Mr. Gulema dated after October 1, 2015, so that Plaintiff can attempt to

EXHIBIT 2<br>14

October 19, 2023
3

waive production of the remainder of the documents related to Mr. Gulema by ICE[1] (without waiving Plaintiff's right to later provide "positive indications of overlooked materials" under *Transgender L. Ctr. v. Immigr. & Customs Enf't*, 46 F.4th 771, 780 (9th Cir. 2022)). Plaintiff understands ICE's current position that it is "unable to separate out pages for Mr. Gulema created after October 1, 2015." October 10, 2023 Letter. However, this appears to be a result of a document-collection issue that ICE could readily fix. ICE has made clear that it can filter by date, representing in a declaration that "date ranges can be applied to further narrow the scope" of documents after they have been collected and threaded. Dkt. 38-1 at ¶ 19; see also *id*. at ¶ 18.c (explaining that ICE's email collection and processing system is able to use "Email From, Email To, **Email Date**, and Email Subject headers" for processing) (emphasis added). Rather, ICE represented that this filtering "did not obtain accurate results" because the metadata was incorrect. October 10, 2023 Letter. It thus appears that ICE collected the documents in a way that altered their metadata, and that ICE could remedy this issue by simply collecting the documents again in a forensically proper way. Plaintiff is happy to work with ICE's technical staff to assist them in these efforts to collect the documents again. Defendants have declined to make these technical staff available when Plaintiff has made previous, similar requests, so Plaintiff will move the Court for an order requiring ICE to make them available. **If ICE is willing to make these technical staff available, please let us know as soon as possible so that we can avoid taking that issue to the Court.**

*Third*, Plaintiff has consistently requested that ICE sequence their processing of documents responsive to Parts 1 to 3 in the following order:

- Documents related to Mr. Gulema that post-date October 1, 2015
- Documents related to Mr. Ibarra Bucio
- Documents related to Ms. Medina Leon
- Documents related to Mr. Vargas Arellano
- The remainder of the documents related to Mr. Gulema

*See* Plaintiff's June 26 Letter. As discussed above, Defendants have yet to be able to segregate Mr. Gulema's documents by date, so at the moment, Plaintiffs request that Defendants give top priority to documents related to Mr. Ibarra Bucio.

*Fourth*, we had previously identified deficient documents responsive to Parts 1 to 3 in our September 14, 2023 correspondence. Please produce the requested corrected documents by November 20, 2023. To address ICE's confusion about pages 7197-7200, we have attached it for your convenience as Exhibit A.

---

[1] Please note that Plaintiff has requested documents related to Mr. Gulema from DHS-OIG. Although DHS-OIG has referred these documents to ICE, Plaintiff will not waive its request for production of the DHS-OIG documents related to Mr. Gulema dated prior to Oct. 1, 2015.

EXHIBIT 2
15

October 19, 2023
4

### IV. Parts 4 to 9: Finalizing Search Parameters and Proposed Production Rate

The following responds to the remaining issues with ICE's searches for and processing of records for Parts 4 to 9. We again request that ICE make available IT staff tasked with conducting and processing these searches to confer with Plaintiff's counsel, so we can address any technical issues without further delay.

#### A. Part 4

As Plaintiff understands the status of ICE's efforts to respond to this Part, there are two primary issues.

*First*, Plaintiff lacks clarity about what locations Defendant is searching for Part 4. Plaintiff's understanding is that ICE has conducted a search resulting in 520,000 records. However, Defendant has not specified the custodians and search locations for this search. Defendant has previously stated that it would search for records from the following custodians: Tae Johnson, Deborah Fleischacker, and Scott Schuchart. September 1, 2023 Letter. Please identify and confirm which custodians ICE searched in response to Part 4 so that Plaintiff can assess the adequacy of these efforts.

