UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | 2:22-CV-04760-SB-AFM | Date: | December 8, 2023 |
|---|---|---|---|
| Title | *American Civil Liberties Union Foundation of Southern California v. United States Immigration and Customs Enforcement, et al.* | | |

Present: The Honorable  Shashi H. Kewalramani, United States Magistrate Judge

| D. Castellanos | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings (IN CHAMBERS):**  ORDER RE: PLAINTIFF'S REQUEST FOR SCHEDULING ORDER AND FOIA PROCESSING RATE

On October 23, 2023, Plaintiff American Civil Liberties Union of Southern California ("Plaintiff" or "ACLU SoCal") filed a Brief In Support Of Request For Scheduling Order And FOIA Processing Rate ("Motion" or "Mot."). Electronic Filing Number ("ECF No.") 57, Mot. In the Motion, Plaintiff requests that the Court: (1) "set specific timetables for the Parties to confer and for Defendants to conduct searches"; (2) "set revised processing and production requirements that will realign the Parties' incentives towards prompt resolution of the case"; and (3) "set a Status Conference in December 2023, to re-set deadlines for Defendants to produce search adequacy declarations, *Vaughn* indices, a summary judgment briefing deadline, and to re-set the trial date." Id. at 6.[1]

On November 6, 2023, Defendants U.S. Immigration and Customs Enforcement ("ICE"), U.S. Department of Homeland Security ("DHS"), and DHS Office of Inspector General ("OIG") (collectively, "Defendants") filed their Opposition to Plaintiff's Motion ("Opposition" or "Opp'n"). ECF No. 60, Opp'n. On November 13, 2023, Plaintiff filed its Reply ("Reply"). ECF No. 61, Reply.

After reviewing the parties' arguments, for the reasons set forth in this Order, the Court **GRANTS** Plaintiff's Motion as outlined in the Conclusion of this Order.

---

[1] The Court cites to the pagination as assigned by CM/ECF.

## I.      BACKGROUND

### A.      Procedural History

On July 12, 2022, Plaintiff filed the complaint ("Complaint" or "Compl.") in this action seeking disclosure of documents from Defendants pursuant to Plaintiff's Freedom of Information Act ("FOIA") request ("Request"), dated April 29, 2022.  ECF No. 1, Compl.  ACLU SoCal alleged in the Complaint that Defendants failed to respond to its Request for information regarding Defendants' "treatment of hospitalized detainees and detainees released from custody prior to their death."  Id. at 15.  On October 4, 2022, Plaintiff filed a First Amended Complaint ("FAC").  ECF No. 24, FAC.  On October 18, 2022, Defendants filed an Answer to the FAC ("Answer").  ECF No. 26, Answer.

On November 29, 2022, the parties filed a Joint Report of Conference of the Parties ("Joint Report"), in which Defendants indicated, in relevant part, that "ICE ha[d] already produced 2,444 pages of documents[,]" and that ICE was still processing Plaintiff's FOIA Request and had identified approximately 5,550 pages of potentially responsive records.  ECF No. 28, Joint Report at 9, 13.  Defendants also indicated that it could "commit to processing 500 pages per month" and that it would "submit to the Court explaining the current workloads and resources before the scheduling conference."  Id.

On January 10, 18, and 24, 2023, the Court held case management conferences ("CMCs") where the parties discussed the rate of review of documents by Defendants.  ECF Nos. 36-38.  On February 9, 2023, the Court approved the parties' Proposed Order Re: Case Management Order ("CMO"), by which the parties agreed that ICE would "review and process no less than 1,000 pages per month," and Defendants indicated that they "anticipate [the conclusion of review and production] will be in May 2023" and stated that they would "provide a *Vaughn* index" "prior to filing their motion for Summary Judgment."  ECF No. 40, CMO at 2-3.

"[O]n June 6, 2023, the date on which Defendants' motion for summary judgment had been due, ICE announced that it had not completed production in response to Parts 1 to 3 as anticipated but instead had newly located approximately 40,000 more pages to process."  ECF No. 57, Mot. at 7.  This was in part due to "ongoing meet and confer efforts" that "led to a broadening of the search, which in turn, . . . resulted in the identification of a greater number of potentially responsive records."  ECF No. 60, Opp'n at 17.

In July and August 2023, the parties briefed Defendants' Motion for Judgment on the Pleadings ("MJP").  ECF Nos. 44, 50, 51.  On August 11, 2023, the Court held a status conference with the parties, after which the Court vacated the substantive summary judgment motion briefing schedule "pending the completion of the production of documents and the Court's ruling" on the Defendants' MJP.  ECF No. 53, Minutes of Status Conference.  On

August 29, 2023, the Court denied Defendants' MJP ("Order re MJP"). ECF No. 54, Order re MJP.

On October 23, 2023, Plaintiff submitted its Motion requesting a Scheduling Order. ECF No. 57, Mot. On November 6, 2023, Defendants filed its Opposition. ECF No. 60, Opp'n. On November 13, 2023, Plaintiff filed its Reply. ECF No. 61, Reply.

### B. Status of Plaintiff's FOIA Request

Plaintiff's Request consisted of nine parts. In sum, Parts 1-3 sought information about the following four individuals: Martin Vargas Arellano ("Vargas Arellano"), Jose Ibarra Bucio ("Ibarra Bucio"), Teka Gulema ("Gulema"), and Johana Medina Leon ("Medina Leon"), who all allegedly "died shortly after ICE released them from custody." ECF No. 61, Reply at 7. "Parts 4-9 sought information about ICE's policies and practices of releasing critically-ill detainees from custody prior to their deaths, as well as information about other ICE detainees who met a similar fate." ECF No. 54, Order re MJP at 3. In their briefing, the parties summarize the status of each part of the Request as follows.

