# EXHIBIT A



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

## MEMORANDUM OF ACTIVITY

**Type of Activity**: Personal Contact: Interview of (b)(6); (b)(7)(C)  LVN

| **Case Number:** I19-ICE ERO-ELP-16066 | **Case Title:** Death of Jonathan Alberto Medina-Leon, Non-Employee, ICE, El Paso, TX |
|---|---|

On June 4, 2019, Special Agents (b)(6); (b)(7)(C), Department of Homeland Security (DHS), Office of Inspector General (OIG), El Paso, TX, and (b)(6); (b)(7)(C)  Immigration and Customs Enforcement (ICE), Office of Professional Responsibility (OPR), El Paso, TX, interviewed (b)(6); (b)(7)(C)  Licensed Vocational Nurse (LVN), Maintenance and Training Corporation (MTC), Otero County Processing Center (OCPC), Otero, NM.  The interview was in regards to an allegation involving the circumstances surrounding the death of Jonathan Alberto Medina-Leon, Non-DHS Employee, El Paso, TX, prior to her release from the OCPC. (b)(6); (b)(7)(C) agreed to a voluntary interview regarding the aforementioned allegation.

The following is from a Report of Investigation (ROI), provided by (b)(6); (b)(7)(C)  which documented the interview of (b)(6);

"On June 3, 2019, ERO El Paso notified OIG El Paso of the death of Jonathan Medina-Leon, a 25-year-old transgender female, at a local El Paso hospital five days after being released from ICE custody.  On June 3, 2019, OIG El Paso notified OPR El Paso of the death of the former ICE detainee.

On June 4, 2019, Senior Special Agent (b)(6); (b)(7)(C)  OPR El Paso, and Special Agent (b)(6); (b)(7)(C)  OIG El Paso, interviewed LVN (b)(6);, MTC, at the Otero County Processing Center, in Chaparral, New Mexico.

LVN (b)(6); (b)(7)(C) advised she was the main nurse that attended to Medina-Leon on May 27, 2109, the day before Medina was hospitalized.

RN (b)(6); (b)(7)(C) stated that on May 27, 2019, Registered Nurse (RN) (b)(6); (b)(7)(C)  MTC, instructed LVN (b)(6); to monitor Medina-Leon and take him to see Dr. (b)(6);  Medical Director, MTC, when Dr. (b)(6); arrived at the facility.  LVN (b)(6); stated that while she monitored Medina-Leon's condition, she observed Medina-Leon's temperature fluctuate from very high to very low temperatures.  LVN (b)(6); stated that during that time, Medina-Leon asked her if she thought her symptoms could be caused by (b)(6);  LVN (b)(6); advised that she asked Medina-Leon if she had engaged in (b)(6); (b)(7)(C)  LVN (b)(6); (b)(7)(C) stated Medina- Leon denied having engaged in

| Name, Title, Signature, and Date: (b)(6); (b)(7)(C)  (b)(6); (b)(7)(C) Special Agent | 6·21·2019 | Reviewing Official Name, Title, Signature, and Date: (b)(6); (b)(7)(C) for (b)(6); Special Agent in Charge | 6/21/19 |
|---|---|---|---|

**IMPORTANT NOTICE**
This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General, and is disseminated only on a need-to-know basis.  This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General.  Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552.  Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

Cho Decl. ISO MSJ
Exhibit A
Page 8

ISO MSJ

Page 1 of 2

Item #:

Exh. 00001

**DHS-OIG November 2022 0015**

## MEMORANDUM OF ACTIVITY

[(b)(6); (b)(7)(C)] but explained that she had worked as a nurse about a year before at which time she had been stuck by a dirty hypodermic needle. LVN [(b)(6); (b)(7)(C)] stated Medina-Leon informed her she had been instructed to undergo medical testing to determine if she had been exposed to disease by the dirty needle, but she never sought the recommended follow-up testing.

LVN [(b)(6);] stated that when Dr. [(b)(6);] arrived, he examined Medina-Leon and based on Medina-Leon's condition, Dr. [(b)(6);] ordered numerous lab tests, to include a test for [(b)(6);] LVN [(b)(6);] stated Medina-Leon was administered a liter of intravenous (IV) fluid, Tylenol, and an antacid. LVN [(b)(6);] explained the antacid was for gastritis, which was not uncommon for detainees who were not used to the food served in the facility.

LVN [(b)(6); (b)(7)(C)] advised that shortly after the IV was administered, Medina-Leon began to experience chest pain. LVN [(b)(6); (b)(7)(C)] stated Dr. [(b)(6);] then ordered that Medina-Leon be given an electrocardiogram (EKG). LVN [(b)(6);] stated medical staff contacted Dr. [(b)(6);] with the results of the EKG and based on the results of the EKG, Dr. [(b)(6);] ordered that EMS be contacted to transport Medina-Leon to the hospital. LVN [(b)(6); (b)(7)(C)] stated Dr. [(b)(6);] instructed staff to get an automated external defibrillator (AED) and sit with Median-Leon until the ambulance arrived.

LVN [(b)(6); (b)(7)(C)] advised while Medina-Leon waited for the ambulance, Dr. [(b)(6);] received the results of Medina-Leon's [(b)(6); (b)(7)(C)] LVN [(b)(6);] stated Dr. [(b)(6); (b)(7)(C)] told Medina-Leon the lab results showed Medina-Leon [(b)(6); (b)(7)(C)] LVN [(b)(6); (b)(7)(C)] stated that upon learning that she [(b)(6); (b)(7)(C)] Medina-Leon covered her face and cried. LVN [(b)(6); (b)(7)(C)] examined Medina-Leon's lab chart and stated Medina Leon departed the OCPC on May 28, 2019 at 11:53 a.m. LVN [(b)(6);] stated she later learned of Medina-Leon's death from Facebook posts."

A copy of the ROI prepared by [(b)(6); (b)(7)(C)] will be made part of this report.

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

INV FORM-09

Cho Decl. ISO MSJ
Exhibit A
Page 9

**DHS-OIG November 2022 0016**

Exh. 00002



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

## MEMORANDUM OF ACTIVITY

**Type of Activity**: Personal Contact: Interview of LVN (b)(6); (b)(7)(C)

| | |
|---|---|
| ***Case Number:*** I19-ICE ERO-ELP-16066 | ***Case Title:*** Death of Jonathan Alberto Medina-Leon, Non-Employee, ICE, El Paso, TX |

On June 5, 2019, Special Agents (b)(6); (b)(7)(C) Department of Homeland Security (DHS), Office of Inspector General (OIG), El Paso, TX, and (b)(6); (b)(7)(C) Immigration and Customs Enforcement (ICE), Office of Professional Responsibility (OPR), El Paso, TX, interviewed (b)(6); (b)(7)(C) , Licensed Vocational Nurse (LVN), Maintenance and Training Corporation (MTC), Otero County Processing Center (OCPC), Otero, NM.  The interview was in regards to an allegation involving the circumstances surrounding the death of Jonathan Alberto Medina-Leon, Non-DHS Employee, El Paso, TX, prior to her release from the OCPC. (b)(6); (b)(7)(C) agreed to a voluntary interview regarding the aforementioned allegation.

(b)(6); stated her assigned duties at the MTC are to assist in medically evaluating new detainees upon arrival and to provide detainees with their prescribed medications at the OCPC. (b)(6); (b)(7)(C) recalled she assisted in medically evaluating Medina when she (Medina) arrived on April 14, 2019. (b)(6); (b)(7)(C) stated Medina notified her she was a transgender female. (b)(6); (b)(7)(C) stated Medina refused a (b)(6); (b)(7)(C) test when she arrived at the facility. An (b)(6); test is a blood test used to screen for (b)(6); (b)(7)(C) added Medina constantly dealt with gastrointestinal issues throughout her stay at the OCPC.

Agents presented two documents filled out by (b)(6); (b)(7)(C) during Medina's medical evaluation on April 14, 2019.  Agents pointed out that (b)(6); checked "Yes" to a question that asked Medina if she ever had a history of (b)(6); (b)(7)(C) Agents explained there were no notes or explanation noted after Medina's answer. (b)(6); (b)(7)(C) stated that April 14, 2019, was her third day of employment with MTC and she incorrectly annotated Medina's answer. (b)(6); (b)(7)(C) further explained there would have been an explanation below the answer providing the details of Medina's (b)(6); (b)(7)(C)

The second medical document presented to (b)(6); (b)(7)(C) was Medina's Dental Screening questionnaire. (b)(6); (b)(7)(C) indicated Medina answered "Yes" to a question asking if she possessed "extreme dental pain/trauma or an acute oral infection." (b)(6); replied she incorrectly checked the "Yes" box again, and explained there would have been an explanation below the answer providing the details of Medina's dental history had there been any.

A copy of the (b)(6); refusal signed by Medina will be placed into the case file.

| Name, Title, Signature, and Date: (b)(6); (b)(7)(C) | | Reviewing Official Name, Title, Signature, and Date: (b)(6); (b)(7)(C) | |
|---|---|---|---|
| | 6-12-2019 | for | 6/13/19 |
| (b)(6); (b)(7)(C)  **Special Agent** | | (b)(6); ...nt in Charge (b)(6); (b)(7)(C) | |

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General, and is disseminated only on a need-to-know basis.  This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General.  Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552.  Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

INV FORM 09

Item #:

Cho Decl. ISO MSJ
Exhibit A
Page 10

**DHS-OIG November 2022 0020**

Exh. 00003



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

## MEMORANDUM OF ACTIVITY

**Type of Activity**: Personal Contact: Interview of [(b)(6); (b)(7)(C)] DO, ICE ERO, Otero, NM

| **Case Number:** I19-ICE ERO-ELP-16066 | **Case Title:** Death of Jonathan Alberto Medina-Leon, Non-Employee, ICE, El Paso, TX |
|---|---|

On June 5, 2019, Special Agents [(b)(6); (b)(7)(C)], Department of Homeland Security (DHS), Office of Inspector General (OIG), El Paso, TX, and [(b)(6); (b)(7)(C)] Immigration and Customs Enforcement (ICE), Office of Professional Responsibility (OPR), El Paso, TX, interviewed [(b)(6); (b)(7)(C)] Deportation Officer (DO), ICE, Enforcement and Removal Operations (ERO), Otero, NM. The interview was in regards to an allegation involving the circumstances surrounding the death of Jonathan Alberto Medina-Leon, Non-DHS Employee, El Paso, TX, prior to her release from the OCPC. [(b)(6);] agreed to a voluntary interview regarding the aforementioned allegation.

The following is from a Report of Investigation (ROI), provided by [(b)(6); (b)(7)(C)] which documented the interview of [(b)(6);]

"On June 2, 2019, ERO El Paso notified OIG El Paso of the death of Jonathan Medina-Leon, a 25-year-old transgender female, at a local El Paso hospital five days after being released from ICE custody. On June 2, 2019, OIG El Paso notified OPR El Paso of the death of the former ICE detainee.

On June 5, 2019, Senior Special Agent [(b)(6); (b)(7)(C)], OPR El Paso, and Special Agent [(b)(6); (b)(7)(C)] OIG El Paso, interviewed DO [(b)(6); (b)(7)(C)], ERO El Paso, at the Otero County Processing Center, in Chaparral, New Mexico.

DO [(b)(6);] stated that he was responsible for [(b)(6); (b)(7)(C); (b)(3):Unspecified Statute]
[(b)(6); (b)(7)(C); (b)(3):Unspecified Statute]

[(b)(6); (b)(7)(C); (b)(3):Unspecified Statute]    DO [(b)(6);] stated he never met

Medina-Leon [(b)(6); (b)(7)(C); (b)(3):Unspecified Statute]

[(b)(6); (b)(7)(C); (b)(3):Unspecified Statute]

DO [(b)(6);] explained, although Medina was served in person by video conference, local policy

| Name, Title, Signature, and Date: [(b)(6); (b)(7)(C)] [(b)(6); (b)(7)(C)] **Special Agent** | 7-8-2019 | Reviewing Official Name, Title, Signature, and Date: [(b)(6); (b)(7)(C)] [(b)(6); (b)(7)(C)] Acting Special Agent in Charge [(b)(6)] | 7-8-19 |
|---|---|---|---|

**IMPORTANT NOTICE**
This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General, and is disseminated only on a need to know basis. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

Cho Decl.
Exhibit A
Page 11

INV FORM-09                    Page 1 of 2

**DHS-OIG November 2022 0023**

Item #:
Exh. 00004

## MEMORANDUM OF ACTIVITY

required that Medina-Leon [(b)(6); (b)(7)(C); (b)(3):Unspecified Statute] before it was filed with the ICE Executive Office of Immigration Review. DO [(b)(6);] stated that after Medina-Leon's [(b)(6); (b)(7)(C); (b)(3):Unspecified Statute] [(b)(6); (b)(7)(C)] USCIS sent Medina-Leon's file to ERO El Paso for processing.

DO [(b)(6);] advised he was not certain when ERO El Paso received the file after USCIS sent it. DO [(b)(6);] explained large volumes of cases are adjudicated by USCIS and ERO El Paso processes files as soon as possible after they are received. DO [(b)(6);] sated that based on Medina-Leon's [(b)(6); (b)(7)(C); (b)(3):Unspecified Statute] Medina-Leon would likely have been processed for a parole which would allow her to be released from ICE custody while she waited for a hearing before an immigration judge.

DO [(b)(6);] stated that on May 28, 2019, Supervisory Detention and Deportation Officer (SDDO) [(b)(6); (b)(7)(C)] ERO El Paso, called him and instructed him to prepare Medina-Leon's Notice to Appear (NTA) paperwork to be served. DO [(b)(6);] advised that SDDO [(b)(6);] told him that DO [(b)(6);] was preparing parole paperwork to release Medina-Leon from ICE custody.

DO [(b)(6);] stated that sometime during the afternoon of May 28, 2019, SDDO [(b)(6); (b)(7)(C)] instructed him to go with DO [(b)(6); (b)(7)(C)] ERO El Paso, to Del Sol Medical Center and serve Medina-Leon with NTA and parole documents.

DO [(b)(6);] advised that on May 28, 2019, at approximately 5:30 p.m., he and DO [(b)(6);] served Medina-Leon with NTA and parole paperwork at Del Sol Medical Center, in El Paso, Texas. DO [(b)(6);] stated that Medina-Leon looked through the documents and signed them in the appropriate locations acknowledging service. DO [(b)(6);] described Medina-Leon as alert and responsive at the time he and DO [(b)(6);] served the paperwork.

SSA [(b)(6); (b)(7)(C)] examined forms contained in MEDINA-Leon's file and observed that the file contained [(b)(6); (b)(7)(C); (b)(3):Unspecified Statute] [(b)(6); (b)(7)(C); (b)(3):Unspecified Statute]

[(b)(6); (b)(7)(C); (b)(3):Unspecified Statute] SSA [(b)(6); (b)(7)(C)] observed that the file contained a Form I-94, Arrival/Departure record. The Form I-94 was stamped indicating Medina-Leon was issued a parole on May 28, 2019 for humanitarian purposes and the parole was valid until May 28, 2020."

