# EXHIBIT S



# United States Department of Justice

## United States Attorney's Office
## Central District of California

*JOSEPH W. TURSI*
*JASON K. AXE*
*Assistant United States Attorney*
*Phone:  (213) 894-3989/8790*
*E-mail:  Joseph.Tursi@usdoj.gov*
*        Jason.Axe@usdoj.gov*

*Federal Building*
*300 N. Los Angeles Street, Suite 7516*
*Los Angeles, California 90012*

January 22, 2024

**VIA E-MAIL**

Laboni A. Hoq
Hoq Law, APC
P.O. Box 753
South Pasadena, CA 91030

   Re: ACLU of SoCal v. ICE, et al.
     C.D.CA Case No. 2:22-cv-04760-SHK

Dear Ms. Hoq:

   Pursuant to the Court's December 8, 2023 Order [Dkt. 62], Defendant ICE provides the following information:

**Parts 1-3**

ICE has approximately 38,285 pages remaining to process, broken down as follows by each individual:

- Jose Ibarra Bucio: 1,157 pages.

- Martin Vargas Arellano: 5,263 pages.

- Teka Gulema: 31,865 pages.  All pages from October 1, 2015 and after have been processed. The remaining 31,865 pages to be processed are from before October 1, 2015.

- Johana Medina Leon: All pages have been processed.

If the Gulema records preceding October 1, 2015 are excluded, the remaining number of pages to process is 6,420.

**Part 4**

The emails of Scott Shuchart, Deborah Fleischaker, and Tae Johnson were searched and resulted in over 142,000 documents of potentially responsive records.

The office of ICE Health Service Corps (IHSC) Policy conducted a search for records and found 27 pages of potentially responsive records.

Ms. Laboni A. Hoq
RE: ACLU of SoCal v. ICE
January 22, 2024
Page 2

The Office of Regulatory Affairs and Policy (ORAP) conducted a search and found 16 pages of potentially responsive records.

**Part 5**

Dr. Stewart Smith, the Assistant Director of IHSC, conducted a search and found 551 pages of potentially responsive records.

**Part 6**

The Joint Intelligence Operations Center (JIOC) was tasked with conducting a search but deferred the search tasking to the Office of Enforcement and Removal (ERO) because the data points requested do not originate with JIOC. ERO Custody Management conducted a search and found 304 pages of potentially responsive records. ERO IHSC conducted a search and found 93 pages of potentially responsive records.

ERO Field Operations (FOPS) conducted a search but found no responsive records.

The Office of Professional Responsibility (OPR) conducted a search but found no responsive records.

**Part 7**

OPR conducted a search and found 9 pages of potentially responsive records.

JIOC was tasked with conducting a search but deferred the search tasking to ERO because the data points requested do not originate with JIOC. ERO Custody Management conducted a search and found 9 pages of potentially responsive records.

ERO IHSC conducted a search but found no responsive records.

ERO FOPS conducted a search but found no responsive records.

**Part 8**

Dr. Stewart Smith, the Assistant Director of IHSC, conducted a search and found 1,711 pages of potentially responsive records.

**Part 9**

The Health Plan Management Unit of ERO IHSC conducted a search and found 1 excel spreadsheet.

Ms. Laboni A. Hoq
RE: ACLU of SoCal v. ICE
January 22, 2024
Page 3

Respectfully,

E. MARTIN ESTRADA
United States Attorney

/s/ *Joseph W. Tursi*

JOSEPH W. TURSI
Assistant United States Attorney

cc: Ms. Eunice Cho (by email)
    Mr. Michael Kaufman (by email)
    Mr. Kyle Virgien (by email)

# EXHIBIT T

January 26, 2024

Joseph Tursi
Jason Axe
Alarice Medrano
United States Attorney's Office
Central District of California
300 N. Los Angeles St. Suite 7516
Los Angeles, CA 90012
Joe.tursi@usdoj.gov
Jason.axe@usdoj.gov
Alarice.medrano@usdoj.gov

**SENT VIA EMAIL**

      Re:    *ACLU of Southern California v. United States Immigration and Customs Enforcement, et al.*, No. 2:22-cv-4760 (C.D. Cal.)

Dear Counsel,

      Plaintiff is in receipt of Defendants' January 17, 2024 letter, and Defendants' January 22, 2024 letter, provided pursuant to the Court's December 8, 2023 Order (ECF No. 62).

      Plaintiff seeks to provide ICE with its position regarding "waiver of production of documents related to Mr. Teka Gulema dated before October 1, 2015, whether it waives production of any other portions of its Request, and whether it narrows the scope of any of its Requests" by February 5, 2024. *See* Order, ECF No. 62. However, Plaintiff requests the following information from Defendant in order to do so. For that reason, please provide Plaintiff with responses to the following questions by **February 1, 2024**, so we can make our best effort to assist ICE reduce its production obligations.

## I.    Documents Referred by DHS-OIG to ICE

      As Plaintiff has noted, it appears that OIG has referred 1,420 pages to ICE. *See* Pl.'s Dec. 13, 2023 Letter at 1 n.1. These pages included:

- 581 pages of documents referenced on page 182 of OIG's June 2023 production, which states: "ATTACHMENTS UPLOADED INTO EDS TOTALS 581 PAGES." These pages appear to be the "Attachment" of files referenced on page 181 of OIG's June 2023 production, reviewed by OIG staff in its investigation of Mr. Teka Gulema's death. *See* Ex. A.
- 328 pages of documents referenced on pages 144-146 of OIG's June 2023 production, *see* Ex. B, including specific documents reviewed by OIG staff in its investigation of Mr. Gulema's death, including:

1

- ICE Release Notification to Gulema from [Redacted], POCR Unit Chief, ICE HQ, dated Oct. 22, 2016 [sic];[1]
- Email from [Redacted] to [Redacted], Gulema's ERO Case Officer, dated October 22, 2015, "regarding the release notification email for Gulema." "The email also contained an email from [Redacted], Management and Program Analyst, DSH/ICE/ERO/RMD/RIO [sic], Middle East/East Africa, to multiple recipients, including [Redacted] with the subject [Redacted]-Release Notification Email 10-22-15.
- Email dated October 23, 2105 [sic].[2] "The email was from [Redacted] to [Redacted]. The email stated that [redacted] spoke with the AFOD and Gulema was not to be released at this time."
- Email dated November 9, 2015, from [Redacted] to [Redacted] and other recipients. It was a continuation of the hold on Gulema's release. Also included in the email chain was an email from [Redacted], FOD, ICE ERO, New Orleans, LA. The email was dated October 22, 2015, and stated, "Please hold on any further actions as we'll need clarification as to the release mechanism, including any continuity of care or alternate placement."
- Email dated October 20, 2015, that "had to do with guard service and placement of Gulema." OIG summarized the email as stating that "[t]he guard services were identified at $20,000+ per month. The email further stated that ICE Health Service Corp [sic] was still seeking placement for Gulema and HQ was still 'deliberating.'"
- Two forms dated November 24, 2015, including DHS ICE Form I-216, Records of Persons Transferred, and DHS ICE Form I-203, Order to Release Alien.

