E. MARTIN ESTRADA
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section
JOSEPH W. TURSI (Cal. Bar No. 300063)
JASON K. AXE (Cal, Bar No. 187101)
Assistant United States Attorneys
        Federal Building, Suite 7516
        300 North Los Angeles Street
        Los Angeles, California 90012
        Telephone: (213) 894-3989 | 8790
        Facsimile: (213) 894-7819
        E-mail: Joseph.Tursi@usdoj.gov
               Jason.Axe@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF SOUTHERN CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,<br><br>Defendants. | No. 2:22-cv-04760-SHK<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>(Filed concurrently with Declarations of Okechi Chigewe, Catrina M. Pavlik-Keenan, and Fernando Pineiro, *Vaughn* Index, Statement of Uncontroverted Facts, and [Proposed] Judgment)<br><br>Hearing Date:   May 22, 2024<br>Hearing Time:   10:00 a.m.<br>Courtroom:      3 or 4<br><br>Honorable Shashi H. Kewalramani<br>United States Magistrate Judge |

1

### **TABLE OF CONTENTS**

2   DESCRIPTION                                                                PAGE

3   I.      INTRODUCTION ................................................................. 1

4   II.     BACKGROUND & PROCEDURAL HISTORY ................................. 1

5           A.      Plaintiff's Nine-Part FOIA Request – Dated April 29, 2022 ...................... 1

6           B.      Defendants' Reasonable Search for and Production of Responsive
                    Records ....................................................................................... 2
7
                    1.      DHS's Decentralized FOIA System ................................. 2
8
9                   2.      DHS Privacy Office's Processing of the FOIA Request ................... 3

10                  3.      Defendant DHS OIG's Processing of the FOIA Request ................ 4

11          C.      Summary of Documents Produced ................................................ 6

12          D.      *Vaughn* Index ............................................................................. 8

13  III.    LEGAL STANDARD ................................................................. 8

14  IV.     ARGUMENT ........................................................................... 10

15          A.      DHS and DHS OIG's Processing and Search Were Reasonably
                    Calculated to Uncover All Responsive Records. ........................... 11

16                  1.      DHS OIG Conducted an Adequate Search for Records ................. 12

17                  2.      DHS Had No Obligation to Conduct a Search or Refer a Search
                            to CRCL ........................................................................... 13
18
19          B.      DHS OIG Properly Withheld Information under Applicable FOIA
                    Exemptions. ...................................................................... 17
20
                    1.      DHS OIG Properly Withheld Information Pursuant to 5 U.S.C.
21                          § 552(b)(5). .................................................................. 17

22                  2.      The Information Redacted by DHS OIG is Exempt under 5
                            U.S.C. § 552(b)(6) and (b)(7)(C) ....................................... 23

23                  3.      DHS OIG Has Not Improperly Redacted Immigration
                            Information Related to Medina-Leon and Gulema ..................... 28
24
                    4.      DHS OIG Has Not Improperly Withheld Documents It
25                          Referred to ICE ............................................................. 29

26                  5.      DHS OIG Released All Reasonably Segregable Portions of the
                            Responsive Records. ....................................................... 30
27
    V.      CONCLUSION ...................................................................... 30
28

1

**TABLE OF AUTHORITIES**

2    DESCRIPTION                                                                                PAGE

3    **Federal Cases**

4    *ACLU v. DHS,*
       738 F. Supp. 2d 93 (D.D.C. 2010) ............................................................. 19
5
     *Aguirre v. United States Nuclear Regul. Comm'n,*
6      11 F.4th 719 (9th Cir. 2021) .................................................................... 17

7    *Amerco v. NLRB,*
       458 F.3d 883 (9th Cir. 2006) .................................................................... 17
8
     *Anderson v. Liberty Lobby, Inc.,*
9      477 U.S. 242 (1986) ................................................................................. 8

10   *Baker & Hostetler LLP v. U.S. Dep't of Commerce,*
       473 F.3d 312 (D.C. Cir. 2006) .................................................................. 18
11
     *Berman v. CIA,*
       501 F.3d 1136 (9th Cir. 2007) ................................................................... 9
12
     *Bloche v. Department of Def.,*
13     370 F. Supp. 3d 40 (D.D.C. Mar. 29, 2019) ............................................ 23

14   *Cameranesi v. U.S. Dep't of Def.,*
       856 F.3d 626 (9th Cir. 2017) .................................................................... 26
15
     *Celotex Corp. v. Catrett,*
16     477 U.S. 317 (1986) ................................................................................. 8

17   *Citizens Comm'n on Hum. Rights v. State Dept.,*
       45 F.3d 1325 (9th Cir. 1995) .................................................................... 11
18
     *Coastal States Gas Corp v. Dep't of Energy,*
       617 F.2d 854 (D.C. Cir. 1980) ............................................................. 19, 20
19
     *Competitive Enter. Inst. v U.S. Env't Prot. Agency,*
20     12 F.Supp.3d 100 (D.D.C. 2014) ............................................................. 20

21   *CREW v. Dep't of Homeland Sec.,*
       648 F. Supp. 2d 152 (D.D.C. 2009) ........................................................ 19
22
     *Dep't of Justice v. Tax Analysts,*
23     492 U.S. 136 (1989) ................................................................................. 9

24   *FBI v. Abramson,*
       456 U.S. 615 (1982) ................................................................................ 10
25
     *Fiduccia v. U.S. Dep't of Justice,*
26     185 F.3d 1035 (9th Cir. 1999) ................................................................. 10

27   *FPL Grp. Inc. v. IRS,*
       698 F. Supp. 2d 66 (D.D.C. 2010) .......................................................... 19

28

i

*Frugone v. CIA*,
169 F.3d 772 (D.C. Cir. 1999) ........................................................ 28

*Hamdan v. U.S. Dep't of Justice*,
797 F.3d 759 (9th Cir. 2015) ......................................................... 30

*Hardy v. Bureau of Alcohol, Tobacco, Firearms and Explosives*,
243 F. Supp. 3d 155 (D.D.C. 2017) ............................................... 19

*Hunt v. FBI*,
972 F.2d 286 (9th Cir. 1992) ......................................................... 25

*Iturralde v. Comptroller of Currency*,
315 F.3d 311 (D.C. Cir. 2003) ....................................................... 11

*John Doe Agency v. John Doe Corp.*,
493 U.S. 146 (1989) ....................................................................... 10

*Johnson v. Exec. Office for U.S. Attorneys*,
310 F.3d 771 (D.C. Cir. 2002) ....................................................... 30

*Kamman v. IRS*,
56 F.3d 46 (9th Cir. 1995) ............................................................. 10

*Khine v. DHS*,
943 F.3d 959 (D.C. Cir. 2019) ....................................................... 17

*Kidd v. Dep't of Just.*,
362 F. Supp. 2d 291 (D.D.C. 2005) ........................................... 18-19

*Kissinger v. Reporters Comm.*,
445 U.S. 136 (1980) ......................................................................... 9

*Kowalczyk v. Dep't of Just.*,
73 F.3d 386 (D.C. Cir. 1996) ......................................................... 16

*Lahr v. Nat'l Transp. Safety Bd.*,
569 F.3d 964 (9th Cir. 2009) ............................................. 10, 11, 25

*Lane v. Dep't of Interior*,
523 F.3d 1128 (9th Cir. 2008) ......................................................... 9

*Lead Indus. Ass'n, Inc. v. Occupational Safety and Health Admin.*,
610 F.2d 70 (2d Cir.1979) ................................................ 20, 21, 22, 23

*Lion Raisins v. U.S. Dep't. of Agric.*,
354 F.3d 1072 (9th Cir. 2004) ......................................................... 9

*Loving v. DOD*,
550 F.3d 32 (D.C. Cir. 2008) ......................................................... 18

*Mapother v. Dep't of Just.*,
3 F.3d 1533 (D.C. Cir. 1993) ......................................................... 19

*Maricopa Audubon Soc'y v. United States Forest Serv.*,
108 F.3d 1089 (9th Cir. 1997) ....................................................... 18

*Marriott Int'l Resorts, L.P. v. United States*,
437 F.3d 1302 (Fed. Cir. 2006) ..................................................... 18

ii

*McCann v. U.S. Dep't of Health & Hum. Servs.*,
  828 F. Supp. 2d 317 (D.D.C. 2011) ............................................................ 19

*McCarthy v. Madigan*,
  503 U.S. 140 (1992) ............................................................................... 16

*Minier v. CIA*,
  88 F.3d 796 (9th Cir. 1996) ....................................................................... 9

*Nation Magazine v. U.S. Customs Serv.*,
  71 F.3d 885 (D.C. Cir. 1995) ................................................................... 11

*National Ass'n of Retired Fed. Employees v. Horner*,
  879 F.2d 873 (D.C. Cir. 1989) ................................................................. 24

*Nat'l Lab. Relations Bd. v. Sears, Roebuck & Co.*,
  421 U.S. 132 (1975) ............................................................................... 18

*Nat'l Sec. Archive v. FBI*,
  No. 88-1507, 1993 WL 128499 (D.D.C. Apr. 15, 1993) ................................ 20

*Nat'l Wildlife Fed'n v. U.S. Forest Serv.*,
  861 F.2d 1114 (9th Cir. 1988) ................................................................. 19

*Oglesby v. U.S. Dep't of Army*,
  920 F.2d 57 (D.C. Cir. 1990) ............................................... 11, 12, 13, 17

