1  E. MARTIN ESTRADA
   United States Attorney
2  DAVID M. HARRIS
   Assistant United States Attorney
3  Chief, Civil Division
   JOANNE S. OSINOFF
4  Assistant United States Attorney
   Chief, Complex and Defensive Litigation Section
5  JOSEPH W. TURSI (Cal. Bar No. 300063)
   JASON K. AXE (Cal. Bar No. 187101)
6  Assistant United States Attorneys
         Federal Building, Suite 7516
7        300 North Los Angeles Street
         Los Angeles, California 90012
8        Telephone: (213) 894-3989 | 8790
         Facsimile: (213) 894-7819
9        E-mail: Joseph.Tursi@usdoj.gov
               Jason.Axe@usdoj.gov
10
   Attorneys for Defendants
11

12              UNITED STATES DISTRICT COURT

13        FOR THE CENTRAL DISTRICT OF CALIFORNIA

14

15  AMERICAN CIVIL LIBERTIES           No. 2:22-cv-04760-SHK
    UNION FOUNDATION OF
16  SOUTHERN CALIFORNIA,               **DECLARATION OF OKECHI**
                                       **CHIGEWE**
17              Plaintiff,

18              v.

19  UNITED STATES IMMIGRATION          Honorable Shashi H. Kewalramani
    AND CUSTOMS ENFORCEMENT, et        United States Magistrate Judge
20  al.

21              Defendants.

22

23

24

25

26

27

28

                              1

I, Okechi Chigewe, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am the Deputy Freedom of Information Act ("FOIA") Officer and Supervisory Government Information Specialist for the FOIA Unit within the Information Law and Disclosure Division ("ILD") in the Office of Counsel at the United States Department of Homeland Security Office of Inspector General ("DHS OIG"), and I have served in this capacity since February 2022.  I have over nine years of FOIA experience, which includes experience in managing FOIA programs at the United States Department of Transportation's Federal Railroad Administration and the United States Department of Labor's Wage and Hour Division.

2.      As the Deputy FOIA Officer for the DHS OIG, I supervise four (4) Government Information Specialists and one (1) Intake Specialist. I oversee the daily operation of FOIA processing from intake to closeout, make assessments of the agency's FOIA program and implement improvements, keep constant communication with agency leadership on our FOIA program and provide technical assistance to ensure agency compliance with the FOIA. As the Deputy FOIA Officer, I assist ILD attorneys, who serve as agency counsel in the representation of DHS OIG in FOIA litigation, including document production.

3.      DHS OIG's FOIA Unit is housed within ILD.  The FOIA Unit is responsible for receiving, processing, and responding to all FOIA, 5 U.S.C. § 552, and Privacy Act, 5 U.S.C. § 552a, requests received by DHS OIG.

4.      My official duties and responsibilities related to the FOIA include the processing of FOIA and Privacy Act requests received by DHS OIG.  As the Supervisory Government Information Specialist and DHS OIG Deputy FOIA Officer within ILD, I also approve search taskings to program offices and review all of the work completed by the division's Government Information Specialists ("GISs"). Due to my experience and the nature of my official duties, I am familiar with DHS OIG's procedures for searching and responding to requests for information pursuant to provisions of the FOIA and the Privacy Act.  In that respect, I am familiar with DHS OIG's processing of the FOIA

2

request dated April 29, 2022, and sent by Plaintiff via email on May 2, 2022, which is a subject of this litigation.

5.     The statements contained in this declaration are based upon my personal knowledge, my review of records kept by DHS OIG in the ordinary course of business, and information provided to me by other DHS OIG employees in the course of my official duties.

6.     This declaration provides a description of DHS OIG's search and challenged withholdings under the FOIA in response to Plaintiff's FOIA request which was assigned case number 2022-IGFO-00158.

## I.     PROCEDURAL HISTORY OF THE PLAINTIFF'S FOIA REQUEST AND THE INSTANT LITIGATION

7.     On May 2, 2022, Plaintiff submitted, via email, the FOIA request at issue in this litigation (the "FOIA Request") to the DHS Privacy Office, the U.S. Immigration and Customs Enforcement ("ICE"), and DHS OIG.  The FOIA Request was received by DHS OIG on May 2, 2022, and assigned case number 2022-IGFO-00158.

8.     By email and letter dated May 16, 2022, DHS OIG acknowledged the FOIA request and provided the case number, 2022-IGFO-00158, to Plaintiff.

9.     By email dated July 5, 2022, the FOIA Unit provided a search proposal to Plaintiff in an attempt to narrow the scope of the request.

10.     In response to this recommended proposal, Plaintiff sent a letter to the FOIA Unit, dated July 12, 2022, via email requesting clarification on the proposal.

11.     By teleconference on August 17, 2022, DHS OIG and Plaintiff discussed the FOIA request, DHS OIG's search proposal, and the clarification points from Plaintiff's July 12, 2022 letter.

12.     The FOIA Unit provided a letter, dated August 18, 2022, to Plaintiff via email, memorializing the points discussed during the August 17, 2022 teleconference and officially responding to Plaintiff's July 12, 2022 letter.

13.     By emails dated September 2, 2022 and September 12, 2022, Plaintiff contacted the FOIA Unit regarding the August 18, 2022 letter. Once Plaintiff filed the Complaint, however, and notification of the lawsuit was provided to DHS OIG, communications directly with Plaintiff ceased.

14.     As noted, while engaged in potential narrowing negotiations, Plaintiff filed the Complaint in this case on July 12, 2022, the same day it responded to DHS OIG's July 5, 2022 proposal. *See* Dkt. 1.

15.     On October 4, 2022, Plaintiff filed the First Amended Complaint (FAC). *See* Dkt. 24. Among other things, the FAC added DHS OIG as a defendant. *See generally id.* DHS OIG filed its Answer to the FAC on October 18, 2022. *See* Dkt. 26.

16.     DHS OIG issued interim responses in November 2022, December 2022, January 2023, February 2023, March 2023, June 2023, and July 2023. The final response was sent in August 2023.

17.     This declaration provides a description of DHS OIG's search in response to Plaintiff's FOIA request 2022-IGFO-00158 and provides the basis under which information has been withheld under the FOIA.

**III.   DHS OIG'S STANDARD PROCEDURE FOR INITIATING SEARCHES IN RESPONSE TO FOIA REQUESTS**

18.     When the DHS OIG receives a FOIA request, the FOIA Unit evaluates it to determine if it is a proper FOIA request per DHS FOIA regulation 6 C.F.R. § 5.3. Generally, a FOIA request is considered proper and in compliance with DHS regulations if it is made in writing, it reasonably describes the records sought, and the records are under the purview of DHS OIG.

