1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                         CENTRAL DISTRICT OF CALIFORNIA

10

11    AMERICAN CIVIL LIBERTIES           Case No: 2:22-CV-04760-SHK

12    UNION FOUNDATION OF

13    SOUTHERN CALIFORNIA,

14                          Plaintiff,

15          v.                           **ORDER ON PARTIES' CROSS
                                         MOTIONS FOR SUMMARY**
16    UNITED STATES IMMIGRATION          **JUDGMENT**

17    AND CUSTOMS ENFORCEMENT, et

18    al.,

19                          Defendants.

20    _____

21                    **I.      INTRODUCTION**

22          Plaintiff American Civil Liberties Union Foundation of Southern California

23    ("ACLU SoCal" or "Plaintiff") and Defendants United States Department of

24    Homeland Security ("DHS"), DHS's Office of Inspector General ("DHS OIG"),

25    and United States Immigration and Customs Enforcement ("ICE") (collectively,

26    "Defendants") cross move for summary judgment[1] on the sufficiency of

27    _____

28    [1] Plaintiff moves for summary judgment only as to Defendants DHS and DHS OIG, and
      excludes Defendant ICE.

Defendants' search and the proprietary of Defendants' withholding of certain documents in response to Plaintiff's Freedom of Information Act ("FOIA") requests ("Requests").  The Requests, generally, sought documents related to ICE's alleged practice of releasing from its custody hospitalized, detained immigrants who were likely to pass away while in custody.  Plaintiff seeks these documents to shed light on whether Defendants failed to adequately report the number of detained migrants who have died while in ICE custody.

After careful review of the parties' cross motions for summary judgment ("MSJ"), Electronic Case Filing Numbers ("ECF Nos.") 66, Pl.'s Not. of Mot. and Mot. for Summary Judgement Against Defs. Dept. of Homeland Security  and Dept. of Homeland Security – Office of Inspector General ("Plaintiff's MSJ" or "Pl.'s MSJ"); ECF No. 79, Defs.' Notice of Mot. and Mot. for Summary Judgment and Opp'n to Pl.'s Mot. for Summary Judgment ("Defendants' MSJ" or "Defs.' MSJ"), the Court: (1) **DENIES** the parties' MSJs on Defendants' withholding of documents under FOIA Exemption 5 and **ORDERS** Defendants to submit the withheld documents for in camera inspection; (2) **GRANTS** Plaintiff's Summary Judgment in favor of Plaintiff on the withholding of documents under Exemptions 6 and 7(C); (3) **GRANTS** Plaintiff's Summary Judgment in favor of Plaintiff on the issue of the adequacy of Defendants' search; and (4) **GRANTS** Defendants' Summary Judgment in favor of Defendants on the issue of DHS's referral of certain documents to ICE.

## II.    BACKGROUND

### A.    <u>Procedural History</u>

On April 29, 2022, Plaintiff submitted its FOIA Request to ICE, DHS OIG, and DHS's Privacy Office.  ECF No. 24-1, First Amended Complaint ("FAC") Exh. A.  On July 12, 2022, Plaintiff initially filed the complaint ("Complaint") in this matter against ICE and DHS, ECF No. 1, Compl., but on October 4, 2022, Plaintiff filed their FAC, adding DHS OIG as a defendant.  ECF No. 24, FAC.

Defendants DHS and DHS OIG completed production of documents in August 2023, ECF No. 79, Defs.' MSJ at 17,[2] and Defendants DHS OIG provided Plaintiff with its *Vaughn* indices on January 19, 2024, and February 9, 2024, respectively. Id.

On February 23, 2024, Plaintiff filed its MSJ, ECF No. 66,[3] along with Plaintiff's Statement of Uncontroverted Facts, ECF No. 66-1, Declaration of Eunice Cho in support of Plaintiff's MSJ ("Cho Declaration" or "Cho Decl."), ECF No. 66-3, and Declaration of Laboni Hoq ("Hoq Declaration" or "Hoq Decl."), ECF No. 66-8.

On April 10, 2024, Defendants filed their MSJ and Opposition to Plaintiff's MSJ, ECF No. 79, along with Defendants' Statement of Uncontroverted Facts, ECF No. 79-1, Defendants' Response to Plaintiff's Statement of Uncontroverted Facts, ECF No. 77-2, DHS OIG *Vaughn* Index ("Amended *Vaughn* Index"), ECF No. 77-3, Declaration of Okechi Chigewe ("Chigewe Declaration" or "Chigewe Decl."), ECF No. 79-4, Declaration of Catrina M. Pavlik-Keenan ("Pavlik-Keenan Declaration" or "Pavlik-Keenan Decl."), ECF No. 79-5, and Declaration of Fernando Pineiro ("Pineiro Declaration" or "Pineiro Decl."),), ECF No. 79-9.

On May 1, 2024, Plaintiff filed its Reply in support of Plaintiff's MSJ ("Plaintiff's MSJ Reply"), ECF No. 80, along with Plaintiff's Statement of Genuine Disputes of Material Fact in Response to Defendants' MSJ, ECF No. 80-1, and Plaintiff's Response to Statement of Genuine Disputes of Material Fact in support of Plaintiff's MSJ ("Plaintiff's SUMF"), ECF No. 80-2.  On May 15, 2024, Defendants filed its Reply in support of Defendants' MSJ ("Defendants' MSJ

---

[2] All citations to the parties' motions for summary judgment are to the ECF-stamped page numbers.

[3] On February 28, 2024, Plaintiff filed an amended MSJ that complied with the word limitations of the United States District Court, Central District of California Local Rules ("Local Rule" or "L.R.").  ECF No. 67.

Reply"), ECF No. 81, along with a Response to the Statement of Genuine Disputes of Material Fact ("Defendants' SUMF"), ECF No. 82.

### B. **FOIA Request**

#### 1. **Nature of the FOIA Request**

On April 29, 2022, Plaintiff submitted its FOIA Request to ICE, DHS OIG, and DHS's Privacy Office, seeking, generally:

> any and all records that were prepared, received, transmitted, collected, and/or maintained by [ICE] or [DHS] that describe, refer, or relate to the release of hospitalized detainees from custody prior to their death; any records related to release of individual detainees once hospitalized; and any records related to the death of such detainees after their release from custody, including any communications or investigations.

ECF No. 24-1, FAC Exh. A at 2-3. Plaintiff sought records dating from January 1, 2016 to April 29, 2022. Id. at 3.

In particular, the Request sought the following categories of records:

> (1) documents related to the hospitalization, death, and release from custody of Teka Gulema [("Gulema")], Johana Medina Leon [("Medina Leon")], Jose Ibarra Bucio [("Ibarra Bucio")], and Martin Vargas Arellano [("Vargas Arellano")]; (2) DHS[]OIG reports of investigation regarding these four individuals, including 'exhibits, appendices, or attachments"; (3) ICE Office of Professional Responsibility (["]OPR["]) investigations regarding these four individuals; (4) ICE and ICE Health Corps directives, policies, and procedures regarding the release from custody of hospitalized detainees; (5) records in possession of specific ICE offices identifying hospitalized detainees released from custody; (6) documents created by DHS[]OIG or OPR that mention ICE's release of hospitalized detainees; (7) documents created by DHS[]OIG or OPR mentioning the death of detainees previously released by ICE while hospitalized; (8) documents identifying detainees who were hospitalized due to COVID-19 and were subsequently released from custody while hospitalized; and (9) financial records reflecting payments for healthcare of detainees released from ICE custody while hospitalized.

ECF No. 80-2, Pl.'s SUMF at ¶ 2.

4

**2.      Defendants' Search and Production of Responsive Records**

"DHS has a decentralized system for responding to FOIA requests, with each component designating a FOIA office to process records from that component." 6 C.F.R. § 5.3(a)(1). "To make a request for DHS records, a requestor should write directly to the FOIA office of the component that maintains the records sought." Id. Alternatively, "[a] requestor may send their request to the Privacy Office . . . for any of the Headquarter Offices of [DHS]" listed in the regulations. 6 C.F.R. § 5.3(a)(2). "[I]f the requestor does not know which DHS component may maintain responsive records to a request, the requestor may explicitly ask for assistance from the DHS Privacy Office with identifying the proper component[.]" Id. Upon such a request, "the Privacy Office will forward the request to the DHS component(s) that it determines to be most likely, as of the date of the request for information, to maintain the records that are sought." Id.

Further, "[w]here a component's FOIA office determines that a request was misdirected within DHS, the receiving component's FOIA Office . . . shall route the request to the FOIA office of the proper component(s) for processing." 6 C.F.R. § 5.4(c). "When a component determines that it maintains responsive records that either originated with another component or agency, or which contains information provided by, or of substantial interest to, another component or agency, then it shall proceed in accordance" with the procedures laid out in the DHS regulations. 6 C.F.R. § 5.4(d).

