# EXHIBIT A



# United States Department of Justice

## United States Attorney's Office
## Central District of California

---

*JOSEPH W. TURSI*
*JASON K. AXE*
*Assistant United States Attorney*
*Phone: (213) 894-3989/8790*
*E-mail: Joseph.Tursi@usdoj.gov*
*   Jason.Axe@usdoj.gov*

*Federal Building*
*300 N. Los Angeles Street, Suite 7516*
*Los Angeles, California 90012*

February 19, 2025

<u>**VIA E-MAIL**</u>

Laboni A. Hoq
Hoq Law, APC
P.O. Box 753
South Pasadena, CA 91030

   Re: ACLU of SoCal v. ICE, et al.
     C.D.CA Case No. 2:22-cv-04760-SHK

Dear Ms. Hoq:

  Pursuant to the Court's January 24, 2025 Order [Dkt. 111] and the parties' agreement, enclosed please find Defendant ICE's search summary.

Respectfully,

JOSEPH T. MCNALLY
Acting United States Attorney

/s/ *Joseph W. Tursi*

JOSEPH W. TURSI
Assistant United States Attorney

Encl.: ICE Search Summary

cc: Ms. Eunice Cho (by email)
  Ms. Eva Bitran (by email)
  Mr. Kyle Virgien (by email)

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF SOUTHERN CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.<br><br>Defendants. | No. 2:22-cv-04760-SHK<br><br>**DEFENDANT U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT'S SEARCH SUMMARY**<br><br><br>Honorable Shashi H. Kewalramani<br>United States Magistrate Judge |

## DEFENDANT ICE'S SEARCH SUMMARY

*Overview and Background*

Plaintiff American Civil Liberties Union Foundation of Southern California ("Plaintiff" or "ACLU of SoCal") submitted a Freedom of Information Act (FOIA) request, dated April 29, 2022 (the "Request"), by email on May 2, 2022, to the U.S. Immigration and Customs Enforcement (ICE), the Department of Homeland Security Office of Inspector General (DHS OIG), and the Department of Homeland Security Privacy Office (DHS PRIV). The nine-part Request specifically sought:

1. Any and all documents, without limitation to date, including any communications, investigatory reports, and any and all exhibits, appendices, or attachments thereto, relating to the hospitalization, death, decision to release from custody, or release from custody of the following individuals: Teka Gulema; Johana Medina Leon; Jose Ibarra Bucio; and/or Martin Vargas Arellano.

2. Any and all DHS OIG reports of investigation that are identified in any of the records responsive to Request #1. This includes any and all exhibits, appendices, or attachments to the DHS OIG reports of investigation.

1

3. Any and all ICE OPR reports of investigation that are identified in any of the records responsive to Request #1. This includes any and all exhibits, appendices, or attachments to the DHS OPR reports of investigation.

4. Any and all documents and communications, including ICE and IHSC directives, policies, procedures, protocols, or trainings that contain guidance, instructions, or standards about the release from custody of (a) hospitalized detainees; (b) detainees who at the time of release were patients in the care of external healthcare providers or facilities. Detainees specified in (a) and (b) above shall include those being treated for COVID-19 during their hospitalization or treatment at external healthcare providers or facilities.

5. Spreadsheets, emails, documents, communications, databases, lists, and other data compilations in the possession of ICE Leadership, ICE Enforcement and Removal Operations, ICE Health Services Corps, and ICE Office of Professional Responsibility that identify detainees who were released from custody while (a) hospitalized (including for COVID-19 treatment); (b) in the full-time care of external healthcare providers or facilities (including for COVID-19 treatment), or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility. Requested materials include, but are not limited to, dates of hospitalization of detainees, dates of hospital or external care facility discharge, name of treated detainees' detention facilities, and reasons for detainees' hospitalization or external medical care. These materials should further include Medical Transfer Summary documents from DHS's her System and Alien Medical Records System, and any versions of the Significant Detainee Illness Spreadsheet that identify detainees who were released from custody while (a) hospitalized (including for COVID-19 treatment); (b) in the care of external healthcare providers or facilities (including for COVID-19 treatment); or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility.

6. Spreadsheets, emails, significant incident reports (SIRs), significant event notification reports (SENs), or documents created by DHS OIG or ICE OPR that mention the release from custody of (a) hospitalized detainees; (b) detainees who at the time of release were patients in the care of external healthcare providers or facilities; or (c) detainees released from custody immediately prior to transfer to an emergency room, hospital, or external care facility.

2

7. Spreadsheets, emails, SIRs, SENs, or documents created by DHS OIG or ICE OPR that mention the death of any detainee who had been previously released from custody while (a) hospitalized; or (b) a patient in the care of an external healthcare provider or facility; or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility.

8. Any and all documents, communications, and other records, including databases, spreadsheets, lists, and other data compilations, that identify detainees who were hospitalized or transferred from detention for off-site medical care due to COVID-19, and were subsequently released from custody while hospitalized, or detainees who were released from custody immediately prior to transfer to an emergency room, hospital, or external care facility to receive treatment for COVID-19. Requested information includes, but is not limited to, dates of hospitalization, detention facility, medical condition/reason for hospitalization or treatment, name and location of hospital, date of return to detention (if any), date of release from custody or issuance of order of recognizance (if any), and/or reason for release from custody.

9. Bills, invoices, charges, or records of payment that reflect payments made for healthcare for any detainee who was released from custody while (a) hospitalized; or (b) a patient in the care of an external healthcare provider or facility, and communications about such bills, invoices, charged, or records of payment.

The date range requested for responsive records was January 1, 2016, to the present.

On May 16, 2022, the ICE FOIA Office sent Plaintiff a letter acknowledging receipt of the FOIA request. It was assigned tracking number 2022-ICFO-16321.

### *Search Conducted by ICE*

### A.  **Subparts 1 Through 3**

Based on the information sought in the Request, and discussions between the parties, with respect to subparts 1 through 3 of the Request, ICE searched the following: (1) previous litigation files requesting records of the deceased individuals, (2) the Los Angeles Field Office, (3) the Office of Professional Responsibility (OPR) External Reviews and Analysis Unit, (4) the New Orleans Field Office Director, (5) the New Orleans Field Office Acting Deputy Field Office

3

Director, (6) the New Orleans Field Office Contracting Officer Representative, (7) a New Orleans Field Office Detention and Deportation Officer, (8) a New Orleans Field Office Supervisory Detention and Deportation Officer, (9) an Enforcement and Removals Operations IHSC Investigations Unit Program Manager, (10) a Field Medical Coordinator, (11) four Los Angeles Field Office Supervisory Deportation and Detention Officers, and (12) the Acting Field Office Director in the Los Angeles Field Office. The results of those searches are set forth below.

- The first search that was undertaken was for responsive records within the file of *Martin Vargas v. DHS, ICE* (Central District of California Case No. 22-cv-00287; ICE FOIA Tracking Number: 2022-ICLI-00031). Within that case file, 2,444 pages of responsive records were found and produced. The same 2,444 pages of records were produced in the instant matter.

- On August 19, 2021, the Section Chief from the OPR External Reviews and Analysis Unit (ERAU) conducted a search of his desktop, hard drive, shared drive and Outlook folders for the terms: Teka Gulema, Johana Medina Leon, Jose Ibarra Bucio, Martin Vargas Arellano, Etowah County Detention Center, Otero County Processing Center, Adelanto ICE Processing Center, Riverview Medical Center, Del Sol Medical Center, Loma Linda University Medical Center, and St. Jude Medical Center. No records were found. No responsive records were found.

- On July 21, 2022, OPR was again tasked with conducting a search. No responsive records were found.

- On August 12, 2022, an ERO IHSC Investigations Unit Program Manager, conducted a search of her Outlook folders for the names of all four decedents (Teka Gulema; Johana Medina Leon; Jose Ibarra Bucio; and Martin Vargas Arellano). Records were found and processed.[1]

- On August 15, 2022, a Supervisory Detention and Deportation Officer in the New Orleans Field Office conducted a search of his desktop, hard drive, shared drive and Outlook folders for the terms: Teka and Gulema. Records were found and processed.

- On August 16, 2022, the Acting Field Office Director from the Los Angeles Field Office conducted a search of his desktop, hard drive, shared drive and Outlook folders for the terms: release and Vargas, release and death, release and hospital, release and Ibarra, Ibarra Bucio and Vargas Arellano. Records were found and processed.

---

[1] The exact number of records found for each search cannot be identified as the search results were all processed together.

- On August 16, 2022, a Supervisory Detention and Deportation Officer searched his desktop, hard drive, shared drive and Outlook folders for the terms: Arellano, Vargas Arellano, 205718808, 808 and Jose Ibarra Bucio. Records were found and processed.

- On August 19, 2022, a Supervisory Detention and Deportation Officer in the New Orleans Field Office conducted a search of his desktop, hard drive, shared drive and Outlook folders for the terms: Teka, Gulema and Teka Gulema. Records were found and processed.

- On August 22, 2022, the Acting Field Office Director from the Los Angeles Field Office, searched his desktop, hard drive, shared drive and Outlook folders for the terms "Vargas-Arellano, Martin" and "Ibarra-Bucio, Jose." Records were found and processed.

- On August 22, 2022 a Supervisory Detention and Deportation Officer in the Los Angeles Field Office searched his desktop, hard drive, shared drive and Outlook folders for the terms: Teka Gulema, Johana Medina Leon, Jose Ibarra Bucio and Martin Vargas Arellano. Records were found and processed.

- On August 22, 2022, a Supervisory Detention and Deportation Officer from the Los Angeles Field Office searched his Outlook folders for the terms: Arellano, Jose Ibarra Bucio, SEN, SIR, Bucio and Martin Vargas Arellano. Records were found and processed.

- On August 23, 2022, A Supervisory Detention and Deportation Officer from the Los Angeles Field Office searched her Outlook folders using the terms: Arellano, Ibarra Bucio, Arellano-Vargas and Ibarra. Records were found and processed.

- On August 24, 2022, the Acting Deputy Field Office Director in the New Orleans Field Office conducted a search of his desktop, hard drive, shared drive and Outlook folders for the term: Gulema. Records were found and processed.

- On August 24, 2022, the Contracting Officer Representative in the New Orleans Field Office ran a search of his desktop, hard drive, shared drive and Outlook folders for the term: Teka Gulema.

- On August 26, 2022, a Field Medical Coordinator in the New Orleans Field Office conducted a search of his desktop, hard drive, shared drive and Outlook folders for the terms: Teka Gulema and 028021556. Records were found and processed.

- After conferring with Plaintiff, Defendant ICE agreed to obtain the emails of the former Los Angeles Field Office Director for the time period of June 30, 2015 through March 30, 2016. At Plaintiff's request, these emails were searched for the following terms:

"Headquarters Removal and International Operations" or "HQRIO" and "Gulema."
"Post Order Custody Review" or "POCR" and "Gulema."
"ICE Health Service Corps," or "IHSC," and "Gulema."
"HQ ERO Domestic Operations"

This search resulted in over 20,000 pages. Plaintiff agreed to waive production of all but 6 SEN emails that were included in the search results from the time period of November 19, 2015 through November 30, 2015, which equated to approximately 1,185 pages. Plaintiff also agreed to waive production of approximately 25,000 pages of records pertaining to Mr. Gulema.

**B. Subpart 4**

Based on the information sought in the Request, and discussions between the parties, with respect to subpart 4, ICE searched ERO IHSC, the Office of Regulatory Affairs and Policy (ORAP), emails of former ICE Directors and emails of three individuals from the ICE Office of the Director.

- On August 16, 2022, a health policy administrator with ERO IHSC searched the Electronic Policy Development System for the search terms: transfer, discharge, covid-19, illness and medical care. The search resulted in 27 pages being found, which were processed and produced.

- On July 18, 2023, at Plaintiff's request, Defendant ICE obtained the emails of ICE Director Tae Johnson, Assistant Director of Policy Deborah Fleischaker and Assistant Director for Regulatory Affairs and Policy Scott Shuchart for the following search terms: (1) Directive; (2) Policy; (3) Protocol; (4) Procedure; (5) Training; (6) Guidance; (7) Instruction; (8) Standard; (9) Death; (10) "offsite referral"; (11) "emergency room"; (12) "emergency department"; (13) "life support"; (14) Coma; (15) Ventilator; (16) "intensive care"; (17) Hospice; (18) palliative; and (19) release.

The search resulted in approximately 530,000 documents. Plaintiff then requested that the search be run in two separate parts, with the first part seeking the following terms and Boolean connectors:

> directive or policy or policies or protocol or procedure or training or guidance or instruction or standard) AND (custody or death or died or deceased or decedent or discharge or surgery or specialist or COVID-19 or hospital or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal).

6

The results of that search were then searched with the following terms:

> (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision")

This resulted in approximately 142,000 documents. Plaintiff ultimately decided not to pursue these documents.

- On December 6, 2023, a policy subject matter expert with ORAP searched the ICE Policy Manual, the ICE intranet, her desktop, hard drive, shared drive and Outlook folders for the terms: hospital, health, release, Covid-19, accommodation and detainee treatment. The search resulted in 16 pages of records found, which were processed and produced.

- On October 15, 2024, at the request of Plaintiff, ORAP conducted a second search where a policy subject matter expert searched the ICE Policy Manual, the ICE intranet, her desktop, hard drive, shared drive, and Outlook folders for the terms: 11003.4, critical condition, hospice, death, intensive care, terminal, life support, ICE and release. No records were found.

- After conferring with Plaintiff, it was agreed that Defendant ICE would request that ORAP conduct a third search of agreed upon search terms. On October 11, 2024, ORAP was asked to search for the following search terms: death, life support, critical condition, intensive care, ICU and hospice. The time period for the search was January 1, 2016 through the present. ORAP was also asked to provide ICE Directive 11003.4. As a result of this search, three documents were found along with over 1,700 pages of documents. The records were processed and produced. ICE Directive 11003.4 was also found and produced.

## C. Subpart 5

Based on the information sought in the Request, and discussions between the parties, with respect to subpart 5, ICE searched ERO IHSC and OPR as follows:

- On August 21, 2023, the Assistant Director of the ICE Health Services Corps conducted a search of his desktop, shared drive, hard drive, and Outlook folders for the following agreed upon terms: (1) Death; (2) Died; (3) Deceased; (4) Ambulance; (5) Emergency; (6) "offsite referral"; (7) "life support"; (8) Coma; (9) Ventilator; (10) "intensive care"; (11) "critical condition"; (12) Hospice; (13) Palliative; and (14) Release.

- Once the search results were obtained, the following Boolean connectors were entered and searched: (release or transfer or benefits or parole or "alternative detention" or discharge or

OSUP or "order of supervision" or humanitarian) AND (custody or death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal.)

- The search resulted in 551 pages, which were processed and produced.

- On November 17, 2023, an email was sent to the Deputy Chief of Staff of IHSC inquiring as to whether she was aware of the existence of a spreadsheet or list of some sort that identifies detainees who were released from custody while (a) hospitalized (including for COVID-19 treatment); (b) in the full-time care of external healthcare providers or facilities (including for COVID-19 treatment), or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility. She indicated that IHSC does not maintain this type of document.

**D.  Subpart 6**

Based on the information sought in the Request, and discussions between the parties, with respect to subpart 6, ICE searched OPR, ERO IHSC, HSI Joint Intelligence Operations Center (JIOC), ERO Custody Management and ERO Field Operations as follows:

-    On August 8, 2023, a Section Chief at OPR conducted a search of her desktop, hard drive and shared drive, as well as her Outlook folders using the terms agreed upon by the Plaintiff, which included: death, died, deceased, coma, ventilator, ambulance, emergency, intensive care, critical condition, offsite referral, life support, hospice, palliative and release. No responsive records were found except for ICE Directive 11003.5. This directive was produced.

-    On August 8, 2023, a Management and Program Analyst with OPR conducted a search of the Office of Detention Oversight Inspection Modernization System (ODO IMS), as well as his desktop, shared drive, hard drive and Outlook folders using the search terms agreed upon by the Plaintiff, which included: death, died, deceased, coma, ventilator, ambulance, emergency, intensive care, critical condition, offsite referral, life support, hospice, palliative and release. No responsive records were found. The Unit Chief for OPR ICE Inspections sent an email on August 10, 2023 explaining that while the term "death" was searched and was identified in several records within the system, when associated with the specific requests in

Subparts 6 and 7, there were no responsive records as the scope of ODO inspections does not extend to released detainees.

- On December 6, 2023, JIOC was tasked to conduct a search for documents responsive to Subparts 6 and 7. JIOC responded that it was not the owner of the data points requested and it deferred the request to ERO Custody Management and ERO IHSC.

- On December 6, 2023, OPR was again tasked to search for records responsive to subpart 6 of the Request. On December 11, 2023, OPR responded that they had no responsive records as the individuals noted in the Request did not die in ICE custody.

- On January 3, 2024, the Chief of IHSC's Investigations Unit conducted a search of her shared drive and Outlook folders for the terms: hospitalized, external healthcare, release, transfer, death, emergency room and external care. No records were found.

- On January 4, 2024, a Managed Care Coordinator with ERO IHSC conducted a search of Excel spreadsheets in her shared drive for the terms: release, hospital, emergency room, long-term, facility and rehab. She also conducted a search of her Outlook folders for the terms: UPTS, hospital, release, emergency room, facility and rehab. Records were found and processed.

- On January 4, 2024, the Acting Deputy Assistant Director of the Custody Programs Division conducted a search of his desktop, shared drive and hard drive using the search term: detainee death directive. The Acting Director also noted that Custody Management does not manage SIRs or SENs and defers to Field Operations.

- On January 4, 2024, a Mission Support Specialist with ERO Field Operations reviewed the Request and on January 17, 2024, an email was sent stating that field operations does not maintain data in relation to the request.

E. **Subpart 7**

Based on the information sought in the Request, and discussions between the parties, with respect to subpart 7, ICE searched OPR, ERO IHSC, HSI JIOC, ERO Custody Management and ERO Field Operations as follows:

- On August 8, 2023, a Section Chief at OPR conducted a search of her desktop, hard drive and shared drive, as well as her Outlook folders using the terms agreed upon by the Plaintiff, which included: death, died, deceased, coma, ventilator, ambulance, emergency, intensive care, critical condition, offsite referral, life support, hospice, palliative and release. No responsive records were found except for ICE Directive 11003.5. This directive was produced.

-    On August 8, 2023, a Management and Program Analyst with OPR conducted a search of the Office of Detention Oversight Inspection Modernization System (ODO IMS), as well as his desktop, shared drive, hard drive, and Outlook folders using the search terms agreed upon by the Plaintiff, which included:  death, died, deceased, coma, ventilator, ambulance, emergency, intensive care, critical condition, offsite referral, life support, hospice, palliative and release. No responsive records were found.

-    On December 6, 2023, the Joint Intelligence Operations Center (JIOC) was tasked to conduct a search for documents responsive to Subparts 6 and 7. JIOC responded that it was not the owner of the data points requested and it deferred the request to ERO Custody Management and ERO IHSC.

-    On January 3, 2024, the Chief of IHSC's Investigations Unit conducted a search of her shared drive, and Outlook folders for the terms: hospitalized, external healthcare, release, transfer, death, emergency room and external care. No records were found.

-    On January 4, 2024, a Mission Support Specialist with ERO Field Operations reviewed the request and on January 17, 2024, an email was sent stating that field operations does not maintain data in relation to the request.

-    On January 17, 2024, ERO Custody Management responded that they do not manage SIRs or SENs and deferred to Field Operations.  Custody Management did, however, provide ICE Directive 11003.5, which was produced to Plaintiff.

F.    **Subpart 8**

Based on the information sought in the Request, and discussions between the parties, with respect to subpart 8, ICE searched ERO IHSC as follows:

-    On August 21, 2023, Dr. Stewart Smith, Assistant Director of IHSC, conducted a search of his desktop, hard drive, shared drive, and Outlook folder using search terms agreed upon with the Plaintiff: (1) Ambulance; (2) 911; (3) Emergency; (4) "offsite referral"; (5) "life support"; (6) Coma; (7) Ventilator; (8) "intensive care"; (9) "critical condition"; (10) "poor outcome"; (11) Hospice; (12) Palliative; (13) Death; (14) Died; and (15) Deceased.

-    Once the search results were obtained, the following Boolean connectors were used, as requested by Plaintiff: (detainee or custody) AND (death or died or deceased or surgery or specialist or COVID19 or hospital! or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or

coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal) AND (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian or "order of recognizance").

Approximately 1,711 pages were found, processed, and produced.

**G. Subpart 9**

Based on the information sought in the Request, and discussions between the parties, with respect to subpart 8, ICE searched:

-    On August 22, 2022, a health informaticist with ERO IHSC conducted a search of Sharepoint and eClinicalWorks for the alien numbers and referral authorization numbers of the four decedents. A spreadsheet was found, processed, and produced.

-    On August 7, 2023, ICE tasked the IHSC Resource Management Unit (RMU) to search for the following terms: (1) Death; (2) Died; (3) Deceased; (4) Ambulance; (5) Emergency; (6) Hospital; (7) "offsite referral;" (8) "life support;" (9) coma; (10) ventilator; (11) "intensive care;" (12) "Critical condition;" (13) hospice; (14) palliative; and (15) release.

-    On August 14, 2023, the RMU responded that they are not involved in billing and they recommended tasking the IHSC Health Plan management Unit (HPMU), who manages medical claims.

-    The HPMU was tasked and responded that they cannot search for the information sought in subpart 9 without specific names. They recommended tasking the Regional Health Service Administrator (HSA) and the Regional Field Medical Coordinator (FMC). These units were tasked on November 14, 2023 and just one individual stated that they had over 16,000 emails. The issue was discussed with the FMCs and HSAs and on January 3, 2024, it was determined that they would not have information responsive to subpart 9 without having specific names to search for.

-    The HPMU provided an Excel spreadsheet with claims information for all 4 decedents. That spreadsheet was processed.

*Records Located*

Based on the above searches, a total of 53,426 pages of potentially responsive records were located[2], along with 911 pages of records referred to ICE from other departments. Of those 53,426 pages, 21,153 pages and an Excel spreadsheet were initially determined to be responsive and produced to the Plaintiff.

Regarding the records that were produced to Plaintiff, a line-by-line review was conducted to identify information exempt from disclosure or for which a discretionary waiver of exemption could be applied. Based on this review, ICE released all reasonably segregable portions of records responsive to Plaintiff's Request.

---

[2] This number does not include records found that Plaintiff later determined it did not wish to pursue.

# EXHIBIT B

**Eunice Cho**

| | |
|---|---|
| **From:** | Tursi, Joseph (USACAC) <Joseph.Tursi@usdoj.gov> |
| **Sent:** | Wednesday, December 11, 2024 8:11 PM |
| **To:** | Laboni Hoq |
| **Cc:** | SHK Chambers; Eunice Cho; Eva Bitran; Kyle Virgien; Axe, Jason (USACAC) |
| **Subject:** | ACLU SoCal v. DHS, et al. 2:22-cv-04760-SHK |
| **Attachments:** | 2024-12-11 Letter to OPC.pdf |

**This Message Is From an External Sender**
This message came from outside your organization.

Good afternoon Judge Kewalramani and counsel,

Pursuant to the Court's December 5, 2024 minute order [Dkt. 106], attached please find correspondence of today's date providing an update on the processing of Plaintiff's FOIA request.

Thank you,
-Joe

**Joseph W. Tursi** | **Assistant United States Attorney**
United States Attorney's Office | Central District of California
300 N. Los Angeles Street, Suite 7516 | Los Angeles, CA 90012
O: 213.894.3989 | F: 213.894.7819 | joseph.tursi@usdoj.gov

# EXHIBIT C



# United States Department of Justice

## United States Attorney's Office
## Central District of California

---

*JOSEPH W. TURSI*
*JASON K. AXE*
*Assistant United States Attorney*
*Phone: (213) 894-3989/8790*
*E-mail: Joseph.Tursi@usdoj.gov*
*Jason.Axe@usdoj.gov*

*Federal Building*
*300 N. Los Angeles Street, Suite 7516*
*Los Angeles, California 90012*

December 11, 2024

**VIA E-MAIL**

Laboni A. Hoq
Hoq Law, APC
P.O. Box 753
South Pasadena, CA 91030

Re:    ACLU of SoCal v. ICE, et al.
       C.D.CA Case No. 2:22-cv-04760-SHK

Dear Ms. Hoq:

Please allow the following to respond to the matters raised in your November 21, 2024 correspondence, as well as issues discussed at the December 4, 2024 Status Conference, and your email of December 4, 2024.

**<u>ICE</u>**

Plaintiff has now requested that ICE provide a revised page count of responsive documents for Part 4. Specifically, Plaintiff asks that a revised page count suppress email attachments, and that it exclude copies of the following ICE detention standards: (1) National Detention Standards (NDS); (2) 2008 Operations Manual ICE Performance-Based National Detention Standards; (3) 2011 Operations Manual ICE Performance-Based National Detention Standards (revised 2016); (4) 2019 National Detention Standards for Non-Dedicated Facilities (2019); and (5) Family Residential Standards.

As an initial matter, upon review, ICE has determined that the page count previously communicated was not accurate. Rather, the supplemental search of its Office of Regulatory Affairs and Policy ("ORAP") located approximately 1,730 pages of potentially responsive documents. Please note, the document hit counts reported in ICE's November 22, 2024 Supplemental Response are accurate. *See* Dkt. 105 at 6. Excluding the five categories of detention standards results in approximately 1,641 pages of potentially responsive documents.

With respect to your inquiry over searched custodians, ICE did not search *only* emails. Rather, in addition to emails, ICE searched the ICE Policy Manual/ICE Intranet and the ORAP Shared drive.

In light of the above, ICE anticipates it will finish processing Plaintiff's FOIA request by January 2025.

Laboni A. Hoq, Esq.
RE: ACLU of SoCal v. ICE
December 11, 2024
Page 2


## CRCL

### A.  CMS Search Results

In your December 4, 2024 email you advised that, for the CMS search results, Plaintiff has agreed to eliminate the search terms "National Qualified Representative Program" and "NQRP." After eliminating those terms and further filtering, this resulted in 112 documents (1,495 pages) marked "responsive" or "referral."

Breaking that down further, there were 43 documents (339 pages) that were marked "responsive" that contain only CRCL equities. The records marked "referral" total 69 documents (1,156 pages) and contain either some CRCL equities and another component's, or another component's equities in its entirety. For records that have another component's equities, they will need to be referred to that other component for processing.

Plaintiff also requested that CRCL process the remaining CMS documents within the next 30-60 days. CRCL can agree to 60 days in which it will process its own records and refer the other records to the appropriate component(s). CRCL has no control over when the referred components will process the records and thus cannot agree to a specific processing time with respect to referred documents.

### B.  OCIO Search Results

As it has throughout, CRCL is amenable to Plaintiff providing a refined set of search terms after the CMS records production is complete.

With respect to Plaintiff's proposal that CRCL agree to provide, within two weeks, available information on the size and any other relevant details about the scope of a further search with the refined set of search terms, CRCL cannot agree. That is because, the timeline depends on when Plaintiff provides the refined set and agency capacity at that time.

### Processing of Documents Referred by CRCL to ICE and DHS OIG

To date, CRCL has referred 243 pages to DHS OIG for direct reply and 19 pages to ICE for direct reply. *See* CRCL November 1, 2024 Correspondence. DHS OIG anticipates producing records by December 20, 2024. With respect to ICE, it will produce the records referred to it by January 21, 2025, at the latest.

Laboni A. Hoq, Esq.
RE: ACLU of SoCal v. ICE
December 11, 2024
Page 3


Respectfully,

E. MARTIN ESTRADA
United States Attorney

/s/ *Joseph W. Tursi*

JOSEPH W. TURSI
Assistant United States Attorney

cc:     Hon. Shashi H. Kewalramani (by Chambers Email)
        Ms. Eunice Cho (by email)
        Ms. Eva Bitran (by email)
        Mr. Kyle Virgien (by email)

# EXHIBIT D

**Eunice Cho**

| | |
|---|---|
| **From:** | Tursi, Joseph (USACAC) <Joseph.Tursi@usdoj.gov> |
| **Sent:** | Tuesday, November 19, 2024 1:18 PM |
| **To:** | Laboni Hoq |
| **Cc:** | Axe, Jason (USACAC); Eunice Cho; Kyle Virgien; Eva Bitran |
| **Subject:** | RE: [Not Virus Scanned] [Not Virus Scanned] RE: [EXTERNAL] ACLU So Cal v. ICE: Follow up OIG and CRCL Productions |

**This Message Is From an External Sender**
This message came from outside your organization.

Good morning Laboni,

The email from OIG was sent at 8:48am on November 1st. They did not report any issues on their end.

I am waiting to hear back from ICE and OIG on the processing of the referred documents from CRCL.

**ICE Updates**

   **A. Parts 1-3**

With respect to Parts 1-3, you asked for a document hit count for the date range of November 19, 2015 – November 30, 2015. ICE has done so and reports this has resulted in six SEN Report Notifications. This is about 1,185 pages.

   **B. Part 4**

For Part 4, ICE tasked ORAP to conduct a search using the additional search terms of "death," "life support," "critical condition," "intensive care," "ICU," and "hospice," for the time period January 1, 2016 to the present. The document hit counts are as follows after deduping and threading:

| | |
|---|---|
| death | 202 |
| "life support" | 56 |
| "critical condition" | 8 |
| "intensive care" | 41 |
| ICU | 15 |
| Hospice | 16 |

This is about 18,171 pages of emails. Additionally, Directive 11003.4 is 8 pages.

Thank you,

**Joseph W. Tursi | Assistant United States Attorney**
United States Attorney's Office | Central District of California
300 N. Los Angeles Street, Suite 7516 | Los Angeles, CA 90012
O: 213.894.3989 | F: 213.894.7819 | joseph.tursi@usdoj.gov

**From:** Laboni Hoq <laboni@hoqlaw.com>
**Sent:** Monday, November 18, 2024 10:41 AM
**To:** Tursi, Joseph (USACAC) <JTursi@usa.doj.gov>
**Cc:** Axe, Jason (USACAC) <JAxe@usa.doj.gov>; Eunice Cho <echo@aclu.org>; Kyle Virgien <kvirgien@aclu.org>; Eva Bitran <EBitran@aclusocal.org>
**Subject:** Re: [Not Virus Scanned] [Not Virus Scanned] RE: [EXTERNAL] ACLU So Cal v. ICE: Follow up OIG and CRCL Productions

Hi Joe,

I'm following up on my November 12 email, regarding documents CRCL referred to OIG and ICE. Can you let us know when OIG and ICE expects to process/produce these documents to us?

We would also appreciate it if you could let us know whether OIG did in fact send us the November 1, 2024 production without issue, so we don't experience that same potential issue with its production of the above-referenced documents referred by CRCL.

Thanks.

On Tue, Nov 12, 2024 at 11:41 AM Laboni Hoq <laboni@hoqlaw.com> wrote:

Thank you!

On Tue, Nov 12, 2024 at 11:40 AM Tursi, Joseph (USACAC) <Joseph.Tursi@usdoj.gov> wrote:

Hi Laboni,


Will do. The password is: ACLU112024




**Joseph W. Tursi | Assistant United States Attorney**
United States Attorney's Office | Central District of California
300 N. Los Angeles Street, Suite 7516 | Los Angeles, CA 90012
O: 213.894.3989 | F: 213.894.7819 | joseph.tursi@usdoj.gov


**From:** Laboni Hoq <laboni@hoqlaw.com>
**Sent:** Tuesday, November 12, 2024 11:38 AM
**To:** Tursi, Joseph (USACAC) <JTursi@usa.doj.gov>
**Cc:** Axe, Jason (USACAC) <JAxe@usa.doj.gov>; Eunice Cho <echo@aclu.org>; Kyle Virgien <kvirgien@aclu.org>; Eva Bitran <EBitran@aclusocal.org>

**Subject:** Re: [Not Virus Scanned] [Not Virus Scanned] RE: [EXTERNAL] ACLU So Cal v. ICE: Follow up OIG and CRCL
Productions

Hi Joe,

I searched my email and I do not see receipt of this production, but thank you for forwarding it. To ensure that I don't miss future productions from OIG, could you check in with them to see what may have happened?  It may still be on my end, but it would be great if you could follow up and make sure it went out on OIG's end.

Also, the production seems to be password protected - can you please forward the password?

Thanks.

On Tue, Nov 12, 2024 at 11:20 AM Tursi, Joseph (USACAC) <Joseph.Tursi@usdoj.gov> wrote:

This message has not been virus scanned because it contains encrypted or otherwise protected data. Please ensure you know who the message is coming from and that it is virus scanned by your desktop antivirus software.

This message has not been virus scanned because it contains encrypted or otherwise protected data. Please ensure you know who the message is coming from and that it is virus scanned by your desktop antivirus software.

Good morning Laboni,

OIG produced those records by email on November 1st. Copies are attached.

Thanks,

**Joseph W. Tursi | Assistant United States Attorney**
United States Attorney's Office | Central District of California

300 N. Los Angeles Street, Suite 7516 | Los Angeles, CA 90012
O: 213.894.3989 | F: 213.894.7819 | joseph.tursi@usdoj.gov

---

**From:** Laboni Hoq <laboni@hoqlaw.com>
**Sent:** Tuesday, November 12, 2024 11:13 AM
**To:** Tursi, Joseph (USACAC) <JTursi@usa.doj.gov>; Axe, Jason (USACAC) <JAxe@usa.doj.gov>
**Cc:** Eunice Cho <echo@aclu.org>; Kyle Virgien <kvirgien@aclu.org>; Eva Bitran <EBitran@aclusocal.org>
**Subject:** [EXTERNAL] ACLU So Cal v. ICE: Follow up OIG and CRCL Productions

Hi Joe and Jason,

We are following up on a few matters.

First, Regarding OIG, we believe you indicated it would be producing November 1, 2024 the documents the Court ordered it to produce in response to its September 30, 2024 order denying Defendants' Motion for Reconsideration. To date we have not received those documents. Can you please follow up and send those to us as soon as possible?

Second, regarding CRCL, based on its recent production it appears it referred 243 pages to OIG and 19 pages to ICE. Can you let us know when we can expect to receive those documents from OIG and ICE?

Thanks.

--

**Laboni A. Hoq**

Hoq Law APC

P.O. Box 753

South Pasadena, CA 91030

Telephone: 213-973-9004

www.hoqlaw.com

--

**Laboni A. Hoq**

Hoq Law APC

P.O. Box 753

South Pasadena, CA 91030

Telephone: 213-973-9004

www.hoqlaw.com

--
**Laboni A. Hoq**
Hoq Law APC
P.O. Box 753
South Pasadena, CA 91030
Telephone: 213-973-9004
www.hoqlaw.com

--
**Laboni A. Hoq**
Hoq Law APC
P.O. Box 753
South Pasadena, CA 91030
Telephone: 213-973-9004
www.hoqlaw.com

# EXHIBIT E



# United States Department of Justice

### United States Attorney's Office
### Central District of California

---

*JOSEPH W. TURSI*
*JASON K. AXE*
*Assistant United States Attorney*
*Phone:  (213) 894-3989/8790*
*E-mail:  Joseph.Tursi@usdoj.gov*
         *Jason.Axe@usdoj.gov*

*Federal Building*
*300 N. Los Angeles Street, Suite 7516*
*Los Angeles, California 90012*

January 22, 2024

**VIA E-MAIL**

Laboni A. Hoq
Hoq Law, APC
P.O. Box 753
South Pasadena, CA 91030

Re:    ACLU of SoCal v. ICE, et al.
       C.D.CA Case No. 2:22-cv-04760-SHK

Dear Ms. Hoq:

Pursuant to the Court's December 8, 2023 Order [Dkt. 62], Defendant ICE provides the following information:

## Parts 1-3

ICE has approximately 38,285 pages remaining to process, broken down as follows by each individual:

- Jose Ibarra Bucio: 1,157 pages.

- Martin Vargas Arellano: 5,263 pages.

- Teka Gulema: 31,865 pages.  All pages from October 1, 2015 and after have been processed. The remaining 31,865 pages to be processed are from before October 1, 2015.

- Johana Medina Leon: All pages have been processed.

If the Gulema records preceding October 1, 2015 are excluded, the remaining number of pages to process is 6,420.

## Part 4

The emails of Scott Shuchart, Deborah Fleischaker, and Tae Johnson were searched and resulted in over 142,000 documents of potentially responsive records.

The office of ICE Health Service Corps (IHSC) Policy conducted a search for records and found 27 pages of potentially responsive records.

Ms. Laboni A. Hoq
RE: ACLU of SoCal v. ICE
January 22, 2024
Page 2

The Office of Regulatory Affairs and Policy (ORAP) conducted a search and found 16 pages of potentially responsive records.

**Part 5**

Dr. Stewart Smith, the Assistant Director of IHSC, conducted a search and found 551 pages of potentially responsive records.

**Part 6**

The Joint Intelligence Operations Center (JIOC) was tasked with conducting a search but deferred the search tasking to the Office of Enforcement and Removal (ERO) because the data points requested do not originate with JIOC. ERO Custody Management conducted a search and found 304 pages of potentially responsive records. ERO IHSC conducted a search and found 93 pages of potentially responsive records.

ERO Field Operations (FOPS) conducted a search but found no responsive records.

The Office of Professional Responsibility (OPR) conducted a search but found no responsive records.

**Part 7**

OPR conducted a search and found 9 pages of potentially responsive records.

JIOC was tasked with conducting a search but deferred the search tasking to ERO because the data points requested do not originate with JIOC. ERO Custody Management conducted a search and found 9 pages of potentially responsive records.

ERO IHSC conducted a search but found no responsive records.

ERO FOPS conducted a search but found no responsive records.

**Part 8**

Dr. Stewart Smith, the Assistant Director of IHSC, conducted a search and found 1,711 pages of potentially responsive records.

**Part 9**

The Health Plan Management Unit of ERO IHSC conducted a search and found 1 excel spreadsheet.

Ms. Laboni A. Hoq
RE: ACLU of SoCal v. ICE
January 22, 2024
Page 3

Respectfully,

E. MARTIN ESTRADA
United States Attorney

/s/ *Joseph W. Tursi*

JOSEPH W. TURSI
Assistant United States Attorney

cc: Ms. Eunice Cho (by email)
    Mr. Michael Kaufman (by email)
    Mr. Kyle Virgien (by email)

# EXHIBIT F



# United States Department of Justice

## United States Attorney's Office
## Central District of California

*JOSEPH W. TURSI*
*JASON K. AXE*
*Assistant United States Attorney*
*Phone: (213) 894-3989/8790*
*E-mail: Joseph.Tursi@usdoj.gov*
*Jason.Axe@usdoj.gov*

*Federal Building*
*300 N. Los Angeles Street, Suite 7516*
*Los Angeles, California 90012*

January 17, 2024

**VIA E-MAIL**

Laboni A. Hoq
Hoq Law, APC
P.O. Box 753
South Pasadena, CA 91030

      Re:    ACLU of SoCal v. ICE, et al.
             C.D.CA Case No. 2:22-cv-04760-SHK

Dear Ms. Hoq:

The following responds to Plaintiff's December 13, 2023 correspondence and the issues raised during the parties' December 14, 2023 telephone conference addressing outstanding issues regarding the search for records responsive to Plaintiff's request.

## I.      DHS-OIG Production

As we have previously advised, OIG's search for and production of responsive records is complete. Any records that were referred will be produced by the agency that created the records, i.e., the agency to which OIG referred the records. That includes the 581 pages referenced on page 182 of OIG's June 2023 production (*see* OIG's July 31, 2023 Second Supplemental Response Letter, identifying 583 pages referred to ICE), and the documents referenced at pages 144-46 of OIG's June 2023 production (*see* OIG's June 29, 2023 First Supplemental Response Letter, identifying 328 pages referred to ICE). The agencies to which records have been referred will review, process, and produce the records, if responsive and subject to applicable FOIA exemptions, in due course. OIG does not exercise any control over other agencies or DHS subcomponents and thus cannot dictate the manner in which the records are produced.

In response to your specific inquiry regarding CRCL and CBP, we have contacted them regarding the pages OIG referred to them (1 to CRCL and 32 to CBP). Upon further review by OIG, however, the records referred to CBP are not responsive to the request. These pages pertain to an individual who died while in ICE's custody. And the record referred to CRCL is also not responsive to Plaintiff's FOIA request. That single page is a response from CRCL to Mr. Gulema thanking him for bringing concerns to their attention, and the FOIA request sought, among other things, any documents "relating to the hospitalization, death, decision to release from custody, or release from custody of…Teka Gulema."

Ms. Laboni A. Hoq
RE: ACLU of SoCal v. ICE
January 17, 2024
Page 2

As for the documents identified on page 3 of Plaintiff's correspondence, the records described in the December 2022 production were referred to ICE. With respect to the March 2023 production, the referenced page did not state that the El Paso Field Office conducted approximately five investigations of *out-of-custody* deaths. Rather, the document states that the El Paso Field Office conducted approximately five investigations "into the circumstances surrounding the deaths of migrants…" There was no specification regarding how many of those investigations were in-custody or out-of-custody. With respect to the records from the June 2023 production, the specific email referenced was referred to ICE. As for the referenced "release letter" in that email, OIG did not locate such a letter during its search and defers to ICE regarding its existence.

## II.    ICE Production

In its December 8, 2023 Order [Dkt. 62], the Court required ICE to provide the following information by January 22, 2024: (a) for Parts 1-3, the total number of pages of documents yet to be produced by ICE, disaggregated by individual; (b) for Parts 1-3, the total number of pages of documents yet to be produced regarding Mr. Teka Gulema dated on or after October 1, 2015; and (c) for Parts 4 to 9, a hit count, broken down by Part, for each of the agreed-to searches (if any). *Id.* at 15. ICE will provide that information by January 22nd, pursuant to the Court's order.

As the Court noted, Plaintiff cannot dictate the order in which records are produced and thus ICE will not provide a date by which specific records will be produced. *Id.* at 11.

### A.  Parts 1-3

Thank you for advising that regarding any medical records dated before October 1, 2015 that are attached to the post October 1, 2015 Gulema emails, "ICE may process only the emails and may exclude the attachments at this time." ICE will do so until you advise us otherwise.

As for the "specific document deficiencies" you noted in the letter, as we have previously advised, ICE is reviewing the issues you raised and will address them and produce updated versions of the documents in due course, if it is able to do so.

### B.  Part 4

As communicated previously, ICE used the search terms and connectors described in your December 13, 2023 letter for the emails of Scott Schuchart (Senior Advisor to the ICE Director), Deborah Fleischaker (Assistant Director for Regulatory Affairs and Policy at ICE), and Tae Johnson (former Acting Director of ICE). This yielded 142,000 documents, most of which are unlikely to be responsive.

ICE also tasked ORAP and IHSC with conducting a search for documents responsive to the Part 4 request. ORAP found 16 pages of responsive records by searching ICE's Policy Manual and the ICE Intranet server using the following terms: "hospital, health, release, COVID-

Ms. Laboni A. Hoq
RE: ACLU of SoCal v. ICE
January 17, 2024
Page 3

19, accommodation, detainee treatment. ORAP also searched the ORAP Shared drive using the following terms: "hospital, health, release, COVID-19, accommodation, detainee treatment."

As for IHSC, its search is ongoing. So far, it has identified 27 pages as its search continues. The pages found so far were found by searching the Electronic Policy Development System-housed policies using the following terms: "transfer, discharge, covid-19, illness, medical care."

ICE did not use the search terms Plaintiff requested for the searches conducted by ORAP and IHSC because, as noted above, utilizing those search terms in the emails of just three custodians (Schuchart, Fleischaker, and Johnson) yielded over 142,000 documents. Instead, ICE has determined that allowing the expert analysts within ORAP and IHSC to determine themselves what terms and locations are most likely to produce responsive records would be best.

## C.  Part 5

As ICE has previously stated, its position at this time is that its search for records responsive to Part 5 of the Request is complete. The records will be processed in due course. After these records have been processed and reviewed, ICE will consider whether additional searches are needed. ICE cannot conclude definitively at this point that further searches may not be necessary until the records identified to date have been processed and reviewed.

## D.  Parts 6-9

For Parts 6 and 7, ICE tasked JIOC to conduct a search, but it deferred to ERO because the data points requested do not originate with JIOC. ERO has tasked HSC and Custody Management to conduct searches, which are continuing. They have been tasked with the language of the actual FOIA request because ICE has determined that allowing the expert analysts within ERO to determine themselves what terms and locations are most likely to produce responsive records would be best.

*     *     *

Pursuant to the Court's Orders and our agreements, OIG will provide Plaintiff with its search summary on January 19, 2024, and ICE will provide Plaintiff with further information on January 22, 2024. At this juncture, ICE believes it has sufficient understanding of the records Plaintiff seeks that further telephonic or video conferences, including the one tentatively scheduled for this afternoon, would not be productive. However, if Plaintiff does have further questions or issues, please feel free to raise them in writing.

Ms. Laboni A. Hoq
RE: ACLU of SoCal v. ICE
January 17, 2024
Page 4


Respectfully,

E. MARTIN ESTRADA
United States Attorney

/s/ *Joseph W. Tursi*

JOSEPH W. TURSI
Assistant United States Attorney

cc: Ms. Eunice Cho (by email)
   Mr. Michael Kaufman (by email)
   Mr. Kyle Virgien (by email)

# EXHIBIT G

December 21, 2023
Re: *ACLU SoCal v. ICE*

December 21, 2023

Joseph Tursi
Jason Axe
Alarice Medrano
United States Attorneys' Office
Central District of California
300 N. Los Angeles St. Suite 7516
Los Angeles, CA 90012
Joe.tursi@usdoj.gov
Jason.axe@usdoj.gov
Alarice.medrano@usdoj.gov



**SENT VIA EMAIL**

> Re:    *ACLU of Southern California v. United States Immigration and
> Customs Enforcement, et al.,* No. 2:22-cv-4760 (C.D. Cal.)

Dear Counsel:

Plaintiff's counsel writes with a summary of our meet and confer with you on December 14, 2023. Please let us know if you disagree with our understanding of the conversation as set out below so that we can address any inconsistencies.

As an initial matter, we would like to note our disappointment that Defendants are not acting more cooperatively in the meet and confer process ordered by the Court. We have repeatedly noted our disappointment in the past with the slow progress of this case because of Defendants' significant delays in providing information that would allow for an efficient resolution without creating unnecessary burdens on any party. We ultimately had to obtain a court order to address those delays. Dkt. 62. We are concerned that, in this latest meet and confer, while facially claiming to abide by the order, Defendants appear to be taking an approach that disregards both the letter and the spirit of the order and the Local Rules, that will further delay the resolution of the case.

For example, during the December 14 meet and confer, ICE repeatedly took the position that it need only provide Plaintiff's counsel the information that the Court ordered it to provide on January 22, 2024 in paragraph (1)(b) of the Court's order. *See* Dkt. 62 at 15. As a result, ICE took the position that it may elect to provide only the hit counts of searches (not the search terms used or the locations searched) for Parts 4 and 6-9 of Plaintiff's FOIA request. This position misreads the letter of Court's order. The order requires Defendants not just to provide the information set out in paragraph (1)(b) on January 22, but to "meet and confer … to address any outstanding issues regarding the search for records responsive to Plaintiff's Request." *Id.* The Court intended this discussion to be meaningful and substantive. The Court intended the parties to meet and confer to

December 21, 2023
Re: *ACLU SoCal v. ICE*

attempt to agree to searches (as set out in part (1)(a) of its order), and then for the Defendants to provide information on the "agreed-to searches (if any)" reached as part of this meet and confer (as set out in part (1)(b) of its order). This meaningful discussion requires ICE to provide information about which custodians it intends to search and what terms it intends to use so that the parties can attempt to reach an agreement before ICE provides its hit counts on January 22. ICE's position is that it need not provide any information beyond the final report set out in part (1)(b) thus violates the letter of the Court's order. More importantly, this position misreads the spirit of the Court's order. By refusing to provide any information beyond what the Court has specifically required in an order, ICE is setting up a pattern where Plaintiff must move the Court for an order every time Plaintiff has any questions about Defendants' search or production beyond those it has already specifically raised with the Court. This pattern will entail significant delay and will require the parties and the Court to expend significant resources. The Court has already expressed its concerns with Defendants' delays that have been resolved "only [] after Plaintiff sought court-intervention over the parties' disputes." Dkt. 62 at 11. Plaintiff hopes that ICE will not insist on another Court order before it will provide basic information about its searches.



As another example, you repeatedly refused to answer whether the documents that DHS-OIG had referred to other DHS components had been produced, stating that these questions did not involve the "outstanding issues regarding the search for records responsive to Plaintiff's Request" on which the Court had ordered the parties to meet and confer. Dkt. 62 at 15. This position violates the spirit of the Court's order as discussed above. It also violates the Local Rules. One of the purposes of this meet and confer was to attempt to narrow the issues for summary judgment under L.R. 7-3. One of the issues on which Plaintiff may need to move for summary judgment is Defendants' failure to produce documents referred by DHS-OIG to other components of Defendant DHS. If these documents have in fact been produced, then Plaintiff may be able to avoid moving on this issue. Your refusal to discuss whether these documents have been produced thus violates the L.R. 7-3 requirement that the parties attempt to narrow the issues that must go before the Court before a motion is filed. You eventually agreed to provide an accounting of which documents referred by DHS-OIG have been produced, after wasting a significant amount of the limited time Defendants had available for the meet and confer. Plaintiffs hope that Defendants do not let this position further complicate efforts to move this case forward.

We trust that Defendants will be more cooperative going forward.

Defendants, moreover, were unable or refused to provide direct responses to Plaintiff's questions, stating that all questions by Plaintiff must be provided in a letter, and that Defendants would respond via letter. Although we understand the need for Defendants' counsel to confer with counsel for ICE, we suggest that Defendants ensure that an agency employee (i.e. ICE counsel) who may be able to

December 21, 2023
Re: *ACLU SoCal v. ICE*

provide responsive information be available in a timely manner on our future calls.

The parties agreed that Defendants would respond to Plaintiff's December 12, 2023 letter in "early January," and that we will further meet and confer at 1:30 pm Pacific on January 17.

We set out the specific issues that we discussed below.

## Local Rule 7-3 Conference on Motion for Summary Judgment Involving DHS-OIG and DHS



### *Vaughn* Index and Search Summary

We sent a letter on December 8, 2023 limiting the number of redactions and withholdings for which Plaintiff requests a *Vaughn* index, and we requested that DHS-OIG provide a *Vaughn* index and search adequacy declaration one month later, by January 8, 2024. You explained that DHS-OIG was not willing to provide a search adequacy declaration ahead of summary judgment briefing. Instead, DHS-OIG will agree to provide a search summary instead, which will contain dates of searches, all search terms used, custodians and file locations searched, and the number of pages produced by DHS-OIG. DHS-OIG committed to providing a *Vaughn* index and search summary by February 9, 2024, at the latest, and it also committed to endeavor to provide the search summary earlier.

### Summary Judgment Briefing Schedule

The parties discussed Plaintiff's proposed briefing schedule for summary judgment. On our call, Defendants proposed a briefing schedule that did not account for cross-motions. The parties agreed to discuss this issue further by email to attempt to reach agreement on a briefing schedule that would account for cross-motions. We have since done so and have agreed on a briefing schedule to submit to the Court.

### Referral of Documents by DHS-OIG

Plaintiff next attempted to discuss DHS-OIG's referral of documents to other DHS components—a topic that Plaintiff included in its December 8, 2023 and December 12, 2023 letters and that was appropriately part of this meet and confer because it related to the parties' continued Local Rule 7-3 conference. Specifically, Plaintiff reiterated its request from its December 8th and 12th letters that Defendants inform Plaintiff whether the documents DHS-OIG referred to other agencies have been produced. Defendants initially refused to provide this information on this call because it did not involve the "outstanding issues regarding the search for records responsive to Plaintiff's Request" on which the Court had ordered the parties to meet and confer. Dkt. 62 at 15. Later during the

December 21, 2023
Re: *ACLU SoCal v. ICE*

call, Defendants agreed to respond, stating that they were not prepared to answer
this question on the call but would provide an answer in writing in early January.

<u>Leads Apparent from DHS-OIG's Production</u>

We next discussed whether Defendants would follow up on several
obvious leads and positive indications of overlooked materials apparent from
DHS-OIG's production.



First, page 182 of DHS-OIG's June 2023 production references 581 pages
of documents that DHS-OIG reviewed in its investigation. Defendants explained
that those 581 pages of documents have been referred to ICE, which will produce
them, but then stated that it seemed that 230 pages had been referred. After again
explaining the contents of page 182 (attached as Exhibit A for Defendants'
convenience), Defendants stated that they will provide a response whether these
documents have been provided, referred, or will be produced in early January. See
Exh. A (DHS-OIG June 2023 Production, page 182)..

Second, pages 144-46 of DHS-OIG's June 2023 production reference
forms regarding Mr. Gulema's release from custody. Defendants stated that they
will provide a response whether these documents have been identified or referred
in early January.

Third, pages 80-82 of DHS-OIG's December 2022 production refer to an
executive summary and emails about the decision to release Ms. Medina Leon,
which were placed on a case file. DHS-OIG did not have an answer, nor could it
provide a date certain by which it will have an answer to this question. However,
it committed to inform Plaintiff whether they would follow up on this lead. We
hope you will provide this information in your early January letter.

Fourth, pages 83-85 of DHS-OIG's December 2022 production refer to
emails, an executive summary, and the OCPC final report of findings, which were
placed into the case file. Defendants agreed to inform Plaintiff whether they
would follow up on this lead in writing in early January.

Fifth, Page 48 of the March 2023 OIG production notes that the El Paso
ICE Field Office has conducted approximately five investigations into out-of-
custody deaths, indicating that Defendants have possession of responsive
documents related to these five investigations. Defendants agreed to inform
Plaintiff whether they would follow up on this lead in writing in early January.

Sixth, page 180 of DHS-OIG's June 2023 production references "an email
dated November 24, 2015 from [REDACTED], Field Office Director, ICE, New
Orleans, LA" to "[REDACTED], Field Medical coordinator, IHSC, New Orleans,
LA." Defendants did not have an answer, nor could they provide a date certain by
which they will have an answer to this question. However, they committed to

December 21, 2023
Re: *ACLU SoCal v. ICE*

inform Plaintiff whether they would follow up on this lead. We hope that you will provide us this information in early January.

Seventh, pages 4-11 of DHS-OIG's August 2023 production show that the document was "received by ESEC at 3:44 pm, Apr 12, 2021." This statement appears to refer to the Secretary of the Department of Homeland Security. Based on this statement, the Office of the Secretary should also have been included in Defendant DHS's search for documents responsive to Plaintiff's request. Specifically, the Office of the Secretary should have been searched for the names and A#s of the four people identified in Parts 1-3 of the request, and the search terms that Plaintiff and DHS-OIG negotiated for its searches. Contrary to the authority Plaintiff provided in its December 12, 2023 letter, Defendants took the position that because Plaintiff named only DHS—not the Office of the Secretary of DHS—as a defendant in this case, it cannot require Defendant DHS to follow up on these leads by searching the Office of the Secretary. We believe that the parties are at an impasse on this issue, but we welcome further discussion.



Eighth, Plaintiff reiterated its request that Defendants search all DHS components to which OIG referred responsive records, including but not limited to CBP, DHS CRCL, and the unidentified component specified in OIG's June 29, 2023 letter. Defendants agreed that these searches would involve components of Defendant DHS. However, they took the position that because Plaintiff named only DHS—not these specific components of DHS—as defendants in this case, then it cannot require Defendant DHS to follow up on these leads by searching its components. Defendants disagreed, again taking the position that because Plaintiff named only DHS—not these other DHS components—as a defendant in this case, then it cannot require Defendant DHS to follow up on these leads by searching its components. We believe that the parties are at an impasse on this issue, but we welcome further discussion.

### **Court-Ordered Meet and Confer**

As you are aware, the Court ordered the parties to meet and confer, within two weeks of its December 8, 2023 order, "to address any outstanding issues regarding the search for records responsive to Plaintiff's Request." Dkt. 62 at 15. We attempted to have the discussion the Court ordered, as described below.

<u>Parts 1-3</u>

Plaintiff requested a revised page count for the records remaining to be produced that relate to Mr. Gulema, omitting documents dated before October 1, 2015, and omitting documents dated before October 1, 2015 that are attached to emails dated on or after October 1, 2015. ICE agreed to provide that revised page count on January 22.

December 21, 2023
Re: *ACLU SoCal v. ICE*

Plaintiff also requested a total page count for all records collected but not yet produced for each of Mr. Gulema, Mr. Vargas Arellano, Mr. Ibarra Bucio, and Ms. Medina Leon. ICE agreed to provide that page count on January 22.

Finaly, Plaintiff reiterated its request, originally made September 14, 2023, for full, readable copies of documents that were missing or partially scanned. These pages are: page 2648 of ICE's December 2022 production, pages 7197-200 of ICE's July 2023 production, and page 7504 of ICE's August 2023 production. Plaintiff asked for a date certain by which it could expect ICE to produce corrected versions of those documents. On our meet and confer, you took the position that ICE has the right to produce corrected versions of these documents in the manner and order in which it prefers, and that it need not provide Plaintiff any indication of when it will produce these corrected versions. However, you agreed to pass along to ICE Plaintiff's request that ICE prioritize the production of these corrected versions.



Part 4

We asked for ICE's response to Plaintiff's December 13 request that ICE narrow the set of documents to be produced by searching only ICE ERO and IHSC servers or shared drives where stand-alone directive, policy, practice, procedure, training, guidance and instruction documents are likely to be located. You explained that you had passed this request on to ICE, which took it into consideration. You also explained that ICE had tasked the search to ICE ORAP (Office of Regulatory Affairs and Policy) and IHSC, and that it would provide a page count of responsive documents, along with all other information required by the Court's order, on January 22. We asked whether ICE is clear as to what, specifically, we meant when we described ICE ERO and IHSC servers or shared drives in our letter. You explained that you had not yet spoken with ICE on the phone but that you would confirm with ORAP and IHSC that they understood this request. We requested that ICE inform us in its early January letter what locations it will search for this Part and what terms it will use.

Part 5

Our December 13 letter set out the specifics of a compromise that we proposed to reach an appropriately narrowed set of documents for review and production, and we asked for ICE's position. Namely, as the Court noted in its Order, we "proposed a compromise that Defendants limit the search to staff who participate in the weekly SDI meeting, and any custodian who possesses the SDI list." Dec. 8, 2023 Order at 11. You stated that ICE would not agree to our compromise, that the issue "will need to be briefed," and that Plaintiff will need to take its issues with the adequacy of ICE's search to the Court. However, you stated that you will provide ICE's final position in writing.

December 21, 2023
Re: *ACLU SoCal v. ICE*

<u>Parts 6 and 7</u>

Plaintiff and ICE had previously reached agreement that ICE will search JIOC for SIRs and SENS. On this meet and confer, we requested that you agree to provide the custodians or locations searched, the search terms used, and hit counts, broken down by search term. You agreed that ICE would provide all information about this search that is within the ambit of the Court's order, by the deadline set in the Court's order of January 22, and that to the extent any of the information Plaintiff requested is beyond the scope of the Court's order, you would determine with the agency whether or not to provide it.

<u>Parts 8-9</u>

Plaintiff and ICE had previously reached agreement on the scope of the searches for Parts 8 and 9. On this meet and confer, we requested that you agree to provide the custodians or locations searched, the search terms used, and hit counts, broken down by search term. You agreed that ICE would provide all information about this search that is within the ambit of the Court's order, by the deadline set in the Court's order of January 22, and that to the extent any of the information Plaintiff requested is beyond the scope of the Court's order, you would determine with the agency whether or not to provide it.



Sincerely yours,

Kyle Virgien
Senior Staff Attorney
ACLU National Prison Project

# EXHIBIT H

December 13, 2023

Joseph Tursi
Jason Axe
Alarice Medrano
United States Attorneys' Office
Central District of California
300 N. Los Angeles St. Suite 7516
Los Angeles, CA 90012
Joe.tursi@usdoj.gov
Jason.axe@usdoj.gov
Alarice.medrano@usdoj.gov

*SENT VIA EMAIL*

      Re:    *ACLU of Southern California v. United States Immigration and Customs Enforcement, et al.,* No. 2:22-cv-4760 (C.D. Cal.)

Dear Counsel:

      This letter responds to Defendants' November 30, 2023 correspondence, as well as the District Court's order at Dkt. No. 62 (Dec. 8, 2023 Order). We had already scheduled a meeting on December 14, 2023 at 1:00 p.m. PT to discuss scheduling for a motion for summary judgment with respect to Defendant OIG. On December 8, 2023, the Court issued an order instructing the parties to meet and confer within two weeks "to address any outstanding issues regarding the search for records responsive to Plaintiff's request." Dec. 8, 2023 Order at 15. We are glad to discuss the following issues regarding the search on December 14, and also to schedule additional time necessary before December 22, 2023, to meet and confer. Please also ensure that Defendants' counsel have ready access to ICE technical staff , as required by the Court's Order. Dec. 8, 2023 Order at 12.

## I.    DHS-OIG Production

### A. Referral of Documents by DHS-OIG

      Plaintiff has raised the issue of DHS-OIG's referral of documents to ICE in its letter regarding *Vaughn* index parameters on December 8, 2023. At this point in time, DHS-OIG has informed Plaintiff that it referred 1,420 pages to ICE.[1] First, please confirm which Defendant—DHS-OIG or ICE—will produce these 1,420 pages to Plaintiff, and by what date. Second, please

---

[1] DHS-OIG referred 220 pages to ICE in November 2022; 280 pages in December 2022; 9 pages in March 2023; 328 pages in June 2023; and 583 pages in July 2023, for a total of 1,420 pages. This does not include the 581 pages of documents described on page 182 of OIG's June 2023 production.

confirm whether Defendants will produce the 581 pages of documents described and reviewed by OIG at page 182 of OIG's June 2023 production, and if so, by which Defendant, and by what date. Third, please confirm whether ICE will produce documents described at page 144-46 of OIG's June 2023 production, which include ICE notifications, emails, and forms regarding Mr. Teka Gulema's release from custody, and by what date.

Please note that OIG's referral of documents to ICE "constitutes a 'withholding' under FOIA 'if its net effect is significantly to impair the requester's ability to obtain the records or significantly to increase the amount of time he must wait to obtain them.'" *Keys v. Dep't of Homeland Sec.*, 570 F. Supp. 2d 59, 67 (D.D.C. 2008). At this point, OIG's referral of documents to ICE has delayed production by at least five months or more. *See* Pl.'s Nov. 9, 2023 Letter (requesting that Defendants prioritize production of referred documents).

Regarding OIG's referral of records to ICE as the "originator of the records," we disagree that OIG followed the prescribed procedures set forth in *McGhee v. CIA*, 697 F.2d 1095, 1111 (D.C. Cir. 1983) to ensure "prompt and public" processing of the records for disclosure to Plaintiff. Among other things, OIG has never established that ICE had the "intent to control" those records, *id.*, such that OIG was justified in referring them to ICE for processing.

Regarding Defendants' refusal to search the specified DHS components to which OIG referred responsive records as their originator, it is irrelevant that on May 18, 2022 the DHS Privacy Office only referred Plaintiff's Request to OIG and ICE. That is because upon OIG's identification of responsive records in its possession that it deemed necessary to refer to other DHS components, particularly given the subject matter of Plaintiff's Request and Plaintiff's specific request that it do so, Defendants were required to follow this "clear and certain" lead and search those components. *Lawyers' Comm. for C.R. Under L. v. United States Dep't of Just.*, No. 18-CV-167 (EGS/GMH), 2020 WL 7319365, at *11 (D.D.C. Oct. 16, 2020), report and recommendation adopted, No. CV 18-167 (EGS/GMH), 2021 WL 1197730 (D.D.C. Mar. 30, 2021) (*quoting Kowalczyk v. DOJ*, 73 F.3d 386, 388–89 (D.C. Cir. 1996)).

Here, Plaintiff's Request did not identify only certain DHS components to be searched, and indeed it sent the Request to the DHS Privacy Office to ensure that all appropriate DHS components be searched. 6 C.F.R. § 5.3(a)(2); *see also Lawyers' Comm.* at 10-11 (finding agency obligation to search other components regardless of whether Requester sent the Request to a specified referral unit). Further, upon obtaining correspondence in March and June of 2023 that OIG had identified responsive records that originated in other DHS components, Plaintiff specifically asked Defendants to search these components. *See* Plaintiff's September 14, 2023 letter at 2. Plaintiff was more than justified in doing so because the records are admittedly responsive to Plaintiff's request, and coupled with Plaintiff's specific request to search the limited number of additional components where they originated, Defendants had "a lead so

apparent that the [agency] [could] not in good faith fail to pursue it." *Lawyers' Comm.* at 11 ("once the [Requester] informed the agency of the records at issue and identified by name and department the [component] who had them 'in their possession,' it provided 'a lead that [was] both clear and certain') (internal citations omitted).

For these reasons, Plaintiff again asks Defendants to search all DHS components to which OIG referred responsive records, including but not limited to CBP, DHS CRCL and the unidentified component specified in OIG's June 29, 2023 letter. If Defendants continue to refuse to do so, Plaintiff will seek appropriate Court intervention.

### B.  Documents Remaining to Be Produced by DHS-OIG

On September 14, 2023, Plaintiff specifically requested that DHS-OIG produce the following responsive documents, which were referred to in documents produced by OIG. Pl.'s Sept. 14, 2023 Letter. On October 2, 2023, Defendants stated that "if they were in OIG's possession, they likely would have been referred to ICE for review and processing." Defs.' Oct. 2, 2023 Letter. Defendants have yet to produce these records. At our next conference, please confirm which Defendant will produce these documents, and by what date Defendants will produce them:

- December 2022 OIG production, pages 80-82, regarding Johana Medina Leon: Please provide the documents referenced in the report, where "copies of the final executive summary and emails documenting Medina's [sic] decision to release her from ICE ERO custody. Copies of the aforementioned documents will be placed in the case file."
- December 2022 OIG production, pages 83-85, regarding Johana Medina Leon. Please provide the documents referenced in the report, where "[a] copy of [REDACTED] emails between the MTC and ICE ERO management, the executive summary, and the OCPC final report of findings will be placed into the case file."
- March 2023 OIG production, page 48, regarding a question about the number of OIG's investigations into out-of-custody deaths, to which the El Paso ICE Field Office, responded, "approximately five investigations." Please provide documents related to these five investigations.
- June 2023 OIG production, page 180, regarding OIG's investigation into Teka Gulema's death, where OIG noted review of "an email dated November 24, 2015 from [REDACTED], Field Office Director, ICE, New Orleans, LA. The email was to [REDACTED], Field Medical coordinator, IHSC, New Orleans, LA. The email stated "FYI, HQ has directed we serve a release letter on Dr. [REDACTED] and release Gulema from ICE custody today." Please provide the document referenced here.

3

## II.    ICE's Production

### A.    Parts 1-3

Thank you for the information about the number of remaining records for each of the individuals named in the Request. Regarding any medical records dated before October 1, 2015 that are attached to the post October 1, 2015 Gulema emails, we agree that ICE may process only the emails and may exclude the attachments at this time. Upon ICE's production of these documents, Plaintiff may identify specific email attachments that we would ask ICE to produce, but this will hopefully be no more than a few discrete attachments. As such, please provide us with any revised hit count for post-October 1, 2015 records related to Mr. Gulema that remain to be produced by ICE.[2]

In addition, to the extent that ICE has not produced documents related to Teka Gulema, Martin Vargas Arrellano, Jose Ibarra Bucio, and Johana Medina Leon in response to Parts 1-3 that were referred by DHS-OIG, please provide a hit count for the remaining number of pages to be produced, and the date by which Defendants plan to produce those documents at our next conference.

It also appears that ICE has produced incomplete versions of certain documents in response to Parts 1-3, and that several of these missing or partially-scanned pages provide critical information regarding failures of medical treatment and decision to release the named individuals from custody. Plaintiff requested full, readable copies of these documents on September 14, 2023. On November 30, 2023, Defendants refused to state when these documents would be produced in full, stating only that they would be provided "in due course." The specific document deficiencies are as follows:

- ICE's December 2022 Production, page 2648: This email was only partially produced. The sender is a commander in the U.S. Public Health Service, responding to an email sent on July 29, 2015, with the subject line: Re: Follow-Up Requested RE: SDI update: Teka Gulema, discussing medical care deficiencies provided at the detention facility.

- ICE's July 2023 Production, pages 7197-7200. This document, titled "ERO New Orleans-Teka GULEMA, A28021556" is dated "November 10, 2022." However, it appears that this date is incorrect, perhaps an inadvertent automatic update of the processing date, as the document references a recommendation that ERO release Mr. Gulema on a letter of supervision, and because Mr. Gulema died in 2016.

---

[2] As Plaintiff has noted, any agreement regarding waiver of documents dated prior to October 2015 regarding Mr. Gulema does not apply to documents referred by DHS OIG to ICE.

- ICE's August 2023 Production, page 7504. This document, which contains only the bottom half of the document, appears to be a document dated Feb. 22, 2019, documenting the timeline for in-custody medical care provided to Mr. Ibarra Bucio immediately before he was transferred via ambulance to the hospital.

Please provide a specific date by which ICE will correct these deficiencies and produce the complete documents specified above.

### B. Part 4

Thank you for providing the latest results of ICE's search, separated by search term. At present, Defendants represent that it has conducted a search resulting over 142,000 potentially responsive email documents.

In order to narrow the scope of records searched by Defendants, Plaintiff suggests, as previously requested in our November 9, 2023 letter, that Defendants conduct a search for records responsive to Part 4 on ICE ERO and IHSC servers or shared drives where stand-alone directive, policy, practice, procedure, training, guidance and instruction documents are likely to be located. We believe that "a professional employee of the agency . . . familiar with the subject area of the request" can "locate the record[s] with a reasonable amount of effort. *Yagman v. Pompeo*, 868 F.3d 1075, 1081 (9th Cir. 2017). These professionals could, for example, include Deborah Fleischaker (Executive Secretary of DHS) and Stewart Smith and Ada Rivera (IHSC). We ask that ICE use the search terms specified in Plaintiff's October 19, 2023 letter at Part 4, and previously agreed upon by ICE, and provide hit counts for those files. Please provide the search terms used, search locations, and hit count (disaggregated by search terms and locations) for Part 4 by January 22, 2024. *See* Dec. 8, 2023 Order at 12. These terms are listed below for your convenience:

- Defendants first should search for the following keywords: (directive or policy or policies or protocol or procedure or training or guidance or instruction or standard) **AND** (custody or death or died or deceased or decedent or discharge or surgery or specialist or COVID-19 or hospital or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal). This search string is under 450 characters. Defendants should save the results of this Boolean search.
- After running this first Boolean search, Defendants should then conduct a search for documents that fall within these saved search results and include at least one of the following keywords: (release or transfer or benefits or parole or "alternative

detention" or discharge or OSUP or "order of supervision" or humanitarian). This
second string, again, is under 450 characters.

**Please exclude:** Any version of ICE Detention Standards (NDS 2000, PBNDS 2008,
PBNDS 2011, NDS 2019), or ICE's COVID-19 Pandemic Response Requirements.

To the extent that this search results in more precise, narrowly-tailored results, Plaintiff
could agree to narrow its request to eliminate a search for "communications," and instead, limit
the search to "ICE and IHSC directives, policies, procedures, protocols, and trainings that
contain instructions or standards about the release from custody of (a) hospitalized detainees; or
(b) detainees who at the time of release were patients in the care of external healthcare providers
or facilities."

Regarding ICE's response that its prior search of email records was conducted by
searching "the three custodians previously identified," Plaintiff assumes this means ICE only
searched the email files of Tae Johnson, Deborah Fleischaker, and Scott Schuchart. *See* ICE
November 11, 2023 letter at 3.  As stated above, we ask that ICE conduct an independent search
of non-email files, including servers or shared drives where stand-alone directive, policy,
practice, procedure, training, guidance and instruction documents are likely to reside. Until this
search is complete, we will hold off on our request that ICE search any additional custodians,
including Tae Johnson's predecessors.

Finally, thank you for tasking a search of ORAP and IHSC. Please identify the locations
being searched, and the search terms and any other parameters ICE is applying to this search.

## C.  Part 5

ICE has run a search of emails of Dr. Stewart Smith, resulting in a hit count of 551 pages.
However, as Plaintiff has raised, this search is inadequate, as it consists only of one custodian
from one subagency and is on its face incomplete. Pl.'s Nov. 9, 2023 Letter. As the Court noted
in its Order, Plaintiff has "proposed a compromise that Defendants limit the search to staff . . .
who participate in the weekly SDI meeting, and any custodian who possess[es] the SDI list."
Dec. 8, 2023 Order at 11.

For this reason, Plaintiff requests that Defendants conduct a search of ICE (including
IHSC, ICE ERO Field Operations, and OPLA) staff who participate in SDI meetings, as well as
any custodian who possesses the SDI list. Please provide a hit count for this search,
disaggregated by custodian (which can be identified by position) and by search term, to allow
parties to work together cooperatively to narrow a search if necessary. Please provide this
information by January 22, 2024. *See* Dec. 8, 2023 Order at 12. The previously agreed-upon
search terms are listed below for your convenience:

(1) Death; (2) Died; (3) Deceased; (4) Ambulance; (5) Emergency; (6) "offsite referral";
(7) "life support"; (8) coma; (9) ventilator; (10) "intensive care"; (11) "critical
condition"; (12) hospice; (13) palliative; and (14) release.

ICE should then perform the following Boolean search in Relativity:
(release or transfer or benefits or parole or "alternative detention" or discharge or OSUP
or "order of supervision" or humanitarian) AND (custody or death or died or deceased or
surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or
"emergency department" or "emergency services" or "poor outcome" or "life support" or
"offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical
observation" or ICU or "critical condition" or hospice or palliative or fatal).

### D.  Parts 6 and 7

Plaintiff appreciates Defendants' agreement to search JIOC for SIRs and SENs not
created by OIG or OPR. *See* Dec. 8, 2023 Order at 11.  Please identify specific search locations
(i.e. names of custodians and/or records systems), and conduct a search with the following search
terms, to which Parties have already agreed. *See* Pl.'s Jun. 12, 2022 letter at 6; Defs.'s Jun. 22,
2023 letter at 3. Please confirm the search terms used, search locations, and hit count
(disaggregated by search terms and locations) for Parts 6 and 7 by January 22, 2024. *See* Dec. 8,
2023 Order at 12.

(1) Death; (2) Died; (3) Deceased; (4) Ambulance; (5) Emergency; (6) "offsite referral";
(7) "life support"; (8) coma; (9) ventilator; (10) "intensive care"; (11) "critical
condition"; (12) hospice; (13) palliative; and (14) release.

ICE should then perform the following Boolean search in Relativity:
(release or transfer or benefits or parole or "alternative detention" or discharge or OSUP
or "order of supervision" or humanitarian) AND (custody or death or died or deceased or
surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or
"emergency department" or "emergency services" or "poor outcome" or "life support" or
"offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical
observation" or ICU or "critical condition" or hospice or palliative or fatal).

### E.  Part 8

Thank you for your further commitment that ICE will not "omit" for its search results
"documents that were compiled or utilized in *Fraihat v. ICE*." However, Plaintiff maintains that
if there is a central repository of documents in that case that are likely to have responsive
records, that repository should be searched. Please let us know if ICE has inquired with those

familiar with ICE's data-collection efforts relevant to the *Fraihat* litigation whether such a repository exists, and if so whether it will be searched for this case. Please confirm the search terms used, search locations/custodians (by position if names are not provided), and hit count (disaggregated by search terms and locations) for Part 8 by January 22, 2024. *See* Dec. 8, 2023 Order at 12.

### F.  Part 9

Thank you for agreeing to conduct the additional search for records responsive to Part 9. Please confirm the search terms used, search locations/custodians (by position if names are not provided), and hit count (disaggregated by search terms and locations) for Part 9 by January 22, 2024. *See* Dec. 8, 2023 Order at 12.

Sincerely,

LABONI A. HOQ (SBN 224140)
laboni@hoqlaw.com
HOQ LAW APC
P.O. Box 753
South Pasadena, California 91030
Telephone: (213) 973-9004

EUNICE CHO (pro hac vice)
echo@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
915 Fifteenth Street NW, 7th Floor
Washington, DC 20005
Telephone: (202) 548-6616

MICHAEL KAUFMAN (SBN 254575)
MKaufman@aclusocal.org
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West Eighth Street
Los Angeles, California 90017 Telephone:
(213) 977-9500
Facsimile: (213) 915-0219

KYLE VIRGIEN (SBN 278747)
kvirgien@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (202) 393-4930

*Attorneys for Plaintiff*

# EXHIBIT I



# United States Department of Justice

## United States Attorney's Office
## Central District of California

---

*JOSEPH W. TURSI*
*JASON K. AXE*
*Assistant United States Attorney*
*Phone: (213) 894-3989/8790*
*E-mail: Joseph.Tursi@usdoj.gov*
         *Jason.Axe@usdoj.gov*

*Federal Building*
*300 N. Los Angeles Street, Suite 7516*
*Los Angeles, California 90012*

November 30, 2023

**VIA E-MAIL**

Laboni A. Hoq
Hoq Law, APC
P.O. Box 753
South Pasadena, CA 91030

     Re:    ACLU of SoCal v. ICE, et al.
                C.D.CA Case No. 2:22-cv-04760-SHK

Dear Ms. Hoq:

The following responds to Plaintiff's November 9, 2023 correspondence. As before, Defendants respond to the issues raised by Plaintiff in order:

## I.      DHS-OIG Production

The 911 pages will be released in due course from ICE as that entity was determined to be the originator of the records. Your citation to *McGehee v. CIA*, 697 F.2d 1095, 1111 (D.C. Cir. 1983) for the proposition that a referral be "prompt and public" describes what occurred in this case. By letters dated June 29, 2023 and July 31, 2023, Plaintiff was advised that 328 pages and 583 pages were being referred to ICE. Therefore, OIG's referral of those documents to ICE was proper. *See also* 6 C.F.R. § 5.4(d)(3) ("Ordinarily, the component or agency that created or initially acquired the record will be presumed to be best able to make the disclosure determination.").

Plaintiff identifies three disagreements with OIG's production. The first, "withholding pursuant to an 'unspecified statute'" was addressed in OIG's October 2, 2023 correspondence. Turning to the second, "improper redactions," please advise what specific pages/redactions Plaintiff is challenging. As we discussed with the Magistrate Judge, OIG requests that you identify the specific redactions Plaintiff is challenging so we can review them further to determine if it is possible to narrow any potential issues for summary judgment briefing. Third, OIG's position is that it has produced complete documents. If there are specific documents Plaintiff believes are incomplete, please identify them by the month produced and corresponding PDF page number.

As for Plaintiff's request that DHS ask other components to conduct independent searches for records, Defendants will not do so. Plaintiff directed its request to ICE, OIG, and the

Ms. Laboni A. Hoq
RE: ACLU of SoCal v. ICE
November 30, 2023
Page 2

DHS Privacy Office specifically. *See* Dkt. 24-1 at 2. In its May 18, 2022 correspondence, a copy of which is enclosed, the DHS Privacy Office advised that it "determined that the records sought, should they exist, would not be under purview of the DHS Privacy Office. Any responsive records would be held by the DHS Office of the Inspector General (OIG) and/or U.S. Immigration and Customs Enforcement (ICE). As you have already submitted your request to the aforementioned office, we are closing your Privacy Office request and will defer to the OIG and ICE's response(s)." Plaintiff did not object to the DHS Privacy Office's position, and Defendants' position is that DHS is not obligated to require other components to conduct independent searches.

Plaintiff cannot reasonably argue that because DHS is a named defendant, that would mean that *every* DHS component is required to conduct a search. Indeed, DHS "has a decentralized system for processing requests, with each component handling requests for its records." 6 C.F.R. § 5.1(c). As DHS's FOIA regulations provide, "a requester should write directly to the FOIA office of the component that maintains the records being sought." *Id.* at § 5.3(a)(1). That said a requestor "may also send his or her request to the Privacy Office … [which] will forward the request to the component(s) that it determines to be most likely to maintain the records that are sought." *Id.* Here, the Privacy Office did so, and if Plaintiff wishes to request that other components conduct searches, it is free to submit separate FOIA requests to those components.

## II.    ICE Production

### A.  Parts 1-3

ICE estimates that the remaining records for each individual are approximately as follows: 1,730 for Mr. Gulema from after October 2015, 1,100 for Mr. Bucio, and 5,200 for Mr. Arellano. Please note, the remaining Gulema records are mostly emails that attach medical records that predate October 2015. Does Plaintiff want ICE to process the attachments with the emails?

As addressed in our November 2, 2023 correspondence, ICE will produce Bates 7197-7200, 2648, 7504, and 8313 in due course. On that note, ICE expects to produced 8313 in its December production.

### B.  Part 4

ICE's initial search returned over 416,000 hits as follows:

(1) Directive-38,230
(2) Policy-274,713
(3) Protocol- 15,594
(4) Procedure-24,661
(5) Training-82,704

Ms. Laboni A. Hoq
RE: ACLU of SoCal v. ICE
November 30, 2023
Page 3

    (6)  Guidance- 84,697
    (7)  Instructions-14,465
    (8)  Standard-65,208
    (9)  Death-37,003
    (10)"offsite referral"-54
    (11) "emergency room"-3,636
    (12) "emergency department"-1,950
    (13) "life support"- 1,811
    (14) coma-867
    (15) ventilator-2,050
    (16) "intensive care"-2,348
    (17) hospice- 715
    (18) palliative-131
    (19) release-209,752

Following the proposal put forth in Plaintiff's October 5, 2023 correspondence, ICE has narrowed the search to approximately 142,000 potentially responsive documents. The hit counts are as follows:

    (1) Alternative detention – 403
    (2) Order of supervisions – 3,093
    (3) Benefits – 19,238
    (4) OSUP – 1,864
    (5) Parole – 21,791
    (6) Release – 112,156
    (7) Transfer – 37,255

ICE is unclear what Plaintiff means by "server files" or "non-custodial source". The searched locations were the three custodians previously identified.

As stated in ICE's November 2, 2023 correspondence, it has no objection to searching the emails of the Directors of ICE prior to Tae Johnson. Again, obtaining and searching their archived emails could take several weeks.

Finally, ICE has tasked this search to ORAP and IHSC as well.

### C.  Part 5

ICE maintains its position at this time that this search is complete. The records will be processed in due course. After these records have been processed, ICE will consider whether additional searches are needed.

Ms. Laboni A. Hoq
RE: ACLU of SoCal v. ICE
November 30, 2023
Page 4

    **D.  Part 6**

ICE has no objection to searching JIOC and will do so.

    **E.  Part 7**

ICE has no objection to searching JIOC and will do so.

    **F.  Part 8**

    As previously stated, in responding to this Part, ICE will not "omit" documents that were compiled or utilized in *Fraihat v. ICE*. If documents pertaining to *Fraihat* appear in the responsive records, then they will be produced.

    **G.  Part 9**

    Thank you for confirming that Plaintiff agrees with the approach to the search as detailed in our November 2, 2023 correspondence. ICE will now conduct those searches and provide you with a resulting hit count in January 2024.


Respectfully,

E. MARTIN ESTRADA
United States Attorney

/s/ *Joseph W. Tursi*

JOSEPH W. TURSI
Assistant United States Attorney

Encl.

cc: Ms. Eunice Cho (by email)
    Mr. Michael Kaufman (by email)
    Mr. Kyle Virgien (by email)

**U.S. Department of Homeland Security**
Washington, D.C. 20528



*Privacy Office, Mail Stop 0655*

May 18, 2022

Michael Kaufman
Senior Staff Attorney
ACLU of Southern California
1313 West 8th Street
Los Angeles, CA 90017

Re: **2022-HQFO-00989**

Dear Mr.Kaufman:

This letter acknowledges receipt of your Freedom of Information Act (FOIA) request to the Department of Homeland Security (DHS), Privacy Office, dated April 29, 2022, and received in this office on May 2, 2022.  You requested documents regarding any and all records that were prepared, received, transmitted, collected, and/or maintained by Immigration and Customs Enforcement (ICE) or the Department of Homeland Security that describe, refer, or relate to the release of hospitalized detainees from custody prior to their death; any records related to release of individual detainees once hospitalized; and any records related to the death of such detainees after their release from custody, including any communications or investigations. Unless otherwise noted, we request the records specified below from January 1, 2016 to the present. Specifically:

1. Any and all documents, without limitation to date, including any communications, investigatory reports, and any and all exhibits, appendices, or attachments thereto, relating to the hospitalization, death, decision to release from custody, or release from custody of the following individuals: Teka Gulema, Johana Medina Leon, Jose Ibarra Bucio, Martin Vargas Arellano

2. Any and all DHS OIG reports of investigation that are identified in any of the records responsive to Request #1. This includes any and all exhibits, appendices, or attachments to the DHS OIG reports of investigation.

3. Any and all ICE OPR reports of investigation that are identified in any of the records responsive to Request #1. This includes any and all exhibits, appendices, or attachments to the DHS OPR reports of investigation.

4. Any and all documents and communications, including ICE and IHSC directives, policies, procedures, protocols, or trainings that contain guidance, instructions, or standards about the release from custody of (a) hospitalized detainees; or (b) detainees who at the time of release were patients in the care of external healthcare providers or facilities. Detainees specified in (a)

and (b) above shall include those being treated for COVID-19 during their hospitalization or treatment at external healthcare providers or facilities.

5. Spreadsheets, emails, documents, communications, databases, lists, and other data compilations in the possession of ICE Leadership, ICE Enforcement and Removal Operations, ICE Health Service Corps, and ICE Office of Professional Responsibility that identify detainees who were released from custody while (a) hospitalized (including for COVID-19 treatment); (b) in the full-time care of external healthcare providers or facilities (including for COVID-19 treatment), or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility. Requested materials include, but are not limited to, dates of hospitalization of detainees, dates of hospital or external care facility discharge, name of treated detainees' detention facilities, and reasons for detainees' hospitalization or external medical care. These materials should further include Medical Transfer Summary documents from DHS's eHR System and Alien Medical Records System, and any versions of the Significant Detainee Illness Spreadsheet that identify detainees who were released from custody while (a) hospitalized (including for COVID-19 treatment); (b) in the care of external healthcare providers or facilities (including for COVID-19 treatment); or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility.

6. Spreadsheets, emails, significant incident reports (SIRs), significant event notification reports (SENs), or documents created by DHS OIG or ICE OPR that mention the release from custody of (continued in request PDF).

Upon review your request, our office has determined that the records sought, should they exist, would not be under purview of the DHS Privacy Office. Any responsive records would be held by the DHS Office of the Inspector General (OIG) and/or U.S. Immigration and Customs Enforcement (ICE). As you have already submitted your request to the aforementioned office, we are closing your Privacy Office request and will defer to the OIG and ICE's response(s).  We have included contact information for the OIG and ICE FOIA offices below for your convenience:

<u>ICE</u>
Freedom of Information Act Office
500 12th Street, SW, Stop 5009
Washington, D.C. 20536-5009
Phone: 866-633-1182 | Fax: 202-732-4265 | E-mail: ice-foia@dhs.gov

<u>OIG</u>
FOIA Public Liaison
DHS-OIG Counsel
STOP 0305
245 Murray Lane, SW
Washington, D.C. 20528-0305
Phone: 202-981-6100 | Fax: 202-245-5217 | E-mail: FOIA.OIG@oig.dhs.gov

If you need to contact our office again about this matter, please refer to **2022-HQFO-00989**. You may contact this office at 1-866-431-0486 or 202-343-1743 or at foia@hq.dhs.gov.

Sincerely,

Jimmy Wolfrey
Senior Director, FOIA Operations and Management (Acting)

# EXHIBIT J

November 9, 2023

Joseph Tursi
Jason Axe
Alarice Medrano
United States Attorney's Office
Central District of California
300 N. Los Angeles St. Suite 7516
Los Angeles, CA 90012
Joe.Tursi@usdoj.gov
Jason.Axe@usdoj.gov
Alarice.Medrano@usdoj.gov

**SENT VIA EMAIL**

> Re:     *ACLU of Southern California v. United States Immigration and Customs
> Enforcement, et al.,* No. 2:22-cv-4760 (C.D. Cal.)

Dear Counsel:

We write in response to Defendants' November 2, 2023 letter.

## I.      DHS-OIG Production

Regarding the 911 total pages (328 and 583 pages) of responsive records that OIG referred to
ICE for processing, Defendants are mistaken that Plaintiff is asking that OIG to "review" those
records. Further, Plaintiff is unaware of any authority indicating that it would be "inappropriate"
for ICE to send back to OIG for production to Plaintiff the records that were in its possession,
after they have been reviewed by ICE. Rather, Plaintiff's request that OIG produce the records it
referred to ICE is consistent with its obligation to ensure that the referral be "prompt and public."
*McGehee v. C.I.A.,* 697 F.2d 1095, 1111 (D.C. Cir.), on reh'g sub nom. *McGehee v. Cent. Intel.
Agency,* 711 F.2d 1076 (D.C. Cir. 1983) ("as soon as the agency retrieved responsive documents
… it would identify those records that originated elsewhere"). If you have authority for this
position, please provide it to us. Without such, we again request that DHS-OIG immediately
produce the 911 pages that were in its possession, and were referred to ICE, directly to Plaintiff
after review. In the alternative, Plaintiff requests that ICE immediately produce the records to
Plaintiff, separate from its stipulated monthly production of its own records, identifying that they
are the records referred to ICE by OIG.

Regarding the remaining disagreements Plaintiff has with OIG's production, Plaintiff has
identified these issues before, including (1) withholding of information pursuant to an
"unspecified statute"; (2) improper redactions; and (3) failure to produce complete documents.
Plaintiff's will follow up with Defendants within the next few weeks to meet and confer
regarding a potential motion for summary judgment schedule for OIG in the event we cannot
resolve our disputes.

Further, regarding the records in OIG's possession that it referred to other DHS components,
to be clear, we are asking Defendants, including DHS, who is a party to this lawsuit, to ask these

1

other components to conduct an independent search using the search parameters we have provided. Please confirm whether or not Defendants will do so.

## II.    ICE Production

### A.  Parts 1-3

Thank you for notifying us that ICE was able to isolate 318 pages of records dated after October 1, 2015 regarding Mr. Gulema. We look forward to reviewing those documents in the next production. With respect to these documents, Plaintiff seeks to further understand the circumstances related to Mr. Gulema's hospitalization after this date, his death, ICE's decision to release Mr. Gulema from custody, and Mr. Gulema's release from custody. Review of these documents will also allow us to assess, based on any references therein, whether there are specific documents created before October 2015 that ICE has not produced thus far.

We appreciate that Defendants will produce documents in the sequence requested (first, post-October 1, 2015 Gulema documents; second, Ibarra Bucio; third, Vargas Arrellano; and fourth, the remaining Gulema documents; you have represented that ICE has completed its production regarding Ms. Medina Leon). However, as we requested on October 19, 2023, we again request that Defendants provide a hit count for each of the individuals for which ICE has remaining records, including Mr. Gulema, Mr. Ibarra Bucio, and Mr. Vargas Arellano. Please do so by **November 20, 2023**.

On September 14, 2023, and on repeated occasions since, we have requested that ICE produce deficient documents. You have confirmed that you have obtained Bates 8313. However, we requested that ICE produce the complete email. Please obtain the entire email document, and produce it by **November 20, 2023.**

Likewise, we appreciate ICE's efforts regarding Bates No. 2648. Again, we requested that ICE produce the complete email, as only part of it was partially produced at 2648. Please obtain the entire email document, and produce it by **November 20, 2023.**

We also appreciate ICE's efforts to obtain Bates Nos. 7197-7200, and 7504. Given the length of time that has passed since our initial request, please produce them by **November 20, 2023.** We appreciate that Defendants identify the above documents as corrective supplements to our letters of September 14, 2023, and October 19, 2023.

### B.  Part 4

Thank you for running the revised Boolean search for documents in response to Part 4, as Plaintiff requested on October 19, 2023, and for providing the update that the search resulted in approximately 142,000 documents. In order to tailor the search more narrowly, Plaintiff requests that Defendants provide the following information:

- Please provide a hit count for each of the initial collection search terms below, and by custodian, by **November 20, 2023**. This information will help identify if there are any

terms that are overinclusive, and may help craft more tailored search or collection parameters:

- ○ Search terms:
  - ▪ (1) Directive; (2) Policy; (3) Protocol; (4) Procedure; (5) Training; (6) Guidance; (7) Instructions; (8) Standard; (9) Death; (10) "offsite referral"; (11) "emergency room"); (12) "emergency department"; (13) "life support"; (14) coma; (15) ventilator; (16) "intensive care"; (17) hospice; (18) palliative; and (19) release. *See* Defs' Jun. 22, 2023 letter at 2 (identifying agreed-upon terms).

- In addition, please identify whether Defendants have searched DHS, ICE, and IHSC server files or any other non-custodial source in response to Part 4 by **November 20, 2023**. Plaintiff suspects that the overbroad search results may be due in part to the fact that Defendants are primarily searching email files, instead of server locations where ICE and IHSC directives, policies, procedures, or trainings would be kept. A targeted search of these files may identify a narrower and more specific universe of results, and Plaintiffs may be able to waive or significantly narrow the email collection in favor of this more specific universe.

  - ○ If Defendants' search does not include server files, Plaintiff requests that Defendants perform one with the search terms and Boolean search specifications identified in Plaintiff's October 19, 2023 letter for Part 4, and provide a hit count of those files by **November 20, 2023.** Again, these steps may identify a narrower and more specific universe of results, and Plaintiffs may be able to waive or significantly narrow the email collection as a result.

Plaintiff again reiterates that ICE's search with respect to Part 4 is insufficient as it excludes a search of an ICE Health Service Corps ("IHSC") custodian. Part 4 of Plaintiff's FOIA requests "any and all documents and communications, including ICE and **IHSC** directives, policies, procedures, protocols, or trainings . . . ." Dkt. 1-1. As we have noted, Defendants' search should, at a minimum, include an IHSC source, which it does not. For that reason, Plaintiff requests that Defendants conduct the search parameters identified above to include an IHSC custodian. To the extent that a search of email documents is needed, Plaintiff reiterates that ICE Directors prior to Tae Johnson should be searched.

**C. Part 5**

Plaintiff appreciates that ICE has run a search of emails of Dr. Stewart Smith, which has resulted in a hit count of 551 pages. However, this search is inadequate, as it plainly fails to respond to the requested search. Part 5 specifies that Defendants produce documents including "spreadsheets, emails, documents, communications, databases, lists, and other data compilations . . . in the possession of ICE Leadership, ICE Enforcement and Removal Operations, ICE Health Service Corps, and ICE Office of Professional Responsibility that identify detainees . . . includ[ing] . . . the Significant Detainee Illness Spreadsheet. . . ." A search that consists only of one custodian from *one* subagency is on its face incomplete.

Plaintiff previously attempted to narrow the search to ICE staff that are involved in the
ICE Significant Detainee Illness Process (which include ICE's Medical Case Management Unit
and Medical Care Coordination Staff). *See* Dkt. 50-2 at 164-65 (Significant Detainee Illness).
Plaintiff appreciates the additional information regarding custodians, but Defendants'
information again misconstrues the request. Plaintiff has requested that ICE conduct a search of
ICE officials who participate in the SDI process.

As an effort to narrow the search, Plaintiff requests at this time that Defendants search the
ICE (including IHSC, ICE ERO Field Operations, and OPLA) staff who participate in the SDI
*meeting*, as well as any custodian who possesses the SDI list and documents related to
individuals placed on the SDI list. As documents produced by Defendants indicate, this should
result in a more limited set of custodians to be searched. *See id.* at 165 (specifying participants in
SDI meeting); *see also* Exhibit A, Bates No. 2466 (Email from Managed Care Coordinator,
IHSC/ERO, Feb. 13, 2015, regarding "ERO short list in preparation for this week's SDI
meeting."). Please conduct a search of these custodians by **November 20, 2023**, and provide a
resulting hit count.

### D. Part 6

The Parties have already agreed to the search terms for Part 6: *See* Plaintiff's Jun. 26,
2023 letter at 3; Email from Jason Axe, Jun. 9, 2023. Defendants have refused to search SIRs and
SENs within the possession of ICE for these search terms. As Plaintiff has repeatedly clarified,
Part 6 is *not* limited to DHS OIG and OPR. *See* Plaintiff's Oct. 19, 2023 letter (noting that "or" is
a grammatically disjunctive term, and citing *United States v. Nishiie*, 996 F. 3d 1013, 1023 (9th
Cir. 2021). Defendants' failure to search SIR and SEN records is not supported by this strained
reading of Plaintiff's request.

Plaintiff has also repeatedly addressed Defendants' claim that each ERO field office
requires individual identifying information for cases to search SIR and SEN records. As Plaintiff
has repeatedly noted, Defendants may conduct a search for SIR and SEN records compiled by
the ICE Joint Intelligence Operations Center (JIOC), which "analyzes the SIRS and sends
summaries of them to the appropriate . . . field offices." DHS, Privacy Impact Assessment for the
Significant Event Notification (SEN) System 1-2, Oct. 15, 2021,
https://www.dhs.gov/sites/default/files/publications/privacy-pia-ice023a-sen-october2021.pdf
(describing the Significant Incident Report system and those who have access to reports). *See*
Dkt. 57-2 at 85-86 (Plaintiff's Jul. 12, 2023 letter); Dkt. 57-2 at 124 (Plaintiff's Sept. 14, 2023
letter, noting same); Plaintiff's Oct. 19, 2023 letter (stating same). Defendants have yet to explain
why a search of JIOC for the SIR records is not possible.

### E. Part 7

Plaintiff reiterates its response regarding Parts 5 and 6 with respect to ICE's failure to
search for responsive documents.

### F. Part 8

4

Plaintiff appreciates Defendants' search for responsive documents to Part 8. Plaintiff again reiterates that ICE has responsive documents regarding hospitalization and/or release of detainees with COVID-19 compiled for or utilized in *Fraihat v. ICE*. *See* Plaintiff's Jun. 12, 2023 letter at 6;  Plaintiff's Jun. 26, 2023 letter at 3 (citing to deposition of Jennifer Moon) ("I think the only place where we were actually capturing the hospitalization is on the Fraihat."). Any search that omits such sources is necessarily inadequate.

### G.  Part 9

Plaintiff agrees with the proposed approach to the search for Part 9 as described in Defendants' November 2, 2023 letter. Please provide a resulting hit count; Plaintiff reserves the right to further suggest alternative search terms or locations based upon the results.


Sincerely,


LABONI A. HOQ (SBN 224140)
laboni@hoqlaw.com
HOQ LAW APC
P.O. Box 753
South Pasadena, California 91030
Telephone: (213) 973-9004

EUNICE CHO (pro hac vice)
echo@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
915 Fifteenth Street NW, 7th Floor
Washington, DC 20005
Telephone: (202) 548-6616


MICHAEL KAUFMAN (SBN 254575)
MKaufman@aclusocal.org
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West Eighth Street
Los Angeles, California 90017 Telephone:
(213) 977-9500
Facsimile: (213) 915-0219

KYLE VIRGIEN (SBN 278747)
kvirgien@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (202) 393-4930

*Attorneys for Plaintiff*

# EXHIBIT A

| From: | (b)(6); (b)(7)(C) |
|---|---|
| Sent: | Fri, 13 Feb 2015 11:01:11 -0500 |
| To: | (b)(6); (b)(7)(C) |

(b)(6); (b)(7)(C)

(b)(6); (b)(7)(C)

| Cc: | #IHSC FMC-EAST;#IHSC FMC-WEST;(b)(6); (b)(7)(C) |
|---|---|

(b)(6); (b)(7)(C)

| Subject: | ERO Short List 2/17/15 |
|---|---|
| Attachments: | ERO 02-17-15.xls |

Good morning,

Please find attached the ERO short list in preparation for next week's SDI meeting, 2/17/15.

(b)(6); (b)(7)(C)   **RN, BSN, CPHM**
Lieutenant Commander, US Public Health Service
Managed Care Coordinator
ICE Health Service Corps
Enforcement Removal Operations
500 12th St. SW, 2nd floor
Mail Stop # 5203
Washington DC 20536
Office: (b)(6); (b)(7)(C)
Cell:
Fax:
(b)(6); (b)(7)(C)   @ice.dhs.gov

Warning: This document is UNCLASSIFIED/FOR OFFICIAL USE ONLY (U/FOUO) It contains information that may be exempt from public release under the Freedom of Information Act (5 USC. 552). It is to be controlled, stored, handled, transmitted, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid 'need-to-know' without prior approval of an authorized DHS official. No portion of this report should be furnished to the media, either in written or verbal form.

# EXHIBIT K



# United States Department of Justice

### United States Attorney's Office
### Central District of California

*JOSEPH W. TURSI*
*JASON K. AXE*
*Assistant United States Attorney*
*Phone: (213) 894-3989/8790*
*E-mail: Joseph.Tursi@usdoj.gov*
*Jason.Axe@usdoj.gov*

*Federal Building*
*300 N. Los Angeles Street, Suite 7516*
*Los Angeles, California 90012*

November 2, 2023

**VIA E-MAIL**

Laboni A. Hoq
Hoq Law, APC
P.O. Box 753
South Pasadena, CA 91030

   Re:  ACLU of SoCal v. ICE, et al.
      C.D.CA Case No. 2:22-cv-04760-SHK

Dear Ms. Hoq:

  The following responds to Plaintiff's October 19, 2023 correspondence. Many of the issues raised therein also appear in Plaintiff's Brief in Support of Request for Scheduling Order and FOIA Processing Rate [Dkt. 57], which was filed on October 23, 2023. Defendants' Opposition will address those issues in full. Still, in an effort to try and reach agreement (and thus narrow the issues for the Court's ultimate consideration), Defendants respond to the issues raised by Plaintiff in order:

  **A. Production Rate**

  Defendants' October 10, 2023 correspondence put forth ICE's position on an "expedited processing rate." As explained in greater detail in Defendants' Opposition to Plaintiff's Request, the processing rate here – 1,000 pages per month – *exceeds* the normal rate. Therefore, Defendants oppose Plaintiff's request to deviate from the current processing rate.

  **B. DHS-OIG Production**

  As explained in OIG's October 2, 2023 correspondence, records originating with ICE have been referred to ICE for its review, processing, and direct response to Plaintiff. ICE is the component best able to review and produce those records, and therefore, referral of them back to OIG would be inappropriate.

  As for Plaintiff's request that ICE and OIG conduct independent searches of other components, neither Defendant will do so. The FOIA process is decentralized in DHS, and therefore neither ICE nor OIG can conduct independent searches of another component.

  In Plaintiff's brief, it states with respect to OIG that there are "some remaining

Ms. Laboni A. Hoq
RE: ACLU of SoCal v. ICE
November 2, 2023
Page 2

disagreements, but they are now ready to address those issues either informally or through summary judgment." Dkt. 57 at 2-3. What are the issues Plaintiff is referring to?

### C.  ICE Production of Parts 1 – 3

At present, there are approximately 9,000-10,000 pages remaining to be processed for the four individuals identified. That said, ICE has finished producing records related to Leon.

With respect to records dated October 1, 2015 or after related to Mr. Gulema, ICE has now been able to identify approximately 318 pages that remain to be processed. ICE was able to identify these records, after previously not having success, by using the entire set of responsive records, rather than just the records that had been "email threaded."

ICE can agree to use best efforts to produce records in the sequence Plaintiff requests on page 3 of its letter (Gulema records from October 1, 2015 and after, followed by Bucio, Arellano, and then the remainder of the Gulema records unless Plaintiff has waived production of them). Relatedly, what information does Plaintiff anticipate it will glean from the October 1, 2015 and after Gulema records that will inform its decision whether to waive the remaining pages?

Finally, ICE is working to obtain the originals of Bates 7197-7200, 2648, and 7504. It has obtained Bates 8313. All documents will be processed and reproduced in due course.

### D.  Parts 4 – 9

As an initial comment, ICE reiterates that Plaintiff's demand that the agency justify its search terms and locations at this stage is improper. So too is Plaintiff's effort to direct (or ask the Court to direct) the search at this stage only because Plaintiff disagrees with the "adequacy" of ongoing searches and productions. "In general, a FOIA petitioner cannot dictate the search terms for his or her FOIA request. Rather, a federal agency has discretion in crafting a list of search terms that it believes to be reasonably tailored to uncover documents responsive to the FOIA requests. Where the search terms are reasonably calculated to lead to responsive documents, a court should neither micromanage nor second guess the agency's search." *Bigwood v. United States Dep't of Def.*, 132 F. Supp. 3d 124, 140 (D.D.C. 2015); *see also Johnson v. Exec. Off. for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002) ("FOIA, requiring as it does both systemic and case specific exercises of discretion and administrative judgment and expertise, is hardly an area in which the court should attempt to micro manage the executive branch."); *see also Inter-Coop. Exch. v. United States Dep't of Com.*, 36 F.4th 905, 911 (9th Cir. 2022) ("For this reason, a FOIA requestor "cannot dictate the search terms for his or her FOIA request."); *DiBacco v. U.S. Dep't of the Army*, 795 F.3d 178, 191 (D.C. Cir. 2015) (an agency "need not knock down every search design advanced by every requester[.]"). Nor is a search's adequacy determined by its fruits. *See Hoffman*, 2023 WL 4237096, at *5.

In any event, there seems to be a miscommunication. Searches for several of the subparts

Ms. Laboni A. Hoq
RE: ACLU of SoCal v. ICE
November 2, 2023
Page 3

have either been tasked or completed. ICE addresses each in turn.

### A. Part 4

ICE agreed to search the emails of Tae Johnson (former Acting Director of ICE),
Deborah Fleischaker (Assistant Director for Regulatory Affairs and Policy at ICE), and Scott
Schuchart (Senior Advisor to the ICE Director) for the following agreed upon search terms:

(1) Directive; (2) Policy; (3) Protocol; (4) Procedure; (5) Training; (6) Guidance; (7)
Instruction; (8) Standard; (9) Death; (10) "offsite referral"; (11) "emergency room"; (12)
"emergency department"; (13) "life support"; (14) Coma; (15) Ventilator; (16) "intensive
care"; (17) Hospice; (18) palliative; and (19) release.

The search resulted in approximately 530,000 documents (not pages).  The parties agreed
that the second part of the search would involve using Relativity software to search for Boolean
connectors. The agreed upon Boolean connectors were as follows:

(directive or policy or policies or protocol or procedure or training or guidance or
instruction or standard) AND (custody or death or died or deceased or decedent or
discharge or surgery or specialist or COVID-19 or hospital or ambulance or "emergency
room" or "emergency department" or "emergency services" or "poor outcome" or "life
support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or
"medical observation" or ICU or "critical condition" or hospice or palliative or fatal)
AND (release or transfer or benefits or parole or "alternative detention" or discharge or
OSUP or "order of supervision" or humanitarian).

ICE attempted to run the Boolean connector search, however, the search could not be run
as it exceeded the allowable number of characters. In an effort to complete the search, ICE
proposed using the following connector terms, essentially removing the terms that were already
included in the initial search:

custody OR death OR died OR deceased OR decedent OR discharge OR surgery OR
specialist OR COVID-19 OR hospital OR ambulance OR "emergency services" OR
"poor outcome" OR "offsite referral" OR unconscious OR "medical observation" OR
ICU OR "critical condition" OR fatal) AND (release OR transfer OR benefits OR parole
OR "alternative detention" OR discharge OR OSUP OR "order of supervision" OR
humanitarian).

Plaintiff rejected ICE's suggestions and has instead suggested in its October 19, 2023
correspondence that ICE run the Boolean search in two separate parts. ICE has no objection to
this and has run the search in the manner suggested by Plaintiff. The search resulted in over
142,000 documents (not pages).

Plaintiff has also requested that the emails of the Directors of ICE prior to Tae Johnson

Ms. Laboni A. Hoq
RE: ACLU of SoCal v. ICE
November 2, 2023
Page 4

from 2016 through 2021 be searched. This includes emails of five additional individuals. ICE has no objection to running these searches, although obtaining and searching their archived emails could take several weeks.

With respect to Plaintiff's position that ICE's search has been "insufficient" and that it "must remedy this deficiency by including an IHSC custodian to be searched for this Part," there is no basis for Plaintiff to make such a demand.

**B. Part 5**

ICE ran a search of the emails of Dr. Stewart Smith, Assistant Director for IHSC. The search was made using agreed upon search terms. After obtaining the search results, the records were then searched using agreed upon Boolean connectors. The search resulted in 551 pages of potentially responsive documents, and the records will be processed in due course.

Plaintiff has requested that, in response to Request No. 5, ICE conduct a search of *all* ICE officials who participate in the Significant Detainee Illness process, *all* of ICE's Medical Case Management Unit, and *all* Medical Care Coordination staff. There are 233 IHSC employees who participated in the Signification Detainee Illness process from 216 to present. The number of ICE employees that have been a part of ICE's Medical Case Management Unit from 2016 to present is 376. The number of ICE employees that have been part of the Medical Care Coordination staff (i.e., managed care coordinators) from 2016 to present is 35. As a result, this request is overly broad and unduly burdensome. It is ICE's position that this search is complete, and the records will be processed in due course.

**C. Part 6**

ICE reads this request as specifically seeking documents *created by* DHS OIG or ICE OPR. As such, ICE OPR was tasked with a search and did not find any responsive records. Plaintiff claims that ICE is reading the request too narrowly and that it is not only seeking documents created by DHS OIG and ICE OPR, but also requesting spreadsheets, emails, SIRs and SENs within the possession of ICE. As Plaintiff has been made aware, SIRs and SENs are generated at the field office level. There are 25 field offices. In order to conduct a search for SIRs and SENs that mention the release from custody of (a) hospitalized detainees; (b) detainees who at the time of release were patients in the care of external healthcare providers or facilities; or (c) detainees released from custody immediately prior to transfer to an emergency room, hospital, or external care facility, each ERO field office would need some type of identifying information, such as name, date of event or alien number.

**D. Part 7**

ICE agreed to ask OPR to run a search of agreed upon search terms. OPR found no responsive records. Just as in Request No. 6, if Plaintiff would like SIRs and SENs from a specific field office that mention the death of any detainee who had been previously released

Ms. Laboni A. Hoq
RE: ACLU of SoCal v. ICE
November 2, 2023
Page 5

from custody while (a) hospitalized; or (b) a patient in the care of an external healthcare provider or facility; or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility, then they need to provide identifying information, such as name, date of event or alien number.

### E.  Part 8

A search was run of the emails of Dr. Stewart Smith using agreed upon search terms. A secondary search was run using agreed upon Boolean connectors. The search resulted in 1,711 pages of potentially responsive documents. This search is complete, and these records will be processed in due course.

To be clear, *if* documents pertaining to *Fraihat* appear in the responsive records, then they will be produced. ICE will not search for *"Fraihat* records" simply because Plaintiff chose to add this request on later. *See Miller v. Casey*, 730 F.2d 773, 777 (D.C. Cir. 1984) (emphasizing that agency is required to read FOIA request as drafted, "not as either [an] agency official or [requester] might wish it was drafted"); *Wallick v. Agric. Mktg. Serv.*, 281 F. Supp. 3d 56, 66 (D.D.C. 2017) (finding search adequate when based on plain language of original request, and holding plaintiff must make new request for additional records first mentioned in clarification emails); *Rein v. U.S. Pat. & Trademark Off.*, 553 F.3d 353, 363 (4th Cir. 2009) (rejecting argument that searches were inadequate merely because "responsive documents refer to other documents that were not produced" and agency did not pursue "leads" appearing in uncovered documents, and explaining that search need only be "reasonably calculated to uncover all relevant documents" based upon request).

### F.  Part 9

ICE tasked nine Regional Field Medical Coordinators (FMCs) and Regional Health Service Administrators (HSAs) to search their emails for search terms that were agreed upon with the Plaintiff. A preliminary search by just one of ICE's HSAs yielded over 16,000 emails (not pages), most of which appeared not to be related (or only peripherally related) to one of the proposed search terms.

As a result, ICE requested clarification from Plaintiff regarding the specific types of records Plaintiff was seeking so that ICE could adequately craft a search that would result in fewer initial hits. Alternatively, ICE proposed (a) adding a second term such as "bill," "invoice," etc. to the preliminary search to reduce the number of records initially identified, or (2) pairing search terms, e.g., "Death + record," "Ambulance + invoice," and "Hospital + bills."

Plaintiff suggests using different search terms and Boolean connectors. Plaintiff further requests that ICE search the Resource Management Unit Staff and the ICE Office of the Chief Financial Officer. Individuals at ICE who are subject matter experts on the information requested believe that the custodians most likely to possess responsive records are the Regional Field Medical Coordinators and the Regional Health Service Administrators within IHSC. If Plaintiff

Ms. Laboni A. Hoq
RE: ACLU of SoCal v. ICE
November 2, 2023
Page 6

agrees with this approach, ICE will task these nine individuals with conducting searches using
the search terms and connectors suggested by Plaintiff.

Thus, the search terms will be:

bill!; invoice!; charges; payment; benefits; discharge; transfer; release
or custody; Medicare; PRUCOL; Martin Vargas Arellano, Teka Gulema, Jose Ibarra
Bucio, Johana Medina Leon, Jonathan Alberto Medina Leon

And the Boolean connectors will be:

(bill!; invoice!; charges; payment; benefits) AND (discharge or transfer or custody or
release or Medicare or PRUCOL or Martin Vargas Arellano or Teka Gulema or Jose
Ibarra Bucio or Johana Medina Leon or Jonathan Alberto Medina Leon)

Please confirm that the above is agreeable. ICE will then conduct those searches.

Respectfully,

E. MARTIN ESTRADA
United States Attorney

/s/ *Joseph W. Tursi*

JOSEPH W. TURSI
Assistant United States Attorney

cc: Ms. Eunice Cho (by email)
    Mr. Michael Kaufman (by email)
    Mr. Kyle Virgien (by email)

# EXHIBIT L



# United States Department of Justice

## United States Attorney's Office
## Central District of California

---

*JOSEPH W. TURSI*
*JASON K. AXE*
*Assistant United States Attorney*
*Phone: (213) 894-3989/8790*
*E-mail: Joseph.Tursi@usdoj.gov*
*            Jason.Axe@usdoj.gov*

*Federal Building*
*300 N. Los Angeles Street, Suite 7516*
*Los Angeles, California 90012*

October 10, 2023

**VIA E-MAIL**

Laboni A. Hoq
Hoq Law, APC
P.O. Box 753
South Pasadena, CA 91030

  Re: ACLU of SoCal v. ICE, et al.
     C.D.CA Case No. 2:22-cv-04760-SHK

Dear Ms. Hoq:

The following responds to your September 14, 2023 correspondence regarding Plaintiff's FOIA request directed to ICE. It also follows our letter dated October 2, 2023, providing responses with the portion of the FOIA request directed to OIG.

## A. Production Rate

As of today's date, with respect to Parts 1-3 of Plaintiff's FOIA request, there are approximately 10,200 pages remaining to be processed out of the approximately 12,000 initially determined to be potentially responsive. Please note that this page number is subject to change as ICE works to ensure that all of Mr. Bucio's records have been located and processed.

Regarding the documents related to Teka Gulema, as noted in our September 1st correspondence, ICE sought to gain further clarity on the remaining Gulema records. However, after further review, ICE is unable to separate out pages for Mr. Gulema created after October 1, 2015. ICE attempted to do so by using the "date created" function, but it did not obtain accurate results. ICE will therefore continue to process the records, which include those related to Mr. Gulema. If your client wishes to waive production of documents related to Mr. Gulema that were created before October 1, 2015, please let us know. It is still not clear to us why the number of documents created after October 1, 2015 is relevant to that determination. Regardless, unless ICE hears otherwise, it will continue processing all records pursuant to the terms of the request.

As set forth in our September 12th email, ICE has obtained a hit count of over 530,000 documents using the terms Plaintiff identified for Part 4 of the FOIA request. As described more fully below, ICE's search for documents responsive to Part 5 resulted in 122 documents (551 pages), and its search for documents responsive to Part 8 resulted in 64 documents (1,711 pages).

Ms. Laboni A. Hoq
RE: ACLU of SoCal v. ICE
October 10, 2023
Page 2

Regarding an "expedited processing rate," although the number of potentially responsive documents is greater now than what ICE initially anticipated, that number has no relation to the processing rate that ICE should be required to undertake. Plaintiff's broad search requests, resulting in potentially large numbers of documents to review, do not take precedence over requests (many of which are more narrowly tailored) submitted by other FOIA requesters. There is a finite limit as to the number of documents that ICE staff can review each month, and every page reviewed with respect to Plaintiff's FOIA request means a page responsive to another person's request that cannot be reviewed. Once again, ICE asks that your client work to narrow and focus its requests to bring the total number of potentially responsive documents down to a more reasonable number. But to the extent that your client is unwilling or unable to do so, that decision does not entitle it to priority over other FOIA requesters, including those who are receiving monthly productions without filing lawsuits and those who have court ordered production rates. As explained in the previously filed declaration from ICE's FOIA Director (Dkt. 48-1), the processing rate in this case of 1,000 pages per month *exceeds* the normal rate. Therefore, Plaintiff is already receiving an "expedited processing rate," and an even greater processing rate is neither appropriate nor warranted.

## B. Parts 1-3

ICE's response to your questions regarding documents that have already been produced is as follows:

- ICE's December 2022 Production, page 2648: ICE will attempt to locate the complete email.

- ICE's July 2023 Production, pages 7197-7200: There appears to be some confusion. These pages are not what consistent with Plaintiff's characterization. Please confirm the Bates Stamp range or provide the three pages of documents you are referring to.

- Bates Stamp 7504: ICE will attempt to locate the complete document.

- Bates Stamp 8313: ICE will attempt to locate the complete email.

- ICE employees, including the AFOD, conducted searches for Mr. Bucio and found records. They will be processed in due course.

## C. Parts 4-9

### 1. Part 4

In response to your inquiry, ICE is using Relativity software to conduct the second part of the search involving the Boolean connectors. On September 12, 2023, we explained by email that the first part of the search resulted in over 530,000 potentially responsive documents.

Ms. Laboni A. Hoq
RE: ACLU of SoCal v. ICE
October 10, 2023
Page 3

However, Plaintiff's proposed Boolean connector search could not be run because it exceeds the allowable number of characters. ICE proposed using the following connector terms, essentially removing the terms that were *already* included in the initial search: custody OR death OR died OR deceased OR decedent OR discharge OR surgery OR specialist OR COVID-19 OR hospital OR ambulance OR "emergency services" OR "poor outcome" OR "offsite referral" OR unconscious OR "medical observation" OR ICU OR "critical condition" OR fatal) AND (release OR transfer OR benefits OR parole OR "alternative detention" OR discharge OR OSUP OR "order of supervision" OR humanitarian). Please advise if that is acceptable, and if not, please provide alternative connector terms and identify exactly what your client's concerns are with the proposed connectors. Furthermore, if you have any "ways to address . . . technical issues," please provide them to us in writing. ICE declines your request to speak directly with its IT staff on this issue.

ICE does not agree at this time that a search of the predecessors or successors of Tae Johnson is necessary. ICE will reevaluate that position as its search for records responsive to Part 4 progresses. As for your request that a custodian from IHSC conduct a search, such a search was undertaken by Stewart Smith, the Assistant Director of IHSC, who ran a search of his entire email archive, with no date restriction for Parts 5 and 8 using many of the same search terms as in Part 4. As a result, a further search of IHSC is not necessary.

### 2. Parts 5 and 7

With respect to Part 5, the Boolean connector search was run and resulted in 122 documents (551 pages). They will be placed in queue for processing. As for your suggestion that ICE "conduct a search of custodians that include key personnel in its Medical Case Management and Unit Medical Care Coordination Program staff, IHSC participants in Significant Detainee Illness (SDI) Meetings, as well as ICE ERO staff in communication with IHSC's Medical Case Management Unit," such a search would be overly burdensome because it would encompass <u>nearly</u> every staff member in the referenced locations.

### 3. Part 6

This part specifically seeks documents *created by* DHS OIG or ICE OPR. Your characterization of the request as seeking "spreadsheets, Significant Incident Reports (SIRs), Significant Event Notification (SEN) system, emails and other communications that would identify individuals subject to Defendants' policies and practices related to releasing ill detainees on their deathbeds" omits the qualifying language in the request itself, "***created by DHS OIG or ICE OPR***." ICE OPR was tasked with a search and did not find any responsive records. Plaintiff's attempt to amend its request to seek additional information is inappropriate. If Plaintiff would like to obtain information on specific detainees, it can submit a FOIA request providing the identifying information to ICE, and the specific records will be searched for.

Ms. Laboni A. Hoq
RE: ACLU of SoCal v. ICE
October 10, 2023
Page 4

### 4. Part 8

The Boolean connector search has now been run for this request, and the resulting hit count is 64 documents, consisting of 1,711 total pages (375 pages if excel files are excluded). These documents will be placed in queue for processing.

The initial search was conducted by Stewart Smith, the Assistant Director of IHSC. Mr. Smith searched the following agreed upon search terms: (1) Ambulance; (2) 911; (3) Emergency; (4) "offsite referral"; (5) "life support"; (6) Coma; (7) Ventilator; (8) "intensive care"; (9) "critical condition"; (10) "poor outcome"; (11) Hospice; (12) Palliative; (13) Death; (14) Died; and (15) Deceased. Once his emails were obtained, the following agreed upon Boolean connectors were used to obtain the final results: (detainee or custody) AND (death or died or deceased or surgery or specialist or COVID19 or hospital! or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal) AND (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian or "order of recognizance").

Your September 14th correspondence appears to misinterpret ICE's intentions with respect to this part. ICE does not intend to exclude from its production *any* records related to the *Fraihat v. ICE* litigation. Should records related to *Fraihat* appear in the search results to this request, and if those records are deemed responsive to Plaintiff's original FOIA request, ICE will process them accordingly. What ICE will not agree to is specifically searching for documents from the *Fraihat* litigation as Plaintiff did not request these documents in its original FOIA request.

### 5. Part 9

In our September 1, 2023 letter, we explained that a preliminary search by just *one* of ICE's Regional Health Service Administrators using the search terms your client proposed ("Death," "Died," "Deceased," "Ambulance," "Emergency," "Hospital," "offsite referral," "life support," "Coma," "Ventilator," "Intensive care," "critical condition," "Hospice," "Palliative," or "Release") yielded 16,000 emails (not pages), most of which appeared not to be related (or only peripherally related) to one of the proposed search terms.

As a result, we wrote that ICE requested clarification from you regarding the specific types of records your client seeks so ICE can adequately craft a search that will result in fewer initial hits. Alternatively, ICE proposed (a) adding a second term such as "bill," "invoice," etc. to the preliminary search to reduce the number of records initially identified, or (2) pairing search terms, e.g., "Death + record," "Ambulance + invoice," and "Hospital + bills."

In your September 14, 2023 letter, you did not respond to ICE's inquiry regarding what specific types of records your client is seeking. That failure makes it harder for ICE to undertake

Ms. Laboni A. Hoq
RE: ACLU of SoCal v. ICE
October 10, 2023
Page 5

a search for records. Therefore, we again ask that you clarify what specific types of records your client is seeking here. Your letter also failed to accept either of ICE's proposals to help narrow the search. Instead, you asked ICE to provide hit counts for each separate search term. Part 9 requests "Bills, invoices, charges, or records of payment." Please explain why ICE's proposal to add a second term, such as "bill," "invoice," etc. to the search terms is not acceptable to Plaintiff to help narrow the initial search for records, which yielded 16,000 emails. Alternatively, please explain why ICE's proposal to pair search terms is also not acceptable. Should we not receive a response, ICE will proceed with your request to put the 16,000 emails in Relativity and run the Boolean search. It will thereafter process those records.

## 6. Referred Documents

In an attempt to clarify some confusion with respect to documents referred to ICE from OIG, ICE has received and is processing the 328 pages from June 2023. ICE will then process the final referral of 583 pages.

## D. Removal of Password Restrictions

In your September 14th email, you ask that Defendants not produce FOIA records in pdf files that require the use of a password to access. The only records that have been provided that have been password restricted are those sent via email from OIG, as that is their protocol. But OIG has now completed its search and production, so this issue appears to be moot. Regardless, once you receive a PDF that is password protected, you are free to take whatever action you like with that document to remove any password protection, including printing it using, for example, the Microsoft Print to PDF function. We suggest you consult with your IT professionals for further assistance with that process.


Respectfully,

E. MARTIN ESTRADA
United States Attorney

/s/ *Joseph W. Tursi*

JOSEPH W. TURSI
Assistant United States Attorney

cc: Ms. Eunice Cho (by email)
   Mr. Michael Kaufman (by email)
   Mr. Kyle Virgien (by email)

# EXHIBIT M

September 14, 2023

Joseph Tursi
Jason Axe
Alarice Medrano
United States Attorney's Office
Central District of California
300 N. Los Angeles St. Suite 7516
Los Angeles, CA 90012
Joe.Tursi@usdoj.gov
Jason.Axe@usdoj.gov
Alarice.Medrano@usdoj.gov

***SENT VIA EMAIL***

> Re:  *ACLU of Southern California v. United States Immigration and Customs Enforcement, et al.,* No. 2:22-cv-4760 (C.D. Cal.)

Dear Joe:

We write in response to Defendants' September 1, 2023 letter and September 12, 2023 email regarding the Parties' ongoing efforts to address the adequacy of Defendants' searches for and production of records in response to Plaintiff's FOIA Request.  We appreciate Defendants' openness to trying to reach agreement on the search and production parameters so the Parties can narrow the issues in dispute and avoid potential motion practice.

To that end, in addition to responding to the issues in Defendants' September 1 letter and September 12 email, we reiterate here issues Plaintiff has raised in prior correspondence to which Defendants have yet to respond. While we appreciate Defendants may not agree to all of Plaintiff's proposed search parameters, we need to know Defendants' positions relating to them to assess whether Plaintiff will need to move the Court to address the adequacy of Defendants' searches and productions. We therefore ask that Defendants respond to each of the outstanding issues below within two weeks of this date, by September 28, 2023

## I.    OIG

Thank you for confirming that with its August 2, 2023 correspondence, OIG has completed its searches for and production of records responsive to Plaintiff's FOIA Request.

Based on OIG's accounting of its productions to date, Plaintiff has the following remaining issues with OIG's productions, as also referenced in prior correspondence as indicated below for your reference.

September 14, 2023

## A.    Basis for OIG's Referral of Records to Other DHS Components/Agencies

By our account, OIG has made the following referrals to ICE, other DHS components and other agencies, but has not established a proper basis for doing so.

- November 2022: 220 records to ICE; 233 records to DOJ/EOUSA
- December 2022: 280 records to ICE; 185 records to DOJ/EOUSA
- March 2023: 9 records to ICE; 32 records to CBP
- June 2023: 8 records to an Unidentified Agency (later produced by OIG in August 2023); 328 records to ICE; 1 record to DHS Office of Civil Rights
- July 2023: 583 records to ICE

OIG must establish a proper basis to refer records in its possession to another agency, particularly because such referrals necessarily impede the government's obligation under FOIA to promptly produce records to requesters. We raised this issue with OIG in a letter dated September 2, 2022, and again in an email dated January 9, 2023.

As referenced in Plaintiff's September 2, 2022 letter, to justify these referrals OIG must determine whether the agency to whom OIG referred records had the "intention ... [to] retain the authority to decide if and when materials are released to the public ... by either (i) explicit indications to that effect on the face of each document or (ii) the circumstances surrounding the creation and transfer of the documents." *McGehee v. C.I.A.*, 697 F.2d 1095, 1111 (D.C. Cir. 1983), on *reh'g sub nom. McGehee v. Cent. Intel. Agency*, 711 F.2d 1076 (D.C. Cir. 1983). Furthermore, assuming another agency or component did maintain an "intent to control" specific records responsive to Plaintiff's request, OIG's process of referring the records to another agency or component would have to be "prompt and public." *Id*. As such, we again ask that OIG justify the above-referenced referrals, or process the records itself and promptly produce them to Plaintiff.

Furthermore, it is apparent that other DHS components possess responsive records that have not been searched or produced, as OIG possesses, but has not produced, responsive documents originating from other DHS components. Plaintiff thus requests that DHS search for and produce responsive records of these component agencies. *See Lawyers' Comm. for C.R. Under L. v. United States Dep't of Just.*, No. 18-CV-167 (EGS/GMH), 2020 WL 7319365, at *10 (D.D.C. Oct. 16, 2020) (finding that an agency's obligation to follow leads includes searches of other components). These components include the "Unidentified" component or agency referenced in OIG's June 29, 2023 production letter, as well as the DHS Office of Civil Rights and Customs and Border Protection (CBP), as referenced above. Please inform us whether Defendants will agree to conduct independent searches of these DHS components. If so, we would be open to collaborating with Defendants on appropriate search parameters.

2

September 14, 2023

Regarding the Unidentified DHS component referenced in its June 29, 2023 letter, OIG cited 6
C.F.R. section 5.4(d)(1) as the basis for its consultation with it.  However, 6 CFR section
5.4(d)(1) does not provide that OIG can withhold the identity of the component or agency, and
doing so violates its obligation to ensure that the referral is "public." *McGehee*, 697 F.2d at 1111.
We therefore ask that OIG identify the unidentified component to Plaintiff.

Finally, we specifically request the following documents, referred to in OIG's production of
documents to date:

- December 2022 OIG production, pages 80-82, regarding Johana Medina Leon: Please
  provide the documents referenced in the report, where "copies of the final executive
  summary and emails documenting Medina's [sic] decision to release her from ICE ERO
  custody. Copies of the aforementioned documents will be placed in the case file."
- December 2022 OIG production, pages 83-85, regarding Johana Medina Leon. Please
  provide the documents referenced in the report, where "[a] copy of [REDACTED] emails
  between the MTC and ICE ERO management, the executive summary, and the OCPC
  final report of findings will be placed into the case file."
- March 2023 OIG production, page 48, regarding a question about the number of OIG's
  investigations into out-of-custody deaths, to which the El Paso ICE Field Office,
  responded, "approximately five investigations." Please provide documents related to
  these five investigations.
- June 2023 OIG production, page 180, regarding OIG's investigation into Teka Gulema's
  death, where OIG noted review of "an email dated November 24, 2015 from
  [REDACTED], Field Office Director, ICE, New Orleans, LA. The email was to
  [REDACTED], Field Medical coordinator, IHSC, New Orleans, LA. The email stated
  "FYI, HQ has directed we serve a release letter on Dr. [REDACTED] and release
  Gulema from ICE custody today." Please provide the document referenced here.

### B.     Unidentified Statue Redaction

In our February 14, 2023 letter, Plaintiff raised the impropriety of withholding information in
responsive records based on an "unspecified" statute. See Plaintiff's February 10, 2023 letter.
Despite meeting and conferring about this issue, Defendants have yet to provide a valid
justification for this withholding, including by: (1) identifying the statute upon which this
exemption is claimed, and (2) providing information about the content of the withheld material
sufficient to allow an assessment of whether it falls within the statute's protections. Please
provide that to us, or reproduce the records to us without the unjustified redactions.

### C.     Total Number of Documents Reviewed

September 14, 2023

In its November 2022 and August 2023 productions, OIG appears to have failed to identify the total number of documents it processed at those times. *See* OIG November 11, 2023 letter; August 2, 2023 letter. We imagine this was simply an oversight on the part of OIG, and ask that it provide this information to us now so we have a proper accounting of its final response to the Request.

## II.    ICE

### A.    Production Rate

Thank you for confirming that ICE has completed the de-duplication and threading process, and that it has approximately 12,000 additional pages responsive to Parts 1-3 in its processing queue. Please also let us know with ICE's next production in September how many of these 12,000 pages remain in its processing queue at that time.

As we have discussed, 12,000 pages for just Request Nos. 1-3 is a large number of pages that brings the total page count to be processed well above the count that Defendants initially provided to Plaintiff and the Court when the parties negotiated a production rate and case schedule. We have discussed several ways to speed ICE's completion of this production, each of which will need to be undertaken to ensure timely completion.

First, regarding documents related to Teka Gulema, we appreciate ICE's willingness to provide clarity on the number of those documents created after October 1, 2015, and to consider prioritizing them in ICE's October production. Please let us know the page count for these documents and confirm that you will prioritize documents related to Mr. Gulema created after October 1, 2015 in your October production. This will allow us to determine whether we can waive production of documents related to Mr. Gulema that were created before October 1, 2015, which we hope would significantly reduce the number of pages ICE must process. A lower page count would benefit all parties.

Second, while we appreciate Defendants commitment to conduct additional searches for Parts 4-9 of the Request, there has been undue delay in ICE's processing of these searches, including providing Plaintiff any hit counts so it can assist in streamlining the production. Please provide a hit count for records responsive to Parts 4-9, to enable the parties and the court to establish a production rate for these records and set the calendar for this case.

Finally, we would also appreciate Defendants' position on Plaintiff's proposal for an expedited processing rate, as we have discussed with the Court at the August 11, 2023 Status Conference.

Please provide the above-referenced information to Plaintiff by September 28, 2023.

September 14, 2023

B.    Parts 1-3

We look forward to the continued production of documents responsive to Parts 1-3 of the
Request. We raise a few immediate issues with documents that have been produced that we hope
that ICE can remedy:

- ICE's December 2022 Production, page 2648: This email appears to be only partially
  produced. The sender is a commander in the U.S. Public Health Service, responding to an
  email sent on July 29, 2015, with the subject line: Re: Follow-Up Requested RE: SDI
  update: Teka Gulema.

- ICE's July 2023 Production, pages 7197-7200. This document, titled "ERO New
  Orleans-Teka GULEMA, A28021556" is dated "November 10, 2022." However, it
  appears that this date is incorrect, perhaps an inadvertent automatic update of the
  processing date, as the document references a recommendation that ERO release Mr.
  Gulema on a letter of supervision, and because Mr. Gulema died in 2016. Please
  reprocess this document with the original date of the document.

- ICE's August 2023 Production, page 7504. This document appears to be a partial scan.
  Please provide the complete document.

- ICE's August 2023 Production, page 8313. This document, which appears to be an email
  between a Deputy Medical Director and another ICE employee, sent on June 3, 2019,
  with the subject line "RE: ES – Medina Leon 209378, El Paso AOR, Otero Processing,
  Detainee Death after ICE Release," appears to be incomplete, as the email produced is
  cut off at the top. In one part of the email chain, the employee states, "Agreed, several
  delays and missed opportunities to intervene appropriately. Since she passed away while
  not in custody then IIU will not investigate-correct?" Please produce the complete
  document.

- We are glad that ICE has been able to locate and produce documents related to Mr. Ibarra
  Bucio. However, it appears that all of the documents produced thus far are from staff of
  the GEO Group, Inc., which operates the Adelanto Detention Center, where Mr. Ibarra
  Bucio was detained prior to his death. None of the documents produced thus far
  regarding Mr. Ibarra Bucio originate from ICE. It is clear from the documents produced
  thus far that ICE employees, including the Assistant Field Office Director, received email
  updates, discussed custodial decisions, and ultimately decided to release Mr. Ibarra Bucio
  on February 22, 2019. *See e.g.* page 7848 (ICE's order to release Ibarra-Bucio from
  custody, Feb. 22, 2019); page 7500 (GEO memo noting "2/22/19 PER THE AFOD

5

September 14, 2023

DETAINEE IBARRA IS NO LONGER IN OUR CUSTODY"). For that reason, please ensure that ICE conducts a search of ICE employees, including the Field Office Director, Assistant Field Office Director, Supervisory Detention and Deportation Officer, and any ICE officers who worked on Ibarra-Bucio's case.

**C.      Parts 4-9**

**1.      Part 4**

In response to Defendants' September 12, 2023 email, regarding ICE's determination that Plaintiff's proposed Boolean search "exceeds the allowable number of characters," please clarify whether ICE is using Relativity software to conduct the search. If so, we believe there are ways to address this technical issue, and ask that the Defendants arrange a call with ICE's FOIA staff who has been responsible for setting up the Boolean search so we can suggest ways to address the technical issues without compromising the agreed upon parameters. Alternatively, we would be glad to request that ICE's FOIA staff be present on a status conference with the court to help resolve the issue.

Importantly, ICE's proposed amendments to the Boolean search as set forth in your September 12 email excludes keywords that are core to the content of Request No. 4, including those that are tailored to locate policies, procedures, protocols, or trainings associated with release from custody of ill detainees. As such, we cannot agree to the proposed amendments, but remain open to working with ICE and its IT staff to fashion an appropriate search consistent with its technological capabilities.

Regarding Defendants' September 1, 2023 letter, we appreciate that you have identified relevant custodians for this search.  While we believe former Acting ICE Director Tae Johnson, Deborah Fleischaker, and Scott Shuchart are appropriate custodians for the search, given that the request specifically seeks documents from ICE Health Service Corps (IHSC), the search should, at minimum, also include a custodian from IHSC. In addition, given the relevant time period of the Request, we believe ICE should also include Tae Johnson's predecessors and successors in this list. Please let us know if ICE is willing to do so.

**2.      Parts 5 and 7**

Regarding the search parameters ICE represents in its September 1, 2023 that it used for Parts 5 and 7, we do not agree that the parameters are adequate. Although the parties have agreed on search terms, as stated in our July 12, 2023 letter, in order to conduct an adequate search, ICE should conduct a search of custodians that include key personnel in its Medical Case Management and Unit Medical Care Coordination Program staff, IHSC participants in

6

September 14, 2023

Significant Detainee Illness (SDI) Meetings, as well as ICE ERO staff in communication with
IHSC's Medical Case Management Unit. Plaintiff's June 26, 2023 letter provides further basis
why a search of these custodians is necessary for an adequate search. Please confirm whether or
not ICE will include these custodians in its search.

### 3.    Part 6

In their September 1, 2023 letter, Defendants claim simply that "OPR has completed its search
and it does not have responsive records." However, a search by OPR alone does not constitute an
adequate search. We remind Defendants that Part 6 of the Request also seeks spreadsheets,
Significant Incident Reports (SIRs), Significant Event Notification (SEN) system, emails and
other communications that would identify individuals subject to Defendants' policies and
practices related to releasing ill detainees on their deathbeds. As discussed in the Plaintiff's July
12, 2023 letter, Defendants are clearly in possession of such documents, which would be
recoverable using the search terms at the suggested search locations provided.

Defendants' production, for example, has indicated that ICE Enforcement and Removal
Operations reports the deaths of detainees—even those that took place outside custody. See, e.g.
Exh. B, OIG June 2023 Production, p. 1-2 (noting that "[o]n June 3, 2019, ICE ERO El Paso
reported the death of [Johana Medina-Leon] to DHS OIG El Paso, TX."). Thus, ICE's search of
only OPR, and not ERO is improper. Please let us know if ICE will rectify this issue and conduct
the proposed searches.

Again, to the extent that ERO is unable to search the SIR system or the SEN system using the
agreed-upon search terms, Plaintiff suggests that ICE search the records of the ICE Joint
Intelligence Operations Center (JIOC), which "analyzes the SIRS and sends summaries of them
to the appropriate . . . field offices." DHS, Privacy Impact Assessment for the Significant
Significant Event Notification (SEN) System 1-2, Oct. 15, 2021,
https://www.dhs.gov/sites/default/files/publications/privacy-pia-ice023a-sen-october2021.pdf.

### 3.    Part 8

Regarding the search parameters ICE represents in its September 1, 2023 that it used for Part 8,
namely a search of records of Stewart Smith, we do not agree that the parameters are adequate,
particularly because it appears ICE will exclude from its search any responsive records that it
deems related to the *Fraihat v. ICE* litigation. It appears that ICE has used the *Fraihat* class
definition for its internal recordkeeping purposes and labels documents related to COVID risk
factors as related to this "*Fraihat*" class definition. However, ICE has cited no exemption—and
can point to no basis—that would permit it to withhold documents simply because they involve
the class definition in the *Fraihat* litigation. Plaintiff explained in its July 12, 2023, July 26, 2023

7

September 14, 2023

and May 19, 2023 letters that the available evidence indicates that ICE keeps responsive
information in its "*Fraihat*" records. Please confirm whether or not ICE will search these *Fraihat*
files for responsive records. If ICE will not search these files, please identify any exemption that
you contend allows it not to produce responsive records in these files.

4.      **Part 9**

We appreciate ICE's further efforts to search for records responsive to Request No. 9. However,
we are confused by ICE's approach to these searches, including whether it conducted the
Boolean searches Plaintiff suggested. To facilitate the work ICE has done, and to narrow the
results, we ask that ICE provide us the hit counts by search term that resulted in its retrieval of
16,000 emails from the Regional Field Medical Coordinators within the Medical Case
Management Unit and the Regional Health Service Administrators within the Health Operations
Unit. Without this information, Plaintiff does not know which of its search terms to narrow.
Once ICE provides this information Plaintiff can suggest further limiting search terms and other
means to narrow the results.

Notwithstanding our disagreements over the parameters of ICE's searches for Request Nos. 4-9,
as discussed above we ask that ICE provide hit counts for the searches it has conducted to date
by September 28, 2023, two weeks from this date. We appreciate your informing us in your
September 12 email that you will be in trial next week and have taken that into account in
proposing this schedule, together with our understanding that your co-counsel Mr. Jason Axe
will be able to assist in timely securing this information from ICE so we can avoid further delay
in completion of the searches. Absent complete receipt of this information by the requested
timeframe, Plaintiff will seek a Status Conference with the Court to address the delay.

III.    **Removal of Password Restrictions on PDF Documents**

In recent months, Defendants have begun to produce FOIA records to Plaintiff in pdf files that
require the use of a password to access the document. *See, e.g.* OIG productions dated July 2023,
August 2023, and March 2023 (provided in September 2023). Password restrictions on pdf
documents released under FOIA are unnecessarily burdensome, and restricts anyone, including
the media or members of the public from viewing the files without the password. Password-
restricted files also hamper the Plaintiff's ability to share excerpts of the pdf documents as
exhibits with the Court on the CM/ECF system, which does not allow filing of such documents.
*See* U.S. District Court, Central District of California, *Technical PDF Related Questions*,
https://www.cacd.uscourts.gov/e-filing/faq/pdf-related%20questions ("PDFs with the following
content will be rejected . . . encrypted or password-protected").

September 14, 2023

As referenced in our September 6, 2023 email, Plaintiff requests that Defendants provide the password-restricted pdf documents in a format that does not require the use of a password to open the file, and to ensure continued production of documents without password restrictions. Alternatively, Plaintiff can request the Court's guidance as to how parties should share FOIA documents with password restrictions with the Court in future filings.

*** 

Please do not hesitate to contact me if you would like to address any of these matters by teleconference.

Sincerely,

LABONI A. HOQ (SBN 224140)
laboni@hoqlaw.com
HOQ LAW APC
P.O. Box 753
South Pasadena, California 91030
Telephone: (213) 973-9004

EUNICE CHO (pro hac vice)
echo@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
915 Fifteenth Street NW, 7th Floor
Washington, DC 20005
Telephone: (202) 548-6616

MICHAEL KAUFMAN (SBN 254575)
MKaufman@aclusocal.org
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West Eighth Street
Los Angeles, California 90017 Telephone:
(213) 977-9500
Facsimile: (213) 915-0219

KYLE VIRGIEN (SBN 278747)
kvirgien@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (202) 393-4930

*Attorneys for Plaintiff*

# EXHIBIT N



# United States Department of Justice

## United States Attorney's Office
## Central District of California

---

*JOSEPH W. TURSI*
*JASON K. AXE*
*Assistant United States Attorney*
*Phone: (213) 894-3989/8790*
*E-mail: Joseph.Tursi@usdoj.gov*
*Jason.Axe@usdoj.gov*

*Federal Building*
*300 N. Los Angeles Street, Suite 7516*
*Los Angeles, California 90012*

September 1, 2023

**VIA E-MAIL**

Laboni A. Hoq
Hoq Law, APC
P.O. Box 753
South Pasadena, CA 91030

  Re: ACLU of SoCal v. ICE, et al.
    C.D.CA Case No. 2:22-cv-04760-SHK

Dear Ms. Hoq:

  The following responds to your client's July 12, 2023 correspondence as well as matters raised during the August 11, 2023 status conference.

  Defendants remain open to engaging in discussions over the narrowing of the scope of Plaintiff's FOIA request. However, please note that regarding search terms, the agencies enjoy "discretion in crafting a list of search terms that they believe[ ] to be reasonably tailored to uncover documents responsive to the FOIA request." *Agility Pub. Warehousing Co. K.S.C. v. NSA*, 113 F. Supp. 3d 313, 339 (D.D.C. 2015) (internal quotation marks omitted). That is because agencies ultimately bear the burden of proving the adequacy of their searches and that they may withhold documents under one of the exemptions. 5 U.S.C. § 552 (a)(4)(B); *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991).

## OIG

  As communicated in OIG's second supplemental response dated July 31, 2023, and its final supplemental response dated August 2, 2023, it has finished its search and processing of all records responsive to Plaintiff's FOIA request. With respect to the documents noted on page 2 of your July 12, 2023 correspondence, OIG has confirmed that those records were referred to ICE for processing as documented in its June 30th letter.

## ICE

  As mentioned at the August 11, 2023 status conference, the Department of Homeland Security recently migrated to a new processing system. This has resulted in unforeseen delays across FOIA offices, including ICE's. Nonetheless, pursuant to the Court's February 9, 2023 Case Management Order, Dkt. 40, it has continued to make its monthly productions by the 21st of each month, including most recently in productions described in letters dated July 19, 2023 and August 18, 2023.

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
September 1, 2023
Page 2

1.  **Request Nos. 1 & 3**

Consistent with our representations during the August 11, 2023 status conference, ICE has de-duplicated and threaded emails as requested. As we have previously informed you, that process reduced the page count from 41,000 pages to 12,000 pages of records for processing.

With respect to records related to Teka Gulema, ICE originally believed that there were 250 pages of documents created on or after October 15, 2015 remaining to be processed. However, after review of the specific documents identified, it became apparent that although Relativity marked them as being created after October 1, 2015, they were actually from earlier than October 1, 2015. Thus, the previously communicated figure was inaccurate. The ICE employee who is responsible for running the Relativity searches in this case is out of the office until September 6, 2023. When he returns, ICE will work with him to get clarity on the Gulema records.

In response to your August 24, 2023 email requesting that ICE now prioritize the processing of Gulema records, we note that Plaintiff previously requested that ICE process records in the following order: "Jose Ibarra Bucio, Johanna Medina Leon, Martin Vargas Arellano, *and then* Teka Gulema." *See* Plaintiff's June 26, 2023 Letter at 2 (emphasis added). ICE agreed to do so, and yet now, Plaintiff seeks to have ICE prioritize the *Gulema* records from October 1, 2015 on, as soon as its September production. ICE is unable to change its review order for its September production, but it will consider Plaintiff's request for future productions in the event it is able to identify the records created on October 1, 2015 and beyond. We will provide an update accordingly.

2.  **Request No. 4.**

The initial search for responsive records has been completed using the agreed-upon search parameters. The requested custodians were Tae Johnson, Deborah Fleischaker, and Scott Shuchart. The records are being loaded into Relativity. When the ICE employee handling the Relativity searches returns to the office next week, he will conduct the Boolean connector search for this request. Upon our receipt of the "hit count" after the connector search, we will provide that number to you as indicated previously.

3.  **Requests Nos. 5 & 7**

With respect to Request No. 5, the initial search for responsive records has been completed using the agreed-upon search parameters. The requested custodian was Stewart Smith, the Director of IHSC. The records are being loaded into Relativity. When the ICE employee handling the Relativity searches returns to the office next week, he will conduct the Boolean connector search for this request. Upon our receipt of the "hit count" after the connector search, we will provide that number to you as indicated previously.

As for Request No. 7, OPR has completed its search and it does not have responsive records.

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
September 1, 2023
Page 3

4.   **Request No. 6**

OPR has completed its search and it does not have responsive records.

5.   **Request No. 8**

The initial search for responsive records has been completed using the agreed-upon
search parameters. The requested custodian was Stewart Smith, the Director of IHSC. The
records are being loaded into Relativity. When the ICE employee handling the Relativity
searches returns to the office next week, he will conduct the Boolean connector search for this
request. Upon our receipt of the "hit count" after the connector search, we will provide that
number to you as indicated previously.

6.   **Request No. 9**

Based on the proposal in your July 12th letter, this search was tasked to the IHSC
Resource Management Unit in July 2023 utilizing the fifteen search terms provided in that letter.

In response, the Resource Management Unit advised that it is not involved with "Bills,
invoices, charges, or records of payment that reflect payments made for healthcare for any
detainee who was released from custody while (a) hospitalized; or (b) a patient in the care of an
external healthcare provider or facility, and communications about such bills, invoices, charges,
or records of payment." However, the Unit Chief recommended that this request be delegated to
the IHSC Health Plan Management Unit (HPMU), which manages medical claims (i.e.,
payments for healthcare for detainees). Based on that recommendation, a request was then sent to
the HPMU. In response, the HPMU stated that the search terms were too broad and that they
would not have anything responsive unless they were provided a list of detainee names.
Nonetheless, they suggested tasking the request to the Regional Field Medical Coordinators
within the Medical Case Management Unit and the Regional Health Service Administrators
within the Health Operations Unit. ICE FOIA then tasked those two divisions, but a preliminary
search by just one of the Health Service Administrators yielded 16,000 emails (not pages), most
of which appeared not to be related (or only peripherally related) to one of the terms.

Based on the preliminary results of its search, ICE requests clarification from Plaintiff
regarding the specific types of records it seeks so it can adequately craft a search that will result
in fewer initial hits. Alternatively, ICE proposes adding a second term such as "bill," "invoice,"
etc. to the preliminary search to reduce the number of records initially identified. Another
approach would be to pair search terms, e.g., "Death + record," "Ambulance + invoice," and
"Hospital + bills." Please let us know if Plaintiff has a revised proposal for this search based on
the information presented here.

*       *       *

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
September 1, 2023
Page 4


Respectfully,

E. MARTIN ESTRADA
United States Attorney

/s/ *Joseph W. Tursi*

JOSEPH W. TURSI
Assistant United States Attorney

cc: Ms. Eunice Cho (by email)
    Mr. Michael Kaufman (by email)
    Mr. Kyle Virgien (by email)

# EXHIBIT O

July 12, 2023

Joseph Tursi
Jason Axe
Alarice Medrano
United States Attorney's Office
Central District of California
300 N. Los Angeles St. Suite 7516
Los Angeles, CA 90012
Joe.Tursi@usdoj.gov
Jason.Axe@usdoj.gov
Alarice.Medrano@usdoj.gov

**SENT VIA EMAIL**

Re:    *ACLU of Southern California v. United States Immigration and Customs Enforcement, et al.,* No. 2:22-cv-4760 (C.D. Cal.)

Dear Counsel,

This responds to Defendants' July 11, 2023 letter regarding the Parties' continued meet and confer over the status of Defendants' searches in response to Plaintiff's FOIA Request.

While we appreciate Defendants' substantive responses, we are disappointed by their attempt to recast their own proposal that the Parties negotiate search parameters as Plaintiff's "micromanagement of Defendants' processing of Plaintiff's FOIA request." As a reminder, in a letter dated March 29, 2023, Defendants *invited* Plaintiff to propose search terms to address Defendant ICE's admitted failure to search for Request Nos. 4-9. In the following three months, the Parties made progress on negotiating these search parameters, albeit at a pace that failed to keep up with the Scheduling Order in the case. Notably, in a June 1, 2022 stipulation which Defendants asked Plaintiff to enter into to extend the summary judgment briefing schedule, they represented to the Court that "the parties have worked together to, among other things, try to clarify search terms for remaining requests, what additional searches Defendants shall undertake, by what date Defendants shall resume producing responsive documents, and the pace of Defendants' monthly production. The additional time requested would allow for the parties to continue their efforts to resolve issues related to the search for records and address issues related to any records withheld in full or part." Dkt. 42.

Given this record, Defendants' claim of Plaintiff's purported "micromanagement" is baseless, and appears to be an attempt to distract from Defendants' wholly unjustified delay in conducting additional searches that meet FOIA's search adequacy requirements. *Transgender Law Center v. ICE*, 46 F. 4th 771, 779 (9th Cir. 2022) (it is Defendants' burden to conduct an adequate search, "reasonably calculated to uncover all relevant documents" "beyond a material doubt," which includes consideration of "positive indications of overlooked materials," and "leads that emerged during the agencies' inquiry."). Indeed, had Plaintiffs not pressed Defendants as to the adequacy of their initial searches, Defendants would never have conducted the supplemental searches for

1

Request Nos. 1-3 that resulted in ICE's identification of an additional 41,000 responsive pages, and OIG's identification of an additional 2,825 responsive pages. *See* Defendants' July 11, 2023 letter. Plaintiff's inquiries that led to these results can hardly be characterized as "dictating" or imposing an unwarranted "burden" on Defendants, so much as efforts to hold Defendants to their FOIA obligations.

**Responses from OIG**

We appreciate Defendant OIG's responses to the inquiries posed in our June 26, 2023 letter. We request that OIG clarify that it will complete its review of the remaining 1,518 pages of responsive records, and produce all non-exempt material by August 2023 per the pace of production required by the Court. Dkt. No. 40, Scheduling Order.

In addition, we specifically request that OIG ensure production of documents received and reviewed by the agency as part of its review of Mr. Teka Gulema's death, listed in the OIG's Memorandum of Activity, produced at p. 144 of the pdf in OIG's June 2023 production. *See* Exh. A, OIG, Memorandum of Activity. These documents include:

- ICE Release Notification to Mr. Gulema, Oct. 22, 2016, with attached checklist
- Email dated Oct. 22,2015, from Gulema's ERO Case Officer, regarding the release notification email for Gulema, as well as the attached email from ICE Management and Program Analyst, with the subject including "Release Notification Email—10-22-15."
- Email dated Oct. 23, 2015, that states that an employee "spoke with the AFOD and Gulema was not to be released at this time."
- Email dated Nov. 9, 2015, characterized as "a continuation on the hold on Gulema's release." This email also included an email dated October 22, 2015, which stated "Please hold on any further actions as we'll need clarification as to the release mechanism, including any continuity of care or alternative placement."
- Document dated Oct. 20, 2015, that relates to guard service and placement of Gulema.
- Two forms dated November 24, 2015, identified as DHS ICE Form I-216, Records of Persons Transferred, which indicated that Gulema was transferred on this date via OSUP. The other form is DHS ICE Form I-203, Order to Release Alien.

**Responses from ICE**

We remain concerned that ICE is continuing to delay completion of searches for Requests Nos. 4-9 without any proper justification. Despite Defendants' stated commitment to "trying to resolve this litigation through negotiations," and their "desire to attempt to resolve this case without the need for further litigation," Defendants' Portion of the Parties' June 30, 2023 Status Report at 13, ICE has yet to commit to any specific timeframe by which it will complete its search for these Requests, even as to those where the Parties have fully negotiated the search parameters. *See* Defendants' July 11, 2023 letter re Request No. 4 ("ICE will commence the search and provide hit counts as soon as practicable."). At the same time, ICE has filed a Rule 12(c) motion to attempt excuse its obligation to search for these Requests altogether. Despite the apparent inconsistency in its words and actions, the one through line is ICE's attempts to draw out and indefinitely delay its search and production obligations for Request Nos. 4-9.

For these reasons, and those discussed below, Plaintiff is fully justified in seeking monthly Status Conferences with the Court. This appears to be the only way that Defendants can be held accountable even to their own stated search and production commitments, and to ensure an expeditious resolution of this case.

1. *Requests Nos.1 and 3:*

We appreciate the information ICE has provided regarding the de-duplication process, and its commitment to thread the 41,000 addition documents yet to be processed. However, we are confused by its statement in its July 11, 2023 letter that it "will de-duplicate" these 41,000 pages. ICE previously represented to Plaintiff that it had already de-duplicated these records. *See* Defendants' June 22, 2022 Letter at 2. If that representation was not correct, ICE should complete de-duplication and threading, and inform Plaintiff how many pages result after these processes have taken place. The Court made clear at the July 5, 2023 Status Conference that this information would be essential to its determination of the monthly pace of production going forward.

In an effort to further prioritize and potentially narrow the field of the additional 41,000 documents to be processed, Plaintiff again requests that ICE provide a breakdown of the number of responsive pages via month for Mr. Gulema. As Plaintiff has repeatedly documented, ICE has substantially failed to produce documents dated after October 1, 2015 in its current production of documents regarding Mr. Gulema. It appears that the ICE FOIA office is able to sort documents via date. *See* Dkt. No. 48-1, Decl. Fernando Piniero, ¶ 19 ("After completing an email threading process, search terms and date ranges can be applied to further narrow the scope.").

2. *Request No. 4*

Now that the Parties have fully agreed on the search parameters, as discussed, ICE should commit to a date certain when it will conduct the searches and provide Plaintiff hit counts. It has been over two weeks since Plaintiffs clarified the search locations on June 26, 2023, when ICE had all of the information it needed to commence the searches. We ask that it do so within five days from today.

3. *Requests Nos. 5 and 7*

Regarding ICE's representation that it will only generally search the Office of Professional Responsibility (OPR) and IHSC in response to Request Nos. 5 and 7, and not key IHSC staff, ICE provides no justification for this position, resulting an inadequate search on its part. Further, Plaintiff is not asking ICE to search "all IHSC staff," but rather key personnel who in its Medical Case Management and Unit Medical Care Coordination Program staff, IHSC participants in Significant Detainee Illness (SDI) Meetings, as well as ICE ERO staff in communication with IHSC's Medical Case Management Unit. Plaintiff's June 26, 2023 letter provided ample reason why these key staff should be searched for responsive records, to which ICE has failed to respond. For these reasons, we maintain our position that omitting these search parameters would result in an inadequate search of Request Nos. 5 and 7.

Defendants have claimed that documents described in Request No. 5 "do not exist" "as described." Plaintiff has requested "spreadsheets, emails, documents, communications, databases, lists, and other data compilations" "that identify detainees who were released from custody while (a) hospitalized (including for COVID-19 treatment); (b) in the full-time care of external healthcare providers or facilities (including for COVID-19 treatment), or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility." Requested custodians include "ICE Leadership, ICE Enforcement and Removal Operations, ICE Health Service Corps, and ICE Office of Professional Responsibility."

Plaintiff does not merely seek a "list" of such individuals, but also seeks spreadsheets, emails, documents, and communications that would identify such detainees. Defendants are clearly in possession of such documents, which would be recoverable using the search terms at the suggested search locations provided. Defendants' production, for example, has indicated that ICE Enforcement and Removal Operations reports the deaths of detainees—even those that took place outside custody. *See, e.g.* Exh. B, OIG June 2023 Production, p. 1-2 (noting that "[o]n June 3, 2019, ICE ERO El Paso reported the death of [Johana Medina-Leon] to DHS OIG El Paso, TX.").

In addition, in order to conduct an adequate search, Defendants are required to "follow 'obvious leads.'" *Transgender Law Center*, 46 F.4th at 780. IHSC monitors detainee hospitalization and offsite medical care treatment, including significantly ill detainees. *See* ICE, IHSC Annual Report for FY 20 (2021), https://www.ice.gov/doclib/ihsc/IHSCFY20AnnualReport.pdf at 24. IHSC's Public Health, Safety, and Preparedness unit monitored and tracked COVID-19 system for ICE detainees across the health care system. In addition, in FY 2011, "IHSC developed and piloted the IHSC Unified Patient Tracking System to track and report significant event notifications, significant detainee illness (SDI) . . . within the IHSC healthcare system." *See* DHS, *Healthcare Costs for Noncitizens in Detention, Fiscal Year 2021 Report to Congress* at 6 (Jul. 22, 2022), https://www.dhs.gov/sites/default/files/2022-09/ICE%20-%20Healthcare%20Costs%20for%20Noncitizens%20in%20Detention.pdf.

Despite our disputes as to the parameters for Request Nos. 5 and 7, so as not to further delay the search for these Requests on the parameters on which we agree, Plaintiff asks that ICE commence the agreed-upon search for Request Nos. 5 and 7, and provide Plaintiff hit counts within five days from today. Please provide information as to the terms and locations searched. Plaintiff reserves the right to revisit the dispute over the appropriate parameters of ICE's search, including through Court process.

  4.  *Request No. 6*

On June 12, 2023, Plaintiff provided a list of search terms, to which Defendant has agreed, for this Request. ICE now states that "ERO needs a date, or an event, or a location, or alien number to search for a SIR or SENs." To the extent that ERO is unable to search the Significant Incident Report (SIR) system in the Significant Event Notification (SEN) system using the agreed-upon search terms, Plaintiff suggests that ICE search the records of the ICE Joint Intelligence Operations Center (JIOC), which "analyzes the SIRS and sends summaries of them to the appropriate . . . field offices." *See* DHS, Privacy Impact Assessment for the Significant

Event Notification (SEN) System 1-2, Oct. 15, 2021,
https://www.dhs.gov/sites/default/files/publications/privacy-pia-ice023a-sen-october2021.pdf
(describing the Significant Incident Report system and those who have access to reports).

In addition, ICE has misread the Request with respect to ICE OPR. Plaintiff also requests any
spreadsheets, emails, or documents in ICE OPR's possession that "mention the death of any
detainee who had been previously released from custody while hospitalized, a patient in the care
of an external healthcare provider or facility, or released from custody immediately prior to
transfer to an emergency room, hospital, or external care facility. Please use the agreed-upon
search terms for such records within OPR's possession.

     *5.*     *Request No. 8*

Regarding ICE's refusal to search for information related to the *Fraihat* case, ICE provides no
valid justification for this position. There is no requirement that Plaintiff must identify a search
location in its FOIA Request in order for ICE to be required to search it.  Rather, particularly
where, as here, Plaintiff has provided ample basis that records regarding COVID-19
hospitalizations from *Fraihat* is likely to yield responsive records, ICE's failure to search it
would result in an inadequate search.  *See Transgender Law Center v. ICE*, 46 F. 4th at 779 (it is
Defendants' burden to conduct an adequate search, "reasonably calculated to uncover all relevant
documents" "beyond a material doubt"). As set forth in our June 26, 2023 letter, *Fraihat*
addresses COVID-19 conditions in ICE detention, which led to hospitalizations and releases, a
core subject of Plaintiff's FOIA Request. *See also* Plaintiff's May 19, 2023 letter, Exh. B
(Deposition transcript of Jennifer Moon). For these reasons, we maintain our position that unless
ICE searches *Fraihat* for responsive records, its search is inadequate.

Notwithstanding the Parties disputes regarding search parameters, so as not to further delay the
search for these Requests on the parameters on which they agree, Plaintiff asks that ICE
commence its search for Request No. 8 based in the parameters on which the Parties agree, and
provide Plaintiff hit counts within five days from today. Please provide information as to the
terms and locations searched. Plaintiff reserves the right to revisit the dispute over whether ICE
is obligated to search records compiled by ICE for *Fraihat* for records responsive to Request No.
8, including through Court process.

     *6.*     *Request No. 9*

The Parties appear to be at an impasse on Request No. 9.  Defendants are clearly in possession of
responsive records. As ICE has reported to Congress, "IHSC reimburses independent providers
who provide care in local hospitals and healthcare systems for services rendered." *See* DHS,
*Healthcare Costs for Noncitizens in Detention, Fiscal Year 2021 Report to Congress* at 3 (Jul.
22, 2022), https://www.dhs.gov/sites/default/files/2022-09/ICE%20-
%20Healthcare%20Costs%20for%20Noncitizens%20in%20Detention.pdf. Moreover, it is clear
that IHSC employees, particularly those in the Medical Resources Unit, discuss billing for
hospitalization or external care of detained people who were released from custody. See Exh. C,

ICE Production, 2022-ICLI-48, 5600 (noting hospital bill for Teka Gulema of "$1.6 million dollars").

To help break impasse, Plaintiff suggests that ICE search the following locations and terms for documents in response to Request No. 9:

- **Search Locations re: Request No.9:**
  - ICE Health Service Corps, Resource Management Unit
- **Search Terms re: Request No. 9:**
  - Death
  - Died
  - Deceased
  - Ambulance
  - Emergency
  - Hospital
  - "offsite referral"
  - "life support"
  - Coma
  - Ventilator
  - "Intensive care"
  - "critical condition"
  - Hospice
  - Palliative
  - Release
- **Boolean Search in Relativity re: Request No. 9:**
  - (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian or death or died or deceased or "critical care") AND (bill! or invoice or charge or payment or Medicaid or MedPAR or paid)

Plaintiff also reserves the right to request additional specific information at a later date if Defendants' searches for Request Nos. 4-9 identify additional people whose records may be responsive to this request.

**Increased Processing Rate**

Plaintiff is in receipt of the Pineiro Declaration attesting to ICE's FOIA workload and information specific to this case. Dkt. 48-1. We appreciate ICE's attestation that it will conduct de-duplication and email threading of the 41,000 pages of documents it has yet to review.  As discussed, we await an updated page count to assess the universe of documents subject to ICE review and production, to determine an appropriate processing rate given the circumstances of this case. Depending on the number of pages at issue after de-duplication and threading, Plaintiff is also amenable to proposing additional parameters, including date ranges, to reduce the total number of documents for processing.

While we appreciate that ICE has 69 federal district court cases in active production across the country, and has a "normal processing rate for cases in litigation [of] 750 pages" per month, this hardly justifies ICE's refusal to increase its processing rate for this case, including to Plaintiff's proposal of 5,000 pages/month for Request Nos. 1-3, and 2,500 pages/month for Request Nos. 4-9).

The facts of this case more than warrant ICE being required to increase their "typical" processing rate along the lines Plaintiff seeks. As set forth in Plaintiff's Portion of the June 30, 2023 Status Report, Courts routinely order increased production rates in situations where, as here, the Defendant agency is at fault for failing to timely search for and produce responsive records. *See Long v. IRS*, 693 F.2d 907, 910 (9th Cir. 1982) ("unreasonable delays in disclosing non-exempt documents violate the intent and purpose of the FOIA, and the courts have a duty to prevent these abuses."); *Los Angeles Times Commc'ns LLC v. U.S. Dep't of Homeland Sec.,* No. 2:20-cv-10911-FLA-MRW, 2020 WL 7055904 (C.D. Cal. 2020), December 3, 2021 Minutes Order, Dkt. 35 (ordering production of 3,000 pages per month FOIA case seeking analogous information); *Seavey v. DOJ*, 266 F. Supp. 3d 241, 248 (D.D.C. 2017) (ordering production at a rate of "at least 2,850 pages per month" and finding this pace "well within the range of what other courts have ordered," despite agency's claim that 500 pages would be consistent with its policy); *Clemente v. FBI*, 71 F. Supp. 3d 262, 269 (D.D.C. 2014) (ordering agency to process 5,000 records a month); *Elec. Privacy Info. Ctr. v. FBI*, 933 F. Supp. 2d 42, 48-50 (D.D.C. 2013) (rejecting claim that "'exceptionally large number' of FOIA cases involving the agency currently in litigation" justified only processing 1,500 pages per month, and ordering significantly higher volume in response to plaintiff's request); *Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enf't Agency*, 811 F. Supp. 2d 713, 731 (S.D.N.Y. 2011) (ordering ICE to fully respond to an outstanding FOIA request that required producing over 14,000 pages in one month); *Judicial Watch, Inc. v. Dep't of Energy*, 191 F. Supp. 2d 138, 140-41 (D.D.C. 2002) (ordering agencies to process over 6,000 pages of material within 60 days).

Plaintiff filed its FOIA Request over a year ago on April 29, 2022, and it filed litigation to expedite production of responsive records in July 2022. It simply would not be fair for Plaintiff to have to wait another 3.5 years for ICE to produce responsive records particularly under the circumstances here.  Among the circumstances weighing in favor of Plaintiff's request for an expedited production schedule include: (1) Defendants' failure to de-duplicate the initial universe of approximately 8,000 pages it identified at the time of the Scheduling Order, which would have greatly reduced the volume of pages for review and production; (2) ICE's inexplicable delayed disclosure of the additional 41,000 pages it identified on June 6, 2023, over four months after the Scheduling Order, whose timely disclosure likely would have resulted in an increased production rate and/or other adjustments to the Scheduling Order to ensure more expeditious prosecution of the case, (3) ICE's delay in agreeing to de-duplicate and thread those 41,000 pages, which it apparently still has yet to do a month after their disclosure, thus delaying their production, and (3) ICE's delayed agreement to conduct any search for Request Nos. 4-9, and its related delay in commencing those searches and committing to any date certain when they will be completed, as discussed above.

For all these reasons, the cherry-picked exemplars ICE provides in Defendants' July 11, 2023 letter reflecting other cases where ICE is subject to lower processing rates than what Plaintiff

seeks here are unhelpful, and they do not justify ICE's refusal to increase its production rate here. Defendants do not attest that those cases contain facts like those here. Further, the cases cited in C.D. Cal. appear to be based on stipulations between the parties, without any explanation of the total universe of documents at issue, or the length of time to complete the production and conclude the case. The cases are also anomalous in that they mostly reflect production rates in the 300-500 range per month, which is even below ICE's "normal" processing rate of 750 pages per month, as reflected in the Pineiro declaration.

Finally, it appears that at least some representations in Mr. Pineiro's declaration regarding the ICE FOIA Office's workload are inaccurate or misleading. For example, in paragraph 5, Mr. Piniero attests that:

> *In fiscal year ("FY") 2020, the number of FOIA requests the ICE FOIA Office handled dramatically increased to over 100,000 from approximately 64,000 in FY 2019. Since FY 2020, that number has continued to increase, with the ICE FOIA Office handling approximately 105,000 requests in FY 2021 and over 110,000 requests in FY 2022. This spike in ICE FOIA's workload is attributed to an increase in the number of requests from individuals for documents in their immigration file coupled with increased public interest in the Department's implementation of Presidential and/or Executive Orders.*

ECF No. 48-1 ¶ 9. However, Mr. Pineiro's declaration is inconsistent with Defendants' attestation regarding elimination of this FOIA backlog. In another case regarding ICE's FOIA processing rates, Defendants attested that "ICE eliminated its A-File backlog entirely by the end of the second quarter—a result made possible by the interagency memorandum of agreement between ICE and USCIS signed in 2020 and renewed in subsequent years." *See Nightingale v. USCIS*, No. 19-03512, N.D. Cal., ECF 138 at 4 (Sept. 15, 2022).

We look forward to continuing to discuss these matters with Defendants and the Court at the July 13, 2023 Status Conference.

Sincerely,

LABONI A. HOQ (SBN 224140)
laboni@hoqlaw.com
HOQ LAW APC
P.O. Box 753
South Pasadena, California 91030
Telephone: (213) 973-9004

EUNICE CHO (pro hac vice)
echo@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
915 Fifteenth Street NW, 7th Floor
Washington, DC 20005
Telephone: (202) 548-6616

MICHAEL KAUFMAN (SBN 254575)
MKaufman@aclusocal.org
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA

KYLE VIRGIEN (SBN 278747)
kvirgien@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

8

1313 West Eighth Street
Los Angeles, California 90017 Telephone:
(213) 977-9500
Facsimile: (213) 915-0219

NATIONAL PRISON PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (202) 393-4930

*Attorneys for Plaintiff*

# EXHIBIT A



**OFFICE OF INSPECTOR GENERAL**

Department of Homeland Security

## MEMORANDUM OF ACTIVITY

**Type of Activity**: Personal Contact (b)(6);

| **Case Number:** I16-ICE-ATL-17063 | **Case Title:** Etowah County Detention Center |
|---|---|

On Thursday, September 1, 2016, (b)(6);     , Special Agent, and (b)(6);   , Lead Criminal Investigator, the Department of Homeland Security (DHS), Office of Inspector General (OIG), Atlanta Field Office, interviewed (b)(6); (b)(7)(C)   Supervisory Deportation and Detention Officer (SDDO), Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO), Gadsden, AL. The interview was in reference to a DHS OIG investigation initiated from a letter dated August 11, 2016, from the office of Zoe Lofgren, Congress of the United States, House of Representatives, Ranking Member, Immigration and Border Security Subcommittee. The Congressional request was made to John Roth, Inspector General, DHS OIG.

The request called for a review of the detainee care and operating policy and procedure at the Etowah County Detention Center (ECDC), Gadsden, AL, specifically in regards to detainee Teka Gulema ((b)(6); (b)(7)(C)   - Ethiopia). According to the request, Gulema spent over eight years in the physical custody of U.S. Immigration and Customs Enforcement (ICE) (several of those years at ECDC) until February 7, 2015, when he was transported to an emergency room at the Riverview Regional Medical Center (RRMC), Gadsden, AL. Gulema remained hospitalized at RRMC until his death on January 18, 2016. According to the letter, Gulema had been released from ICE custody approximately ten days prior to his death. Because Gulema was not in custody at the time of his death, his death was not reported as an custody death and was not investigated by DHS. The request specifically called for an inquiry into the current health care system at ECDC and if the health care system or lack of heath care contributed to the death of Gulema. The request also called for a review of Gulema's ICE detention records.

On the previous date, the agents met briefly with (b)(6); to discuss some logistics for the investigation. Prior to the interview on the date of this report, the agents again explained the nature of the interview. (b)(6); was advised of DHS OIG warnings not to disclose investigative information. (b)(6); (b)(7)(C) was also advised of his Federal Employee Warnings (Garrity Warnings). (b)(6); read and signed the forms and agreed to be interviewed. During the interviews, (b)(6); stated the following in substance:

(b)(6); stated that he became the SDDO in Gadsden in 2013. (b)(6); had previously been a Supervisory Immigration Enforcement Agent and Detention and Removal Officer with ICE. (b)(6); was also an agent with the U.S. Border Patrol from 1996-2001.

| Name, Title, Signature, and Date: | | Reviewing Official Name, Title, Signature, and Date: |
|---|---|---|
| (b)(6);<br>**Special Agent** (b)(6); (b)(7)(C) | 09/14/2016 | (b)(6);<br>**Lead Criminal Investigator** (b)(6); (b)(7)(C)  7/30/16<br>(b)( |

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General, and is disseminated only on a need to know basis. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

# MEMORANDUM OF ACTIVITY

On the previous date, (b)(6); advised that Gulema continually refused to cooperate with ICE officials and would not sign required paperwork for removal proceedings. The process includes a Post Order Custody Review (POCR) once paperwork is signed and travel documents are issued. In the case of Gulema, the POCR clock was basically "suspended" because of Gulema's continual refusal to cooperate. (b)(6); stated that detainee can stay in a failure to comply (FTC) status indefinitely, depending on the specifics of a detainee's case.

According to (b)(6); , once Gulema was placed in the hospital, ICE officials were determining if Gulema could be released. Additional attempts were made to obtain travel documents without success. Eventually, ICE headquarters determined that Gulema could be released on an order of supervision (OSUP). (b)(6); commented that he recalled ICE was paying approximately $20,000 a month in guard services at RRMC and ICE had paid at least three million dollars in medical expenses. (b)(6); stated that these costs were not a determining factor in placing Gulema on OSUP.

(b)(6); did not recall Gulema ever filing a writ of habeas corpus seeking removal from detention. (b)(6); stated that only a deputy field officer director or above can place someone in an FTC status. (b)(6); did not recall Gulema ever pushing to be released and did not make any extra efforts to be released.

(b)(6); stated that medical issues concerning Gulema would be documented in the ECDC paperwork and would not be part of Gulema's ICE file. (b)(6); stated that the American Civil Liberties Union had requested information in regards to Gulema and that information was provided in a Freedom of Information Act request. (b)(6); provided DHS OIG with several documents including copies of electronic mail (email) messages. These will be documented below. (b)(6); further stated he would send additional messages to SA (b)(6); . These records will be documented in a separate report.

The documents received are summarized as follows:

The first document was an ICE Release Notification to Gulema from (b)(6); , POCR Unit Chief, ICE HQ. The notification was dated October 22, 2016. There was an HQ POCR checklist attached to the letter. The checklist stated, "Due to alien's medical condition and prognosis, the Embassy of Ethiopia refused to conduct an interview or issue a travel document on his behalf. Therefore, since alien's medical condition is unlikely to improve anytime soon, there is not a significant likelihood of removal in the reasonable foreseeable future."

The next document is an email from (b)(6); to (b)(6); (b)(7)(C) Gulema's ERO Case Officer, dated October 22, 2015, regarding the release notification email for Gulema. (b)(6); advised that they are not to release at this time, the ERO Field Office Director (FOD) was checking with HQ. The email also contained an email from (b)(6); Management and Program Analyst,

**IMPORTANT NOTICE**
This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

## MEMORANDUM OF ACTIVITY

DSH/ICE/ERO/RMD/RIO, Middle East/East Africa, to multiple recipients, including (b)(6); with the subject "(b)(6); – Release Notification Email – 10-22-15."

The next document was an email dated October 23, 2105. The email was from (b)(6); to (b)(6); The email stated that (b)(6); spoke with the AFOD and Gulema was not to be released at this time.

The next document was an email dated November 9, 2015, from (b)(6); to (b)(6); and other recipients. It was a continuation of the hold on Gulema's release. Also included in the email chain was an email from (b)(6); FOD, ICE ERO, New Orleans, LA. The email was dated October 22, 2015, and stated, "Please hold on any further actions was we'll need clarification as to the release mechanism, including any continuity of care or alternate placement."

Another document was an unrelated to Gulema's release letter dated October 20, 2015. The email was to (b)(6); and (b)(6); from (b)(6); Gulema was the subject of the email and it had to do with guard service and placement of Gulema. The guard services were identified at $20,000+ per month. The email further stated that ICE Health Service Corp was still seeking placement for Gulema and HQ was still "deliberating."

(b)(6); provided DHS OIG with a copy of the ICE contract with ECDC. The contract was dated in October 2009 and was signed by (b)(6); , Assistant Secretary, ICE, and (b)(6); , Sheriff, ECSO. (b)(6); described the contract as ICE was a rider on the United States Marshal's Service, Department of Justice, contract with ECDC. The contract did not list any specific medical requirements, only that the ECDC must meet the applicable ICE National Detention Standards.

The final documents received were two forms dated November 24, 2015. The first form was identified as a DHS ICE Form I-216, Records of Persons Transferred. The form indicated that Gulema was transferred on this date via OSUP. The other form was a DHS ICE Form 1-203, Order to Release Alien.

ATTACHMENTS

**IMPORTANT NOTICE**

This report is intended solely for the official use of the Department of Homeland Security, or any entity receiving a copy directly from the Office of Inspector General. This report remains the property of the Office of Inspector General, and no secondary distribution may be made, in whole or in part, outside the Department of Homeland Security, without prior authorization by the Office of Inspector General. Public availability of the report will be determined by the Office of Inspector General under 5 U.S.C. 552. Unauthorized disclosure of this report may result in criminal, civil, or administrative penalties.

# EXHIBIT B

**To:** [(b)(6); (b)(7)(C)] [redacted]@oig.dhs.gov]
**From:** [(b)(6); (b)(7)(C)]
[(b)(6); (b)(7)(C)]                                                                      [(b)(6):]
**Sent:** Tue 7/14/2020 11:52:51 AM (UTC-04:00)
**Subject:** FW: Enhanced Reporting - I19-ICE ERO-ELP-16066, Death of Jonathan Alberto Medina-Leon/Non-Employee/ICE ERO/El Paso, TX

FYI

[(b)(6); (b)(7)(C)]


Assistant Special Agent in Charge



DHS Office of Inspector General, Investigations



El Paso Field Office



[(b)(6); (b)(7)(C)]


---

**From:** EDS Notifications <[(b)(7)(E)]@oig.dhs.gov>
**Sent:** Tuesday, July 14, 2020 7:20 AM
**To:** [(b)(6); (b)(7)(C)]@oig.dhs.gov; [(b)(6); (b)(7)(C)]@oig.dhs.gov; [(b)(6); (b)(7)(C)]@oig.dhs.gov;
[(b)(6); (b)(7)(C)]@oig.dhs.gov; [(b)(6); (b)(7)(C)]@OIG.DHS.GOV> [(b)(6);]
[(b)(6);]@oig.dhs.gov> [(b)(6);]@oig.dhs.gov; [(b)(6); (b)(7)(C)]@oig.dhs.gov>;
[(b)(6);]@oig.dhs.gov; [(b)(6); (b)(7)(C)]@oig.dhs.gov; [(b)(6); (b)(7)(C)]@oig.dhs.gov>
**Subject:** Enhanced Reporting - I19-ICE ERO-ELP-16066, Death of Jonathan Alberto Medina-Leon/Non-Employee/ICE ERO/El Paso, TX



7/14/2020

The case in subject line is no longer marked for enhanced reporting.

Narrative:

On June 3, 2019, the Department of Homeland Security (DHS), Office of Inspector General (OIG), El Paso, TX, became aware of the death of a 25 year old transgender female at an El Paso local hospital five days after being released from Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) custody. It was reported by ICE ERO that on April 11, 2019, Jonathan Alberto Medina-Leon [(b)(6); (b)(7)(C)] applied for admission into the United States at the Paso Del Norte Port of Entry in El Paso, TX, [(b)(6); (b)(7)(C); (b)(3):Unspecified] On April 14, 2019, ICE ERO, El Paso, TX, took custody of Medina at placed her at the Otero County Processing Center (OCPC) located in Chaparral, NM. According to ICE ERO, on May 28, 2019, the OCPC conducted an [(b)(6); (b)(7)(C)] [(b)(6); (b)(7)(C)] for Medina, at her request, [(b)(6); (b)(7)(C)] The OCPC referred Medina to a local hospital for further evaluation and subsequently served Medina with a Notice to Appear document and released her from ICE ERO custody on parole prior to her release. On June 2, 2019, ICE ERO Domestic Operations informed ICE ERO El Paso of a Facebook post reporting the death of a transgender female allegedly in ICE custody. ICE ERO El Paso later determined that the Facebook post was referring to Medina. On June 3, 2019, ICE

ERO El Paso reported the death of Medina to DHS OIG, El Paso, TX.
Case 2:22-cv-04760-SHK    Document 112-4    Filed 02/26/25    Page 113 of 220    Page
ID #:2099

EDS

# EXHIBIT C

**From:** (b)(6); (b)(7)(C)
**Sent:** Mon, 8 Jun 2015 10:53:50 -0400
**To:** (b)(6); (b)(7)(C)
**Subject:** FW: Teka Gulema

FYI

(b)(6); (b)(7)(C) *RN, BSN, MSHS, CCHP*
CDR, United States Public Health Service
Eastern Regional Field Medical Coordinator

DHS/ICE/IHSC
ERO Miami Field Office
772-419-(b)(6) (Office)
202-321- (Mobile)
866-711-8507 (Fax)
email:(b)(6), @ice.dhs.gov

*Warning. This document is UNCLASSIFIED//FOR OFFICIAL USE ONLY (U//FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official. No portion of this report should be furnished to the media, either in written or verbal form.*

**From:** (b)(6); (b)(7)(C)
**Sent:** Friday, June 05, 2015 4:55 PM
**To:** (b)(6); (b)(7)(C) (CTR)
**Cc:** (b)(6); (b)(7)(C)
**Subject:** RE: Teka Gulema

Thanks so very much. Money is the life's blood for hospitals !!

**From:** (b)(6); (b)(7)(C) (CTR)
**Sent:** Friday, June 05, 2015 4:52 PM
**To:** (b)(6); (b)(7)(C)
**Cc:**
**Subject:** RE: Teka Gulema

Dr. (b)(6); (b)(7)(C)

I just spoke with (b)(6); (b)(7)(C) (Billing Director) and (b)(6); (b)(7)(C) (VP) of Riverview Regional Medical Center. According to Ms.(b)(6); (b)(7)(C) Mr. Teka's bill is $1.6 million dollars. I expressed to both ladies IHSC's sincere apology for any miscommunication that has/had taken place regarding Mr. Teka's care. Both Ms.(b)(6); (b)(7)(C) and Ms. (b)(6); (b)(7)(C) expressed how appreciative they were that I contacted them. As of March 1, 2015 this hospital was purchased by Prime Healthcare so they will actually need to pull information from two different billing systems.

I also spoke with CDR [(b)(6); (b)(7)(C)] and advised that I am going to create sub MedPARs in the MedPAR system which simply links the entire admission to one MedPAR number.  All MedPARs will be under MedPAR number 20150604147000 which will represent the first segment (21 day admission) and the subsequent MedPARs will end in 01, 02, 03 etc. until he is discharged.  Once the bills have dropped in their billing system, Ms. [(b)(6); (b)(7)(C)] will send them to me and I will forward them to the VAFSC for expedited processing.   Once the detainee is discharged/transferred the hospital will submit a final bill which will be reviewed by the VAFSC to ensure that the provider has been reimbursed correctly.

I will provide additional information as it is received.

Thanks
[(b)(6); (b)(7)(C)]
Provider Relations Liaison
Resource Management Unit
ICE Health Service Corps
500 12th Street, S.W., [(b)(6); (b)(7)(C)]
Washington, DC  20536
(202)732 [(b)(6); (b)(7)(C)] office)
(866)382-8756 (efax)
(202)689 [(b)(6); (b)(7)(C)] cell)
[(b)(6); (b)(7)(C)] @associates.ice.dhs.gov

**From:** [(b)(6); (b)(7)(C)]
**Sent:** Friday, June 05, 2015 3:58 PM
**To:** [(b)(6); (b)(7)(C)]      (CTR)
**Cc:** [(b)(6); (b)(7)(C)]
**Subject:** RE: Teka Gulema

Awesome thx

**From:** [(b)(6); (b)(7)(C)]      (CTR)
**Sent:** Friday, June 05, 2015 3:57 PM
**To:** [(b)(6); (b)(7)(C)]
**Cc:**
**Subject:** Teka Gulema
**Importance:** High

Dr. [(b)(6); (b)(7)(C)] ,

Per our conversation, I did reach out to Riverview Regional Medical Center regarding Teka Gulema.  I spoke with [(b)(6); (b)(7)(C)] in billing and she said that currently no bills have dropped for this detainee because he is still in-house.  I asked if they could provide us with interim bills so that we can begin to pay them for some of the services that have been provided. [(b)(6); (b)(7)(C)] stated that due to the amount of the bill I would need to speak with the Hospital Financial Manager. [(b)(6);]

provided me with the contact information for [(b)(6); (b)(7)(C)] however, had had already left the office for the weekend.

I will follow up with Mr. [(b)(6):] next week with regards to the financial piece to see if they can provide us with bills so that we can begin to pay them for services.  I will keep you posted.

Thanks
[(b)(6), (b)(7)(C)]
Provider Relations Liaison
Resource Management Unit
ICE Health Service Corps
500 12th Street, S.W. [(b)(6); (b)(7)(C)]
Washington, DC  20536
(202)732[(b)(6); (b)(7)(C)] (office)
(866)382-8756 (efax)
(202)689[(b)(6); (b)(7)(C)] (cell)
[(b)(6), (b)(7)(C)]@associates.ice.dhs.gov

# EXHIBIT P

June 26, 2023

Jason Axe
Joseph Tursi
Alarice Medrano
United States Attorney's Office
Central District of California
300 N. Los Angeles St. Suite 7516
Los Angeles, CA 90012
Jason.Axe@usdoj.gov
Alarice.Medrano@usdoj.gov

**SENT VIA EMAIL**

     Re:     *ACLU of Southern California v. United States Immigration and Customs Enforcement, et al.,* No. 2:22-cv-4760 (C.D. Cal.)

Dear Counsel,

Thank you for your June 22, 2023 letter regarding the Parties' continued meet and confer over the status of Defendants' additional searches in response to Plaintiff's FOIA Request. Please see Plaintiff's responses to certain of the outstanding issues. We look forward to agreement on search parameters within the week, so that Defendants can commence their searches and timely produce responsive documents.

**OIG**

    *1. Additional Search of Narrative Field of EDS and Two Additional Special Agents*

Regarding OIG's additional searches, including of the EDS narrative field and the two additional Special Agents, please identify the total number of pages that have yielded from the search. Please identify whether the additional pages located through these searches are part of the 41,000 additional pages Defendants identified in their June 9, 2023 correspondence, or whether the additional documents OIG located are distinct from those documents.

Further, in order for Plaintiff to assess the sufficiency of OIG's search, please identify for which of the four individuals named in the FOIA request OIG searched two additional Special Agents. Please also identify the total number of Special Agents OIG searched for each of the four named individuals identified in the FOIA request.

    *2. Mr. Ibarra Bucio*

To the extent Defendants claim that OIG has no responsive documents regarding Mr. Ibarra Bucio, please confirm that OIG did not conduct an investigation into Mr. Ibarra Bucio's detention and/or death.

    *3. Mr. Vargas Arellano*

Please identify whether OIG's search of Mr. Vargas Arellano's name and A# yielded any additional responsive documents.

**ICE**

*1. Request Nos.1 and 3:*

Regarding ICE's representation that it de-duplicated but did not thread the 41,000 pages it located based on its additional search for Requests Nos. 1 and 3, given the large volume of documents at issue Plaintiff asks the ICE take steps to thread those documents prior to production. We again note that threading is possible using Relativity, the program ICE is using to process documents in this case. *See* https://help.relativity.com/RelativityOne/Content/Relativity/Analytics/Email_threading.htm. We understand that, even after documents have been batched out for review or even after a review has been started, it is a straightforward matter to run threading on the unreviewed documents and batch them out again for review. As such, please explain what you mean when you say "these documents are already in the processing system, [and] cannot be threaded." In addition, we ask that ICE identify the volume of the 41,000 pages that constitute emails, as opposed medical and other documents, to assess where threading should be applied here.

Given that Defendants have consistently produced duplicative documents for lack of threading, if threading is not conducted to deduplicate records, we will request that the court significantly increase the monthly rate of production (not processing) regarding these documents.

With respect to documents responsive to Request Nos. 1 and 3, please produce documents in the following order: Jose Ibarra Bucio, Johanna Medina Leon, Martin Vargas Arellano, and then Teka Guelma.

Regarding Mr. Gulema, please provide a breakdown of the number of responsive pages via month for Mr. Gulema. Please also specify whether these responsive records include SEN and SIR records, communications related to Significant Detainee Illness (SDI) meetings, and communications between IHSC Staff, Field Medical Coordinators, ERO, and agency staff responsible for reviewing the SDI spreadsheet. *See* IHSC Directive: 03-32/ERO Directive Number: 11853.3, *Significant Detainee Illness,* Dec. 1, 2015, attached as Exhibit A.

Finally, in accordance with the Court's February 9, 2023 order, please specify the new locations/databases for the new documents located, and search terms used to locate the records produced with each production. Dkt. 40 at 1.

*2. Request No. 4*

In response to your request for clarification, Plaintiff asks that ICE search the ICE Front Office, and not the ERO Front Office. Plaintiff reiterates that ICE should exclude any version of ICE Detention Standards or ICE's COVID-19 Pandemic Response Requirements, as these are publicly available.

Given that Parties appear to agree on the search parameters for ICE's search of Request No. 4, please confirm that it will commence the search and provide us hit counts within the next week.

*3. Requests Nos. 5 and 7*

Regarding ICE's representation that it will only generally search the Office of Professional Responsibility (OPR) and IHSC in response to Request Nos. 5 and 7, Plaintiff does not agree that limiting its search locations in this way meets ICE's search adequacy requirements. We reiterate our request that ICE specifically search IHSC staff, including Medical Case Management, Unit Medical Care Coordination Program Staff, as well as IHSC participants in Significant Detainee Illness (SDI) Meetings.

It is unreasonable for ICE to refuse to search participants in SDI Illness Meetings, as they possess the authority to determine release. It is highly likely that participants in these meetings will possess responsive records. Plaintiffs thus request that Defendants search the records of all participants in SDI Illness meetings. As ICE ERO Directive No. 11853.3, *Significant Detainee Illness*, states, "the SDI list ensures Enforcement and Removal Operations (ERO) HQ is aware of detainees/residents with significant medical conditions and the potential effect on enforcement actions." The Directive notes that the "SDI meeting is a collaborative effort involving IHSC, ERO Field Operations, and the Office of the Principal Legal Advisor (OPLA). The IHSC Assistant Director, IHSC Medical Director, Associate Medical Director, or Regional CDs may approve the addition of any detainee/resident to the SDI list." The criteria to be included on the SDI list includes cases where there is "significant coordination required to repatriate *or to release* a detainee/resident in the United States due to their medical condition." See Exh. A, ICE ERO Directive No. 11853.3, *Significant Detainee Illness,* Dec. 1, 2015. Indeed, IHSC reported to Congress that in FY 2021 that there were 155 instances of Significant Detainee Illness. DHS, Healthcare Costs for Noncitizens in Detention, Jul. 22, 2022 at 22, https://www.dhs.gov/sites/default/files/2022-09/ICE%20-%20Healthcare%20Costs%20for%20Noncitizens%20in%20Detention.pdf.

It is also unreasonable for Defendants to refuse to search records of ICE ERO staff in communication with IHSC's Medical Case Management Unit. As DHS itself has reported to Congress with respect to individuals on the Significant Detainee Illness list, IHSC's Medical Case Management Unit staff "report SDIs to . . . ICE Enforcement and Removal Operations Personnel." *Id.* Indeed, it is clear from ICE's prior disclosures that these communications include records concerning custodial decisions for detainees on the SDI list. *See, e.g.* 2022-ICLI-48 5604-06 (communication between IHSC Managed Care Coordinator and ICE ERO Detention and Deportation Officer discussing option to release Teka Gulema from custody).

       4.    *Request No. 6*

Plaintiff appreciates Defendants' agreement to its proposed search terms. Plaintiff reiterates that its search for Request No. 6 should include the locations identified in its June 12, 2023 letter.

       5.    *Request No. 8*

Plaintiff appreciates Defendants' agreement to its proposed search terms. Plaintiff reiterates that its search for Request No. 8 should include the locations identified in its June 12, 2023 letter. With regard to records related to COVID-19 related hospitalizations and/or releases as documented in case files for *Fraihat v. ICE*, No. 5:19-cv-1546 (C.D. Cal.), we do not agree that ICE should not be required to search for these records simply because *Fraihat* was not mentioned in Plaintiff's FOIA request. The specified records in *Fraihat* are likely to contain responsive documents. *Fraihat* addresses COVID-19 conditions in ICE detention, which led to hospitalizations and releases. As the deposition transcript of Jennifer Moon indicates, ICE compiled records related to COVID-19 hospitalization is in relation to *Fraihat.* ("I think the only place where we were actually capturing the hospitalization is on the Fraihat.") Plaintiff's May 19, 2023 letter, Exh. B (Deposition transcript of Jennifer Moon).

       6.    *Request No. 9*

Regarding IHSC, Plaintiff reiterates the request in its June 12, 2023 letter that ICE conduct a search of its records systems, for the four individuals (using their names and A#s) named in the FOIA Request, including for billing records and communications, as well as for documents related to billing involving IHSC staff responsible for medical claims, including Ms. Jennifer Moon and others similarly tasked. *See* Plaintiff's May 19, 2023 letter, Exh. B (Deposition transcript of Jennifer Moon).

Plaintiff also reserves the right to request additional specific information at a later date if Defendants' searches for requests 4-8 identify additional people whose records may be responsive to this request.

Sincerely,

LABONI A. HOQ (SBN 224140)
laboni@hoqlaw.com
HOQ LAW APC
P.O. Box 753
South Pasadena, California 91030
Telephone: (213) 973-9004

EUNICE CHO (pro hac vice)
echo@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
915 Fifteenth Street NW, 7th Floor
Washington, DC 20005
Telephone: (202) 548-6616

MICHAEL KAUFMAN (SBN 254575)
MKaufman@aclusocal.org
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West Eighth Street
Los Angeles, California 90017 Telephone:
(213) 977-9500
Facsimile: (213) 915-0219

KYLE VIRGIEN (SBN 278747)
kvirgien@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (202) 393-4930

*Attorneys for Plaintiff*

# EXHIBIT A

**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT**
**ENFORCEMENT AND REMOVAL OPERATIONS**
**ICE HEALTH SERVICE CORPS**

**SIGNIFICANT DETAINEE ILLNESS (SDI)**

**IHSC Directive:  03-32**
**ERO Directive Number: 11853.3**
**Federal Enterprise Architecture Number: 306-112-002b**
**Effective Date: 01 Dec 2015**

_____

**By Order of the Acting Assistant Director**
**Stewart D. Smith, DHSc/s/**
_____

1. **PURPOSE:** The purpose of this issuance is to set forth the policy and procedures for detainees/residents who have significant illnesses while in ICE custody.

2. **APPLICABILITY:** This directive applies to all IHSC personnel, including but not limited to, Public Health Service (PHS) officers and civil service employees supporting health care operations in ICE-owned or contracted detention facilities and to IHSC Headquarters (HQ) staff. This directive applies to contract personnel when supporting IHSC in detention facilities and at HQ.  Federal contractors are responsible for the management and discipline of their employees supporting IHSC.

3. **AUTHORITIES AND REFERENCES:**

    **3-1.**   Title 8, Code of Federal Regulations, Section 235.3 (8 CFR 235.3), Inadmissible Aliens and Expedited Removal;

    **3-2.**   Section 232 of the Immigration and Nationality Act (8 USC 1222), Detention of Aliens for Physical and Mental Examination;

    **3-3.**   Title 8, Code of Federal Regulations, Section 232 (8 CFR 232), Detention of Aliens for Physical and Mental Examination;

    **3-4.**   Section 322 of the Public Health Service Act (42 USC 249(a)), Medical  Care and Treatment of Quarantined and Detained Persons; and

    **3-5.**   Title 42, U.S. Code, Public Health Service Act, Section 252 (42 USC 252); Medical Examination of Aliens.

4. **POLICY:** The IHSC provides medical care to detainees/residents with illnesses. A significant illness is a serious or potentially life-threatening illness, injury or impairment that may involve inpatient care in a hospital or other extended care

2018-ICLI-00023   2046

facility, periods of incapacity due to the illness, or an illness that has continuity of care needs requiring significant coordination with external partners.

**4-1.** The Health Services Administrator (HSA) and the Clinical Director (CD) at IHSC-staffed facilities, and Field Medical Coordinators (FMCs), should request to place any detainee/resident with a significant illness on the significant detainee illness (SDI) list for review. The SDI list ensures Enforcement and Removal Operations (ERO) HQ is aware of detainees/residents with significant medical conditions and the potential effect on enforcement actions.

**4-2.** The SDI meeting is a collaborative effort involving IHSC, ERO Field Operations, and the Office of the Principal Legal Advisor (OPLA). The IHSC Assistant Director (AD), the IHSC Medical Director, Associate Medical Director, or Regional CDs may approve the addition of any detainee/resident to the SDI list.

**4-3.** **Criteria for placement on the SDI List:** Detainees who meet the SDI criteria may be added to the SDI list based on, but not limited to, the following qualifying conditions:

   a.   Critical illness due to a life-threatening condition (any terminal illness, cardiac arrest, life-threatening cardiac arrhythmias, coma, severe sepsis, severe diabetic ketoacidosis, fulminant hepatitis, brain mass, pulmonary embolus, significant intracranial bleeding, stroke, a condition requiring intubation/mechanical ventilation, terminal cancer, post-surgical complications posing risk to life).

   b.   Anyone who is in intensive care for 24 hours or more.

   c.   Potentially life-threatening  medical condition requiring urgent action to prevent deterioration. This includes a detainee/resident who will need to undergo a medical procedure that poses a significant risk of possible complications (cardiac valve replacement, coronary artery bypass grafting, intracranial surgery, carotid endarterectomy, aortic aneurysm repair, etc.).

   d.   Significant coordination required to repatriate or to release a detainee/resident in the United States due to their medical condition (end-stage liver disease, end-stage congestive heart failure, ongoing cancer treatment, acute infectious disease, unstable/uncontrolled psychiatric conditions, or oxygen-dependent condition).

e.   Anyone who has cancer and is requiring or receiving treatment (easily treated cancers like basal cell or squamous cell carcinoma do not necessarily require SDI monitoring).

f.   Extended hunger strike with deteriorating condition.

g.   Current significant complications associated with Acquired Immuno-Deficiency Syndrome (AIDS), severe opportunistic infections, tuberculosis, or failing treatment.

h.   Multi-drug-resistant (MDR) or extensively drug-resistant (XDR) tuberculosis disease.

i.   Severe cognitive impairment where detention poses a significant risk to the detainee's wellbeing (dementia, encephalopathy, moderate to severe mental retardation).

j.   Infirmity requiring continuous or near-continuous medical care (bedbound, status/post (s/p) stroke with permanent deficits rendering the detainee/resident incapable of caring for self).

k.   Mental health conditions that are not controlled and require prolonged ongoing inpatient hospitalization or that present significant detention management concerns. The significant mental illness (SMI) directive further defines the criteria for detainees/residents who have significant mental health conditions.

**4-4.**   Detainees/residents are added and removed from the SDI list as directed by IHSC Managed Care Unit, which collaborates with ICE Field Operations and OPLA.

**4-5.**   **Criteria for detainee/resident removal from the SDI List:** The following reasons may warrant the removal of detainees/residents from the SDI list:

a.   The acute medical condition stabilizes/resolves with treatment.

b.   The detainee/resident is no longer deemed to be critically-ill or to have a life-threatening condition.

c.   The detainee/resident is released from ICE custody.

d.   The detainee/resident is deceased.

**4-6.**   **Significant Historical Physical Findings:** Significant detainee illnesses are brought to the attention of the appropriate medical provider immediately, if an emergent condition exists.

2018-ICLI-00023   2048

4-7.   **Entry into the Health record:** The nature of the significant detainee illness is entered in the detainee's/resident's health record. Any detainee/resident with a significant detainee illness must have a Medical/Psychiatric Alert documented in his/her health record. IHSC personnel will document in the health record in Medical/Psychiatric Alert when the detainee/resident is removed from the SDI list.

4-8.   **Reporting:** The FMC, HSA, or designee will provide daily updates on detainees/residents with serious medical conditions via email to the Managed Care Coordinator(s) (MCC) managing the SDI list. The FMC, HSA, or designee will provide daily updates of detainees/residents placed on the SDI list by close of business of each duty day. The FMC, HSA, or designee will provide updates twice a day or more often for those detainees/residents on the SDI list in the intensive care unit or in critical condition depending on the condition of the detainee/resident.

5.   **PROCEDURES:** IHSC AD, Deputy Assistant Director for Clinical Services, Associate Medical Director, or Regional CD approves or disapproves the HSA, CD or FMC's request. If the request is approved, the detainee/resident with a significant illness shall be added to the SDI list. The HSA, CD, and/or FMC request(s) will be based on the criteria mentioned in section 4-3 of this directive The MCC will add the detainee/resident to the SDI list upon approval, as noted above. Once a detainee's/resident's name is entered on the SDI list, IHSC shall collaborate with ICE ERO Field Operations and OPLA. Removal of a detainee's/resident's name from the SDI list shall be based on the criteria listed in section 4-5 of this policy.

6.   **HISTORICAL NOTES:** This directive replaces the previous version dated 13 Feb 2015.  It changes the NCCHC reference from 2008 to 2014.

7.   **DEFINITIONS:** See definitions for this policy at IHSC Glossary.

8.   **APPLICABLE STANDARDS:**

8-1.   **Performance-Based National Detention Standards (PBNDS) 2011:** 4.3 Medical Care, Section M *Medical/Psychiatric Alerts and Holds.*

8-2.   **Family Residential Standards:** 4.3, V. Expected Practices, 17. *Special Needs and Close Medical Supervision.*

8-3.   **American Correctional Association (ACA):**

a.   Performance-Based Standards for Adult Local Detention Facilities, 4th edition; 4-ALDF-4C-40 *Special Needs Inmates*.

b.   Standards for Adult Correctional Institutions, 4th edition; 4-4399

2018-ICLI-00023  2049

*Special Needs.*

    c. Performance-Based Standards for Correctional Health Care in Adult Correctional Institutions; 1-HC-3A-06 *Special Needs.*

**8-4.  National Commission on Correctional Health Care (NCCHC):** Standards for Health Services in Jails, 2014: J-A-08 *Communication on Patients' Health Needs.*

**9.  RECORDKEEPING.** IHSC maintains detainee/resident health records as provided in the Alien Health Records System of Records Notice, 80 Fed. Reg. 239 (Jan. 5, 2015).

**Protection of Health Records and Sensitive Personally Identifiable Information (PII).**

**9-1.**  Staff must keep all health records, whether electronic or paper, secure with access limited only to those with a need to know. Staff must lock paper records in a secure cabinet or room when not in use or not otherwise under the control of a person with a need to know;

**9-2.**  Staff are trained at orientation and annually on the protection of a patient's health information and Sensitive PII;

**9-3.**  Only authorized individuals with a need to know are permitted to access health records and Sensitive PII; and

**9-4.**  Staff should reference the Department of Homeland Security *Handbook for Safeguarding Sensitive PII* (Handbook) at:
(b)(7)(E)
when additional information is needed concerning safeguarding sensitive PII.

**10. NO PRIVATE RIGHT STATEMENT.** This directive is an internal statement of IHSC. It is not intended to, and does not create any rights, privileges, or benefits, substantive or procedural, enforceable against the United States; its departments, agencies, or other entities; its officers or employees; or any other person.

# EXHIBIT Q



# United States Department of Justice

### United States Attorney's Office
### Central District of California

---

*JOSEPH W. TURSI*
*JASON K. AXE*
*Assistant United States Attorney*
*Phone: (213) 894-3989/8790*
*E-mail: Joseph.Tursi@usdoj.gov*
*        Jason.Axe@usdoj.gov*

*Federal Building*
*300 N. Los Angeles Street, Suite 7516*
*Los Angeles, California 90012*

June 22, 2023

## VIA E-MAIL

Laboni A. Hoq
Hoq Law, APC
P.O. Box 753
South Pasadena, CA 91030

Re:    ACLU of SoCal v. ICE, et al.
       C.D.CA Case No. 2:22-cv-04760-SHK

Dear Ms. Hoq:

Please allow the following to serve as Defendants' response to Plaintiff's June 12, 2023 correspondence.

## Questions Directed to OIG

(1) OIG conducted another search in EDS (the Office of Investigations' investigative case management system) of the narrative field for the four individuals identified in Plaintiff's FOIA request, which is in addition to OIG's previous search of the subject/complainant field in EDS. (The additional search in EDS for the four individuals in the narrative field thus supplemented the initial search in the subject/complainant field.) OIG also conducted an email search of two additional Special Agents who were the case agents for two investigations that resulted in responsive records. (Those agents are no longer with the agency, which required their emails to be searched separately.)

(2) OIG did conduct a search for Mr. Ibarra Bucio's name, in addition to his A#. The search was conducted in EDS, and no records were located.

(3) OIG did conduct a search for Mr. Vargas Arellano's name, in addition to his A#. As explained above, OIG conducted an additional search in EDS for the four individuals in the narrative field which supplemented the original search of the subject/complainant field.

(4) OIG has not located any documents from the Detroit Field Office that are responsive to Plaintiff's request.

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
June 22, 2023
Page 2


**Questions Directed to ICE**

1. **Documents Referred to ICE from OIG**

   ICE is currently processing documents referred from OIG. Some, but not all, of the documents were corrupted and thus needed to be resent from OIG for processing. ICE anticipates completing its review of the referred documents by June 30, 2023.

2. **Request Nos. 1 & 3**

   ICE has already run the 40,000 pages through Relativity and deduplicated. Of the remaining documents, 31,170 relate to Teka Gulema. Of the remaining documents, approximately 300 relate to Johana Medina Leon, 1,240 to Jose Ibarra Bucio, and 8,500 to Martin Vargas Arellano. Please note these are estimates only.

   As these documents are already in the processing system, they cannot be threaded. That said, the records are mostly medical records such that email threading would not greatly impact this set of documents. Nonetheless, we will ask that the agency thread emails moving forward as feasible.

3. **Request No. 4**

   With respect to the proposed search locations for Request No. 4, does Plaintiff want the ICE front office or the ERO front office searched? Previously, you indicated the ERO front office, but in your June 12th letter, you identify the ICE front office. Please clarify.

   As for the search terms, ICE will agree to the following requested search terms: (1) Directive; (2) Policy; (3) Protocol; (4) Procedure; (5) Training; (6) Guidance; (7) Instruction; (8) Standard; (9) Death; (10) "offsite referral"; (11) "emergency room"; (12) "emergency department"; (13) "life support"; (14) Coma; (15) Ventilator; (16) "intensive care"; (17) Hospice; (18) palliative; and (19) release.

   ICE will also agree to the following Boolean search in Relativity with respect to Request No. 4: (directive or policy or policies or protocol or procedure or training or guidance or instruction or standard) AND (custody or death or died or deceased or decedent or discharge or surgery or specialist or COVID-19 or hospital or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal) AND (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian).

   Please confirm that ICE's proposed search terms and Boolean search in Relativity are acceptable to Plaintiff.

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
June 22, 2023
Page 3

4. **Request Nos. 5 & 7**

    ICE will agree to search OPR and IHSC and to the following requested search terms: (1) Death; (2) Died; (3) Deceased; (4) Ambulance; (5) Emergency; (6) "offsite referral"; (7) "life support"; (8) Coma; (9) Ventilator; (10) "intensive care"; (11) "critical condition"; (12) Hospice; (13) Palliative; and (14) Release.

    ICE will also agree to the following Boolean search in Relativity with respect to Request Nos. 5 & 7: (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian) AND (custody or death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal).

    Please confirm that ICE's proposed search terms and Boolean search in Relativity are acceptable to Plaintiff.

    Information related to *Fraihat* was not requested in your client's FOIA request and thus ICE will not agree to add it to this search.

5. **Request No. 6**

    ICE is still considering the appropriate search locations/custodians, and we will advise of same under separate cover.

    As for the search terms, ICE will agree to the following: (1) Ambulance; (2) "Emergency" and "detainee"; (3) "offsite referral"; (4) "life support"; (5) Coma; (6) Ventilator; (7) "intensive care"; (8) "critical condition"; (9) Hospice; (10) Palliative; and (11) Release.

    ICE will also agree to the requested Boolean search in Relativity with respect to Request No. 6: release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian) AND (custody or death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal).

6. **Request No. 8**

    ICE is still considering the appropriate search locations/custodians and we will advise of same under separate cover.

    As for the search terms, ICE will agree to the following: (1) Ambulance; (2) 911; (3) Emergency; (4) "offsite referral"; (5) "life support"; (6) Coma; (7) Ventilator; (8) "intensive

Ms. Laboni A. Hoq
RE: ACLU of SoCal v. ICE
June 22, 2023
Page 4

care"; (9) "critical condition"; (10) "poor outcome"; (11) Hospice; (12) Palliative; (13) Death; (14) Died; and (15) Deceased.

ICE will also agree to the requested Boolean search in Relativity with respect to Request No. 8: (detainee or custody) AND (death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal) AND (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian or "order of recognizance").

Finally, as noted above, information related to *Fraihat* was not requested in Plaintiff's FOIA request and thus ICE will not agree to add it to this search.

7. **Request No. 9**

As previously communicated to you by email on June 9th, in order to conduct this search, IHSC would need specific names of non-citizens for these inquiries. With specific names, they can request information on anyone detained by ICE that was hospitalized and then they can review custody dates to check for release dates. They cannot provide a generalized list nor can they provide any information if the inquiry involves non-citizens who were in CBP, BP or OFO custody. That information would need to be requested from CBP.

Regarding bills and invoices, the Office of Veterans Affairs would maintain this information. The VA Financial Service Center is the third-party claims processor for IHSC. The VA runs a query on all claims for ICE before they pay the claims based on custody status or other administrative checks, however they do not keep a comprehensive list on file.

As you were also informed on June 9, 2023, the Office of Chief Financial Officer had no responsive records pertaining to the four individuals identified in your client's FOIA request.

Please let me know if you have any questions or would like to further discuss any of the matters raised above.

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
June 22, 2023
Page 5


Respectfully,

E. MARTIN ESTRADA
United States Attorney

/s/ *Joseph W. Tursi*

JOSEPH W. TURSI
Assistant United States Attorney

cc: Ms. Eunice Cho (by email)
    Mr. Michael Kaufman (by email)
    Mr. Kyle Virgien (by email)

# EXHIBIT R

June 12, 2023

Jason Axe
Alarice Medrano
United States Attorney's Office
Central District of California
300 N. Los Angeles St. Suite 7516
Los Angeles, CA 90012
Jason.Axe@usdoj.gov
Alarice.Medrano@usdoj.gov

**SENT VIA EMAIL**

      Re:     *ACLU of Southern California v. United States Immigration and Customs
Enforcement, et al.,* No. 2:22-cv-4760 (C.D. Cal.)

Dear Jason,

Thank you for your June 9, 2023 correspondence to Plaintiff, regarding Defendants' response to
Plaintiff's June 1, 2023 correspondence discussing the parameters of Defendants' supplemental
searches for documents responsive to Plaintiff's FOIA Request. At the outset, we wanted to
make clear that our June 9, 2023 request for a status conference with the Court regarding setting
deadlines and the pace of Defendants' supplemental searches and productions was not meant to
supplant the process the parties have been engaged in to negotiate the parameters of Defendants
supplemental searches.  We sincerely hope we can work collaboratively to agree on appropriate
parameters for Defendants' supplemental searches to ensure Plaintiff's goal of an expeditious
conclusion of this case, and that Defendants conduct appropriate searches as outlined here.

In response to Defendants' June 9, 2023 correspondence to Plaintiff, below, Plaintiff outlines
revised parameters for Defendants' supplemental searches. Plaintiff appreciates that "ICE
recommends using the same search terms for all these requests for ease of tasking to different
program offices," (*see* June 9, 2023 Email from Jason Axe). However, as discussed below,
Defendants' approach will be overinclusive for some requests, and underinclusive for others,
particularly if it fails to use all of the search terms we propose. As such, it will fail to meet
Defendants' burden to conduct an adequate search, "reasonably calculated to uncover all relevant
documents" "beyond a material doubt." *Transgender Law Center v. ICE*, 46 F. 4th 771, 779 (9th
Cir. 2022).

In addition, Plaintiff's previously suggested search terms and locations that identify specific
offices and positions that are likely to yield relevant documents, in an effort to avoid returning
non-responsive documents. Defendants now suggest that "ICE will need the specific names and

titles of the custodians you wish to conduct the searches within the ERO Front Office, IHSC, and the Los Angeles Field Office." June 9, 2023 Email from Jason Axe.  Plaintiffs have provide Defendants with specific, descriptive parameters regarding locations, and responsibility of agency staff who would likely possess responsive records. However, given Defendants' (b)(6) and other redactions on documents produced to date, and the asymmetry of information between the parties, Plaintiff is generally unable to provide specific names of custodians. To the extent that Defendants insist on specific names and titles, we ask that Defendants both identify names, departments and job titles of individuals they recommend for the searches, as well as provide Plaintiff with an organizational chart and list of employee names/departments/job titles from which Plaintiff can potentially identify additional custodians to search.

Plaintiff has already faced lengthy delays in receiving documents responsive to Request Nos. 3-9. Plaintiff made these request in April of 2022. From April of 2022 through February of 2023, Defendant ICE left Plaintiff under the impression that ICE had conducted searches for documents responsive to these requests and was processing those search results for production. It was only after Plaintiff inquired into the absence of any responsive documents in ICE's productions in February of 2023 that ICE admitted it had done nothing to search for documents responsive to these requests. During the past four months, Plaintiff has repeatedly attempted to secure ICE's agreement to search for responsive documents, including providing two proposed sets of search terms. In light of this already lengthy delay in ICE's commencement of its supplemental searches, **Plaintiff requests that Defendants commence a search using the search terms and locations identified below, without further delay**. These terms and locations are further streamlined from Plaintiff's June 1 correspondence. Where Defendants may require further clarity or propose other approaches, we are glad to meet and confer. We again reiterate our suggestion that Defendants include ICE's FOIA officer and counsel in our conferrals in order to streamline communication and more quickly resolve any confusion.

## <u>OIG</u>

First, with respect to OIG, please provide a response to Plaintiff's questions in our June 1, 2023 letter, including:

1. Please identify the scope of the additional search OIG is now conducting, including the search terms and locations it is searching.

2. Mr. Ibarra Bucio: Did OIG search his name, in addition to his A#? In which locations did it search for his documents?

June 12, 2023
Page 3

3. Mr. Vargas Arellano: Did OIG not initially search his name? In which locations did OIG conduct the search for his records that has now turned up the additional documents mentioned in your May 25, 2023 email?

Further, pursuant to your May 17, 2023 email correspondence, please update us on the status of OIG's search of the Detroit Field Office for responsive records, including the parameters of that search and when we can expect OIG to produce responsive records.

**ICE**

1. **Documents Referred to ICE from OIG**
In your May 17, 2023 email correspondence you stated that OIG had referred records to ICE on November 2022, December 2022, and March 2023, and that you would get back to use as to whether or not ICE had processed those documents for production to Plaintiffs. Please let us know if it has done so, and if so the bates numbers of the documents ICE produced from that referral. If ICE has not processed the documents referred by OIG, please let us know when ICE intends to do so.

2. **Request Nos. 1 and 3**
With respect to the approximately 40,000 new pages responsive to Request No. 1 regarding the four individuals identified in the FOIA request, we request that the Defendants perform the following to narrow the production:

- Please run a de-duplication analysis of the approximately 40,000 new pages, and provide a revised page count of these new documents. As part of this de-duplication process, please use email thread to ensure that lengthy, duplicate case files are not repeatedly produced as part of the page count. This process is readily available in Relativity. If ICE's FOIA processers have difficulty with this process, Plaintiff's technological consultants are happy to confer with the ICE FOIA office to provide assistance.

- After de-duplication, please provide a page count of documents relevant to each individual (*i.e.* Gulema, Ibarra Bucio, Medina Leon, and Vargas Arellano.

Please provide this analysis before June 20, 2023. At that time, Plaintiff will inform Defendants of which cache of documents should be produced. **Defendants should not use this supplemental production to delay the search and production of documents responsive to Request Nos. 4-9**. Plaintiff again requests that Defendants produce records in response to the specific search terms and locations made on June 1, 2023, with respect to Teka Gulema, Medina Leon, Ibarra Bucio, and Vargas Arellano.

### 3. Request No. 4

Defendants' proposed search terms are underinclusive and proposed locations are overinclusive. Plaintiff suggests the following search terms and locations to ensure a more precise search:

- **Search Locations and Custodians:** ICE Front Office and IHSC staff responsible for compiling agency directives, policies, protocols, procedures, guidance, standards, instructions, and trainings related to detention.
- **Search Terms re Request No. 4:** Directive; Policy; Protocol; Procedure; Training; Guidance; Instruction; Standard; Death; "offsite referral"; "emergency room"; "emergency department"; "life support"; Coma; Ventilator; "intensive care"; Hospice; palliative; release
- **Boolean Search in Relativity re Request No. 4.**

  After the Search is conducted, please use Relativity to conduct the following Boolean search of the recovered records:

  - (directive or policy or policies or protocol or procedure or training or guidance or instruction or standard) **AND** (custody or death or died or deceased or decedent or discharge or surgery or specialist or COVID-19 or hospital or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal) **AND** (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian)

- **Please exclude:** Any version of ICE Detention Standards (NDS 2000, PBNDS 2008, PBNDS 2011, NDS 2019), or ICE's COVID-19 Pandemic Response Requirements

### 4. Request Nos. 5 and 7

Defendants' proposed search terms are underinclusive and proposed locations are overinclusive. Plaintiff suggests the following search terms and locations to ensure a more precise search:

- **Search Locations and Custodians re Request Nos. 5 and 7:**
  - ISHC Medical Case Management Unit Medical Care Coordination Program staff[1]
  - Significant Detainee Illness Spreadsheets;
  - Records of any and all participants in ICE and/or IHSC's Significant Detainee Illness meetings;
  - Office of Professional Responsibility staff responsible for investigation of hospitalized and/or deceased ICE detainees

---

[1] *See* DHS, *Healthcare Costs for Noncitizens in Detention: FY 2020 Report to Congress* 29 (2022), https://www.dhs.gov/sites/default/files/2022-06/ICE%20-%20Healthcare%20Costs%20for%20Noncitizens%20in%20Detention.pdf (noting that IHSC's Medical Case Management Unit Medical Care Coordination Program oversees care for ICE detainees who are on the Significantly Ill list; and that MCCs "obtain patient care updates from field staff and report SDIs to IHSC leadership, the ICE legal staff, and ICE Enforcement and Removal Operations personnel.").

- ○ Spreadsheets regarding hospitalization or release compiled for or utilized in *Fraihat v. ICE*, No. 5:19-cv-1546;
- ○ ICE ERO staff in communication with IHSC Medical Case Management Unit
- **Search Terms re Request Nos. 5 and 7:** Plaintiff proposes the following non-case sensitive terms:
  1. Death
  2. Died
  3. Deceased
  4. Ambulance
  5. Emergency
  6. "offsite referral"
  7. "life support"
  8. Coma
  9. Ventilator
  10. "intensive care"
  11. "critical condition"
  12. Hospice
  13. Palliative
  14. Release
- **Boolean Search in Relativity re Request Nos. 5 and 7:**
  - ○ (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian) **AND** (custody or death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal)

5. **Request No. 6**

Defendants' proposed search terms are underinclusive and proposed locations are overinclusive. Plaintiff suggests the following search terms and locations to ensure a more precise search

- **Search Locations re Request No. 6:**
  - ○ ICE ERO Significant Event Notifications
  - ○ ICE ERO Significant Incident Reports
- **Search Terms re Request No. 6**
  1. Ambulance
  2. "Emergency" and "detainee"
  3. "offsite referral"
  4. "life support"
  5. Coma
  6. Ventilator

7. "intensive care"
8. "critical condition"
9. Hospice
10. Palliative
11. Release

- **Boolean Search in Relativity re Request No. 6:**
  - (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian) **AND** (custody or death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal)

6. **Request No. 8.** Defendants' proposed search terms are underinclusive and proposed locations are overinclusive. Plaintiff suggests the following search terms and locations to ensure a more precise search:

- **Search Locations re Request No. 8:**
  - o IHSC or ERO staff responsible for compiling records regarding hospitalization utilized in *Fraihat v. ICE*, No. 5:19-cv-1546 (C.D. Cal.);
  - o Spreadsheets regarding hospitalization or release compiled for or utilized in *Fraihat v. ICE*, No. 5:19-cv-1546 (C.D. Cal.).

- **Search Terms re Request No. 8:**
  1. Ambulance
  2. 911
  3. Emergency
  4. "offsite referral"
  5. "life support"
  6. Coma
  7. Ventilator
  8. "intensive care"
  9. "critical condition"
  10. "poor outcome"
  11. Hospice
  12. Palliative
  13. Death
  14. Died
  15. Deceased

- **Boolean Search in Relativity re Request No. 8:**
  - o (detainee or custody) **AND** (death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or

June 12, 2023
Page 7

"offsite referral" or coma or unconscious or ventilator or "intensive care" or
"medical observation" or ICU or "critical condition" or hospice or palliative or
fatal) **AND** (release or transfer or benefits or parole or "alternative detention" or
discharge or OSUP or "order of supervision" or humanitarian or "order of
recognizance")

7. **Request No. 9.** Thank you for confirming that ICE's Office of the Chief Financial
Officer has already been tasked to search for records pertaining to the 4 decedents.

As stated in our May 19, 2023 letter, Defendants' search should include bills, invoices,
charges, or records of payment for *any* detainee who was released from custody while
hospitalized, and *communications* about such bills, invoices, charges, or records of
payment. Thus Defendants should conduct a search of relevant records, including
communications from IHSC staff responsible for medical claims, including Ms. Jennifer
Moon and others similarly tasked. *See* Plaintiff's May 19, 2023 letter, Exh. B.

We look forward to working with you to ensure Defendants' expeditious production of
supplemental responses to Plaintiff's FOIA request in the coming days.
Sincerely,

Sincerely,

LABONI A. HOQ (SBN 224140)
laboni@hoqlaw.com
HOQ LAW APC
P.O. Box 753
South Pasadena, California 91030
Telephone: (213) 973-9004

EUNICE CHO (pro hac vice)
echo@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
915 Fifteenth Street NW, 7th Floor
Washington, DC 20005
Telephone: (202) 548-6616

MICHAEL KAUFMAN (SBN 254575)
MKaufman@aclusocal.org
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West Eighth Street
Los Angeles, California 90017 Telephone:
(213) 977-9500
Facsimile: (213) 915-0219

KYLE VIRGIEN (SBN 278747)
kvirgien@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (202) 393-4930

*Attorneys for Plaintiff*

# EXHIBIT S

June 1, 2023

Jason Axe
Alarice Medrano
United States Attorney's Office
Central District of California
300 N. Los Angeles St. Suite 7516
Los Angeles, CA 90012
Jason.Axe@usdoj.gov
Alarice.Medrano@usdoj.gov

**SENT VIA EMAIL**

      Re:    *ACLU of Southern California v. United States Immigration and Customs Enforcement, et al.,* No. 2:22-cv-4760 (C.D. Cal.)

Dear Jason,

Thank you for the May 25, 2023 follow-up information on the status of OIG and ICE's searches. Related to our May 19, 2023 correspondence, we provide the following responses, including those related to supplemental searches for Defendants.

Further, as discussed below, we remain concerned about the pace of Defendants' responses to the outstanding issues with their FOIA responses to date. Therefore, despite our willingness to continue to work collaboratively with Defendants to overcome these issues, we believe it is time to schedule a status conference with the Court. Among other things, we will ask the Court to address our current disputes about search issues and a reasonable production schedule, including setting a briefing schedule on these issues if necessary.

    I.      **Outstanding Searches**

You have requested that Plaintiff provide Defendants with revised search terms and locations. Regarding additional search locations, we reiterate that the appropriate search locations for ICE's searches should include the terms and locations identified below.

Regarding search terms, thank you for explaining the sequence in which ICE is able to conduct terms and connector searches using a Relativity database. In response to your request that Plaintiff provide initial search terms without terms and connectors to identify that universe of documents that may be imported into Relativity database, Plaintiff has proposed those terms below. Plaintiff has also proposed Boolean search terms to further narrow responsive documents in Relativity. Please conduct a search as specified below, and provide hit counts for each

June 1, 2023
Page 2

category of search locations with the Boolean search, so that we may further collaborate on narrowing terms for production.

To the extent Defendants object to these terms, or proposes others/alternatives, we ask that we schedule a call with ICE and/or its IT staff to negotiate the final list of terms, and production schedule. As we have mentioned previously, this would be the most efficient way to timely complete the supplemental searches. Given the lengthy delays we have experienced in obtaining responsive documents in this case, as documented in our prior correspondence, we believe this approach to the supplemental searches is appropriate.

Regarding the issue of Defendants' production of duplicative emails as a result of email threading, we agree to your proposal that once the universe of documents is loaded into the Relativity database, Defendants will propose an approach to exclude production of duplicate emails, and the parties will agree in writing on how to implement that proposal.

Regarding the timing of ICE's production of records based on these supplemental searches, we reiterate our request that it agree to resume monthly production of documents on June 20, 2023, at a production rate of 2,500 pages per month. Given the unjustified delays in its searches and productions to date, we believe it is appropriate for ICE to prioritize this case in this way.

**A. OIG:** ***Request No. 2.***

1. Please identify the scope of the additional search OIG is now conducting, including the search terms and locations it is searching.

2. Mr. Ibarra Bucio: Did OIG search his name, in addition to his A#? In which locations did it search for his documents?

3. Mr. Vargas Arellano: Did OIG not initially search his name? In which locations did OIG conduct the search for his records that has now turned up the additional documents mentioned in your May 25, 2023 email?

**B. ICE**

***1. Request No. 1.***

Thank you for your update noting that ICE has identified "another database" requiring a search by A-number, which may include records dated after November 6. 2015. Please identify this database, consistent with the Court's February 9, 2023 order, and whether ICE will search it for both A#s as well as the names of the four decedents referenced in Plaintiff's FOIA request.

June 1, 2023
Page 3

Regarding other search locations for Request No. 1, as discussed below, it appears ICE has not searched any of the following locations we specified for each of the four decedents referenced in Plaintiff's FOIA request: ERO Los Angeles Field Office, Office of Public Affairs, ERO's Front Office, ICE Office of Professional Responsibility ("OPR"), and ICE Health Service Corps ("IHSC"). For the reasons discussed below, we again ask that ICE do so.

    a. *Teka Gulema*

Upon review of the documents released by ICE thus far, it is clear that the agency has not conducted an adequate search for records related to Mr. Teka Gulema. Although ICE has provided periodic reports maintained by the agency regarding Mr. Gulema's hospitalization, these conclude at October 19, 2015, well before his release from custody and death. Please provide any Significant Event Notification ("SEN") records and Significant Incident Reports ("SIR") related to Mr. Gulema, specifically those dated after October 19, 2015. We also request all records and communications related to Mr. Gulema from any Significant Detainee Illness ("SDI") meetings, including emails, spreadsheets, and meeting notes. Please also provide any records related to Mr. Gulema's release, including any communications of ICE Health Service Corps ("IHSC") staff, Field Medical Coordinators, ICE Enforcement and Removal Operations ("ERO"), and any agency staff responsible for reviewing the SDI spreadsheet, regarding Mr. Gulema.

    b. *Johana Medina Leon*

You have represented that Defendants are unable to locate Johana Medina Leon's A-number, and have asked Plaintiff to provide it to you. We are not currently in possession of Medina Leon's A number and will provide it to you if we obtain it. However, Defendants are far better equipped to locate the A number, for the reasons stated below. We therefore request that ICE redouble its efforts to locate Medina Leon's A number so that it can complete relevant searches for records.

By way of suggestions as to how best to do so, Defendants should refer to OIG Case Number 119-ICE ERO ELP-16066, which should include Medina Leon's A number in the case file as a matter of course. Indeed, several documents referred to in Defendants' production would provide Medina Leon's A number. *See, e.g.* December 2022 OIG production p. 58-59 (referring to emails and parole documents prepared by ICE in the OIG case file); *Id.* page 68 (referring to Notice to Appear ("NTA") paperwork and Form I-94 for Medina Leon).

We further request that ICE conduct a search for the name "Jonathan Alberto Medina-Leon," Ms. Medina Leon's former name,[1] to locate the A number and associated records, and produce such records to the extent ICE has not done so thus far. In addition, it appears that Medina

---
[1] As previously noted, Ms. Medina Leon was transgender.

June 1, 2023
Page 4

Leon's A number is present (although redacted) in documents already produced by Defendants. *See, e.g.* December 2022 OIG Production; page 99; 101. We further note that Defendants have failed to provide emails and parole documents related to Medina Leon's release referred to in these records and request their production. *Id.*

    c.   Mr. Jose Ibarra Bucio

You have represented that ICE has searched only the ERO Adelanto Field Office for records related to Mr. Jose Ibarra Bucio, and have not otherwise located any records. The scope of ICE's search, and this conclusion, are unreasonable, particularly as the Adelanto Detention Center, where Mr. Ibarra Bucio was detained, was under the jurisdiction of the ERO Los Angeles Field Office at the time of his death. Indeed, it is clear that some records must have existed regarding Mr. Ibarra Bucio. For example, USA Today reported that Lori Haley, an employee of the ICE Office of Public Affairs, provided a statement regarding Mr. Ibarra Bucio's death to reporters. The same article noted that DHS left a notice in Mr. Ibarra's hospital room indicating that he had been released on his own recognizance (while comatose), two weeks after he had collapsed at the Adelanto Detention Center.[2]

Plaintiff reiterates its request that Defendants search the ERO Los Angeles Field Office, ICE's Office of Public Affairs (including all records and communications of Ms. Lori Haley), ERO's Front Office, ICE Office of Professional Responsibility ("OPR"), ICE Office of the Chief Financial Officer, and IHSC, including IHSC Medical Case Management Unit Medical Care Coordinators, for records related to Mr. Ibarra Bucio, and his A#, which Plaintiff has provided. Such records should also include all SEN, SIR, and SDI reports, as well as emails, documents, communications, investigatory reports, and exhibits, appendices, and attachments related to Mr. Ibarra Bucio.

If ICE is declining to conduct these searches, please identify the location-specific reasons for Defendants' decision, or please certify to the Court that Defendants have no records related to Mr. Ibarra Bucio in their possession, and the reason why such records no longer exist, including whether or not Defendants have destroyed documents related to Mr. Ibarra Bucio.

    d.   *Mr. Vargas Arellano*:

Regarding ICE's position as referenced in your May 25 email that searching "field locations" other than ERO Adelanto would not "reasonably be expected to disclose responsive records," we ask for further basis for this conclusion.  We also ask that ICE clarify whether or not it will

---

[2] Rebecca Plevin, *Adelanto Moves to Revisit Ending Contract for Troubled Immigration Detention Facility*, USA Today, Apr. 12, 2019, https://www.usatoday.com/story/news/politics/immigration/2019/04/11/adelanto-wants-revisit-decision-ending-immigrant-detention-facility-contract/3437933002/.

June 1, 2023
Page 5

search the other locations identified in Plaintiff's May 19, 2023 correspondence, including: ICE's Office of Public Affairs, ERO's Front office ICE OPR, and IHSC.

ICE's apparent refusal to search all relevant field locations and the other locations referenced in our May 19 correspondence is inconsistent with the facts and circumstances of ICE's handing of Mr. Vargas Arellano's case. As mentioned in the FOIA request, Mr. Vargas Arellano's death garnered much media attention requesting a statement from ICE, which would have resulted in records responsive to Plaintiff's FOIA request. Further, his death was the subject of a Special Master report in *Hernandez-Roman v. Wolf,* No. 5:20-cv-769 (C.D. Cal.), which relied on information in ICE's possession, presumably in the above-referenced locations. However, neither that report nor the underlying information appears to have been produced in this case. Despite these facts, if ICE is declining to search the above-referenced locations, or other locations it is obliged to search to locate and produce such responsive records, please provide location-specific reasons for this position.

Regarding ICE's "re-view" of records withheld from its response to another FOIA request regarding Mr. Vargas Arellano (*Martin Vargas v. U.S. ICE et al.*, No. 5:22-cv-287-JWH-SP (C.D. Cal.), we look forward to your update as to when ICE will complete its review and production.

**3. Request No. 4**

- **Non-Boolean Search Terms, Locations, and Boolean Search Terms in Relativity:**
  - **Search Terms #4**: Plaintiff proposes the following non-case sensitive terms: [3] Directive; Policy or policies; Protocol; Procedure; Training; Guidance; Instruction; Standard; Detainee; Custody; Death; Died; Deceased; Decedent; Discharge; Surgery; Specialist; COVID-19; Hospital; Ambulance; "Emergency Room"; "Emergency Services"; "Poor Outcome"; "Life Support"; "Offsite Referral"; Coma; Unconscious; Ventilator; "Intensive Care"; "Medical Observation"; ICU; "Critical Condition"; Hospice: Palliative; Fatal; "Humanitarian Release".
  - **Search Locations #4**: ICE Enforcement and Removal Operations Front Office; ICE Health Service Corps
  - **Boolean Search in Relativity #4:** After the Search is conducted, please use Relativity to conduct the following Boolean search of the recovered records: (directive or policy or policies or protocol or procedure or training or guidance or

---

[3] Defendants have suggested searching the following terms on May 16, 2023: "humanitarian release"; "intensive care"; "ICU"; "life support"; "hospice"; "palliative"; "fatal"; "critical condition"; "coma"; "unconscious"; "ventilator"; "death"; "died"; "deceased"; "decedent"; "ambulance"; "discharge"; "emergency room"; "emergency services". Email from Jason Axe, May 16, 2023. These terms are incorporated above.

instruction or standard) AND (custody or death or died or deceased or decedent or discharge or surgery or specialist or COVID-19 or hospital or ambulance or "emergency room" or "emergency services" or "poor outcome" or "life support" or "offsite referral"; or coma or "offsite referral" or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal) AND (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian)

o **Please exclude:** Any version of ICE Detention Standards (NDS 2000, PBNDS 2008, PBNDS 2011, NDS 2019), or ICE's COVID-19 Pandemic Response Requirements

4. **Requests Nos. 5-8**

    o **Search Terms #5-8**: Plaintiff proposes the following non-case sensitive terms: death; died; deceased; decedent; surgery; specialist; hospital!; ambulance; "emergency room"; "emergency services"; "poor outcome"; "life support"; "offsite referral"; coma; unconscious; ventilator; "intensive care"; "medical observation"; ICU; "critical condition"; hospice; palliative; fatal; humanitarian release; discharge.

    o **Search locations #5-8**:

        ▪ ISHC Medical Case Management Unit Medical Care Coordination Program staff[4]

        ▪ Significant Detainee Illness Spreadsheets;

        ▪ Records of any and all participants in ICE and/or IHSC's Significant Detainee Illness meetings;

        ▪ Medical transfer summary documents from DHS's eHR System;

        ▪ Medical transfer summary documents from the Alien Medical Records System:

        ▪ Spreadsheets regarding hospitalization or release compiled for or utilized in *Fraihat v. ICE*, No. 5:19-cv-1546;

        ▪ ICE ERO staff in communication with IHSC Medical Case Management Unit;

        ▪ ICE ERO Significant Event Notifications

        ▪ ICE ERO Significant Incident Reports

        ▪ ICE Office of Professional Responsibility

---

[4] *See* DHS, *Healthcare Costs for Noncitizens in Detention: FY 2020 Report to Congress* 29 (2022), https://www.dhs.gov/sites/default/files/2022-06/ICE%20-%20Healthcare%20Costs%20for%20Noncitizens%20in%20Detention.pdf (noting that IHSC's Medical Case Management Unit Medical Care Coordination Program oversees care for ICE detainees who are on the Significantly Ill list; and that MCCs "obtain patient care updates from field staff and report SDIs to IHSC leadership, the ICE legal staff, and ICE Enforcement and Removal Operations personnel.").

- o **Boolean Searches in Relativity #5-8:**
  - ▪ (detainee or custody) AND (custody or death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal) AND (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian)
  - ▪ (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian) AND (custody or death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal)
  - o **Specific instructions: Please provide a hit count of responsive documents for each category of search locations**

**5. Request No. 9:**
- • **Search Terms #9**: bill!; invoice!; charges; payment; benefits; discharge; transfer; release or custody; Medicare; PRUCOL; Martin Vargas Arellano, Teka Gulema, Jose Ibarra Bucio, Johana Medina Leon, Jonathan Alberto Medina Leon
- • **Search Locations #9**
  - o Resource Management Unit Staff, IHSC: emails and records
  - o ICE Office of the Chief Financial Officer
- • **Boolean Searches in Relativity #9:**
- • (bill!; invoice!; charges; payment; benefits) AND (discharge or transfer or custody or release or Medicare or PRUCOL or Martin Vargas Arellano or Teka Gulema or Jose Ibarra Bucio or Johana Medina Leon or Jonathan Alberto Medina Leon)

## II.    <u>Scheduling Conference</u>

While we appreciate your efforts in addressing the issues we have raised regarding the adequacy of Defendants' searches to date, it seems the parties are at an impasse on a few issues.  Again, while we remain willing to work collaboratively with Defendants to narrow these issues, it appears that there is impasse on at least a few issues which need to be resolved now. We therefore plan to seek a status conference with the Court to present the following issues for the Court's intervention and/or guidance to ensure this case moves forward expeditiously.

June 1, 2023
Page 8

As we discussed previously, we will also ask that the parties each be permitted to file a status report two business days before the status conference to update the Court on our respective positions on the following issues:

1. ICE Search parameters: ICE's refusal to conduct a search according to provided search terms and locations;

2. Commencement of production: Defendants' deadline by which they will begin monthly production of documents in response to the supplemental searches;

3. Pace of production: ICE and OIG's refusal to agree to an increased production schedule of 2,500 pages per month;

The following are the dates we plan to propose for the status conference. Please let us know which of these dates work for you by **Monday June 5**.

Tues. June 20: 9, 11, and after 1 pm PT
Wed. June 21: 9, 11, and after 2:30 pm PT
Thurs. June 22: 10-1, after 2 pm PT
Friday, June 23: 9, 11, and after 1pm PT

Sincerely,

LABONI A. HOQ (SBN 224140)
laboni@hoqlaw.com
HOQ LAW APC
P.O. Box 753
South Pasadena, California 91030
Telephone: (213) 973-9004

EUNICE CHO (pro hac vice)
echo@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
NATIONAL PRISON PROJECT
915 Fifteenth Street NW, 7th Floor
Washington, DC 20005
Telephone: (202) 548-6616

MICHAEL KAUFMAN (SBN 254575)
MKaufman@aclusocal.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West Eighth Street
Los Angeles, California 90017 Telephone: (213) 977-9500
Facsimile: (213) 915-0219

KYLE VIRGIEN (SBN 278747)
kvirgien@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
NATIONAL PRISON PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (202) 393-4930

*Attorneys for Plaintiff*

# EXHIBIT T

May 19, 2023

Jason Axe
Alarice Medrano
United States Attorney's Office
Central District of California
300 N. Los Angeles St. Suite 7516
Los Angeles, CA 90012
Jason.Axe@usdoj.gov
Alarice.Medrano@usdoj.gov

**SENT VIA EMAIL**

> Re:     *American Civil Liberties Union Foundation of Southern California v. United States Immigration and Customs Enforcement, et al.,* No. 2:22-cv-4760 (C.D. Cal.)

Dear Counsel:

Thank you for conferring with us via videoconference yesterday, May 18, 2023 and for your follow up emails of May 18 and 19, 2023. As we discussed, Plaintiff ACLU of Southern California again raised the following issues regarding Defendants' deficient response to its FOIA request. Please provide Plaintiff with responses to each item in advance of our next meeting, to take place on Thursday, May 25, 2023 at 10:00 am PT. Regarding issues related to Defendant ICE, we again suggest that ICE counsel and/or any ICE personnel familiar with ICE's records systems be invited to participate in our next meeting, to provide immediate clarification, reduce misunderstanding and delay in response.

**As discussed during yesterday's meeting, please provide a hit count and proposed schedule for Defendants' production of documents responsive to Request Nos. 3-9, and documents related to Mr. Jose Ibarra Bucio prior to our meeting by May 25, reflecting the search terms and locations suggested below.** To be clear, as referenced in Defendants' May 19, 2023 email, we understand that ICE cannot "estimate a hit count" and we are not asking for that. The actual hit counts we are seeking are necessary to determine revisions to the current scheduling order, including a realistic amended summary judgment briefing schedule.

1. **Request Nos. 1-3 for Jose Ibarra Bucio.** Defendants have confirmed that they have not produced any documents regarding Mr. Ibarra Bucio, in response to Request Nos. 1-3, and requested Mr. Ibarra Bucio's A number, which Plaintiff has provided.

Defendants' May 19, 2023 email appears to indicate that both ICE and OIG will conduct a subsequent search for Mr. Ibarra Bucio's A number, but please confirm that will do so, *as well as search his name and A number in all of the locations identified herein*. In addition to locations already searched (with Mr. Ibarra Bucio's name), please ensure that ICE searches its applicable Field Offices, which, at a minimum, should include the Adelanto and Los Angeles Field Offices (including searches of email accounts of ICE personnel involved in Mr. Bucio's case), as well as any offices responsible for communications with the media, the

OIG, the ICE Office of Professional Responsibility, and the Office of Chief Financial Officer, in addition to the "ERO Front Office" and IHSC. *See* Email from Jason Axe, May 18, 2023. Note that the information should include any SENs, SIRs, emails, documents, communications, investigatory reports, and any exhibits, appendices, and attachments, related to his hospitalization, death, decision to release from custody, or release from custody. Please provide a hit count of responsive records for Mr. Ibarra Bucio prior to our meeting on May 25.

2. **Request No. 1-3 for Martin Vargas Arellano.** Defendants have confirmed that no unique search for records responsive to Plaintiff's FOIA request was conducted for Martin Vargas Arellano, but rather, produced records also provided in response to another requestor in the case *Martin Vargas v. U.S. ICE et al*., No. 5:22-cv-287-JWH-SP (C.D. Cal.).

   Please conduct a search for documents responsive to Plaintiff's FOIA request, and outside the scope of the FOIA request in *Martin Vargas v. U.S. ICE et al*., No. 5:22-cv-287-JWH-SP (C.D. Cal.). Among documents that appear to be missing are documents referencing Mr. Vargas Arellano in the case *Hernandez Roman v. Wolf*, 5:20-cv-00768-TJH-PVC (C.D. Cal.), including but not limited to a Special Masters' Report dates July 16, 2021 and documents and information referenced therein. Further, to the extent ICE and OIG have not searched for documents utilizing Mr. Vargas Arellano's A#, please do so. Please provide a hit count of responsive records prior to our meeting on May 25.

   Regarding the documents produced to date from the case *Martin Vargas v. U.S. ICE et al*., No. 5:22-cv-287-JWH-SP (C.D. Cal.), ICE indicated it would review the redactions in that case to ensure they do not contain non-exempt material, and would re-produce them accordingly. We asked that ICE do so by the May 2023 production deadline, but it indicated it may not be able to meet this deadline. Please indicate when ICE will do so.

3. **Request Nos. 1-3.** Regarding the searches conducted for Martin Vargas Arellano, Teka Gulema, and Johana Medina Leon, please identify ICE's search locations and custodians (by name, and if subject to exemption, by title), and whether ICE's search locations included relevant Field Office staff (including a search of their email accounts) prior to our meeting on May 25.

4. **Request Nos. 3-9.** Defendants have admitted that ICE has not conducted a search for these requests. Email from Joseph Tursi, Feb. 1, 2023, Defendants' March 29, 2023 Letter. Plaintiff has repeatedly asked that they do so. On April 14, 2023, Plaintiffs reiterated ICE's obligation to conduct these searches, and provided a proposed list of search terms and locations to identify records responsive to these requests.  We asked that that Defendants use them to conduct searches of all records systems searched thus far, as well as the additional locations identified. A month later, on May 16, 2023, ICE identified a global set of search terms it was "considering" utilizing to respond to these requests, and also identified two potential search locations including the "ERO Front Office" and IHSC. However, Defendants

indicated that "ICE has not finalized its views with respect to these search terms and locations," and sought Plaintiffs input on them.

As discussed on our call on May 18, 2023, because each request concerns unique types of records and locations, ICE's proposed search terms and locations are not narrowly tailored, fail to review specified sources and databases for search. For that reason, ICE should conduct a tailored search for each request, as detailed below. To the extent ICE does not agree to use the search terms and/or locations identified below, please provide us ICE's specific reasons for declining to do so as to each term and/or location.

**Boolean W/N Search Connector**. Consistent with Defendants' prior practice, Plaintiff has proposed that Defendants use Boolean W/N proximity search terms. On May 16, 2023, Defendants stated via email that "although you have suggested search terms that ask for words 'within x' of other words, ICE cannot conduct searches like that." Email from Jason Axe, May 17, 2023. On our May 18 call, we explained that we have good reason to believe this is not true, and you asked us to provide proof of that. First, Defendants have applied identical Boolean search functions in other FOIA cases, including those litigated by the ACLU. *See, e.g. ACLU v. DHS, ICE,* No. 1:20-cv-3204 (D.D.C.) (applying Boolean w/n search connector to "social w/2 (isolate* or distanc*) for FOIA request related to COVID-19 in ICE detention facilities). ICE uses the Relativity system as part of its review. *See* Exhibit A, Relativity Report for Tae Johnson, Oct. 21, 2021. Second, the Relativity system allows for use of the Boolean W/N proximity search function. *See* Boolean Connectors, https://www.relativity.com/relativity/Portals/0/Documents/7.5%20Documentation%20Help%20Site/Content/Relativity%20Searching/dtSearch/Search%20Syntax%20Options/Boolean%20connectors.htm (last visited May 19, 2023) ("When two expressions are connected by W/N, at least one of them must be a single word or phrase").

a.  **Request No. 3.**
   - **Suggested search terms**: Teka Gulema, Johana Medina Leon, Jonathan Alberto Medina Leon, Jose Ibarra Bucio (and A# 204380214), and Martin Vargas Arellano
   - **Suggested search locations**: ICE Office of Professional Responsibility Reports of Investigation, ICE Field Offices in which these individuals were detained (including email accounts of ICE personnel tasked with overseeing these individuals)

b.  **Request No. 4.**
   - **Suggested search terms:**
     - (directive or policy or policies or protocol or procedure or training or guidance or instruction or standard or detainee or custody) w/25 (death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency services" or "poor outcome" or "life support" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal)
     - (release or transfer or benefits or parole or alternative detention or discharge) w/25 (death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency services" or "poor outcome" or "life support" or coma or unconscious or ventilator or

3

"intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal)
  o humanitarian release

- **Suggested search locations**: ICE Enforcement and Removal Operations Front Office, ICE Health Service Corps
- **Please exclude**: Any version of ICE Detention standards (NDS 2000, PBNDS 2008, PBNDS 2011, NDS 2019), or ICE's COVID-19 Pandemic Response Requirements

c. **Request Nos. 5-8.**
  - **Suggested search terms:**
    o (detainee or custody) w/25 (death or died or deceased or surgery or specialist or hospital! or ambulance or "emergency room" or "emergency services" or "poor outcome" or "life support" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal)
    o (release or transfer or benefits or parole or alternative detention or discharge) w/25 (death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency services" or "poor outcome" or "life support" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal)
  - **Suggested search locations:** ICE Enforcement and Removal Operations Front Office, ICE Health Service Corp's Medical Case Management Unit, IHSC Field Medical Coordinators, ICE Office of Professional Responsibility, any staff responsible for creating or reviewing the Significant Detainee Illness Spreadsheet; ICE personnel responsible for reviewing Significant Incident Reports or Significant Event Notification Reports; any version of the Significant Detainee Illness Spreadsheet; Medical Transfer Summary documents from DHS's eHR system; and Alien Medical Records System

d. **Request No. 9:** Thank you for confirming in your May 19, 2023 email that, per Defendants' March 29, 2023 correspondence, that they will task ICE's Office of the Chief Financial Officer to search for responsive records. This search should include bills, invoices, charges, or records of payment that reflect payments made for healthcare for *any* detainee who was released from custody while hospitalized, or in the care of an external healthcare provider or facility, and communications about such bills, invoices, charges, or records of payment. These detainees include Martin Vargas Arellano, Teka Gulema, Jose Ibarra Bucio, and Johana Medina Leon, as well as any other such detainees. In addition to the Office of the Chief Financial Officer, the following is a list of locations ICE should search for documents responsive to this request:
  - **Suggested search locations:** ICE Office of Chief Financial Officer; IHSC (including staff responsible for reviewing medical claims). *See* Exhibit B (Excerpts of transcript of Jennifer Moon, *Coreas v. Bounds*, No. 8:20-cv-780 (D. Md.) (Sept. 15, 2021).

4

5. **Teka Gulema.** As noted in our May 8, 2023 letter, please inform us as to whether Defendants' scheduled production for May 2023 will include records dated later than November 6, 2015, and related to Mr. Gulema's release from custody.

6. **Email Threading and Production of Multiple Copies of Identical Material**. Plaintiff's FOIA request instructed the government to de-duplicate its search results to avoid producing "multiple copies of identical material." As we raised in our May 8, 2023 letter, ICE has produced at least 1140 pages that are email threads consisting of identical material. Pl. Letter, May 8, 2023. Plaintiff requested that Defendants apply email threading to Defendants' collection before review to eliminate emails that consist entirely of material duplicated in another email in the review set.

Defendants suggest that *Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Justice*, No. 18-cv-007, No. 2020 WL 2735570 (D.D.C. May 26, 2020) "addresses the question regarding what a record is as that term applies to email threads." Email from Jason Axe, May 19, 2023.  However, this misses the point: Plaintiffs do not object to the Defendants' production of entire email threads. Defendants "may not distinguish between responsive and non-responsive portions of a record, but instead must disclose the entirety of a responsive record 'as a unit.'" *Id.* at *3 (citation omitted). Rather, Plaintiff requests that Defendants apply threading and eliminating emails that consist entirely of material duplicated in another email in the review set. This is achievable by Defendants, as ICE uses the Relativity system as part of its review. *See* Exhibit A, Relativity Report for Tae Johnson, Oct. 21, 2021. The Relativity system allows for email threading to identify duplicates. *See* Email Threading, https://help.relativity.com/RelativityOne/Content/Relativity/Analytics/Email_threading.htm (last visited May 19, 2023).

7. **OIG.** As discussed in our September 2, 2022 and May 8, 2023 letters, as well as during our May 18, 2023 conference call, to the extent OIG has referred any responsive documents to ICE to for potential release to Plaintiff, OIG is obligated to identify those documents to Plaintiff.  During the May 18 call, and in Defendants' May 19, 2023 email, Defendants confirmed that OIG has indeed refereed responsive documents to ICE.  We appreciate OIG and ICE's commitment to comply with its obligations regarding those referred documents. However, we are confused by why they are unable to identify them to us at this time. Regardless of information about "whether those records were already processed, and if not, how many documents they are and when they will be processed," information we also ultimately seek, we also ask that OIG identify now the following information: dates OIG referred documents to ICE,  what requests they are responsive to, and how may pages were referred to ICE. This information is necessary to assess OIG and ICE's obligation to account for all responsive documents, timely process referrals and release responsive documents to Plaintiff.

8. **Increased Production Rate.** As discussed on our May 18 call, in light of Defendants numerous failures to meet its obligation to conduct basic searches reasonably likely to identify responsive documents, Plaintiff ask that for subsequent productions each of OIG and ICE increase their rate of production to 2,500 pages per month. Please respond whether Defendants will agree to do so, so that we can conclude this case in a timely manner.

Plaintiffs appreciate Defendants' response regarding these searches. Plaintiff will address other deficiencies in Defendants' production, including redactions, in future communications.

Sincerely,

LABONI A. HOQ (SBN 224140)
laboni@hoqlaw.com
HOQ LAW APC
P.O. Box 753
South Pasadena, California 91030
Telephone: (213) 973-9004

EUNICE CHO (pro hac vice)
echo@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
915 Fifteenth Street NW, 7th Floor
Washington, DC 20005
Telephone: (202) 548-6616

MICHAEL KAUFMAN (SBN 254575)
MKaufman@aclusocal.org
ACLU FOUNDATION OF SOUTHERN
CALIFORNIA
1313 West Eighth Street
Los Angeles, California 90017 Telephone:
(213) 977-9500
Facsimile: (213) 915-0219

KYLE VIRGIEN (SBN 278747)
kvirgien@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
NATIONAL PRISON PROJECT
39 Drumm Street
San Francisco, CA 94111
Telephone: (202) 393-4930

*Attorneys for Plaintiff*



# OPLA - GILD - ACLU Covid 21-00008
## Search Terms Report

Exhibit A

---

**Report Name:**  STR - 102121 - Tae Johnson

**Searchable Set:**  Docs with Excluded Terms - Tae Johnson



## Results Summary

| Documents in searchable set | Total documents with hits | Total documents with hits, including Relativity Group ID | Total documents without hits |
|---|---|---|---|
| 144,929 | 3,774 | 9,168 | 135,761 |

EXHIBIT A

# OPLA - GILD - ACLU Covid 21-00008
## Search Terms Report

**Report Name:** STR - 102121 - Tae Johnson          **Searchable Set:** Docs with Excluded Terms - Tae Johnson



## OPLA - GILD - ACLU Covid 21-00008
### Search Terms Report

**Report Name:** STR - 102121 - Tae Johnson

**Searchable Set:** Docs with Excluded Terms - Tae Johnson

## Terms Summary

| Term | Documents with hits | Documents with hits, including Relativity Group ID | Unique hits |
|------|---------------------|----------------------------------------------------|-------------|
| ((detain* OR detention OR facility OR center) W/10 COVID*) AND date(Oct 1 2020 to Oct 21 2021) | 3,774 | 9,168 | 3,774 |

Jennifer Moon - 9/15/2021
Case 2:22-cv-04760-SHK   Document 112-4   Filed 02/26/25   Page 162 of 220   Page
Mauricio Coreas, et al. vs. Donna Bounds, et al.   EXHIBIT B
ID #:2148

```
 1

 2

 3                IN THE UNITED STATES DISTRICT COURT

 4                   FOR THE DISTRICT OF MARYLAND

 5      --------------------------------------------------------

 6      MAURICIO COREAS, et al.,

 7                  Petitioners-Plaintiffs,

 8                              Civil Action No. (L)TDC-20-780

 9      v.

10      DONNA BOUNDS, et al.,

11                  Respondents-Defendants.

12      --------------------------------------------------------

13                REMOTE VIDEOCONFERENCE DEPOSITION

14          The following is the deposition of

15      JENNIFER MOON, taken before Patricia K. Carl, RPR,

16      Notary Public, conducted virtually pursuant to Notice

17      of Taking Deposition, commencing at approximately

18      10:45 a.m., September 15, 2021.

19

20

21

22

23

24

25
```

Jennifer Moon - 9/15/2021
Case 2:22-cv-04760-SHK    Document 112-4    Filed 02/26/25    Page 163 of 220    Page
Mauricio Coreas, et al. vs. Donna Bounds, et al.
ID #:2149
EXHIBIT B

1          A.      Yeah, that is the report that we

2    mentioned earlier that is actually for public view on

3    the website.

4          Q.      Does that report track hospitalization?

5          A.      I haven't looked -- I am -- I don't

6    think that is on there.  I'm not sure.  I haven't

7    looked at it in a minute, but I don't think so.  I

8    don't think so.  I think the only place where we were

9    actually capturing the hospitalization is on the

10   Fraihat.

11         Q.      Ms. Moon, to the best of your knowledge

12   how many detainees in Maryland facilities have been

13   hospitalized?

14         A.      I don't know.

15         Q.      How many have been hospitalized, how

16   many at the Worcester County Detention Center?

17         A.      I don't know.

18         Q.      Do you know if there is a policy or

19   practice for releasing people from custody while

20   hospitalized?

21         A.      While hospitalized, is there a policy?

22   Not that I'm aware of.

23         Q.      Is there a practice?

24         A.      Has it happened, yes.

25         Q.      How often has that happened?

Jennifer Moon - 9/15/2021
Mauricio Cereas, et al. vs. Donna Bounds, et al.

1          A.      I don't know.

2          Q.      How do you know that has happened?

3          A.      Because we have patients -- because one

4    of the things that is within my preview is medical

5    claims, and so we try to ensure that hospitals and

6    community providers are reimbursed for the services

7    they provide.  And one thing that happens is when an

8    individual is no longer in custody, we are not legally

9    able to pay for their medical care.

10         Q.      You cannot pay for any of their medical

11   care even up to the point that the person was in

12   custody?

13         A.      When they are in custody we can, but

14   the moment that they are no longer in custody, we

15   cannot legally cover their medical care and services.

16         Q.      Even if the medical care was provided

17   during the point at which they were in custody?

18         A.      Correct.

19         Q.      So in that case who would be

20   responsible for the medical bill?

21         A.      Usually the hospitals will make

22   arrangements for them to be able to receive Medicade

23   or some other services that are available.

24         Q.      So it would be the patient?

25         A.      Correct.

Jennifer Moon - 9/15/2021
Mauricio Coreas, et al. vs. Donna Bounds, et al.
Case 2:22-cv-04760-SHK    Document 112-4    Filed 02/26/25    Page 165 of 220    Page ID #:2151    EXHIBIT B

```
 1              Q.      You said that you are responsible for
 2      medical claims.  How often have you seen the situation
 3      come up?
 4              A.      I don't know.
 5              Q.      More than five?
 6              A.      Over, let's see, in the past three
 7      years, maybe.  Yes.  Less than five maybe.  It doesn't
 8      happen often.
 9              Q.      When it does happen, why does it
10      happen?
11              A.      Again, we don't make custody
12      determinations.  So that would be a question for the
13      custody side for ERO.
14              Q.      Just so I'm clear, if a detainee is
15      admitted to a hospital for COVID 19, who pays that
16      bill?
17              A.      ICE pays the bill as long as they are
18      in ICE custody.
19              Q.      If the person is released, then
20      individual is responsible for the entire hospital
21      bill?
22              A.      Just for the dates that they are not in
23      custody.  We will cover it up until they are no longer
24      in custody.
25              Q.      Okay.  Just so I'm understanding this
```

1    clearly, if I were a patient with COVID-19, a detainee

2    with COVID-19 and was admitted on Sunday, I was

3    hospitalized for a week, but if ICE released me on

4    Wednesday, ICE would cover the bill from Sunday until

5    Wednesday, is that correct?

6         A.    Correct.

7         Q.    Then Thursday through Sunday I would be

8    responsible for the bill, is that correct?

9         A.    Correct.

10        Q.    Okay.  Let's turn to Page 24 of the

11   document which is Bates number 76.

12        A.    Okay.

13        Q.    Do you see the section titled COVID 19

14   Vaccine?

15        A.    Yes.

16        Q.    Looking at the line three of that

17   paragraph, you agree that "Detention facility staff

18   should contact their states COVID-19 vaccine resource

19   (i.e., state or county Department of Health) to obtain

20   vaccine," do you agree that is what the PR states?

21        A.    Yes, that is what it states.

22        Q.    How does ICE ensure all facilities

23   provide COVID vaccines to detainees?

24        A.    Since publication of this version of

25   the PRR, ICE has made arrangements to obtain vaccine

# EXHIBIT U



# United States Department of Justice

### United States Attorney's Office
### Central District of California

---

*JOSEPH W. TURSI*
*Assistant United States Attorney*
*Phone: (213) 894-3989*
*E-mail: Joseph.Tursi@usdoj.gov*

*Federal Building*
*300 N. Los Angeles Street, Suite 7516*
*Los Angeles, California 90012*

March 29, 2023

**<u>VIA E-MAIL</u>**

Laboni A. Hoq
Hoq Law, APC
P.O. Box 753
South Pasadena, CA 91030

   Re: ACLU of SoCal v. ICE, et al.
      C.D.CA Case No. 2:22-cv-04760-SHK

Dear Ms. Hoq:

Please allow the following to serve as a follow-up to our March 24, 2023 videoconference meet and confer. Among other things, your client raised concerns over ICE FOIA's search with respect to your client's April 29, 2022 FOIA request – specifically requests 3-9. Those requests include:

  3. Any and all ICE OPR reports of investigation that are identified in any of the records responsive to Request #1. This includes any and all exhibits, appendices, or attachments to the DHS OPR reports of investigation.

  4. Any and all documents and communications, including ICE and IHSC directives, policies, procedures, protocols, or trainings that contain guidance, instructions, or standards about the release from custody of (a) hospitalized detainees; or (b) detainees who at the time of release were patients in the care of external healthcare providers or facilities. Detainees specified in (a) and (b) above shall include those being treated for COVID-19 during their hospitalization or treatment at external healthcare providers or facilities.

  5. Spreadsheets, emails, documents, communications, databases, lists, and other data compilations in the possession of ICE Leadership, ICE Enforcement and Removal Operations, ICE Health Service Corps, and ICE Office of Professional Responsibility that identify detainees who were released from custody while (a) hospitalized (including for COVID-19 treatment); (b) in the full-time care of external healthcare providers or facilities (including for COVID-19 treatment), or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility. Requested materials include, but are not limited to, dates of hospitalization of detainees, dates of hospital or external care facility discharge, name of treated detainees' detention facilities, and reasons for detainees' hospitalization or external medical care. These materials

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
March 29, 2023
Page 2

should further include Medical Transfer Summary documents from DHS's eHR System and Alien Medical Records System, and any versions of the Significant Detainee Illness Spreadsheet that identify detainees who were released from custody while (a) hospitalized (including for COVID-19 treatment); (b) in the care of external healthcare providers or facilities (including for COVID-19 treatment); or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility.

6. Spreadsheets, emails, significant incident reports (SIRs), significant event notification reports (SENs), or documents created by DHS OIG or ICE OPR that mention the release from custody of (a) hospitalized detainees; (b) detainees who at the time of release were patients in the care of external healthcare providers or facilities; or (c) detainees released from custody immediately prior to transfer to an emergency room, hospital, or external care facility.

7. Spreadsheets, emails, SIRs, SENs, or documents created by DHS OIG or ICE OPR that mention the death of any detainee who had been previously released from custody while (a) hospitalized; or (b) a patient in the care of an external healthcare provider or facility; or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility.

8. Any and all documents, communications, and other records, including databases, spreadsheets, lists, and other data compilations, that identify detainees who were hospitalized or transferred from detention for off-site medical care due to COVID-19, and were subsequently released from custody while hospitalized, or detainees who were released from custody immediately prior to transfer to an emergency room, hospital, or external care facility to receive treatment for COVID-19. Requested information includes, but is not limited to, dates of hospitalization, detention facility, medical condition/reason for hospitalization or treatment, name and location of hospital, date of return to detention (if any), date of release from custody or issuance of order of recognizance (if any), and/or reason for release from custody.

9. Bills, invoices, charges, or records of payment that reflect payments made for healthcare for any detainee who was released from custody while (a) hospitalized; or (b) a patient in the care of an external healthcare provider or facility, and communications about such bills, invoices, charges, or records of payment[.]

*See* Dkt. 1, Ex. A.

Plaintiff further defined the scope of the FOIA requests on pages 2 to 4 of its request letter.  *Id*. It includes expansive definitions of "communications" and "documents."  *Id* at 2.  Plaintiff requests records from "January 1, 2016 to the present."  *Id*.  The FOIA requests are not limited to certain individuals, offices, or divisions but encompass all of ICE and DHS OIG if not also DHS. ICE is defined as "Immigration and Customs Enforcement, and any components, subcomponents, offices, or personnel therein."  *Id*. at 3.  Similarly, DHS OIG is defined as the "Department of Homeland Security Office of Inspector General and any component and offices therein."  *Id*.  Although some requests relate to certain named detainees, most of the requests

Ms. Laboni A. Hoq
RE: ACLU of SoCal v. ICE
March 29, 2023
Page 3

seek records regarding detainees more broadly, as "detainee" is defined as "any person detained or formerly detained in an immigration facility or holding facility." *Id.* In turn, "immigration detention facility" is defined broadly as "Service Processing Centers, Contract Detention Facilities, Family Residential Facilities, Intergovernmental Service Agreement (IGSA) Facilities, Dedicated Intergovernmental Service Agreement (DIGSA) Facilities, Intergovernmental Agreement (lGA) Facilities, and any other facilities where individuals may be held in ICE custody for 72 hours or more." *Id.*

As Defendants have raised, on several occasions, these requests are overbroad and vague.[1] To begin, requests 3-4 & 8 do not request identifiable records at all but instead request "any and all" documents and communications "relating to", "regarding", or "related to" certain subjects. Courts in this D.C. District hold that requests seeking all records "pertaining to," "relating to," or "regarding" a subject matter are insufficient under FOIA. *See, e.g., Cable News Network v. FBI*, 271 F. Supp. 3d 108, 112 (D.D.C. 2017) (dismissing as overbroad a request for records that "relate in any way to" certain subject areas); *Freedom Watch v. Dep't of State*, 925 F. Supp. 2d 55, 61 (D.D.C. 2013) (granting motion to dismiss and finding a "relating to" request "overbroad since life, like law, is 'a seamless web,' and all documents 'relate' to all others in some remote fashion") (citation omitted); *Latham v. Dep't of Just.*, 658 F. Supp. 2d 155, 161 (D.D.C. 2009) (a request for records "that pertain in any form or sort to [the plaintiff]" was "overly broad"); *Dale*, 238 F. Supp. 2d at 104 (request for documents "that refer or relate in any way to [the plaintiff]" did not reasonably describe the records sought); *Am. Ctr. for L. & Just. v. Dep't of Homeland Sec.*, Civ. A. No. 21-1364 (TNM), 2021 WL 5231939, at *5 (D.D.C. Nov. 10, 2021) (dismissing as not reasonably described where requests sought documents that "regard[ ] in any way" the eight specified topics).

To illustrate the vagueness of Plaintiff's requests, Request No. 8 seeks "any and all documents, communications, and other records . . . that identify detainees who were hospitalized or transferred for off-site medical care due to COVID-19, and were subsequently released from custody while hospitalized . . . name and location of hospital, date of return to detention (if any), date of release from custody or issuance of order of recognizance (if any), and/or reason for release from custody." Putting aside the potential applicability of FOIA exemptions, it is unclear whether the search should seek documents limited to records showing that the reason for release was because of or "due to COVID-19" or whether the search should seek documents showing that a detainee was released from custody while in the process of receiving off-site treatment for COVD-19 at the time of release or whether the search should seek documents showing that a

---

[1] Such concerns were raised over a nearly identical FOIA request made by the ACLU in *ACLU v. DHS, et al.*, D.D.C. case no. 21-2627 (TJK). In that action, the U.S. Department of Homeland Security, U.S. Department of Homeland Security Office of Inspector General, and U.S. Immigration and Customs Enforcement moved to dismiss the complaint. *Id.*, Dkt. 12. The ACLU opposed the motion and the defendants there replied. *Id.*, Dkt. nos. 14 & 16. Before the court ruled the motion, the ACLU dismissed without prejudice. *Id.*, Dkt. 17. Indeed, much of the discussion in this correspondence comes from the Motion to Dismiss in that action.

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
March 29, 2023
Page 4

detainee was released from custody who had at one point been treated off-site "due to COVID-19."  And because the terms of the request seek "any and all" records that "identify" the release of detainees, that would appear to encompass documents about the release (i.e., logistics, notices to appear) that do not themselves reflect a COVID-19 diagnosis or treatment.  Plaintiff's broad descriptions do not allow the agency "to determine precisely what records are being requested." *Tax Analysts v. IRS*, 117 F.3d 607, 610 (D.C. Cir. 1997) (quoting *Kowalczyk v. Dep't of Just.*, 73 F.3d 386, 388 (D.C. Cir. 1996)).

Second, the FOIA requests are exceedingly and impermissibly broad.  "Even where a request 'identif[ies] the documents requested with sufficient precision to enable the agency to identify them,' the request may still fail to 'reasonably describe[ ]' the records sought if it is 'so broad as to impose an unreasonable burden upon the agency.'"  *Nat'l Sec. Couns. v. CIA*, 960 F. Supp. 2d 101, 163 (D.D.C. 2013) (quoting *Am. Fed'n Gov't Emps. ("AFGE") v. Dep't of Com.*, 907 F.2d 203, 209 (D.C. Cir. 1990)).  "[I]t is the requester's responsibility to frame requests with sufficient particularity to ensure that searches are not unreasonably burdensome." *Assassination Archives & Rsch. Ctr., Inc. v. CIA*, 720 F. Supp. 217, 219 (D.D.C. 1989), aff'd, No. 89-5414, 1990 WL 123924 (D.C. Cir. Aug. 13, 1990).  "Agencies must read FOIA requests as drafted," *Miller v. Casey*, 730 F.2d 773, 777 (D.C. Cir. 1984), and thus are not obligated to construe FOIA requests to be less vague and less burdensome than the text of the requests.

According to the plain language of the FOIA requests here, Plaintiff requests that Defendants search and review the records of any and all employees that might possess records "regarding" the foregoing subjects or "identify" "detainees."  Plaintiff "does not try to cabin [its requests] to particular employees at those agencies." *Am. Ctr. for L. & Just.*, 2021 WL 5231939, at *6.  ICE alone has approximately 20,000 personnel. *See ICE's Mission*, at https://www.ice.gov/mission.  Further, the FOIA requests encompass any "immigration detention facility," which is defined to include not just ICE-run facilities, but "contract detention facilities" run by private companies.  The definition also includes "intergovernmental service agreement facilities," which are state, county, and local jails that by agreement with ICE, house detainees. *See Sanchez v. Decker*, Civ. A. No. 19-8354, 2019 WL 6311955, at *5 n.4 (S.D.N.Y. Nov. 25, 2019).  Plaintiff has estimated that there are over 200 immigration detention facilities.  Plaintiff's requests, therefore, seek in essence "an all-encompassing search of the records of every field office" even though "the FOIA does not mandate that [an agency] comply" with such a request. *Marks v. Dep't of Just.*, 578 F.2d 261, 263 (9th Cir. 1978); *see also AFGE*, 907 F.2d at 208-09 (holding request that "would require the Bureau to locate 'every chronological office file and correspondent file, internal and external, for every branch office, staff office' does not "'reasonably describe[]' a class od documents subject to disclosure").  And almost all the requests—Nos. 1, 4 & 8, —seek "[a]ny and all documents and communications" regarding certain subjects.  "The phrase 'any and all' is capacious, involving a huge number of potentially responsive documents." *Am. Ctr. for L. & Just.*, 2021 WL 5231939, at *5; *Dale*, 238 F. Supp. 2d at 104 (D.D.C. 2002) ("FOIA requests for all documents concerning a requester are too broad.").

As drafted then, the requests do not reasonably describe records that can be located without an unreasonable burden.  Request No. 8, for example, requests "any and all" documents, communications, and other records that "identify" any "detainees" (and by definition, from any "immigration detention facility") "hospitalized"  and "subsequently released from ICE custody

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
March 29, 2023
Page 5

while hospitalized."  Responding to this request would be a "massive undertaking," *see Nat'l Sec. Counselors. v. CIA*, 969 F.3d 406, 410 (D.C. Cir. 2020), made all the more challenging by the fact that it places on the agency the onus of determining what records "regard[]" these detainees.  Layered on top, in Request No. 9, Plaintiffs seek the "bills, invoices, charges, or payment" for all the hospitalizations.

Other requests have separate issues.  Although Request Nos. 5 and 8 do not seek records "identifying" "detainees" and with them certain subjects, they seek "any and all" records that "identify detainees who were hospitalized" along with the dates of departure from detention, discharge from hospital, and return to detention; the date of and reason for release; the detention facility; and the medical condition or reason for hospitalization.  Request No. 8 seeks this and additional information.  These requests have similarities to the request in *Krohn v. Department of Justice*, 628 F.2d 195, 196 (D.C. Cir. 1980), which sought a variety of information with respect to "each and every criminal case" in which judgment was entered pursuant to Fed. R. Crim. P. 32(b).  The D.C. Circuit held that the request was "too vague" and explained that "[a] reasonable description requires the requested record to be reasonably identified as a record not as a general request for data, information and statistics to be gleaned generally from documents which have not been created and which the agency does not generally create or require."  *Id*. at 198.  The Court continued that "the request is so broad and general as to require the agency to review the entire record of 'each and every . . . criminal case' in order to determine whether it contains any evidence of the data, information or statistics that appellant requests. Such request is fatally flawed by lack of a reasonable description."  *Id*.  Likewise here, Plaintiff's requests as drafted would require Defendants to review each and every case and record of a detainee who was hospitalized to effectively compile the requested information.  But "an agency is not required to 'answer questions disguised as a FOIA request,' . . . nor conduct research in response to a FOIA request."  *Hall & Assocs. v. EPA*, 83 F. Supp. 3d 92, 102 (D.D.C. 2015) (citations omitted).

Request Nos. 2 and 3 also do not reasonably describe the records sought and are impermissibly vague.  These requests seek "any and all DHS OIG reports of investigation" or "ICE [Office of Professional Responsibility] reports of investigation" "that are identified in any of the records responsive to Request #1."  One could characterize these as "springing" FOIA requests.  Thus, Plaintiff requests Defendants not only produce records responsive to Request No. 1 but review those records to determine if further searches should be conducted based on the content of those records.  But "FOIA was not intended to reduce government agencies to full-time investigators on behalf of requesters."  *Assassination Archives*, 720 F. Supp. at 219.  Further, the FOIA requests do not define a "report of investigation" or what would constitute "identif[ying]" those reports such that there would be a trigger for Defendants to have to search for and produce them. And again, Request Nos. 2 and 3 are based on the content of "records responsive to Request #1," which ask for records "relating to" the hospitalization, death, decision to release, or release of four named individuals.

The above highlights the issues Defendants have confronted in attempting to respond to the FOIA requests at issue here.  Indeed, an agency employee familiar with the requests' subject matter would not be able to locate the records with a "reasonable amount of effort."

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
March 29, 2023
Page 6

Notwithstanding the above, ICE FOIA has reviewed the remaining potentially responsive records identified through its searches thus far. Based on my understanding, the records related to the specific noncitizens mentioned in the FOIA requests appear to be included in the production. The production also includes potentially responsive records from IHSC, including policies and spreadsheets. ICE OPR did not produce any responsive records, which is not unusual because it does not typically conduct investigations into noncitizen deaths that occur outside of ICE custody.

In reviewing the locations searched in this action, ICE FOIA did determine that it does not appear that ICE's Office of the Chief Financial Officer was tasked. It therefore intends to ask that office to search for records that may be responsive to your client's FOIA request and process them accordingly. To that end, ICE FOIA is amenable to collaborating over any subsequent search terms and parameters your client may like to suggest for that search.

Relatedly, on several occasions, Plaintiff has raised issues with Defendants' efforts thus far, but when invited to provide search terms or locations Plaintiff believes would be sufficient, it has declined to do so. Rather, Plaintiff has repeatedly raised that it is Defendants' burden to conduct the search and then, once completed, Plaintiff will "supplement" if it thinks the search terms or locations are inadequate. However, as highlighted above, the requests themselves are vague and overbroad. Thus, while Defendants have conducted searches, and produced responsive records, it cannot be said that such efforts thus far have been inadequate. Rather, it is the vague and overbroad nature of the requests themselves that have frustrated Defendants' ability to conduct an adequate search. Still, defendants remain open to considering any search terms or locations Plaintiffs may wish to offer.

Finally, with respect to the redactions in ICE FOIA's initial 2,444 page production, those records were determined to be responsive in *Vargas v. DHS, et al.* C.D. Cal. Case No. 22-cv-00287 and were produced in the same format there as they were here, in order to expedite their release. In *Vargas*, the requestor did not challenge the redactions and thus there is not a *Vaughn* index available to provide additional information on the redactions. Thus, if there are specific redactions of concern, please advise so that ICE FOIA may review at least a sampling of the challenged redactions.

Ms. Laboni A. Hoq
RE:  ACLU of SoCal v. ICE
March 29, 2023
Page 7


Please let me know if you have any questions, or would like to further discuss any of the matters raised above.

Respectfully,

E. MARTIN ESTRADA
United States Attorney

/s/ *Joseph W. Tursi*

JOSEPH W. TURSI
Assistant United States Attorney



cc: Ms. Eunice Cho (by email)
    Mr. Michael Kaufman (by email)
    Mr. Kyle Virgien (by email)

# EXHIBIT V

From:
Sent:
To:

# (b)(6),(b)(7)(C)

**Subject:** FW: VARGAS-Arellano, Martin, A205 718 808
**Attachments:** ES Presentation- Field Ops version 6-11-2019.ppt

ES Presentation, for your review please look at slides 15, 16 and 17 for death notifications.

**From:** (b)(6),(b)(7)(C) ice.dhs.gov>
**Sent:** Thursday, March 4, 2021 9:27 AM
**To:** (b)(6),(b)(7)(C) ice.dhs.gov>; (b)(6),(b)(7)(C) ice.dhs.gov>
**Subject:** FW: VARGAS-Arellano, Martin, A205 718 808

Good morning,

Please plan accordingly.

Any updates from IHSC on what's next in regards to long term care?

Thanks.

**From:** (b)(6),(b)(7)(C) ce.dhs.gov>
**Sent:** Thursday, March 4, 2021 9:07 AM
**To** (b)(6),(b)(7)(C) ice.dhs.gov>
**Subject:** RE: VARGAS-Arellano, Martin, A205 718 808

Thank you. Not sure if you need this but please see attached ppt for some guidance on detainee death notice ESs (slides 15, 16 and 17).

(b)(6),(b)(7)(C)
DDO, Domestic Operations - West
Field Operations Division
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
202 732 (b)(6),(b)(7)(C)

**From** (b)(6),(b)(7)(C) e.dhs.gov>
**Sent:** Thursday, March 4, 2021 11:59 AM
**To:** (b)(6),(b)(7)(C) ice.dhs.gov>; (b)(6),(b)(7)(C) @ice.dhs.gov>; (b)(6),(b)(7)(C)
(b)(6),(b)(7)(C) ice.dhs.gov>; (b)(6),(b)(7)(C) ice.dhs.gov>; (b)(6),(b)(7)(C)
**Subject:** RE: VARGAS-Arellano, Martin, A205 718 808

REL0000009691.0008

Good morning,

Will do. Thanks.

**From:** (b)(6),(b)(7)(C) ice.dhs.gov>
**Sent:** Thursday, March 4, 2021 8:54 AM
**To:** (b)(6),(b)(7)(C) ice.dhs.gov>; (b)(6),(b)(7)(C) ice.dhs.gov>; (b)(6),(b)(7)(C) (b)(6),(b)(7)(C) ice.dhs.gov>; (b)(6),(b)(7)(C) ice.dhs.gov> (b)(6),(b)(7)(C) (b)(6),(b)(7)(C) ice.dhs.gov>
**Subject:** VARGAS-Arellano, Martin, A205 718 808

Good Morning,

Field Ops has been notified that the detainee listed above is in serious medical condition. LOS is being requested to begin the necessary paperwork for a death notification in the event of his demise.

Thank you.

(b)(6),(b)(7)(C)
DDO, Domestic Operations - West
Field Operations Division
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
202 732 (b)(6),(b)(7)(C)

REL0000009691.0008

# ERO

## Domestic Operations



# Executive Summaries (ES)

Law Enforcement Sensitive – For Official Use Only

Date: Date

**ERO Xxxxxx– First Name LAST NAME, Axx xxx xxx**

<u>**ISSUE:**</u>

On Date, ERO Xxxxxx provided HQ ERO Domestic Operations with information pertaining to First Name LAST NAME, Axx xxx xxx, a XX year old citizen of Xxxxxx, ……issue……

<u>**BACKGROUND:**</u>

This section is in a chronological background of the case including immigration and criminal history.



U.S. Immigration
and Customs
Enforcement

# ICE

# Why Do We Write Executive Summaries?

- Summarize large amounts of information for quick understanding.
- Provide enough information for busy executives to make a decision or understand an event, topic or case.

- Provide concise information for concerned parties within and outside of our agency prior to an action.
- Respond to inquires from concerned parties after an action.



U.S. Immigration and Customs Enforcement

2022-ICLI-00048    13389.3



# Executive Summaries

- An ES may be distributed to a wide leadership audience, including executives outside of ICE.
- All ES's must have **"DRAFT"** as the watermark.
- There are only two sections to an ES with rare exceptions:

  - **ISSUE**
    - The ISSUE section is the reason for sending the ES (limited to 2-3 sentences)
  - **BACKGROUND**
    - The BACKGROUND section outlines the aliens entire immigration and criminal history. This means from the very first time they entered the United States to the current date.

- An ES is always in ***active*** voice, words such as "was" indicate passive voice. Remember, a sentence in active voice is basically stating that an action took place.
  - Incorrect: (b)(6); (b)(7)(c) *was* arrested by ERO
  - Correct: ERO Atlanta arrested (b)(6); (b)(7)(c)

  - Incorrect: (b)(6); (b)(7)(c) was arrested on January 1, 2018 by ERO
  - Correct: On January 1, 2018, ERO Atlanta arrested (b)(6); (b)(7)(c)



U.S. Immigration and Customs Enforcement

# **ICE**

# **Why Active Voice?**

- Active voice means that the subject of the sentence comes first and performs the action that the rest of the sentence describes.

- Active voice is the most straightforward way to present ideas, information or points, because it creates a clear image in the reader's mind of who is doing what.



U.S. Immigration and Customs Enforcement

# ICE

## General Guidelines for ES Content

- Avoid puns, ambiguity or clever wording.
- Cut the fat. Remove needless words and / or phrases.
- Keep sentences short (15-20 words) when possible

- Watch your tone, keep it objective.
- Avoid stuffy or halting sentences.
- Proofread it from the last line to the top.
- Spell out acronyms at the first usage and the acronym thereafter.



U.S. Immigration
and Customs
Enforcement

# **ICE**

# **Executive Summaries**

- Make sure you include a ***complete*** account of the alien's immigration ***and*** criminal history, in ***chronological*** order of events/actions.

- Always check all available systems such as PLAnet, BIA, PACER, CIS, TECS, PCQS, etc. If applicable, list all actions taken with regards to obtaining a travel document.

- As a reminder, for any events that occurred prior to March 2003 you must use the phrase "**former** Immigration and Naturalization Service" beginning in April 2003 you would use ERO, HSI, USCBP and USCIS.



U.S. Immigration
and Customs
Enforcement



# **Executive Summaries**

- There are only 24 Field offices so an ES must only list the action as such.
  - Incorrect:  ERO Dover arrested $^{(b)(6); (b)(7)(c)}$.
  - Correct:  ERO Philadelphia arrested$^{(b)(6); (b)(7)(c)}$
  - Also Correct:  ERO Philadelphia, Dover sub-office arrested $^{(b)(6); (b)(7)(c)}$

- List <u>convictions</u> only, unless an arrest led to an ERO encounter or otherwise directed, arrests are not needed
  - include formal name of the court that convicted the alien
  - the offense (not capitalized)
  - all sentences the court imposed

Incorrect:  $^{(b)(6); (b)(7)(c)}$was convicted on February 1, 2018 for the offense of driving under the influence.  The court sentenced him to two year's probation.

Correct:  On February 1, 2018, the Fairfax County Circuit Court in Fairfax, VA, convicted $^{(b)(6); (b)(7)(c)}$ the offense of driving under the influence and sentenced him to two years of probation.



U.S. Immigration and Customs Enforcement



# Executive Summaries

ISSUE Examples:

On June 2, 2015, ERO Miami provided HQ ERO Domestic Operations with information pertaining to **(b)(6); (b)(7)(c)** a 22-year old citizen of Romania, who on June 1, 2015, Miami Dade Police Department in Miami, FL arrested for driving under the influence and hit and run causing injury or death.**(b)(6); (b)(7)(c)** case has garnered significant media attention.

On March 5, 2017, ERO Chicago provided HQ ERO Domestic Operations with information pertaining to **(b)(6); (b)(7)(c)** , a 56-year old citizen of Mexico, after the Chicago University Hospital in Chicago, IL admitted her for congenital heart failure. ERO Chicago plans to remove **(b)(6); (b)(7)(c)** on March 10, 2017.



U.S. Immigration
and Customs
Enforcement



# **Executive Summaries**

**Incorrect and Correct Examples:**

Incorrect: **(b)(6); (b)(7)(c)** had his conditions of his residency card lifted by U.S. CIS on May 16, 1995.

Correct: On May 16, 1995, the former Immigration and Naturalization Service (INS) granted **(b)(6); (b)(7)(c)** Petition to Remove the Conditions of Resident Status, Form I-751.

_____

Incorrect: **(b)(6); (b)(7)(c)** came into ERO Atlanta custody on June 3, 2017.

Correct: On June 3, 2017, the Smyrna County Jail (SCJ) in Smyrna, GA transferred **(b)(6); (b)(7)(c)** to ERO Atlanta.

_____

Incorrect: **(b)(6); (b)(7)(c)** was admitted into the United States at Miami, FL on September 24, 2017. He was admitted as a non-immigrant visitor with authorization until February 1, 2018

Correct: On September 24, 2017, U.S. Customs and Border Protection (USCBP) admitted **(b)(6); (b)(7)(c)** to the United States in Miami, FL as a non-immigrant visitor for pleasure, B2, with authorization to stay until February 1, 2018.


U.S. Immigration and Customs Enforcement



# Executive Summaries

**Incorrect and correct examples cont'd:**

Incorrect: **(b)(6); (b)(7)(c)** was convicted on February 1, 2018 for the offense of driving under the influence. The court sentenced him to two years of probation.

Correct: On February 1, 2018, the Fairfax County Circuit Court (FCCC) in Fairfax, VA, convicted **(b)(6); (b)(7)(c)** for the offense of driving under the influence and sentenced him to two years of probation.

_____

Incorrect: **(b)(6); (b)(7)(c)** was ordered removed by an IJ on December 15, 2010.

Correct: On December 15, 2010, an immigration judge (IJ) in Orlando, FL ordered **(b)(6); (b)(7)(c)** removed to Mexico.

_____

Incorrect: **(b)(6); (b)(7)(c)** appealed to the BIA on April 18, 2010.

Correct: On April 18, 2010, **(b)(6); (b)(7)(c)** appealed the IJ's decision to the Board of Immigration Appeals (BIA).



U.S. Immigration
and Customs
Enforcement



# Executive Summaries

**Incorrect and correct examples cont'd:**

Incorrect:  <sup>(b)(6); (b)(7)(c)</sup> was convicted on February 05, 2018 for the offense of driving under the influence.  The court sentenced him to 2 year's probation.

Correct:  On February 5, 2018, the Fairfax County Circuit Court (FCCC) in Fairfax, VA convicted<sup>(b)(6); (b)(7)(c)</sup> for the offense of driving under the influence and sentenced him to two years of probation.



U.S. Immigration and Customs Enforcement



# **Executive Summaries**

**Chronological example:**

On March 2, 2016, the U.S. Border Patrol (USBP) arrested **(b)(6); (b)(7)(c)** at Laredo, TX and served him a Notice to Appear, Form I-862, charging inadmissibility pursuant to Section 212(a)(6)(A)(i) of the Immigration and Nationality Act (INA), as an alien present in the United States without admission or parole.

On March 3, 2016, USBP transferred **(b)(6); (b)(7)(c)** to ERO San Antonio.

On April 10, 2016, an immigration judge (IJ) in San Antonio, TX ordered **(b)(6); (b)(7)(c)** removed to Mexico.

On April 25, 2016, **(b)(6); (b)(7)(c)** appealed the IJ's decision to the Board of Immigration Appeals (BIA).

On June 4, 2016, the BIA dismissed **(b)(6); (b)(7)(c)** appeal.

On June 6, 2016, ERO San Antonio removed **(b)(6); (b)(7)(c)** to Mexico.



U.S. Immigration and Customs Enforcement



# Executive Summaries

**Chronological example with *immigration* & *criminal history*:**

On July 11, 2017, <sup>(b)(6); (b)(7)(c)</sup> filed an Application to Register Permanent Residence or Adjust Status, Form I-485, with U.S. Citizenship and Immigration Services (USCIS).

On August 8, 2017, the Richmond Police Department (RPD) in Richmond, VA, arrested <sup>(b)(6); (b)(7)(c)</sup> for assault.

On August 9, 2017, ERO Washington encountered <sup>(b)(6); (b)(7)(c)</sup> at the Richmond County Jail (RCJ) in Richmond, VA and lodged an Immigration Detainer-Notice of Action, Form I-247. *(A, none, etc.)

On September 10, 2017, the Richmond District Court (RDC) in Richmond, VA, convicted <sup>(b)(6); (b)(7)(c)</sup> of assault and sentenced him to 60 days incarceration.

On September 25, 2017, USCIS denied <sup>(b)(6); (b)(7)(c)</sup> I-485.

On December 9, 2017, RCJ released <sup>(b)(6); (b)(7)(c)</sup> to ERO Washington.



U.S. Immigration
and Customs
Enforcement



# **Executive Summaries**

## **Detainee Death Notifications**:

- Similar to an ES, a Detainee Death Notification has only two sections: Issue and Background (with some differences)

  - **ISSUE**
    - ◆ The ISSUE section is the reason for sending the Death Notification (to include time of death and the field office notifications). This is very structured and MUST appear this way.

**Issue Example**:



On July 10, 2018, U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) Atlanta reported the death of ICE detainee **(b)(6); (b)(7)(c)** , A209 XXX 301, a 40-year-old citizen of Mexico, at the Southwest Georgia Regional Medical Center (SGRMC) in Cuthbert, GA. The medical staff pronounced **(b)(6); (b)(7)(c)** deceased at 11:29 p.m. EDT. Medical staff identified the preliminary cause of death as self-induced strangulation.

Consistent with ICE policy, ERO Atlanta notified the U.S. Department of Homeland Security, Office of Inspector General, and the ICE Office of Professional Responsibility via the Joint Intake Center. ERO Atlanta also notified the Consulate of Mexico in Atlanta, GA, of **(b)(6); (b)(7)(c)** death, who, in turn, notified **(b)(6); (b)(7)(c)** next of kin.


U.S. Immigration and Customs Enforcement



# Executive Summaries

**Detainee Death Notifications**:

- **BACKGROUND**
  - ◆ The BACKGROUND section outlines the aliens entire immigration and criminal history. This means from the very first time they entered the U.S. to the current date.

  - ◆ The BACKGROUND should contain a detailed moment by moment account of the medical treatment the alien received, in particular after ICE became aware the alien was in crisis.

  - ◆ The BACKGROUND section should end with a statement designating what number of detainee deaths this person would be for the fiscal year.

- **Background Example:**
  (b)(6); (b)(7)(c) is the first detainee to pass away in ICE custody for fiscal year 2017.



U.S. Immigration and Customs Enforcement



# **Executive Summaries**

Detainee Death Notifications:

- **DO NOT SEND THE SIGNIFICANT INCIDENT REPORT (SIR) WITHOUT HQ CLEARING THE NARRATIVE**

- **PLEASE NOTE: Once a narrative has been cleared, the field office <u>can not</u> make any changes without having to send it back through the chain again.**
- **The field office must <u>use the ES as the SIR narrative</u>.**



U.S. Immigration
and Customs
Enforcement

2022-ICLI-00048    13389.17

# **ICE**

# **Executive Summaries**

- The BACKGROUND of the ES should contain:
  - A complete case summary
  - The basis for the U Visa application
  - Date USCIS found prima facie eligibility*
- The RECOMMENDATION of the ES should contain:
  - A short synopsis of the case
  - A synopsis of the SUBJECT's positive equities
  - Verification that the field office consulted with local Office of Chief Counsel
  - Verification that the applicant is no longer needed in connection with any prosecution, etc.
  - A statement that the field office reviewed the case and, in the balance, feels the stay should be denied because…

\* There is **_no need_** to request a full expedited determination from USCIS


U.S. Immigration
and Customs
Enforcement



**ICE**

# QUESTIONS???



U.S. Immigration and Customs Enforcement

# EXHIBIT W



*Office for Civil Rights and Civil Liberties*
**U.S. Department of Homeland Security**
Washington, DC 20528

[ DATE \@ "MMMM d, yyyy" ]

MEMORANDUM FOR:    Tae D. Johnson
                   Acting Director
                   U.S. Immigration and Customs Enforcement

                   Kerry E. Doyle
                   Principal Legal Advisor
                   Office of the Principal Legal Advisor
                   U.S. Immigration and Customs Enforcement

FROM:              Dana Salvano-Dunn
                   Director, Compliance Branch
                   Office for Civil Rights and Civil Liberties

                   Zazy Ivonne López
                   Deputy Director, Compliance Branch
                   Office for Civil Rights and Civil Liberties

SUBJECT:           Adelanto Processing Center
                   Complaint Nos. 20-03-ICE-0220,
                   21-07-ICE-0400, 21-07-0403, 21-02-ICE-0411,

The U.S. Department of Homeland Security (DHS), Office for Civil Rights and Civil Liberties (CRCL) conducted an investigation into conditions of detention for U.S. Immigration and Customs Enforcement (ICE) detainees at the Adelanto Processing Center (Adelanto) in Adelanto, CA. CRCL's virtual onsite investigation occurred July 12-16, 2021 and was in response to complaints regarding conditions of detention, medical and mental health care, suicide prevention and intervention, sexual abuse and assault prevention, and environmental health and safety issues.

We greatly appreciate the cooperation and assistance provided by ICE and its contractors before and during the virtual onsite investigation. As part of the investigation, CRCL engaged the assistance of four subject-matter experts: a conditions of detention expert, an environmental health and safety expert, a medical expert, and a mental health expert. As a result of detainee and staff interviews, document and record reviews, and virtual direct observation, the subject-matter experts identified concerns in each of their areas.

On July 16, 2021, as part of the virtual onsite closing discussion, CRCL and the subject-matter experts discussed our preliminary findings and recommendations with ICE field office management, personnel from ICE Enforcement and Removal Operations (ERO) headquarters, and GEO management. Shortly following the onsite, CRCL sent an email to ICE on August 16, 2021,

~~Protected by Deliberative Process Privilege~~

24-CRLI-00005-000063

summarizing these initial recommendations, to ensure ICE had sufficient information to begin to
initiate proposed changes.

Enclosed with this memorandum are the reports prepared by our subject-matter experts.[1] They have
been divided into priority and non-priority recommendations. Priority recommendations are listed in
the body of this memorandum, and CRCL requests that ICE formally concur or non-concur with
these recommendations and provide an implementation plan for all accepted recommendations
within 60 days of issuance. Non-priority recommendations are contained in a separate attachment to
this memorandum. Although CRCL is not requesting formal responses to these, we encourage ICE
consider and implement these recommendations to the fullest extent possible.

With this memorandum, and consistent with our standard practice, we request that ICE indicate
whether it concurs with the expert recommendations, and that for those agreed to, ICE provide an
action plan within 60 days.

<u>Conditions of Detention</u>

CRCL's conditions of detention expert made the following priority recommendations related to the
Performance Based National Detention Standards 2011-2016 (PBNDS 2011/16); U.S. Immigration
and Customs Enforcement / Enforcement and Removal Operations COVID-19 Pandemic Response
Requirements, (ICE/ERO COVID-19 PRR) (Version 6.0, March 16, 2021); the Centers for Disease
Control Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in
Correctional and Detention Facilities (CDC COVID-19 Guidance); and the Department of
Homeland Security Language Access Plan, issued Feb. 28, 2012, the  ICE Language Access Plan,
issued on June 14, 2015, and the Performance-Based National Detention Standards (PBNDS 2011):

1. 

2. Detainees continued to report, as they did in the 2017 onsite investigation, having no faith in
the grievance system due to a lack of responsiveness by staff, disrespectful treatment by the
Grievance Coordinator, a perceived lack of impartiality, and the grievance system being
ineffective. ICE and Adelanto management (including the Warden) must ensure that facility

---

[1] In general, CRCL's experts relied on the applicable 2011 PBNDS and related professional standards in conducting their
work and preparing their reports and recommendations.  Some of their analyses or recommendations, however, may be
based on constitutional or statutory requirements that exceed the detention or professional standards.

24-CRLI-00005-000064

personnel effectively respond to and resolve the detainee grievance issues assigned to them by the Grievance Coordinator. (PBNDS 2011, Justice, Grievance System, 6.2, I., II. V.A.6).

3.    # (b)(5)

4.    During the previous onsite investigation in 2017 language access was identified as a barrier to legal access for LEP detainees. During onsite interviews with male detainees in July 2021 detainees continue to voice significant complaints regarding the lack of language assistance related to using Lexis-Nexis, and language barriers to preparing legal forms that are only available in English. Adelanto should institute a computer training class, demonstrating use of the Lexis-Nexis software and computers, and create a detainee worker position in each housing unit to assist detainees with utilizing the computer system or provide LEP detainees with reasonable access to the Lexis Nexis system utilizing some form of translation or interpretation services. (PBNDS 2011, Justice, Law Libraries and Legal Materials 6.3 II.11)

5.    # (b)(5)

6.    Detainees reported being asked to sign forms that were written in English with no explanation provided in a language they could understand. ICE and Adelanto must ensure all forms issued to detainees for informational purposes and/or for detainee signatures must be written and/or translated in a language the detainee comprehends. All written material provided to detainees shall generally be translated into Spanish and to comply with the Detention Standards. (DHS Language Access Plan 2012) (PBNDS 2011)

7.    # (b)(5)

8.    Detainees with complex behavioral mental health needs remain in segregation at Adelanto for extended periods of time as ICE does not have sufficient therapeutic treatment or step-down program beds to transfer detainees to. As a result, detainees remain in segregation for an extended period of time. ICE should develop additional capacity to ensure detainees with complex behavioral and mental health needs do not remain in segregation for extended

---

[2] The language Line Log exists at various locations within the facilities, but non-medical staff do not consistently use the language line

*Protected by Deliberative Process Privilege*                                                              3

periods of time due to the lack of a facility to transfer the detainee to. (PBNDS 2011 Security, SMU 2.12; ICE Segregation Directive)

9. **(b)(5)**

10. ICE DOs do not adhere to a schedule that detainees can rely upon to allow for communication with their assigned DO as mandated by PBNDS 2011.  All assigned DOs should be responsive to detainee requests to speak with their assigned DO in person or by telephone. (PBNDS 2011, Security, Staff Detainee Communication 2.13. V.A and V.B).

11. Postings of DO scheduled visits are not regularly updated. Adelanto's posted schedules for DO visits to detainee housing units and DO contact and assignment information is not updated quarterly or more frequently as DO staff changes occur. Adelanto must provide updated DO schedule and assignment information in each housing unit that reflects accurate and updated information to enable detainees to communicate with their assigned DO. (PBNDS 2011, Security, Staff Detainee Communication, 2.13 V.A).

12. Some responses on detainee request forms were vague or non-responsive to the detainee's request to see their DO and there is a lack of quality control measures. ICE Supervisory Detention and Deportation Officers should regularly review ICE DO responses to detainee requests as a quality control measure and provide additional training to DOs as needed to ensure DOs are timely and effectively communicating with detainees. (PBNDS 2011 Security, Staff Detainee Communication, 2.13 V.B.1)

13. **(b)(5)**

14. Adelanto did not complete an incident report for a serious Use of Force (UOF) incident involving a detainee on September 8, 2020, because ICE staff used the force and Adelanto staff did not use physical force.  Adelanto should complete a UOF facility incident report when any Adelanto staff are involved in responding to or witness an UOF incident.  All staff involved in an incident should complete individual reports if the force occurs in the facility regardless of whether ICE or Adelanto staff use the physical force. (PBNDS 2011, Security, Use of Force and Restraints 2.15 V. A.5, V. B.14, and V.0)

15. **(b)(5)**

16. **(b)(5)**

*Protected by Deliberative Process Privilege*

4

**(b)(5)**

17. ICE and Adelanto did not conduct an after-action review of the September 8 incident involving a detainee who had documented medical disabilities. ICE and Adelanto should prepare a joint incident report and conduct a joint after-action review when a UOF incident involves ICE staff and Adelanto personnel. (PBNDS 2011, Security, Use of Force and Restraints 2.15 O. and P)

18. Adelanto should cease the current practice of housing detainees who are identified as predators and those identified as vulnerable in the same housing unit, a practice that violates PBNDS. The current practice of comingling predators and vulnerable detainees is a serious policy violation and puts the detainees at risk of sexual abuse and assault. (PBNDS 2011, Security, Sexual Abuse and Assault Prevention and Intervention 2.11 II.8, V.H.1)

19. Adelanto does not maintain records of all detainee disability accommodations. The ADA Coordinator should create a log of all detainee requested disability accommodations that she approves and provide a copy of the log to the Medical Disability Compliance Coordinator who is responsible for processing disability accommodation requests and maintaining the Disability Tracking log. (PBNDS 2011, Care, Disability Identification, Assessment and Accommodation 4.8 V.F.4.G)

20. **(b)(5)**

21. Some ICE and Adelanto staff fail to wear masks consistent with CDC COVID-19 guidelines and the ICE/ERO PRR. ICE and Adelanto should continuously remind staff and detainees in multiple languages through training, town halls, visual media (posters and television, etc.) of the importance of wearing masks to prevent the spread of COVID-19.

22. Staff do not consistently take corrective measures when detainees are improperly masked. ICE and Adelanto Supervisors during their regular rounds should be vigilant about taking corrective measure to address any staff or detainee observed that is not wearing their face mask consistent with CDC COVID-19 Guidance and the ICE/ERO PRR. (CDC COVID-19 Guidance; ICE/ERO PRR)

Environmental Health and Safety

CRCL's environmental health and safety expert made the following recommendations related to the PBNDS 2011, Environmental Health and Safety standard, the U.S. Food and Drug Administration (FDA) Food Code, the CDC COVID-19 Guidance and the ICE/ERO PRR.

23. The current schedule of thrice weekly cleaning and disinfection of the dayrooms, showers, and bathrooms at Adelanto does not comply with the PBNDS 2011 Environmental Health and Safety standard requirements, COVID-19 Guidance, and DHS ERO PRR and is not adequate to ensure sanitation and hygiene in communal living areas. Adelanto should fully comply with the PBNDS 2011's specific requirements stating that all horizontal surfaces shall be damp dusted daily with an approved germicidal solution; windows, window frames and windowsills be cleaned on a weekly schedule; furniture and fixtures be cleaned daily; and floors be mopped daily and when soiled. (PBNDS 2011, 1.2 Environmental Health and

24-CRLI-00005-000067

Safety, V. Expected Practices, A. Environmental Health and Safety, 3. General Housekeeping)

24. 

25. Often there are birds present in the east housing unit, which can cause health hazards for detainees and staff. Adelanto administration should closely monitor the birds in the east housing unit, discourage detainees from feeding and thus attracting the birds, and ensure that any bird droppings are promptly cleaned up to facilitate compliance with the standards (PBNDS 2011, 1.2 Environmental Health and Safety, II. Expected Outcomes, 1 and 12)

26. Detainees interviewed complained about the amount, quality, and repetitive nature of the food at the facility. As noted in the detention standards, the food service program significantly influences morale among detainees. Adelanto should implement a multidisciplinary team or committee to meet regularly to evaluate the menus, analyze the data from the food surveys, review food related grievances, assess the overall satisfaction with the foodservice program, recommend changes based on their findings, and ensure that previous recommendations were implemented to facilitate compliance with the standards. (PBNDS 2011, 4.1 Food Service, V. Expected Practices, E. Menu Planning, (1.) General Policy)

27. During interviews, detainees reported that occasionally their laundry is damp or wet when it returns from the laundry. Clean laundry is fundamental to maintaining personal hygiene and good health; therefore, Adelanto administration should develop and implement procedures for filling and laundering the washable laundry bags, including staff and detainee education to facilitate compliance with the standards. (Applicable Standard: PBNDS 2011, 4.5 Personal Hygiene, I. Purpose and Scope, 2)

28. 

29.

Protected by Deliberative Process Privilege

6

24-CRLI-00005-000068

**(b)(5)**

<u>Medical Care</u>

CRCL's medical expert made the following recommendations related to PBNDS 2011.

30. **(b)(5)**

31. **(b)(5)**

<u>Mental Health Care</u>

CRCL's mental health expert made the following recommendations related to PBNDS 2011 and the National Commission on Correctional Health Care (NCCHC), Standards for Health Services in Jails.

32. **(b)(5)**

33. A major programming concern was the gap in Adelanto's continuum of care, with little to no access to an inpatient level of care for seriously mentally ill detainees who were unable to adaptively function in both general population and alternative housing units. It is strongly recommended that Adelanto develop a chronic care residential program in the alternative housing unit for detainees with chronic mental illness who do not require inpatient treatment but do require a therapeutic milieu with programming and treatment services due to their inability to adequately function in other units. Adelanto is also strongly recommended to either create a forensic psychiatric inpatient unit on-site or contract with a local, external

24-CRLI-00005-000069

facility that has a secure forensic inpatient unit. (PBNDS 2011, Medical Care, VO. Mental Health Program, Mental Health Services Required).

34. 

35.

36. There were few treatment services for seriously mentally ill detainees. In place of treatment and active programming, detainees in the infirmary on suicide watch or observation, and detainees in the SMU, were locked in their cells, observed closely, given limited property, and seen daily during rounds and at least weekly for treatment It is recommended that psychiatrists, psychologists, and social workers collaboratively develop interdisciplinary treatment plans and positive behavior support plans for seriously mentally ill detainees who are difficult to manage, with the goal of placing them in a less restrictive environment. (PBNDS 2011, Medical Care, VO. Mental Health Program, Mental Health Services Required).

It is CRCL's statutory role to advise department leadership and personnel about civil rights and civil liberties issues, ensuring respect for civil rights and civil liberties in policy decisions and implementation of those decisions. We look forward to working with ICE to determine the best way to resolve these complaints. We request that ICE provide a response to CRCL 60 days whether it concur or non-concur with these recommendations. If ICE concurs, please include an action plan. The response can be sent by email. If there are any questions, please contact [(b)(6)], Senior Policy Advisor, by telephone at [(b)(6)] or by email at [(b)(6)]

24-CRLI-00005-000070

Copy to:

Corey A. Price
Executive Associate Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b)(6),(b)(7)(C)

Daniel Bible
Acting Deputy Executive Associate Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b)(6),(b)(7)(C)

Michael V. Bernacke
Chief of Staff
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b)(6),(b)(7)(C)

Dr. Stewart D. Smith
Assistant Director, ICE Health Service Corps
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b)(6),(b)(7)(C)

Monica Burke
Acting Assistant Director, Custody Management
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b)(6),(b)(7)(C)

Dawn Daggett
Acting Chief of Staff, Custody Management
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
(b)(6),(b)(7)(C)

Greg Hutton
Acting Deputy Assistant Director, Custody Programs
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
Gregory.J.Hutton@ice.dhs.gov

Jason Houser
Acting Chief of Staff

Protected by Deliberative Process Privilege

9

U.S. Immigration and Customs Enforcement

**(b)(6),(b)(7)(C)**

Claire Trickler-McNulty
Assistant Director
Office of Immigration Program Evaluation
U.S. Immigration and Customs Enforcement

**(b)(6),(b)(7)(C)**

Deborah Fleischaker
Assistant Director
Office of Regulatory Affairs and Policy
U.S. Immigration and Customs Enforcement

**(b)(6),(b)(7)(C)**

Christopher S. Kelly
Deputy Assistant Director
Office of Regulatory Affairs and Policy
U.S. Immigration and Customs Enforcement

**(b)(6),(b)(7)(C)**

**(b)(6),(b)(7)(C)**

**(b)(6),(b)(7)(C)**

24-CRLI-00005-000072

| From: | (b)(6) |
|---|---|
| To: | (b)(6),(b)(7)(C) ERO CRCL;       (b)(6),(b)(7)(C) |
| | (b)(6),(b)(7)(C) |
| Cc: | Salvano-Dunn, Dana;     (b)(6) |
| Subject: | CRCL Investigation at the Adelanto ICE Processing Center |
| Date: | Monday, August 16, 2021 12:14:20 PM |

ICE Colleagues,

As you are aware, CRCL recently conducted a virtual onsite investigation into the conditions of detention at the Adelanto ICE Processing Center in Adelanto, CA from July 12-16, 2021. In an effort to allow ICE to more quickly respond to the concerns we identified, CRCL is sending you a brief, informal summary of issues identified by our subject matter experts. The information below represents many, but not all, of the issues that will be included in our forthcoming formal expert recommendations memo.

During our virtual onsite, CRCL identified the following issues:

**Mental Health**

1. Medical record reviews revealed that historical information obtained during mental health evaluations was often minimal. The Behavioral Health Supervisor reported that staff attempted to obtain signed releases of information, allowing them to request confidential historical information; however, detainees often refused to sign the "release of information" (ROI). When detainees refused to sign the forms, staff had been instructed to document their refusals in the medical record. A review of several medical records did not reveal such documentation. (b)(5)

   (b)(5)

2. A medical record review and staff interviews revealed diagnostic and treatment uncertainties. On one specific case, some staff rendered a rule out psychotic disorder while others rendered a rule out personality disorder. These disagreements were reportedly resolved during weekly treatment team meetings; however, medical records continued to display diagnostic uncertainty. (b)(5)

   (b)(5)

3. Statistical reports and medical records revealed seriously mentally ill detainees were often inappropriately placed in segregation and/or psychological observation in the infirmary. Segregation and psychological observation cannot be substituted for long-term inpatient residential treatment. (b)(5)

   (b)(5)

4. Medical records revealed seriously mentally ill detainees, who required structured therapeutic and non-therapeutic activities, were often only receiving health and wellness checks, weekly rounds and/or supportive counseling. (b)(5)

**(b)(5)**

5. Staff interviews, policy and procedure reviews, and medical record reviews revealed that detainees were rarely referred to an external mental health acute care facility. Despite having a policy and procedure which addressed transferring detainees whose mental health needs exceeded the capabilities of Adelanto (Mental Health Screening and Evaluation, OPS-300-05), detainees who needed long-term inpatient psychiatric care were unable to access such care. The disciplinary housing unit continued to be used to observe and ensure that seriously mentally ill detainees were safe, rather than transferring them to a mental health unit where they could receive a higher level of mental health care. This practice was illustrated by a psychiatric progress note, which stated a detainee could be treated as an outpatient but could not be moved to the general population because he had problems with GP officers; consequently, he would have to either move to disciplinary housing or to a psychological observation cell in the infirmary. (b)(5)

**(b)(5)**

6. Psychiatry Leadership: CRCL's 2015 and 2017 investigations reported that the lack of psychiatric leadership/oversight was a significant finding, contributing to substandard care. Interviews during the current virtual onsite revealed this issue continued to be a problem. Both staff psychiatrists stated they clinically reported to a corporate regional psychiatrist. They did not have any on-site psychiatric leadership/oversight and they had minimal contact with their regional clinical supervisor. They reported their most recent contact was two to three months ago. (b)(5)

**(b)(5)**

7. Continuity of care for detainees returning from a higher level of care: A review of CRCL's 2017 mental health expert's report on Adelanto revealed inadequate follow-up when detainees returned from outside facilities. The Behavior Health Supervisor reported this finding had been corrected, noting any clinician who changed the treatment protocol provided by the external facility would have to justify their change. Record reviews revealed a modification of treatment following a detainee's return from an external facility, without a documented rationale for the change. Additionally, the discharge summary and recommendations could not be found in the electronic medical record. (b)(5)

**(b)(5)**

8. Continuous quality improvement: Staff interviews and document reviews revealed that the mental health program was not actively involved with the continuous quality improvement program. Interviews and document reviews revealed the Behavioral Health Supervisor was not on the CQI Committee, and the mental health staff were not participating in any CQI studies or quality improvement plans. The facility CQI Committee Meeting Minutes revealed an active CQI program, which was conducting

several quarterly mental health studies to include completion of psychotropic medication consents, mental health treatment updates, suicide watch rounds, utilization of the Columbia Suicide Severity Rating Scale, and critical clinical events. The committee also developed and implemented improvement plans involving suicide watch rounds and utilization of the Columbia Suicide Severity Rating Scale, with no apparent input from mental health; however, the Behavior Health Supervisor was identified as the "responsible person" for the improvement plan which addressed the utilization of the Columbia Suicide Severity Rating Scale. The improvement plan's completion target date was August 30, 2021. (b)(5)

(b)(5)

9. During the virtual onsite orientation tour of Adelanto, staff reported that the custody supervisor was the only person who carried a cut-down tool. An additional cut-down tool was available in a locked box in the medical area. (b)(5)

(b)(5)

10. Suicide prevention and intervention program: A review of policies and procedures revealed a need for policy clarification. A procedural inconsistency was identified between WellPath's Suicide Prevention and Intervention Program dated January 30, 2019, and the Suicide Prevention Policy Revisions for GEO Sites and Review of Post Watch Follow-Up Requirements dated January 2020. The Wellpath policy, which was used to train staff on February 20, 2020, noted only Qualified Behavior Health Professionals (QBHPs), who had been assessed by the Regional Behavior Health Manager, could discontinue a constant/staggered suicide watch; however, the revision entitled Suicide Prevention Policy Revision, dated January 2020 noted the Suicide Prevention Committee required notification and approval prior to a suicide watch discontinuation. (b)(5)

(b)(5)

11. During the virtual onsite tour, Adelanto staff reported the infirmary had four mental health observation cells, two suicide watch cells which were suicide resistant, and two mental health observation cells which were not suicide resistant. A review of suicide watch admission data from June 2021 through May 2021 revealed an average of six suicide watch admissions per month, in contrast to a monthly average of 31 admissions between June 2020 through January 2021. With an average length of stay of at least a few days, the 2020 findings indicated that suicidal detainees had to be placed on suicide watch in non-suicide resistant cells, with a dedicated observer providing continuous observation. (b)(5)

(b)(5)

12. A review of the medical and mental health 2020 Policy and Procedure Manual/Training Roster indicated that suicide prevention training consisted of reading the suicide prevention policy and signing the attendance roster. Additionally, the roster revealed that neither psychiatrist acknowledged reading the Suicide Prevention and Intervention Policy. The 2011 PBNDS revision in 2016 reduced the required annual suicide prevention training from eight hours to two hours. It did not replace the training with

staff reading the suicide prevention policy. Additionally, the training was required for all staff, especially psychiatry who needed to stay updated on suicide prevention policies and procedures. (b)(5)

(b)(5)

**Medical Care**

13. One of the detainees noted in the Retention Memo was released from custody a short time after being transferred to an outside hospital. He died in the hospital a few days later. No DDR was done. From a Quality Assurance/Quality Improvement perspective, not doing a DDR for patients who die shortly after release from custody who are hospitalized and subsequently die is a missed opportunity to improve the care provided and reduce liability. (b)(5)

(b)(5)

14. Outside referrals for specialist care are generally not completed. This issue was evaluated by the CQI Committee who documented the poor completion rates of outside specialist appointments, and there were clearly many problems, including- delays in approvals for outside visits (although review of the June and July approvals suggest relatively short, generally less than a week approval, however, that occurred during a very low census period), prolonged times in scheduling outside visits (many detainees were released before their appointment time arrived), visits cancelled due to the pandemic- which upon re-evaluation were deemed lower priority, and finally patient refusal. (b)(5)

15. Many patients refused to be taken to outside appointments. In fact, in June and July 2021, 90% and 75% respectively, were the proportion of visits missed because the detainee refused the visit (as opposed to scheduling or another reason). When asked, most detainees reported that they had to quarantine, generally alone, for 14 days, sometimes in circumstances that were problematic, for example under bright lights that interfered with sleep. One detainee, with a history of mental illness, specifically stated that he would be unable to sleep adequately for those 14 day and he knew that his mental illness would become decompensated. (b)(5)

(b)(5)

16. There were allegations of staff not wearing masks and many rumors about what was going on in the facility. (b)(5)

(b)(5)

**Conditions of Detention**

17. An ICE safe release policy is needed regarding notification of legal counsel or emergency contact when a detainee is hospitalized and released from ICE custody. (b)(5)

24-CRLI-00005-000076

**(b)(5)**

18. **(b)(5)**

19. Use of Force: Adelanto did not complete a UOF incident report for an incident that involved ICE personnel and Adelanto's medical staff who responded to medically evaluate the detainee. **(b)(5)**

    **(b)(5)**

20. Special Management Unit (Segregation)- One detainee was housed in segregation for an extended period (over 210 days) due to a lack of transfer to another facility that could address the detainee's mental health and custody needs. **(b)(5)**

    **(b)(5)**

21. Staff Detainee Communication:  Some ICE Detention Officers are not adhering to posted schedules in housing units or alternatively providing timely telephonic contact which prevents detainees from contacting their Detention Officers (DOs). **(b)(5)**

    **(b)(5)**

22. Staff Detainee Communication:  A review of detainee ICE requests identified deficiencies in the responses.  Some ICE responses to detainee requests were vague, illegible, and do not address the requests. **(b)(5)**

    **(b)(5)**

23. Language Access: Language Access for LEP detainees continues to be problem at this facility and does not conform to DHS Language Access policy and multiple PBNDS standards. **(b)(5)**

    **(b)(5)**

(b)(5)

24. Religious Services:  Adelanto does not provide religious services due to COVID-19 which is a violation of the PBNDS. (b)(5)

(b)(5)

25. Grievances/Staff complaint: Numerous male and Female detainees made serious allegations including disrespectful treatment, harassment, and retaliation by the Grievance Officer for filing grievances.  Similar complaints have been raised by detainees during past CRCL investigations.  Detainees complained the Grievance Officer tries to dissuade detainees from filing grievances and in some cases refuses to accept certain grievances and lacks objectivity. The reported actions are in violation of the PBNDS, Grievance System. (b)(5)

(b)(5)

26. Disability Identification, Assessment and Accommodation:  The Adelanto Disability Access Coordinator (DAC) (non-medical) does not log detainee disability requests for assistance or actions taken to address detainee's disability needs, so there is no formal record of any non-medical detainee accommodation that may have been requested or provided. (b)(5)

(b)(5)

27. Suicide Prevention and Intervention: Adelanto only has two suicide resistance cells for a contracted capacity of 1940 beds which is not sufficient for a facility of that size. (b)(5)

(b)(5)

28. COVID-19: Detainees reported during interviews that some ICE and Adelanto staff, and detainees do not wear face masks in a manner consistent with the manufacturer's specifications and the Center for Disease Control (CDC) Guidelines to prevent the spread of COVID-19.  It appears some staff and detainees are experiencing mask fatigue which is not uncommon in a detention setting. (b)(5)

(b)(5)

(b)(5)

**Environmental Health & Safety**

29. During interviews, detainees stated that the dayrooms, bathrooms, and shower areas are cleaned and disinfected by officers three times per week and Adelanto staff confirmed that the areas are cleaned and disinfected three times per week, by employee "clean teams". The current schedule of thrice weekly cleaning and disinfection does not comply with the PBNDS 2011 Environmental Health and Safety standard requirements and is not adequate to ensure sanitation and hygiene in communal living areas.

(b)(5)

30. A detainee stated that feces was occasionally observed in the showers and another detainee stated that he had picked up the feces of others off of the shower floor using paper towels, while wearing disposable gloves provided to him specifically for this purpose, because the officers threw paper towels on top of it and stated that they were not going to do it. Feces may be contaminated with blood, and therefore requires proper clean-up due to the risk of the transmission of bloodborne pathogens. (b)(5)

(b)(5)

31. Small birds, approximately 3" in size, are entering the east housing unit dormitories through the exterior doors when they are left open during outdoor recreation time. The birds perch on the fixtures and overhead piping in the dormitory style housing units; however, the high ceilings create an impediment when trying to clean the bird

droppings. **(b)(5)**

**(b)(5)**

32. Although opinions about food are personal and subjective, the detainee's statements during interviews combined with numerous grievances related to food indicate that the detainee's attitude toward and opinion of the food is a serious concern.  While the food surveys are certainly a good practice and can generate useful information for the food service department, they may also be hurting detainee morale and hence facility morale if the detainees do not understand how the information is used or if they do not see or perceive changes to the menu or food, as was stated during detainee interviews.

**(b)(5)**

33. During interviews, detainees reported that occasionally their laundry is damp or wet, rather than dry, when it returns from the laundry.  Adelanto staff confirmed that this can happen when detainees "overstuff" their laundry bags.  Net or mesh laundry bags should be loosely filled and tied off at the end of the bag, not tied off tightly in the middle of the bag, thereby creating a tight ball of laundry that inhibits the cleaning and disinfection of the laundering process as the hot water, detergent, and bleach cannot penetrate the tightly packed laundry, and the water that is absorbed during washing cannot be adequately dried by the heat from the dryer.  **(b)(5)**

**(b)(5)**

34. Detainees report that they were aware of postings in their housing units regarding Covid-19; however, they are infrequently updated, if at all.  Since limited outside information is available to detainees, unease and misinformation regarding Covid-19 can easily spread in a detention facility, thus, detainee education is needed.  **(b)(5)**

**(b)(5)**



CRCL does not require a formal response to this email. Instead, we will send ICE the formal expert recommendations memo in accordance with our usual process. At that time, CRCL will ask ICE to respond, indicating concurrence or non-concurrence with each recommendation and noting any actions taken to implement the recommendations. Please let us know if you have any questions.


Thank you.


(b)(6)

(b)(6)
Senior Policy Advisor
Office for Civil Rights and Civil Liberties
Department of Homeland Security
(b)(6)

This message may contain information that is confidential, deliberative, law enforcement sensitive and/or otherwise protected from public disclosure. If it has been sent to you in error, please reply immediately to advise the sender of the error and then destroy this message, any copies of this message and any printout of this message. If you are not the intended recipient of the message, any unauthorized dissemination, distribution or copying of the material in this message, and any attachments to the message, is strictly forbidden. This document is for INTERNAL GOVERNMENT USE ONLY and may be exempt from disclosure under the Freedom of Information Act, 5 U.S.C. §§ 552(b)(5),(b)(6), and/or (b)(7).

U.S. DEPARTMENT OF HOMELAND SECURITY          OFFICE FOR CIVIL RIGHTS AND CIVIL LIBERTIES

# ROUTING SHEET

Page 1 of 4

| | | 05/2017 |
|---|---|---|

**Contact # / Complaint #:** Contact-DHS-21-2188 /

**Complainant(s):** (b)(6)

**Source(s):** Other

| Date Received by CRCL | 04/15/2021 | Date Tasked for Processing | 04/15/2021 |
|---|---|---|---|
| Presented by | | Date Presented | |
| Primary Assigned | | Secondary Assigned | |

## TYPE OF COMPLAINT

| ☒ Short Form | ☒ Referred | ☒ Retained | ☒ Info Layer | ☒ No Jurisdiction |
|---|---|---|---|---|

| PRIMARY ISSUE | Medical/Mental Health Care | SITUATION | Immigration detention |
|---|---|---|---|
| Issue Basis | Medical Care, Mental Health Care, Communicable disease | Situation Basis | Safe release |

| SIGNATURE | | | DATE | |
|---|---|---|---|---|
| DIRECTOR/DESIGNEE | | | | |
| Signature of assigned PA (confirming issue/situation) | | | DATE | |

## RESPONSE

| Letter Needed | ☒ **Yes:** *Select Letter Below* | ☒ **No** |
|---|---|---|

*ACKNOWLEDGEMENT LETTER (select below):*

| ☒ Standard | ☒ Section 504 | ☒ DHS TRIP | ☒ DHS TRIP Source 504 | ☒ Special/Tailored |
|---|---|---|---|---|

*INFO LAYER LETTER (select below):*

| ☒ Standard | ☒ ICE ERO | ☒ TSA Disability | ☒ DHS TRIP | ☒ Special/Tailored |
|---|---|---|---|---|

☒ *No Jurisdiction Letter*

| ☒ CBP Info Center/PDO Reply | ☒ Forward to ERO DRIL | ☒ Forward to _____ |
|---|---|---|

☒ **Respond in Non-English Language:** *Specify Language*

## SPECIAL INSTRUCTIONS / MORE INFORMATION NEEDED

| FACILITY NAME/LOCATION: | CITY, STATE OF INCIDENT: |
|---|---|
| ADELANTO ICE PROCESSING CENTER | ADELANTO, California |
| | |
| | |
| | |

| FROM | TO | DATE | SUMMARY/TASKING/COMMENTS |
|---|---|---|---|
| (b)(6) | (b)(6) | 04/15/2021 | COVID-19 On April 16, 2021, CRCL received postal correspondence from a group of National Qualified Representative Program (NQRP) Providers addressed to Secretary of Homeland Security Alejandro Mayorkas. On April 15, 2021, CRCL received email referral from the DHS Executive Secretariat (ESEC) (WF 1212179) of a copy of the same letter to Secretary Mayorkas. The tasker states that ICE |

**U.S. DEPARTMENT OF HOMELAND SECURITY**                    **OFFICE FOR CIVIL RIGHTS AND CIVIL LIBERTIES**

# ROUTING SHEET

| FROM | TO | DATE | SUMMARY/TASKING/COMMENTS |
|------|-----|------|--------------------------|
|      |     |      | is tasked to take the lead on preparing a DHS response. In the letter, dated April write to you today as Qualified Representatives ("QR") who are appointed by the Immigration Courts to represent detained immigrants who have been found mentally incompetent to represent themselves in their removal proceedings under the National Qualified Representative Program ("NQRP"). The signatory organizations alleged that "ICE has a widespread practice of unsafely releasing our mentally incompetent clients and fails to guarantee their right to a safe discharge" and that "ICE refused to release Martin Vargas Arellano despite his clear medical vulnerability and continued declining health. When he was finally discharged to a hospital, ICE failed to notify his legal representatives of the discharge, and subsequently obscured his location and death." The correspondence states that in the case of NQRP client Martin Vargas Arellano, ICE's mistreatment resulted in a preventable death. Mr. Vargas died on March 8, 2021, three days after he was released from ICE custody. Specifically, the correspondence states: "For the past two years, Mr. Vargas was held in ICE custody at Adelanto ICE Processing Center. Mr. Vargas was one of the most vulnerable people in Adelanto, suffering from Schizophrenia, Diabetes, Hypertension, Gout, Cellulitis, and Hepatitis C. ICE was fully aware of his medical vulnerability - he was hospitalized more than 16 times during his two years in ICE detention - but repeatedly denied his release. In December 2020, Mr. Vargas contracted COVID-19 in Adelanto and was hospitalized three times from December 2020 through February 2021, before being transferred to St. Jude Hospital on March 5, where he died three days later. "Mr. Vargas was represented by attorney **(b)(6)** of the Esperanza Immigrant Rights Project in Los Angeles . . . . On February 22, 2021, ICE informed Ms. **(b)(6)** that they were considering releasing Mr. Vargas and asked her to provide information about his transportation and housing, which she did. Mr. Vargas' Deportation Officer told Ms. **(b)(6)** that he would inform her in advance of any release so she could ensure it could be done safely, which she was prepared to do. ICE later informed Ms. **(b)(6)** that Mr. Vargas would be released once he recovered from surgery and asked her to provide information for his next of kin (an uncommon request for release from ICE custody), which she did. When Mr. Vargas suffered a stroke on March 3, ICE did not inform Ms. **(b)(6)** instead, ICE transferred Mr. Vargas to the hospital two days later, again without informing Ms. **(b)(6)** On March 15, seven days after Mr. Vargas' death, Ms. **(b)(6)** learned that he had been released from ICE |

**U.S. DEPARTMENT OF HOMELAND SECURITY**          **OFFICE FOR CIVIL RIGHTS AND CIVIL LIBERTIES**

# ROUTING SHEET

| FROM | TO | DATE | SUMMARY/TASKING/COMMENTS |
|------|-----|------|--------------------------|
|      |     |      | custody on March 5. Ms. **(b)(6)** then spoke to Mr. Vargas' Deportation Officer at Adelanto, who led her to believe that he had been released into the community and denied knowing where he was. The next day, Ms. **(b)(6)** filed a missing person report, which prompted the police to compel ICE to disclose Mr. Vargas' last-known location, St. Jude Hospital. Ms. **(b)(6)** contacted the hospital and was told he was not there, prompting her to contact the Orange County Coroner. On March 18, Ms. **(b)(6)** learned from the coroner that Mr. Vargas had died at St. Jude Hospital on March 8." The signatory organizations are: National Qualified Representative Program (NQRP) Providers: Becker & Lee LLP Brooklyn Defender Services Capital Area Immigrants' Rights (CAIR) Coalition Catholic Charities Atlanta Esperanza Immigrant Rig |
|      |     |      |  |
|      |     |      |  |
|      |     |      |  |
|      |     |      |  |
|      |     |      |  |
|      |     |      |  |

**U.S. DEPARTMENT OF HOMELAND SECURITY**                **OFFICE FOR CIVIL RIGHTS AND CIVIL LIBERTIES**

# ROUTING SHEET

Page 4 of 4

| FROM | TO | DATE | SUMMARY/TASKING/COMMENTS |
|------|-----|------|--------------------------|
|      |     |      |                          |
|      |     |      |                          |