Plaintiff notes that, although it may identify additional deficiencies, ICE's search was certainly deficient at least in that was not calculated to return any IHSC policies, which explicitly fall under the language of Part 4. Plaintiff understands that ICE did not search any IHSC custodian for Part 4. ICE has taken the position that this search is unnecessary because "such a search was undertaken by Stewart Smith, the Assistant Director of IHSC, who ran a search of his entire email archive, with no date restriction for Parts 5 and 8 using *many* of the same search terms as in Part 4.") October 10, 2023 Letter (emphasis added). This is insufficient. Parts 5 and 8 involve different records and different search terms. For example, ICE's searches for those Parts lack terms related to training and protocols. ICE must remedy this deficiency by including an IHSC custodian to be searched for this Part. **Please confirm by November 2, 2023, that ICE will agree to this remedy.**

*Second*, ICE's proposal for search terms is flawed. As Plaintiff explained in its September 14 letter, ICE's proposed Boolean search terms exclude limiting keywords core to the content of Request 4, and the results are accordingly vastly overinclusive. Defendants claim that the Boolean connector search cannot be run because it exceeds the allowable number of characters. Our understanding is that Relativity limits search strings to 450 characters, and that, when a user needs to run a search exceeding this number of characters, the user may do so by using saved searches to break up the search string into multiple searches. Plaintiff thus proposes that Defendants run two separate Boolean searches:

EXHIBIT 2
16

October 19, 2023
5

- Defendants first should search for the following keywords: (directive or policy or policies or protocol or procedure or training or guidance or instruction or standard) **AND** (custody or death or died or deceased or decedent or discharge or surgery or specialist or COVID-19 or hospital or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal). This search string is under 450 characters. Defendants should save the results of this Boolean search.
- After running this first Boolean search, Defendants should then conduct a search for documents that fall within these saved search results and include at least one of the following keywords: (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian). This second string, again, is under 450 characters.

**Please provide the page count of the results of this search, along with any additional technical questions you may have for us, by November 2, 2023. If Plaintiff is incorrect about the character limit or this proposal otherwise does not work, please explain specifically why it is not possible by November 2, 2023.**

Additionally, Plaintiff continues to believe that a conversation between Plaintiff's counsel and ICE's FOIA staff would help to overcome this technical issue. Plaintiff thus reiterates its request to speak with ICE's FOIA staff responsible for processing the search for records responsive to Part 4. Given that ICE has refused to do so, Plaintiff will ask the Court to order this conversation in the letter brief that the Court requested. **If ICE is willing to make these technical staff available, please let us know as soon as possible so that we can avoid taking that issue to the Court.**

**B.     Part 5**

Plaintiff appreciates that Defendants have conducted a search with respect to Part 5, resulting in a hit count of 551 pages. However, Defendants do not specify at all which offices, custodians, or search locations were actually searched. As Plaintiff has repeatedly stated, an adequate search requires a search of custodians that include *key personnel* in its Medical Case Management and Unit Medical Care Coordination Program Staff, IHSC and ICE ERO participants in Significant Detainee Illness (often referred to by ICE as "SDI") meetings, as well as ICE ERO staff in communication with IHSC's Medical Case Management Unit. Contrary to Defendants' assertion, Plaintiff does not request a search of every staff member in the referenced locations; only a search reasonably calculated to return responsive records. **Please provide a list of search locations and custodians that ICE has searched for Part 5 by either name or position by November 2, 2023.**

EXHIBIT 2
17

October 19, 2023
6

C.  Part 6

It is clear from the plain language of Part 6 of the Request that it seeks Significant Incident Reports (often referred to by ICE as "SIRs") and significant event notification reports (often referred to by ICE as "SENs"), and ICE's failure to include these documents results in an inadequate search. Part 6 requests "Significant Incident Reports, significant event notification reports or documents created by DHS OIG or ICE OPR." The word "or" stands for the disjunctive or alternative. *See, e.g. United States v. Nishiie*, 996 F. 3d 1013, 1023 (9th Cir. 2021) (Noting that "or" is a disjunctive term, and that use of disjunctive "indicates alternatives and requires that they be treated separately."). Neither OIG or OPR, as oversight agencies, are responsible for creating SIR or SEN reports, which are created by staff in contact with detainees at the time of the incident itself.  Plaintiff has already suggested that ICE search the records of the ICE Joint Intelligence Operations Center (JIOC), which analyzes SIRS and sends summaries to appropriate field offices. **Please conduct a search of this source, with the suggested search terms identified by Plaintiff in its June 12, 2023 letter, and provide a hit count and identify locations searched by November 2, 2023.**