#### 1. Parts 1-3:

The search for Parts 1-3 resulted in "over 41,000 pages of potentially responsive documents," which "ICE was able to de-duplicate . . . and conduct email threading to reduce the number to approximately 12,000 pages." ECF No. 60, Opp'n at 9. "There are currently approximately 9,000 pages remaining to be processed for Requests Nos. 1-3." Id. As to Mr. Gulema, Plaintiff requested that his records be sorted by date after October 1, 2015, which ICE determined it can do after Plaintiff filed its Motion. ECF No. 61, Reply at 7. ICE states that it has "identified approximately 318 pages of records dated October 1, 2015 and after that remain to be processed for Mr. Gulema." ECF No. 60, Opp'n at 9. "Plaintiff also requested that ICE produce complete versions of several significant documents in its next production." ECF No. 61, Reply at 8.

#### 2. Part 4:

The search for Part 4 "initially resulted in over 530,000 documents (not pages)." ECF No. 60, Opp'n at 10. While Defendants had previously "taken the position that it could not conduct a Boolean search proposed by Plaintiff," ICE has "conducted a revised Boolean search, resulting in 142,000 documents." ECF No. 61, Reply at 8. On November 9, 2023, Plaintiff requested "Defendants provide hit count information for individual search terms so [the] [p]arties can further narrow the search, and suggested that Defendants search server files and ICE Health Service Corps ("IHSC") records instead of emails." Id.

#### 3. Part 5:

ICE asserts its search for Part 5 is complete, ECF No. 60, Opp'n at 10, and has resulted in "551 pages of responsive records," ECF No. 61, Reply at 8. Plaintiff disagrees that the search for Part 5 is complete because "Defendants have searched only one custodian employed by one agency component (ISHC)," but the "requested records related to those deathbed releases 'in the

possession of'" several ICE departments, including the "Significant Detainee Illness ["SDI"] Spreadsheet." Id. at 8 (brackets in the original). "Plaintiff on November 9, 2023 proposed a compromise that Defendants limit the search to staff . . . who participate in the weekly SDI meeting, and any custodians who possess the SDI list and documents related to individuals placed on the SDI list. Plaintiff requested that Defendants provide a hit count of such records by November 20, 2023." Id. at 9.

      **4.**      **Part 6:**

Part 6 seeks "'significant Incident Reports (["]SIRs["]), significant event notification reports (["]SENs["]), or documents created by DHS OIG or ICE [Office of Professional Responsibility] [("]OPR["])] that mention the release' of hospitalized detainees." Id. ICE reads Part 6 "as specifically seeking documents *created by* DHS OIG or ICE OPR" and contends that it has not found any responsive records. ECF No. 60, Opp'n at 10 (emphasis in the original). Plaintiff, on the other hand, asserts that "the word 'or' [in Part 6's request] is a disjunctive term, and ICE should thus search for SIRs and SENs, even if they are not created by OIG or OPR." ECF No. 61, Reply at 9-10. As to the SIRS and SENs, Defendants assert that those documents "are generated at the field office level" and require "some type of identifying information, such as name, date of event or alien number" to conduct a search. ECF No. 60, Opp'n at 10. Plaintiff responds that ICE "can search the records of the ICE Joint Intelligence Operations Center (["]JIOC["]), which analyzes SIRs and sends summaries to appropriate field offices, without individual identifiers, and with the agreed-upon search terms." ECF No. 61, Reply at 10. Plaintiff has requested that Defendants conduct such a search by November 20, 2023. Id.

      **5.**      **Part 7:**

Part 7 "seeks similar information" as Part 6. ECF No. 61, Reply at 10. Defendants assert that they "ask[ed] OPR to run a search of agreed upon search terms" and "found no responsive records." ECF No. 60, Opp'n at 10. Plaintiff requests that Defendants conduct a search of JIOC as discussed under Part 6. ECF No. 61, Reply at 10.

      **6.**      **Part 8:**

As to Part 8, "[a] search was run of the emails of Dr. Stewart Smith using agreed upon search terms" and was narrowed "using agreed upon Boolean connectors." ECF No. 60, Opp'n at 11. "The search resulted in 1,711 pages of potentially responsive documents," id., but "Defendants have [not] produce[d] these records," ECF No. 61, Reply at 10.

      **7.**      **Part 9:**

"ICE tasked nine Regional Field Medical Coordinators (["]FMCs["]) and Regional Health Service Administrators (["]HSAs["]) to search their emails for search terms that were agreed upon with Plaintiff," resulting in "over 16,000 emails (not pages), most of which appeared not to be related (or only peripherally related) to one of the proposed search terms." ECF No. 60, Opp'n at 11. Given the large amount of unresponsive hits, the parties met and conferred on search terms. See id. Plaintiff initially "suggest[ed] using different search terms and Boolean connectors" than those offered by ICE, and requested that ICE search in different departments' systems. Id. As of November 9, 2023, the parties reached an agreement as to

"initial search terms and locations for Part 9" and "Plaintiff has requested that Defendants provide a hit count for the search, and awaits further information." ECF No. 61, Reply at 10.