**IMPORTANT NOTICE**
This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of this report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

Cho Decl. ISO MSJ
Exhibit A
Page 12

**DHS-OIG November 2022 0024**                      Exh. 00005



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

## MEMORANDUM OF ACTIVITY

**Type of Activity**: Personal Contact: Interview of [(b)(6); (b)(7)(C)] MD

| **Case Number:** I19-ICE ERO-ELP-16066 | **Case Title:** Death of Jonathan Alberto Medina-Leon, Non-Employee, ICE, El Paso, TX |
|---|---|

On June 5, 2019, Special Agents [(b)(6); (b)(7)(C)], Department of Homeland Security (DHS), Office of Inspector General (OIG), El Paso, TX, and [(b)(6); (b)(7)(C)] Immigration and Customs Enforcement (ICE), Office of Professional Responsibility (OPR), El Paso, TX, interviewed [(b)(6); (b)(7)(C)] Medical Doctor (MD), Maintenance and Training Corporation (MTC), Otero County Processing Center (OCPC), Otero, NM. The interview was in regards to an allegation involving the circumstances surrounding the death of Jonathan Alberto Medina-Leon, Non-DHS Employee, El Paso, TX, prior to her release from the OCPC. [(b)(6);] agreed to a voluntary interview regarding the aforementioned allegation.

[(b)(6);] stated he never physically saw Medina at the OCPC until May 27, 2019. [(b)(6);] stated he was approached by [(b)(6); (b)(7)(C)], Registered Nurse (RN), MTC, OCPC, Otero, NM, upon arrival to the medical unit and asked to look at Medina. According to [(b)(6); (b)(7)(C)] [(b)(6); (b)(7)(C)] explained Medina possessed a rash on her forehead. [(b)(6);] stated the OCPC had been experiencing a chickenpox outbreak among detainees at the facility.

Prior to his visit with Medina, [(b)(6); (b)(7)(C)] stated he looked over her medical file which indicated her blood pressure had been low, had a high sitting pulse rate and had lost approximately 22 pounds since her arrival at OCPC. [(b)(6);] explained that on paper, Medina appeared dehydrated and required an intravenous saline drip (IV). When [(b)(6);] walked over to Medina, he noticed her skin was a "yellowish" color, she was weak and very thin. [(b)(6);] further explained Medina told him she had been vomiting and had been dealing with stomach issues. [(b)(6); (b)(7)(C)] stated Medina told him she had never been tested for the [(b)(6); (b)(7)(C)] [(b)(6); (b)(7)(C)] or [(b)(6);] and never had a [(b)(6); (b)(7)(C)].

[(b)(6);] stated he ordered blood tests in an attempt to diagnose Medina's symptoms. [(b)(6); (b)(7)(C)] [(b)(6); (b)(7)(C)] [(b)(6);] stated Medina's vitals indicated that her heart struggled to pump blood throughout her body. He ordered an IV and an antibiotic (in the event she had a bacterial infection) for her while they awaited the results of the blood test. A short time later, [(b)(6);] stated he looked in on Medina and noticed her pulse rate had slowed a bit and she showed no signs of acute distress. [(b)(6);] further stated Medina told him she was feeling better. [(b)(6);] explained he then placed Medina into a medical isolation room while he waited for the test results.

| Name, Title, Signature, and Date [(b)(6); (b)(7)(C)] | | Reviewing [(b)(6); (b)(7)(C)] | |
|---|---|---|---|
| [(b)(6); (b)(7)(C)]  **Special Agent** | 6·19·2019 | for  [(b)(6);]  Special Agent in Charge | 6/14/19 |

**IMPORTANT NOTICE**
This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General, and is disseminated only on a need to know basis. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

Cho Decl. ISO MSJ
Exhibit A
Page 13

DHS-OIG November 2022 0025

Exh. 00006

# MEMORANDUM OF ACTIVITY

[b)(6); b)(7)(C)] stated he obtained Medina's blood test results the following day (May 28, 2019).   One of the test results showed high potassium levels, to which [b)(6);] stated it indicated Medina was having heart issues. [b)(6);] said he ordered an Electrocardiogram (EKG) for Medina.  Once the results of the EKG were sent to [b)(6);], he called [b)(6);] and asked her to call for an ambulance. [b)(6);] explained the results showed Medina might have been having a heart attack or was about to. [b)(6);] stated he was contacted a short time later and notified of Medina's [b)(6); b)(7)(C)] [b)(6);] said he asked [b)(6); b)(7)(C)] to notify Medina [b)(6); b)(7)(C)] [b)(6);]

[b)(6);] stated a representative at Del Sol Medical Center hospital later notified him of Medina's passing. [b)(6);] stated he could not provide a reason why Medina was referred to him and/or the Nurse Practitioner (NP) on May 24, 2019, but not seen until May 27, 2019. [b)(6);] stated someone at OCPC should have telephoned him or the NP as to the condition of Medina prior to May 27th. [b)(6);] stated he is available 24 hours a day, seven days a week.

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General.  This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General.  Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552.  Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

INV FORM-09                    Page 2 of 2

Cho Decl. ISO MSJ
Exhibit A
Page 14                    **DHS-OIG November 2022 0026**                    Exh. 00007



# OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security

## MEMORANDUM OF ACTIVITY

**Type of Activity:** Personal Contact: Interview of (b)(6); (b)(7)(C)

| *Case Number:* I19-ICE ERO-ELP-16066 | *Case Title:* Death of Jonathan Alberto Medina-Leon, Non-Employee, ICE, El Paso, TX |
|---|---|

On June 6, 2019, Special Agents (b)(6); (b)(7)(C) Department of Homeland Security (DHS), Office of Inspector General (OIG), El Paso, TX, and (b)(6); (b)(7)(C) Immigration and Customs Enforcement (ICE), Office of Professional Responsibility (OPR), El Paso, TX, interviewed (b)(6); (b)(7)(C) Supervisory Detention and Deportation Officer (SDDO), ICE, Enforcement and Removal Operations (ERO), Otero, NM.  The interview was in regards to an allegation involving the circumstances surrounding the death of Jonathan Alberto Medina-Leon, Non-DHS Employee, El Paso, TX, prior to her release from the OCPC. (b)(6); agreed to a voluntary interview regarding the aforementioned allegation.

The following is from a Report of Investigation (ROI), provided by (b)(6); (b)(7)(C) which documented the interview of (b)(6);

"On June 2, 2019, ERO El Paso notified OIG El Paso of the death of Jonathan Medina-Leon, a 25-year-old transgender female, at Del Sol Medical Center (DSMC) five days after being released from ICE custody. On June 2, 2019, OIG El Paso notified OPR El Paso of the death of the former ICE detainee.

On June 6, 2019, Senior Special Agent (b)(6); (b)(7)(C) OPR El Paso, and Special Agent (b)(6); (b)(7)(C), OIG El Paso, interviewed SDDO (b)(6); ERO El Paso, at the Otero County Processing Center (OCPC), in Chaparral, New Mexico. The following paragraphs contain a summary of statements made by SDDO (b)(6); during the interview.

(b)(6); (b)(7)(C); (b)(3):Unspecified Statute

(b)(6); (b)(7)(C); (b)(3):Unspecified Statute SDDO (b)(6); stated that once the documents were received by ERO El Paso, the case would be referred to a docket officer who would personally serve Medina-Leon with the NTA, then file the document with the Executive Office of Immigration Review (EIOR). SDDO (b)(6); stated the EIOR requires an NTA be served in person and does not accept documents served telephonically.

| Name, Title, Signature, and Date: | (b)(6); (b)(7)(C) | | Reviewing Official Name, Title, Signature, and Date: | |
|---|---|---|---|---|
| | | 8-12-19 | for (b)(6); (b)(7)(C) | 8/12/19 |
| (b)(6); (b)(7)(C)   **Special Agent** | | | (b)(6); (b)(7)(C) **, Acting Special Agent in Charge** | |

### IMPORTANT NOTICE
This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General, and is disseminated only on a need to know basis.  This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General.  Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552.  Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

Cho Decl. ISO MSJ
Exhibit A
Page 15

**DHS-OIG November 2022 0028**                          Exh. 00008

## MEMORANDUM OF ACTIVITY

(b)(6); stated that on May 28, 2019, he was notified by email that Medina-Leon was ill and had been transported to the DSMC Emergency Room by EMS (Emergency Medical Services). SDDO (b)(6); advised that Management and Training Corporation (MTC) personnel notified ERO El Paso management, the ICE Office of Chief Counsel (OCC), MTC management, and the ICE Heath Service Corps (IHSC), regarding Medina-Leon's hospitalization.

SDDO (b)(6); (b)(7)(C) stated he later received an email from the IHSC advising that Medina-Leon (b)(6), (b)(7)(C) and the IHSC recommended an alternative to detention if Medina-Leon was not subject to mandatory detention. SDDO (b)(6); stated he had Deportation Officer (DO (b)(6); (b)(7)(C) , ERO El Paso, prepare documents to release Medina-Leon on parole and then waited to see if Medina-Leon would be admitted to DSMC or returned to the OCPC.

SDDO (b)(6); stated that later during the afternoon of May 28, 2019, Assistant Field Operations Director (AFOD) (b)(6); ERO El Paso, called him and advised Medina Leon had been admitted to DSMC and instructed that Medina-Leon be served with the NTA and parole documents. SDDO (b)(6); stated he then contacted SDDO (b)(6); (b)(7)(C) who sent DOs to serve Medina-Leon with the documents at DSMC. SDDO (b)(6); stated that service of the parole documents released Medina-Leon from ICE custody. SDDO (b)(6); stated that on June 1, 2019, he received an email from AFOD (b)(6); notifying him that Medina-Leon had died."

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

INV FORM-09

**DHS-OIG November 2022 0029**



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

## MEMORANDUM OF ACTIVITY

**Type of Activity**: Personal Contact: Interview of (b)(6); (b)(7)(C)  FMC, RN, IHSC, ICE ERO

| **Case Number:** I19-ICE ERO-ELP-16066 | **Case Title:** Death of Jonathan Alberto Medina-Leon, Non-Employee, ICE, El Paso, TX |
|---|---|

On June 25, 2019, Special Agents (b)(6); (b)(7)(C)  Department of Homeland Security (DHS), Office of Inspector General (OIG), El Paso, TX, and (b)(6); (b)(7)(C)  Immigration and Customs Enforcement (ICE), Office of Professional Responsibility, El Paso, TX, interviewed (b)(6); (b)(7)(C)  Field Medical Coordinator and Registered Nurse, ICE, Health Service Corps, El Paso, TX. The interview was in regards to an allegation involving the circumstances surrounding the death of ICE detainee Jonathan Alberto Medina-Leon, Non-DHS Employee, El Paso, TX, prior to her release from the Otero County Processing Center (OCPC), Otero, NM. (b)(6); (b)(7)(C) agreed to a voluntary interview regarding the aforementioned allegation.

(b)(6); (b)(7)(C) stated he recalled receiving an email on May 28, 2019, from the Management and Training Corporation (MTC), OCPC, stating that detainee Medina was being transported from the OCPC to the Del Sol Medical Center (DSMC) in El Paso, TX. (b)(6); (b)(7)(C) said the email advised Medina was being referred to the DSMC for uncontrolled hypertension, chest pains, an abnormal electrocardiogram and significant weight loss.

(b)(6); (b)(7)(C) stated he went to the DSMC and spoke with Medina. According to (b)(6); (b)(7)(C) Medina stated she felt well prior to her current medical condition (b)(6); (b)(7)(C) (b)(6); (b)(7)(C)

(b)(6); (b)(7)(C) stated he telephonically contacted (b)(6); (b)(7)(C), Assistant Field Office Director, ICE, Enforcement and Removal Operations (ERO), El Paso, TX, to inform (b)(6); that he (b)(6); (b)(7)(C) planned to compose an email to recommend "alternative detention," should Medina not require mandatory detention at the OCPC.

(b)(6); (b)(7)(C) stated approximately one hour later he sent an email to ICE ERO management and the MTC, which stated that Medina was (b)(6); (b)(7)(C) transgender, who had lost significant weight over the last several weeks with uncontrollable hypertension. (b)(6); (b)(7)(C) suggested that, if possible, Medina be granted "alternative detention" from ICE ERO custody.

Sometime in the evening of May 28, 2019, (b)(6); (b)(7)(C) stated he received an email from (b)(6); which stated Medina was no longer in ICE ERO Custody.

| Name, Title, Signature, and Date: (b)(6); (b)(7)(C) | Review (b)(6); (b)(7)(C) ature, and Date: |
|---|---|
| (b)(6); (b)(7)(C)  **Special Agent**  7-8-2019 | (b)(6); (b)(7)(C)  **Acting Special Agent in Charge**  7-8-19 |

**IMPORTANT NOTICE**
This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General, and is disseminated only on a need to know basis. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.



# OFFICE OF INSPECTOR GENERAL
### Department of Homeland Security

## MEMORANDUM OF ACTIVITY

**Type of Activity**: Other: Requested Death Certificate of Jonathan Medina

| *Case Number:* I19-ICE ERO-ELP-16066 | *Case Title:* Death of Jonathan Alberto Medina-Leon, Non-Employee, ICE, El Paso, TX |
|---|---|

On August 12, 2019, the Department of Homeland Security, Office of Inspector General requested and was provided a certified copy of Jonathan Alberto Medina-Leon's Certificate of Death from the El Paso County. The Certificate of Death stated the "IMMEDIATE CAUSE (Final disease or condition resulting in death)" was "Sepsis." The Certificate of Death further listed "Pneumonia" (b)(6), (b)(7)(C) as underlying causes resulting in the death of Medina.

According to the Certificate of Death, Medina's remains were sent to "CEMENTERIO PARQUE JARDIN LAS FLORES, SANTA ANA, ES."

A copy of the Certificate of Death will be included as part of this report.

| Name, Title, Signature, and Date: | | Reviewing Official Name, Title, Signature, and Date: | |
|---|---|---|---|
| (b)(6); (b)(7)(C) **Special Agent** | (b)(6); (b)(7)(C)  *8·19·19* | (b)(6); (b)(7)(C) for _____ (b)(6); (b)(7)(C) (b)(6); **Agent in Charge** | 8/19/19 |

**IMPORTANT NOTICE**
This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General, and is disseminated only on a need-to-know basis. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

| INV FORM-09 | Page 1 of 1 | Item #: |
|---|---|---|

Cho Decl. ISO MSJ
Exhibit A
Page 18

**DHS-OIG November 2022 0037**

Exh. 00011

## CERTIFICATION OF VITAL RECORD

# EL PASO COUNTY

TEXAS DEPARTMENT OF STATE HEALTH SERVICES - VITAL STATISTICS

Jun 27 2019

**STATE OF TEXAS — CERTIFICATE OF DEATH**

STATE FILE NUMBER 142-19-095989

| | |
|---|---|
| 1. LEGAL NAME OF DECEASED (Include AKA's, if any) (First, Middle, Last) | 2. DATE OF DEATH - ACTUAL OR PRESUMED (mm-dd-yyyy) |
| JONATHAN ALBERTO MEDINA LEON | JUNE 1, 2019 |

| 3. SEX | 4. DATE OF BIRTH (mm-dd-yyyy) | 5. AGE-Last Birthday (Years) | If UNDER 1 YR Mo Days | If UNDER 1 DAY Hours Min | 6. BIRTHPLACE (City & State or Foreign Country) |
|---|---|---|---|---|---|
| MALE | (b)(6); | 25 | | | EL SALVADOR |

| 7. SOCIAL SECURITY NUMBER | 8. MARITAL STATUS AT TIME OF DEATH | 9. SURVIVING SPOUSE'S NAME (If spouse, give name prior to first marriage) |
|---|---|---|
| | ☐ Married ☐ Widowed (and not remarried) ☐ Divorced (and not remarried) ☒ Never Married ☐ Unknown | |

| 10a. RESIDENCE STREET ADDRESS | 10b. APT. NO. | 10c. CITY OR TOWN |
|---|---|---|
| (b)(6); (b)(7)(C) | | SANTA ANA |

| 10d. COUNTY | 10e. STATE | 10f. ZIP CODE | 10g. INSIDE CITY LIMITS? |
|---|---|---|---|
| | EL SALVADOR | | ☒ Yes ☐ No |

| 11. FATHER/PARENT 2 NAME PRIOR TO FIRST MARRIAGE | 12. MOTHER/PARENT 1 NAME PRIOR TO FIRST MARRIAGE |
|---|---|
| (b)(6); (b)(7)(C) | (b)(6); (b)(7)(C) |