On January 17, 2024, Defendants stated the documents referenced above "will be produced by the agency that created the records, i.e. the agency to which OIG referred the records," in this instance, ICE. Defs.' Jan. 17, 2024 Letter at 1. On January 22, 2024, ICE stated that it has 31,865 pages remaining to be produced regarding Mr. Gulema, but that "[a]ll pages from October 1, 2015 and after have been processed." Defendants' Jan. 22, 2024 Letter at 1.

Defendants, however, have not produced the records referenced above regarding Mr. Gulema to Plaintiff, including those dated after October 1, 2015. Before we can make a decision on waiving production of documents, we need to ensure that we will receive the referred documents, which OIG found relevant to its analysis and which are likely highly relevant to Plaintiff's Request.

**Further, please answer the following questions by February 1, 2024:**

- **How many pages of the 1,420 pages referred from OIG to ICE have been produced to Plaintiff? When will ICE produce any of these documents not yet produced?**
- **How many of the 1,420 pages referred from OIG to ICE refer to Mr. Gulema? Of those pages, how many are dated on or after October 1, 2015?**

---

[1] Plaintiff assumes that this is a typographical error, as OIG states that Mr. Gulema died on January 18, 2016. *See* June 2022 OIG Production at 144.
[2] Plaintiff assumes that this is a typographical error, and refers to the year 2015.

## II.   ICE Production

### A.  Parts 1-3

Defendants have stated that ICE has 31,865 pages regarding Mr. Gulema dated prior to October 1, 2015, remaining to be processed.

A number of documents produced regarding Mr. Teka Gulema indicate that specific custodians are likely to have highly responsive records, including the New Orleans ICE Field Office Director, Gulema's ICE Enforcement and Removal Operations Officer, and Headquarters Level Staff.

For example. ICE Document Number 10542 (Ex. C), an email dated November 17, 2015, states that the decision related to "a potential date of release" for Mr. Gulema was "at the HQ level with ERO and [Redacted]."

Plaintiff hopes that it is possible to waive the large majority of the 31,865 pages while obtaining a relatively small number of pages related to these key custodians. In order to explore this possibility, Plaintiff requires some additional information.

**Please answer the following questions by February 1, 2024:**

- **Who is the officer referred to at Document Number 10542 (redacted name)? If ICE declines to provide her name, what is her title and department? Did ICE conduct a search for her records? If so, how many pages of those records are included in the 31,865 remaining pages?**
- **Did ICE conduct a search of records belonging to: the New Orleans ICE Field Office Director? Mr. Gulema's ICE Enforcement and Removal Operations (ERO) Officer? ICE Headquarters Staff?**
  - **If ICE conducted a search of these custodians, please provide a page count for remaining documents originating from these custodians. Please omit any pages including duplicate copies of SEN Report Notifications already produced to Plaintiff. Please provide a page count including attachments to these emails, and a page count excluding attachments to these emails.**
- **Of the 31,865 pages remaining, how many *pages* (not documents) include: 1) medical records regarding Mr. Gulema; 2) emailed SEN daily or biweekly reports regarding Mr. Gulema's health status?**

### B.  Part 4

Thank you for providing a hit count and search terms for records responsive to Part 4. You reported that IHSC Policy conducted a search for records and found 27 pages of potentially responsive records, and that the Office of Regulatory Affairs and Policy (ORAP) found 16 pages of potentially responsive records. Defs.' Jan. 22, 2024 Letter at 1-2.

3

Plaintiff, however, is concerned that the search terms utilized by IHSC and ORAP are underinclusive, and fail to include key terms that are highly relevant to the subject matter—including terms that ICE has agreed upon with Plaintiff. For example, IHSC and ORAP used search terms "hospital, health, release, COVID-19, accommodation, detainee treatment," ORAP did not search for key terms such as "death, life support, critical condition, intensive care, ICU, or hospice." Plaintiff requests that IHSC and ORAP conduct a search with these additional search terms, and provide a hit count of documents that include these terms by February 1, 2024.

### C.  Part 5

Plaintiff notes that Part 5 requested:

"Spreadsheets, emails, documents, communications, databases, lists, and other data compilations in the possession of ICE Leadership, ICE Enforcement and Removal Operations, ICE Health Service Corps, and ICE Office of Professional Responsibility that identify detainees who were released from custody while (a) hospitalized (including for COVID-19 treatment); (b) in the full-time care of external healthcare providers or facilities (including for COVID-19 treatment), or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility.  Requested materials include, but are not limited to, dates of hospitalization of detainees, dates of hospital or external care facility discharge, name of treated detainees' detention facilities, and reasons for detainees' hospitalization or external medical care.  These materials should further include Medical Transfer Summary documents from DHS's eHR System and Alien Medical Records System, and any versions of the Significant Detainee Illness Spreadsheet that identify detainees who were released from custody while (a) hospitalized (including for COVID-19 treatment); (b) in the care of external healthcare providers or facilities (including for COVID-19 treatment); or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility." ECF No. 1-1 at 6.

Plaintiff has "proposed a compromise that Defendants limit the search to staff . . . who participate in the weekly [Significant Detainee Illness] meeting and any custodian who possess[es] the SDI list." ECF No. 62, Dec. 8, 2023 Order at 11. In response, Defendants have run a search of *one* custodian of ICE Health Service Corps, to the exclusion of the other requested subagencies. Defs.' Jan. 22, 2024 Letter at 2. This search is clearly inadequate. Plaintiff again requests that Defendants conduct a search of custodians pursuant to the proposed compromise.

### D. Parts 6 and 7

Throughout this litigation, Defendants have claimed that it could not search Significant Incident Reports (SIR) and Significant Event Notifications (SEN), without individual identifying information. Plaintiff repeatedly made clear that the ICE Joint Intelligence Operations Center (JIOC) compiles these SIR and SEN records and would be a suitable location to conduct this search. On November 30, 2023, ICE stated that it "has no objection to searching JIOC and will do so." Defs.' Nov. 30, 2023 Letter at 4.

Defendants, however, have now reversed course, stating that JIOC has now "deferred the search tasking to ERO because the data points requested do not originate with JIOC." Defs.' Jan. 22, 2024 Letter at 2. This is not a reasonable response. ICE has previously claimed that ERO could not search SIR and SEN records without individual identifying information. *See* Defendants' Jul. 11, 2023 Letter ("ERO needs a date, or an event, or a location, or alien number to search for a SIR or SENs."). Thus, although SIR and SEN records originate with ERO, they apparently are not searchable by ERO. JIOC, which compiles these records, can search them. Defendants' Kafkaesque position that they need not search the only location where these records are searchable does not square with their obligations under FOIA.