*Pac. Fisheries Inc. v. United States*,
  539 F.3d 1143 (9th Cir. 2008) ................................................................. 30

*Petroleum Info. Corp v. v. U.S. Dep't of Interior.*,
  976 F.2d 1429 (D.C. Cir. 1992) ............................................................... 20

*Pomares v. U.S. Dep't of Veterans Affs.*,
  2023 WL 2378939 (S.D. Cal. Jan. 6, 2023) ............................................... 25

*Prop. of the People, Inc. v. Off. of Mgmt. & Budget*,
  330 F.Supp.3d 373 (D.D.C. 2018) ........................................................... 20

*Protect Democracy Project, Inc. v. U.S. Dep't of Def.*,
  320 F.Supp.3d 162 (D.D.C. 2018) ........................................................... 20

*Protect the Public's Trust v. U.S. Dep't of Homeland Sec.*,
  2022 WL 3226275 (D.D.C. Aug. 10, 2022) ............................................... 15

*U.S. Dep't of State v. Ray*,
  502 U.S. 164 (1991) ............................................................................... 25

*Reed v. NLRB*,
  927 F.2d 1249 (D.C. Cir. 1991) ......................................................... 23, 24

*Russell v. Dep't of the Air Force*,
  682 F.2d 1045 (D.C.Cir.1982) ................................................................. 20

*SafeCard Servs. Inc. v. SEC*,
  926 F.2d 1197 (D.C. Cir. 1991) ............................................................... 11

*Schrecker v. DOJ*,
  254 F.3d 162 (D.C. Cir. 2001) ........................................................... 26-27

iii

*Sellers v. IRS,*
   2009 WL 700647 (D. Ore. 2009) ............................................. 24

*Shannahan v. IRS,*
   672 F.3d 1142 (9th Cir, 2012) ............................................... 10

*Skinner v. DOJ,*
   744 F. Supp. 2d 185 (D.D.C. 2010) ......................................... 19

*U.S. Dep't of Defense v. Fed. Lab. Relations Auth.,*
   510 U.S. 487 (1994) ...................................................... 25, 26

*United States Dep't of Justice v. Reporters Comm. for Freedom of the Press*
   (Reporters Comm.), 489 U.S. 749 (1989) ............................. 24, 25

*United States Dep't of State v. Washington Post Co.,*
   456 U.S. 595 (1982) .......................................................... 24

*Vaughn v. Rosen,*
   484 F.2d 820 (D.C. Cir. 1973) .......................................... viii, 9

*Willamette Indus., Inc. v. United States,*
   689 F.2d 865 (9th Cir. 1982) ............................................... 30

*Wolf v. CIA,*
   473 F.3d 370 (D.C. Cir. 2007) ............................................. 10

*Yagman v. Pompeo,*
   868 F.3d 1075 (9th Cir. 2017) ............................................. 17

*Yonemoto v. Dep't of Veterans Affairs,*
   686 F.3d 681 (9th Cir. 2012) ........................................... viii, 8

*Zemansky v. EPA,*
   767 F.2d 569 (9th Cir. 1985) ............................................... 11

**Federal Statutes**

5 U.S.C. § 552(a)(3)(A) ........................................................ 9

5 U.S.C. § 552(a)(4)(B) ............................................... 30, 8-9, 9

5 U.S.C. § 552(a)(6)(A)(i)–(ii), (C)(i) .................................... 16

5 U.S.C. § 552(b) ......................................................... 30, 9

5 U.S.C. § 552(b)(5) ........................................................ 17

5 U.S.C. § 552(b)(6) and (b) (7) (C) .................................. 23, 24

**Rules**

6 C.F.R. § 5.1(c) ......................................................... 3, 4

6 C.F.R. § 5.3 ................................................................ 4

6 C.F.R. § 5.3(a)(1) .......................................................... 2

iv

6 C.F.R. § 5.3(a)(2) ............................................................................ 14, 3

6 C.F.R. § 5.4(c) ....................................................................... *passim*

6 C.F.R. § 5.4(d)(3) ............................................................................ 4

21 C.F.R. § 20.62 ............................................................................ 17

Fed. R. Civ. P. 56(a) ............................................................................ 8

Fed. R. Civ. P. 56 ............................................................................ viii

## <u>NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT</u>

PLEASE TAKE NOTICE that, on May 22, 2024 at 10:00 a.m., or as soon thereafter as they may be heard, Defendants U.S. Department of Homeland Security (DHS) and U.S. Department of Homeland Security Office of Inspector General (DHS OIG) (collectively, "Defendants") will, and hereby do, move this Court for an order entering judgment in Defendants' favor. This motion will be made in the George E. Brown, Jr. Federal Building and Courthouse before the Honorable Shashi H. Kewalramani, United States Magistrate Judge, located at 3470 Twelfth Street, Riverside, CA 92501, Courtroom 3 or 4, 3rd Floor.

Defendants bring their motion pursuant to Federal Rule of Civil Procedure 56, on the grounds that Defendants have fully complied with their obligations under the Freedom of Information Act ("FOIA"). Plaintiff American Civil Liberties Union of Southern California ("ACLU of SoCal") cannot raise a genuine dispute of material fact or otherwise prevail under the FOIA, and Defendants are therefore entitled to judgment as a matter of law.

This motion is made upon this Notice, the attached Memorandum of Points and Authorities, the declarations of Okechi Chigewe, Catrina M. Pavlik-Keenan, Fernando Pineiro, the *Vaughn* Index,[1] the Separate Statement of Uncontroverted Facts, and all pleadings, records, and other documents on file with the Court in this action, and upon such oral argument as may be presented at the hearing of this motion.

This motion is made following the conference of counsel pursuant to Local Rule 7-3 which was held on March 20, 2024.

---

[1] A *Vaughn* Index is a document that is prepared in litigation to justify withholding of information under the FOIA. The term arose from the case of *Vaughn v. Rosen*, 484 F.2d 820, 823-25 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974), in which such an index was required to determine the validity of the agency's withholdings. *See also Yonemoto v. Dep't of Veterans Affairs*, 686 F.3d 681, 688 (9th Cir. 2012) (describing requirements for *Vaughn* Index).

1    Dated: April 10, 2024                     Respectfully submitted,

2                                              E. MARTIN ESTRADA
                                               United States Attorney
3                                              DAVID M. HARRIS
                                               Assistant United States Attorney
4                                              Chief, Civil Division
                                               JOANNE S. OSINOFF
5                                              Assistant United States Attorney
                                               Chief, Complex and Defensive Litigation
6                                              Section

7                                                /s/ *Joseph W. Tursi*
8                                              JOSEPH W. TURSI
                                               JASON K. AXE
9                                              Assistant United States Attorneys

10                                             Attorneys for Defendants

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Defendants Department of Homeland Security ("DHS") and the Department of Homeland Security's Office of the Inspector General ("DHS OIG") have complied fully with their obligations under the Freedom of Information Act with respect to Plaintiff ACLU of SoCal's April 29, 2022 nine-part FOIA Request (the "FOIA Request"). As a result, they are entitled to summary judgment.

First, DHS, through its Privacy Office, reviewed the FOIA Request upon receipt and, consistent with DHS's decentralized FOIA processing and regulations, determined that DHS OIG and United States Immigration and Customs Enforcement ("ICE") were the components most likely to have responsive records. Upon determining that Plaintiff had already also submitted its request to those offices, DHS administratively closed its file on the request on May 18, 2022 with no further action. Other than its initial intake and review of the FOIA Request, DHS's Privacy Office was never involved in the search for, or processing of, any records responsive to the FOIA Request.

Second, DHS OIG properly responded to the FOIA Request by (a) conducting an adequate search reasonably calculated to uncover all responsive documents based on the terms of the FOIA request and after consultation with Plaintiff and (b) processing the records found following its search, and applying appropriate exemptions under the FOIA – specifically Exemptions 5, 6, and 7(C). *See* 5 U.S.C. §§ 552(b)(5), (6), and 7(C).

As there is not a genuine dispute of material fact, the Court should grant this motion, deny Plaintiff's Motion (Dkt. Nos. 66 & 67), and enter judgment in Defendants' favor.

**II.    BACKGROUND & PROCEDURAL HISTORY**

    **A.    Plaintiff's Nine-Part FOIA Request – Dated April 29, 2022**

Plaintiff's FOIA Request sought "any and all records that were prepared, received, transmitted, collected, and/or maintained by ICE or DHS that describe, refer, or relate to the release of hospitalized detainees from custody before their death; any records related

to release of individual detainees once hospitalized; and any records related to the death of such detainees after their release from custody, including any communications or investigations" dating from January 1, 2016. Uncontroverted Fact (UF) 1. In that request, Plaintiff specified that it was seeking records in nine separate categories. *See* Dkt. 24-1 at 5-7.

Both DHS's Privacy Office and DHS-OIG received the FOIA request on May 2, 2022. UF 2-3. On July 12, 2022, Plaintiff filed this action. *See* Dkt 1. On October 4, 2022, Plaintiff filed its operative First Amended Complaint, adding DHS OIG as a defendant. Dkt. 24.