19.     DHS has a decentralized system for responding to FOIA requests. This means that each component within DHS has a designated FOIA office that processes records from that specific component. *See* 6 C.F.R. § 5.3(a)(1). One DHS component does not process records for all DHS components, and one DHS component does not run searches of another DHS component's systems, databases, etc. for records.

20.     Pursuant to 6 C.F.R. § 5.3(c), if a FOIA request does not reasonably describe the records sought or it is improperly submitted, the FOIA Unit may seek clarification from the requestor or administratively close the request.

21.     Pursuant to § 5.4(a), the DHS component that first receives the FOIA request and maintains records that are responsive to the request is the component responsible for responding to the request.

22.     Moreover, in determining which records are responsive, a component will ordinarily include only those records that are in its possession as of the date that the search begins. *Id*.

23.     If the FOIA request is determined to be misdirected, meaning if DHS OIG's FOIA Unit first received the FOIA request, reviewed it, and made the determination that the request should have been submitted or sent to another component within DHS, DHS OIG's FOIA Unit shall route the request to the proper component's FOIA office.  The FOIA Unit will then inform the requestor to contact that agency or component directly and DHS OIG will administratively close the FOIA request. *See* 6 C.F.R. § 5.4(c).

24.     Perfected FOIA requests were previously entered into a database known as FOIAXpress and assigned a case tracking number and FOIA processor.[1]  Based upon the requestor's description of the records being sought, and the FOIA Unit's knowledge of the various program offices' missions, the FOIA processor identifies the program office(s) likely to possess responsive records and tasks the appropriate program office(s) to conduct the necessary searches.

25.     The program offices are typically staffed with a designated point of contact ("POC") who is the primary person responsible for communications between that program office and the FOIA Unit.  Each POC is a person with detailed knowledge about the operations of their particular program office.

---

[1] FOIAXpress is no longer used by DHS OIG for processing FOIA requests. It was, however, used at the time that Plaintiff submitted its FOIA request; thus, I included a reference to it here.

26.     The POC within each of those program offices is provided with a copy of the FOIA request, an email detailing the FOIA request, instructions to conduct a search for responsive records, and a search form to document information, such as: search terms, databases searched, and any other program offices believed to have responsive records.  As the program offices are best positioned to determine where responsive records are located, they are responsible for searching all locations and by all keywords that the program office reasonably believes would produce responsive records.  The POC then reviews the FOIA request, along with any case-specific instructions that may have been provided, and based on the POC's experience and knowledge of the program office's practices and activities, forwards the request and instructions to the individual employee(s) within the program office that the POC believes is reasonably likely to have responsive records, if any.  Once those searches are completed, the individual(s) and program offices provide any potentially responsive records along with a completed search form to the assigned FOIA processor.  The FOIA processor then reviews the collected records for responsiveness, application of appropriate FOIA exemptions, and the necessity of any referrals and/or consultations.

27.     DHS OIG employees maintain records in several ways.  DHS OIG program offices use various systems to maintain records.  DHS OIG employees may store electronic records on their individual computer hard drives, their program office's shared drive, databases, DVDs, CDs, and/or USB storage devices.  The determination of whether or not these electronic locations must be searched in response to a particular FOIA tasking, as well as how to conduct any necessary searches, is necessarily based on the manner in which employees maintain their files.

28.     DHS OIG employees may also maintain hard copies of records, such as investigation files, which may be stored and maintained within an employee's office and/or the DHS OIG Sensitive Compartmented Information Facility ("SCIF"), depending on whether the records are classified.

29.     Additionally, all DHS OIG employees have access to e-mail.  DHS OIG uses the Microsoft Outlook e-mail system.  Each OIG employee stores his/her files within Outlook in the way that works best for that particular employee.

30.     Once records are received, the FOIA processor will make a determination whether or not the records are responsive to the FOIA request.  If the records are responsive, the FOIA processor will redact information pursuant to the FOIA or Privacy Act, as appropriate, while simultaneously ensuring that all reasonably segregated non-exempt information is released.

31.     Once the responsive records are processed by the FOIA processor, a second-line review of the records is conducted by the Deputy FOIA Officer or an attorney within ILD.  Once the second-line review is completed, the records are produced to the requestor in either an interim and/or final response.

## IV.   GENERAL DESCRIPTION OF THE PROGRAM OFFICE TASKED WITH SEARCHING FOR RECORDS IN RESPONSE TO PLAINTIFF'S FOIA REQUEST 2022-IGFO-00158

32.     As stated, Plaintiff submitted a FOIA request to the DHS Privacy Office, ICE, and DHS OIG. The request sought: (1) [a]ny and all documents, without limitation to date, including any communications, investigatory reports, and any and all exhibits, appendices, or attachments thereto, relating to the hospitalization, death, decision to release from custody, or release from custody of the following individuals: Teka Gulema; Johana Medina Leon; Jose Ibarra Bucio; and/or Martin Vargas Arellano; (2) [a]ny and all DHS OIG reports of investigation that are identified in any of the records responsive to Request #1. This includes any and all exhibits, appendices, or attachments to the DHS OIG reports of investigation; (3) [a]ny and all ICE OPR reports of investigation that are identified in any of the records responsive to Request #1. This includes any and all exhibits, appendices, or attachments to the DHS OPR reports of investigation; (4) [a]ny and all documents and communications, including ICE and IHSC directives, policies, procedures, protocols, or trainings that contain guidance,

7

instructions, or standards about the release from custody of (a) hospitalized detainees; (b) detainees who at the time of release were patients in the care of external healthcare providers or facilities. Detainees specified in (a) and (b) above shall include those being treated for COVID-19 during their hospitalization or treatment at external healthcare providers or facilities; (5) [s]preadsheets, emails, documents, communications, databases, lists, and other data compilations in the possession of ICE Leadership, ICE Enforcement and Removal Operations, ICE Health Services Corps, and ICE Office of Professional Responsibility that identify detainees who were released from custody while (a) hospitalized (including for COVID-19 treatment); (b) in the full-time care of external healthcare providers or facilities (including for COVID-19 treatment), or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility. Requested materials include, but are not limited to, dates of hospitalization of detainees, dates of hospital or external care facility discharge, name of treated detainees' detention facilities, and reasons for detainees' hospitalization or external medical care. These materials should further include Medical Transfer Summary documents from DHS's her System and Alien Medical Records System, and any versions of the Significant Detainee Illness Spreadsheet that identify detainees who were released from custody while (a) hospitalized (including for COVID-19 treatment); (b) in the care of external healthcare providers or facilities (including for COVID-19 treatment); or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility; (6) [s]preadsheets, emails, significant incident reports (SIRs), significant event notification reports (SENs), or documents created by DHS OIG or ICE OPR that mention the release from custody of (a) hospitalized detainees; (b) detainees who at the time of release were patients in the care of external healthcare providers or facilities; or (c) detainees released from custody immediately prior to transfer to an emergency room, hospital, or external care facility; (7) [s]preadsheets, emails, SIRs, SENs, or documents created by DHS OIG or ICE OPR that mention the death of any detainee who had been previously released from custody while