"DHS's Privacy Office reviewed the FOIA Request, and in accordance with DHS regulations, determined that ICE and DHS OIG were the DHS components 'most likely' to maintain responsive records." ECF No. 82, Defs.' SUMF at ¶ 4. On May 18, 2022, DHS's Privacy Office responded to Plaintiff's Request, acknowledging receipt of the request and informing Plaintiff the following:

> Upon review [of] your request, our office has determined that the records sought, should they exist, would not be under the purview of the DHS Privacy Office. Any responsive records would be held by

5

> the DHS [OIG] and/or [ICE].  As you have already submitted your request to the aforementioned offices, we are closing your Privacy Office request and will defer to the OIG and ICE's response(s).

ECF No. 79-6, Pavlik-Keenan Decl., Exh. 1 at 2.

"Based on the FOIA Unit's knowledge of the DHS FOIA Regulations and the various program offices' missions, it was determined that the DHS OIG Office of Investigations may be in possession of potentially responsive records that fall under OIG's purview."  ECF No. 82, Defs.' SUMF at ¶ 10.  "As investigatory reports, Reports of Investigations, and other similar records sought in the [R]equest would have been created by the Office of Investigations, a search tasking was sent on September 1, 2022" to the Office of Investigations.  Id. at ¶ 11.

> The Office of Investigations conducts investigations into allegations of criminal, civil, and administrative misconduct involving DHS employees, contractors, grantees, and programs.  These investigations can result in criminal prosecutions, fines, civil monetary penalties, administrative sanctions, and personnel actions.  Additionally, the Office of Investigations provides oversight and monitors the investigatory activity of DHS's various internal affairs offices.

Id.

"To gather records responsive to Plaintiff's FOIA [R]equest, the Office of Investigations searched for records located in the electronic case management system, [Enforcement Data System] [("]EDS["]) with parameters fully described in the [Chigewe] Declaration[.]"  Id. at ¶ 12.  As a result of those searches, "a total of 7,402 pages of records w[ere] located."  Id. at ¶ 13.

"DHS OIG began its first production of FOIA documents on November 23, 2022, and made its final production on August 2, 2023."  ECF No. 80-2, Pl.'s SUMF at ¶ 9.[4]  "In total, DHS-OIG produced 1[3]3 pages of records in full."  Id. at ¶ 10.  DHS OIG also referred certain documents to the U.S. Department of Justice,

---

[4] The Court has reviewed Plaintiff's SUMF, ECF No. 80-2, including Defendants' responses and Plaintiff's replies to disputed facts, and finds that the nature of the disputed facts are either corrections to typographical errors or recitations of procedures, and thus immaterial to the adjudication of the cross motions for summary judgment.

1    Executive Office for United States Attorney ("EOUSA"), ICE, U.S. Customs and

2    Border Patrol ("CBP"), and DHS Office for Civil Rights and Civil liberties

3    ("CRCL") "for processing and direct response."  See ECF No. 82, Defs.' SUMF at

4    ¶¶ 15-23.  Defendants "withheld 460 pages in part, and 367 in full."  ECF No. 80-

5    2. Pl.'s SUMF at ¶ 10.

6                    **3.     Challenged Withholdings and Alleged Search Inadequacies**

7         Plaintiff challenges the following withholdings and redactions in DHS

8    OIG's redactions:

9    • "Withholding of draft Reports of Investigation ("ROI") and
     Memoranda of Activity ("MOA") regarding the deaths of [Gulema]
10       and [Medina Leon]" based on FOIA Exemption 5, ECF No. 66, Pl.'s
     MSJ at 16-17;
11
12   • "Redaction of DHS OIG's ROIs and draft media statements related to
     Medina Leon's death, including diagnostic questions and medical
13       tests by ICE detention medical staff prior to her release from custody,
     and the cause of death listed on her death certificate" based on
14       Exemptions 6 and 7(C), id. at 17;
15   • Redactions, based on Exemptions 6 and 7(C), of information in
     "DHS[]OIG ROIs and MOAs, which ICE describes as 'immigration
16       information' related to [Gulema] and [Medina Leon][,]" and appear to
     relate to "statements made by ICE officers assigned to Medina Leon
17       regarding ICE's decision to release her from custody, information
     related to Medina Leon's entry to the United States, and ICE's
18       attempts to obtain travel documents to deport Gulema[,]" id.;
19
20   • "Withholding of documents reviewed by DHS[]OIG in its
     investigations, including attachments to MOAs and ROIs, which
21       DHS[]OIG referred to ICE for production[,]" and which "include
     records[,] documents[,] and emails regarding Gulema's release from
22       custody dated after October 1, 2015[,]" id.
23

24        Plaintiff also "challenges DHS OIG's failure to search for records related to

25   a [c]ase [s]ummary [r]eport it produced related to Mr. Vargas Arellano."  Id. at 18.

26   Plaintiff also contends DHS failed to conduct searches in other components despite

27   Plaintiff identifying records showing that additional searches were warranted.  Id.

28

                                                    7

1

### III.   STANDARD OF REVIEW

2      FOIA's core purpose is to inform citizens about "what their government is
3  up to." DOJ v. Reporters Comm. For Freedom of Press, 489 U.S. 749, 773 (1989).
4  FOIA "ensure[s] an informed citizenry, vital to the functioning of a democratic
5  society, needed to check against corruption and to hold the governors accountable
6  to the governed." John Doe Agency v. John Doe Corp., 493 U.S. 146, 152 (1989).
7      "In response to a FOIA request, government agencies must conduct a
8  reasonable search to find documents responsive to the request." Hamdan v. DOJ,
9  797 F.3d 759, 770 (9th Cir. 2015) (citing Lahr v. Nat'l Transp. Safety Bd., 569
10 F.3d 964, 973 (9th Cir. 2009)).  FOIA contemplates "full agency disclosure unless
11 information is exempted under clearly delineated statutory language." Reporters
12 Comm., 489 U.S. at 753 (internal quotation marks and citation omitted).  "If an
13 agency improperly withholds any documents, the district court has jurisdiction to
14 order their production." Id. at 755.  "[T]he FOIA expressly places the burden 'on
15 the agency to sustain its action' and directs district courts to 'determine the matter
16 de novo.'"  Id.
17      FOIA cases are typically resolved on motions for summary judgment.
18 Yonemoto v. Dep't of Veterans Affs., 686 F.3d 681, 688 (9th Cir. 2012), overruled
19 on other grounds by Animal Legal Def. Fund v. FDA, 836 F.3d 987 (9th Cir.
20 2016).  Summary judgment is appropriate when the "movant shows that there is no
21 genuine dispute as to any material fact and the movant is entitled to judgment as a
22 matter of law."  Fed. R. Civ. P. 56(a).
23      "To carry their summary judgment burden, agencies are typically required to
24 submit an index and detailed public affidavits that, together, identify the
25 documents withheld, the FOIA exemptions claimed, and a particularized
26 explanation of why each document falls within the claimed exemption."
27 Yonemoto, 686 F.3d at 688 (cleaned up and citations omitted).  This index is
28 usually referred to as a Vaughn index, after Vaughn v. Rosen, 484 F.2d 820, 823-

25 (D.C. Cir. 1973), and "must be from affiants who are knowledgeable about the information sought and detailed enough to allow courts to make an independent assessment of the government's claim of exemption."  Id. at 688 (cleaned up and citations omitted).  The government may not rely upon "conclusory and generalized allegations of exemptions[.]"  Vaughn, 484 F.2d at 826.  Summary judgment in favor of the government is appropriate if the government's evidence "show[s] that the justifications [for withholding documents responsive to the FOIA request] are not controverted by contrary evidence in the record or by evidence of bad faith."  Berman v. CIA, 501 F.3d 1136, 1140 (9th Cir. 2007), overruled on other grounds by Animal Legal Defense Fund, 836 F.3d 987 (9th Cir. 2016).

If the court finds the government's evidence to be too generalized or vague to establish the propriety of a FOIA exemption, then the court also has discretion to order in camera review of documents to determine if they are properly withheld or redacted.  5 U.S.C. § 552(a)(4)(B).  "Though the burden remains at all times with the government to establish exempt status, [i]n camera inspection may supplement an otherwise sketchy set of affidavits" and help "determine whether the weakness of the affidavits is a result of poor draftsmanship or a flimsy exemption claim."  Church of Scientology of Cal.v. Dep't of Army, 611 F.2d 738, 743 (9th Cir. 1979), overruled on other grounds by Animal Legal Def. Fund, 836 F.3d 987.

## IV.   DISCUSSION

### A.   Disputed Facts

As a preliminary matter, there are several facts in Defendants' SUMF which the parties appear to dispute.  See ECF No. 82, Defs.' SUMF at ¶¶ 5-9, 27-29, 31.  However, the Court does not find any of these facts to be genuine issues of material facts precluding summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) ("By its very terms, [the summary judgment] standard provides that the mere existences of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary

1   judgment; the requirement is that there be no *genuine* issue of *material* fact."