D.  Part 7

Defendants have not conducted a search for Part 7, which includes Significant Incident Reports and other Significant Event Notification reports that mention (1) the death of any detainee who had been previously released from custody while hospitalized or while a patient in the care of an external healthcare provider or facility, or (2) the death of any detainee who was released from custody immediately prior to transfer to an emergency room, hospital, or external care facility. Plaintiff reiterates that Defendants must conduct a search for such records in order to conduct an adequate search. **Please confirm by November 2, 2023, that ICE will conduct a search that includes SIRs and SENs, and explain the specific efforts ICE will undertake to ensure its search returns SIRs and SENs.**

E.  Part 8

Plaintiff appreciates that Defendant has conducted a search for Part 8, and looks forward to reviewing the documents. However, ICE's continued refusal to "search[] for documents from the *Fraihat* litigation" because "Plaintiff did not request these documents in its original FOIA request," is unjustified. *See* Defendants' October 10, 2023 letter, at 4. Defendants cite no authority for this position, and it is contrary to their obligation to search in locations that they discovery through "leads" are likely to contain responsive records. *Transgender Law Center v.*

EXHIBIT 2
18

October 19, 2023<br>7

*ICE*, 46 F. 4th 771, 779 (9th Cir. 2022). Plaintiff reserves the right to challenge the adequacy of ICE's search on this and any other basis.

### E.  Part 9

Plaintiff appreciates that Defendants have conducted a search for Part 9, and the additional information regarding the search terms and locations that Defendants used to conduct the search. It appears that Defendants' search terms were overbroad, and did not utilize Boolean searches to narrow the search results, resulting in over 16,000 emails. It appears that Defendants did not conduct a search according to the guidelines that Plaintiff suggested in its June 1, 2023 letter for this part, but rather, used a set of terms for a different Part of the Request.

Plaintiff again suggests the following search terms and locations, as identified on June 1, 2023, which will likely yield a more narrowly-tailored result:

- Search Terms #9: bill!; invoice!; charges; payment; benefits; discharge; transfer; release or custody; Medicare; PRUCOL; Martin Vargas Arellano; Teka Gulema; Jose Ibarra Bucio; Johana Medina Leon; Jonathan Alberto Medina Leon
- Search Locations #9:
    - Resource Management Unit Staff, IHSC: Emails and records
    - ICE Office of the Chief Financial Officer
- Boolean Searches in Relativity #9:
    - (Bill!; invoice!; charges; payment; benefits) AND (discharge or transfer or custody or release or Medicare or PRUCOL or Martin Vargas Arellano or Teka Gulema or Jose Ibarra Bucio or Johana Medina Leon or Jonathan Alberto Medina Leon)

Plaintiff requests that Defendants conduct a search according to the search methodology above, and provide a hit count and list of custodians and search locations by November 2, 2023. Plaintiff also reserves the right to request additional specific information at a later date if Defendants' searches for Parts 4 to 8 identify additional people whose records may be responsive to this request.

***

Please do not hesitate to contact us if you would like to address any of these matters by teleconference.

Sincerely,

LABONI A. HOQ (SBN 224140)                    EUNICE CHO (pro hac vice)

EXHIBIT 2<br>19

October 19, 2023
8

laboni@hoqlaw.com
HOQ LAW APC
P.O. Box 753
South Pasadena, California 91030
Telephone: (213) 973-9004

echo@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
NATIONAL PRISON PROJECT
915 Fifteenth Street NW, 7th Floor
Washington, DC 20005
Telephone: (202) 548-6616

MICHAEL KAUFMAN (SBN 254575)
MKaufman@aclusocal.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, California 90017 Telephone: (213) 977-9500
Facsimile: (213) 915-0219

KYLE VIRGIEN (SBN 278747)
kvirgien@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
NATIONAL PRISON PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (202) 393-4930

*Attorneys for Plaintiff*

EXHIBIT 2
20

# EXHIBIT A

EXHIBIT 2
21

Law Enforcement Sensitive – For Official Use Only
Deliberative


U.S. Immigration and Customs Enforcement

November 10, 2022

# ERO New Orleans – Teka GULEMA, A28 021 556

ISSUE:

On February 8, 2015, ERO New Orleans was notified by the Etowah County Detention Center (ECDC) that an ICE detainee Teka GULEMA, a 53-year-old male citizen of Ethiopia, went into cardiac arrest and coded while under care at the Riverview Regional Medical Center (RRMC) in Gadsden, AL. GULEMA remains hospitalized in the Critical Care Unit at RRMC on a ventilator.