### C.  The Parties' Arguments

#### 1.  Plaintiff's Motion

The impetus behind Plaintiff's Motion is that "[t]hroughout this case, ICE has exhibited a pattern of repeatedly delaying its search for any records responsive to Parts 4 to 9 of the request," "ICE has produced a ballooning numbers of records Responsive to Parts 1 to 3 . . . while resisting Plaintiff's attempts to shrink that set of records for production," and "fourteen months after Plaintiff filed suit, Defendants have yet to produce a single record responsive to Parts 4 to 9." ECF No. 57, Mot. at 5.

As to Parts 1-3 of the Request, "Plaintiff has proposed a potential avenue to narrow the bulk of the over 10,000 pages that remain of the documents ICE belatedly located," but "Defendants continue to raise various excuses—for example, claiming that they cannot perform tasks as basic as sorting documents by date—while refusing to allow Plaintiff to confer with ICE's FOIA staff to attempt to find a solution to Defendants' technical challenges." Id. at 5-6. As to Parts 4-6 of the Request, Plaintiffs contend that "Defendants failed for several months to conduct any searches or timely provide even basic information such as hit counts necessary for parties to confer about production schedule," "ignored Plaintiff's suggestions for narrowly-tailored search terms" while "conduct[ing] overbroad searches," and "refused to search for categories of records or custodians highly likely to contain responsive records." Id. at 5. ACLU SoCal provides several examples of what it argues evidence Defendants' "refusal to engage with Plaintiff's good faith efforts to streamline the production process and address ICE's technical issues." See id. at 8-13.

Plaintiff thus "seeks the Court's assistance to ensure efficient prosecution of this case." Id. at 13. First, Plaintiff "proposes that the Court order the parties to meet and confer to narrow responsive records and set search parameters, including with ICE's technical staff present, with specific deadlines to do so." Id.  Plaintiff proposes the following parameters:

- At the meet and confer, Plaintiff proposes that the parties will address: (1) "[f]or Parts 1 to 3, disaggregation of records regarding Mr. Gulema by date" and (2) "[f]or Parts 4 to 9, a revised set of search terms and locations (including custodians), including a resolution of . . . [f]or Part 4, the technical feasibility of the search string Plaintiff proposed in April 2023 and Defendant agreed to run in July 2023 [and] [f]or Part 6, the technical feasibility of a search of ICE's JIOC." Id.

- By four-weeks of the Court's Order, "Defendants shall provide": (1) "[f]or Parts 1 to 3, the total number of pages of documents yet to be produced by ICE, disaggregated by individual"; (2) "[f]or Parts 1 to 3, the total number of pages of documents yet to be produced by ICE regarding Mr. [] Gulema . . . [and] [i]f ICE is unable to accurately disaggregate such records by date, ICE shall provide the Court with an explanation why . . . and steps it can take to identify documents regarding"

    Mr. Gulema; and (3) "[f]or Parts 4 to 9, a hit count, broken down by Part, for each of the agreed upon searches." Id. at 14.

- "By six weeks after the date of the Court's Order, Plaintiff will inform ICE whether it waives ICE's general production of documents related to Mr. [] Gulema dated before October 1, 2014 (without waiving Plaintiff's right to later provide 'positive indications of overlooked materials' under Transgender L. Ctr. v. [ICE], 46 F.4th 771, 780 (9th Cir. 2022)). By this date, Plaintiff will also inform ICE the order in which ICE should process these four individuals' records." Id. at 15.

- "Between four and eight weeks after the Court's order, the Parties shall work cooperatively to narrow the search results for Parts 4 to 9, as needed." Id.

    Second, Plaintiff "proposes the Court revise the production schedule to realign the parties' incentives towards efficient solution of the case." Id. Plaintiff argues the "current production rate of 1,000 pages per month does not incentivize ICE to engage meaningfully in" the production process. Id. Plaintiff proposes that ICE: (1) "continue to process FOIA records at a rate of 1,000 pages per month for the first eight weeks following this Order"; (2) "[e]ight weeks after this Order, Defendants' rate of production shall increase, such that the production" will be complete in six months and "each month, ICE shall process documents at a rate equal to the total page count for Parts 1 to 9 divided by six, rounding up to the nearest whole page, not to exceed 5,000 pages per month"; and (3) "Defendants shall ensure that is has conducted email threading and de-duplication of records prior to processing[.]" Id. at 16.

    Third, Plaintiff "requests that the Court set a further Status Conference in December 2023" "to address any further adjustments to the search, processing and production schedules, to set a summary judgment briefing schedule together with prior deadlines for Defendants to produce search adequacy and *Vaugh* indices, and to re-set the trial date." Id. at 17.

    **2.    Defendants' Opposition**

    Defendants assert that "the parties have been in regular communication about Plaintiff's FOIA request" and "Defendants ICE and OIG have complied with the Court's CMO and processed records at the expedited rate of 1,000 pages per month." ECF No. 60, Opp'n at 8. By way of background, ICE explains that "the ICE FOIA Office is processing approximately 32,456 open FOIA requests addressing a backlog of 29,398 FOIA requests," and that "[t]here are approximately 161 open federal district court cases, and 69 in active record production" with "an average processing rate of 750 pages per month." Id. at 8-9. "ICE FOIA Litigation Unit is currently processing approximately 51,000 pages of potentially responsive records per month." Id. at 9. ICE is currently processing "approximately 9,000 pages . . . in response to Parts 1 to 3" of the Request, id. at 14, and contends that it "it has completed searches for Parts 5 and 8," id. at 14 n.5.