**13. PLACE OF DEATH (CHECK ONLY ONE)**

IF DEATH OCCURRED IN A HOSPITAL: ☒ Inpatient ☐ ER/Outpatient ☐ DOA
IF DEATH OCCURRED SOMEWHERE OTHER THAN A HOSPITAL: ☐ Hospice Facility ☐ Nursing Home ☐ Decedent's Home ☐ Other (Specify)

| 14. COUNTY OF DEATH | 15. CITY/TOWN, ZIP (IF OUTSIDE CITY LIMITS, GIVE PRECINCT NO) | 16. FACILITY NAME (if not institution, give street address) |
|---|---|---|
| EL PASO | EL PASO, 79925 | DEL SOL MEDICAL CENTER |

| 17. INFORMANT'S NAME & RELATIONSHIP TO DECEASED | 18. MAILING ADDRESS OF INFORMANT (Street and Number, City, State, Zip Code) |
|---|---|
| (b)(6); (b)(7)(C) - CONSULATE OF EL SALVADOR | 400 W. SAN ANTONIO SUITE B, EL PASO, TX 79901 |

| 19. METHOD OF DISPOSITION | 20. SIGNATURE AND LICENSE NUMBER OF FUNERAL DIRECTOR OR PERSON ACTING AS SUCH | 21. |
|---|---|---|
| ☒ Burial ☐ Cremation ☐ Donation ☐ Entombment ☐ Removal from state ☐ Mausoleum ☐ Other (Specify) | BY ELECTRONIC SIGNATURE - 11127 (b)(6); | ☒ Unknown Section Block Lot Space |

| 22. PLACE OF DISPOSITION (Name of cemetery, crematory, other place) | 23. LOCATION (City/Town, and State) |
|---|---|
| CEMENTERIO PARQUE JARDIN LAS FLORES | SANTA ANA, ES |

| 24. NAME OF FUNERAL FACILITY | 25. COMPLETE ADDRESS OF FUNERAL FACILITY (Street and Number, City, State, Zip Code) |
|---|---|
| LA PAZ FUNERAL HOME | 3331 ALAMEDA AVE, EL PASO, TX 79905 |

**26. CERTIFIER (Check only one)**
☐ Certifying physician-To the best of my knowledge, death occurred due to the cause(s) and manner stated.
☒ Medical Examiner/Justice of the Peace - On the basis of examination, and/or investigation, in my opinion, death occurred at the time,date and place, and due to the cause(s) and manner stated.

| 27. SIGNATURE OF CERTIFIER | 28. DATE CERTIFIED (mm-dd-yyyy) | 29. LICENSE NUMBER | 30. TIME OF DEATH (Actual or presumed) |
|---|---|---|---|
| (b)(6); BY ELECTRONIC SIGNATURE | JUNE 26, 2019 | (b)(6) | 10:12 PM |

| 31. PRINTED NAME, ADDRESS OF CERTIFIER (Street and Number, City,State,Zip Code) | 32. TITLE OF CERTIFIER |
|---|---|
| (b)(6); 10555 VISTA DEL SOL, STE 120, EL PASO, TX 79925 | MD |

**33. PART 1. ENTER THE CHAIN OF EVENTS - DISEASES, INJURIES, OR COMPLICATIONS - THAT DIRECTLY CAUSED THE DEATH. DO NOT ENTER TERMINAL EVENTS SUCH AS CARDIAC ARREST, RESPIRATORY ARREST, OR VENTRICULAR FIBRILLATION WITHOUT SHOWING THE ETIOLOGY. DO NOT ABBREVIATE. ENTER ONLY ONE CAUSE ON EACH.**

| | | Approximate interval Onset to death |
|---|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) → a. SEPSIS | Due to (or as a consequence of): | UNKNOWN |
| Sequentially list conditions, if any, leading to the cause listed on line a. Enter the UNDERLYING CAUSE (disease or injury that initiated, the events resulting in death) LAST b. PNEUMONIA | Due to (or as a consequence of): | UNKNOWN |
| c. (b)(6); (b)(7)(C) | Due to (or as a consequence of): | UNKNOWN |

**33. PART 2. ENTER OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN PART I.**

| 34. WAS AN AUTOPSY PERFORMED? ☐ Yes ☒ No |
|---|
| 35. WERE AUTOPSY FINDINGS AVAILABLE TO COMPLETE THE CAUSE OF DEATH? ☐ Yes ☐ No |

| 36. MANNER OF DEATH | 37. DID TOBACCO USE CONTRIBUTE TO DEATH? | 38. IF FEMALE: | 39. IF TRANSPORTATION INJURY, SPECIFY |
|---|---|---|---|
| ☒ Natural ☐ Accident ☐ Suicide ☐ Homicide ☐ Pending Investigation ☐ Could not be determined | ☐ Yes ☐ No ☐ Previously ☐ Probably ☒ Unknown | ☐ Not pregnant within past year ☐ Not pregnant at time of death ☐ Not pregnant, but pregnant within 42 days of death ☐ Not pregnant, but pregnant 43 days to one year before death ☐ Unknown if pregnant within the past year | ☐ Driver/Operator ☐ Passenger ☐ Pedestrian ☐ Other (Specify) |

| 40a. DATE OF INJURY(mm-dd-yyyy) | 40b. TIME OF INJURY | 40c. INJURY AT WORK? ☐ Yes ☐ No | 40d. PLACE OF INJURY (e.g. Decedent's home, construction site, restaurant, wooded area) |
|---|---|---|---|
| | | | |

| 40e. LOCATION (Street and Number, City,State,Zip Code) | 40f. COUNTY OF INJURY |
|---|---|
| | |

41. DESCRIBE HOW INJURY OCCURRED

| 42a. REGISTRAR FILE NO. | 42b. DATE RECEIVED BY LOCAL REGISTRAR | 42c. REGISTRAR |
|---|---|---|
| 01002867 | JUNE 27, 2019 | REGISTRAR - EL PASO COUNTY CLERK, ELECTRONICALLY FILED |

EDR NUMBER 000044444516694

WARNING: The penalty for knowingly making a false statement in this form can be 2-10 years in person and a fine of $10,000. Health and Safety Code, Sec. 195.003

VS-112 REV 1/2006
S00084O162

This is a true and correct reproduction of the original record as recorded in this office. Issued under authority of Section 191.051, Health and Safety Code.

(b)(6); (b)(6); (b)(7)(C)

County Clerk/Local Registrar

AUG 1 2 2019 ISSUED

WARNING: THIS DOCUMENT...

Cho Decl. ISO MSJ
Exhibit A
Page 19

DHS-OIG November 2022 0038

Exh. 00012



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

## MEMORANDUM OF ACTIVITY

**Type of Activity:** Other: Documents Contained in Medina's Medical File

| **Case Number:** I19-ICE ERO-ELP-16066 | **Case Title:** Death of Jonathan Alberto Medina-Leon, Non-Employee, ICE, El Paso, TX |
|---|---|

On August 26, 2019, Special Agent (b)(6); (b)(7)(C) Immigration and Customs Enforcement (ICE), Office of Professional Responsibility (OPR), El Paso, TX, prepared a report documenting the information contained in the medical file of Jonathan Alberto Medina-Leon, Non-DHS Employee, El Paso, TX.

The following is from an ICE OPR Report of Investigation, provided by (b)(6); (b)(7)(C) which is verbatim and unedited:

"On June 2, 2019, ERO El Paso notified OIG El Paso of the death of Jonathan Medina-Leon, a 25-year-old transgender female, at Del Sol Medical Center (DSMC), five days after being released from ICE custody. On June 2, 2019, OIG El Paso notified OPR El Paso of the death of the former ICE detainee.

Senior Special Agent (SSA) (b)(6); (b)(7)(C) OPR El Paso examined documents contained in Medina-Leon's medical file, which was created and maintained by Management and Training Corporation (MTC) medical personnel while Medina-Leon was in ICE custody at the Otero County Processing Center (OCPC), Chaparral, NM. The following paragraphs are a summary of information documented in the medical file.

On April 14, 2019, Medina-Leon was administered an intake screening where she was medically evaluated by MTC medical staff who found her to be in good health. During the initial medical evaluation, Medina-Leon identified herself as male who identified as a transgender female and was referred to the MTC Mental Health Provider (MHP) for evaluation as is MTC protocol for individuals identifying themselves as transgender. The MHP found Medina-Leon to be in good mental health and recommended Medina-Leon be isolated from general detainee population as per Medina-Leon's request. Documents indicate Medina-Leon was instructed on how to access medical care via the sick call and emergency referral processes. On April 14, 2019, Medina-Leon signed a form declining a (b)(6); (b)(7)(C) test. The (b)(6); form was signed by (b) (6); (b)(7)(C) LVN.

| Name, Title, Signature, and Date: | | Reviewing Official Name, Title, Signature, and Date: | |
|---|---|---|---|
| (b)(6); (b)(7)(C)  **Special Agent** | 8-28-19 | (b)(6); (b)(7)(C) _for_ (b)(6); (b)(7)(C) **, Acting S**(b)(6) **t in Charge** | 8/29/19 |

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General, and is disseminated only on a need to know basis. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

Cho Decl. ISO MSJ
Exhibit A
Page 20

**DHS-OIG November 2022 0039**                    Exh. 00013

## MEMORANDUM OF ACTIVITY

chills, fever, and dizziness on May 27, 2019 through May 28, 2019.

On May 28, 2019, at approximately 9:35 a.m., Medina-Leon complained of dizziness and weakness. Medina-Leon ate breakfast then complained of nausea and vomiting. At approximately 11:10 a.m., Medina-Leon experienced chest pains which radiated to her left arm and shoulder. Dr. (b)(6); (b)(7)(C) ordered that Medina-Leon be administered an electrocardiogram (EKG) and that she be transported to Del Sol Medical Center (DSMC) via Emergency Medical Services (EMS).

An MTC "Hospital Send Out" form described Medina-Leon's situation as uncontrolled hypotension, chest pain, and (b)(6); (b)(7)(C) MTC records indicated Medina-Leon departed the OCPC in stable condition at 11:53 a.m.

The medical file contained an email titled "Hospital Update", which was sent from OCPC Medical to various recipients on May 28, 2019 at 12:11 p.m. The email stated Medina-Leon was sent to the emergency room for uncontrolled hypotension, chest pain, abnormal EKG, dehydration, and weight loss. The email stated (b)(6); (b)(7)(C) were received on May 28, 2019.  Medina-Leon's current status was described as "stable, alert and oriented x4". Medina-Leon was noted to have been complaining of dizziness and chest pain. The email was signed by (b)(6); (b)(7)(C) LVN."

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General.  This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General.  Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552.  Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

Cho Decl. ISO MSJ
Exhibit A
Page 21

**DHS-OIG November 2022 0041**                    Exh. 00014

# MEMORANDUM OF ACTIVITY

at the OCPC and asked a nurse to refer Medina to the Medical Doctor or the Nurse Practitioner when they arrived at the facility.

(b)(6);  stated Medina had been to the medical unit a few times complaining of stomachaches and was provided antacids as a result.

(b)(6);  admitted he heard Medina (b)(6); (b)(7)(C)
(b)(6);  prior to her release from ICE custody. (b)(6);  stated he could not locate anything in Medina's medical file annotating she asked the medical unit for (b)(6); (b)(7)(C)  (b)(6);  stated he later heard that Medina had passed away.

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

Cho Decl. ISO MSJ
Exhibit A
Page 22

**DHS-OIG November 2022 0050**                    Exh. 00015



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

# REPORT OF INVESTIGATION

| | |
|---|---|
| *Case Number:* | I19-ICEERO-ELP-16066 |
| *Case Title:* | Jonathan Alberto Medina-Leon<br>Non-DHS Employee<br>Santa Ana, El Salvador |
| *Report Status:* | Final |
| *Subject:* | Circumstances Surrounding the Non-Custodial Death of Jonathan Alberto Medina-Leon |

## SYNOPSIS

The Department of Homeland Security (DHS), Office of Inspector General (OIG) initiated this investigation based on information received on June 3, 2019, from the DHS, Joint Intake Center, Washington, D.C., regarding the death of Jonathan Alberto Medina-Leon, a transgender woman from El Salvador. Medina died at the Del Sol Medical Center (DSMC), El Paso, TX, on June 1, 2019, following her release from detention from the Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO). Prior to her death, Medina was detained at the Otero County Processing Center (OCPC), Otero, NM, where she received medical treatment for gastrointestinal issues, weight loss, and rashes. Blood tests at OCPC revealed Medina was (b)(6); (b)(7)(C) and had high potassium levels. OCPC transferred Medina to DSMC for additional medical treatment, where she later died from complications of (b)(6)

The El Paso County Medical Examiner's death certificate revealed Medina died from natural causes due to sepsis with pneumonia and (b)( as underlying causes. No autopsy was performed on Medina, as she was not in U.S. Government custody and the family declined an autopsy.

DHS OIG conducted numerous interviews, and reviewed video, medical and detention records. The investigation did not reveal any evidence of malfeasance or policy violations by DHS personnel.

| *Reporting Agent* | | | *Distribution:* | |
|---|---|---|---|---|
| Name: (b)(6): | Signature: (b)(6); | | El Paso Field Office | Original |
| Title: Special Agent | Date: (b)(7)(C) | | | |
| | | | Headquarters | cc |
| *Approving Official* | | Digitally signed by | | |
| Name: (b)(6): | Signa (b)(6); | (b)(6): | Component(s) ICE | cc |
| Title: Assistant Special Agent in Charge | Date: (b)(7)(C) | Date: 2020.08.21 14:44:11 -06'00' | | |
| | | | Other | cc |

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

Cho Decl. ISO MSJ
Exhibit A
Page 23
Page 1 of 18
**DHS-OIG December 2022 0037**
Exh. 00016

## REPORT OF INVESTIGATION

May 28, 2019, the parole he prepared and an NTA were served to Medina at DSMC by (b)(6); DO, ICE ERO, Otero, NM. (Exhibit 5)

DHS OIG interviewed (b)(6); (b)(7)(C) LVN, OCPC, Otero, NM. (b)(6); recalled that she assisted in medically evaluating Medina when Medina arrived at the OCPC on April 14, 2019. (b)(6); stated Medina notified her she was a transgender woman. (b)(6); said Medina refused a (b)(6); (b)(7)(C) test when she arrived. [Agent's note: An (b)(6 test is a blood test used to screen for (b)(6); (b)(6); stated Medina dealt with gastrointestinal issues throughout her detainment at the OCPC. (Exhibit 6)

DHS OIG interviewed (b)(6; RN, OCPC, Otero, NM. (b)(6); stated she medically examined Medina twice while Medina was at the OCPC. (b)(6); stated she first saw Medina on May 16, 2019, and provided her with antacids (Maalox and Zantac) for gastrointestinal discomfort. According to (b)(6); she next saw Medina on May 24, 2019, and noted Medina had suffered significant weight loss since she had last seen her. (b)(6); stated Medina complained of nasal congestion, a cough, lack of appetite, and gastrointestinal issues and asked to be examined as soon as possible. (b)(6); provided Medina with Tylenol and additional antacids. (b)(6); also stated she referred Medina to the one of the medical providers for further assessment.