**Please provide the list of search terms that ERO conducted in its search for SIR and SEN records, and explain how ICE ERO conducted the search absent individual identifying information.**

We appreciate your response by February 1, 2024. We remain open to discussing these issues over the telephone or videoconference, if it is more convenient for counsel.

Sincerely,

//s//

LABONI A. HOQ (SBN 224140)
laboni@hoqlaw.com
HOQ LAW APC
P.O. Box 753
South Pasadena, California 91030
Telephone: (213) 973-9004

EUNICE CHO (pro hac vice)
echo@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
915 Fifteenth Street NW, 7th Floor
Washington, DC 20005
Telephone: (202) 548-6616

MICHAEL KAUFMAN (SBN 254575)
MKaufman@aclusocal.org
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West Eighth Street
Los Angeles, California 90017 Telephone:
(213) 977-9500
Facsimile: (213) 915-0219

KYLE VIRGIEN (SBN 278747)
kvirgien@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (202) 393-4930

*Attorneys for Plaintiff*

5

# EXHIBIT A



**OFFICE OF INSPECTOR GENERAL**

Department of Homeland Security

## MEMORANDUM OF ACTIVITY

**Type of Activity**: Records Review: IHSC Medical Records

| **Case Number:** I16-ICE-ATL-17063 | **Case Title:** Etowah County Detention Center |
|---|---|

On September 21, 2017, (b)(6):      Special Agent (SA), Department of Homeland Security (DHS), Office of Inspector General (OIG), Atlanta, GA, completed a review of records received from U.S. Immigration and Customs Enforcement (ICE) Health Services Corp (IHSC). According to the IHSC website, "IHSC is the only entity in ICE with the responsibility of providing direct patient care. IHSC is made up of a multi-sector, multidisciplinary workforce of over 1,100 personnel that include U.S. Public Health Service (PHS) Commissioned Corps officers, federal civil servants and contract health professionals." The records were in regards to a DHS OIG investigation into detainee care and operating policy and procedure at the Etowah County Detention Center (ECDC), Gadsden, AL, and specifically with regard to the death of detainee Teka Gulema (b)(6), (b)(7)(C) - Ethiopia). The records were received in electronic format directly from IHSC.

The investigation was initiated by a Congressional request. According to the request, Gulema spent over eight years in the physical custody of ICE with several of those years at ECDC. On February 7, 2015, Gulema was transported to an emergency room at the Riverview Regional Medical Center (RRMC), Gadsden, AL. Gulema remained hospitalized at RRMC until his death on January 18, 2016. The request specifically called for an inquiry into the current health care system at ECDC and if the health care system or lack of heath care contributed to the death of Gulema. The request also called for a review of Gulema's ICE detention records.

The records review is summarized below:

The records reviewed included medical records from IHSC, RRMC, and ECDC, and totaled over one-thousand records. A review of the records determined that there were multiple duplicate records. The records also contained electronic mail messages (emails) from the same entities, but primarily from ECDC and IHSC. The majority of the records were updates to the concerned parties regarding Gulema's medical status and condition. Also included in the records request was a total cost for Gulema's care. There were a total of three-hundred and fifty-three claims for service with a total payment of $389,355. There were twenty-one claims for service while in custody at ECDC with a payment of $2,486. The total payment to the hospital was $230,719.

The records indicated that Gulema primarily suffered from chronic back pain, hypertension, severe dental issues, declining vision (loss of prescription glasses while at ECDC) and dry skin.

| Name, Title, Signature, and Date: (b)(6); (b)(7)(C) Special Agent 09/21/2017 | Reviewing Official Name, Signature, and Date: (b)(6); (b)(7)(C) Assistant Special Agent in Charge |
|---|---|

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General, and is disseminated only on a need to know basis. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

Hoq Decl. ISO MSJ
Exhibit T
Page 148

# MEMORANDUM OF ACTIVITY

The ECDC policy for non-emergency conditions was to make a written request for medical care and the ECDC staff would respond to the detainee in writing, providing the request or denying the request along with the reason for denial.  It was noted in the review of the records that Gulema often refused medical examinations and recommended dental procedures for his conditions, including periodontal disease.  The records documented the recommendation that Gulema's teeth be removed due to poor condition which led to other issues.  Gulema refused to have his teeth pulled unless he received dental implants to replace the pulled teeth.  IHSC advised ECDC and Gulema that IHSC would replace the removed teeth with dentures, which Gulema declined.

The records contained an email (FW Etowah PARS) with the following information regarding Gulema's various medical issues:

"Dental Complaint: Mr. Gulema has been seen by the dental provider on multiple occasions since arriving to Etowah for dental complaints of pain and swollen gums. In March 2012, Mr. Gulema had dental extractions without complications. Mr. Gulema was seen for full oral exam and debridement in April 2012, September 2012, September 2013 and July 2014. In September 2013, Mr. Gulema began to complain of bleeding gums and pain. Mr. Gulema has had subsequent evaluations for this complaint in September 2013, October 2013, July 2014 and the most recent on November 7, 2014. The dentist has provided debridements and recommendations to extract multiple teeth and diagnosed periodontal disease and recommended a referral to a periodontist. Mr. Gulema has refused these extractions until he is assured that ICE will pay for implants to replace the extracted teeth. Furthermore, there is documentation in the medical record in August 2014, that the physician felt a periodontal consultation was not warranted in this case. Etowah medical and dental staff have not submitted a MedPAR or documentation for IHSC dental consultants to review to request further care including implants or dentures nor submitted a referral for a periodontal exam.

Eyeglasses Complaint: Mr. Gulema initially was referred to an optician in October 2011 after a vision screening at the facility and was seen by an optician in November 2011 and prescription glasses were ordered. There is no documentation in the medical record that they were received and when; however, IHSC approved the eye glasses in November 2011. In February 2013, the detainee submitted a request to replace his eyeglasses. The facility submitted a MedPAR stating that they were lost when moving between housing units. IHSC does not replace glasses for this reason as this is a custody issue. The SDDO provided Mr. Gulema with a form to request glasses through a charity organization; however, they denied the request because the prescription was over a year old. The Etowah staff did not submit a new request for an optometry evaluation to obtain a current prescription. In December 2013 and May 2014, Mr. Gulema submitted sick call requests for replacement glasses. On May 20, 2014, Mr. Gulema was notified that he was placed on the list for vision exam which was to be conducted on June 7, 2014; however, Mr. Gulema refused the exam while in the clinic. The exam finally took place on June 11, 2014 and Mr. Gulema was referred to the optician. The optician evaluated him on July 1, 2014 and provided a new prescription. New glasses were provided to Mr. Gulema on July 29, 2014.