**B.     Defendants' Reasonable Search for and Production of Responsive Records**

**1.     DHS's Decentralized FOIA System**

DHS has a decentralized system for responding to FOIA requests, as explained in its regulations:

> DHS has a decentralized system for responding to FOIA requests, with each component designating a FOIA office to process records from that component. All components have the capability to receive requests electronically, either through email or a web portal. To make a request for DHS records, a requester should write directly to the FOIA office of the component that maintains the records being sought. A request will receive the quickest possible response if it is addressed to the FOIA office of the component that maintains the records sought.... Each component's FOIA office and any additional requirements for submitting a request to a given component are listed in appendix A to this part. These references can all be used by requesters to determine where to send their requests within DHS.

6 C.F.R. § 5.3(a)(1).

Aside from submitting a request directly to the specific component's FOIA office, a requestor may also direct the request to DHS's Privacy Office for specific

Headquarters Offices. *Id.* § 5.3(a)(2); *see also* Declaration of Catrina M. Pavlik-Keenan, ¶ 6 (listing specific Headquarters Offices). If a requestor does not know which DHS component may "maintain responsive records to a request, the requester may *explicitly ask for assistance* from the DHS Privacy Office with identifying the proper component that most likely maintains any potential responsive records." 6 C.F.R. § 5.3(a)(2) (emphasis added). Upon such request for assistance, the Privacy Office "will forward the request to the DHS component(s) that it determines to be most likely, *as of the date of the request for information*, to maintain the records that are sought." *Id.* (emphasis added).

DHS's decentralized FOIA system results in each component within DHS having a designated FOIA office that processes records from that specific component. *See* 6 C.F.R. § 5.1(c). As a result, there is no single DHS component that processes records for all other DHS components, nor is there one single DHS component that runs searches of another DHS component's systems, databases, etc. for records. UF 27.

### 2.    DHS Privacy Office's Processing of the FOIA Request

Upon receipt by the DHS Privacy Office of the FOIA Request, it carefully reviewed it and, in accordance with DHS regulations, determined that ICE and DHS OIG were the DHS components "most likely" to maintain responsive records. UF 4. The FOIA Request did not contain an explicit request for assistance with identifying the proper component that most likely maintains any responsive records. *See* Dkt. 1-1 at 2-13.

On May 18, 2022, DHS's Privacy Office provided Plaintiff with a final response in which it acknowledged receipt of the FOIA request and informed Plaintiff of the determination that "the records sought, should they exist, would not be under the purview of the DHS Privacy Office. Any responsive records would be held by the DHS Office of the Inspector General (OIG) and/or U.S. Immigration and Customs Enforcement (ICE)." UF 5. The May 18, 2022 correspondence further explained, "As you have already submitted your request to the aforementioned office[s], we are closing

your Privacy Office request and will defer to the OIG and ICE's response(s)." *Id*. As a result, on the same day, DHS's Privacy Office administratively closed the FOIA Request with no further action pursuant to 6 C.F.R. § 5.4(d)(3). UF 6. At no time prior to administratively closing the FOIA Request did the DHS Privacy Office process the FOIA Request or supervise the processing of the FOIA Request by the referred components. UF 7.

After receiving the May 18, 2022 letter, Plaintiff did not object to DHS's Privacy Office's final determination that DHS OIG and ICE would be the appropriate components to process the request, nor did Plaintiff object to the Privacy Office's notification that it would administratively close the request. UF 8. Plaintiff does not allege that it administratively appealed this determination before filing its complaint on July 12, 2022. *See generally* Dkts. 1, 24).

### 3.    Defendant DHS OIG's Processing of the FOIA Request

When DHS OIG receives a FOIA request, its FOIA Unit evaluates it to determine whether it is a proper FOIA request under DHS FOIA regulation 6 C.F.R. § 5.3. UF 28. If the FOIA request is determined to be misdirected, meaning if DHS OIG's FOIA Unit first received the FOIA request, reviewed it, and made the determination that the request should have been submitted or sent to another component within DHS, DHS OIG's FOIA Unit routes the request to the proper component's FOIA office. UF 29. The FOIA Unit then informs the requestor to contact that agency or component directly and DHS OIG will administratively close the FOIA request. *Id.*; *see also* 6 C.F.R. § 5.4(c).

Based on a requestor's description of the records being sought, and the FOIA Unit's knowledge of the various program offices' missions, the FOIA processor identifies the program office(s) likely to possess responsive records and tasks the appropriate program office(s) to conduct the necessary searches. *Id*.

As the program offices are best positioned to determine where responsive records are located, they are responsible for searching all locations and by all keywords that the program office reasonably believes would produce responsive records. UF 31. The POC

then reviews the FOIA request, along with any case-specific instructions that may have been provided, and based on the program office's FOIA point of contact's (POC) experience and knowledge of the program office's practices and activities, forwards the request and instructions to the individual employee(s) within the program office that the POC believes is reasonably likely to have responsive records, if any. *Id*.

Once those searches are completed, the individual(s) and program offices provide any potentially responsive records along with a completed search form to the assigned FOIA processor. *Id*. The FOIA processor then reviews the collected records for responsiveness, application of appropriate FOIA exemptions, and the necessity of any referrals and/or consultations. *Id*.

Pursuant to the FOIA Request's specific language, which sought ICE and OIG records, the DHS OIG FOIA Unit initially determined that the request was properly under DHS OIG's purview, i.e., it was not misdirected. UF 9. Thus, it remained OIG's responsibility to process and respond to the request. Because there was no determination of misdirection, there was no requirement to route the request elsewhere. See 6 C.F.R. § 5.4(c).

Based on the FOIA Unit's knowledge of the various program offices' missions, it was determined that the Office of Investigations may be in possession of potentially responsive records that fall under OIG's purview. UF 10. As investigatory reports, Reports of Investigations, and other similar records sought in the request would have been created by the Office of Investigations, a search tasking was sent on September 1, 2022. UF 11.

The Office of Investigations conducts investigations into allegations of criminal, civil, and administrative misconduct involving DHS employees, contractors, grantees, and programs. UF 10. These investigations can result in criminal prosecutions, fines, civil monetary penalties, administrative sanctions, and personnel actions. UF 11. Additionally, the Office of Investigations provides oversight and monitors the investigative activity of DHS's various internal affairs offices. *Id.*

5

1        To gather records responsive to Plaintiff's FOIA request, the Office of
2    Investigations searched for records located in the electronic case management system,
3    EDS with the parameters fully described in the Declaration of Okechi Chigewe. *See* UF
4    12-13; *see also* Chigewe Decl., ¶ 40. Additionally, and when warranted, searches in the
5    appropriate Office of Investigations' Field Offices were conducted either by the Office
6    of the Chief Information Officer (OCIO) or by the custodian. *Id.* As a result of those
7    searches, a total of 7,402 pages of records was located. UF 13.

8        **C.    Summary of Documents Produced**

9        DHS OIG produced records in response to Plaintiff's FOIA request from
10   November 2022 – March 2023 and June-August 2023. UF 14.

11       On November 23, 2022, DHS OIG issued its first interim response to the Plaintiff.
12   UF 15. In that response and corresponding production, the FOIA Unit reviewed 701
13   pages of records. *Id.* Of the 701 pages, 4 pages were released in full; 117 pages were
14   released in part; 127 pages were duplicates; 233 pages were referred to the U.S.
15   Department of Justice, Executive Office for United States Attorney ("EOUSA") for
16   processing and direct response; and 220 pages were referred to ICE for processing and
17   direct response. *Id.*

18       On December 21, 2022, DHS OIG issued its second interim response to the
19   Plaintiff. UF 16. In that response and corresponding production, the FOIA Unit
20   processed 653 pages of records. *Id.* Of the 653 pages, 60 pages were released in full; 128
21   pages were released in part; 185 pages were referred to EOUSA for processing and
22   direct response; and 280 pages were referred toICE for processing and direct response.
23   *Id.*

24       On January 30, 2023, DHS OIG issued its third interim response to the Plaintiff.
25   UF 17. In that response and corresponding production, the FOIA Unit reviewed 1,078
26   pages of records. *Id.* Of the 1,078 pages, 5 pages were released in full; 1 page was
27   released in part; and 1,072 pages were non-responsive. *Id.*

28       On February 27, 2023, DHS OIG issued its fourth interim response to the Plaintiff.

UF 18. In that response, the FOIA Unit reviewed 1,140 pages of records. *Id.* Based on the review, none of the records were determined to be responsive to Plaintiff's request. *Id.*

On March 30, 2023, DHS OIG issued its fifth interim response to the Plaintiff. UF 19. In that response and corresponding production, DHS OIG indicated that the FOIA Unit reviewed 1,005 pages of records. *Id.* Of the 1,005 pages, 10 pages were released in full; 44 pages were released in part; 113 pages were withheld in full; 736 pages were non-responsive; 61 pages were duplicates; 9 pages were referred to ICE for processing and direct response; and 32 pages were referred to the U.S. Customs and Border Protection ("CBP") for processing and direct response.[2] *Id.*

On June 29, 2023, DHS OIG issued its sixth interim (first supplemental) response to the Plaintiff. UF 21. In that response and corresponding production, DHS OIG indicated that the FOIA Unit reviewed 1,307 pages of records. *Id.* Of the 1,307 pages, 48 pages were released in full; 74 pages were released in part; 74 pages were withheld in full; 17 pages were non-responsive; 757 pages were duplicates; 328 pages were referred to ICE for processing and direct response; 1 page was referred to the DHS Office for Civil Rights and Civil Liberties for processing and direct response; and 8 pages were sent to the DHS Privacy Office on a consultation. *Id.*

On July 31, 2023, DHS OIG issued its seventh interim (second supplemental) response to the Plaintiff. UF 22. In that response and corresponding production, DHS OIG indicated that the FOIA Unit reviewed 1,518 pages of records. *Id.* Of the 1,518 pages, 91 pages were released in part; 180 pages were withheld in full; 20 pages were non-responsive; 644 pages were duplicates; and 583 pages were referred to ICE for

---

[2] Pursuant to continuous reviews of the records and other related information during the course of this litigation, it was determined that the 32 pages of records referred to CBP were not responsive to Plaintiff's request. UF 20. DHS OIG issued a supplemental response letter, dated February 2, 2024, to Plaintiff, explaining that coordination with CBP and continued review of the records assisted in the determination that the records were not responsive. *Id.*

processing and direct response. *Id*.