(a) hospitalized; or (b) a patient in the care of an external healthcare provider or facility; or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility; (8) [a]ny and all documents, communications, and other records, including databases, spreadsheets, lists, and other data compilations, that identify detainees who were hospitalized or transferred from detention for off-site medical care due to COVID-19, and were subsequently released from custody while hospitalized, or detainees who were released from custody immediately prior to transfer to an emergency room, hospital, or external care facility to receive treatment for COVID-19. Requested information includes, but is not limited to, dates of hospitalization, detention facility, medical condition/reason for hospitalization or treatment, name and location of hospital, date of return to detention (if any), date of release from custody or issuance of order of recognizance (if any), and/or reason for release from custody; and (9) [b]ills, invoices, charges, or records of payment that reflect payments made for healthcare for any detainee who was released from custody while (a) hospitalized; or (b) a patient in the care of an external healthcare provider or facility, and communications about such bills, invoices, charged, or records of payment.

33.     The date range requested for responsive records was January 1, 2016, to the present.

34.     Pursuant to the request's specific language, which again sought ICE and OIG records, the DHS OIG FOIA Unit initially determined that the request was properly under DHS OIG's purview, i.e., it was not misdirected. Thus, it remained OIG's responsibility to process and respond to the request. Because there was no determination of misdirection, there was no requirement to route the request elsewhere. *See* 6 C.F.R. § 5.4(c)[2].

_____

[2] An amendment to the DHS FOIA Regulations was published on February 27, 2024, with an effective date of March 28, 2024. The amendment revises, among other things, § 5.4(c) to read as follows, "(c) *Forwarding misdirected requests*. Where a

*(footnote cont'd on next page)*

35.     Moreover, as noted above, because DHS has a decentralized system for processing FOIA requests, DHS OIG was under no obligation to search for another DHS component's records. OIG's responsibility was and is to search for, process, and produce responsive DHS OIG records with redactions made pursuant to appropriate exemptions[3].

36.     Therefore, based on the FOIA Unit's knowledge of the DHS FOIA Regulations and the various program offices' missions, it was determined that the DHS OIG Office of Investigations may be in possession of potentially responsive records that fall under OIG's purview. As investigatory reports, Reports of Investigations, and other similar records sought in the request would have been created by the Office of Investigations, a search tasking was sent on September 1, 2022.

---

component's FOIA office determines that a request was misdirected within DHS, the receiving component's FOIA office, within 10 working days, shall route the request to the FOIA office of the proper component(s) for processing…A request is not a misdirected request if the receiving DHS component may maintain records responsive to any portion of the request. In other words, the receiving DHS component is not obligated to forward to other DHS components that may maintain responsive records unless those other DHS components are explicitly listed in the request." 89 FR 14371 (February 27, 2024) (revising 6 C.F.R. § 5.4(c)).

[3] Plaintiff alleges that DHS OIG was required to not only refer the request to DHS's Office for Civil Rights and Civil Liberties ("CRCL") based on records that were located in the Office of Investigations during our search and processing of the request, but also that DHS OIG should have conducted a search of DHS CRCL for responsive records. As noted, the DHS FOIA Regulations do not require a component, who is in proper receipt of a FOIA request and maintains potentially responsive records, to refer a request to another DHS component. Routing of FOIA requests occurs when there is a determination that the request was misdirected. DHS OIG did not determine that the request was misdirected.

Additionally, because DHS is decentralized, DHS OIG is only obligated to search for records within DHS OIG. DHS CRCL is not a part of DHS OIG.

Therefore, DHS OIG's actions in referring *records* not only to ICE but also to CRCL was proper and any indication that DHS OIG should have also (1) referred the request to CRCL, and/or (2) conducted an independent search of CRCL's records is improper.

10

1

*Office of Investigations Searches*

2

37.     The Office of Investigations conducts investigations into allegations of

3

criminal, civil, and administrative misconduct involving DHS employees, contractors,

4

grantees, and programs.  These investigations can result in criminal prosecutions, fines,

5

civil monetary penalties, administrative sanctions, and personnel actions.  Additionally,

6

the Office of Investigations provides oversight and monitors the investigative activity of

7

DHS's various internal affairs offices.

8

38.     DHS OIG maintains complaint and investigation related files on paper and

9

in the electronic Enforcement Data System ("EDS"). Hard copies of records, if they

10

exist, may be stored and maintained within an employee's office, at the investigating

11

field office, and/or the DHS OIG Sensitive Compartmented Information Facility

12

("SCIF").

13

39.     EDS is the official DHS OIG electronic case management system for the

14

Office of Investigations.  DHS OIG uses EDS to manage and store information and

15

records relating to complaints and investigations of alleged criminal, civil, or

16

administrative violations by DHS employees, contractors, grantees, beneficiaries, and

17

other individuals and entities associated with DHS. OIG uses EDS to manage

18

investigations born from those complaints to facilitate the tracking of the investigations'

19

process.

20

40.     To gather records responsive to Plaintiff's FOIA request, the Office of

21

Investigations searched for records located in the electronic case management system,

22

EDS, with the following parameters:

23

      a.  Subpart 1 of the request sought: [a]ny and all documents, without limitation

24

          to date, including any communications, investigatory reports, and any and

25

          all exhibits, appendices, or attachments thereto, relating to the

26

          hospitalization, death, decision to release from custody, or release from

27

          custody of the following individuals: Teka Gulema; Johana Medina Leon;

28

11

Jose Ibarra Bucio; and/or Martin Vargas Arellano.  Based on the language of the request, itself, the names of the four individuals, Teka Gulema, Johana Medina Leon aka Jonathan Medina Leon, Jose Ibarra Bucio, and Martin Vargas Arellano, were searched in the narrative field, which is a free text field in the system that is intended to contain a summary of the allegation, as well as in the complainant/subject field of EDS.