2   (emphasis in the original)).

3       First, some disputed facts, or at least Defendants' characterization of the

4   fact, are immaterial to the adjudication of summary judgment.  <u>Anderson</u>, 477 U.S.

5   at 248 ("Only disputes over facts that might affect the outcome of the suit under

6   the governing law will preclude the entry of summary judgment.").  For example,

7   as explained in Section II.D.2 <u>infra</u>, the Court does not consider DHS Privacy

8   Office's characterization of its handling of the Request as "process[ing]" or

9   "supervised the processing" as material to the Court's determination of DHS's

10  search adequacy.  <u>See id.</u> at ¶ 7.  Likewise, whether Plaintiff objected to the

11  Privacy Office's administrative closure of its Request, <u>id.</u> at ¶ 8; and whether "the

12  program offices are best positioned to determine where responsive records are

13  located," <u>id.</u> at ¶ 31, are also not material to the issues at hand.

14      Second, several disputed facts appear to be Defendants' characterization of

15  facts based on their interpretation of DHS FOIA regulations, and constitute legal

16  conclusions.  In particular, Defendants' characterization of the May 18, 2022 letter

17  sent by DHS's Privacy Office to Plaintiff as a "final response" or "final

18  determination," ECF No. 82, Defs.' SUMF at ¶¶ 5,8; whether Defendants

19  "properly determined" that ICE and OIG "most likely" held responsive records, <u>id.</u>

20  at ¶ 6; or that the Request was not "misdirected" to DHS OIG, <u>id.</u> at ¶ 9, all require

21  an interpretation of FOIA and DHS regulations to determine whether the Privacy

22  Office's response was indeed "final" and "proper," and the Request was not

23  "misdirected."  <u>See</u> 10A Wright & Miller, Fed. Prac. & Proc. § 2725 (2024) ("[I]f

24  the only issues that are presented involve legal construction of statutes or

25  legislative history, or the legal sufficiency of certain documents, summary

26  judgment would be proper.").  Similarly, Defendants' summary of DHS

27  regulations explaining how DHS responds to FOIA requests is best accomplished

28  by referring to the regulations themselves.  <u>See id.</u> at ¶¶ 27-29.

1  Thus, none of the parties' disputed facts preclude summary judgment.

2  **B.     Withholdings Under FOIA Exemptions**

3  Plaintiff challenges Defendants' withholding and redactions of certain

4  documents responsive to the Request under FOIA Exemptions 5, 6, and 7(C).  A

5  government agency may withhold documents pursuant to a FOIA exemption

6  "'only if the agency reasonably foresees that disclosure would harm an interest

7  protected by exemption' and only after 'consider[ing] whether partial disclosure of

8  information is possible' and taking 'reasonable steps necessary to segregate and

9  release nonexempt information.'"  Transgender Law Center v. Immigr. & Customs

10  Enf't, 46 F.4th 771, 782 (9th Cir. 2022) (quoting 5 U.S.C. § 552(a)(8)(A)

11  (alteration in the original) (hereinafter "TLC").  The government must "'articulate

12  both the nature of the harm [from release] and the link between the specified harm

13  and specific information contained in the material withheld.'"  Reporters Comm.

14  for Freedom of Press v. FBI, 3 F.4th 350, 369 (D.C. Cir. 2021) (quoting H.R. Rep.

15  NO. 391, at 9).  Importantly, these FOIA exemptions are to be narrowly construed.

16  Dep't of State v. Ray, 502 U.S. 164, 173 (1991).

17  **1.     Exemption 5**

18  Exemption 5 of FOIA permits the government to withhold "inter-agency or

19  intra-agency memorandums or letters that would not be available by law to a party

20  other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  "This

21  allows agencies to withhold privileged information, including documents revealing

22  an agency's deliberative process and confidential attorney-client communications."

23  TLC, 46 F.4th 782 (citing Dep't of Interior v. Klamath Water Users Protective

24  Ass'n, 532 U.S. 1, 8 (2001)).  With respect to the deliberative process assertion,

25  "[t]o carry its burden at summary judgment, the government must demonstrate that

26  (A) the materials at issue are covered by the deliberative process privilege, and (B)

27  it is reasonably foreseeable that release of those materials would cause harm to an

28  interest protected by that privilege."  Reporters Comm., 3 F.4th at 361.

To properly invoke the deliberative process privilege, the government must show the document is both:

> (1) "predecisional or antecedent to the adoption of agency policy" and (2) "deliberative, meaning it must be actually related to the process by which policies are formulated."  A document is "predecisional" if it was prepared in order to assist an agency decisionmaker in arriving at his decision.  A document is "deliberative" if "disclosure of materials would expose an agency's decision-making progress in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions."

TLC, 46 F.4th at 783 (quoting Nat'l Wildlife Fed'n v. Forest Serv., 861 F.2d 1114, 1117 (9th Cir. 1988)) (cleaned up).

Congress adopted the distinct foreseeable harm requirement in the FOIA Improvement Act in 2016 in part out of concerns regarding "increasing agency overuse and abuse of Exemption 5 and the deliberative process privilege." Reporters Comm., 3 F.4th at 369 (citing H.R. REP. NO. 391, at 9-10).  "In the context of withholdings made under the deliberative process privilege, the foreseeability requirement means that agencies must concretely explain how disclosure 'would'—not 'could'—adversely impair internal deliberations." Id. at 369-70 (citing Machado Amadis v. U.S. Dep't of State, 971 F.3d 364, 371 (D.C. Cir. 2020)).  "[W]hat is needed is a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impeded those same agency deliberations going forward." Id. at 370.

Defendants argue they properly invoked the deliberative process privilege under Exemption 5 in withholding in full "draft [MOAs] from two [ROIs] pertaining to the investigations into the death of . . . Medina Leon and . . . Gulema[.]"  ECF No. 79, Defs.' MSJ at 27.

a.  <u>Predecisional and Deliberative</u>

Defendants contend the draft MOAs are predecisional because they "reflect drafts of a document that were ultimately included in a ROI." <u>Id.</u> at 30.  The draft ROIs "show the investigation of the evidence and circumstances surrounding the death[s] of" Medina Leon and Gulema before "DHS OIG finalized its determination as to whether the evidence supported a finding that a criminal, civil, or administrative violation occurred." <u>Id.</u>  Defendants argue the "records are deliberative because the draft MOAs reflect the Special Agent's/Investigator's process, which includes the various interviews and review of data sets, in formulating whether the evidence collected and analyzed supported a finding of a criminal, civil, or administrative violation." <u>Id.</u>

Plaintiff initially argues that Defendants' *Vaughn* Index merely "recite[d] a summary of the deliberative process privilege," but did not "meaningfully reference any decision or policy process to which the withheld information applies."  ECF No. 66, Pl.'s MSJ at 22.  However, Plaintiff does not elaborate on this position regarding the "predecisional" and "deliberative" elements in light of Defendants' Amended *Vaughn* Index.  <u>See</u> ECF No. 80, Pl.'s MSJ Reply at 10.

The Court finds that Defendants have met their burden of proving that their withholdings fall within the deliberative process privilege.  The draft MOAs were records "that were ultimately included in an ROI."  <u>See</u>, <u>e.g.</u>, ECF No. 79-3, Amended *Vaughn* Index at 27.  The ROIs, in turn, "review the evidence and the circumstances of the death[s]" of Gulema and Medina Leon to assist DHS OIG in "its determination as to whether the evidence supported a finding that a criminal, civil, or administrative violation occurred."  <u>Id.</u>  These documents were clearly predecisional in that they were antecedent to DHS OIG's final determination and assisted it in reaching that decision.  <u>See</u> <u>TLC</u>, 46 F.4th at 783.

Moreover, the draft MOAs were deliberative because they reflect DHS OIG's internal process of sifting through factual investigative material to

determine what facts were important, and editing and drafting the final MOA, to be included in the publicly released ROI.  Defendants explain that the draft MOAs "reflect the Special Agent[]/Investigator's process, which includes the various interviews and review of data sets[.]"  ECF No. 79-3, Amended *Vaughn* Index at 27.  In deciding what investigative materials to include in the MOAs and describing how these materials support DHS OIG's final decision, the MOAs are "reviewed by a 'reviewing official,' which may be more than one person, to comment and edit the draft[,]" by "asking questions, making recommendations, or changing the language[,]" and "the case agent . . . send[s] the draft back to the reviewing official with previously made edits and comments incorporated."  Id. at 28.  Such a selection of which facts are important and how to explain the significance of those facts in reaching DHS OIG's final decision as to whether a civil, criminal, or administrative violation occurred is protected by the deliberative process privilege.