BACKGROUND:

**The following case summary is based on a review of the alien's A-file, Planet, EARM, CIS, NFTS, TECS records checks and data provided by the case management officer.**

On March 27, 1987, GULEMA, entered the United States at Washington, DC and was admitted as a non-immigrant visitor. On October 1, 1989, GULEMA adjusted his status to that of a Lawful Permanent Resident (AS-6).

On December 17, 1999, the Arlington County General District Court (ACGDC) convicted GULEMA of assault and battery and sentenced him to 12 months confinement.

On September 23, 2000, ACGDC convicted GULEMA of trespassing and sentenced him to 12 months confinement.

On February 13, 2001, the Arlington County, VA Circuit Court convicted GULEMA of assault and battery on a law enforcement officer and sentenced him to nine months confinement.

On April 12, 2002, ACGDC convicted GULEMA of assault and battery and sentenced him to ten months confinement.

On November 14, 2002 and October 21, 2004, ACGDC convicted GULEMA of trespassing and sentenced him to 12 month confinement each time.

On May 6, 2005, ACGDC convicted GULEMA of trespassing with intent to damage or the contents there of and sentenced him to 12 months confinement.

On August 10, 2005, ACGDC convicted GULEMA of trespassing and sentenced him to 12 months confinement.

Deliberative
Law Enforcement Sensitive – For Official Use Only

2022-ICLI-00048   7197

EXHIBIT 2
22

ERO New Orleans – Teka GULEMA, A28 021 556
Page 2 of 4

On March 8, 2006, the Arlington County VA Circuit Court convicted GULEMA of drunk in public and obstruction of justice, and sentenced him to 12 months confinement.

On April 3, 2007, GULEMA ERO Washington encountered GULEMA at the Arlington County Jail, Arlington, VA and lodged an immigration detainer.

On May 7, 2007, Arlington County Jail remanded GULEMA to ICE custody.  On May 8, 2007, ERO Washington served GULEMA a Notice to Appear, charging him with removability per section 237(a)(2)(A)(i) of the Immigration and Nationality Act (INA), as an alien who has been convicted of a crime involving moral turpitude.  On May 31, 2007, ICE served GULEMA form I-261, Additional Charges of Inadmissibility/Deportability, also charging him with violation of 237(a)(2)(A)(iii) of the INA, as an alien who at any time has been convicted of an aggravated felony.

On May 31, 2007, ERO Washington transferred GULEMA to Hampton Roads Regional Jail, Portsmouth, VA.

On October 22, 2007, an immigration judge in Arlington, VA ordered GULEMA removed to Ethiopia.  On November 21, 2007, GULEMA appealed to the Board of Immigration Appeals (BIA).  On February 14, 2008, the BIA dismissed his appeal.

On October 22, 2008, GULEMA was placed in Failure to Comply status for refusing to sign his Ethiopian Travel Document application and refusing to interview with the Ethiopian Consulate. On the same date, GULEMA sustained minor abrasions to his fingers after he became physically combative with ICE officers during fingerprinting. ICE has followed up with GULEMA on a monthly basis trying to gain compliance since then.

On October 20, 2009, the U.S. Attorney's Office (USAO) for the Eastern District of Virginia declined to prosecute GULEMA for failure to comply, 8 USC 1253(a).

On May 14, 2010, GULEMA was transferred to the Pamunkey Regional Jail, Hanover, VA.

On July 20, 2010, the U.S. District Court for the Western District of Virginia remanded GULEMA to the custody of the U.S. Marshals Service pending prosecution for 8 USC 1253(a). This charge was later dismissed without prejudice.

On May 19, 2011, U.S. Marshals remanded GULEMA to ERO Washington custody.  On July 1, 2011, ERO Washington transferred GULEMA to ERO New Orleans custody, and the following day he was placed in Etowah County Detention Center (ECDC) in Gadsden, AL.