    Defendants first argue that "Plaintiff's request for an order requiring Defendants to 'make available the ICE FOIA OFFICE responsible for this Request, to address ways to reduce the total

number of responsive FOIA records . . . , and to finalize the search parameters for remaining searches for Parts 4 to 9 of the request' is an improper effort to obtain informal discovery regarding ICE's search." Id. at 14. Defendants assert that ACLU SoCal is free to "communicate any information to ICE's FOIA Office . . . through ICE's counsel," but Plaintiffs refuse to do so "as they hope that this Court will acquiesce to their improper demand for direct access to an employee of Defendant." Id.

Defendants next argue that "ACLU SoCal offers no legal support for its request that the Court order the parties to meet and confer with the ICE FOIA Office and to 'finalize search parameters.'" Id. ICE asserts that "[i]t is left to the agency's discretion how and where to search," Plaintiff cannot dictate "search terms and locations," and "[d]isagreements over search adequacy are common in FOIA cases, but" are addressed during summary judgment. Id. ICE claims that Plaintiff's Motion "seeks to depart from typical resolution of FOIA cases and place on ICE what the FOIA and case law does not – justification of its search terms, locations, and productions while the searches and processing are *ongoing*." Id. at 15 (emphasis in the original). In sum, Defendants argue that Plaintiff's Motion seeks to "micromanage" the search process and that there is "no authority" for "a Court [to] order how an agency conducts its search and processes potentially responsive records." See id. at 16, 19.

Additionally, Defendants point out that "[a]bsent from Plaintiff's brief (or any of its correspondence) is an agreement to narrow the request without pre-condition." Id. at 18. Defendants take issue with Plaintiff's proposal to "consider *whether* it will waive production of certain documents related to only one individual." Id. Defendants argue that there is no "authority that a party may limit the scope of its request but nonetheless reserve the right to challenge the sufficiency of the search." Id. at 19.

Defendants also assert that Plaintiff's proposed processing rate is illogical and unsupported by case law. Id. at 20. Defendants explain that Plaintiff's proposal "presumes that the entire universe of documents would be under 30,000 pages," but "ICE has communicated that one of the subparts has returned over 142,000 *records* alone." Id. Further, Defendants argue that Plaintiff's request ignores the fact that "FOIA cases take years to resolve," and Plaintiff's requests "necessarily implies that its FOIA request is more important than others[] as it demands priority[.]" Id. Further on that point, Defendant points to case law approving average process rates of 500 pages per month in light of an agency's competing FOIA obligations. See id. at 21-24. Based on the case law Defendants cite, Defendants add "ICE is already processing Plaintiff's FOIA request on an expedited basis." Id. at 25.

### 3. Plaintiff's Reply

In the Reply, Plaintiff first argues that the Court has broad authority to ensure prompt disclosure of records under the FOIA. In support of this argument, Plaintiffs point to case law where courts have "exercised their authority to effectuate prompt production in cases where the information sought under [the] FOIA is of 'paramount public importance' and where the government has taken unreasonable length of time to respond to a request." ECF No. 61, Reply at 11 (citing Open Soc'y Justice Initiative v. CIA, 399 F. Supp. 3d 161, 167 (S.D.N.Y. 2019)). Plaintiff asserts that "[t]his Request addresses an issue of paramount public importance and

interest: ICE's release of detained immigrants facing imminent death from custody, which was allowed the agency to avoid public reporting and accountability for an untold number of deaths." Id.

Plaintiff then argues that "courts routinely issue similar orders" requiring the "[p]arties to meet and confer and work collaboratively to set search parameters and finalize a production table," including this Court in its previous order "requiring Defendants to 'meet and confer to discuss the responses and rate of productions on a rolling basis.'" Id. at 12-13.  Plaintiff also points out that Defendants "initiated the conferral process" and "now characterize these mutually beneficial efforts as 'micromanaging.'" Id.  Moreover, Plaintiff contends "[n]othing in Plaintiff's Proposed Order requires that Defendants justify the adequacy of their searches" because the Proposed Order "merely requires [the] [p]arties to confer, in good faith, . . . to eliminate as many issues as possible prior to summary judgment, and to ensure Defendants conduct their search and production under a concrete timeline." Id. at 13.

Plaintiff further argues that its request to meet with ICE's technical staff does not constitute discovery, but an effort to "resolve purported technical difficulties in [ICE's] management and production of documents." Id. at 15.  Plaintiff counters Defendants' reliance on "a number of cases related to the propriety and timing of discovery in FOIA requests" is misplaced because "none support its position that Plaintiff's request amounts to discovery, informal or otherwise." Id.  ACLU SoCal claims the need to meet with ICE's technical staff was prompted by "ICE . . . repeatedly invoke[ing] technical challenges in resisting some of the suggested methods to tailor searches," and "ICE's insistence that Plaintiff provide technical questions only in writing has significantly delayed the process[.]" Id. at 16.  "Any fear of improper discovery," Plaintiff posits, "should be easily cured by the presence of ICE's counsel." Id. at 15.

Finally, pointing to case law where courts have ordered a processing rate at or above 5,000 pages a month, Plaintiff asserts that the Court has authority to order Defendants to increase their processing rate.  Id. at 19.  Plaintiff claims "[u]nder ICE's current production rate of 1,000 page per month, Plaintiff would need to wait anywhere between an additional 30 months and over 12 years for ICE to complete its current production." Id. at 16-17.  Plaintiff argues that: (1) Defendants have not supported their claim that "increased production rate in this case" would divert resources from other ICE FOIA requests; and (2) "[e]ven where the government might 'divert resources['] . . . the court must balance the competing interest at hand, as FOIA case law required." Id. at 17-18 (internal quotation marks and citations omitted).