According to (b)(6); she placed Medina's referral into the referral inbox of (b)(6); (b)(6); Nurse Practitioner (NP), OCPC, Otero, NM, on May 24, 2019. (b)(6); explained that when an RN feels any detainee needs to see the NP or MD, the RN enters a written referral into the inbox of the NP or MD who is working that particular day. (b)(6); stated Medina was not seen by (b)(6); on May 24, 2019, and was not seen by a medical provider until May 27, 2019, when Medina was seen by (b)(6); . When asked why she did not contact a medical provider via a telephone call when Medina was not seen on May 24, 2019, (b)(6); stated she followed protocol for referrals. (b)(6); explained telephone calls are only placed if the patient is in acute distress and not in stable condition, a diagnosis Medina did not receive. (Exhibit 7)

DHS OIG interviewed (b)(6); , DO, ICE ERO, Otero, NM. (b)(6); stated that he was responsible for (b)(6); (b)(7)(C); (b)(3):Unspecified Statute
(b)(6); (b)(7)(C); (b)(3):Unspecified Statute

(b)(6); (b)(7)(C); (b)(3):Unspecified Statute (b)(6) stated that as Medina's docket officer, he received documents from (b)(6); (b)(7)(C); (b)(3):Unspecified Statute
(b)(6), (b)(7)(C); (b)(3):Unspecified Statute

(b)(6); stated that on May 28, 2019, (b)(6); called him and instructed him to prepare Medina's NTA paperwork so it could be served on Medina. (b)(6); stated that on May 28, 2019, (b)(6) (b)(6); SDDO, ICE ERO, Otero, NM, instructed him to go with (b)(6); , DO, ICE ERO, Otero, NM, to the DSMC and serve Medina with the NTA and parole documents. According to

**IMPORTANT NOTICE**
This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General, and will be disseminated only on a "Need to Know" basis. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.
OIG FORM 08

Cho Decl. ISO MSJ
Exhibit A
Page 24
Page 4 of 10
**DHS-OIG December 2022 0040**
Exh. 00017

## REPORT OF INVESTIGATION

(b)(6); he and (b)(6); served Medina with the NTA and parole paperwork at the DSMC. (b)(6) said Medina looked through the documents and signed them in the appropriate locations, acknowledging service. (b)(6); described Medina as alert and responsive at the time he served the paperwork. (Exhibit 8)

DHS OIG interviewed (b)(6); MD, OCPC, Otero, NM. (b)(6); stated he never physically saw Medina at the OCPC until May 27, 2019. Upon (b)(6); arrival on May 27, 2019, (b)(6); stated he was approached by (b)(6); , and was asked to medically assess Medina. Prior to assessing Medina, (b)(6); explained he reviewed Medina's medical file, which indicated her blood pressure came back low, she had a high sitting pulse rate, and had lost approximately 22 pounds since her arrival at OCPC. (b)(6); stated the medical file revealed Medina appeared dehydrated and was administered an IV. (b)(6); said he then walked over to Medina and noticed her skin was a "yellowish" color, and she appeared weak and very thin. (b)(6); stated Medina told him she had never been tested for (b)(6 or (b)(6); , and never had a (b)(6); (b)(7)(C) . (b)(6); stated he then ordered a blood test and placed Medina into a medical isolation room while they waited for the blood test results.

According to (b)(6); , on May 28, 2019, he obtained some of Medina's blood test results. The test results showed high potassium levels, which (b)(6); stated indicated Medina was having heart issues. (b)(6); was also notified by (b)(6); that Medina was having chest pains and said he ordered an EKG for Medina. Once (b)(6); received the results of the EKG, he asked (b)(6); to call for an ambulance because it appeared Medina might have been having a heart attack or was about to. (b)(6); stated he was notified a short time later of Medina's (b)(6); (b)(6); (b)(7)(C) (b)(6); said he asked (b)(6); to notify Medina of (b)(6); (b)(6); (b)(7)(C) After learning of Medina's death, (b)(6); opined someone at OCPC should have telephoned him or the NP as to the condition of Medina prior to May 27th. (b)(6); said he is available 24 hours a day, seven days a week. (Exhibit 9)

DHS OIG interviewed (b)(6); (b)(7)(C) , NP, OCPC, Otero, NM. (b)(6); stated he recalled reviewing Medina's medical file on May 14, 2019. (b)(6); admitted he did not see Medina on May 14, 2019, because the medical referral was only for an antacid (Zantac) prescription refill, which he authorized for her on her first and second visits to the medical unit. (b)(6); explained he was unaware Medina had been referred to him on May 24, 2019. According to (b)(6); prior to attending a training at the OCPC, he went into the medical facility early that morning on May 24, 2019, checked and cleared all his inbox referrals, and would have attended to Medina if the referral had been present.

(b)(6); stated he was scheduled to go into work on May 26, 2019, but decided to take the day off and instead work the holiday (Memorial Day) on May 27, 2019. (b)(6); said he called the medical unit at the OCPC on May 26, 2019, and spoke with (b)(6); , and was told there were six to eight referrals sitting in his inbox and none were emergencies requiring him to come in to work. (b)(6); said that after reviewing Medina's file after her death, he again felt someone

**IMPORTANT NOTICE**
This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General, and will be disseminated only on a "Need to Know" basis. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

Cho Decl. ISO MSJ
Exhibit A
Page 25

Page 5 of 10
**DHS-OIG December 2022 0041**                    Exh. 00018

# REPORT OF INVESTIGATION

should have called him or (b)(6): on Saturday, May 26 and/or Sunday, May 27, 2019. (b)(6): stated he is on call 24 hours a day, seven days a week. (Exhibit 10)

DHS OIG interviewed (b)(6):, SDDO, OCPC, Otero, NM. (b)(6): stated that upon reviewing Medina's alien file on May 22, 2019, (b)(6), (b)(7)(C); (b)(3) Unspecified Statute telephonically notified Medina she was approved for an NTA. (b)(6): advised that the actual NTA and related documents are mailed to the OCPC, but could not state when Medina's documents arrived. (b)(6): explained that once ICE ERO receives the aforementioned documents, they are transferred to the docket officer, processed, and served 1 to 3 weeks later, depending on processing times.

(b)(6): stated that on May 28, 2019, he was notified via email from the OCPC that Medina was ill and had been transported to the DSMC emergency room by an ambulance. (b)(6): explained that one of the entities copied in the email was the ICE Health Service Corps (IHSC). (b)(6): stated he later received an email from the IHSC advising that Medina (b)(6); (b)(7)(C) (b)(6): (b)( (b)( and the IHSC recommended alternative detention (release from ICE Custody) if Medina was not subject to mandatory detention.

(b)(6): stated he directed (b)(6): to prepare documents to release Medina on parole. (b)(6): further stated he received a telephone call from (b)(6):, Assistant Field Office Director, ICE ERO, Otero, NM, who instructed him to serve Medina with her NTA and parole documents. (Exhibit 11)

The DHS OIG reviewed all video provided by OCPC of Medina. The video provided was from May 24, 2019 to May 28, 2019. All video viewed by DHS OIG did not reveal evidence of malfeasance or employee misconduct involving Medina at the OCPC. (Exhibit 12)

DHS OIG interviewed (b)(6):, SDDO, ICE ERO, Otero, NM. (b)(6) stated that on May 28, 2019, medical personnel at the OCPC notified ICE ERO management via email that Medina was transported to the DSMC by ambulance for further evaluation due to uncontrolled hypertension, chest pain, dehydration, unusual weight loss, and an abnormal EKG. (b)(6): explained that (b)( (b)(6):, Field Medical Coordinator (FMC)/RN, IHSC, El Paso, TX, recommended they release Medina from custody, if possible, due to medical concerns.

(b)(6): stated (b)( sent him an email, which stated ICE ERO should attempt to get Medina released from ICE ERO custody based on (b)(6): recommendation. (b)(6) stated an immigration parole was prepared by (b)(6): and he ((b)(6): approved the parole. (Exhibit 13)

DHS OIG interviewed (b)(6); (b)(7)(C) FMC/RN, IHSC, El Paso, TX. (b)(6): recalled receiving an email on May 28, 2019, from OCPC medical personnel stating Medina was transported to the DSMC for uncontrolled hypertension, chest pains, an abnormal EKG, and significant weight loss.

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General, and will be disseminated only on a "Need to Know" basis. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

## REPORT OF INVESTIGATION

gastritis for which Medina had previously taken medication. During this medical examination, Medina was prescribed omeprazole (antacids) and a bland diet as a result.

On May 14, 2019, Medina was examined by (b)(6); who documented that Medina complained of loss of appetite and continuous pain in her stomach. Medina was prescribed Maalox and Zantac (antacids) as a result. On May 24, 2019,(b)(6); evaluated Medina and reported she suffered from nasal congestion, runny nose, dry cough, lack of appetite, sore throat, abdominal pain, nausea, vomiting, weakness, weight loss, and acid reflux. (b)(6); documented Medina's weight was 125.6 pounds on April 14, 2019, 110 pounds on May 14, 2019, and 103.4 pounds on May 24, 2019. Staff notes reflected Medina's visit on May 24, 2019, was her second visit within 10 days and her third visit within that month. The notes for this visit stated Medina was concerned there may have been something wrong with her and she wanted to be evaluated by the provider as soon as possible. Documentation indicated Medina was referred on May 24, 2019, to either the MD or NP for further evaluation.

On May 27, 2019, Medina submitted a medical request for an examination of a rash on her forehead. (b)(6); evaluated Medina, and found her weak and with a 22-pound weight loss. (b)(6); ordered numerous lab tests to include tests for Hepatitis,(b)(6, and Varicella IGM (Chicken Pox).

On May 28, 2019, Medina experienced chest pains, which radiated to her left arm and shoulder. (b)(6); ordered an EKG and when presented with the results, ordered that Medina be transported to the DSMC. While she was waiting for Emergency Medical Services (ambulance) to arrive, her bloodwork results became available which showed Medina (b)(6); (b)(7)(C) (b)(6 (Exhibit 18)

A timeline of events revealed:

- On April 11, 2019, Medina arrived at the Paso Del Norte Port of Entry, El Paso, TX, and requested entry into the United States (b)(6); (b)(7)(C); (b)(3):Unspecified Statute (b)(6); (b)(7)(C); (b)(3):Unspecified
- On April 12, 2019, Medina was transferred to the Marcelino Serna Port of Entry, Tornillo, TX, for processing. Upon arrival, Medina told Customs and Border Protection Officers she was not ill, injured, or taking medication.
- On April 14, 2019, Medina was transferred to the OCPC, Otero, NM. During her initial medical assessment, Medina gave negative responses to questions about having any prior medical issues. Medina was found to be in good health at the conclusion of this medical assessment.
- On April 16, 2019, Medina was seen by OCPC medical personnel, who determined she suffered from chronic gastritis for which she had previously taken medication. Consequently, Medina was prescribed omeprazole (antacids) and a bland diet.

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General, and will be disseminated only on a "Need to Know" basis. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

INV FORM 08

## REPORT OF INVESTIGATION

- On May 14, 2019, Medina was seen by OCPC medical personnel for gastrointestinal issues and lack of appetite. Medina was prescribed Maalox and Zantac (antacids).
- On May 24, 2019, Medina was seen by OCPC medical personnel for nasal congestion, runny nose, dry cough, lack of appetite, sore throat, abdominal pain, nausea, vomiting, weakness, weight loss, and acid reflux. OCPC medical personnel documented Medina's weight was 125.6 pounds on April 14, 2019, 110 pounds on May 14, 2019, and 103.4 pounds on May 24, 2019. Medina was referred to the OCPC MD or NP for further evaluation.
- On May 27, 2019, Medina was examined by (b)(6);     (b)(6);    found Medina weak and possibly dehydrated. (b)(6);   ordered a blood test for Medina.
- On May 28, 2019, Medina complained of chest pains and was administered an EKG. (b)(6); (b)(7)(C)   ordered an ambulance to transport Medina to the DSMC. Bloodwork results revealed Medina (b)(6); (b)(7)(C)
- On June 1, 2019, Medina died at the DSMC. The certificate of death reported the final disease or condition resulting in her natural death was sepsis, with pneumonia and (b)(6) as contributing causes.
- On June 7, 2019, the El Paso County of the Medical Examiner, El Paso, TX, notified DHS OIG that no autopsy was performed on Medina.
- On June 26, 2019, the remains of Medina were returned to family members in Santa Ana, El Salvador.

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General, and will be disseminated only on a "Need to Know" basis. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

INV-FORM-08

Cho Decl. ISO MSJ
Exhibit A
Page 28

Page 9 of 10

**DHS-OIG December 2022 0045**

Exh. 00021

# MEMORANDUM OF ACTIVITY

at the OCPC and asked a nurse to refer Medina to the Medical Doctor or the Nurse Practitioner when they arrived at the facility.

(b)(6); stated Medina had been to the medical unit a few times complaining of stomachaches and was provided antacids as a result.

(b)(6); admitted he heard Medina (b)(6); (b)(7)(C) (b)(6); prior to her release from ICE custody. (b)(6); stated he could not locate anything in Medina's medical file annotating she asked the medical unit for (b)(6); (b)(7)(C) (b)(6); stated he later heard that Medina had passed away.

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

INV FORM-09                                    Page 2 of 2

Cho Decl. ISO MSJ
Exhibit A                     **DHS-OIG December 2022 0051**              Exh. 00022
Page 29



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

## MEMORANDUM OF ACTIVITY

**Type of Activity**: Personal Contact: Interview of (b)(6); (b)(7)(C)    LVN

| **Case Number:** I19-ICE ERO-ELP-16066 | **Case Title:** Death of Jonathan Alberto Medina-Leon, Non-Employee, ICE, El Paso, TX |
|---|---|

On June 4, 2019, Special Agents (b)(6); (b)(7)(C)  , Department of Homeland Security (DHS), Office of Inspector General (OIG), El Paso, TX, and (b)(6); (b)(7)(C)  , Immigration and Customs Enforcement (ICE), Office of Professional Responsibility (OPR), El Paso, TX, interviewed (b)(6); (b)(7)(C)    Licensed Vocational Nurse (LVN), Maintenance and Training Corporation (MTC), Otero County Processing Center (OCPC), Otero, NM.  The interview was in regards to an allegation involving the circumstances surrounding the death of Jonathan Alberto Medina-Leon, Non-DHS Employee, El Paso, TX, prior to her release from the OCPC. (b)(6): agreed to a voluntary interview regarding the aforementioned allegation.

The following is from a Report of Investigation (ROI), provided by (b)(6):  which documented the interview of (b)(6):

"On June 3, 2019, ERO El Paso notified OIG El Paso of the death of Jonathan Medina-Leon, a 25-year-old transgender female, at a local El Paso hospital five days after being released from ICE custody.  On June 3, 2019, OIG El Paso notified OPR El Paso of the death of the former ICE detainee.

On June 4, 2019, Senior Special Agent (b)(6); (b)(7)(C)  , OPR El Paso, and Special Agent (b)(6); (b)(7)(C)  , OIG El Paso, interviewed LVN (b)(6):  MTC, at the Otero County Processing Center, in Chaparral, New Mexico.

LVN (b)(6):  advised she was the main nurse that attended to Medina-Leon on May 27, 2109, the day before Medina was hospitalized.