**IMPORTANT NOTICE**
This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General.  This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552.  Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

## MEMORANDUM OF ACTIVITY

Physical Exam, evaluations by medical staff, various complaints related to internal bleeding, dizziness, back pain, skin infection, headache, weakness, high blood pressure, weight loss, etc.: Mr. Gulema had an initial physical exam upon arrival on July 2, 2011 with a registered nurse (RN). Annual physical exams with a RN were completed in July 2012, July 2013. Mr. Gulema refused his annual physical exam eight times between June 30, 2014 and July 18, 2014. He finally agreed to an annual physical exam completed on July 22, 2014, during an evaluation with the NP for high blood pressure.

Mr. Gulema submitted various sick call requests for pain medications and skin issues. Etowah provided responses via written communication to most nursing sick call requests vs. a face-to-face evaluation until October 2014. In October 2014, Etowah initiated a program of face-to-face evaluations done on the unit after an area for evaluation was constructed in the vestibule area. Over the counter medications are either sent or are available via commissary purchases. All ICE detainees are provided OTCs free of charge at Etowah (medications and other items such as lotion and dandruff shampoo) since January 2012.

Mr. Gulema was evaluated by a nurse practitioner (NP) or physician (MD) for various issues (bloody stool, low back pain, dizziness, cerumen impaction and high blood pressure) on various occasions during his stay. During these evaluations multiple medications, laboratory and radiology studies were ordered and treatments provided if necessary.

On July 22, 2014, Mr. Gulema was evaluated by the NP for complaints of stating he had been previously diagnosed with high blood pressure but refused medications. Mr. Gulema's blood pressure was elevated. The NP ordered antihypertensive medications, labs, blood pressure checks and a follow-up in 90 days. Mr. Gulema refused the antihypertensive medications and blood pressure checks. On November 4, 2014, Mr. Gulema was re-evaluated by the NP for the high blood pressure. Initially Mr. Gulema refused the evaluation due to dental complaints but was evaluated one hour later. The NP ordered antibiotics for dental infections and referred him to the dentist for an urgent evaluation. The blood pressure was not addressed."

Included in the records was a letter dated November 28, 2014, from Doctor's Care Physicians, P.C., ECDC Medical Unit, Gadsden, AL. The letter contained a listing of medical services provided to Gulema from July 2011 through November 2014 and will be attached to this report.

The records contained an IHSC email that documented based on a review of the medical records, Gulema denied having diabetes upon his initial intake at ECDC in July 2011. When Gulema was admitted to RRMC, he was diagnosed with diabetic ketoacidosis, which significantly contributed to his declining health and eventual death.

The records contained a summary of care from December 2014 through February 2015 when he was admitted to RRMC. The records included an email dated June 8, 2015, stating that Gulema had communicated to RRMC staff that he did not want to be resuscitated should he code.

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

Hoq Decl. ISO MSJ
Exhibit T
Page 150

## MEMORANDUM OF ACTIVITY

The records contained a listing of all of the medications issued to Gulema from the ECDC. These records will be attached to this report.

The records contained the ICE Significant Activity Report dated February 8, 2015, that detailed the admission of Gulema to the hospital. The SIR included details that Gulema was admitted for diabetic ketoacidosis and dehydration.

The records included e-mail correspondence with IHSC personnel. One record inquired about the dental issues and relation to his declining condition and Gulema's declinations of treatment. The response was as follow:

"I don't know Ma'am. He was sent to the ER in a dizzy, fatigued status…..his blood sugar was @421. The first dx was ketoacidosis and dehydration. Then an infection. The local thought is that his dental issues may have led to the infection and subsequent conditions. He refused antibiotics and most all healthcare including treatment for hypertension, according to the facility stating his God would take care of him. A local ICE officer that dealt with him stated his teeth looked to be literally falling out of his mouth. At the same time of refusing medical care, he filed complaints of receiving inadequate medical care. So, I don't have the answer and maybe we'll see as it plays out. I didn't get lab results today re: the CSF. I'm not a dentist, but I've met Dr. (b)(6); and seen some of his requests. In my view, he seems to have done everything he could for a patient that would not comply with recommendations."

Another e-mail between IHSC personnel detailed that Gulema had not previously been treated for diabetes prior to being admitted to the RRMC. The e-mail included the statement that "In summary, he refuses most care. He was never treated for diabetes, only hypertension which he refused."

There was an e-mail dated November 24, 2015, from (b)(6); Field Office Director, ICE, New Orleans, LA. The e-mail was to (b)(6); Field Medical coordinator, IHSC, New Orleans, LA. The e-mail stated "FYI, HQ has directed we serve a release letter on Dr. (b)(6 and release Gulema from ICE custody today. We will be serving the document shortly."

A review of the records determined that there were multiple refusals for treatment by Gulema when offered various medical services including dental, routine exams, and vital sign checks. Due to the voluminous nature of these documents, they will not be individually reported, but will be attached to this report.

Based on the findings in the records, it suggested that Gulema was never diagnosed with diabetes upon initial admission in to ICE custody. Gulema did not state that he had diabetes or had taken medications for diabetes related issues. The RMCC admission documentation stated Gulema suffered from diabetes ketoacidosis. It could be concluded that Gulema had undiagnosed diabetes prior to entering into ICE custody or more likely developed diabetes at an unspecified time while in ICE custody. The records do not indicate any tests for diabetes prior to his hospitalization. The

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

Hoq Decl. ISO MSJ
Exhibit T
Page 151

# MEMORANDUM OF ACTIVITY

records showed that Gulema was offered various medical exams and treatments, but the same records showed that Gulema had also refused and denied on multiple occasions, the medical exams and treatments offered by ECDC and IHSC.

ATTACHMENTS

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

Hoq Decl. ISO MSJ
Exhibit T
Page 152

# EXHIBIT B

OIG June 2023 00144



**OFFICE OF INSPECTOR GENERAL**

Department of Homeland Security

## MEMORANDUM OF ACTIVITY

**Type of Activity**: Personal Contact (b)(6);

| **Case Number:** I16-ICE-ATL-17063 | **Case Title:** Etowah County Detention Center |
|---|---|

On Thursday, September 1, 2016, (b)(6);          , Special Agent, and (b)(6);          , Lead Criminal Investigator, the Department of Homeland Security (DHS), Office of Inspector General (OIG), Atlanta Field Office, interviewed (b)(6); (b)(7)(C)          Supervisory Deportation and Detention Officer (SDDO), Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO), Gadsden, AL.  The interview was in reference to a DHS OIG investigation initiated from a letter dated August 11, 2016, from the office of Zoe Lofgren, Congress of the United States, House of Representatives, Ranking Member, Immigration and Border Security Subcommittee.  The Congressional request was made to John Roth, Inspector General, DHS OIG.