On August 2, 2023, DHS OIG issued its final (supplemental) response to the Plaintiff. UF 23. In that response and corresponding production, the FOIA Unit reviewed 11 pages of records. *Id*. Of the 11 pages, 6 pages were released in full, and 5 pages were released in part.[3] *Id*.

### D.   *Vaughn* Index

Pursuant to the Court's December 8, 2023 Order [Dkt. 62], DHS OIG provided a search summary and *Vaughn* Index to Plaintiff's counsel on January 19, 2024 and February 9, 2024, respectively. UF 24 & 25. The *Vaughn* was based on the specific pages that Plaintiff stated it intended to challenge. UF 26.

After the parties met and conferred over the exemptions Plaintiff intended to challenge via its Motion for Summary Judgment, and upon review of the arguments raised in Plaintiff's Motion, DHS OIG has prepared an updated *Vaughn* Index that is filed concurrently with this Motion.

## III.   LEGAL STANDARD

Courts generally and appropriately resolve FOIA cases on motions for summary judgment. *Yonemoto v. Dep't of Veterans Affairs*, 686 F.3d 681, 688 (9th Cir. 2012), *overruled on other grounds by Animal Legal Def. Fund v. State Dept.*, 836 F.3d 987 (9th Cir. 2016), *rev'd*, 839 F.3d 750 (9th Cir. 2016). Motions for summary judgment should be granted when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is any fact that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A court reviews an agency's response to a FOIA request *de novo*.  5 U.S.C.

---

[3] These 11 pages were comprised of the 8 pages that were previously sent to the DHS Privacy Office for consultation and 3 pages that were required to be re-processed as an incorrect FOIA Exemption was applied to some of the redactions. UF 34.

§ 552(a)(4)(B). Summary judgment may be granted to an agency in a FOIA case on the basis of information provided in affidavits or declarations that describe "the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemptions, and show that the justifications are not controverted by contrary evidence in the record or by evidence of [agency] bad faith." *Berman v. CIA*, 501 F.3d 1136, 1140 (9th Cir. 2007). "If the affidavits contain reasonably detailed descriptions of the documents and allege facts sufficient to establish an exemption, the district court need look no further." *Lane v. Dep't of Interior*, 523 F.3d 1128, 1135-36 (9th Cir. 2008) (quotations and citations omitted). In evaluating an exemption claim, a court "must accord substantial weight to [the agency's] affidavits." *Minier v. CIA*, 88 F.3d 796, 800 (9th Cir. 1996) (quotation omitted).

The FOIA requires all United States agencies to disclose agency records, upon written request, *except* for records that are protected from disclosure by nine exemptions, or fall within three categories of excluded records. *See* 5 U.S.C. § 552(b). Under FOIA, a court is authorized to enjoin an agency from withholding agency records and to order the production of agency records improperly withheld from a person who properly submitted a written request for the records. 5 U.S.C. § 552(a)(4)(B); *see also* 5 U.S.C. § 552(a)(3)(A); *Kissinger v. Reporters Comm.*, 445 U.S. 136, 150 (1980). To "withhold" agency records means to refuse to give records to the requestor or to deny a valid request. *See Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 149–50 (1989); *Kissinger v. Reporters Comm.*, 445 U.S. at 155 (noting that withholding agency records is an essential prerequisite to liability in FOIA suits).

 Ordinarily, government agencies submit "detailed public affidavits identifying the documents withheld, the FOIA exemptions claimed, and a particularized explanation of why each document falls within the claimed exemption" that are "commonly referred to as [] '*Vaughn*' ind [ices]." *Lion Raisins v. U.S. Dep't. of Agric.*, 354 F.3d 1072, 1082 (9th Cir. 2004) (citing *Vaughn v. Rosen*, 484 F.2d 820, 823-25 (D.C. Cir.1973)). A formal *Vaughn* index is not always required, however, especially where the agency produces the

documents in redacted form rather than withholding them altogether. *Fiduccia v. U.S. Dep't of Justice*, 185 F.3d 1035, 1043-44 (9th Cir. 1999) (holding that "neither a *Vaughn* index nor an affidavit is necessarily required in all cases" and that in certain circumstances a "letter, ... affidavit, [or] copy of redacted document" may be adequate). Instead, the agency must simply offer "'reasonably detailed descriptions of the documents and [] facts sufficient to establish an exemption.'" *Kamman v. IRS*, 56 F.3d 46, 48 (9th Cir. 1995) (citation omitted). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Wolf v. CIA*, 473 F.3d 370, 374-75 (D.C. Cir. 2007). And courts "accord substantial weight to an agency's declarations regarding the application of a FOIA exemption." *Shannahan v. IRS*, 672 F.3d 1142, 1148 (9th Cir. 2012). For the reasons discussed below, Defendant DHS OIG's withholdings in this case are appropriate.

## IV.   ARGUMENT

"FOIA was enacted to facilitate public access to Government documents." *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 973 (9th Cir. 2009) (quotation omitted). The statute represents a balance struck by Congress "between the right of the public to know and the need of the Government to keep information in confidence." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989). Congress recognized "that legitimate governmental and private interests could be harmed by release of certain types of information and provided nine specific exemptions under which disclosure could be refused." *FBI v. Abramson*, 456 U.S. 615, 621 (1982); *see also Lahr*, 569 F.3d at 973 ("FOIA contemplates that some information may legitimately be kept from the public. The statute contains nine enumerated exemptions allowing the government to withhold documents or portions of documents."). While these exemptions are to be "narrowly construed," *Abramson*, 456 U.S. at 630, courts must not fail to give them "meaningful reach and application." *John Doe*, 493 U.S. at 152.

DHS and DHS OIG have satisfied their obligations under FOIA with respect to Plaintiff's Request. As the Declarations of Okechi Chigewe and Catrina M. Pavlik-

Keenan and the *Vaughn* Index establish, and as described more fully below, DHS met its obligations under the FOIA and DHS OIG conducted searches that were reasonably calculated to locate all responsive records. Defendant DHS OIG properly applied FOIA exemptions to withhold information protected from disclosure by FOIA Exemptions 5, 6, and 7(C). *See* 5 U.S.C. §§ 552(b)(5), (6), and 7(C). Those redactions were necessary and appropriate to protect governmental agency communications and private individuals' personal privacy information. Because Defendants conducted an adequate search and have not improperly withheld any non-exempt responsive records, there is no genuine issue as to any material fact and summary judgment should be granted in Defendants' favor.

A.     **DHS and DHS OIG's Processing and Search Were Reasonably Calculated to Uncover All Responsive Records.**

In FOIA cases, "[t]he adequacy of the agency's search is judged by a standard of reasonableness, construing the facts in the light most favorable to the requestor." *Citizens Comm'n on Hum. Rights v. State Dept.*, 45 F.3d 1325, 1328 (9th Cir. 1995) (*citing Zemansky v. EPA*, 767 F.2d 569, 571 (9th Cir. 1985)). An agency's search for records is considered "adequate" if it was conducted "using methods which can be reasonably expected to produce the information requested." *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995) (*quoting Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)); *Lahr*, 569 F.3d at 986; *SafeCard Servs. Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991) (the agency need only show that "the search was reasonably calculated to discover the requested documents, not whether it actually uncovered every document extant."). The "issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the search for those documents was adequate." *Citizens Comm'n on Human Right*, 45 F.3d at 1328; *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003) ("[T]he adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search."). An

11

agency's search need not be exhaustive, merely reasonable. *Oglesby*, 920 F.2d at 68. The agency need not search every record system, but must conduct a good faith, reasonable search of those systems of records likely to possess the requested records. *Id*.

### 1. DHS OIG Conducted an Adequate Search for Records

As explained in the Chigewe Declaration, DHS OIG conducted an adequate search for records. *See* Chigewe Decl., ¶¶ 37-40. In its motion, Plaintiff's argument regarding the adequacy of DHS OIG's search is limited to an argument that DHS OIG "should have searched for records, including email and other correspondence, related to who referred the NQRP letter to DHS-OIG, how the letter resulted in DHS-OIG opening a case in response to it, and where and why DHS-OIG referred the matter out." Dkt. 67 at 33. This argument misunderstands how case summary reports are generated by the Enforcement Data System ("EDS").