1.     Moreover, the A Number for Martin Vargas Arellano, which was specifically requested and provided by the Plaintiff, was also searched in EDS.

2.     Because an investigation into the death of two of the individuals was conducted by DHS OIG's Office of Investigations – Teka Gulema and Jonathan Alberto Medina Leon – additional searches in the appropriate Office of Investigations Field Offices were completed, as detailed below.[4]

1. Additional Search for Teka Gulema:

   a. DHS OIG Office of the Chief Information Officer ("OCIO") E-mail Search of the case agent for Teka Gulema's investigation (Special Agent in the Atlanta Field Office)

      i. Date range of search: January 1, 2016 to December 31, 2018

      ii. Search Terms used:

---

[4] Based on Plaintiff's filed Motion for Summary Judgment, it does not appear that Plaintiff is challenging DHS OIG's search, in general. Rather, Plaintiff's search challenge appears to be limited to DHS OIG's search for records responsive to Martin Vargas Arellano. Because DHS OIG has an obligation to defend its search for responsive records, we are including the entire scope of our searches, with an additional explanation of the Martin Vargas Arellano search.

       1. "I16-ICE-ATL-17063[5]" AND "Teka Gulema"

       2. "17063" AND "Teka Gulema"

       3. "I16-ICE-ATL-17063" AND "Teka"

       4. "I16-ICE-ATL-17063" AND "Gulema"

  2. Additional Searches for Jonathan Alberto Medina Leon

    a. DHS OIG OCIO E-mail Search of the case agent for Jonathan Medina-Leon's investigation (Special Agent in the El Paso Field Office)

      i. Date range of search: June 1, 2019 to September 30, 2020[6]

      ii. Search Terms used:

       1. "I19-ICE ERO-ELP-16066[7]" AND "Jonathan Alberto Medina-Leon"

       2. "16066" AND "Jonathan Alberto Medina-Leon"

       3. "I19-ICE ERO-ELP-16066" AND "Johana Alberto Medina-Leon"

      iii. Custodian-Conducted Search – Special Agent in the El Paso Field Office

       1. Custodian searched their e-mails and their network drive for records responsive to the investigation pertaining to Jonathan Alberto Medina-Leon, I19-ICE ERO-ELP-16066

---

[5] This is the case number associated with Teka Gulema's investigation.

[6] This date range encompasses the initiation and conclusion of Jonathan Alberto Medina-Leon's investigation.

[7] This is the case number associated with Jonathan Alberto Medina-Leon's investigation.

        2.  Search Term used:

            a.  I19-ERO-ELP-16066

    iv.  Custodian-Completed Search – Special Agent-in-Charge in the El Paso Field Office

        1.  Custodian searched their e-mails and their network drive for records responsive to the investigation pertaining to Jonathan Alberto Medina-Leon, I19-ICE ERO-ELP-16066

        2.  Search Terms used:

            a.  I19-ERO-ELP-16066

            b.  16066

            c.  Search by individual's full name

            d.  Search by individual's last name

        3.  For the network drive search, an electronic folder for the investigation was maintained and searched.

3.  Because DHS OIG did not conduct an investigation into the deaths of Martin Vargas Arellano and Jose Ibarra Bucio, the Office of Investigations' electronic case management system, EDS, would house all relevant material pertaining to these two individuals.[8]

    a.  Specific to Mr. Vargas Arellano, in conducting a search of EDS for Mr. Vargas Arellano's name and A Number, DHS OIG located an Office of Investigations' case

---

[8] As noted above, Plaintiff's Motion for Summary Judgment challenges specific portions of DHS OIG's search, one of which is the search for records pertaining to Martin Vargas Arellano. DHS OIG is responding to this specific allegation in paragraphs 40 (a)(3)(a) and (b)(i-v).

summary report[9] that included a third-party correspondence letter from the National Qualified Representative Program ("NQRP") addressed to the Secretary of Homeland Security as an attachment.

b. All case summary reports include, among other things, a "Comments" field, a "Date Opened" field, a "Date Closed" field, a "Rcd Method" field – which relates to how the complaint was received by the DHS OIG – and a "Ref Cases" field.

    i. The "Comments" field of the case summary report located for Mr. Vargas Arellano is a direct and exact recitation of a portion of the third-party correspondence letter.

    ii. The "Rcd Method" field on this case summary report states "Public Website." This means that DHS OIG received this complaint/third-party correspondence from its public website, i.e., the Department of Homeland Security submitted this complaint/third-party correspondence through DHS OIG's Hotline on the public website. The complaint/third-party correspondence was not received via an email.

---

[9] Case summary reports are automatically generated by EDS when the system is searched, and records are retrieved for FOIA purposes. The case summary reports include information from the submitted complaint. In the case of Martin Vargas Arellano's case summary report, the third-party correspondence letter from NQRP was the "complaint" submitted via the public website, as noted in paragraph 40 (a)(3)(b)(ii). Thus, the information included in the produced case summary report was derived directly from the NQRP correspondence letter.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

iii.  The "Date Opened" on a case summary report is the first date that the complaint was reviewed – this does not indicate that an investigation was "opened" on this date. The "Date Closed" is the date on which the complaint was referred for consideration – this does not indicate that an investigation was "closed" on this date.

iv.  The "Ref Cases" field in this case summary report indicates numbers that are associated with this particular complaint. The first number identified refers to the DHS OIG complaint number associated with the case summary report. The second number identified is not a DHS OIG-generated number, thus there would conceivably be no reason to search for a DHS number in an OIG system. The final number, which begins with HLCN, is DHS OIG's internal tracking hotline number. It is used to track this complaint as a website submission. It is merely a serial number that ties directly to this particular complaint and case summary report. It does not reflect a case number for another, independent complaint or investigation.

v.  If there was an indication that additional, responsive records may be available, either for Mr. Vargas Arellano or Mr. Bucio, the FOIA Unit would have performed additional searches, as evidenced by the additional steps and searches the

16

FOIA Unit requested of the Office of Investigations' appropriate Field Offices and OCIO for records pertaining to Jonathan Alberto Medina Leon and Teka Gulema.

    b. For the remaining subparts of Plaintiff's FOIA request that were under DHS OIG's purview, DHS OIG conducted the following search.