The Court finds Defendants' citation to Hardy v. Bureau of Alcohol Tobacco, Firearms, and Explosives, 243 F. Supp. 3d 155 (D.D.C. 2017) illustrative on this point.  In Hardy, "records of interviews and notes of telephone interviews . . . that line-level inspectors believed was relevant to [a] review that resulted in [a final publicly released] report" would disclose: "(1) the specific topics that the inspectors chose to focus on in developing their findings, and (2) what information inspectors chose to communicate to their supervisors."  243 F. Supp. 3d at 168-69 (internal quotation marks and citations omitted).  These "thoughts of the author and internal communications about . . . findings still in development[,]" even if purely factual material, "reflect[ed] an exercise of judgment as to what issues are most relevant to the pre-decisional findings and recommendations . . . for the benefit of an official called upon to take discretionary action."  Id. at 169 (internal quotation marks and citations omitted).  Likewise, here, the case agent's selection of facts and internal dialogue with "reviewing officials" over how to present those facts

14

reveals the "editorial judgment" of the agency staff in the deliberative process.  See id. (quoting Edmonds Inst. v. U.S. Dep't of Interior, 460 F. Supp. 2d 63, 71(D.D.C. 2006)); see also Am. Oversight v. Dep't of Homeland Security, 691 F. Supp. 3d 109, 117 (D.D.C. Sept. 5, 2023) ("So those preliminary drafts were part of ICE's processing of determining what to include in its final report.  That counts as an agency decision.").

b.   Foreseeable Harm

As to foreseeable harm in the release of these draft MOAs, Defendants posit disclosure would: (1) "result in a chilling effect on interactions and communications between agency employees, and specifically a case agent and supervising or reviewing agent[,]" ECF No. 79, Defs.' MSJ at 30; and (2) "confuse the public as to how and/or why one version [of the MOA] says one thing while the final says something different, and it may lead to questions regarding the internal process of determining how decision are made[,]" id. at 31.

In Plaintiff's Reply, Plaintiff argues that "[e]ven considering Defendants' new [Amended] *Vaughn* Index . . . Defendants also fail to meet their burden of showing that foreseeable harm would result if the withheld documents were released[,]" ECF No. 80, Pl.'s MSJ Reply at 10, because: (1) "Defendants' description of the purported harm . . . 'is wholly generalized and conclusory, just mouthing the generic rationale for the deliberative process privilege itself'" without linking "the specified harm and the specific information contained in the material withheld[,]" id. at 11-12 (quoting Reporters Comm., 3 F.4th at 369, 370); and (2) Defendants fail to provide "'a situation-specific reason for withholding [the] nonfinal draft[s]'" to support their claim of potential public confusion, id. at 12 (quoting Ams. For Fair Treatment v. U.S. Postal Serv., 663 F. Supp. 3d 39, 61 (D.D.C. 2023)).

The Court agrees with Plaintiff that the "foreseeable harm" provided by Defendants are "cookie-cutter formulations [that] nowhere explain why actual

15

harm would foreseeably result from the release of the specific type of material at issue here." <u>Reporters Comm.</u>, 3 F.4th at 371.  Defendants' explanations are nearly identical to the "chilling effect" explanation rejected by the D.C. Circuit in <u>Reporters Committee</u> and "public confusion" explanation rejected by the D.C. District Court in <u>American Oversight</u>.[5]

Defendants' *Vaughn* indices and affidavits fall short because Defendants do not identify the specific material in the MOAs that, if released, would cause a chilling effect on communications between "a case agent and supervising or reviewing agent."  <u>See</u> ECF No. 79-3, Amended *Vaughn* Index at 28; 79-4, Chigewe Decl. at ¶¶ 59, 61.  In fact, the Chigewe Declaration merely repeats what the Amended *Vaughn* Index says, unlike the government's declarations in <u>Machado Amadis</u>, which "specifically focused on the 'information at issue' in the Blitz Forms under review, and . . . concluded that disclosure of that information 'would' chill future internal discussions," 971 F.3d at 371 (citations omitted).

Defendants' assertion that disclosure of draft documents would "confuse the public" fails for similar reasons.  Defendants fail to identify specific changes or differences amongst the drafts and how those changes would "lead to questions regarding the internal process of determining how decisions are made not only in regard to the language of the draft, but also whether a finding of a violation is

---

[5] <u>Compare</u> ECF No. 79-3, Amended *Vaughn* Index at 27 ("If employees are aware that their internal communications, pre-decisional thoughts, and edited drafts may be released to the public, it will reduce the free exchange of ideas and confidence that is necessary for open dialogue about draft language or a particular finding in the investigation.") <u>with</u> <u>Reporters Comm.</u>, 3 F.4th at 370 ("If agency personnel know that their preliminary impressions, opinions, evaluations, or comments would be released to the general public, they would be less candid and more circumspect in expressing their thoughts, which would impeded the fulsome discussion of issues necessary to reach a well-reasoned decision."); <u>Compare</u> ECF No. 79-3, Amended *Vaughn* Index at 27 ("If the final version differs from the draft version, it would confuse the public as to how and/or why one version says one thing while the final says something different[.]") <u>with</u> <u>Am. Oversight</u>, 691 F. Supp. 3d at 117 ("In both its affidavits and its *Vaughn* Index, ICE provides little more than generalized asserts.  For example, it says that releasing those draft 'would only serve to confuse the public.'").

supported, and how questions are answered."  ECF No. 79-3, Amended *Vaughn* Index at 28.  For example, Defendants generally reference that the draft MOAs may contain "edits and comments[,]" without specifying, for example, whether those "edits or comments" were substantive or with regard to sensitive information collected in the investigation process, or whether those "edits or comments" actually changed the findings of the Special Agent/ Investigator on a specific occasion.  See id.  Simply put, "[i]f stating simply that a draft version 'differ[s] from the final version' of a policy or a statement, were enough to show reasonably foreseeable harm, agencies would never need to provide a situation specific reason for withholding a nonfinal draft."  Am. for Fair Treatment, 663 F.3d at 60-61 (internal citations omitted) (alteration in the original).

For these reasons, the Court is not persuaded that Defendants' explanations of foreseeable harm "was precisely the same explanation that the district court found sufficient in a case cited by Plaintiff in its brief . . ., i.e., Sea Shepherd Legal v. Nat'l Oceanic & Atmospheric Admin., 516 F. Supp. 3d 1217, 1242 (W.D. Wash. 2021)[.]"  ECF No. 81, Defs.' MSJ Reply at 9.  For each category of documents withheld, the government agency in Sea Shepherd Legal "delved into the redacted information" and linked a corresponding precise harm that would result from disclosure.  See 516 F. Supp. at 1241-42.  Defendants failed to do the same.

c.    In Camera Review

Although Defendants' claim of foreseeable harm is insufficient due to lack of specificity, the Court sees the plausibility of disclosure "chilling" internal communications or leading to "public confusion" depending on the nature of the withheld information.  Therefore, the Court finds in camera review of the documents withheld under Exemption 5 appropriate.  Church of Scientology of Cal., 611 F.2d at 743 ("[I]f the court finds the affidavits or testimony too

1    generalized to establish eligibility for exemption, it may, in its discretion, proceed

2    to examine disputed documents in camera[.]").

3        **C.**    <u>**Exemptions 6 and 7(C)**</u>

4        FOIA Exemption 6 protects "personnel and medical files and similar files

5    the disclosure of which would constitute a clearly unwarranted invasion of

6    personal privacy." 5 U.S.C. § 552(b)(2).  "The phase 'similar files' has a 'broad,

7    rather than a narrow meaning'" and "[g]overnment records containing information

8    that applies to a particular individual" fall under Exemption 6.  <u>TLC</u>, 46 F.4th at

9    783, 784 (quoting <u>Forest Serv. Emps. For Env't Ethics v. Forest Serv.</u>, 524 F.3d

10   1021, 1024 (9th Cir. 2008)).  There is a "'two-step test for balancing individual

11   privacy right against the public's right of access' under Exemption 6, which begins

12   with a threshold evaluation of whether the personal privacy interest at stake 'is

13   nontrivial[,]'" <u>id.</u> at 784 (quoting <u>Cameranesi v. Dep't of Def.</u>, 856 F.3d 626, 637

14   (9th Cir. 2017)), "or, put differently 'more than [] de minimis[,]'" <u>Yonemoto</u>, 686

15   F.3d at 693 (quoting <u>Lahr</u>, 569 F.3d at 977).

16       "If, at step one, the agency fails to establish that disclosing the contested

17   information would lead to the invasion of a non-trivial personal privacy interest

18   protected by Exemption 6, [] FOIA demands disclosure, without regard to any

19   showing of public interest."  <u>Id.</u> at 694 (citations omitted).  "If, on the other hand,

20   the agency does make the requisite threshold showing regarding a privacy

21   interest," the court must examine "the public interest in disclosure."  <u>Id.</u>

22       Exemption 7(C) applies to "records or information compiled for law

23   enforcement purposes" that "could reasonably be expected to constitute an

24   unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).  Exemption

25   7(C) has a threshold requirement that the records "were compiled for law

26   enforcement purposes."  <u>See id.</u>  The analysis of personal privacy under Exemption

27   6 and 7(C) is the same.  <u>See Yonemoto</u>, 686 F.3d at 693 n.7.  "If a nontrivial

28

privacy interest is at stake, however, Exemption 7(C) requires a somewhat higher showing of public interest to overcome it than does Exemption 6." Id.