On September 21, 2011, ERO New Orleans batch audited GULEMA's A-file.  On August 8, 2012, GULEMA's A-file was declared lost.  File audits since 2011 have not turned up the missing A-file.

Deliberative
Law Enforcement Sensitive – For Official Use Only

ERO New Orleans – Teka GULEMA, A28 021 556
Page 3 of 4

On March 28, 2013, USAO for the Northern District of Alabama declined to prosecute GULEMA for 8 USC 1253(a).

On or about August 30, 2014, GULEMA addressed correspondence to ERO New Orleans titled RE: Inadequate Medical Care at ECDC. On or about September 16, 2014, ERO closed out the grievance stating that ECDC Medical is addressing the situation.

On February 8, 2015, ECDC notified ERO New Orleans that GULEMA had been evaluated by onsite medical staff for dizziness and general fatigue. GULEMA was referred to RRMC for further evaluation and treatment. The attending physician at RRMC admitted GULEMA for diabetic ketoacidosis and dehydration. Prior to this hospital admission, GULEMA had no previous history or treatment for diabetes. While receiving medical care at RRMC, GULEMA went into cardiac arrest. He was revived by the hospital staff and placed on the ventilator.

On February 9, 2015, RRMC diagnosed GULEMA with possible bacterial meningitis.

On February 20, 2015, ERO New Orleans was notified by the ECDC medical staff that GULEMA is now alert and oriented. Medical staff also advised that GULEMA is experiencing unexplained paralysis, and remains on the ventilator.

On February 24, 2015, ERO spoke with GULEMA and asked if he had any next of kin. GULEMA is unable to speak, but indicated though nonverbal signals that he does not have any kin. ERO has made an exhaustive search of all files and contacted previous detention facilities in an unsuccessful attempt to locate and identify a next of kin to no avail.

On February 24, 2015, GULEMA received an external pacemaker to regulate his heart.

On February 27, 2015, the Ethiopian Embassy First Secretary, Mr. Dineka, spoke with ERO New Orleans AFOD Gerald Smith who provided an update on GULEMA's condition. However, due to lack of identity documents and GULEMA's refusal to interview, Mr. Dineka stated that he has been unable to confirm that GULEMA is Ethiopian. Mr. Dineka further stated that the Embassy of Ethiopia does not accept after-hours communications in the event of an emergency.

IHSC has evaluated the records provided on Mr. GULEMA's medical condition and reviewed the status with his on-site medical personnel (Dr. (b)(6); ) All of the treating medical personnel at the Riverview Regional Medical Center in Gadsden, Alabama feel that the long term prognosis for recovery is very poor and the expectation for him to survive this illness has been described by his Riverview Regional Medical Center medical team at <10% chance of living longer than one year. That whatever improvement the patient will have, will not allow him to live independently and not be on a ventilator (this is a breathing machine that forces the patient to breathe). He will require constant intensive nursing and medical care for the rest of life.

RECOMMENDATION

The Embassy of Ethiopia has advised that a telephonic interview is needed to confirm GULEMA's citizenship in the absence of identity documents or other proofs of citizenship.

Deliberative
Law Enforcement Sensitive – For Official Use Only

2022-ICLI-00048   7199

EXHIBIT 2
24

ERO New Orleans – Teka GULEMA, A28 021 556
Page 4 of 4

GULEMA has failed to comply with his removal by repeatedly refusing to interview with the Embassy and ICE has no identification documents available in his record.

IHSC continues to work with RRMC for possible transfer options to provide a higher level of care for GULEMA's current medical condition. Due to the uncertainty of GULEMA's prognosis and length of recovery it is very unlikely he will be medically approved for removal.

ERO New Orleans recommends releasing GULEMA on an order of supervision based on little likelihood that he will be removed from the United States in the foreseeable future. As part of this release, it is recommended that ERO New Orleans draft a Sotolongo letter for state authorities giving them 30 days to assist with getting GULEMA benefits prior to his release from U.S. Immigration and Customs Enforcement (ICE) custody

Deliberative
~~Law Enforcement Sensitive – For Official Use Only~~

2022-ICLI-00048   7200

EXHIBIT 2
25