## II.  DISCUSSION

### A.  FOIA Legal Standard

The "FOIA sets forth a policy of broad disclosure of Government documents in order to ensure an informed citizenry, vital to functioning of a democratic society." F.B.I. v. Abramson, 456 U.S. 615, 621 (1982) (internal citations and quotation marks omitted).  "Congress enacted the FOIA to ensure that all government materials are made available to the public unless

explicitly exempted from disclosure by [the FOIA]." Long v. I.R.S., 693 F.2d 907, 909 (9th Cir. 1982) (internal quotation marks and citations omitted).

"As the enforcement arm of the FOIA, the courts are charged with the responsibility of ensuring the fullest responsible disclosure." Long, 693 F.2d at 909. "[T]he Supreme Court [has] held that Congress did not intend to limit the court's exercise of its inherent equitable powers where consistent with the FOIA." Id. (citing Renegotiation Bd. v. Bannercraft Clothing Co., Inc., 415 U.S. 1, 19 (1974)). Moreover, "[i]t is the duty of the court to uphold FOIA by striking the proper balance between plaintiffs' right to receive information on government activity[,] and government concerns, including agency capabilities and the heightened clearance process for issues of national security." Open Soc'y Just. Initiative, 399 F.Supp.3d at 166 (internal quotation marks and citations omitted).

"Congress has long recognized that 'information is often useful only if it is timely,' and that, therefore, 'excessive delay by the agency in its response is often tantamount to denial.'" Open Soc'y Just. Initiative, 399 F. Supp. 3d at 164 (citing H.R. Rep. No. 93-876, at 6271 (1971)). "Notwithstanding the statutory deadlines for responding to FOIA requests, as to the timetable for production, FOIA 'does not assign any particular time to release of the records sought.'" Id. at 165 (quoting Landmark Legal Found. v. E.P.A., 910 F. Supp. 2d 270, 275 (D.D.C. 2012)). "[U]nreasonable delays in disclosing non-exempt documents violate the intent and purpose of the FOIA, and the courts have a duty to prevent these abuses." Long, 693 F.2d at 910.

### B.      Analysis

After careful review of Plaintiff's Motion, the Opposition, and the Reply, and relevant law, the Court finds that: (1) a meet and confer schedule to narrow responsive records and set search parameters is appropriate and, as part of the meet and confer process, ICE shall make available its technical staff if any technical challenges arise; (2) an increase in ICE's rate of processing to 3,000 pages per month after March 4, 2024 is appropriate given that Plaintiff's Request involves a matter of great public concern; and (3) a Status Conference for March 4, 2024 with the parties is also needed.

As such, the Plaintiff's Motion is granted, as detailed in the Conclusion of this Order.

#### 1.      Meet and Confer to Narrow Responsive Records and Set Search Parameters

As an initial matter, contrary to Defendants' contentions in the Opposition, the Court has the authority and discretion to "order the parties to meet and confer with the ICE FOIA Office and to 'finalize search parameters.'" ECF No. 60, Opp'n at 14. The courts are the "enforcement arm of the FOIA" and "charged with the responsibility of ensuring the fullest responsible disclosure." Long, 693 F.2d at 909. "[C]ourts have recognized they may draw on their equitable powers to effectuate FOIA's 'policy of broad disclosure.'" Los Angeles Times Communications LLC v. U.S. Department of Homeland Security, 2:20-cv-10911-FLA (MRWx), 2022 WL 18932816, at *3 (citing Abramson, 456 U.S. at 621 (1982)). Moreover, "federal courts have long 'understood that [c]ertain implied powers necessarily result to our [c]ourts'[,]" which are

"'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" Club v. E.P.A., 505 F. Supp. 3d 982, 988-89 (N.D. Cal. 2020) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991)); see also Spurlock v. F.B.I., 69 F.3d 1010, 1016 (9th Cir. 1995) ("A district court possesses inherent power over the administration of its business[,]" including the "inherent authority . . . to promulgate and enforce rules for the management of litigation . . ."). Given that the Court must enforce FOIA's broad policy of disclosure and its inherent authority to ensure "orderly and expeditious disposition" of this case, the Court has the power to order the parties to meet and confer regarding the search and production of documents responsive to Plaintiff's Request. See Clemente v. F.B.I., 71 F. Supp. 3d 262, 269 (D.D.C. 2014) ("A court therefore may use its equitable powers to require the agency to process documents according to a court-imposed timeline."); see also Elec. Priv. Info. Ctr. v. D.O.J., 416 F. Supp. 2d 30, 38 (D.D.C. 2006) ("[R]elevant case law establishes that courts have the authority to impose concrete deadlines on agencies that delay the processing of requests meriting expedition);

The Court next addresses the parties' arguments with respect to: (1) the need for the parties to meet and confer about search terms and locations; and (2) Plaintiff's request to meet with ICE's technical staff.

### a. Search Terms and Locations

Defendants argue that Plaintiff's Motion seeks "justification of [Defendants'] search terms, locations, and productions while the searches are *ongoing*." ECF No. 60, Opp'n at 15 (emphasis in the original). Nothing in Plaintiff's Proposed Order, however, requires the parties to "agree" over search terms and locations or for Defendants to justify them. Plaintiff's proposal requests that the parties meet and confer over certain topics, that Defendants provide certain information to Plaintiff to assist in further narrowing the search, and that "the Parties . . . work cooperatively to narrow the search results for Parts 4 to 9, as needed." ECF No. 57, Mot. at 15 (emphasis added). To be sure, if Defendants have good reason to object or refuse Plaintiff's requested search parameters, then Defendants are entitled to do so. However, an agency's discretion in conducting a search in response to a FOIA request does not preclude the agency from working with a FOIA requester to ensure that the search and production are carried out in an efficient and timely manner. Especially, when such a meeting may result in the agency spending less resources. To reject such an offer out of hand, however, is concerning and may not be in the agency's best interest.