RN (b)(6):  stated that on May 27, 2019, Registered Nurse (RN) (b)(6):  MTC, instructed LVN (b)(6):  to monitor Medina-Leon and take him to see Dr. (b)(6):  Medical Director, MTC, when Dr. (b)(6):  arrived at the facility.  LVN (b)(6):  stated that while she monitored Medina-Leon's condition, she observed Medina-Leon's temperature fluctuate from very high to very low temperatures.  LVN (b)(6):  stated that during that time, Medina-Leon asked her if she thought her symptoms could be caused by (b)(6).  LVN (b)(6):  advised that she asked Medina-Leon if she had engaged in (b)(6); (b)(7)(C)

(b)(6); (b)(7)(C)    LVN (b)(6):  stated Medina- Leon denied having engaged in

| Name, Title, Signature, and Date: (b)(6); (b)(6): Special Agent (7)(C | 6·21·2019 | Reviewing Official Name, Title, Signature, and Date: for (b)(6); (b)(7)(C) (b)(7)(C) Special Agent in Charge | 6/21/19 |
|---|---|---|---|

**IMPORTANT NOTICE**
This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General, and is disseminated only on a need to know basis.  This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General.  Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552.  Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

Cho Decl. ISO MSJ
Exhibit A
Page 30

Page 1 of 2

Item #:

Exh. 00023

**DHS-OIG December 2022 0055**

## MEMORANDUM OF ACTIVITY

(b)(6); (b)(7)(C)                                                        but explained that she had
worked as a nurse about a year before at which time she had been stuck by a dirty hypodermic
needle. LVN (b)(6): stated Medina-Leon informed her she had been instructed to undergo
medical testing to determine if she had been exposed to disease by the dirty needle, but she
never sought the recommended follow-up testing.

LVN (b)(6): stated that when Dr. (b)(6): arrived, he examined Medina-Leon and based
on Medina-Leon's condition, Dr. (b)(6): ordered numerous lab tests, to include a test for
(b)(6) LVN (b)(6): stated Medina-Leon was administered a liter of intravenous (IV) fluid,
Tylenol, and an antacid. LVN (b)(6): explained the antacid was for gastritis, which was
not uncommon for detainees who were not used to the food served in the facility.

LVN (b)(6): advised that shortly after the IV was administered, Medina-Leon began to
experience chest pain. LVN (b)(6): stated Dr. (b)(6): then ordered that Medina-Leon be
given an electrocardiogram (EKG). LVN (b)(6): stated medical staff contacted Dr. (b)(6):
with the results of the EKG and based on the results of the EKG, Dr. (b)(6): ordered that
EMS be contacted to transport Medina-Leon to the hospital. LVN (b)(6): stated Dr.
(b)(6): instructed staff to get an automated external defibrillator (AED) and sit with Median-
Leon until the ambulance arrived.

LVN (b)(6): advised while Medina-Leon waited for the ambulance, Dr. (b)(6): received
the results of Medina-Leon's (b)(6): LVN (b)(6): stated Dr. (b)(6): told Medina-Leon
the lab results showed Medina-Leon (b)(6); (b)(7)(C) LVN (b)(6): stated that upon
learning that she (b)(6); (b)(7)(C) Medina-Leon covered her face and cried. LVN
(b)(6): examined Medina-Leon's lab chart and stated Medina Leon departed the OCPC on
May 28, 2019 at 11:53 a.m. LVN (b)(6): stated she later learned of Medina-Leon's death
from Facebook posts."

A copy of the ROI prepared by (b)(6): will be made part of this report.

**IMPORTANT NOTICE**
This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

INV FORM-09                          Page 2 of 2

Cho Decl. ISO MSJ
Exhibit A                        **DHS-OIG December 2022 0056**          Exh. 00024
Page 31



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

## MEMORANDUM OF ACTIVITY

**Type of Activity**:  Personal Contact: Interview of (b)(6): _____ , DO, ICE ERO, Otero, NM

| **Case Number:** I19-ICE ERO-ELP-16066 | **Case Title:** Death of Jonathan Alberto Medina-Leon, Non-Employee, ICE, El Paso, TX |
|---|---|

On June 5, 2019, Special Agents (b)(6); (b)(7)(C) _____ Department of Homeland Security (DHS), Office of Inspector General (OIG), El Paso, TX, and (b)(6); (b)(7)(C) ____ Immigration and Customs Enforcement (ICE), Office of Professional Responsibility (OPR), El Paso, TX, interviewed (b)(6): _____ , Deportation Officer (DO), ICE, Enforcement and Removal Operations (ERO), Otero, NM.  The interview was in regards to an allegation involving the circumstances surrounding the death of Jonathan Alberto Medina-Leon, Non-DHS Employee, El Paso, TX, prior to her release from the OCPC. (b)(6): agreed to a voluntary interview regarding the aforementioned allegation.

The following is from a Report of Investigation (ROI), provided by (b)(6): ____ which documented the interview of (b)(6):

"On June 2, 2019, ERO El Paso notified OIG El Paso of the death of Jonathan Medina-Leon, a 25-year-old transgender female, at a local El Paso hospital five days after being released from ICE custody. On June 2, 2019, OIG El Paso notified OPR El Paso of the death of the former ICE detainee.

On June 5, 2019, Senior Special Agent (b)(6); (b)(7)(C) , OPR El Paso, and Special Agent (b)(6); (b)(7)(C) ____ OIG El Paso, interviewed DO (b)(6): _____ ERO El Paso, at the Otero County Processing Center, in Chaparral, New Mexico.

DO (b)(6): stated that he was responsible for (b)(6); (b)(7)(C); (b)(3):Unspecified Statute
(b)(6); (b)(7)(C); (b)(3):Unspecified Statute

(b)(6); (b)(7)(C); (b)(3):Unspecified Statute
Medina-Leon (b)(6); (b)(7)(C); (b)(3):Unspecified Statute          DO (b)(6) stated he never met

(b)(6); (b)(7)(C); (b)(3):Unspecified Statute

DO (b)(6) explained, although Medina was served in person by video conference, local policy

| Name, Title, Signature, and Date: (b)(6) | Reviewing Official Name, Title, Signature, and Date: |
|---|---|
| 7·8·2019 | (b)(6); (b)(7)(C)   7-8-19 |
| (b)(6):     Special Agent (b)(7) | (b)(6)   Acting Special Agent in Charge |

**IMPORTANT NOTICE**
This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General, and is disseminated only on a need to know basis.  This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General.  Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552.  Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

Cho Decl. ISO MSJ
Exhibit A
Page 32
Page 1 of 2
Item #:
Exh. 00025

**DHS-OIG December 2022 0067**

## MEMORANDUM OF ACTIVITY

required that Medina-Leon [(b)(6); (b)(7)(C); (b)(3):Unspecified Statute] before it was filed with the ICE Executive Office of Immigration Review. DO [(b)(6);] stated that after Medina-Leon's [(b)(6); (b)(7)(C); (b)(3):Unspecified Statute] [(b)(6); (b)(7)(C):] USCIS sent Medina-Leon's file to ERO El Paso for processing.

DO [(b)(6)] advised he was not certain when ERO El Paso received the file after USCIS sent it. DO [(b)(6)] explained large volumes of cases are adjudicated by USCIS and ERO El Paso processes files as soon as possible after they are received. DO [(b)(6)] sated that based on Medina-Leon's [(b)(6); (b)(7)(C); (b)(3):Unspecified Statute] Medina-Leon would likely have been processed for a parole which would allow her to be released from ICE custody while she waited for a hearing before an immigration judge.

DO [(b)(6)] stated that on May 28, 2019, Supervisory Detention and Deportation Officer (SDDO) [(b)(6);] ERO El Paso, called him and instructed him to prepare Medina-Leon's Notice to Appear (NTA) paperwork to be served. DO [(b)(6)] advised that SDDO [(b)(6);] told him that DO [(b)(6);] was preparing parole paperwork to release Medina-Leon from ICE custody.

DO [(b)(6)] stated that sometime during the afternoon of May 28, 2019, SDDO [(b)(6);] instructed him to go with DO [(b)(6); (b)(7)(C)] ERO El Paso, to Del Sol Medical Center and serve Medina-Leon with NTA and parole documents.

DO [(b)(6)] advised that on May 28, 2019, at approximately 5:30 p.m., he and DO [(b)(6);] served Medina-Leon with NTA and parole paperwork at Del Sol Medical Center, in El Paso, Texas. DO [(b)(6);] stated that Medina-Leon looked through the documents and signed them in the appropriate locations acknowledging service. DO [(b)(6)] described Medina-Leon as alert and responsive at the time he and DO [(b)(6);] served the paperwork.

SSA [(b)(6);] examined forms contained in MEDINA-Leon's file and observed that the file contained [(b)(6); (b)(7)(C); (b)(3):Unspecified Statute]

[(b)(6); (b)(7)(C); (b)(3):Unspecified Statute]

[(b)(6); (b)(7)(C); (b)(3):Unspecified Statute] SSA [(b)(6);] observed that the file contained a Form I-94, Arrival/Departure record. The Form I-94 was stamped indicating Medina-Leon was issued a parole on May 28, 2019 for humanitarian purposes and the parole was valid until May 28, 2020."

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

INV FORM-09

Cho Decl. ISO MSJ
Exhibit A
Page 33

**DHS-OIG December 2022 0068**          Exh. 00026



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

## MEMORANDUM OF ACTIVITY

**Type of Activity**: Personal Contact: Interview of (b)(6);        MD

| *Case Number:* I19-ICE ERO-ELP-16066 | *Case Title:* Death of Jonathan Alberto Medina-Leon, Non-Employee, ICE, El Paso, TX |
|---|---|

On June 5, 2019, Special Agents (b)(6); (b)(7)(C)  , Department of Homeland Security (DHS), Office of Inspector General (OIG), El Paso, TX, and (b)(6); (b)(7)(C)  Immigration and Customs Enforcement (ICE), Office of Professional Responsibility (OPR), El Paso, TX, interviewed (b)(6);        Medical Doctor (MD), Maintenance and Training Corporation (MTC), Otero County Processing Center (OCPC), Otero, NM.  The interview was in regards to an allegation involving the circumstances surrounding the death of Jonathan Alberto Medina-Leon, Non-DHS Employee, El Paso, TX, prior to her release from the OCPC.  (b)(6);  agreed to a voluntary interview regarding the aforementioned allegation.

(b)(6);  stated he never physically saw Medina at the OCPC until May 27, 2019. (b)(6);  stated he was approached by (b)(6); (b)(7)(C)  , Registered Nurse (RN), MTC, OCPC, Otero, NM, upon arrival to the medical unit and asked to look at Medina.  According to (b)(6);  , (b)(6);  explained Medina possessed a rash on her forehead. (b)(6);  stated the OCPC had been experiencing a chickenpox outbreak among detainees at the facility.

Prior to his visit with Medina, (b)(6);  stated he looked over her medical file which indicated her blood pressure had been low,  had a high sitting pulse rate and  had lost approximately 22 pounds since her  arrival at OCPC.  (b)(6);  explained that on paper, Medina appeared dehydrated and required an intravenous saline drip (IV).  When (b)(6);  walked over to Medina, he noticed her skin was a "yellowish" color, she was weak and very thin.  (b)(6);  further explained Medina told him she had been vomiting and had been dealing with stomach issues.  (b)(6);  stated Medina told him she had never been tested for the (b)(6); (b)(7)(C)  (b)(6);  or (b)(6);  and never had a (b)(6), (b)(7)(C)

(b)(6);  stated he ordered blood tests in an attempt to diagnose Medina's symptoms, (b)(6); (b)(7)(C)  (b)(6); (b)(7)(C)  (b)(6);  stated Medina's vitals indicated that her heart struggled to pump blood throughout her body.  He ordered an IV and an antibiotic (in the event she had a bacterial infection) for her while they awaited the results of the blood test.  A short time later, (b)(6);  stated he looked in on Medina and noticed her pulse rate had slowed a bit and she showed no signs of acute distress.  (b)(6);  further stated Medina told him she was feeling better.  (b)(6);  explained he then placed Medina into a medical isolation room while he waited for the test results.

| Name, Title, Signature, and Da (b)(6); (b)(7)(C)  (b)(6);  Special A | 6·14·2019 | Reviewing Official Name, Title, Signature, and Date: (b)(6); (b)(7)(C)  (b)(6); (b)(7)(C)  large | 6/14/19 |
|---|---|---|---|

**IMPORTANT NOTICE**
This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General, and is disseminated only on a need to know basis.  This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General.  Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552.  Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

DHS FORM 709

Cho Decl. ISO MSJ
Exhibit A
Page 34
Page 1 of 2
Item #:
**DHS-OIG December 2022 0070**
Exh. 00027

## MEMORANDUM OF ACTIVITY

(b)(6):  stated he obtained Medina's blood test results the following day (May 28, 2019).  One of the test results showed high potassium levels, to which (b)(6):  stated it indicated Medina was having heart issues.  (b)(6):  said he ordered an Electrocardiogram (EKG) for Medina.  Once the results of the EKG were sent to (b)(6):  , he called (b)(6):  and asked her to call for an ambulance.  (b)(6):  explained the results showed Medina might have been having a heart attack or was about to.  (b)(6):  stated he was contacted a short time later and notified of Medina's (b)(6); (b)(7)(C)  (b)(6):  said he asked (b)(6):  to notify Medina (b)(6); (b)(7)(C) (b)().

(b)(6):  stated a representative at Del Sol Medical Center hospital later notified him of Medina's passing.  (b)(6):  stated he could not provide a reason why Medina was referred to him and/or the Nurse Practitioner (NP) on May 24, 2019, but not seen until May 27, 2019.  (b)(6):  stated someone at OCPC should have telephoned him or the NP as to the condition of Medina prior to May 27th.  (b)(6):  stated he is available 24 hours a day, seven days a week.

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from and/or the Office of Inspector General.  This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General.  Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552.  Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

Cho Decl. ISO MSJ
Exhibit A                    **DHS-OIG December 2022 0071**          Exh. 00028
Page 35



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

## MEMORANDUM OF ACTIVITY

**Type of Activity**: Personal Contact: Interview of (b)(6);

| **Case Number:** I19-ICE ERO-ELP-16066 | **Case Title:** Death of Jonathan Alberto Medina-Leon, Non-Employee, ICE, El Paso, TX |
|---|---|

On June 6, 2019, Special Agents (b)(6); (b)(7)(C) , Department of Homeland Security (DHS), Office of Inspector General (OIG), El Paso, TX, and (b)(6); (b)(7)(C) Immigration and Customs Enforcement (ICE), Office of Professional Responsibility (OPR), El Paso, TX, interviewed (b)(6); , Supervisory Detention and Deportation Officer (SDDO), ICE, Enforcement and Removal Operations (ERO), Otero, NM. The interview was in regards to an allegation involving the circumstances surrounding the death of Jonathan Alberto Medina-Leon, Non-DHS Employee, El Paso, TX, prior to her release from the OCPC. (b)(6); agreed to a voluntary interview regarding the aforementioned allegation.

The following is from a Report of Investigation (ROI), provided by (b)(6); which documented the interview of (b)(6); :

"On June 2, 2019, ERO El Paso notified OIG El Paso of the death of Jonathan Medina-Leon, a 25-year-old transgender female, at Del Sol Medical Center (DSMC) five days after being released from ICE custody. On June 2, 2019, OIG El Paso notified OPR El Paso of the death of the former ICE detainee.

On June 6, 2019, Senior Special Agent (b)(6); (b)(7)(C) , OPR El Paso, and Special Agent (b)(6); (b)(7)(C) OIG El Paso, interviewed SDDO (b)(6); ERO El Paso, at the Otero County Processing Center (OCPC), in Chaparral, New Mexico. The following paragraphs contain a summary of statements made by SDDO (b)(6); during the interview.