The request called for a review of the detainee care and operating policy and procedure at the Etowah County Detention Center (ECDC), Gadsden, AL, specifically in regards to detainee Teka Gulema ((b)(6); (b)(7)(C)          - Ethiopia).  According to the request, Gulema spent over eight years in the physical custody of U.S. Immigration and Customs Enforcement (ICE) (several of those years at ECDC) until February 7, 2015, when he was transported to an emergency room at the Riverview Regional Medical Center (RRMC), Gadsden, AL.  Gulema remained hospitalized at RRMC until his death on January 18, 2016.  According to the letter, Gulema had been released from ICE custody approximately ten days prior to his death.  Because Gulema was not in custody at the time of his death, his death was not reported as an custody death and was not investigated by DHS.  The request specifically called for an inquiry into the current health care system at ECDC and if the health care system or lack of heath care contributed to the death of Gulema. The request also called for a review of Gulema's ICE detention records.

On the previous date, the agents met briefly with (b)(6); to discuss some logistics for the investigation.  Prior to the interview on the date of this report, the agents again explained the nature of the interview.  (b)(6); was advised of DHS OIG warnings not to disclose investigative information. (b)(6); (b)(7)(C) was also advised of his Federal Employee Warnings (Garrity Warnings). (b)(6); read and signed the forms and agreed to be interviewed.  During the interviews, (b)(6); stated the following in substance:

(b)(6); stated that he became the SDDO in Gadsden in 2013. (b)(6); had previously been a Supervisory Immigration Enforcement Agent and Detention and Removal Officer with ICE. (b)(6); was also an agent with the U.S. Border Patrol from 1996-2001.

| Name, Title, Signature, and Date: | | Reviewing Official Name, Title, Signature, and Date: | |
|---|---|---|---|
| (b)(6); Special Agent | (b)(6); (b)(7)(C)          09/14/2016 | (b)(6); Lead Criminal Investigator | (b)(6); (b)(7)(C)          (b)( |

**IMPORTANT NOTICE**
This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General, and is disseminated only on a need-to-know basis.  This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General.  Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552.  Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

Hoq Decl. ISO MSJ
Exhibit T
Page 154

# MEMORANDUM OF ACTIVITY

On the previous date, (b)(6);   advised that Gulema continually refused to cooperate with ICE officials and would not sign required paperwork for removal proceedings. The process includes a Post Order Custody Review (POCR) once paperwork is signed and travel documents are issued. In the case of Gulema, the POCR clock was basically "suspended" because of Gulema's continual refusal to cooperate. (b)(6);   stated that detainee can stay in a failure to comply (FTC) status indefinitely, depending on the specifics of a detainee's case.

According to (b)(6); , once Gulema was placed in the hospital, ICE officials were determining if Gulema could be released. Additional attempts were made to obtain travel documents without success. Eventually, ICE headquarters determined that Gulema could be released on an order of supervision (OSUP). (b)(6);   commented that he recalled ICE was paying approximately $20,000 a month in guard services at RRMC and ICE had paid at least three million dollars in medical expenses. (b)(6);   stated that these costs were not a determining factor in placing Gulema on OSUP.

(b)(6);   did not recall Gulema ever filing a writ of habeas corpus seeking removal from detention. (b)(6);   stated that only a deputy field officer director or above can place someone in an FTC status. (b)(6);   did not recall Gulema ever pushing to be released and did not make any extra efforts to be released.

(b)(6);   stated that medical issues concerning Gulema would be documented in the ECDC paperwork and would not be part of Gulema's ICE file. (b)(6);   stated that the American Civil Liberties Union had requested information in regards to Gulema and that information was provided in a Freedom of Information Act request. (b)(6);   provided DHS OIG with several documents including copies of electronic mail (email) messages. These will be documented below. (b)(6);   further stated he would send additional messages to SA (b)(6); . These records will be documented in a separate report.

The documents received are summarized as follows:

The first document was an ICE Release Notification to Gulema from (b)(6); , POCR Unit Chief, ICE HQ. The notification was dated October 22, 2016. There was an HQ POCR checklist attached to the letter. The checklist stated, "Due to alien's medical condition and prognosis, the Embassy of Ethiopia refused to conduct an interview or issue a travel document on his behalf. Therefore, since alien's medical condition is unlikely to improve anytime soon, there is not a significant likelihood of removal in the reasonable foreseeable future."

The next document is an email from (b)(6);   to (b)(6); (b)(7)(C)   Gulema's ERO Case Officer, dated October 22, 2015, regarding the release notification email for Gulema. (b)(6);   advised that they are not to release at this time, the ERO Field Office Director (FOD) was checking with HQ. The email also contained an email from (b)(6);   Management and Program Analyst,

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

Hoq Decl. ISO MSJ
Exhibit T
Page 155

## MEMORANDUM OF ACTIVITY

DSH/ICE/ERO/RMD/RIO, Middle East/East Africa, to multiple recipients, including (b)(6); with the subject "(b)(6); – Release Notification Email – 10-22-15."

The next document was an email dated October 23, 2105. The email was from (b)(6); to (b)(6); The email stated that (b)(6); spoke with the AFOD and Gulema was not to be released at this time.

The next document was an email dated November 9, 2015, from (b)(6); to (b)(6); and other recipients. It was a continuation of the hold on Gulema's release. Also included in the email chain was an email from (b)(6); FOD, ICE ERO, New Orleans, LA. The email was dated October 22, 2015, and stated, "Please hold on any further actions was we'll need clarification as to the release mechanism, including any continuity of care or alternate placement."

Another document was an unrelated to Gulema's release letter dated October 20, 2015. The email was to (b)(6); and (b)(6); from (b)(6); Gulema was the subject of the email and it had to do with guard service and placement of Gulema. The guard services were identified at $20,000+ per month. The email further stated that ICE Health Service Corp was still seeking placement for Gulema and HQ was still "deliberating."

(b)(6); provided DHS OIG with a copy of the ICE contract with ECDC. The contract was dated in October 2009 and was signed by (b)(6); , Assistant Secretary, ICE, and (b)(6); , Sheriff, ECSO. (b)(6); described the contract as ICE was a rider on the United States Marshal's Service, Department of Justice, contract with ECDC. The contract did not list any specific medical requirements, only that the ECDC must meet the applicable ICE National Detention Standards.

The final documents received were two forms dated November 24, 2015. The first form was identified as a DHS ICE Form I-216, Records of Persons Transferred. The form indicated that Gulema was transferred on this date via OSUP. The other form was a DHS ICE Form 1-203, Order to Release Alien.

ATTACHMENTS

**IMPORTANT NOTICE**
This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

Hoq Decl. ISO MSJ
Exhibit T
Page 156

# EXHIBIT C

| From: | (b)(6); (b)(7)(c) |
|---|---|
| on behalf of | (b)(6); (b)(7)(c) |
| Sent: | 11/17/2015 8:37:42 PM |
| To: | (b)(6); (b)(7)(c) |
| Subject: | RE: SEN Report Notification |

Not a minute too soon?