Case summary reports are automatically generated by EDS when the system is searched, and records are retrieved for FOIA purposes. Chigewe Decl., ¶ 40(a)(3)(a), n. 9. The case summary reports include information from the submitted complaint. *Id.* In the case of Martin Vargas Arellano's case summary report, the third-party correspondence letter from NQRP was the "complaint" submitted via the public website. *Id.* Thus, the information included in the produced case summary report was derived directly from the NQRP correspondence letter. *Id.*

All case summary reports include, among other things, a "Comments" field, a "Date Opened" field, a "Date Closed" field, a "Rcd Method" field – which relates to how the complaint was received by the DHS OIG – and a "Ref Cases" field. *Id.*, ¶ (40)(a)(b). The "Comments" field of the case summary report located for Mr. Vargas Arellano is a direct and exact recitation of a portion of the third-party correspondence letter. *Id.*, ¶ (40)(a)(b)(i). The "Rcd Method" field on this case summary report states "Public Website." This means that DHS OIG received this complaint/third-party correspondence from its public website, i.e., the Department of Homeland Security received this complaint/third-party correspondence through DHS OIG's Hotline on the public website.

*Id.*, ¶ (40)(a)(b)(ii). The complaint/third-party correspondence was not received via an email. *Id.*

The "Date Opened" on a case summary report is the first date that the complaint was reviewed – this does not indicate that an investigation was "opened" on this date. *Id.*, ¶ (40)(a)(b)(iii). The "Date Closed" is the date on which the complaint was referred for consideration – this does not indicate that an investigation was "closed" on this date. *Id.*

Plaintiff also argues that DHS OIG should have "searched each of the case numbers referenced on the Case Report." Dkt. 67 at 33. But as explained in the Chigewe Declaration, the "Ref Cases" field in this case summary report indicates numbers that are associated with this particular complaint. Chigewe Decl., ¶ (40)(a)(b)(iv). The first number identified refers to the DHS OIG complaint number associated with the case summary report. *Id.* The second number identified is not a DHS OIG-generated number, thus there would conceivably be no reason to search for a DHS number in an OIG system. *Id.* The final number, which begins with HLCN, is DHS OIG's internal tracking hotline number. *Id.* It is used to track this complaint as a website submission. *Id.* It is merely a serial number that ties directly to this particular complaint and case summary report. *Id.* It does not reflect a case number for another, independent complaint or investigation. *Id.*

If there was an indication that additional, responsive records may be available, either for Mr. Vargas Arellano or Mr. Bucio, the FOIA Unit would have performed additional searches, as shown by the additional steps and searches the FOIA Unit requested of the Office of Investigations' appropriate Field Offices and IT for records pertaining to Jonathan Alberto Medina Leon and Teka Gulema. *Id.*, ¶ (40)(a)(b)(v).

### 2. DHS Had No Obligation to Conduct a Search or Refer a Search to CRCL

As explained above, on May 18, 2022, once DHS determined that the response to Plaintiff's FOIA request would be handled by ICE and DHS OIG, it properly advised

Plaintiff of that fact and closed its file. UF Nos. 4-6. Nonetheless, Plaintiff argues that based on the production of two documents in *June and August 2023* by *DHS OIG*, DHS should have reopened its file on this matter and referred a search to the DHS Office of Civil Rights and Civil Liberties ("CRCL"). *See* Dkt. 66 at 34-35. Not so.

As explained above, DHS has a decentralized system for responding to FOIA requests. *See supra* Section II.B. As provided in the DHS FOIA regulations, when a FOIA request is submitted directly to the Privacy Office, it "will forward the request to the DHS component(s) that it determines to be most likely, *as of the date of the request for information*, to maintain the records that are sought." 6 C.F.R. § 5.3(a)(2) (emphasis added). Here, DHS's Privacy Office was not involved in, nor had knowledge about, the searches conducted by DHS OIG or the production of records by DHS OIG to Plaintiff because the Privacy Office did not take any action to supervise or coordinate the search conducted by DHS OIG. Pavlik-Keenan Decl., ¶ 18.  Second, the July 6, 2023 consultation by DHS's Privacy Office of documents sent to it by DHS OIG happened *after* the administrative closure by the Privacy Office of the FOIA Request. *Id.* Yet Plaintiff apparently argues that the Privacy Office must effectively serve as an ongoing monitor for any FOIA request it receives and then forwards.

In support of its argument, Plaintiff cites two district court cases. The first, *ACLU v. Dep't of Homeland Security*, 2023 WL 2733721 (D.D.C. Mar. 31, 2023) is readily distinguishable. There, the DHS Privacy Office notified the requestor that it would "be coordinating a search with ICE and will respond to your request on behalf of DHS and its components." *Id.* at *1. In addition, ICE confirmed that its response "w[ould] be coordinated by the DHS Privacy Office." *Id*. Here, the Privacy Office informed Plaintiff that as the FOIA request had already been submitted directly to ICE and DHS OIG (the two components that the Privacy Office determined to be most likely to have responsive documents, if they existed) it was "closing [Plaintiff's] Privacy Office request and will defer to the OIG and ICE's response(s)." UF 5. It then administratively closed the case on May 18, 2022 with no further action. UF 6. In *ACLU*, the DHS Privacy Office

14

1    engaged directly with the requestor, including a request that the ACLU narrow its FOIA

2    request. *ACLU*, 2023 WL 2733721, at \*2. But, here, the DHS Privacy Office did not take

3    further action after determining that DHS OIG and ICE were the components most likely

4    to have records, if any existed. UF Nos. 5-6. Indeed, unlike in *ACLU*, here the DHS

5    Privacy Office did not represent that it would be responding on behalf of DHS and its

6    components.

7           In *ACLU*, the question for the court was whether the DHS Privacy Office's

8    decision to forward the FOIA request at issue there to ICE alone was reasonable. *See*

9    *generally ACLU*, 2023 WL 2733721. A key fact in the court's analysis was that "DHS

10   was on notice before it even commenced its search—that is, it certainly should have

11   known before starting its search—that responsive records will almost certainly be found

12   in OIG's files, it must search those files." *Id.*, at \*11. Yet here, the DHS Privacy Office

13   conducted no search. And, indeed, Plaintiff's request that DHS and DHS OIG conduct

14   additional searches did not come until *after* even DHS OIG had finished its processing of

15   responsive records. *See* UF 23 ("On August 2, 2023, DHS OIG issued its final

16   (supplemental) response to the Plaintiff."); Dkt. 67 at 34 (identifying Plaintiff's request

17   for an additional search in letters dated September 14, 2023, October 19, 2023,

18   November 9, 2023, and December 13, 2023).

19          As for Plaintiff's purpose in citing *Protect the Public's Trust v. U.S. Dep't of*

20   *Homeland Sec.*, 2022 WL 3226275 (D.D.C. Aug. 10, 2022), that is unclear. That case

21   turned on whether DHS's Privacy Office had received a proper FOIA request. *Id.* at \*2-

22   \*3 ("…resolution of these Cross-Motions turns on a purely legal question regarding

23   'receipt.'") The portion of the memorandum opinion that Plaintiff cites in its Motion

24   relates to DHS regulations over an obligation of each component's FOIA office to route

25   the request to the proper component(s) when they determine that they have received a

26   request intended for another office. *Id.* at \*4 (citing 6 C.F.R. § 5.4(c).) But no such

27   determination was made here. Said differently, neither DHS nor DHS OIG made a

28   determination that the FOIA request was misdirected. *See* UF 5-6; *see also* Chigewe

                                                15

Decl., ¶ 35, n. 3. Nor is there any obligation for any component to search another component's records. *Id.*

Rather, the facts here are more analogous to *Kowalczyk v. Dep't of Just.*, 73 F.3d 386 (D.C. Cir. 1996). In that FOIA case, the requestor submitted his request to FBI headquarters in Washington, D.C. *Id.* at 387-88. Four months after the FBI searched its Washington headquarters, the plaintiff sent a letter that suggested that the FBI should have also searched its New York field office for responsive records. *Id.* at 388. In rejecting that argument, the D.C. Circuit concluded that "[a] reasonable effort to satisfy [a FOIA] request does not entail an obligation to search anew based upon a subsequent clarification," because "[r]equiring an additional search each time the agency receives a letter that clarifies a prior request could extend indefinitely the delay in processing new requests." *Id.* Applying this principle, the D.C. Circuit concluded that the plaintiff's initial request "did not enable the FBI to determine that the New York field office had responsive records." *Id.* at 388.

At bottom, Plaintiff's argument stands in direct contrast with the DHS regulations themselves, which describe a decentralized system for responding to FOIA requests. There was no obligation for DHS or DHS OIG to search CRCL, as explained above. Of course, Plaintiff is not without a remedy – it could have (and still may) submit a FOIA request directly to CRCL, as they were so advised in November 2023. *See* Dkt. 66-8, ¶ 10 Ex. J.

Importantly, Plaintiff did not object to DHS Privacy Office's final determination (in May 2022) that DHS OIG and ICE would be the appropriate components to process the request, nor did Plaintiff object to the Privacy Office's notification that it would administratively close the request. UF Nos. 6-8; Pavlik-Keenan Decl., ¶ 14. A requestor dissatisfied with an agency's response can challenge it in court but must first exhaust available administrative remedies, including an appeal within the agency. 5 U.S.C. § 552(a)(6)(A)(i)–(ii), (C)(i). This serves to "protect[ ] administrative agency authority and promot[e] judicial efficiency." *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992). It

16

also allows agencies to correct their mistakes and creates a useful record "should judicial review become necessary." *Amerco v. NLRB*, 458 F.3d 883, 888 (9th Cir. 2006); *see also Khine v. DHS*, 943 F.3d 959, 964 (D.C. Cir. 2019).