        1.    A search of the Office of Investigations was conducted, and specifically, a search of EDS was conducted.[10]

            1. The date range searched in EDS was January 1, 2016 to present (the search of the Office of Investigations was initiated on September 1, 2022, which is the search cutoff date. Therefore, the timeframe was January 1, 2016 to September 1, 2022).

            2. Search Terms used in EDS:

                a. "**detainee**" and one of the following terms:

                    i. "death" or "died" or "hospitalized" or "hospital" or "emergency room" or "emergency services" or "poor outcome" or "life support" or "coma" or "unconscious" or "ventilator" or "intensive care" or "hospice" or "palliative" or "fatal"

                b. "**custody**" and one of the following terms:

---

[10] Typically for requests that do not seek a specific investigation or complaint by name or case number, the Office of Investigations will run a search in EDS using specific parameters to pull all complaints, investigations, and/or referrals that may be related to the specific topic of the FOIA request in the format of an Excel spreadsheet. Once the Office of Investigations has compiled the list of potentially responsive complaints, investigation, and/or referrals, the spreadsheet is forwarded to the FOIA Unit. The FOIA Unit will then further review the spreadsheet to determine what records are responsive to the FOIA request and request that the Office of Investigations pull those specific records for processing and production. For the present case, to ensure a comprehensive review was conducted, all complaints, investigations, and/or referrals and any associated attachments that were initially located based on the search parameters for Paragraph 31(b) were pulled and provided to the FOIA Unit for review and processing.

                i. "death" or "died" or "hospitalized" or "hospital" or "emergency room" or "emergency services" or "poor outcome" or "life support" or "coma" or "unconscious" or "ventilator" or "intensive care" or "hospice" or "palliative" or "fatal"

    c. **"detainee"** and **"release"** and one of the following terms:

                i. "medical" or "surgery" or "specialist" or "doctor"

    d. **"custody"** and **"release"** and one of the following terms:

                i. "medical" or "surgery" or "specialist" or "doctor"

    e. **"detainee"** and **"transfer"** and one of the following terms:

                i. "medical" or "surgery" or "specialist" or "doctor"

    f. **"custody"** and **"transfer"** and one of the following terms:

                i. "medical" or "surgery" or "specialist" or "doctor"

    g. **"detainee"** and **"parole"** and one of the following terms:

                i. "medical" or "surgery" or "specialist" or "doctor"

    h. **"custody"** and **"parole"** and one of the following terms:

                i. "medical" or "surgery" or "specialist" or "doctor"

    i. **"detainee"** and **"alternative detention"** and one of the following terms:

                i. "medical" or "surgery" or "specialist" or "doctor"

    j. **"custody"** and **"alternative detention"** and one of the following terms:

                i. "medical" or "surgery" or "specialist" or "doctor"

41. As a result of the above searches, a total of 7,402 pages of records was located.

18

42.     On November 23, 2022, DHS OIG issued its first interim response to the Plaintiff. In that response and corresponding production, the FOIA Unit reviewed 701 pages of records. Of the 701 pages, 4 pages were released in full; 117 pages were released in part; 127 pages were duplicates; 233 pages were referred to the U.S. Department of Justice, Executive Office for United States Attorney for processing and direct response; and 220 pages were referred to the U.S. Immigration and Customs Enforcement for processing and direct response.

43.     On December 21, 2022, DHS OIG issued its second interim response to the Plaintiff. In that response and corresponding production, the FOIA Unit processed 653 pages of records. Of the 653 pages, 60 pages were released in full; 128 pages were released in part; 185 pages were referred to the U.S. Department of Justice, Executive Office for United States Attorney for processing and direct response; and 280 pages were referred to the U.S. Immigration and Customs Enforcement for processing and direct response.

44.     On January 30, 2023, DHS OIG issued its third interim response to the Plaintiff. In that response and corresponding production, the FOIA Unit reviewed 1,078 pages of records. Of the 1,078 pages, 5 pages were released in full; 1 page was released in part; and 1,072 pages were non-responsive.

45.     On February 27, 2023, DHS OIG issued its fourth interim response to the Plaintiff. In that response, the FOIA Unit reviewed 1,140 pages of records. Based on the review, none of the records were determined to be responsive to Plaintiff's request.

46.     On March 30, 2023, DHS OIG issued its fifth interim response to the Plaintiff. In that response and corresponding production, DHS OIG indicated that the FOIA Unit reviewed 1,005 pages of records. Of the 1,005 pages, 10 pages were released in full; 44 pages were released in part; 113 pages were withheld in full; 736 pages were non-responsive; 61 pages were duplicates; 9 pages were referred to the U.S. Immigration

and Customs Enforcement for processing and direct response; and 32 pages were referred to the U.S. Customs and Border Protection for processing and direct response.[11]

47. On June 29, 2023, DHS OIG issued its sixth interim (first supplemental) response to the Plaintiff. In that response and corresponding production, DHS OIG indicated that the FOIA Unit reviewed 1,307 pages of records. Of the 1,307 pages, 48 pages were released in full; 74 pages were released in part; 74 pages were withheld in full; 17 pages were non-responsive; 757 pages were duplicates; 328 pages were referred to the U.S. Immigration and Customs Enforcement for processing and direct response; 1 page was referred to the DHS Office for Civil Rights and Civil Liberties for processing and direct response; and 8 pages were sent to the DHS Privacy Office on a consultation.

48. On July 31, 2023, DHS OIG issued its seventh interim (second supplemental) response to the Plaintiff. In that response and corresponding production, DHS OIG indicated that the FOIA Unit reviewed 1,518 pages of records. Of the 1,518 pages, 91 pages were released in part; 180 pages were withheld in full; 20 pages were non-responsive; 644 pages were duplicates; and 583 pages were referred to U.S. Immigration and Customs Enforcement for processing and direct response.

49. On August 2, 2023, DHS OIG issued its final (supplemental) response to the Plaintiff. In that response and corresponding production, the FOIA Unit reviewed 11 pages of records. Of the 11 pages, 6 pages were released in full, and 5 pages were released in part.[12]

---

[11] Pursuant to continuous reviews of the records and other related information during the course of this litigation, it was determined that the 32 pages of records referred to the U.S. Customs and Border Protection (CBP) were not responsive to Plaintiff's request. DHS OIG issued a supplemental response letter, dated February 2, 2024, to Plaintiff, explaining that coordination with CBP and continued review of the records assisted in the determination that the records were not responsive.