Plaintiff contends Defendants improperly redacted information regarding "an official cause of death listed on Medina Leon's death certificate, diagnostic questions and medical tests conducted by ICE detention medical staff prior to her release from custody, statements describing ICE's decision to release her from custody, and information related to her initial entry to the United States." ECF No. 66, Pl.'s MSJ at 23.  Plaintiff also objects to Defendants' redaction of "information apparently related to ICE's attempts to obtain travel documents to deport Gulema from the United States." Id.  Defendants respond by stating these redactions were appropriate to protect "sensitive medical and health diagnoses, sensitive medical testing, and personal immigration histories" under FOIA Exemptions 6 and 7(C). ECF No. 79, Defs.' MSJ at 35.

### 1.    Exemption 7(C) Law Enforcement Purpose

"'[L]aw enforcement purposes' under Exemption 7 includes both civil and criminal matters within its scope." Tax Analysts v. I.R.S., 294 F.3d 71, 77 (D.C. Cir. 2002) (citations omitted).  Agencies that combine administrative and law enforcement functions and agencies whose principal function is criminal law enforcement may both withhold records under Exemption 7.  See id.  When a mixed-function agency withholds records, "a court must scrutinize with some skepticism [whether] the particular purpose claimed for the disputed documents" was, in fact, related to law enforcement purposes. Id. (quoting Pratt v. Webster, 673 F.2d 408, 418 (D.C. Cir. 1982)).

The court focuses "on how and under what circumstances the requested files were complied . . ., and whether the files sought related to anything that can fairly be characterized as an enforcement proceeding." Jefferson v. DOJ, Office of Professional Responsibility, 284 F.3d 172, 177 (D.C. Cir. 2002) (internal quotation marks and citations omitted).  The agency must show: (1) "the investigatory

19

activity that gave rise to the documents is 'related to the enforcement of federal laws,'" and (2) "there is a rational nexus between the investigation at issue and the agency's law enforcement duties."  Id. (quoting Pratt, 673 F.2d at 420, 421).

Here, Plaintiff argues "DHS OIG is a mixed-function agency" conducting "both law enforcement investigations that could result in prosecution and other investigations that could result in personnel actions."  ECF No. 66, Pl.'s MSJ at 25. As a "mixed-function agency," Plaintiff contends, DHS OIG failed to show that the redacted documents were compiled for law enforcement purposes because Defendants do not "attempt to distinguish between DHS[ ]OIG's law-enforcement role and its other roles to show the required nexus between the investigation and law enforcement duties."  Id. at 26.

Defendants' response highlights that DHS OIG's Office of Investigations "investigates allegations of criminal, civil, and administrative misconduct involving DHS employees, contractors, grantees, and programs" and "investigations can result in criminal prosecutions, fines, civil monetary penalties, administrative sanctions, and personnel actions."  ECF No. 79, Defs.' MSJ at 34-35.  The Chigewe Declaration explains that "[t]he records at issue here are ROIs, the MOAs included therein, e-mails pertaining to the investigations, a Question-and-Answer record pertaining to the investigation, and case summary reports[,]" were complied for "law enforcement investigations conducted by Special Agents to determine what, if any, misconduct occurred that resulted in the death of two individuals."  ECF No. 81, Defs.' MSJ Reply at 10-11.

Defendants' evidence is "not sufficiently detailed to demonstrate a rational nexus between the agency's law enforcement duties and the withheld documents." Black v. U.S. Dep't of Homeland Sec., No. 2:10-cv-2040 JCM (VCF), 2012 WL 3155142, at *3 (D. Nev. Aug. 2, 2012).  DHS OIG is a mixed function agency because it not only investigates potential criminal and civil violations, but also "administrative" violations that can result in "administrative sanctions" or

"personnel actions."  See ECF No. 79-3, Chigewe Decl. at ¶ 66.  DHS OIG's functions are analogous to those of the Department of Justice's Office of Professional Responsibility ("DOJ OPR") in Jefferson, where the court found that the DOJ OPR's mixed criminal, civil, and internal employee oversight functions rendered it a "mixed-function" agency.  See 284 F.3d at 178 (The DOJ OPR reviewed "any information or allegation concerning conduct by a [DOJ] employee that may be a violation of law, regulations or orders, or applicable standards of conduct." (quoting 28 C.F.R. § 0.39(a) (2001)).

Here, as in Jefferson, DHS OIG claims "all records relating to [its] investigations are compiled for law enforcement purposes" and "[t]hat may well be true, for this court has recognized that Exemption 7(C) 'covers investigatory files related to enforcement of all kinds of laws,' including those involving 'adjudicative proceedings.'" Id. (quoting Rural Housing Alliance v. U.S. Dep't of Agriculture, 498 F.2d 73, 81 n. 46 (D.C. Cir. 1974)) (cleaned up).  However, DHS OIG "cannot rely on a bare assertion to justify invocation of exemption from disclosure, especially when, as here, [DHS OIG admits part of its function is] government oversight of the performance of duties by its employees." Id. (internal quotation marks and citations omitted); see ECF No. 79-3, Chigewe Decl. at ¶ 66.

The Chigewe Declaration does not clarify if the ROIs, MOAs, and underlying investigative documents were compiled "in response to and focused upon a specific, potentially illegal [conduct] by a particular, identified official." Kimberlin v. DOJ, 139 F.3d 944, 947 (D.C. Cir. 1998).  "The declaration does not discuss: (1) the underlying [DHS OIG] investigation to show that the investigation was conducted pursuant to [DHS OIG's] law enforcement duties, or (2) how [DHS OIG] determined that the underlying investigation was for law enforcement purposes." Black, 2012 WL 3155142, at *3.  In sum, "[t]he declaration does not make any effort to show that the [DHS OIG's] investigation was conducted

21

1  pursuant to [DHS OIG's] duty to investigate allegations of misconduct which

2  could constitute violations of state or federal criminal law." Id.

3       Because Defendants have not shown a rational nexus between DHS OIG's

4  law enforcement functions and the withheld documents, the Court cannot conclude

5  that the withheld documents were compiled for law enforcement purposes.

6  Therefore, Exemption 7(C) does not protect the withheld documents from

7  disclosure.

8                    **2.    Exemption 6**

9                         a.    Privacy Interest

10      The personal privacy interest contemplated by Exemption 6 "encompasses

11  the individual's control of information concerning his or her person[.]" Yonemoto,

12  686 F.3d at 693 (cleaned up). "'The legislative history is clear that Exemption 6

13  was directed at threats to privacy interests more palpable than mere possibilities.'"

14  Id. at 693-94 (quoting Dep't of Air Force v. Rose, 452 U.S. 352, 380 n. 19 (1976)).

15      "[T]he death of the subject of personal information does diminish to some

16  extent the privacy interest in that information, though it by no means extinguishes

17  that interest; one's own and one's relations' interest in privacy ordinarily extends

18  beyond one's death." Schrecker v. DOJ, 254 F.3d 162, 166 (D.C. Cir. 2001)

19  (citations omitted). "The fact of death, therefore, while not requiring the release of

20  information, is a relevant factor to be taken into account in the balancing decision

21  whether to release information." Id.

22      Here, as to Medina Leon's medical information, Plaintiff argues "[t]here is a

23  limited privacy interest in the redacted information" because: (1) the individuals to

24  which the information pertains are deceased and (2) Defendants have already

25  disclosed Medina Leon's health information publicly. ECF No. 66, Pl.'s MSJ at

26  27. As to Medina Leon and Gulema's immigration information, Plaintiff asserts

27  the Amended *Vaughn* Index's description of what immigration information is

28

redacted is too "categorical [and] boilerplate . . . [to] allow Plaintiff or the [C]ourt to evaluate the privacy interest of this information." Id. at 30.

Defendants respond by stating "[d]isclosure of medical, health, or personal immigration information for these deceased individuals might reignite undue public attention, embarrassment, harassment, and derogatory inferences and suspicion regarding the decedent which could potentially impact the decedent's family, kin, or related individuals in a negative manner." ECF No. 79, Defs.' MSJ at 35. Moreover, Defendants add, "[i]f another agency component makes a discretionary determination to release information in its own records that it believes requires disclosure that does not waive DHS OIG's obligations to withhold information in its own records that is properly exempt from disclosure." Id. at 37.