As to Defendants' contention that Plaintiff seeks to "micromanage" the search process, ECF No. 60, Opp'n at 16, the Court notes that Defendants "*initiated* the conferral process by requesting Plaintiff's assistance in setting search parameters and narrowing responsive records for processing," ECF No. 61, Reply at 13 (emphasis in the original). The conferral between the parties has been fruitful, to an extent, in narrowing the universe of responsive documents and advancing production efforts. The "[p]arties have agreed to initial search terms and locations for Part 9" and have reduced the number of documents related to Mr. Gulema by conferring on ICE's date-filtering capabilities. Id. at 8, 10. The parties were also able to "search the emails of Dr. Stewart Smith of IHSC with the agreed-upon search terms." Id. at 10 (emphasis added). The Court therefore has difficulty understanding how Plaintiff's request for an order to meet and

confer constitutes "micromanagement" when Defendants have already engaged with Plaintiffs, with some success, through the exact process Plaintiff requests. The Court hopes that further, informed, consultation can only benefit the litigation by either resulting in more narrow search parameters or focusing the issues for the Court's review at a later date.

Despite the parties' meet and confer efforts, however, it is clear that further efforts are necessary to ensure efficient and timely production in response to Plaintiff's Request. The Court finds it notable that Defendants resisted date-filtering records related to Mr. Gulema, first claiming that it did not have the capability to do so and then claiming it was "unable to separate out pages for Mr. Gulema" by date, ECF No. 57, Mot. at 9-10, but Defendants have now determined they are able to date-filter after Plaintiff filed its Motion, see ECF No. 61, Reply at 7. Likewise, ICE took five months after Plaintiff suggested search terms for Part 4 to advise that it could not run the search, ECF No. 57, Mot. at 8, but after Plaintiff filed its Motion, Defendant ICE discovered it could conduct a "revised Boolean search" that resulted in a significant reduction of documents, see ECF No. 61, Reply at 8. Defendants also initially conducted a search for Part 9 without "Plaintiff's suggested Boolean search terms" and "'yielded 16,000 emails[,]'" ECF No. 57, Mot. at 10, but now "have agreed to initial search terms and locations for Part 9," ECF No. 61, Reply at 10. It appears to the Court that Defendants have accurately determined its abilities to carry out some of Plaintiff's technical suggestions or to compromise on search terms only recently, after Plaintiff sought court-intervention over the parties' disputes.

Further, there remains areas of impasse between the parties that would benefit from the meet and confer process to narrow the issues at summary judgment. For example, as to Part 5, the parties disagree over whether ICE's search is complete because it has "searched only one custodian employed by one agency component." ECF No. 61, Reply at 8. Recognizing that the Request may involve a "large number of potential custodians identified by Defendants," Plaintiff has "proposed a compromise that Defendants limit the search to staff . . . who participate in weekly SDI meeting, and any custodian who possess the SDI list . . ." Id. Parts 6 and 7 of the Request presents another area where the parties may be able to find common ground on whether and to what extent ICE may search for SIRs and SENs not created by OIG or OPR, or search for records in the ICE JIOC. See ECF No. 57, Mot. at 11-12; ECF No. 60, Opp'n at 10-11. While Defendants are correct that "the parties may well reach an impasse which can be addressed during summary judgment briefing" on some of these issues, ECF No. 60, Opp'n at 14, the parties' recent progress in resolving some of the issues that prompted this Motion demonstrates that further meet and confer efforts may very well narrow the issues at summary judgment and advance the search and production process.

Turning to the specifics of Plaintiff's Request for an order requiring the parties to meet and confer, the Court agrees with Defendants that Plaintiff cannot "require[e] ICE to process records in Plaintiff's preferred order." See id. at 18. While this may allow Plaintiff to determine where to narrow its Request and reduce the burden on ICE, Plaintiff provides no authority for requiring, rather than suggesting, that Defendants process its production in a particular order. Moreover, in addition to considering whether to "waive ICE's general production of documents related to Mr. Teka Gulema dated on or before October 1, 2015," Plaintiff should also consider where it would be willing to narrow its Request through the meet and confer process since

Plaintiff "takes issue that Defendant . . . 'ICE has produced a ballooning number of records **responsive** to Parts 1 to 3[.]'" Id. at 17 (emphasis in the original).

Therefore, the Court hereby orders: (1) the parties shall meet and confer via telephone or video conference within two weeks of the Court's order to address any outstanding issues regarding the search for records responsive to Plaintiff's Request; (2) by January 22, 2024, ICE shall provide the following to Plaintiff: (a) for Parts 1-3, the total number of pages of documents yet to be produced by ICE, disaggregated by individual; (b) for Parts 1-3, the total number of pages of documents yet to be produced regarding Mr. Teka Gulema dated on or after October 1, 2015; and (c) for Parts 4 to 9, a hit count, broken down by Part, for each of the agreed-to searches (if any); (3) by February 5, 2024, Plaintiff shall inform ICE whether it waives production of documents related to Mr. Teka Gulema dated before October 1, 2015, whether it waives production of any other portions of its Request, and whether it narrows the scope of any of its Requests; and (4) the parties shall work cooperatively to narrow the search results for Parts 4 to 9, as needed, before the Status Conference set for March 4, 2024 (as discussed below).