(b)(6); (b)(7)(C); (b)(3):Unspecified Statute

(b)(6); (b)(7)(C); (b)(3):Unspecified Statute SDDO (b)(6); stated that once the documents were received by ERO El Paso, the case would be referred to a docket officer who would personally serve Medina-Leon with the NTA, then file the document with the Executive Office of Immigration Review (EIOR). SDDO (b)(6); stated the EIOR requires an NTA be served in person and does not accept documents served telephonically.

| Name, Title, Signature, and Date: (b)(6); (b)(7)(C) | 8-12-19 | Reviewing Official Name, Title, Signature, and Date: _for_ (b)(6); (b)(7)(C) | 8/12/19 |
|---|---|---|---|
| (b)(6); **Special Agent** | | (b)(6); , Acting Special Agent in Charge | |

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General, and is disseminated only on a need to know basis. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

INV FORM-09

Item #:

Cho Decl. ISO MSJ
Exhibit A
Page 36

**DHS-OIG December 2022 0075**                Exh. 00029

## MEMORANDUM OF ACTIVITY

(b)(6);   stated that on May 28, 2019, he was notified by email that Medina-Leon was ill and had been transported to the DSMC Emergency Room by EMS (Emergency Medical Services). SDDO (b)(6);   advised that Management and Training Corporation (MTC) personnel notified ERO El Paso management, the ICE Office of Chief Counsel (OCC), MTC management, and the ICE Heath Service Corps (IHSC), regarding Medina-Leon's hospitalization.

SDDO (b)(6);   stated he later received an email from the IHSC advising that Medina-Leon (b)(6); (b)(7)(C)   and the IHSC recommended an alternative to detention if Medina-Leon was not subject to mandatory detention. SDDO (b)(6);   stated he had Deportation Officer (DO) (b)(6): (b)(7)(C)  ERO El Paso, prepare documents to release Medina-Leon on parole and then waited to see if Medina-Leon would be admitted to DSMC or returned to the OCPC.

SDDO (b)(6);   stated that later during the afternoon of May 28, 2019, Assistant Field Operations Director (AFOD) (b)(6);   ERO El Paso, called him and advised Medina Leon had been admitted to DSMC and instructed that Medina-Leon be served with the NTA and parole documents. SDDO (b)(6);   stated he then contacted SDDO (b)(6);   who sent DOs to serve Medina-Leon with the documents at DSMC. SDDO (b)(6);   stated that service of the parole documents released Medina-Leon from ICE custody. SDDO (b)(6);   stated that on June 1, 2019, he received an email from AFOD (b)(6) notifying him that Medina-Leon had died."

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

Cho Decl. ISO MSJ
Exhibit A
Page 37

**DHS-OIG December 2022 0076**          Exh. 00030



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

## MEMORANDUM OF ACTIVITY

**Type of Activity**:  Personal Contact: Interview of (b)(6); (b)(7)(C) FMC, RN, IHSC, ICE ERO

| *Case Number:* I19-ICE ERO-ELP-16066 | *Case Title:* Death of Jonathan Alberto Medina-Leon, Non-Employee, ICE, El Paso, TX |
|---|---|

On June 25, 2019, Special Agents (b)(6); (b)(7)(C) Department of Homeland Security (DHS), Office of Inspector General (OIG), El Paso, TX, and (b)(6); (b)(7)(C) Immigration and Customs Enforcement (ICE), Office of Professional Responsibility, El Paso, TX, interviewed (b)(6); (b)(7)(C) Field Medical Coordinator and Registered Nurse, ICE, Health Service Corps, El Paso, TX.  The interview was in regards to an allegation involving the circumstances surrounding the death of ICE detainee Jonathan Alberto Medina-Leon, Non-DHS Employee, El Paso, TX, prior to her release from the Otero County Processing Center (OCPC), Otero, NM. (b)(6); agreed to a voluntary interview regarding the aforementioned allegation.

(b)(6); stated he recalled receiving an email on May 28, 2019, from the Management and Training Corporation (MTC), OCPC, stating that detainee Medina was being transported from the OCPC to the Del Sol Medical Center (DSMC) in El Paso, TX. (b)(6); said the email advised Medina was being referred to the DSMC for uncontrolled hypertension, chest pains, an abnormal electrocardiogram and significant weight loss.

(b)(6); stated he went to the DSMC and spoke with Medina.  According to (b)(6); Medina stated she felt well prior to her current medical condition (b)(6); (b)(7)(C) (b)(6); (b)(7)(C)

(b)(6); stated he telephonically contacted (b)(6); Assistant Field Office Director, ICE, Enforcement and Removal Operations (ERO), El Paso, TX, to inform (b)(6) that he (b)(6); ) planned to compose an email to recommend "alternative detention," should Medina not require mandatory detention at the OCPC.

(b)(6); stated approximately one hour later he sent an email to ICE ERO management and the MTC, which stated that Medina was (b)(6); (b)(7)(C) transgender, who had lost significant weight over the last several weeks with uncontrollable hypertension. (b)(6); suggested that, if possible, Medina be granted "alternative detention" from ICE ERO custody.

Sometime in the evening of May 28, 2019, (b)(6); stated he received an email from (b)(6) which stated Medina was no longer in ICE ERO Custody.

| Name, Title, Signature, and Date: | (b)(6); (b)(7)(C) | 7-8-2019 | Reviewed (b)(6) Name, Title, Signature, and Date: (b)(6); (b)(7)(C) | 7-8-19 |
|---|---|---|---|---|
| (b)(6); Special Agent | | | (b)(6); Acting Special Agent in Charge | |

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General, and is disseminated only on a need to know basis.  This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General.  Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552.  Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

Cho Decl. ISO MSJ
Exhibit A
Page 38

Page 1 of 2

Item #:
Exh. 00032

**DHS-OIG December 2022 0084**



# OFFICE OF INSPECTOR GENERAL
Department of Homeland Security

## MEMORANDUM OF ACTIVITY

**Type of Activity**:  Other: Requested Death Certificate of Jonathan Medina

| *Case Number:*  I19-ICE ERO-ELP-16066 | *Case Title:* Death of Jonathan Alberto Medina-Leon, Non-Employee, ICE, El Paso, TX |
|---|---|

On August 12, 2019, the Department of Homeland Security, Office of Inspector General requested and was provided a certified copy of Jonathan Alberto Medina-Leon's Certificate of Death from the El Paso County.  The Certificate of Death stated the "IMMEDIATE CAUSE (Final disease or condition resulting in death)" was "Sepsis."  The Certificate of Death further listed "Pneumonia" (b)(6); (b)(7)(C)                                              as underlying causes resulting in the death of Medina.

According to the Certificate of Death, Medina's remains were sent to "CEMENTERIO PARQUE JARDIN LAS FLORES, SANTA ANA, ES."

A copy of the Certificate of Death will be included as part of this report.



| Name, Title, Signature, and Date: (b)(6); (b)(7)(C) | 8·19·19 | Reviewing Official Name, Title, Signature, and Date: (b)(6); (b)(7)(C)   8/19/19 |
|---|---|---|
| (b)(6);      Special Agen | | (b)(6);     Act (b)(6);      Agent in Charge |

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General, and is disseminated only on a need to know basis.  This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General.  Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552.  Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

INV FORM-09

Cho Decl. ISO MSJ
Exhibit A
Page 39                                    Page 1 of 1                                    Item #:

**DHS-OIG December 2022 0092**                     Exh. 00033

## MEMORANDUM OF ACTIVITY

chills, fever, and dizziness on May 27, 2019 through May 28, 2019.

On May 28, 2019, at approximately 9:35 a.m., Medina-Leon complained of dizziness and weakness. Medina-Leon ate breakfast then complained of nausea and vomiting. At approximately 11:10 a.m., Medina-Leon experienced chest pains which radiated to her left arm and shoulder. Dr. (b)(6): ordered that Medina-Leon be administered an electrocardiogram (EKG) and that she be transported to Del Sol Medical Center (DSMC) via Emergency Medical Services (EMS).

An MTC "Hospital Send Out" form described Medina-Leon's situation as uncontrolled hypotension, chest pain, and (b)(6), (b)(7)(C) MTC records indicated Medina-Leon departed the OCPC in stable condition at 11:53 a.m.

The medical file contained an email titled "Hospital Update", which was sent from OCPC Medical to various recipients on May 28, 2019 at 12:11 p.m. The email stated Medina-Leon was sent to the emergency room for uncontrolled hypotension, chest pain, abnormal EKG, dehydration, and weight loss. The email stated (b)(6), (b)(7)(C) were received on May 28, 2019. Medina-Leon's current status was described as "stable, alert and oriented x4". Medina-Leon was noted to have been complaining of dizziness and chest pain. The email was signed by (b)(6): LVN."

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

INV FORM-09                               Page 3 of 3

Cho Decl. ISO MSJ
Exhibit A                    **DHS-OIG December 2022 0097**              Exh. 00034
Page 40

# Case Summary Report
# I19-ERO-ELP-16066

**Title:**     Jonathan Alberto Medina-Leon/Non-Employee/ICE ERO/El Paso, TX

| | | | |
|---|---|---|---|
| Date Rcd: | 6/3/2019 | Date Assigned: 6/4/2019 | Date Opened: 6/4/2019 | Date Closed: 9/24/2020 |

Rcd Method:     Email                                                    Agent:     (b)(6); (b)(7)(C)

Affected Agency:  ICE, Enforcement Removal Operations            PrimaryOffice:  El Paso, TX

Ref Agency:     ICE, Office of Professional Responsibility

Alleg Type:

Special:     No          Privacy:  No  Confidential:  No     Dollar Loss:  $0.00

Joint Agency:     ICE, Office of Professional Responsibility

Ref Cases:     C1916066
              C2000141
              C1916238
              C1916238

Comments:     On June 3, 2019, the Department of Homeland Security (DHS), Office of Inspector General (OIG), El Paso, TX, became aware of the death of a 25 year old transgender female at an El Paso local hospital five days after being released from Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) custody.

It was reported by ICE ERO that on April 11, 2019, Jonathan Alberto Medina-Leon (b)(6); applied for admission into the United States at the Paso Del Norte Port of Entry in El Paso, TX, (b)(6); (b)(6); (b)(7)(C);                 On April 14, 2019, ICE ERO, El Paso, TX, took custody of Medina at placed her at the Otero County Processing Center (OCPC) located in Chaparral, NM.

According to ICE ERO, on May 28, 2019, the OCPC conducted an (b)(6); (b)(7)(C) (b)(6);           for Medina, at her request, which resulted in (b)(6); (b)(7)(C)           The OCPC referred Medina to a local hospital for further evaluation and subsequently served Medina with a Notice to Appear document and released her from ICE ERO custody on parole prior to her release.

On June 2, 2019, ICE ERO Domestic Operations informed ICE ERO El Paso of a Facebook post reporting the death of a transgender female allegedly in ICE custody.  ICE ERO El Paso later determined that the Facebook post was referring to Medina.

On June 3, 2019, ICE ERO El Paso reported the death of Medina to DHS OIG El Paso, TX.

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General.  This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General.  Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552.  Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

Cho Decl. ISO MSJ
Exhibit A
Page 41

1. Advocates and attorneys, including the ACLU in a lawsuit last year, have expressed concern about underreporting of detainee deaths by ICE. Namely, there have been repeated questions about whether ICE's official annual list of in-custody detainee deaths is a true reflection of all deaths of people who were in ICE's care. Can OIG comment on the ACLU lawsuit as it relates to OIG's oversight of ICE? How many investigations and/or inquiries to date has the OIG opened into in-custody detainee deaths? How many investigations and/or inquiries to date has the OIG opened into out-of-custody deaths such as that of Johana Medina Leon (case number: I19-ICEERO-ELP-16066)?

   The El Paso Field Office has opened approximately five investigations into the circumstances surrounding the deaths of migrants to include the investigation into the death of Johana Medina Leon.

2. We have reviewed OIG/ICE's joint internal investigation I19-ICEERO-ELP-16066. Can you please explain OIG's decision to open the investigation in the first place?

   The El Paso Field Office was directed by HQ to initiate an investigation into this allegation.

3. Can you please explain OIG's decision to conduct the investigation as a joint investigation with ICE?

   ICE OPR was the initial agency to notify the DHS OIG of the death of Medina Leon.

4. Was the decision to carry out the investigation jointly a typical one for OIG?

   The DHS OIG utilized ICE OPR to assist with obtaining documentation, policies, access to employees and other material relevant to the investigation.

5. What safeguard(s) and/or policy considerations were put into place to ensure the integrity of OIG's investigation?

   I will defer this question to HQ.

6. What was ICE's specific role(s) in the investigation?

   See above

7. Can OIG explain the final findings of the investigation, which found no "policy violations" or "malfeasance" on the part of "DHS personnel?" How do these findings account for the fact that all of Johana's medical care while detained at Otero was delivered by MTC contractors (e.g. non-DHS personnel)? Did OIG conduct its investigation looking into possible policy violations and/or malfeasance on the part of non-DHS personnel as well? Why or why not? Please describe OIG's oversight role as it relates to ICE's private contractors.

   I will defer this question to HQ

8.  Can OIG explain why no policy recommendations or changes were recommended as a result of the investigation?

    I will defer this question to HQ.

9.  At certain points in the investigation, OIG investigators spoke to MTC medical personnel who agreed that more could have been done earlier to diagnose and treat Johana. Similarly, OIG found that ICE's own medical advisor had specifically recommended that transgender detainees like Johana be treated as chronic patients to facilitate earlier diagnosis and treatment in the months prior to Johana's death. Can OIG comment on whether ICE and/or MTC responded adequately to these internal recommendations prior to Johana's death?

    I will defer this question to HQ

10. Records show Johana was suffering from sepsis, fungal infections and other ailments as a result of her (b)(6); (b)(7)(C) Can OIG comment on ICE's decision to not conduct screening for (b)(6); (b)(7)(C) during the detainee intake process? Has OIG ever issued recommendations regarding screening for (b)(6); (b)(7)(C) during ICE's detainee intake process? If so, what are they?

    .

    I will defer this question to HQ

Cho Decl. ISO MSJ
Exhibit A
Page 43

**DHS-OIG March 2023 0049**                    Exh. 00037

**To:** (b)(6); (b)(7)(C) @oig.dhs.gov]
**From:** (b)(6); (b)(7)(C) / (b)(6); (b)(7)(C)
(b)(6); (b)(7)(C)                                                                     (b)(6);
**Sent:** Tue 7/14/2020 11:52:51 AM (UTC-04:00)
**Subject:** FW: Enhanced Reporting - I19-ICE ERO-ELP-16066, Death of Jonathan Alberto Medina-Leon/Non-Employee/ICE ERO/El Paso, TX

FYI

(b)(6); (b)(7)(C)

Assistant Special Agent in Charge

DHS Office of Inspector General, Investigations

El Paso Field Office

(b)(6); (b)(7)(C)

---

**From:** EDS Notifications <(b)(7)(E) @oig.dhs.gov>
**Sent:** Tuesday, July 14, 2020 7:20 AM
**To:** (b)(6); (b)(7)(C) @oig.dhs.gov; (b)(6); (b)(7)(C) @oig.dhs.gov>; (b)(6); (b)(7)(C) @oig.dhs.gov>;
(b)(6); (b)(7)(C) @oig.dhs.gov>; (b)(6); (b)(7)(C) @OIG.DHS.GOV> (b)(6);
(b)(6); @oig.dhs.gov> (b)(6); @oig.dhs.gov> (b)(6); (b)(7)(C) @oig.dhs.gov>;
(b)(6); @oig.dhs.gov> (b)(6); (b)(7)(C) @oig.dhs.gov> (b)(6); (b)(7)(C) @oig.dhs.gov>
**Subject:** Enhanced Reporting - I19-ICE ERO-ELP-16066, Death of Jonathan Alberto Medina-Leon/Non-Employee/ICE ERO/El Paso, TX

7/14/2020

The case in subject line is no longer marked for enhanced reporting.