Haven't heard....that's at the HQ level with ERO and (b)(6); (b)(7)(c)  . She notified the hospital a week ago last Friday.

-----Original Message-----
From: (b)(6); (b)(7)(c)
Sent: Tuesday, November 17, 2015 2:23 PM
To: (b)(6); (b)(7)(c)
Subject: RE: SEN Report Notification

Anything regarding a potential date of release for this subject?  Thanks!

-----Original Message-----
From: (b)(6); (b)(7)(c)
Sent: Tuesday, November 17, 2015 3:17 PM
To: (b)(6); (b)(7)(c)
Cc: (b)(6); (b)(7)(c)

Subject: RE: SEN Report Notification

Hospital update: Day #291

Gulema, Teka
A# 028021556
Etowah County Detention Center, Gadsden, AL
Dx:   Diabetic Ketoacidosis, Dehydration

Condition:  Stable

Concurrent Review:  Detainee Gulema remains on the IVU floor at Riverview Regional Medical Center.  He remains on the ventilator with no changes.  His foley is still intact, and has had 600cc's of noted urine output since this morning.  His most recent vital signs are:  BP 90/55, P 99, O2 100%, R 8, Temp 97.5. He is still being administered Merrem, Vancomycin, Diflucan, and Cipro by IV.  No lab work or diagnostic testing has been performed today.  No new orders to report.  Will continue to update.

R/

(b)(6); (b)(7)(c) ,RN,BSN,CPHM
LCDR/USPHS
Field Medical Coordinator
New Orleans Field Office
DHS/ICE/ERO/IHSC
1250 Poydras St, (b)(6); (b)(7)(c)
New Orleans, LA 70113
Office: 504-599(b)(6); (b)(7)(c)
Cell: 202-210(b)(6); (b)(7)(c)
Fax(secure): 866-620-6788
(b)(6); (b)(7)(c) @ice.dhs.gov

Important:  This e-mail message is intended for the exclusive use of the recipient(s) named above.  It may contain information that is protected, privileged, or confidential, and it should not be disseminated, distributed, or copied to persons not authorized to receive such information.  If you are not the intended recipient, any dissemination, distribution, or copying is strictly prohibited.  If you think you have received this e-mail message in error, please notify the sender immediately.

Warning: This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this report should be furnished to the media, either in written or verbal form

Hoq Decl. ISO MSJ
Exhibit T
Page 158

2022-ICLI-00048     010542

# EXHIBIT U

| | |
|---|---|
| **From:** | Axe, Jason (USACAC) |
| **To:** | Laboni Hoq; Tursi, Joseph (USACAC) |
| **Cc:** | Michael Kaufman; Eunice Cho; Kyle Virgien |
| **Subject:** | RE: [EXTERNAL] Re: ACLU SoCal v. DHS |
| **Date:** | Saturday, February 3, 2024 12:47:48 AM |

**This Message Is From an External Sender**
This message came from outside your organization.

Laboni,

We are in receipt of your letter, and ICE is reviewing it, but we have nothing to provide to you at this time.

Thank you,

Jason K. Axe
Assistant U.S. Attorney
300 North Los Angeles St., Suite 7516
Los Angeles, CA  90012
(213) 894-8790
(213) 894-7819 (FAX)

---

**From:** Laboni Hoq <laboni@hoqlaw.com>
**Sent:** Friday, February 2, 2024 11:00 AM
**To:** Tursi, Joseph (USACAC) <JTursi@usa.doj.gov>
**Cc:** Axe, Jason (USACAC) <JAxe@usa.doj.gov>; MKaufman@aclusocal.org; echo@aclu.org; kvirgien@aclu.org
**Subject:** [EXTERNAL] Re: ACLU SoCal v. DHS

Hi Joe,
I'm writing to follow up on our correspondence from January 26, 2024, where we requested information from Defendants regarding documents referred by Defendant OIG to ICE related to Mr. Teka Gulema, and the remaining documents that ICE has yet to produce regarding Mr. Gulema. As you are aware, the Court has ordered Plaintiff to provide its position regarding "waiver of production of documents related to Mr. Teka Gulema dated before October 1, 2015" by February 5, 2024.  ECF No. 62.

We had requested that Defendants provide us with this information by yesterday, February 1, 2024, but we have not received any updates from you. Plaintiff has requested this information to make best efforts to assist ICE with reducing its production obligations. Do Defendants plan to provide answers to our questions prior to February 5? We are also happy to discuss over the phone.
Thanks,

**Laboni A. Hoq**
Hoq Law APC

P.O. Box 753
South Pasadena, CA 91030
Telephone: 213-973-9004
www.hoqlaw.com


On Fri, Jan 26, 2024 at 4:22 PM Laboni Hoq <laboni@hoqlaw.com> wrote:

Dear Joe,

Please see attached correspondence.

Have a good weekend.


On Mon, Jan 22, 2024 at 4:34 PM Tursi, Joseph (USACAC) <Joseph.Tursi@usdoj.gov> wrote:

Good afternoon Laboni,

Please see the attached correspondence of today's date.

Thank you,

**Joseph W. Tursi | Assistant United States Attorney**
United States Attorney's Office | Central District of California
300 N. Los Angeles Street, Suite 7516 | Los Angeles, CA 90012
O: 213.894.3989 | C: 213.500.9355 | F: 213.894.7819 | joseph.tursi@usdoj.gov


--
**Laboni A. Hoq**
Hoq Law APC
P.O. Box 753
South Pasadena, CA 91030
Telephone: 213-973-9004
www.hoqlaw.com

# EXHIBIT V

February 5, 2024

Joseph Tursi
Jason Axe
Alarice Medrano
United States Attorney's Office
Central District of California
300 N. Los Angeles St. Suite 7516
Los Angeles, CA 90012
Joe.tursi@usdoj.gov
Jason.axe@usdoj.gov
Alarice.medrano@usdoj.gov

**SENT VIA EMAIL**

Re:     *ACLU of Southern California v. United States Immigration and Customs Enforcement, et al.*, No. 2:22-cv-4760 (C.D. Cal.)

Dear Counsel,

Plaintiff writes to inform Defendants of its position regarding waiver of production of documents related to Mr. Teka Gulema dated before October 1, 2015, waiver of other portions of its FOIA Request, and areas where it narrows the scope of its request. *See* Order, ECF No. 62.

## I.     Documents Related to Mr. Teka Gulema Dated Before October 1, 2015

Defendants have reported that ICE has 31,865 pages regarding Mr. Gulema that are from before October 1, 2015, that remain to be processed. Defendants also stated that ICE has produced all pages from October 1, 2015 and after. Defs.' Jan. 22, 2024 Letter.