Exhaustion under FOIA is a prudential rather than jurisdictional consideration, however, so courts can waive the requirement when, for example, further administrative proceedings would prove futile. *Yagman v. Pompeo*, 868 F.3d 1075, 1083–84 (9th Cir. 2017). Still, "a requestor must exhaust his administrative remedies under FOIA so long as an agency properly responds before suit is filed." *Aguirre v. United States Nuclear Regul. Comm'n*, 11 F.4th 719, 726 (9th Cir. 2021). That is because a contrary rule would "allow[ ] requestors unhappy with the first level response ... to go to court months or even years after the agency has responded." *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 64 (D.C. Cir. 1990).

Here, Plaintiff filed its initial action on July 12, 2022 (Dkt. 1), almost two months after DHS issued its May 2022 letter. Plaintiff's failure to exhaust its administrative remedies supports Defendant's argument that Plaintiff's claim against DHS should be dismissed. Therefore, this Court should either dismiss Plaintiff's claim against DHS for failure to exhaust its administrative remedies, or alternatively, find that DHS's Privacy Office properly determined that its obligations to respond to the FOIA Request had terminated and enter judgment in its favor.

**B.    DHS OIG Properly Withheld Information under Applicable FOIA Exemptions.**

**1.    DHS OIG Properly Withheld Information Pursuant to 5 U.S.C. § 552(b)(5).**

FOIA Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency."  5 U.S.C. § 552(b)(5); *see also* 21 C.F.R. § 20.62.  Courts construe this language to exempt documents that would not be available to an agency's opponent in a civil discovery context and to incorporate all evidentiary privileges that would be

available in that context. *Nat'l Lab. Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 148-49 (1975) (holding that Exemption 5 exempts those documents that would be privileged as deliberative process, attorney-client communications, and attorney work-product); *see also Maricopa Audubon Soc'y v. United States Forest Serv.*, 108 F.3d 1089, 1092 (9th Cir. 1997)). Exemption 5 "'incorporates the traditional privileges that the Government could assert in civil litigation against a private litigant'—including the presidential communications privilege, the attorney-client privilege, the work product privilege, and the deliberative process privilege—and excludes these privileged documents from FOIA's reach." *Loving v. DOD*, 550 F.3d 32, 37 (D.C. Cir. 2008) (*quoting Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 321 (D.C. Cir. 2006)).

The three primary, most frequently invoked privileges that have been held to be incorporated into Exemption 5 are the deliberative process privilege (referred to by some courts as "executive privilege"), the attorney work-product privilege, and the attorney-client privilege. *See, e.g., Marriott Int'l Resorts, L.P. v. United States*, 437 F.3d 1302, 1305 (Fed. Cir. 2006); *See also Sears*, 421 U.S. at 149.

DHS OIG withheld in full under Exemption 5 draft Memorandums of Activity ("MOAs") from two Reports of Investigations ("ROIs") pertaining to the investigations into the death of Jonathan Alberto Medina Leon and Teka Gulema pursuant to the deliberative process privilege. *See* Chegewe Decl., ¶ 58. These drafts reflect unsigned versions of MOAs, some of which contain redline edits and internal comments. *Id.* The content within these drafts reflects an integral part of DHS OIG's Office of Investigations' process of reviewing, analyzing, and determining what, if any, criminal, civil, or administrative misconduct has occurred. *Id.*

The deliberative process privilege is designed to protect the "decision making processes of government agencies." *See Sears*, 421 U.S. at 150; *Kidd v. DOJ*, 362 F. Supp. 2d 291, 296 (D.D.C. 2005) (protecting documents on the basis that disclosure would "inhibit drafters from freely exchanging ideas, language choices, and comments in

drafting documents") (internal citation omitted); *ACLU v. DHS*, 738 F. Supp. 2d 93, 110 (D.D.C. 2010) (holding that agency properly withheld documents so as not to discourage the candid exchange of ideas and analysis required to conduct thorough investigation). Three policy purposes have been held to constitute the basis for the deliberative process privilege: "(1) to encourage open, frank discussions on matters of policy between subordinates and superiors; (2) to protect against premature disclosure of proposed policies before they are actually adopted; and (3) to protect against public confusion that might result from disclosure of reasons and rationales that were not in fact ultimately the grounds for an agency's action. *McCann v. U.S. Dep't of Health & Hum. Servs.*, 828 F. Supp. 2d 317, 321 (D.D.C. 2011); *see Coastal States*, 617 F.2d at 866; *CREW v. Dep't of Homeland Sec.*, 648 F. Supp. 2d 152, 156 (D.D.C. 2009); *FPL Grp. Inc. v. IRS*, 698 F. Supp. 2d 66, 81 (D.D.C. 2010). Courts have established two requirements for the deliberative process privilege: (1) the communication must be pre-decisional, and (2) the communication must be deliberative.  *See Mapother v. Dep't of Just.*, 3 F.3d 1533, 1537 (D.C. Cir. 1993).

In concept, this privilege protects not merely documents, but also the integrity of the deliberative process itself where the exposure of that process would result in harm. *See, e.g., Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1119 (9th Cir. 1988) ("[T]he ultimate objective of exemption 5 is to safeguard the deliberative process of agencies, not the paperwork generated in the course of that process."); *Skinner v. DOJ*, 744 F. Supp. 2d 185, 205-06 (D.D.C. 2010) (protecting emails between ATF agents and ATF attorneys discussing ongoing criminal investigation as release "'would inhibit the candid, internal discussion necessary for efficient and proper . . . preparation'") (internal citation omitted).

Although draft documents are not *per se* privileged, they are, by definition, pre-decisional, and they are "typically considered deliberative." *Hardy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 243 F. Supp. 3d 155, 173–74 (D.D.C. 2017) (citing *Coastal States Gas Corp v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). An

agency of course may not elude disclosure requirements by simply labeling a document a "draft," *id.* at 174, but if it identifies a policy-oriented decision-making process to which the draft contributed, the privilege claim will usually be upheld. This is true regardless of whether a final version of the document is ever ultimately made public. *See Nat'l Sec. Archive*, 752 F.3d at 463 ("There may be no final agency document because a draft died on the vine. But the draft is still a draft and thus still pre-decisional and deliberative.").

The privilege also covers determinations about how to respond to statements or inquiries made by public interest groups, and it covers how to respond to Congress. In those instances, too, the documents at issue memorialize the "ongoing decisionmaking about 'how the agency's activities should be described to the general public.' " *Competitive Enter. Inst. V. U.S. Env't Prot. Agency*, 12 F.Supp.3d 100, 118 (D.D.C. 2014) (quoting *Nat'l Sec. Archive v. FBI*, No. 88-1507, 1993 WL 128499, at *2 (D.D.C. Apr. 15, 1993)); *see also Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 320 F.Supp.3d 162, 177 (D.D.C. 2018) (responses to both press and Congress covered by privilege). Because these kinds of public communications all require the "formulation [and] exercise of agency policy-oriented judgment," they fall within the scope of the deliberative process privilege. *Prop. of the People, Inc. v. Off. of Mgmt. & Budger*, 330 F.Supp.3d 373, 382 (D.D.C. 2018) (emphasis omitted) (quoting *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992)).

Indeed, draft documents in particular are exempt under this privilege since they "reflect the personal opinions of the writer rather than the policy of the agency." *Coastal State Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). Where an employee writes a draft document and the agency uses a consultative process (e.g., circulating the draft for comments, or having the draft reviewed up the supervisory or organization chain) to determine what the final versions will include, and where the final document is released, then the draft is exempt. *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048–49 (D.C.Cir.1982); *Lead Indus. Ass'n, Inc. v. Occupational Safety and Health Admin.*, 610 F.2d 70, 86 (2d Cir.1979). The draft is pre-decisional in that it is

20

written before the agency decides what the final version will include; it is deliberative because it is submitted to others as the author's input to the decisionmaking process.

The information contained within the pages DHS OIG withheld here falls within the deliberative process privilege and consists of intra-agency draft MOAs that are pre-decisional and deliberative. They are pre-decisional because these records reflect drafts of a document that were ultimately included in a ROI. The ROIs show the investigation of the evidence and circumstances surrounding the death of Jonathan Alberto Medina-Leon and Teka Gulema. *See Vaughn* Index at Entries (1) – (9). These drafts were created and generated before DHS OIG finalized its determination as to whether the evidence supported a finding that a criminal, civil, or administrative violation occurred. *Id.* The records are deliberative because the draft MOAs reflect the Special Agent's/Investigator's process, which includes the various interviews and review of data sets, in formulating whether the evidence collected and analyzed supported a finding of a criminal, civil, or administrative violation. Chigewe Decl., ¶ 63.