[12] These 11 pages were comprised of the 8 pages that were previously sent to the DHS Privacy Office for consultation and 3 pages that were required to be re-processed as an incorrect FOIA Exemption was applied to some of the redactions.

50.     Following the conclusion of all productions by DHS OIG, and in an attempt to narrow any outstanding issues, and pursuant to the Court's December 21, 2023 Order [Dkt. 64], DHS OIG sent a search summary to Plaintiff on January 19, 2024. The search summary provided an overview of DHS OIG's search, which included a description of the program office searched, specifications of the custodians searched, search terms used, and the date range for the records, where applicable (if no date range was specified, the date range was January 1, 2016 to September 1, 2022). In addition to this search summary, DHS OIG, in accordance with the Court's December 21, 2023 Order [Dkt. 64], provided on February 9, 2024, a *Vaughn* Index to Plaintiff describing and explaining (1) the information withheld pursuant to the appropriate FOIA Exemption(s), and (2) the rationale for the application of each FOIA Exemption.

51.     Unfortunately, despite several back-and-forth correspondences, to include correspondence prior to and after DHS OIG completed (1) its productions of responsive records, (2) the search summary, and (3) the *Vaughn* Index, the parties were unable to come to a complete resolution over the adequacy of DHS OIG's search and applied FOIA exemptions.

52.     In addition to the above explanation of the searches conducted by DHS OIG, the basis under which challenged information has been withheld in DHS OIG's interim responses is found in the following paragraphs.

## V.   EXPLANATION OF FOIA EXEMPTION WITHHOLDINGS AND REFERRAL OF RECORDS TO ICE[13]

### Exemption 5

53.     Exemption 5 of the FOIA protects "inter-agency or intra-agency memorandum or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).  Exemption 5 incorporates

---

[13] DHS OIG's *Vaughn* Index should be read in tandem with this declaration to ensure a complete understanding of the exemptions applied and the reasoning, rationale, and support for such withholdings.

21

three privileges: Deliberative Process, Attorney-Work Product, and Attorney-Client Privilege.

54.     As a threshold matter, in order to withhold records or information from release pursuant to Exemption 5 of the FOIA, they must be inter- or intra-agency records.  Here, DHS OIG invoked the deliberative process privilege of Exemption 5 for the Office of Investigations' draft Memorandums of Activity (MOAs) from two DHS OIG Reports of Investigation (ROIs).

55.     Deliberative process privilege "covers recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency."  *See Coastal States Gas Corp. v. DOE*, 617 F.2d 854, 867 (D.C. Cir. 1980).

56.     Three policy purposes have been held to constitute the basis for the deliberative process privilege: "(1) to encourage open, frank discussions on matters of policy between subordinates and superiors; (2) to protect against premature disclosure of proposed policies before they are actually adopted; and (3) to protect against public confusion that might result from disclosure of reasons and rationales that were not in fact ultimately the grounds for an agency's action."[14]

57.     Courts have established two requirements for the deliberative process privilege: 1) the communication must be pre-decisional, and 2) the communication must be deliberative.  *See Mapother v. Dep't of Just.*, 3 F.3d 1533, 1537 (D.C. Cir. 1993).

58.     DHS OIG withheld in full under Exemption 5[15] draft MOAs from two ROIs pertaining to the investigations into the death of Jonathan Alberto Medina Leon and Teka Gulema. These drafts reflect unsigned versions of MOAs some of which contain

---

[14] *McCann v. U.S. Dep't of Health & Hum. Servs.*, 828 F. Supp. 2d 317, 321 (D.D.C. 2011); *see Coastal States*, 617 F.2d at 866; *CREW v. Dep't of Homeland Sec.*, 648 F. Supp. 2d 152, 156 (D.D.C. 2009); *FPL Grp. Inc. v. IRS*, 698 F. Supp. 2d 66, 81 (D.D.C. 2010).

[15] Additional FOIA Exemptions, as necessary, were also applied to these drafts. If challenged by Plaintiff, DHS OIG is addressing these other FOIA Exemptions in this declaration and accompanying *Vaughn* Index.

22

redline edits and internal comments. Moreover, the final versions of these drafts have already been provided to the Plaintiff, as noted in the *Vaughn* Index. The content within these drafts reflects an integral part of DHS OIG's Office of Investigations' process of reviewing, analyzing, and determining what, if any, criminal, civil, or administrative misconduct has occurred.

59.     In reviewing the records, DHS OIG considered the foreseeable harm standard.  *See* 5 U.S.C. § 552(a)(8)(A)(i)(I).  The release of the agency's draft MOAs would cause harm to the agency's deliberative process and the quality of its decisions. Release of these drafts would result in a chilling effect on interactions and communications between agency employees, and specifically in this case, a case agent and supervising or reviewing agent. If employees are aware that their internal communications, pre-decisional thoughts, and edited drafts may be released to the public, it will reduce the free exchange of ideas and the confidence that is necessary for open dialogue about draft language or a particular finding in the investigation.

60.     Moreover, draft documents go through a series of reviews which may require multiple versions. If the final version differs from the draft version, it could confuse the public as to how and/or why one version says one thing while the final says something different, and it may lead to questions regarding the internal process of determining how decisions are made not only in regards to the language of a draft, but also whether a finding of a violation is supported, and how questions are answered.

61.     Drafts are necessary and important for ensuring the final product is accurate and appropriate, and disclosing drafts inhibits an agency from freely having open discussions and making decisions for fear that their recommendations will be disclosed, scrutinized, or questioned prior to finalization.

62.     Along with recommendations and analysis, the drafts that were withheld in full contain factual information; however, it would be unreasonable for DHS OIG to segregate the factual information from the draft MOAs.

63.     First, the factual information used by the DHS OIG Special Agent/Investigator assisted with the development of recommendations to the agency decisionmaker as to whether criminal, civil, or administrative wrongdoing was found as part of the investigation. Second, the information included in the draft MOAs derives from interviews of various witnesses and the collection of information, data sets, and documents from ICE as well as any other appropriate party. The selection of facts to include in the MOA is, itself, deliberative in nature. In general, when conducting an investigation, DHS OIG receives a large amount of information not only in the way of data sets and documents but also during interviews of witnesses. It is incumbent on the Special Agent/Investigator involved in the investigation and drafting the report to determine what information, including facts, should be made part of the report to ensure the decisionmaker is fully informed on the investigation in order to agree or disagree on the recommendations provided.

64.     Withholding the drafts, in full, was appropriate because disclosing them would foreseeably harm the deliberative process privilege Exemption 5 seeks to protect.