The Court finds there is only a de minimis privacy interest in the third cause of death listed on Medina Leon's death certificate and the condition identified in a blood test taken by Medina Leon. Although the decedent has a continuing privacy interest in their sensitive medical data, see Shrecker, 254 F.3d at 166, the diminished nature of that interest, coupled with the fact that Medina Leon's HIV status and third cause of death were disclosed by ICE to national media, supports a finding of a trivial privacy interest. Whether ICE or DHS OIG itself disclosed this information is irrelevant. See Am. Oversight v. U.S. Gen. Servs. Admin., 311 F. Supp. 3d 327, 346 (D.D.C. 2018) (finding disclosure by a third-party undermined privacy interest). The fact that Medina Leon's cause of death and HIV status is already publicly available undermines Defendants' claims that this information could draw "undue public attention, embarrassment, harassment, and derogatory inferences[,]" ECF No. 79, Defs.' MSJ at 35, because such a threat to the decedent's privacy interest already exists, see Am. Oversight, 311 F. Supp. 3d at 346 ("This publicly available information could already facilitate the 'unwarranted

1  contacts' cited by GSA, significantly undercutting the significance of any privacy

2  interest . . . .").

3       However, nothing in the record suggests that the disclosure extends beyond

4  Medina Leon's cause of death and HIV status.  Thus, the Court finds that there is a

5  non-trivial interest in the redacted "information about how [Medina Leon] may

6  have contracted this condition" and "sample questions considered by [DHS OIG's]

7  press office about its failure to screen Medina Leon for this condition."  See ECF

8  No. 66, Pl.'s MSJ at 26-27.

9       Moreover, Exemption 6's privacy interest "encompass[es] the individual's

10  control of information concerning his or her person[,]" Yonemoto, 686 F.3d at 693,

11  and thus the Court rejects Plaintiff's suggestion that "personal privacy details

12  pertaining to the subject's life and immigration history" is too vague to trigger a

13  privacy interest, see ECF No. 66, Pl.'s MSJ at 30.  The decedents and their next-of-

14  kin have a privacy interest in controlling dissemination of the details of their or

15  their loved one's personal lives, how they entered to the United States, and

16  interactions with immigration law enforcement.

17       Therefore, the Court finds that Defendants have failed to establish a privacy

18  interest for Medina Leon's third cause of death and the condition identified in a

19  blood test taken by Medina Leon.  Defendants have met their burden with respect

20  to details of Medina Leon's other medical history and Medina Leon and Gulema's

21  immigration history.  However, as discussed subsequently, the Court finds the

22  public interest in this information outweighs the privacy interest, and should be

23  disclosed.

24            b.    Public Interest

25  Plaintiff urges that the public interest outweighs the privacy interest because:

26  Medina Leon was not the first transgender woman detained by ICE to
   die with HIV that year.  ICE apparently did not screen Medina Leon
27  for HIV on intake, nor did it provide any HIV screening when she
   reported serious symptoms.  The redactions at issue likely withhold
28

24

1
2
3

information about ICE's failure to screen and treat Medina Leon for HIV and the fact that it contributed to her death.  This information will shed light on the ways in which ICE's screening systems of medically vulnerable detainees must be improved.

4   ECF No. 66, Pl.'s MSJ at 28.  Plaintiff further argues disclosure of Medina Leon

5   and Gulema's immigration histories would serve the public interest because the

6   redacted information seems pertinent to DHS OIG's investigation into their deaths

7   and "ICE's determinations to release Medina Leon and Gulema before their

8   deaths." Id. at 30-31.  Plaintiff adds that one court has already found ICE's

9   practices concerning, which raises questions about potential wrongdoing by ICE.

10  Id. at 31.

11      Defendants respond, in sum, "[r]eleasing this personal privacy information

12  does nothing to increase the public's knowledge of the duties performed by DHS

13  OIG" and the withholdings "does not thwart an understanding of the released

14  records in any way[.]"  ECF No. 79, Defs.' MSJ at 36.

15      Here, the public interest for disclosure outweighs the privacy interests.

16  Defendants' knowledge of Medina Leon's medical conditions leading up to her

17  death is relevant to whether the steps ICE took for her care were sufficient, and

18  whether DHS OIG appropriately addressed any concerns related to Defendants'

19  handling of Medina Leon's health and death.  The redacted details of Medina Leon

20  and Gulema's immigration history are likewise relevant to ICE's decision to

21  release the decedents from its custody prior to their deaths, and DHS OIG's

22  investigation into that decision.  Such information is sufficiently important to the

23  public's understanding of how Defendants handle the care of sick detainees,

24  whether Defendants engage in practices intended to conceal the number of deaths

25  of detainees in their custody, and goes to the public's right to know "what their

26  government is up to." Reporters Comm. For Freedom of Press, 489 U.S. at 773.

27  Disclosure of the withheld documents will shed light on Defendants' practices

28  regarding the releasing detainees facing imminent death.

25

The Court rejects DHS OIG's narrow reading of the public interest as limited to the conduct of a sub-component of the government agency to which the FOIA request was directed.  See ECF No. 79, Defs. MSJ at 36 ("In general, this personal privacy information *may* touch on ICE's activities regarding detention, but DHS OIG is not ICE, and neither ICE's mission nor DHS OIG's duties are the same." (emphasis in the original)).  The public's interest is in "the extent to which disclosure of the information sought would shed light on an agency's performance of its statutory duties **or otherwise let citizens know what their government is up to**."  Dep't of Defense v. FLRA, 510 U.S. 487, 497 (1994) (cleaned up) (emphasis added).  In any event, this argument fails because the Court finds the information sought would shed light not only on ICE's practices of releasing detainees facing imminent death, but also DHS OIG's evaluation of whether those practices are appropriate.  Both DHS OIG and ICE's roles, as components of DHS, sheds light on DHS's activities generally.

As such, the public's interest in Medina Leon and Gulema's immigration history, "information about how [Medina Leon] may have contracted this condition[,]" and "sample questions considered by [DHS OIG's] press office about its failure to screen Medina Leon for this condition[,]" ECF No. 66, Pl.'s MSJ at 26-27, outweighs the privacy interests in this information.  Therefore, Defendants must disclose this information.

### D.  <u>Search Adequacy</u>

The court "must assess whether the [g]overnment has met its burden of demonstrating that its search was 'reasonably calculated to uncover all relevant documents.'"  TLC, 46 F.4th at 779 (citation omitted).  "[T]he agency has a burden to demonstrate adequacy 'beyond material doubt.'"  Id.  "Demonstrating adequacy 'beyond material doubt' is, to be sure, a heavy burden, but such a burden appropriately reflects the purpose and policy of FOIA, including transparency, public access, and an informed citizenry."  Id. at 779 (internal citations omitted).

1    "An agency can demonstrate the adequacy of its search through 'reasonably

2    detailed, nonconclusory affidavits submitted in good faith.'" Id. (quoting Hamdan,

3    797 F.3d at 770).  Agencies must "appropriately respond to 'positive indications of

4    overlooked materials[,]'" id. (quoting Hamdan, 797 F.3d at 771), and have a "duty

5    to follow 'obvious leads,'" id. (quoting Valencia-Lucena v. U.S. Coast Guard, 180

6    F.3d 321, 325 (D.C. Cir. 1999)).  "Ultimately, the adequacy of a search is judged

7    'not by the fruits of the search, but by the appropriateness of the methods used to

8    carry out the search.'" Id. (quoting Iturralde v. Comptroller of Currency, 315 F.3d

9    311, 315 (D.C. Cir. 2003)).

10    Here, the parties' dispute concerns two documents: (1) "an April 5, 2021

11    letter sent to the DHS Secretary Alejandro Mayorkas, CRCL, and ICE by legal

12    service providers representing detained immigrants as part of the National

13    Qualified Representative Program ("NQRP")[,]" which "asked that CRCL 'initiate

14    an investigation into [Mr. Vargas Arellano's death][,]" ECF No. 66, Pl.'s MSJ at

15    35 (first alteration in the original); and (2) "a 4-page [c]ase [s]ummary [r]eport

16    indicating that DHS[]OIG and other DHS components had opened investigations

17    related to the letter[,]" id.  Plaintiff contends these two letters provide "'clear and

18    certain' leads for additional searches." Id. (citation omitted).  Specifically,

19    Plaintiff argues DHS OIG or DHS should have: (1) "searched for records,

20    including email and other correspondence, related to who referred the NQRP letter

21    to DHS[]OIG, how the letter resulted in DHS[]OIG opening a case in response to

22    it, and where and why DHS[]OIG referred the matter out[,]" id. at 36; (2)

23    "searched components to which the NQRP providers sent the letter, including

24    CRCL[,]" id.; and (3) "searched each of the case numbers referenced on the [c]ase

25    [r]eport[,]" id.

26         **1.      Additional Searches in DHS OIG Records**

27    Defendant DHS OIG objects arguing it did not need to conduct additional

28    searches outside of its electronic case management system, EDS, regarding these

27

two letters because "the information included in the produced case summary report was derived directly from the NQRP correspondence letter."  ECF No. 79, Defs.' MSJ at 21.  DHS OIG did not conduct an investigation in response to the NQRP letter, and thus, the "'Date Closed' [field] is the date on which the complaint was referred [out] for consideration[.]"  Id. at 22.  Further, the "'Ref Cases' fields in this case summary report" do not "reflect a case number for another, independent complaint or investigation."  Id.