### b. Meet with Technical Staff

"Although the imminent need for direct communication with ICE's technical staff has abated," "Plaintiff maintains its request that the Court order ICE to make its technical staff available to address any future challenges." ECF No. 61, Reply at 16. Defendants object to this portion of Plaintiff's proposal on the grounds that it is "an improper effort to obtain informal discovery regarding ICE's search," ECF No. 60, Opp'n at 14. Defendants, however, do not explain how making its technical staff available to resolve technical issues constitute "informal discovery."

The Court agrees "there are sound case management reasons to require the availability of ICE's technical staff" because "ICE has repeatedly invoked technical challenges in resisting some of the suggested methods to tailor searches, for example, claiming that it could sort records by date, or de-duplicate records." ECF No. 61, Reply at 16. Tellingly, "[o]nly when Plaintiff has raised these technical issues before the court, after several weeks—even months—of its request to Defendants, have Defendants realized that they could overcome their technical challenges." Id.

Though the Court appreciates Defendants concerns regarding making the ICE technical staff available to Plaintiff's counsel, there have been delays in this case that may have been resolved by quicker consultation with ICE's technical staff by Defendants' counsel. Therefore, to avoid further delays regarding resolvable issues, the Court finds it appropriate that Defendants have ready access to ICE technical staff during any meet and confer so that Defendants' counsel can get more immediate responses to proposals made by Plaintiff and to identify issues that should be resolvable within hours and days, rather than weeks or months. Further, to make the most efficient use of ICE technical staff, the parties are to meet and confer on the topics that will be addressed as well as any matters ICE may consider to be subject to discovery prior to the meet and confer where ICE technical staff will be available to Defendants' counsel.

/ / /

### 2. Processing Rate

Plaintiff proposes the "the Court revise the production schedule" such that "production of documents responsive to the FOIA Request shall be completed in six months," by, in part, requiring Defendants to increase the processing rate to no more than 5,000 pages per month. ECF No. 57, Mot. at 16.

As an initial matter, the Court rejects Defendants' suggestion that because "many FOIA cases take years to resolve" and "courts have issued orders providing for the processing of 500 pages per month, even where that schedule will result in lengthy production periods," ECF No. 60, Opp'n at 20, 22, a drawn-out production period should be accepted as the norm in this case. "The value of information is partly a function of time." Fiduccia v. D.O.J., 184 F.3d 1035, 1041 (9th Cir. 1999). Nineteen months have passed since Plaintiff's submitted its Request to Defendants, and under Defendant ICE's current rate of searching, the total number of pages to be produced is still unclear. Consequently, "Plaintiff would need to wait anywhere between an additional 30 months and over 12 years for ICE to complete its current production." ECF No. 61, Reply at 17. "Telling the requester 'You'll get the documents 15, or eight, years from now' amounts as a practical matter in most cases to saying 'regardless of whether you are entitled to the documents, we will not give them to you.'" Fiduccia, 184 F.3d at 1041.

Defendants' main argument against increasing the processing rate is that ICE has limited resources to review all FOIA requests, and increasing the processing rate in this litigation will necessarily delay production for other FOIA requests. See ECF No. 60, Opp'n at 25. The Court finds that ICE "has not presented the relevant data that would sufficiently explain what its capabilities are and demonstrate why asking it to do more would cause harm to other requestors." Seavy v. Dep't of Just., 266 F. Supp. Ed 241, 247 (D.D.C. July 20, 2017). For example, merely reciting the increase in the number of FOIA requests in recent years, the backlog of FOIA requests and number of current litigations, and average processing rate per month "doesn't shed any light on the key question: whether processing particularly large requests, at a faster rate would materially slow down the processing of other requests." Id. at 246 (The FBI's administrative efficiency arguments failed to demonstrate the diversion of resources from other FOIA requests); see also Elec. Priv. Info. Ctr. v. F.B.I., 933 F. Supp. 2d 42 (D.D.C. 2013) (The FBI's reliance on the number and complexity of FOIA requests, other FOIA litigation, and its backlog did not support "exceptional circumstances" warranting a stay of FOIA proceedings). ICE also does not explain why it has a large backlog of 29,398 FOIA requests. ECF No. 60-1, Declaration of Fernando Pinerio ("Pinero Decl.") at ¶ 4.

Defendants primarily rely on ACLU v. D.H.S., 20 Civ. 10083 (PGG), 2021 WL 5449733 (S.D.N.Y. 2021), see id. at 22, but in that case, ICE faced a 240% increase in FOIA requests between 2017 to 2020, staff vacancies due to the COVID-19 pandemic, and a larger number of active litigations, ACLU, 2021 WL 5449733, at *1. Unlike in ACLU, here, the Court must manage an indefinite and potentially years-long production period, in part, due to the delays that appear to have been resolvable in a quicker fashion if ICE technical staff were immediately available, or better yet, part of the process to give insight into actual issues prohibiting the more efficient gathering and review of relevant information. Compare id. ("[G]iven a processing rate

of 500 pages per month, production will be complete within eighteen months.") with Los Angeles Times, 2022 WL 18932816, at *3 (denying reconsideration of a 3,000 pages per month processing rate where defendants did not respond to plaintiff's FOIA requests until the commencement of the action, the defendants' "counterproposal would require nearly two years of additional review," defendants failed "to articulate good cause for their failure to respond to [p]laintiff's requests or for their proposed slower pace of review," and "the seriousness of underlying allegations regarding sexual and other abuse against ICE detainees."); Open Soc'y Just. Initiative, 399 F. Supp. 3d at 167 (denying reconsideration of a 5,000 pages per month processing rate given, in part, the "anticipated duration of the State Department's review").