Narrative:

On June 3, 2019, the Department of Homeland Security (DHS), Office of Inspector General (OIG), El Paso, TX, became aware of the death of a 25 year old transgender female at an El Paso local hospital five days after being released from Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) custody. It was reported by ICE ERO that on April 11, 2019, Jonathan Alberto Medina-Leon (b)(6); (b)(7)(C) applied for admission into the United States at the Paso Del Norte Port of Entry in El Paso, TX, (b)(6); (b)(7)(C); (b)(3) Unspecified On April 14, 2019, ICE ERO, El Paso, TX, took custody of Medina at placed her at the Otero County Processing Center (OCPC) located in Chaparral, NM. According to ICE ERO, on May 28, 2019, the OCPC conducted an (b)(6); (b)(7)(C) (b)(6); (b)(7)(C) for Medina, at her request, (b)(6); (b)(7)(C) The OCPC referred Medina to a local hospital for further evaluation and subsequently served Medina with a Notice to Appear document and released her from ICE ERO custody on parole prior to her release. On June 2, 2019, ICE ERO Domestic Operations informed ICE ERO El Paso of a Facebook post regarding the death of a transgender female allegedly in ICE custody. ICE ERO El Paso later determined that the Facebook post was referring to Medina. On June 3, 2019, ICE

REPORT OF INVESTIGATIONS

Gulema was booked into the ECDC on July 2, 2011. Gulema's health conditions at booking stated "Detainee claims good health." The records indicated that Gulema was released from ICE ERO custody on an order of supervision (OSUP) on November 24, 2015. Gulema was released to the RRMC. The book out comment showed "Subject was released on OSUP per HQ RIO and NOL FOD. Subject does not have any reporting requirements."

A review of the custody actions and decisions in the detention module contained comments from April 2007 through November 2015. It was noted in the comments section that Gulema was in the Post Order Custody Report (POCR) process and was served multiple ICE Forms I-229s (Warning for Failure to Depart) and Notices of Failure to Comply (FTC).

Based on a review of the case summary in the removal module, it appeared that several attempts to obtain travel documents were unsuccessful, contributing to Gulema's FTC status. (b)(6); (b)(7)(C); (b)(6); (b)(7)(C); (b)(3):Unspecified Statute

There were multiple comments in the removal module from May 2007 through November 25, 2015. The comments indicated that Gulema was ordered removed and refused to sign the I-229 forms placing him in an FTC status. On November 25, 2008, it was noted in the comments section that Gulema stated he was not going back to Ethiopia. There was another comment that on July 8, 2009, that the Ethiopian consulate refused to issue travel documents based on pending litigation. Gulema remained in FTC status and the ICE ERO Headquarters Travel Document Unit (HQTDU) continued to attempt to obtain travel documents.

On July 23, 2009, Gulema refused to speak with the Ethiopian consulate for a telephonic interview.

Another notation on June 4, 2010, indicated that the consulate needed identification documents for Gulema in order to issue travel documents without a telephone interview. On June 22, 2010, the first notation regarding medical complaints was entered.

There were notations on July 9 through July 20, 2010, regarding Gulema's prosecution for failure to comply. Gulema was indicted on one count of Title 8 U.S. Code (USC) § 1253 Failure to Comply and was booked by the United States Marshals Service. The case was dismissed on May 9, 2011. On June 30, 2011, Gulema signed the I-229, but would only comply for any country except Ethiopia and would not complete the Ethiopian passport application, which is required for an HQTDU travel document package. There were several additional comments regarding dealings with Gulema and his failure to comply. On March 7, 2013, ICE ERO presented a case to the United States Attorney's Office (USAO) for prosecution under 8 USC § 1253. The USAO declined the case for prosecution. Gulema continued to decline to cooperate, declined to speak with the Ethiopian Embassy, and continued to remain in an FTC status.

Gulema remained uncooperative and on February 17, 2015 it was noted that Gulema was taken to the emergency room where he suffered from cardiopulmonary arrest and was revived by

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General, and will be disseminated only on a "Need to Know" basis. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

INV FORM-08A

I16-ICE-ATL-17063

Cho Decl. ISO MSJ
Exhibit A
Page 45

Page 7 of 12
**DHS-OIG June 2023 0118**

Exh. 00039

## MEMORANDUM OF ACTIVITY

On the previous date, (b)(6); advised that Gulema continually refused to cooperate with ICE officials and would not sign required paperwork for removal proceedings. The process includes a Post Order Custody Review (POCR) once paperwork is signed and travel documents are issued. In the case of Gulema, the POCR clock was basically "suspended" because of Gulema's continual refusal to cooperate. (b)(6); stated that detainee can stay in a failure to comply (FTC) status indefinitely, depending on the specifics of a detainee's case.

According to (b)(6); , once Gulema was placed in the hospital, ICE officials were determining if Gulema could be released. Additional attempts were made to obtain travel documents without success. Eventually, ICE headquarters determined that Gulema could be released on an order of supervision (OSUP). (b)(6); commented that he recalled ICE was paying approximately $20,000 a month in guard services at RRMC and ICE had paid at least three million dollars in medical expenses. (b)(6); stated that these costs were not a determining factor in placing Gulema on OSUP.

(b)(6); did not recall Gulema ever filing a writ of habeas corpus seeking removal from detention. (b)(6); stated that only a deputy field officer director or above can place someone in an FTC status. (b)(6); did not recall Gulema ever pushing to be released and did not make any extra efforts to be released.

(b)(6); stated that medical issues concerning Gulema would be documented in the ECDC paperwork and would not be part of Gulema's ICE file. (b)(6); stated that the American Civil Liberties Union had requested information in regards to Gulema and that information was provided in a Freedom of Information Act request. (b)(6); provided DHS OIG with several documents including copies of electronic mail (email) messages. These will be documented below. (b)(6); further stated he would send additional messages to SA (b)(6); . These records will be documented in a separate report.

The documents received are summarized as follows:

The first document was an ICE Release Notification to Gulema from (b)(6); , POCR Unit Chief, ICE HQ. The notification was dated October 22, 2016. There was an HQ POCR checklist attached to the letter. The checklist stated, "Due to alien's medical condition and prognosis, the Embassy of Ethiopia refused to conduct an interview or issue a travel document on his behalf. Therefore, since alien's medical condition is unlikely to improve anytime soon, there is not a significant likelihood of removal in the reasonable foreseeable future."

The next document is an email from (b)(6); to (b)(6); (b)(7)(C) Gulema's ERO Case Officer, dated October 22, 2015, regarding the release notification email for Gulema. (b)(6); advised that they are not to release at this time, the ERO Field Office Director (FOD) was checking with HQ. The email also contained an email from (b)(6); Management and Program Analyst,

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

Cho Decl. ISO MSJ
Exhibit A
Page 46

**DHS-OIG June 2023 0145**                         Exh. 00040

## MEMORANDUM OF ACTIVITY

DSH/ICE/ERO/RMD/RIO, Middle East/East Africa, to multiple recipients, including (b)(6); with the subject "(b)(6);      – Release Notification Email – 10-22-15."

The next document was an email dated October 23, 2105. The email was from (b)(6); to (b)(6);      The email stated that (b)(6); spoke with the AFOD and Gulema was not to be released at this time.

The next document was an email dated November 9, 2015, from (b)(6);      to (b)(6); and other recipients. It was a continuation of the hold on Gulema's release. Also included in the email chain was an email from (b)(6);      FOD, ICE ERO, New Orleans, LA. The email was dated October 22, 2015, and stated, "Please hold on any further actions was we'll need clarification as to the release mechanism, including any continuity of care or alternate placement."

Another document was an unrelated to Gulema's release letter dated October 20, 2015. The email was to (b)(6); and (b)(6); from (b)(6);   Gulema was the subject of the email and it had to do with guard service and placement of Gulema. The guard services were identified at $20,000+ per month. The email further stated that ICE Health Service Corp was still seeking placement for Gulema and HQ was still "deliberating."

(b)(6); provided DHS OIG with a copy of the ICE contract with ECDC. The contract was dated in October 2009 and was signed by (b)(6);      , Assistant Secretary, ICE, and (b)(6);      , Sheriff, ECSO. (b)(6); described the contract as ICE was a rider on the United States Marshal's Service, Department of Justice, contract with ECDC. The contract did not list any specific medical requirements, only that the ECDC must meet the applicable ICE National Detention Standards.

The final documents received were two forms dated November 24, 2015. The first form was identified as a DHS ICE Form I-216, Records of Persons Transferred. The form indicated that Gulema was transferred on this date via OSUP. The other form was a DHS ICE Form 1-203, Order to Release Alien.

ATTACHMENTS

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

INV FORM-09                              Page 3 of 3                              I16-ICE-ATL-17063

Cho Decl. ISO MSJ
Exhibit A                          **DHS-OIG June 2023 0146**                          Exh. 00041
Page 47

## MEMORANDUM OF ACTIVITY

Gulema as a having any aggravated felony convictions. The records did show a total of ten convictions. The records indicated that based on the charges, Gulema did have at least one conviction of a crime involving moral turpitude.

Gulema was initially detained as a deportable alien into a federal agency on July 20, 2010. Gulema was booked into the ECDC on July 2, 2011. The records indicated that Gulema was released from ICE ERO custody on an order of supervision (OSUP) on November 24, 2015. Gulema was released to the RRMC. There were no specific comments when Gulema was booked into ECDC other than the health condition observed on July 2, 2011, which stated "Detainee claims Good Health." The book out comment showed "Subject was released on OSUP per HQ RIO and NOL FOD. Subject does not have any reporting requirements."

A review of the custody actions and decisions in the detention module contained comments from April 2007 through November 2015. It was noted in the comments section that Gulema was in the Post Order Custody Report (POCR) process and was served multiple ICE Forms I-229s (Warning for Failure to Depart) and Notices of Failure to Comply (FTC).

Based on a review of the case summary in the removal module, it appeared that several attempts to obtain travel documents were unsuccessful. This would have contributed to Gulema's FTC status. (b)(6); (b)(7)(C); (b)(3):Unspecified Statute

(b)(6); (b)(7)(C); (b)(3):Unspecified Statute

There were multiple comments in the removal module from May 2007 through November 25, 2015. The comments indicated that Gulema was ordered removed and refused to sign the I-229 forms placing him in an FTC status. On November 25, 2008, it was noted in the comments section that Gulema stated he was not going back to Ethiopia. There was another comment that on July 8, 2009, that the Ethiopian consulate refused to issue travel documents based on pending litigation. Gulema remained in FTC status and the ICE ERO Headquarters Travel Document Unit (HQTDU) continued to attempt to obtain travel documents.

On July 23, 2009, Gulema refused to speak with Ethiopian consulate for telephone interview. Another notation on June 4, 2010, indicated that the consulate needed identification documents for Gulema in order to issue travel documents without a telephone interview. On June 22, 2010, the first notation regarding medical complaints was entered.

There were notations on July 9-July 20, 2010, regarding prosecution for failure to comply. Gulema was indicted on one count of 8 United States code 1253 (Failure to Comply) and was booked by the United States Marshals Service. The case was dismissed on May 9, 2011. On June 30, 2011, Gulema signed the I-229, but would only comply for any country except Ethiopia and would not complete the Ethiopian passport application, which is required for an HQTDU travel document package. There were several additional comment regarding dealings with Gulema and his failure to comply.

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

INV FORM-09                                   Page 2 of 3                                   I16-ICE-ATL-17063

Cho Decl. ISO MSJ
Exhibit A                        **DHS-OIG June 2023 0151**                        Exh. 00042
Page 48



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## MEMORANDUM OF ACTIVITY

**Type of Activity**: Records Review: Person Centric Query System

| *Case Number:* I16-ICE-ATL-17063 | *Case Title:* Etowah County Detention Center |
|---|---|

On Tuesday, November 1, 2016, (b)(6):          , Special Agent, Department of Homeland Security (DHS), Office of Inspector General (OIG), Atlanta Field Office, completed a review of records contained in the Person Centric Query System (PCQS) which is maintained by U.S. Citizenship and Immigration Services (CIS). The records were in regards to a DHS OIG investigation into detainee care and operating policy and procedure at the Etowah County Detention Center (ECDC), Gadsden, AL. This investigation was initiated by a Congressional request. According to the request, Teka Gulema spent over eight years in the physical custody of U.S. Immigration and Customs Enforcement (ICE) with several of those years at ECDC. On February 7, 2015, Gulema was transported to an emergency room at the Riverview Regional Medical Center (RRMC), Gadsden, AL. Gulema remained hospitalized at RRMC until his death on January 18, 2016. The request also called for a review of Gulema's ICE detention records and medical records at ECDC.

The records reviewed here are not specifically related to Gulema's detention; however, they were related to his dealings with immigration and the review was to determine if any information contained in these records that could provide any investigative information.

The records review is summarized below:

The PCQS records showed that Gulema was born in Ethiopia (Alien Number (b)(6):          . The records in PCQS were queried using this alien number. The information indicated that Gulema had several applications to obtain benefits from CIS and legacy Immigration and Naturalization Services. These benefits included applications for employment authorization, permanent residence status, application to replace permanent residence card. The reason for the replacements cards were listed as change of data. The records indicated that Gulema had been a legal permanent residence (CIS Form I-551 Permanent Residence Card) since October 1, 1989
(b)(6); (b)(7)(C); (b)(3):Unspecified Statute

The records showed where Gulema's alien file (A-File) was listed as a lost file. The date of the last action was August 8, 2012, and the last action is listed as lost. The responsible party and section was listed as Etowah (Detained File Room), ICE, Deportation. The records also had information on the T-File (Temporary A-File) and where the file was requested for DHS OIG in late August 2016.

| Name, Title, Signature, and Date: | | Reviewing Official Name, Title, Signature, and Date: | |
|---|---|---|---|
| (b)(6); (b)(7)(C) Special Agent | 11/01/2016 | (b)(6); (b)(7)(C) Lead Criminal Investigator (b)(6) | 4/16 |

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General, and is disseminated only on a need to know basis. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

INV FORM-09

Item #: 8

**DHS-OIG June 2023 0157**

Exh. 00043

# ATTACHMENTS UPLOADED INTO EDS

# TOTALS 581 PAGES

**DHS-OIG June 2023 0182**                    Exh. 00044

April 5, 2021

RECEIVED
By ESEC at 3:44 pm, Apr 12, 2021

Alejandro N. Mayorkas
Secretary
U.S. Department of Homeland Security
3801 Nebraska Ave. NW
Washington, DC 20016

**Re:   ICE's Failure to Safely Release People with Serious Mental Illness and the Death of Martin Vargas Arellano**

We write to you today as Qualified Representatives ("QR") who are appointed by the Immigration Courts to represent detained immigrants who have been found mentally incompetent to represent themselves in their removal proceedings under the National Qualified Representative Program ("NQRP"). The NQRP was established pursuant to the District Court's orders in *Franco-Gonzalez v. Holder* and is funded by the Executive Office for Immigration Review (EOIR). Our clients are among the most vulnerable people in ICE custody, and we zealously advocate for the humane treatment of our clients, including their conditions of detention and safe release from detention.

In this capacity, we have observed firsthand the deliberate indifference and inhumane treatment that our clients endure in ICE custody, which has led many of them to severely decompensate. This inhumane treatment includes a failure to ensure the attorneys of record and family members of our medically vulnerable clients are provided with notice in order to coordinate dignified and safe releases from ICE custody. In the case of *Franco* class member and NQRP client Martin Vargas Arellano, this indifferent and inhumane treatment resulted in an undignified and preventable death. We write today to demand that your office holds ICE accountable for the death of Mr. Vargas and takes swift and appropriate measures to ensure that all people with disabilities, including all NQRP clients, are treated humanely while in ICE custody and released safely.