Plaintiff waives production of the remaining 31,865 pre October 1, 2015 pages, with some exceptions.

- Plaintiff does not waive production of any records referred by DHS-OIG to ICE.
- Plaintiff does not waive any records that result from a search conducted of the following custodians: DHS Headquarters personnel; the New Orleans Field Office Director; Mr. Gulema's ERO Officer; or any documents from members of the Senate or their staff, including Sen. Jeff Sessions, any member of Sen. Sessions' staff (which Plaintiff believes could be accomplished by searching for the email domain "@sessions.senate.gov"), and Stephen Miller.
- Plaintiff does not waive production of any records that include or are the result of a search of the custodian named on Page 10542 of ICE's production.

**By February 19, 2024, please provide Plaintiff with a page count of the remaining pages responsive to Part 1 to 3 of Plaintiff's FOIA Request, a list of the custodians searched, and whether or not the Headquarters staff person named but redacted at page 10542 was searched**. Based on Defendants' response, Plaintiff may be willing to further limit production.

1

Plaintiff reiterates its concern that ICE has not produced all documents in its possession regarding Mr. Gulema that are dated on or after October 1, 2015. For example, Plaintiff has repeatedly asked Defendants about the production of 1,420 pages referred by DHS-OIG to ICE, which include 581 pages of documents reviewed by OIG in its investigation of Mr. Gulema's death, as well as 328 pages of documents referenced on pages 144-46 of OIG's June 2023 production. Several of these documents are apparently dated on or after October 1, 2015, and are likely highly responsive to Plaintiff's FOIA request, including ICE release notifications (dated Oct. 22, 2015); emails from Gulema's Case Officer regarding release notification emails (dated Oct. 22, 2015); an email dated Oct. 23, 2015 stating that "Gulema was not to be released at this time"; an email dated Nov. 9, 2015, regarding a continuation of the hold on Gulema's release; an email dated Oct. 20, 2015 regarding guard service and placement; and forms dated November 24, 2016, including DHS ICE Form I-216 (Records of Persons Transferred), and DHS ICE Form I-203 (Order to Release Alien). *See* Pl.'s Jan. 26, 2024 Letter.

On January 17, 2024, Defendants stated the documents referenced above "will be produced by the agency that created the records, i.e. the agency to which OIG referred the records," in this instance, ICE. Defs.' Jan. 17, 2024 Letter at 1. On January 22, 2024, ICE stated that it has 31,865 pages remaining to be produced regarding Mr. Gulema, but that "[a]ll pages from October 1, 2015 and after have been processed." Defendants' Jan. 22, 2024 Letter at 1. Plaintiff wrote to Defendants on January 26, 2024, asking for further explanation regarding the documents referenced above by February 1, 2024, but Defendants did not respond. After Plaintiff again reached out on February 2, Defendants' counsel merely stated that "[w]e are in receipt of your letter, and ICE is reviewing it, but we have nothing to provide to you at this time." Email from Jason Axe, Feb. 3, 2023.  **By February 19, 2024, please provide a response to the questions outlined in Plaintiff's January 26, 2024 letter.**

## II.      Waiver and Narrowing of Other Portions of Plaintiff's FOIA Request

Plaintiff agrees to waive and/or narrow portions of the remaining Parts of its FOIA Request.

### A.   Part 4

Defendants had previously used the search terms and connectors that the Parties had agreed upon and searched the emails of Scott Schuchart (Sr. Advisor to the ICE Director), Deborah Fleischaker (Asst. Dir. Regulatory Affairs and Policy at ICE), and Tae Johnson (former Acting Director of ICE), and had yielded 142,000 documents. Plaintiff agrees to waive this email search and agrees that, instead, ICE search as appropriate locations the hard drive and server data of IHSC Policy and the Office of Regulatory Affairs and Policy (ORAP).

You reported that IHSC Policy conducted a search for records and found 27 pages of potentially responsive records, and that the Office of Regulatory Affairs and Policy (ORAP) found 16 pages of potentially responsive records. Defs.' Jan. 22, 2024 Letter at 1-2. However, Plaintiff is concerned that the search terms utilized by IHSC and ORAP are underinclusive, and

fail to include key terms that are highly relevant to the subject matter—including terms that ICE has agreed upon with Plaintiff. For example, IHSC and ORAP used search terms "hospital, health, release, COVID-19, accommodation, detainee treatment," ORAP did not search for key terms such as "death, life support, critical condition, intensive care, ICU, or hospice." Plaintiff requests that IHSC and ORAP conduct a search with these additional search terms. The very low page count returned by the searches already conducted indicates that Plaintiffs' waiver of email searches significantly narrowed the universe of responsive documents, and it suggests that these additional search terms will only return limited numbers of pages.

## B. Part 5

Plaintiff agrees to waive certain portions and significantly narrow the scope of Part 5. Part 5 requested:

> "Spreadsheets, emails, documents, communications, databases, lists, and other data compilations in the possession of ICE Leadership, ICE Enforcement and Removal Operations, ICE Health Service Corps, and ICE Office of Professional Responsibility that identify detainees who were released from custody while (a) hospitalized (including for COVID-19 treatment); (b) in the full-time care of external healthcare providers or facilities (including for COVID-19 treatment), or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility. Requested materials include, but are not limited to, dates of hospitalization of detainees, dates of hospital or external care facility discharge, name of treated detainees' detention facilities, and reasons for detainees' hospitalization or external medical care. These materials should further include Medical Transfer Summary documents from DHS's eHR System and Alien Medical Records System, and any versions of the Significant Detainee Illness Spreadsheet that identify detainees who were released from custody while (a) hospitalized (including for COVID-19 treatment); (b) in the care of external healthcare providers or facilities (including for COVID-19 treatment); or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility." ECF No. 1-1 at 6.

First, Plaintiff agrees to waive searches of Medical Transfer Summary Documents from DHS's eHR System and Alien Medical Records System.

Second, Plaintiff also agrees to significantly narrow the list of custodians searched for Part 5. The parties have already agreed to search terms. Plaintiff narrows its requested search to all staff who participate in the weekly Significant Detainee Illness (SDI) meeting and any custodian who possesses the SDI list.

## C. Parts 6 and 7

Plaintiff does not, at this time, waive or narrow the scope of searches for Parts 6 and 7. Plaintiff reiterates that ICE should conduct a search for Significant Incident Reports (SIR) and Significant Event Notifications (SEN) records compiled by the ICE Joint Intelligence Operations

3

Center (JIOC). On November 30, 2023, ICE stated that it "has no objection to searching JIOC and will do so." Defs.' Nov. 30, 2023 Letter at 4.