Before finalization of these drafts, DHS OIG's MOAs are reviewed by a "reviewing official," which may be more than one person, to comment and edit the draft. *See Vaughn* Index at Entries (1) – (9). As evidenced by the accompanying parent email for many of these drafts, the case agent routinely requests review of the draft or is sending the draft back to the reviewing official with previously made edits and comments incorporated. *Id.* Additionally, to support the draft nature of these records, none of them are finalized and signed as they are in the final ROI that was produced. *Id.* Also, many of the drafts contain redline edits and comments on the draft either asking questions, making recommendations, or changing the language. *Id.*

When considering the foreseeable harm in the release of these investigative draft MOAs, it was determined that the release of this material would result in a chilling effect on interactions and communications between agency employees, and specifically a case agent and supervising or reviewing agent. *See* Chigewe Decl., ¶ 59. If employees are aware that their internal communications, pre-decisional thoughts, and edited drafts may

21

be released to the public, it will reduce the free exchange of ideas and the confidence that is necessary for open dialogue about draft language or a particular finding in the investigation. *Id.* This hampers the agency's ability to efficiently and effectively formulate law enforcement techniques, strategies, and investigative reports. *Id.*

Draft documents, including those at issue in this case, go through a series of reviews that may require multiple versions. If the final version differs from the draft version, it could confuse the public as to how and/or why one version says one thing while the final says something different, and it may lead to questions regarding the internal process of determining how decisions are made not only in regards to the language of a draft, but also whether a finding of a violation is supported, and how questions are answered. *Id.*, ¶ 60. Drafts are necessary and important for ensuring the final product is accurate and appropriate, and disclosing drafts inhibits an agency from freely having open discussions and making decisions for fear that their recommendations will be disclosed, scrutinized, or questioned prior to finalization. *Id.*, ¶ 61.

Plaintiff argues that even if Exemption 5 properly applies to these records (which it does), DHS OIG must nonetheless segregate and disclose any factual information that is not pre-decisional or deliberative. *See* Dkt. 67 at 22-23. To the extent that factual information is included within the drafts, it is unreasonable for DHS OIG to segregate such information. First, the factual information used by the DHS OIG Special Agent/Investigator assisted with the development of recommendations to the agency decisionmaker as to whether criminal, civil, or administrative wrongdoing was found as part of the investigation. Chigewe Decl., ¶ 63. Second, the information included in the draft MOAs derives from interviews of various witnesses and the collection of information, data sets, and documents from ICE as well as any other appropriate party. *Id.* The selection of facts to include in the MOA is, itself, deliberative in nature. *Id.* In general, when conducting an investigation, DHS OIG receives a large amount of information not only in the way of data sets and documents but also during interviews of witnesses. *Id.* It is incumbent on the Special Agent/Investigator involved in the

22

investigation and drafting the report to determine what information, including facts, should be made part of the report to ensure the decisionmaker is fully informed on the investigation in order to agree or disagree on the recommendations provided. *Id.*

In *Bloche v. Department of Def.*, 370 F. Supp. 3d 40 (D.D.C. Mar. 29, 2019), the court in ruling on a FOIA plaintiff's motion for partial summary judgment, found that a draft portion of an investigation report was privileged. *Id.* at 53, n.3. The court rejected the plaintiff's argument that any parts of the drafts that were eventually adopted in the final versions needed to be disclosed. *See id.* As the district court observed, "FOIA does not require an agency to release portions of any draft that are ultimately repeated in the final policy." *Id.* Further, "even these repeat disclosures would have consequences for the agencies: they 'would divulge information regarding 'decisions to insert or delete material or to change [the] draft's focus or emphasis' and thus 'would stifle the creative thinking and candid exchange of ideas necessary to produce good ... work.' Such a dynamic is exactly that the deliberative process privilege is designed to prevent." *Id.* (citations omitted). The same is true here.

As explained in the *Vaughn* Index, Defendant has reviewed these documents and determined that no further portions can be disclosed. The withheld information is therefore exempt from release under Exemption 5 pursuant to the deliberative process privilege.

### 2.    The Information Redacted by DHS OIG is Exempt under 5 U.S.C. § 552(b)(6) and (b)(7)(C)

FOIA Exemption 6 applies to "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).

There are two steps to determine whether Exemption 6 is properly applied. First, as a threshold matter, the records must be determined to be personnel, medical, or similar files. *Reed v. NLRB*, 927 F.2d 1249, 1250-51 (D.C. Cir. 1991). The Supreme Court has directed lower courts to construe "similar files" broadly to apply to any "Government

1    records on an individual which can be identified as applying to that individual." *Id.* at

2    1251 (*citing United States Dep't of State v. Washington Post Co.*, 456 U.S. 595, 601-02

3    (1982)). Second, a court must weigh the relevant privacy interests in nondisclosure and

4    the public interests in disclosure and determine "whether, on balance, disclosure would

5    work a clearly unwarranted invasion of personal privacy." *Reed*, 927 F.2d at 1251 (*citing*

6    *National Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d 873, 874 (D.C. Cir.

7    1989)). Courts construing Exemption 6 have held that substantial privacy interests

8    cognizable under FOIA include personally identifiable information, such as a person's

9    name, address, email address, phone number, medical history, and Social Security

10   number. *See, e.g., U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 600 (1982)

11   ("Information such as place of birth, date of birth, date of marriage, employment history,

12   and comparable data is not normally regarded as highly personal, and yet ... such

13   information ... would be exempt from any disclosure that would constitute a clearly

14   unwarranted invasion of personal privacy.")

15           Based on guidance from the Supreme Court, the D.C. Circuit has recognized that

16   only "official information that sheds light on an agency's performance of its statutory

17   duties" merits disclosure under FOIA, while "disclosure of information about private

18   citizens that is accumulated in various governmental files" would "reveal[] little or

19   nothing about an agency's own conduct." *Reed*, 927 F.2d at 1251 (quoting *United States*

20   *Dep't of Justice v. Reporters Comm. for Freedom of the Press (Reporters Comm.)*, 489

21   U.S. 749, 773 (1989)); *see also Sellers v. IRS*, 2009 WL 700647, at *14 (D. Ore. 2009)

22   (citation omitted).

23           Similarly, Exemption 7(C) protects from disclosure "records or information

24   compiled for law enforcement purposes" to the extent that their disclosure "could

25   reasonably be expected to constitute an unwarranted invasion of personal privacy." 5

26   U.S.C. § 552(b)(7)(C).

27           While Exemptions 6 and 7(C) are similar, they require different analyses, as

28   "Exemption 7(C)'s privacy language is broader than the comparable language in

                                                 24

Exemption 6 in two respects." *Reporters Comm.*, 489 U.S. at 756. First, Exemption 6 "requires that the invasion of privacy be '*clearly* unwarranted,' a requirement omitted from the language of Exemption 7(C)." *Lahr*, 569 F.3d at 974 (emphasis in original) (quoting *Reporters Comm.*, 489 U.S. at 756). Second, while Exemption 7(C) prevents disclosure of information that "could reasonably be expected to constitute" an unwarranted invasion of privacy, Exemption 6 restricts disclosure of information that "would constitute" an unwarranted invasion of privacy. *Id.* (citing *Reporters Comm.*, 489 U.S. at 755–56).

Exemption 7(C), therefore, is *more* protective of privacy interests than Exemption 6, as the "threatened invasion" of privacy "need not be as likely as where personnel, medical, or similar files are at issue (Exemption 6)." *Hunt v. FBI*, 972 F.2d 286, 288 (9th Cir. 1992); *see also U.S. Dep't. of State v. Ray*, 502 U.S. 164, 172 (1991) ("[T]he Government's burden in establishing the requisite invasion of privacy to support an Exemption 6 claim is heavier than the standard applicable to Exemption 7(C)."); *Pomares v. U.S. Dep't of Veterans Affs.*, No. 21-cv-084, 2023 WL 2378939, at *7 (S.D. Cal. Jan. 6, 2023) ("Exemption 7(C) is more protective of privacy interests than is Exemption 6 ...."). Further, "although both exemptions require the court to engage in a similar balancing analysis, they 'differ in the magnitude of the public interest that is required to override the respective privacy interests protected by the exemptions.' " *Lahr*, 569 F.3d at 974 (quoting *U.S. Dep't of Defense v. Fed. Lab. Relations Auth.*, 510 U.S. 487, 496 n.6 (1994)).

In its motion, Plaintiff argues that DHS OIG "fail[s] the threshold requirement for Exemption 7(C)" that the records were compiled for law enforcement purposes. Dkt. 67 at 24. Among the various Offices within DHS OIG is the Office of Investigations. Chigewe Decl., ¶ 66. The Office of Investigations investigates allegations of criminal, civil, and administrative misconduct involving DHS employees, contractors, grantees, and programs. *Id.* These investigations can result in criminal prosecutions, fines, civil monetary penalties, administrative sanctions, and personnel actions. *Id.* DHS OIG has

statutory law enforcement authority, and OIG investigators have the power to make arrests, execute warrants, and carry firearms. *Id.* Based on the nature of work that DHS OIG conducts, DHS OIG routinely uses Exemptions 6 and 7(C) in concert. *Id.*; *see also, Vaughn* at 1 - 9 (stating that DHS OIG compiled this information for law enforcement purposes, i.e., the information, was compiled within a completed DHS OIG report that stemmed from a law enforcement investigation.).

To determine whether a disclosure would "constitute a clearly unwarranted invasion of personal privacy," the court first requires the agency to show that "nontrivial or more than de minimis" personal privacy interests are at stake. *Cameranesi v. U.S. Dep't of Def.*, 856 F.3d 626, 637 (9th Cir. 2017) (cleaned up). If the agency so shows, the burden shifts to the requestor to "show that the public interest sought to be advanced is a significant one and that the information [sought] is likely to advance that interest." *Id.* (alteration in original).