### Exemptions 6 and 7(C)

65.     Exemption 6 allows the withholding of information from disclosure that would constitute "a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 7(C) protects from public disclosure "records or information complied for a law enforcement purpose… [if disclosure] could be reasonably be expected to cause an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).

*Threshold for Exemption 7(C)*

66.     Among the various Offices within DHS OIG is the Office of Investigations. As referenced above, the Office of Investigations investigates allegations of criminal, civil, and administrative misconduct involving DHS employees, contractors, grantees, and programs. These investigations can result in criminal prosecutions, fines, civil

monetary penalties, administrative sanctions, and personnel actions. DHS OIG has statutory law enforcement authority[16], and OIG investigators have the power to make arrests, execute warrants, and carry firearms.[17] Based on the nature of work that DHS OIG conducts DHS OIG routinely uses Exemptions 6 and 7(C) in concert.

67.     When determining whether to withhold information pursuant to Exemption 7(C), DHS OIG first assessed whether the records were compiled for a law enforcement purpose.  The records at issue here are ROIs, the MOAs included therein, e-mails pertaining to the investigations, a Question-and-Answer record pertaining to the investigation, and case summary reports pertaining to the subjects of the investigations. These records all reflect and relate to law enforcement investigations conducted by Special Agents to determine what, if any, misconduct occurred that resulted in the death of two individuals. The records also include investigatory material that was provided to DHS OIG by either ICE or another third party as part of the investigation. Therefore, it was determined that the records were compiled for a law enforcement purpose. As a result, Exemption 7(C) was applied in tandem with Exemption 6.

*Analysis for the Application of Exemptions 6 and 7(C)*

68.     When determining whether to withhold information under both Exemptions 6 and 7(C), DHS OIG assessed whether the personal privacy information of the individuals involved had a substantial privacy interest that would outweigh any public interest in disclosure.  As discussed in DHS OIG's *Vaughn* Index, in reviewing the responsive records, DHS OIG determined that the deceased individuals' personal privacy information pertaining to their health and medical diagnoses as well as their immigration-related history and case information was substantial.  To support the

---

[16] *See* Homeland Security of 2002, Pub. L. No. 107-296, §812, 116 Stat. 2135, as amended; Inspector General Act of 1978, Pub. L. No. 95-452, §6, Oct. 12, 1978, 92 State. 1104, as amended.

[17] *See* https://www.oig.dhs.gov/about/faqs. (This information is found under the "What type of work does the Office of Investigations conduct?" tab.)

redaction of this privacy information, DHS OIG balanced the privacy interest of these individuals with any FOIA public interest.

69.    "Substantial privacy interests cognizable under the FOIA are generally found to exist in personal identifiable information as a person's name, physical address, email address, image, computer user ID, phone number, date of birth, criminal history, medical history, and social security number."[18]

70.    In order to constitute a FOIA public interest, the information must shed light on the workings of the government in the performance of its statutory duties and and/or mission and any non-disclosure must outweigh the FOIA public interest.[19]

71.    Personal privacy information withheld under Exemptions 6 and 7(C) in DHS OIG's productions included, but was not limited to, sensitive medical and health diagnoses, sensitive medical testing, and personal immigration history[20] of the deceased.

72.    In conducting its analysis under the FOIA, it was determined that the release of this personal privacy information of these deceased individuals would cause a clearly unwarranted invasion of their personal privacy.  As stated, the records released in DHS OIG's productions included records from the Office of Investigations, such as ROIs, case summary reports, emails, and Q&As. The sensitive medical information pertaining to the deceased individuals and the personal immigration history of these deceased individuals was withheld.  Specifically, as discussed in DHS OIG's *Vaughn* Index, disclosure of medical, health, or personal immigration information for these

---

[18] *Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 600 (1982).

[19] *McGegee v. DOJ*, 800 F. Supp. 2d 220, 234 (D.D.C. 2011) ("the relevant question is not whether the public would like to know the names of FBI agents and victims involved, but whether knowing those names would shed light on the FBI's performance of its statutory duties.")

[20] Pursuant to Exemptions 6 and 7(C), the personal immigration history is also withheld in compliance with a DHS immigration regulation that requires this information be protected from disclosure. DHS OIG is not permitted to disclose the specific regulation as disclosure of it would also be a violation in this context.

deceased individuals[21] may reignite undue public attention, embarrassment, harassment, and derogatory inferences and suspicion regarding the decedent which could potentially impact the decedent's family, kin, or related individuals in a negative manner. Although the personal privacy information protected in these records pertain to individuals that are deceased, that does not mean their privacy interest is completely extinguished. There may be a diminishment to some extent, but there remains a substantial privacy interest that must be balanced against the public interest.[22]

73.     An individual's sensitive medical history, sensitive medical diagnosis, and personal immigration history outweighs any public interest. This personal privacy information protected does not reveal DHS OIG's techniques in conducting investigations, nor does it offer insight into how DHS OIG determines when to open an investigation stemming from a complaint, nor does it provide information pertaining to any standards that must be followed to initiate and conduct investigations into wrongdoing, or initiate and conduct audits, inspections, or evaluations of DHS component programs or activities. The withholding of sensitive medical, health, and personal immigration information does not thwart an understanding of the released records in any way, and it does not inform or shed any additional light on the agency's activities. The information released by DHS OIG more than accomplishes the goal of responding to the FOIA request by releasing non-exempt information that explains the details of the investigations and the agency's actions throughout.  Releasing this personal

---

[21] These individuals were previously the subject of public attention.

[22] *See Schrecker v. DOJ*, 254 F.3d 162, 166 (D.C. Cir. 2001) ("one's own and one's relations' interests in privacy ordinarily extend beyond one's death"), remanded, 217 F. Supp. 2d 29 (D.D.C. 2002) (continuing to find that "[d]eath does not extinguish a privacy interest but it does affect the weight accorded the privacy interest"), aff'd, 349 F.3d 657, 665 (D.C. Cir. 2003).

privacy information would do nothing more than invade the subjects' and potentially the subjects' families' personal privacy interests.[23]

74.     Furthermore, although certain information pertaining to the subjects of the investigation may already be in the public domain, such information was not released by DHS OIG. If another agency component makes a discretionary determination to release information in its own records that it believes requires disclosure, that does not waive DHS OIG's obligations to withhold information in its own records that is properly exempt from disclosure.[24] Because the subjects' privacy interest, as explained above, outweighs the public's interest, this personal privacy information was properly withheld.