Plaintiff responds arguing, "even Defendants' explanation of the information in the [c]ase [s]ummary [r]eport identifies leads[] that DHS[]OIG should have followed in its search for responsive records."  ECF No. 80, Pl.'s MSJ Reply at 24.  For example, "the Chigewe Declaration fails to identify who reviewed the complaint on that date, and why a search of that individual's email or other correspondence, or other files, would not yield additional responsive records" and "fails to identify who at DHS[]OIG 'referred' the complaint 'for consideration,' and why a search of that individual's files would not yield responsive records."  Id. Finally, Plaintiff argues that Defendants' explanation of each "case numbers referred in the [case summary] [r]eport" is "at best conclusory[.]"  Id.

The Court finds DHS OIG failed to adequately conduct a search regarding the NQRP letter and case summary report related to Vargas Arellano's death.  The Court is not persuaded that "[b]ecause DHS OIG did not conduct an investigation into the death[] of . . . Vargas Arellano and Jose Ibarra Bucio, the Office of Investigations' electronic case management system, EDS, would house **all** relevant material pertaining to these two individuals."  See ECF No. 79-4, Chigewe Decl. at ¶ 40(a)(3) (emphasis added).  Plaintiff correctly points out that the case summary report indicates "the first date that the complaint **was reviewed**" and "the date on which the complaint **was referred** for consideration."  See ECF No. 80, Pl.'s MSJ Reply at 24 (citing ECF No. 79-4, Chigewe Decl. at ¶ 40(a)(3)(b)(iii)) (emphasis added).

This would indicate that, at the very least, someone within DHS OIG reviewed the NQRP letter, concluded it should be referred out, and identified the appropriate DHS components to which the complaint was referred.  Defendants' insistence, therefore, that the "[c]ase [s]ummary [r]eport was solely derived from the submitted complaint" is not the case.  ECF No. 81, Defs.' MSJ Reply at 15.  Defendants seem focused on the fact that the NQRP letter did not turn into a DHS OIG investigation, without ever addressing how the complaint was handled by its office.  In fact, Defendants' declarations do not address whether the EDS would contain communications regarding the decision to refer out a complaint, where such records would otherwise be housed, or why a search of the emails of the DHS OIG employee who handled the referral of the NQRP letter would not be appropriate.  Accordingly, Defendants have not demonstrated beyond a material doubt that it has "undertaken all reasonable measures to uncover all relevant documents." TLC, 46 F.4th at 780.

Therefore, the Court grants summary judgment to Plaintiff with respect to the adequacy of DHS OIG's search for records related to the NQRP Letter related to Vargas Arellano's death.

### 2.    Failure to Search CLCR

Plaintiff takes issue with Defendants' position that DHS's Privacy Office had no obligation to search other DHS components, particularly the CRCL, after the Privacy Office initially determined DHS OIG and ICE would likely have responsive records.  ECF No. 66, Pl.'s MSJ at 36.  Plaintiff argues, "[e]ven if the DHS FOIA Office did not initially believe components other than ICE and DHS[]OIG were likely to have responsive records, it became aware that it should refer the Request to other DHS components including CRCL as early as August 2023, when DHS[]OIG consulted with the Privacy Office[,]" and subsequently when Plaintiff requested that DHS refer the Request to CRCL. Id. at 37.

1    Defendants respond arguing the Privacy Office does not "serve as an

2  ongoing monitor for any FOIA request it receives and then forwards."  ECF No.

3  79, Defs.' MSJ at 23.  Defendants explain that DHS has a "decentralized system

4  for responding to FOIA Requests" and the Privacy Office "'will forward a request

5  to the DHS component(s) that it determines to be most likely, *as of the date of the*

6  *request for information*, to maintain the records that are sought.'"  Id. (quoting 6

7  C.F.R. § 5.3(a)(2)) (emphasis in the original).  According to Defendants, the

8  Privacy Office was not aware of the documents that mentioned CRCL, and did not

9  consult with DHS OIG about them until after it had administratively closed

10  Plaintiff's Request.  Id.  Additionally, Defendants add that if Plaintiff was

11  dissatisfied with the Privacy Office's response or decision to administratively close

12  the Request, it could have either submitted a new FOIA request or exhausted

13  administrative remedies through an appeal within the agency.  Id. at 25-26.

14    Plaintiff counters this by stating "DHS had an obligation at various stages of

15  the litigation to task DHS[]CRCL to search for those records based on 'leads that

16  emerge[d] during [the agencies'] inquiry,' [TLC, 46 F.4th] at 780, as well as 'in

17  particular, the leads provided by [Plaintiff],' id. at 781."  ECF No. 89, Pl.'s MSJ

18  Reply at 25 (alterations in the original).  Plaintiff also argues it was not required to

19  appeal the Privacy Office's administrative closure of its Request because the

20  closure did not constitute final determination under FOIA or an adverse

21  determination as defined by 6 C.F.R. § 5.6(d).  Id. at 27.

22    The Court agrees with Plaintiff that DHS's search was inadequate for its

23  refusal to refer Plaintiff's Request to CRCL for several reasons.  First, the Court

24  does not agree with DHS's position that its determination of where to direct a

25  FOIA Request "is static in time—it applies only at the moment in time when the

26  Privacy Office decides where to direct the FOIA request[.]"  See Am. Civil

27  Liberties Union v. Dep't of Homeland Sec., 20-3204 (RDM), 2023 WL 2733721,

28  at *5 (D.D.C. Mar. 31, 2023) (herein after, "ACLU").  By DHS providing an

30

"alternative path" for a FOIA requestor to direct its request to the Privacy Office, the Privacy Office is subject to the "standard that governs all FOIA requests[,]" which requires "[t]he agency [to] make a 'good faith effort to conduct a search for requested records, using methods which can be reasonably expected to produce the information requested.'" Id. (quoting Oglesby v. Dep't of Army, 920 F.2d 57, 68 (D.C. Cir. 1990)).  It would be contrary to the letter and spirit of FOIA if the Privacy Office could skirt this obligation by initially identifying certain components to which to refer a request, immediately administratively closing the request thereafter, and then refusing to revisit its determination upon receiving "positive indications of overlooked materials" both internally and from the requestor.  TLC, 46 F.4th at 781; see ECF No. 66, Pl.'s MSJ at 37 (noting that DHS OIG "became aware that it should refer the Request to other DHS components including CRCL as early as August 2023, when DHS[]OIG consulted with the Privacy Office" and "Plaintiff [also] specifically reminded [the Privacy Office] of its obligation to do so").

Second, Defendants do not address the fact that DHS regulations "contemplate that [FOIA] requests may travel between components as more information becomes available."  See ACLU, 2023 WL 2733721, at *6 n. 3. Indeed, a component is "duty-bound to forward the request" when it determines either another component was the intended addressee, and is required to consult or coordinate with, or refer a request to, another component where the responsive information originated from, was provided by, or is of substantial interest to another component.  Id. at *6, 7 (finding that 6 C.F.R. §§ 5.4(c) and (d) support a finding that "DHS's responsibility is not limited to the moment in which the Privacy Office first forwards the request").  These DHS regulations, and the case law, support that the Privacy Office's FOIA obligations are not cabined to its

initial referral determination, see ACLU, 2023 WL 2733721, at *7[6] (inadequate search where DHS Privacy Office initially forwarded a request to ICE, but was aware that DHS OIG also maintained responsive records and refused to refer the request there); Protect the Public's Trust v. U.S. Dep't of Homeland Sec., 22-138 (JEB), 2022 WL 3226275, at *1 (D.D.C. Aug. 10, 2022) (inadequate search where CRCL "identified responsive materials that originated in other DHS offices and had referred those to the DHS Privacy Office . . . for processing" and "DHS made clear that [it would] not initiate any search unless and until Plaintiff submit[ted] a new FOIA request[.]" (internal quotation marks omitted)).[7]

Third, any concern that "the Privacy Office must effectively serve as an ongoing monitor for any FOIA request it receives and then forwards," is overstated.  See ECF No. 79, Defs.' MSJ at 23.  Here, on July 6, 2023, DHS OIG consulted with the Privacy Office about the NQRP letter and case summary report related to the complaint inquiring about Vargas Arellano's death.  ECF No. 79-5, Pavlik-Keenan Decl. at ¶¶ 17-18.  The consultation process is triggered when "one component or agency, while processing records, determines that a record

---

[6] Defendants argue ACLU is distinguishable because in that case "DHS was on notice before it even commenced its search . . . that responsive records will almost certainly be found in OIG's files[,]" ECF No. 79, Defs.' MSJ at 24 (quoting ACLU, 2023 WL 2733721, at *11), but this fact is not referenced in the portion of the ACLU court's analysis holding that DHS's FOIA obligations did not end the with its initial referral determination, see generally, ACLU, 2023 WL 273321, at *4-7. Further, "DHS's represent[tation] that the Privacy Office—not ICE—would respond to the request on behalf of DHS and its components," id. at *5, was just one of several reasons why the ACLU reached the conclusion that this Court relies on herein.