Another factor related to arriving at an appropriate processing rate is the public importance of the information sought as well as the purpose for which it is being sought. See Nat. Res. Def. Council v. Dep't of Energy, 191 F. Supp. 2d 41, 43 (D.D.C. 2002) (granting expedited release of documents where the documents sought were of "enormous [public] concern" and a recent subject of national policymaking); Open Soc'y Just. Initiative, 399 F. Supp. 3d at 167 (increased processing rate where "the instant FOIA request concerns a matter of exceptional public importance and obvious and unusual time-sensitivity"). This Magistrate Judge is not comfortable making a quantitative assessment of the information sought in this FOIA versus the other FOIA requests pending, based on the record before it. However, this Magistrate Judge is comfortable stating that the it would be (and has been) of substantial importance and interest to the public, policy makers, and journalists to know what ICE's actions and policies have been with respect to actions that endanger detained migrants and what steps, if any, have been taken by the agency to "avoid public reporting and accountability for an untold number of deaths." ECF No. 61, Reply at 11; see Compl. at 1-4 (listing news articles addressing the topic of the Request). The possibility that more human life may be lost in the time this Request is processed (potentially extending twelve years), without public knowledge of the information Plaintiff seeks, creates an urgency and need to potentially commit more resources to addressing this Request.

In balancing "the competing interests at hand, as FOIA requires," that is "plaintiff['s] right to receive information on government activity" and "agency capabilities," Open Soc'y Just. Initiative, 399 F. Supp. 3d at 166, the Court finds it reasonable that: (1) ICE shall continue to process FOIA Records at a rate of 1,000 pages per month until March 4, 2024; (2) After March 4, 2024, Defendant ICE shall increase its process rate to 3,000 pages per month; and (3) Defendant ICE shall ensure that it has conducted email threading and de-duplication of records prior to processing to reduce the number of records to be processed and produced.

### 3. Further Status Conference

Plaintiff also requests that "the Court set a further Status Conference in December 2023" and that the "Court should also order a briefing schedule to address outstanding issues for the Court's intervention, with Plaintiff's brief due two weeks before, and Defendants' brief due one week before the December 2023 Status Conference. ECF No. 57, Mot. at 17. The Court finds that a future Status Conference would be appropriate to address any outstanding issues regarding the search and production, "set a summary judgment briefing schedule together with prior

deadlines for Defendants to produce search adequacy and *Vaughn* indices, and to re-set the trial date." See id.

The Court thus sets a Status Conference with the parties for March 4, 2024 at 9:30 AM via Zoom. By March 1, 2024, the parties shall each submit to the Court status updates, of no more than ten pages in length, double spaced, 14-point font, on the progress of searching and production. Defendant ICE shall include in its update: (1) an estimated time for concluding the search for responsive documents; (2) an estimated number of pages to be produced in response to the Request; and (3) an estimated time for completion of production at processing rate of 3,000 pages per month. The Court **may** order briefing on any issues raised at the Status Conference, but declines Plaintiff's proposal to require briefing before the Status Conference.

### III. CONCLUSION

For the reasons set forth above, Plaintiff's Motions is **GRANTED** as outlined below. Based on the foregoing, IT IS ORDERED THAT:

(1) The parties shall meet and confer according to the following:
  a. The parties shall meet and confer via telephone or video conference within two weeks of the Court's Order to address any outstanding issues regarding the search for records responsive to Plaintiff's Request;
  b. By January 22, 2024, ICE shall provide the following to Plaintiff: (a) for Parts 1-3, the total number of pages of documents yet to be produced by ICE, disaggregated by individual; (b) for Parts 1-3, the total number of pages of documents yet to be produced regarding Mr. Teka Gulema dated on or after October 1, 2015; and (c) for Parts 4 to 9, a hit count, broken down by Part, for each of the agreed-to searches (if any);
  c. By February 5, 2024, Plaintiff shall inform ICE whether it waives production of documents related to Mr. Teka Gulema dated before October 1, 2015, whether it waives production of any other portions of its Request, and whether it narrows the scope of any of its Requests; and
  d. The parties shall work cooperatively to narrow the search results for Parts 4 to 9, as needed, before the Status Conference set for March 4, 2024.

(2) ICE shall make its technical staff available to Defendants' counsel during a meet and confer to address any technical questions that may arise. Before any such meeting, the parties are to meet and confer on the topics that will be addressed as well as any matters ICE may consider to be subject to discovery;

(3) ICE shall continue to process FOIA Records at a rate of 1,000 pages per month until March 4, 2024. After March 4, 2024, Defendant ICE shall increase its process rate to 3,000 pages per month. Defendant ICE shall ensure that it has conducted email threading and de-duplication of records prior to processing to reduce the number of records to be processed and produced;

(4) By March 1, 2024, the parties shall each submit to the Court a status update, with page limit of ten pages, double spaced, 14-point font. Defendant ICE shall

    include in its update: (1) an estimated time for concluding the search for responsive documents; (2) an estimated number of pages to be produced in response to the Request; and (3) an estimated time for completion of production at processing rate of 3,000 pages per month; and

(5) A Status Conference with the parties will be held on March 4, 2024 at 9:30 AM via Zoom.

**IT IS SO ORDERED.**