◊   *ICE has a widespread practice of unsafely releasing our mentally incompetent clients and fails to guarantee their right to a safe discharge.*

Since at least the beginning of the NQRP, but especially in recent months, ICE has engaged in a dangerous, pervasive, and widespread practice of releasing people with medical and mental health vulnerabilities in an unsafe manner. For NQRP clients, unsafe releases can pose a severe and immediate risk to their health and their lives. ICE must swiftly guarantee that all people in ICE custody, especially those with serious medical and mental health conditions, are provided with appropriate medical and mental health care and released safely from ICE custody.

This letter includes an Appendix listing several recent examples of ICE's unsafe release of NQRP clients. These represent a small portion of the incidents of unsafe release we have observed in our work and illustrate the risks that our clients face when they are released without medication and without notice to their legal team. With every unsafe release, ICE risks the lives of our NQRP clients and other vulnerable people in detention.

Cho Decl. ISO MSJ
Exhibit A
Page 51

1

**DHS-OIG August 2023 0004**

Exh. 0045

◊ *ICE refused to release Martin Vargas Arellano despite his clear medical vulnerability and continued declining health. When he was finally discharged to a hospital, ICE failed to notify his legal representatives of the discharge, and subsequently obscured his location and death.*

When he died on March 8, 2021, Martin Vargas Arellano had lived in the United States for over 50 years. In 2013, he was found incompetent to represent himself and appointed a representative under the NRQP; he was still in removal proceedings at the time of his death. For the past two years, Mr. Vargas was held in ICE custody at Adelanto ICE Processing Center. Mr. Vargas was one of the most vulnerable people in Adelanto, suffering from (b)(6); (b)(7)(C) (b)(6); (b)(7)(C) ICE was fully aware of his medical vulnerability – he was hospitalized more than 16 times during his two years in ICE detention - but repeatedly denied his release.[1] In December 2020, Mr. Vargas contracted COVID-19 in Adelanto and was hospitalized three times from December 2020 through February 2021, before being transferred to St. Jude Hospital on March 5, where he died three days later.

Mr. Vargas was represented by attorney (b)(6); (b)(7)(C) of the Esperanza Immigrant Rights Project in Los Angeles, which had represented Mr. Vargas in all of his proceedings before the immigration court for the past 7 years. On February 22, 2021, ICE informed (b)(6); (b)(7)(C) that they were considering releasing Mr. Vargas and asked her to provide information about his transportation and housing, which she did. Mr. Vargas' Deportation Officer told (b)(6); (b)(7)(C) that he would inform her in advance of any release so she could ensure it could be done safely, which she was prepared to do. ICE later informed (b)(6); (b)(7)(C) that Mr. Vargas would be released once he recovered from surgery and asked her to provide information for his next of kin (an uncommon request for release from ICE custody), which she did. When Mr. Vargas suffered a stroke on March 3, ICE did not inform (b)(6); (b)(7)(C) instead, ICE transferred Mr. Vargas to the hospital two days later, again without informing (b)(6); (b)(7)(C)

On March 15, seven days after Mr. Vargas' death, (b)(6); (b)(7)(C) learned that he had been released from ICE custody on March 5. (b)(6); (b)(7)(C) then spoke to Mr. Vargas' Deportation Officer at Adelanto, who led her to believe that he had been released into the community and denied knowing where he was. The next day, (b)(6); (b)(7)(C) filed a missing person report, which prompted the police to compel ICE to disclose Mr. Vargas' last-known location, St. Jude Hospital. (b)(6); (b)(7)(C) contacted the hospital and was told he was not there, prompting her to contact the Orange County Coroner. On March 18, (b)(6); (b)(7)(C) learned from the coroner that Mr. Vargas had died at St. Jude Hospital on March 8.

---

[1] In addition to being a *Franco-Gonzalez v. Holder* class member (*Franco-Gonzalez v. Holder*, No. 10-02211, Dkt. No. 786, 2014 WL 5475097 (C.D. Cal. October 29, 2014), Mr. Vargas was a named Plaintiff in *Robles v. Wolf*, No. 5:20-cv-00627-TJH (C.D. Cal.). On April 2, 2020, a Federal District Court Judge ordered his release, but stayed the release when the transitional center that had initially confirmed a placement for Mr. Vargas determined that it no longer had space. Mr. Vargas was also identified as a *Fraihat v. DHS* class member. (Fraihat v. ICE , Case No. 5:19-cv-1546-JGB-SHK (C.D. Cal. Apr. 20, 2020). *Fraihat* specifically identified psychiatric illness as one of the risk factors that place someone at heightened risk of severe illness and death upon contracting the COVID-19 virus. *Id.* Mr. Vargas's legal team filed a request for release under *Fraihat* in tandem with a request for release under Humanitarian Parole on June 4, 2020. Both were denied on July 2, 2020. Mr. Vargas received a second denial under *Fraihat* on November 2, 2020.

Cho Decl. ISO MSJ
Exhibit A
Page 52

2

**DHS-OIG August 2023 0005**

Exh. 0046

By intentionally withholding information about Mr. Vargas' decline in health, stroke, and hospitalization, ICE denied Mr. Vargas the opportunity for a hospital visit from his attorney, (b)(6); (b)(7); (b)(6); (b)(7)(C) ensured that (b)(6); (b)(7)(C) spent time coordinating care and housing under the belief that Mr. Vargas would be released to the community; created confusion and panic over Mr. Vargas' whereabouts after his release from ICE custody; and forced Esperanza Immigrant Rights Project and the LAPD to spend days searching for him.

We have no doubt that ICE knew Mr. Vargas was likely to die, and that as soon as ICE found out about Mr. Vargas' stroke, they "released" him from custody to the hospital to evade responsibility for yet another in-custody death. ICE is responsible for the suffering, health complications, and preventable death of Martin Vargas Arellano, and should not be allowed to evade responsibility for their serious failures. Mr. Vargas's death is attributable to ICE's negligent and indifferent practices and should be reported as an in-custody death.

◊ *Our concrete demands.*

The unsafe release of people represented by the NQRP is unnecessary and preventable. To ensure that no NQRP client is released from ICE custody in an unsafe manner, we request that ICE take the following steps:

1. Immediately implement a Mental Health Safety Discharge policy or procedure for all NQRP clients in ICE custody that includes, at minimum:

    a. Scheduling and confirming the time and date of release with the client's legal team to ensure a safe release plan can be executed.

    b. Notifying the person's legal team of any changes in the date, time, or manner of the client's release, and coordinating a new safe release plan with the legal team.

    c. Ensuring that NQRP clients are released with a sufficient supply of medication, and at least as much as is required under the relevant standards.[2]

    d. Where discharge will occur at a bus station or other transport hub, ensuring the client has access to telephonic communications to call his family and legal team prior to release.

    e. Ensuring clients are released with any commissary funds and are able to immediately access those funds at release, including, if necessary, instruction in the client's preferred language.

    f. Enforcement of this policy, including accountability and sanctions, when ICE releases NQRP clients and other vulnerable people unsafely.

2. Provide accountability to Mr. Vargas and his family by, at minimum:

---

[2] See, e.g., 2011 ICE Performance-Based National Detention Standards (PBNDS 2011) 4.3.Z ("Upon removal or release from ICE custody, the detainee shall receive up to a 30-day supply of medication as ordered by the prescribing authority and a detailed medical care summary …. The HSA must ensure that a continuity of treatment care plan is developed and a written copy provided to the detainee prior to removal").

Cho Decl. ISO MSJ
Exhibit A
Page 53

3

**DHS-OIG August 2023 0006**

Exh. 0047

    a. Reporting his death as an in-custody death in Adelanto, as ICE deposited him in a near-death state on the doorstep of a local hospital.

    b. Ordering that the Office of Civil Rights and Civil Liberties initiate an investigation into his death and violations of Section 504 of the Rehabilitation Act of 1973.

3. Prioritize and immediately evaluate all NQRP clients for release under the new enforcement policy and, in close coordination with their legal representatives, ensure their right to a safe and humane discharge.

We urge you to take immediate and serious measures to address this problem, and we welcome the opportunity to work with you to ensure that no person with mental illness is ever again subject to inhumane treatment in or unsafe release from ICE custody.

We eagerly await your office's response.

Sincerely,

National Qualified Representative Program (NQRP) Providers:

Becker & Lee LLP
Brooklyn Defender Services
Capital Area Immigrants' Rights (CAIR) Coalition
Catholic Charities Atlanta
Esperanza Immigrant Rights Project
Galveston-Houston Immigrant Representation Project
Graves and Doyle, Attorneys at Law
Immigrant Defenders Law Center
Immigrant Legal Defense
ISLA: Immigration Services and Legal Advocacy

Law Office of Andrew Nietor
Law Office of Daniela Hernández Chong Cuy
Legal Services of New Jersey (LSNJ)
Lucas & Barba LLP
Mariposa Legal, program of COMMON Foundation
Mid Minnesota Legal Aid
Open Immigration Legal Services
Pennsylvania Immigration Resource Center (PIRC)
Rocky Mountain Immigrant Advocacy Network
YMCA International Services

Cho Decl. ISO MSJ
Exhibit A
Page 54

4

**DHS-OIG August 2023 0007**

Exh. 0048

CC:   Katherine Culliton-Gonzalez
      Officer for Civil Rights and Civil Liberties
      U.S. Department of Homeland Security
      2707 Martin Luther King, Jr. Avenue, SE
      Mail Stop #0190
      Washington, DC 20528-0190

CC:   Tae D. Johnson
      Acting Director for U.S. Immigration and Customs Enforcement
      U.S. Immigration and Customs Enforcement
      U.S. Department of Homeland Security
      500 12th St. SW
      Washington, DC, 20536

Cho Decl. ISO MSJ
Exhibit A
Page 55

1

**DHS-OIG August 2023 0008**

Exh. 0049

## APPENDIX

*The cases and stories below were compiled by NQRP attorneys to illustrate recent instances of unsafe release of NQRP clients from ICE custody. Client names and identities have been redacted but can be provided separately upon request.*

### Arizona

**Client 1:** On November 24, 2020, Client 1 was released under *Fraihat* from ICE custody in Arizona. Client 1's attorney had alerted ICE to the client's *Fraihat* class membership twice, but ICE released the client while his *Fraihat* custody review was still pending, without notifying his attorney. A stranger at a Phoenix bus station allowed Client 1 to use their phone to call his family. The attorney only learned of his client's release when he called ICE to ask about the *Fraihat* review.

**Client 2:** In late May 2019, ICE abruptly released Client 2 without providing enough notice to his recently-appointed attorney to make a release plan. Client 2 experienced dementia, was not oriented to place or time, and was seriously ill, and had no release plan in place and nowhere to go when ICE released him. Despite the attorney's requests to ICE for time to develop a safe release plan, ICE insisted on releasing him before a plan could be implemented. The attorney was able to find Client 2's sister at the last minute, but had little information about Client 2's illness and the care he required. Within a few days of release, Client 2 wandered away from his sister's home. Several days later, his body was found in a canal in Phoenix.

### DC/ Virginia/Maryland

**Client 3:** Client 3 was granted asylum in July 2020 while in ICE custody. Client 3's legal team sent multiple requests to his DO to coordinate a safe release plan, but never received a response. ICE then released Client 3 without notifying his attorney, who learned from another detained individual that Client 3 had been released. The attorney made attempts to locate Client 3 and eventually discovered that he had been taken to a local Magistrate (due to concerns about a bench warrant), then released to the street with no means to contact anyone. A stranger let Client 3 use his phone to let his legal team know where he was. The client's case manager coordinated with a taxi driver to get the client to a hotel, where he arrived after 1am.

**Client 4:** In 2018, ICE transferred Client 4, who had been newly appointed an attorney, to a hospital for invasive, high-risk surgery after his cancer was detected following several instances where he collapsed requiring emergency services at the detention center. Through a review of medical records, the attorney learned that the jail had dismissed Client 4's concerns for some time as mental health related. Client 4 was not competent to consent to surgery and doctors refused to operate without more. ICE called the legal team to ask whether they could consent to the surgery to remove the malignant tumor, which, the legal team believes is the only reason they were notified. Ultimately, consent was obtained through the legal team working with a state agency. After DHS agreed to stipulate to asylum, ICE would not accommodate the attorney's safe release requests with no other options, the legal team was forced to put Client 4 up in a hotel overnight

Cho Decl. ISO MSJ
Exhibit A
Page 56

**DHS-OIG August 2023 0009**

Exh. 0050

and arrange to pick him up the following day. When the team arrived at the hotel the following evening, the hotel had already put him out on the street, where he was near collapse, requiring a visit to the ER. Ultimately, the provider was able to find local shelter for him until he was able to reunite with family in another part of the country Client 4 has since passed away from cancer and it remains unknown how much ICE's actions and inaction contributed to his death.

## Georgia

**Client 5:** In December 2019, Client 5 was released without notice to the legal team. Although the IJ had terminated proceedings, Client 5 remained in ICE custody while ICE reserved appeal. When his attorney requested to speak with their client, they learned he'd been released. Although his legal team made multiple attempts to locate him, he has never been able to locate Client 5, who was experiencing severe symptoms of mental illness while in ICE custody. Client 5's current whereabouts remain unknown.

## Louisiana

**Client 6:** In July 2021, Client 6's legal team learned that he had been released after the attorney contacted the detention facility to schedule a call with him. While in ICE custody, Client 6 suffered from severe psychotic episodes and his medication and dosage was changed regularly in the months before his release. After initially being told that Client 6 had been "transferred," ICE told the legal team that their client been dropped off at a bus station headed to address in California that he had not used in years. The legal team was finally able to locate him after Client 6 arrived in California. Since his release, Client 6 has been absent and estranged from his family, and his legal team has been unable to maintain regular contact with him.

**Client 7:** On approximately February 5, 2021, Client 7, who suffers from schizophrenia, was released from ICE custody without notice to the legal team and without his prescribed medication. When the attorney attempted to visit Client 7 on February 12, he was told that visitations had been cancelled due to the weather. The attorney did not learn of his client's release until February 15, when Client 7 called his legal team. The attorney has been unable to meet or regularly communicate with Client 7, since Client 7's medication regimen was disrupted and he does not have a fixed address or means of communication, all of which could have been avoided if ICE had provided sufficient notice to Client 7's legal team.

**Client 8:** In March 2021, ICE released Client 8 without notifying her legal team. Client 8 has an intellectual disability and only speaks an indigenous Mayan language, presenting enormous communication barriers. The legal team later learned that ICE released Client 8 to a local program along, without informing the program director that Client 8 had an attorney and suffered mental disabilities. The legal team is actively searching for an appropriate living placement for Client 8.

## Michigan

**Client 9:** In November 2020, Client 9 was granted relief from removal while in ICE custody. Almost immediately upon learning from DHS that they would not appeal the decision, ICE told

Cho Decl. ISO MSJ
Exhibit A
Page 57

**DHS-OIG August 2023 0010**

Exh. 0051

the legal team that Client 9 would be released within hours, on the street, unless someone could pick him up at the detention facility. The legal team arranged for Client 9's brother
to fly from out of state to pick him up and asked the facility to hold Client 9 until his brother arrived. Instead, ICE released Client 9 prior to his brother's arrival - without medication and without proper clothing in 35-degree weather. Client 9 wandered the streets without any identification or means to contact his legal team or anyone else and the attorney filed a missing persons report. Client 9's abusive wife found him a few hours later and she connected him with his brother who had, by then arrived from Florida.

Cho Decl. ISO MSJ
Exhibit A
Page 58

**DHS-OIG August 2023 0011**

Exh. 0052