Defendants, however, have now reversed course, stating that JIOC has now "deferred the search tasking to ERO because the data points requested do not originate with JIOC." Defs.' Jan. 22, 2024 Letter at 2. This is not a reasonable response. ICE has previously claimed that ERO could not search SIR and SEN records without individual identifying information. *See* Defendants' Jul. 11, 2023 Letter ("ERO needs a date, or an event, or a location, or alien number to search for a SIR or SENs."). Thus, although SIR and SEN records originate with ERO, they apparently are not searchable by ERO. JIOC, which compiles these records, can search them. Defendants' Kafkaesque position that they need not search the only location where these records are searchable does not square with their obligations under FOIA.

Plaintiff again requests that Defendants conduct a search of JIOC using the agreed-upon search terms, provide the list of search terms that ERO used in its search for SIR and SEN records, and explain how ICE ERO conducted the search absent individual identifying information.

**D.  Parts 8 and 9**

The parties have currently agreed to search terms and locations for Parts 8 and 9, and offers no further narrowing of these Parts at this time. Further, Plaintiff reserves the right to review the resulting documents for adequacy purposes.

Sincerely,

LABONI A. HOQ (SBN 224140)
laboni@hoqlaw.com
HOQ LAW APC
P.O. Box 753
South Pasadena, California 91030
Telephone: (213) 973-9004

EUNICE CHO (pro hac vice)
echo@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
915 Fifteenth Street NW, 7th Floor
Washington, DC 20005
Telephone: (202) 548-6616

MICHAEL KAUFMAN (SBN 254575)
MKaufman@aclusocal.org
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West Eighth Street
Los Angeles, California 90017 Telephone:
(213) 977-9500
Facsimile: (213) 915-0219

KYLE VIRGIEN (SBN 278747)
kvirgien@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (202) 393-4930

*Attorneys for Plaintiff*

4

# EXHIBIT W

*Office of Information Governance and Privacy*

**U.S. Department of Homeland Security**
500 12th St., SW
Washington, D.C. 20536



U.S. Immigration
and Customs
Enforcement

January 31, 2024

Ms. Laboni Hoq, Esq.
HOQ Law
P.O. Box 753
South Pasadena, CA 91030

**RE:  American Civil Liberties Union Foundation of Southern California v, ICE 2:22-cv-04760**
**OIG Case Number 2022-IGFO-00158**
**ICE FOIA Case Number 2022-ICLI-00048**

Dear Ms. Hoq:

This is a referral response to your Freedom of Information Act (FOIA) request to the Department of Homeland Security Office of the Inspector General (OIG) dated July 12, 2022, given the litigation tracking number 2022-ICLI-00048. Your client has requested:

Any and all documents, without limitation to date, including any communications, investigatory reports, and any and all exhibits, appendices, or attachments thereto, relating to the hospitalization, death, decision to release from custody, or release from custody of the following individuals: Teke Gulema, Johana Medina Leon, Jose Ibarra Bucio, and Martin Vargas Arellano.

A search of OIG for records responsive to your request produced records that originated from U.S. Immigration and Customs Enforcement (ICE). OIG referred these records to ICE for review and processing under the FOIA, 5 U.S.C. § 552.

After our review of the 583 pages referred by OIG, ICE has determined that 16 pages are non-responsive and the remaining 567 pages will be withheld in part pursuant to FOIA Exemptions (b)(6), (b)(7)(c) and (b)(7)(e) as described below. These pages have been marked 2022-ICLI-00048  12293 through 2022-ICLI-00048 12859.

**FOIA Exemption (b)(6)** exempts from disclosure personnel or medical files and similar files the release of which would cause a clearly unwarranted invasion of personal privacy. This requires a balancing of the public's right to disclosure against the individual's right to privacy. The privacy interests of the individuals in the records you have requested outweigh any minimal public interest in disclosure of the information. Any private interest you may have in that information does not factor into the aforementioned balancing test.

www.ice.gov

Hoq Decl. ISO MSJ
Exhibit W
Page 168

**FOIA Exemption (b)(7)(C)** protects records or information compiled for law enforcement purposes that could reasonably be expected to constitute an unwarranted invasion of personal privacy.  This exemption takes particular note of the strong interests of individuals, whether they are suspects, witnesses, or investigators, in not being unwarrantably associated with alleged criminal activity.  That interest extends to persons who are not only the subjects of the investigation, but those who may have their privacy invaded by having their identities and information about them revealed in connection with an investigation.  Based upon the traditional recognition of strong privacy interest in law enforcement records, categorical withholding of information that identifies third parties in law enforcement records is ordinarily appropriate.  As such, I have determined that the privacy interest in the identities of individuals in the records you have requested clearly outweigh any minimal public interest in disclosure of the information. Please note that any private interest you may have in that information does not factor into this determination.

**FOIA Exemption 7(E)** protects records compiled for law enforcement purposes, the release of which would disclose techniques and/or procedures for law enforcement investigations or prosecutions or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law. I have determined that disclosure of certain law enforcement sensitive information contained within the responsive records could reasonably be expected to risk circumvention of the law. Additionally, the techniques and procedures at issue are not well known to the public.

If you have any questions about this letter, please contact Assistant U.S. Attorney Joseph Tursi at Joseph.Tursi@usdoj.gov.

Sincerely,

ROLANDO VELASCO JR

Digitally signed by ROLANDO VELASCO JR
Date: 2024.01.31 11:48:12 -05'00'

Rolando Velasco
Supervisory Paralegal Specialist

Enclosure: 567 pages

cc:  AUSA Joseph Tursi

# EXHIBIT X



**Laboni Hoq <lhoq@hoqlaw.com>**

---

## 2022-ICLI-00048 - ACLU SoCal vs. ICE, et al. - 22-cv-04760

**Stroebel, Victoria** <Victoria.Stroebel@ice.dhs.gov>          Thu, Feb 8, 2024 at 4:40 PM
To: "laboni@hoqlaw.com" <laboni@hoqlaw.com>
Cc: "jason.axe@usdoj.gov" <jason.axe@usdoj.gov>, "Tursi, Joseph (USACAC)" <joseph.tursi@usdoj.gov>,
ICEFOIALITIGATION <ICEFOIALITIGATION@ice.dhs.gov>, "Rezvani, Azadeh" <Azadeh.Rezvani@ice.dhs.gov>

Greetings-


I'm writing to inform you that the documents and cover letter regarding the referral response from 583 pages of DHS OIG
referral documents were uploaded into USAfx on Wednesday, January 31, 2024, for the above-subject case.  The cover
letter for this production is also attached.


Respectfully,


## Victoria Stroebel

FOIA Paralegal Specialist

Freedom of Information Act Office

U.S. Department of Homeland Security

U.S. Immigrations and Customs Enforcement

Washington D. C.

Phone: 202-695-9379

Email:  Victoria.stroebel@ice.dhs.gov




---



📄 **2022-ICLI-00048 Referral Response 2022-IGFO-00158 Jan 2024 Release.pdf**
334K