Here, personal privacy information withheld under Exemptions 6 and 7(C) in DHS OIG's productions included, but was not limited to, sensitive medical and health diagnoses, sensitive medical testing, and personal immigration history[4] of third parties. Disclosure of medical, health, or personal immigration information for these deceased individuals may reignite undue public attention, embarrassment, harassment, and derogatory inferences and suspicion regarding the decedent which could potentially impact the decedent's family, kin, or related individuals in a negative manner. Although the personal privacy information protected in these records pertain to individuals that are deceased, that does not mean their privacy interest is completely extinguished. There may be a diminishment to some extent, but there remains a substantial privacy interest that must be balanced against the public interest. *See Schrecker v. DOJ*, 254 F.3d 162,

---

[4] Pursuant to Exemptions 6 and 7(C), the personal immigration history is also withheld in compliance with a DHS immigration regulation that requires this information be protected from disclosure. DHS OIG is not permitted to disclose the specific regulation as disclosure of it would also be a violation in this context.

166 (D.C. Cir. 2001) ("one's own and one's relations' interests in privacy ordinarily extend beyond one's death"), *remanded*, 217 F. Supp. 2d 29 (D.D.C. 2002) (continuing to find that "[d]eath does not extinguish a privacy interest but it does affect the weight accorded the privacy interest"), *aff'd,* 349 F.3d 657, 665 (D.C. Cir. 2003).

A third-party's sensitive medical history, sensitive medical diagnosis, and personal immigration history outweighs any public interest. This information does not reveal DHS OIG's techniques in conducting investigations, nor does it offer insight into how DHS OIG determines when to open an investigation stemming from a complaint, nor does it provide information pertaining to any standards that must be followed to initiate and conduct investigations into wrongdoing, or initiate and conduct audits, inspections, or evaluations of DHS component programs or activities. The withholding of sensitive medical, health, and personal immigration information does not thwart an understanding of the released records in any way, and it does not inform or shed any additional light on DHS OIG's activities. The information released by DHS OIG more than accomplishes the goal of responding to the FOIA request by releasing non-exempt information that explains the details of the investigations and DHS OIG's actions throughout. Releasing this personal privacy information would do nothing more than invade the subject's and potentially the subjects' families' personal privacy interests.[5]

Releasing this personal privacy information does nothing to increase the public's knowledge of the duties performed by DHS OIG. In general, this personal privacy information *may* touch on ICE's activities regarding detention, but DHS OIG is not ICE, and neither ICE's mission nor DHS OIG's duties are the same. This information does not shed light on how DHS OIG conducted its law enforcement investigation into the

---

[5] One action that may have been considered by DHS OIG in evaluating the privacy interest here, including protection or disclosure of personal privacy information, would have been the provision of documentation from the Plaintiff, executed by the family members or next of kin of the deceased individuals, permitting DHS OIG to disclose personal privacy information of the deceased to specified third parties. Plaintiff, however, did not provide such documentation, nor have they explained whether they attempted to obtain that information.

1    subject's death. Any claim that some of this information is already well-known only

2    supports DHS OIG's position that releasing it does not, in anyway, increase the public's

3    knowledge of DHS OIG's activities.

4          Plaintiff argues that because certain withheld information may have been

5    disclosed by a separate agency, DHS OIG is therefore required to similarly release any

6    records disclosing the same information. Dkt. 67 at 26. Not so. If another agency

7    component makes a discretionary determination to release information in its own records

8    that it believes requires disclosure that does not waive DHS OIG's obligations to

9    withhold information in its own records that is properly exempt from disclosure. *See*

10   *Frugone v. CIA*, 169 F.3d 772, 774 (D.C. Cir. 1999) (stating that to be an official

11   disclosure, the release of information must be made by "the agency from which the

12   information is being sought.")[6] Here, DHS OIG has properly determined that the privacy

13   interest of individuals mentioned in its records, whose families have not provided

14   documentation permitting disclosure of those records to Plaintiff, outweighs Plaintiff's

15   assertions of public interest.

16         **3.    DHS OIG Has Not Improperly Redacted Immigration**

17               **Information Related to Medina-Leon and Gulema**

18         Plaintiff also challenges specific redactions "involving Medina-Leon and

19   Gulema's immigration information," namely what it believes to be "witness statements

20   made by ICE officers related to the decision to release Medina-Leon from custody,

21   information related to her entry to the United States, and ICE's attempts to obtain travel

22   documents to deport Gulema from the United States." Dkt. 67 at 27-28.  As explained in

23   detail in Defendant's *Vaughn* Index at Entries (3) and (4), DHS OIG properly withheld

24   the redacted information because (a) the disclosure of the privacy information of the

25   decedent would constitute a clearly unwarranted invasion of this individual's personal

26

27         [6] To the extent that Plaintiff is representing to the Court that it already has the
     information it seeks through this FOIA action, it is unclear what the public interest
28   would then be in duplicate information contained in OIG records that have not
     previously been released by OIG that is allegedly already in the public domain.

privacy interests in being free from harassment, intimidation, legal consequences, embarrassment, physical harm, and derogatory inferences and suspicion, and (b) the disclosure of this information would serve no public benefit and would not inform the public how DHS OIG is executing its statutory responsibilities.

### 4. DHS OIG Has Not Improperly Withheld Documents It Referred to ICE

Plaintiff erroneously claims that DHS OIG has improperly withheld documents that it referred to ICE. Dkt. 67 at 30-32. This argument, while evincing a misunderstanding of DHS FOIA regulations, is also moot because ICE has processed and produced all records referred to it by DHS OIG. Chigewe Decl., ¶¶ 76-86 (explaining referral process); *see also* Declaration of Fernando Pineiro, ¶ 7 ("As of the date of this declaration, ICE does not have any other referred documents from OIG to process in this matter.")

In its Motion, Plaintiff challenges 16 pages of referred records that ICE initially determined to be non-responsive. Dkt 67 at 30. After the parties met and conferred, ICE agreed to produce the documents, which were outside the date range included in the FOIA Request, and did so on February 28, 2024. *See* Pineiro Decl., ¶ 5. In correspondence dated February 21, 2024, defense counsel advised that the pages "are largely illegible. *ICE has already consulted with OIG and determined that these are the best copies available.*" *See* Dkt. 66-15. at 1 (emphasis added). And ICE noted the same in its cover letter producing the documents at the end of February 2024. *See* Pineiro Decl., ¶ 5, Ex. 1 at 1 ("The records are largely illegible, and ICE has consulted with OIG and determined that these are the best copies available.").

Yet, in its Motion, Plaintiff quotes only the first sentence of the February 21, 2024 (Dkt. 66-15) correspondence and ignores ICE's cover letter completely as it argues that "Defendants should not be permitted to avoid production of documents in legible form." Dkt. 67 at 31. Defendants can only produce the best copies they themselves have and did so here as confirmed by ICE.

29

As explained above, DHS OIG has not improperly withheld any records that it referred to ICE.

**5.      DHS OIG Released All Reasonably Segregable Portions of the Responsive Records.**

Under FOIA, "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt . . . ." 5 U.S.C. § 552(b). The agency need not disclose non-exempt portions of a document if "they are inextricably intertwined with exempt portions such that the excision of exempt information would impose significant costs on the agency and produce an edited document with little informational value." *Willamette Indus., Inc. v. United States*, 689 F.2d 865, 867-68 (9th Cir. 1982) (internal quotation marks and citations omitted).  The agency must provide a "detailed justification" for its claim of non-segregability, but "is not required to provide so much detail that the exempt material would be effectively disclosed." *Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002) (citation omitted).  "The burden is on the agency to establish that all reasonably segregable portions of a document have been segregated and disclosed."  *Pac. Fisheries Inc. v. United States*, 539 F.3d 1143, 1148 (9th Cir. 2008) (citing 5 U.S.C. § 552(a)(4)(B), (b)). "The agency can meet its burden by offering an affidavit with reasonably detailed descriptions of the withheld portions of the documents and alleging facts sufficient to establish an exemption."  *Pac. Fisheries*, 539 F.3d at 1148 (internal citations omitted); *see Hamdan v. U.S. Dep't of Justice*, 797 F.3d 759, 779 (9th Cir. 2015).

Here, DHS OIG personnel conducted a careful page-by-page, line-by-line review of all records and disclosed all reasonably segregable information. *See* Chigewe Decl., ¶¶ 87-90. Therefore, DHS OIG has complied with its obligation to segregate and release all reasonably segregable, non-exempt information related to Plaintiff's Request.

**V.      CONCLUSION**

For the reasons discussed above, Defendants DHS and DHS OIG request that the

1   Court grant this motion and enter judgment in their favor and deny Plaintiff's Motion

2   (Dkt. Nos. 66 & 67).

3

4    Dated: April 10, 2024                    Respectfully submitted,

5                                             E. MARTIN ESTRADA
                                              United States Attorney
6                                             DAVID M. HARRIS
                                              Assistant United States Attorney
7                                             Chief, Civil Division
                                              JOANNE S. OSINOFF
8                                             Assistant United States Attorney
                                              Chief, Complex and Defensive Litigation Section
9

10                                             /s/ *Joseph W. Tursi*
                                              JOSEPH W. TURSI
11                                            JASON K. AXE
                                              Assistant United States Attorneys
12
                                              Attorneys for Defendants
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

31

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**L.R. 11-6.1 Certification**

     The undersigned counsel of record for the Defendants certifies that this brief contains 10,389 words, which complies with the word limit set in the Court's February 9, 2023 Case Management Order for the filing of an opposition and cross-motion for summary judgment. *See* Dkt. 40 at 3.

Dated: April 10, 2024

                            ___/s/ *Joseph W. Tursi*_____
                            JOSEPH W. TURSI
                            Assistant United States Attorney