75.     Lastly, releasing this personal privacy information does nothing to increase the public's knowledge of the duties performed by DHS OIG. In general, this personal privacy information may touch on ICE's activities regarding detention, but DHS OIG is not ICE, and neither our mission nor our duties are the same. This information does not shed light on how DHS OIG conducted its law enforcement investigation into the subject's death. Any claim that some of this information is already well-known only supports DHS OIG's position that releasing it does not, in any way, increase the public's knowledge of DHS OIG's activities.

## Referral Records

76.     In addition to challenging the application of Exemption 5 and Exemptions 6 and 7(C) to certain information in the records, Plaintiff also claims that DHS OIG's referral of records, specifically to ICE, is an improper or unlawful withholding.

---

[23] One action that may have been considered by DHS OIG in determining the protection or disclosure of personal privacy information would have been the provision of documentation from the Plaintiff, executed by the family members or next of kin of the deceased individuals, permitting DHS OIG to disclose personal privacy information of the deceased to specified third parties. Plaintiff, however, did no such actions.

[24] *See Frugone v. CIA*, 169 F.3d 772, 774 (D.C. Cir. 1999) (stating that to be an official disclosure, the release of information must be made by "the agency from which the information is being sought.")

77.     As referenced above, in various interim response letters, DHS OIG stated that records were referred to the U.S. Immigration and Customs Enforcement, the U.S. Department of Justice, Executive Office for United States Attorneys, and the DHS Office for Civil Rights and Civil Liberties.[25]

78.     Pursuant to Section 5.4 of the DHS FOIA Regulations, "[w]hen a component determines that it maintains responsive records that either originated with another component or agency, or which contains information provided by, or of substantial interest to, another component or agency, then it *shall* proceed in accordance with either paragraph (d)(1), (2), or (3) of this section, as appropriate: (3) [t]he component may refer the responsibility for responding to the request or portion of the request to the component or agency best able to determine whether to disclose the relevant records, or to the agency that created or initially acquired the record as long as that agency is subject to the FOIA. *Ordinarily, the component or agency that created or initially acquired the record will be presumed to be best able to make the disclosure determination*. The referring component shall document the referral and maintain a copy of the records that it refers" (emphasis added). 6 C.F.R. §5.4(d)(3).

79.     Additionally, the U.S. Department of Justice's Office of Information Policy (OIP), which encourages and oversees federal agency compliance with the FOIA, specifically states that, "[w]hen an agency locates records that originated with another agency or component, as a matter of sound administrative practice, it should ordinarily refer those records to their originating agency so that the originating agency can make a direct response to the requester on those records."[26]

---

[25] *See* footnote 13 regarding the referral records to CBP.

[26] Department of Justice Guide to the Freedom of Information Act, Procedural Requirements, referencing OIP Guidance: Referrals, Consultations, and Coordination: Procedures for Processing Records When Another Agency or Entity Has an Interest in Them (posted December 5, 2011), https://www.justice.gov/oip/page/file/1199421/dl?inline.

80.     Under the Inspector General Act of 1978, as amended,[27] DHS OIG is responsible for conducting and supervising independent and objective audits, inspections, and investigations of programs and operations of DHS. DHS OIG promotes economy, efficiency, and effectiveness within DHS and prevents and detects employee corruption, fraud, waste, and abuse in its programs and operations. In satisfying the conduction and completion of this important work, during the course of investigations, audits, or inspections, DHS OIG requests from the relevant DHS component documents, data sets, interviews of relevant witnesses, etc. which assist with DHS OIG's review, analysis, and findings. The information received by DHS OIG for an investigation, for example, is not created by DHS OIG. It is simply used and referenced by DHS OIG to assist with the investigative process and outcome.

81.     Based on this supply of records by the various DHS components who may assist with a DHS OIG investigation, when a FOIA request is submitted to DHS OIG, it is rather common that many of the records that may be responsive to said FOIA request are not DHS OIG's.  For instance, if DHS OIG conducts an inspection of an ICE detention facility, DHS OIG would necessarily need ICE to provide the requisite documents about the facility. DHS OIG would not already be in possession of any documents about a particular ICE detention facility.

82.     In responding to this example FOIA request, DHS OIG would conduct a search in the Office of Inspections and Evaluations; obtain any potentially responsive records; review and process any responsive records that are DHS OIG's; consult any appropriate DHS component or other federal agency if the other agency has an interest in the records; and refer any records that originated with another DHS component or federal agency.

83.     These are the exact steps DHS OIG took in the present lawsuit. The records that were referred to ICE were properly sent in accordance with the DHS FOIA

---

[27] 5 U.S.C. App. 3.

Regulations and OIP's guidance. The records were initially created by ICE and provided to DHS OIG to assist with investigations that took place several years ago. There was no indication during our review of the records that ICE relinquished or intended to relinquish any control over the use and disclosure of the records to DHS OIG.

84.     Also, in accordance with the DHS FOIA Regulations, DHS OIG notified Plaintiff of the referral of records and provided the contact information for ICE for this referral.

85.     Here, ICE has already completed the processing and production of the referred records.

86.     Moreover, Plaintiff submitted the exact same FOIA request to DHS OIG and ICE; it is possible that Plaintiff already received these records as part of ICE's initial search for and production of responsive records.[28]

## VI.   SEGREGABILITY

87.     5 U.S.C. § 552(b) requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt."

88.     A line-by-line review was conducted to identify information exempt from disclosure or for which a discretionary waiver of exemption could be applied.

89.     With respect to the records that were released, all information not exempted from disclosure pursuant to the FOIA Exemptions specified above was correctly segregated and non-exempt portions were released.  DHS OIG did not withhold any non-exempt information on the grounds that it was non-segregable.

---

[28] It should be noted that if DHS OIG is ordered to produce the records instead of ICE, DHS OIG would be required to consult ICE as DHS OIG does not have specific knowledge of the contents of the records. DHS OIG would need ICE to opine on what may or may not be released. This action would take additional time. Thus, the most efficient way of getting the records to Plaintiff is for DHS OIG to refer the records to ICE (which has already happened) and for ICE to review, redact, and produce them (which they have already completed).

90.    Accordingly, DHS OIG released all reasonably segregable portions of records responsive to Plaintiff's request.

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge and belief.  Signed this __9th__ day of April 2024.


_____
Okechi Chigewe
Supervisory Government Information Specialist
Information Law and Disclosure Division, FOIA Division
U.S. Department of Homeland Security
Office of Inspector General