[7] Likewise, Defendants' attempt to distinguish Protect the Public's Trust because it "turned on whether DHS's Privacy Office had a received a proper FOIA request," see ECF No. 79, Defs.' MSJ at 24, is not persuasive because there, as here, DHS attempted to eschew its obligations by requiring the requester to submit a new FOIA request directed at another component when it already knew that that component had responsive material.  As in ACLU, the Protect the Public Trust court cited 6 C.F.R. § 5.4(c), not to address a "misdirected" request, but for the proposition that where one component knows another component "was an **additional** intended addressee . . . one would assume that it would have a duty to forward the request on."  2022 WL 3226275, at *4 (emphasis added).

considered for production **may contain equities or information belonging to another component or agency.**" Id. at ¶ 19 (emphasis added).

Although the Privacy Office "does not review consultations . . . and then cross references them against past received FOIA requests[,]" id., when DHS OIG alerted the Privacy Office that the NQRP letter and case summary report was reviewed in response to Plaintiff's Request and involved a request to CRCL to investigate Vargas Arellano's death, the Privacy Office was put on notice that responsive records were likely maintained with the CRCL.  Moreover, Plaintiff requested that DHS search other components in September 2023 because "it [was] apparent that other DHS components possess responsive records that have not been searched or produced[.]"  See ECF No. 66-9, Hoq. Decl. Exh. C at 2.  Thus, Defendants did not have to continually monitor the Request, nor is this a case where the requestor asked an agency "to search anew based upon a subsequent clarification" from the requestor or where the agency would have to "speculate about potential leads."  Kowalczyk v. DOJ, 73 F.3d 386, 388, 389 (D.C. Cir. 1996).[8]

These facts distinguish this case from Kowalczyk v. DOJ, where the plaintiff's request "contain[ed] so little information that, in order to incur any obligation to search the New York field office, the Bureau would have to had to find a document at [its Washington, D.C.] headquarters specifically indicating that documents related to [the] case . . . were located in its New York office[,]" 73 F.3d at 389.  Because Plaintiff's Request clearly indicates it sought "any and all records that were . . . maintained by [ICE] or [DHS] that describe, refer, or relate to the release of hospitalized detainees from custody prior to death[,]" ECF No. 24-1,

---

[8] Defendants' arguments regarding imposing additional duties on the Privacy Office fail for the additional reason that "by DHS's own design, the Privacy Office is already front and center in processing FOIA requests" and "[i]t seems unlikely that reading section 5.3(a)(2) to require the Privacy Office to ensure that the proper components receive other FOIA requests would overwhelm the office."  ACLU, 2023 WL 2733721, at *6.

33

1   FAC Exh. A at 2-3, and the Privacy Office was on notice that one of DHS's

2   subcomponents, CRCL, maintained documents related to that subject, the Privacy

3   Office was obligated to "pursue [the] lead it cannot in good faith ignore, i.e., a lead

4   that [was] both clear and certain[,]" Kowalczyk, 73 F.3d at 389.

5         Fourth, and finally, Plaintiff was not required to appeal the administrative

6   closure of the Request.  On May 18, 2022, the Privacy Office sent Plaintiff a letter

7   stating it administratively closed its Request "and will refer to the OIG and ICE's

8   response(s)."  ECF No. 79-6, Pavlik-Keenan Exh. 1 at 2.  The Privacy Office's

9   administrative closure of a request after referral to another component does not

10  constitute a final determination or denial triggering administrative appeal

11  obligations under FOIA.  See ECF No. 80, Pl.'s MSJ Reply at 27, 27 n. 16 (citing

12  Citizens for Resp. & Ethics in Washington v. Fed. Elections Comm'n, 711 F.3d

13  180, 188 (D.C. Cir. 2013) for the proposition that a determination triggering

14  exhaustion requires an agency to: "(i) gather and review the documents; (ii)

15  determine and communicate the scope of the documents it intends to produce and

16  withhold, and the reasons for withholding any documents; and (iii) inform the

17  requester that it can appeal whatever portion of the 'determination' is adverse").

18  Defendants do not explain how the administrative closure after referral constitutes

19  a "determination" under FOIA, or an "adverse determination" under 6 C.F.R.

20  § 5.6(d)[9], which, in turn, triggers the obligation to administratively appeal under

21  6 C.F.R. § 5.8(e)[10].  Nor could they because the Privacy Office's closure letter "did

---

[9] 6 C.F.R. § 5.6(d) provides that "[a]dverse determinations, or denials of requests, include
decisions that the requested record is exempt, in whole or in part; the request does not reasonably
describe the records sought; the information requested is not a record subject to FOIA; the
requested record does not exist, cannot be located, or has been destroyed; or the requested record
is not readily producible in the form or format sought by the requester.  Adverse determinations
also include denials involving fees, including requester categories or fee waiver matters, or
denials for expedited processing."

[10] 6 C.F.R. § 5.8(e) provides that "[i]f a requester wishes to seek court review of a component's
adverse determination on a matter appealable under paragraph (a)(1) of this section, the requester
must generally appeal it under this subpart" before seeking court review.

not identify that Plaintiff was required to appeal its determination that only DHS[]OIG and ICE had responsive records, which under DHS FOIA regulations is a prerequisite for a 'denial' of a request that triggers appeal obligations[.]"  ECF No. 80, Pl.'s MSJ Reply at 28 n. 17(citing C.F.R. §§ 5.6(d) and 5.8(e)); see also Citizens for Resp., 711 F.3d at 188 (FOIA's statutory "requirement that the agency notify the requester about administrative appeal rights further indicates that the 'determination' must be substantive, not just a statement of a future intent to produce non-exempt responsive documents.").

Defendants' case law holding that an administrative closure constituted a final determination triggering exhaustion is inapposite, see ECF No. 81, Defs.' MSJ Reply at 18, because those closures were caused by the plaintiffs' failure to perfect their requests, which is not the case here, Aguirre v. U.S. Nuclear Regul. Comm'n, 11 F.4th 719, 726 (9th Cir. 2021) (requestor failed to respond to agency's request for clarification to determine appropriate processing fees and thus closed the request); Moorer v. DOJ, 2:12-cv-269-WTL-WGH, 2014 WL 853043, at *3 (S.D. Ind. Mar. 5, 2014) (requestor failed to respond to agency letter outlining costs for searching for records).

As such, DHS's search was inadequate because it refused to search CRCL despite being aware that CRCL maintained records relevant to Plaintiff's Request. Therefore, the Court grants Plaintiff summary judgment on this issue.

###   E.    **Documents Referred to ICE**

Plaintiff's MSJ raised two issues regarding DHS OIG's referral of "1,420 pages to ICE" for production: (1) that 16 pages were not produced in legible form and (2) Defendants failed to produce a remaining 853 pages.  ECF No. 66, Pl.'s MSJ at 32, 33.  Defendants respond that they "can only produce the best copies they themselves have" and "[t]his argument . . . is also moot because ICE has processed and produced all records referred to it by DHS OIG."  ECF No. 79, Defs.' MSJ at 38.  Plaintiff seems to concede this point, noting in its Reply that

"[a]fter Plaintiff filed its Motion for Summary Judgment, Defendants produced records referred by DHS[]OIG to ICE."  ECF No. 80, Pl.'s MSJ Reply at 8 n. 2. Therefore, the Court grants Defendants summary judgment on the issue of DHS OIG's referral of certain documents to ICE for production.

## V.    CONCLUSION

For the reasons stated above, the Court holds:

- (1) The parties' cross motions for summary judgment are **DENIED** as to Defendants' withholdings under Exemption 5.  Defendants are ORDERED to produce the withheld documents for in camera inspection **within 21 days** from the date of this Order;

- (2) Summary judgment is **GRANTED** in favor of Plaintiff as to Defendants' withholding under Exemption 6 and 7(C).  The parties are ORDERED to meet and confer **within 21 days** of the date of this Order on a timeline for production of these materials;

- (3) Summary judgment is **GRANTED** in favor of Plaintiff as to the adequacy of Defendants' search.  The parties are ORDERED to meet and confer **within 21 days** of the date of this Order regarding Defendant DHS OIG's search for documents related to the NQRP Letter regarding Vargas Arellano's death and the Privacy Office's referral of Plaintiff's Request to CRCL; and

- (4) Summary judgment is **GRANTED** in favor of Defendants as to DHS OIG's referral of certain documents to ICE.

DATED:  July 8, 2024

HON. SHASHI H. KEWALRAMANI
United States Magistrate Judge

36