JOSEPH T. MCNALLY
Acting United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section
JOSEPH W. TURSI (Cal. Bar No. 300063)
JASON K. AXE (Cal, Bar No. 187101)
Assistant United States Attorneys
     Federal Building, Suite 7516
     300 North Los Angeles Street
     Los Angeles, California 90012
     Telephone: (213) 894-3989 | 8790
     Facsimile: (213) 894-7819
     E-mail: Joseph.Tursi@usdoj.gov
           Jason.Axe@usdoj.gov

Attorneys for Defendant U.S. Immigration
and Customs Enforcement

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF SOUTHERN CALIFORNIA,<br><br>        Plaintiff,<br><br>        v.<br><br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,<br><br>        Defendants. | No. 2:22-cv-04760-SHK<br><br>**DEFENDANT UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [Dkt. 112]**<br><br>(Filed concurrently with Declaration of Fernando Pineiro, Statement of Uncontroverted Facts, and [Proposed] Judgment)<br><br>Hearing Date:   May 7, 2025<br>Hearing Time:  10:00 a.m.<br>Courtroom:     3 or 4<br><br>Honorable Shashi H. Kewalramani<br>United States Magistrate Judge |

# **TABLE OF CONTENTS**

<u>DESCRIPTION</u>                                                                                      <u>PAGE</u>

I.     INTRODUCTION ................................................................. 1

II.    BACKGROUND & RELEVANT PROCEDURAL HISTORY ........................... 2

    A.     Plaintiff's Nine-Part FOIA Request – Dated April 29, 2022 ........................ 2

    B.     Defendant ICE's Reasonable Search for Responsive Records to Plaintiff's Nine-Part FOIA Request ................................................. 2

        1.     ICE's Standard Procedure for Initiating Searches in Response to FOIA Requests. ............................................................... 2

        2.     Description of Program Offices Tasked With Searching for Records in Response to Plaintiff's FOIA Request ........................... 5

III.   LEGAL STANDARD ............................................................. 6

IV.    ARGUMENT ................................................................... 6

    A.     Parts 1-3 ................................................................ 9

    B.     Part 4 .................................................................. 11

    C.     Part 5 .................................................................. 13

    D.     Parts 6-7 ............................................................... 14

    E.     Part 8 .................................................................. 17

    F.     Part 9 .................................................................. 19

V.     CONCLUSION ................................................................ 20

# TABLE OF AUTHORITIES

**Federal Cases**

*AFGE v. Dep't of Com.*,
  907 F.2d 203 (D.C. Cir. 1990) ................................................................. 14

*Am. Oversight v. U.S. Dep't of Just.*,
  401 F. Supp. 3d 16 (D.D.C. 2019) ............................................................ 6

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ..................................................................................... 6

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ..................................................................................... 6

*Citizens Comm'n on Hum. Rights v. State Dept.*,
  45 F.3d 1325 (9th Cir. 1995) ..................................................................... 6

*Ctr. for Investigative Reporting v. U.S. Dep't of Just.*,
  14 F.4th 916 (9th Cir. 2021) .................................................................... 20

*DiBacco v. U.S. Dep't of the Army*,
  795 F.3d 178 (D.C. Cir. 2015) ................................................................... 7

*Frost v. U.S. Dep't of Justice*,
  2018 WL 1626682 (N.D. Cal. Apr. 4, 2018) ........................................... 1

*Goland v. CIA*,
  607 F.2d 339 (D.C. Cir. 1978) ......................................................... *passim*

*Hall & Assocs. v. EPA*,
  83 F. Supp. 3d 92 (D.D.C. 2015) ............................................................ 18

*Hamdan v. U.S. Dep't of Just.*,
  797 F.3d 759 (9th Cir. 2015) ................................................................. 7, 9

*Hoffman v. U.S. Border Prot.*,
  2023 WL 4237096 (E.D. PA. 2023) .......................................................... 6

*Inst. for Just. v. Internal Revenue Serv.*,
  941 F.3d 567 (D.C. Cir. 2019) ................................................................. 20

*Inter-Coop. Exch. v. U.S. Dep't of Com.*,
  36 F.4th 905 (9th Cir. 2022) ...................................................................... 7

*Iturralde v. Comptroller of Currency*
  315 F.3d 311 (D.C. Cir. 2003) ................................................................. 11

i

*John Doe Agency v. John Doe Corp.*,
    493 U.S. 146 (1989) .................................................................... 6

*Jud. Watch, Inc. v. DOJ*,
    373 F. Supp. 3d 120 (D.D.C. 2019) ....................................... 8

*Lahr v. Nat'l Transp. Safety Bd.*,
    569 F.3d 964 (9th Cir. 2009) ...................................... *passim*

*Lawyers' Comm. for C.R. of San Francisco Bay Area v. U.S. Dep't of the Treasury*,
    534 F. Supp. 2d 1126 (N.D. Cal. 2008) ............................ *passim*

*MacLeod v. DHS*,
    2017 WL 4220398 (D.D.C. Sept. 21, 2017) .................. 17, 18

*Miller v. Casey*,
    730 F.2d 773 (D.C. Cir. 1984) ......................... 18, 19, 20

*Miller v. U.S. Dep't of State*,
    779 F.2d 1378 (8th Cir. 1985) ................................... 9, 10

*Minier v. Cent. Intelligence Agency*,
    88 F.3d 796 (9th Cir. 1996) .......................................... 6

*Oglesby v. U.S. Dep't of Army*,
    920 F.2d 57 (D.C. Cir. 1990) ....................................... 7

*Pub. Emps. for Env't Resp. v. U.S. Int'l Boundary & Water Comm'n*,
    842 F. Supp. 2d 219 (D.D.C. 2012) ............................... 8

*Rubman v. U.S. Citizenship & Immigr. Servs.*,
    800 F.3d 381 (7th Cir. 2015) ....................................... 7

*SafeCard Servs., Inc. v. SEC*,
    926 F.2d 1197 (D.C. Cir. 1991) ................................. 7, 9

*Transgender Law Center v. Immigr. & Customs Enf't*,
    46 F.4th 771 (9th Cir. 2022) .............................. 6, 7, 11

*Valencia-Lucena v. U.S. Coast Guard*,
    180 F.3d 321 (D.C. Cir. 1999) ..................................... 7

*Weisberg v. U.S. Dep't of Just.*,
    745 F.2d 1476 (D.C. Cir. 1984) ................................... 7

*Whitaker v. Dep't of Com.*,
    970 F.3d 200 (2d Cir. 2020) ...................................... 17

ii

*Zemansky v. EPA*,
   767 F.2d 569 (9th Cir. 1985) ............................................................................. 6

**Regulations**

6 C.F.R. § 5.3 ........................................................................................... 3, 4, 5

Fed. R. Civ. P. 56(a) ............................................................................ 6

## NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT

PLEASE TAKE NOTICE that, on May 7, 2025 at 10:00 a.m., or as soon thereafter as it may be heard, Defendant U.S. Immigration and Customs Enforcement ("Defendant" or "ICE") will, and hereby does, move this Court for an order entering judgment in Defendant's favor on Plaintiff's claim for failure to conduct an adequate search for responsive records [Dkt. 24, ¶ ¶ 54-59]. This motion will be made in the George E. Brown, Jr. Federal Building and Courthouse before the Honorable Shashi H. Kewalramani, United States Magistrate Judge, located at 3470 Twelfth Street, Riverside, CA 92501, Courtroom 3 or 4, 3rd Floor.

Defendant brings its motion pursuant to Federal Rule of Civil Procedure 56, on the grounds that ICE has fully complied with its obligations under the Freedom of Information Act ("FOIA") with respect to the sufficiency of its search for records responsive to Plaintiff American Civil Liberties Union of Southern California's ("Plaintiff" or "ACLU of SoCal") nine-part FOIA request.[1] Thus, Plaintiff cannot raise a genuine dispute of material fact or otherwise prevail under the FOIA, and Defendant is therefore entitled to judgment as a matter of law on the issue of the sufficiency of its search.

This motion is made upon this Notice, the attached Memorandum of Points and Authorities, the Declaration of Fernando Pineiro, the ICE FOIA Director, the Separate Statement of Uncontroverted Facts, and all pleadings, records, and other documents on file with the Court in this action, and upon such oral argument as may be presented at the hearing of this motion.

This motion is made following the conference of counsel pursuant to Local Rule 7-3 which was held on January 17, 2025.

---

[1]    The parties will separately move for summary judgment with respect to Defendant's withholdings and applied exemptions. *See* Dkt. 111.

iv

Dated: March 19, 2025

Respectfully submitted,

JOSEPH T. MCNALLY
Acting United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, Complex and Defensive Litigation
Section

  /s/ *Joseph W. Tursi*
JOSEPH W. TURSI
JASON K. AXE
Assistant United States Attorneys

Attorneys for Defendant U.S. Immigration
and Customs Enforcement

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Defendant U.S. Immigration and Customs Enforcement ("Defendant" or "ICE") has complied fully with its obligations under the Freedom of Information Act ("FOIA") to search for records responsive to Plaintiff American Civil Liberties Union of Southern California's nine-part FOIA Request, dated April 29, 2022 (the "FOIA Request"). As a result, Defendant ICE is entitled to summary judgment on the issue of the sufficiency of its search.

"To prevail on a motion for summary judgment, the agency must demonstrate 'beyond material doubt ... that it has conducted a search reasonably calculated to uncover all relevant documents.'" *Frost v. U.S. Dep't of Justice*, 2018 WL 1626682, at \*4 (N.D. Cal. Apr. 4, 2018) (citation omitted). Defendant ICE provides a detailed affidavit describing the process by which it searched for records responsive to the FOIA Request. *See* Declaration of Fernando Pineiro ("Pineiro Decl."). Affidavits that describe what was searched and by whom are enough to establish an adequate search. *See Lawyers' Comm. for C.R. of San Francisco Bay Area v. U.S. Dep't of the Treasury*, 534 F. Supp. 2d 1126, 1131 (N.D. Cal. 2008). The ICE affidavit explains who handled the FOIA Request and how those professionals conducted their searches. The ICE affidavit also explains how the designated employees searched for potentially responsive documents and substantiates why this approach was reasonably calculated to uncover such documents, including after many different and separate consultations with Plaintiff.[2]

As there is not a genuine dispute of material fact, ICE respectfully requests that the Court grant this Motion, deny Plaintiff's Motion (Dkt. 112), and enter judgment in Defendant ICE's favor with respect to Plaintiff's second claim for failure to conduct

---

[2]    Plaintiff complains that ICE "provided [its search summary] to Plaintiff just the week before this brief is due…." Dkt. 112 at 2. ICE timely provided its search summary pursuant to the Court's January 24, 2025 setting the briefing schedule, Dkt. 111 at 2. Moreover, the parties stipulated to the schedule. Dkt. 110.

1

adequate search for responsive records [Dkt. 24, ¶¶ 54-59].

## II.    BACKGROUND & RELEVANT PROCEDURAL HISTORY

### A.    Plaintiff's Nine-Part FOIA Request – Dated April 29, 2022

Plaintiff's FOIA Request sought "any and all records that were prepared, received, transmitted, collected, and/or maintained by ICE or DHS that describe, refer, or relate to the release of hospitalized detainees from custody before their death; any records related to release of individual detainees once hospitalized; and any records related to the death of such detainees after their release from custody, including any communications or investigations" dating from January 1, 2016. Uncontroverted Fact (UF) 1. In that request, Plaintiff specified that it was seeking records in nine separate categories related to ICE's alleged practice of releasing from its custody hospitalized, detained immigrants who were likely to pass away while in custody. *See* Dkt. 24-1 at 5-7; Pineiro Decl., ¶ 4.

ICE received the FOIA Request on May 2, 2022. UF 2. On May 16, 2022, the ICE FOIA Office sent Plaintiff a letter acknowledging receipt of the FOIA request. It was assigned tracking number 2022-ICFO-16321. UF 3.

On July 12, 2022, Plaintiff filed this action. *See* Dkt 1. On October 4, 2022, Plaintiff filed its operative First Amended Complaint. Dkt. 24.

### B.    Defendant ICE's Reasonable Search for Responsive Records in Response to Plaintiff's Nine-Part FOIA Request

ICE is the principal investigative arm of the Department of Homeland Security and the second largest investigative agency in the federal government. Pineiro Decl., ¶ 17. Created in 2003 through a merger of the investigative and interior enforcement elements of the U.S. Customs Service and the Immigration and Naturalization Service, ICE now employs more than 20,000 people in offices in every state and in 48 foreign countries. *Id.*

1.    ICE's Standard Procedure for Initiating Searches in Response to FOIA Requests.

When the ICE FOIA Office receives a FOIA request, the intake staff evaluates it

2

1   to determine if it is a proper FOIA request per DHS FOIA regulation 6 C.F.R. § 5.3. UF

2   4. Generally, a FOIA request is considered proper and in compliance with DHS

3   regulations if it reasonably describes the records sought and the records are under the

4   purview of ICE. *Id.*

5         Proper FOIA requests are entered into a database known as Secure Release and

6   assigned a case tracking number. UF 5. Based upon the requestor's description of the

7   records being sought and ICE FOIA's knowledge of the various program offices'

8   missions, the ICE FOIA Office identifies the program office(s) likely to possess

9   responsive records and tasks the appropriate program office(s) to conduct the necessary

10  searches. *Id.*

11        ICE records are maintained by leadership offices and/or within ICE directorates,

12  including but not limited to, the Office of Public Affairs ("OPA"), the Office of

13  Enforcement and Removal Operations ("ERO"), the Office of Professional

14  Responsibility (OPR) and the ICE FOIA Office. UF 6. The program offices are typically

15  staffed with a designated point of contact ("POC") who is the primary person responsible

16  for communications between that program office and the ICE FOIA Office. *Id.* Each

17  POC is a person with detailed knowledge about the operations of his/her respective

18  program office. *Id.*

19        Upon receipt of a proper FOIA request, the ICE FOIA Office will identify which

20  program offices, based upon their experience and knowledge of ICE's program offices,

21  within ICE are reasonably likely to possess records responsive to that request, if any, and

22  task the relevant program offices with searches. UF 7. Once the ICE FOIA Office

23  determines the appropriate program offices for a given request, it provides the POCs

24  within each of those program offices with a copy of the FOIA request and instructs them

25  to conduct a search for responsive records. UF 8. The POCs then review the FOIA

26  request, along with any case-specific instructions that may have been provided and,

27  based on their experience and knowledge of their program office practices and activities,

28  forward the request and instructions to the individual employee(s) or component

3

office(s) within the program office that they believe are reasonably likely to have responsive records, if any. *Id.* In conformity with the ICE FOIA Office's instructions, the individuals and component offices are directed to conduct searches of their file systems, including both paper files and electronic files, which in their judgment, based on their knowledge of the manner in which they routinely keep records, would most likely be the files to contain responsive documents. UF 9. Once those searches are completed, the individuals and component offices provide any potentially responsive records to their program office's POC, who in turn, provides the records to the ICE FOIA Office. The ICE FOIA Office then reviews the collected records for responsiveness and the application of appropriate FOIA Exemptions. UF 10.

ICE employees maintain records in several ways. UF 11. ICE program offices use various systems to maintain records, such as investigative files, records regarding the operation of ICE programs, and administrative records. *Id.* ICE employees may store electronic records on their individual computer hard drives or their program office's shared drive (if the office uses one). UF 12. The determination of whether or not these electronic locations must be searched in response to a particular FOIA tasking, as well as how to conduct any necessary searches, is necessarily based on the manner in which the employee maintains his/her files. UF 13.

Additionally, all ICE employees have access to e-mail. ICE uses the Microsoft Outlook e-mail system. UF 14. Each ICE employee stores his/her files in the way that works best for that particular employee. UF 15. ICE employees use various methods to store their Microsoft Outlook e-mail files - some archive their files monthly, without separating by subject; others archive their e-mail by topic or by program; still others may create PST files of their emails and store them on their hard drive or shared drive. *Id.*

Records received by the ICE FOIA Office from the program office POCs are assigned to a FOIA processor who determines whether the records are responsive to the FOIA request. UF 16. If the records are responsive, the FOIA processor will redact information pursuant to the FOIA or Privacy Act, as appropriate, while simultaneously

4

ensuring that all reasonably segregated non-exempt information is released. *Id.*

Frequently, the ICE FOIA Office must coordinate between multiple program offices to ensure the program office records are properly redacted and information is correctly segregated. UF 17. Once the ICE FOIA Office completes its coordination efforts and all responsive records have been processed, the ICE FOIA Office releases the responsive records to the requestor. UF 18.

2.   <u>Description of Program Offices Tasked With Searching for Records in Response to Plaintiff's FOIA Request</u>

After reviewing the FOIA Request, and based on the information sought in the FOIA Request, the experience and knowledge of ICE's practices and activities and discussions with the Plaintiff, the ICE FOIA Office determined that because of the subject matter of the Request, OPR, various subcomponents of ERO, the Office of Regulatory Affairs and Policy ("ORAP"), and Homeland Security Investigations Joint Intelligence Operations Center ("JIOC") were the program offices likely to have responsive records (if such records existed). UF 19. At Plaintiff's request, the ICE FOIA Office also agreed to search the emails of former ICE Directors. UF 20. Therefore, based on their subject matter expertise and knowledge of the agency record systems, the ICE FOIA Office instructed these program offices to conduct a comprehensive search for records and to provide all potentially responsive records located during that search to the ICE FOIA Office for review and processing. UF 21. Accordingly, all locations likely to contain records responsive to the FOIA Request (to the extent that they exist within ICE's custody) were searched. UF 22. A full explanation of ICE's searches, including search terms and parameters, broken down by subpart, is included in the Pineiro Declaration and summarized below. *See* Pineiro Decl., ¶ ¶ 19-80.

Based on ICE's searches, a total of 53,426 pages of potentially responsive records were located, along with 911 pages of records referred to ICE from other departments. UF 23. Of those 53,426 pages, 21,153 pages and an Excel spreadsheet were determined to be responsive and produced to the Plaintiff. UF 24.

### III.  LEGAL STANDARD

FOIA cases are typically decided on motions for summary judgment because the facts are rarely in dispute. *See Minier v. Cent. Intelligence Agency*, 88 F.3d 796, 800 (9th Cir. 1996). Motions for summary judgment should be granted when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is any fact that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

### IV.  ARGUMENT

As explained in the concurrently filed Pineiro Declaration and below, ICE met its obligation by conducting an adequate search for records in response to Plaintiff's nine-part FOIA Request. *See* Pinero Decl., ¶¶ 18-81; UF 22.

"FOIA was enacted to facilitate public access to Government documents."  *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 973 (9th Cir. 2009) (quotation omitted). The statute represents a balance struck by Congress "between the right of the public to know and the need of the Government to keep information in confidence." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989).

As relevant to this motion, in FOIA cases, "[t]he adequacy of the agency's search is judged by a standard of reasonableness, construing the facts in the light most favorable to the requestor." *Citizens Comm'n on Hum. Rights v. State Dept*., 45 F.3d 1325, 1328 (9th Cir. 1995) (*citing Zemansky v. EPA*, 767 F.2d 569, 571 (9th Cir. 1985)).

"[T]he agency has a burden to demonstrate adequacy 'beyond material doubt.'" *Transgender Law Center v. Immigr. & Customs Enf't,* 46 F.4th 771, 779 (9th Cir. 2022) (citation omitted). The proper focus for this inquiry thus is "the reasonableness of [an agency's] methods, not the quantity or quality of documents it unearths." *Am. Oversight v. U.S. Dep't of Just.*, 401 F. Supp. 3d 16, 22 (D.D.C. 2019); *see also Hoffman v. U.S. Border Prot.*, 2023 WL 4237096, at *5 (E.D. PA. 2023) (Nor is a search's adequacy determined by its fruits.). An agency's search methods are sufficient so long as they "can

1  be reasonably expected to produce the information requested." *Oglesby v. U.S. Dep't of*

2  *Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).

3      "[T]he issue to be resolved is not whether there might exist any other documents

4  possibly responsive to the request, but rather whether the *search* for those documents

5  was adequate." *Weisberg v. U.S. Dep't of Just.*, 745 F.2d 1476, 1485 (D.C. Cir. 1984).

6  Accordingly, adequacy of a FOIA search is determined by whether it was "reasonably

7  calculated to discover the requested documents, not whether it actually uncovered every

8  document extant." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991).

9  As with all FOIA searches, courts must make a fact-specific determination regarding the

10  adequacy of the agency's search. *See, e.g., Inter-Coop. Exch. v. U.S. Dep't of Com.*, 36

11  F.4th 905, 912 n.3 (9th Cir. 2022) ("The government's response to a FOIA request is

12  context specific ...."); *see also Rubman v. U.S. Citizenship & Immigr. Servs.*, 800 F.3d

13  381, 387 (7th Cir. 2015) ("Reasonableness is a flexible and context-dependent

14  standard."); *DiBacco v. U.S. Dep't of the Army*, 795 F.3d 178, 191 (D.C. Cir. 2015) (an

15  agency "need not knock down every search design advanced by every requester[.]").

16      "An agency can demonstrate the adequacy of its search through 'reasonably

17  detailed, nonconclusory affidavits submitted in good faith.'" *Transgender Law Center*,

18  46 F.4th at 780 (quoting *Hamdan v. U.S. Dep't of Just.*, 797 F.3d 759, 770 (9th Cir.

19  2015)). Agencies must "appropriately respond to 'positive indications of overlooked

20  materials[,]'" *id.* (quoting *Hamdan*, 797 F.3d at 771), and have a "duty to follow

21  'obvious leads,'" *id.* (quoting *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325

22  (D.C. Cir. 1999)). Agency affidavits "need not set forth with meticulous documentation

23  the details of an epic search for the requested records," but they must "describe what

24  records were searched, by whom, and through what processes." *See Lawyers' Comm. for*

25  *C.R. of San Francisco Bay Area v. U.S. Dep't of the Treasury*, 534 F. Supp. 2d 1126,

26  1131 (N.D. Cal. 2008). (internal quotations omitted). Such affidavits are accorded "a

27  presumption of good faith, which cannot be rebutted by 'purely speculative claims about

28  the existence and discoverability of other documents.'" *SafeCard*, 926 F.2d at 1200.

Affidavits that describe what was searched and by whom are enough to establish an adequate search. *See Lawyers' Comm.*, 534 F. Supp. 2d at 1131. The Pineiro Declaration establishes that ICE has met its obligations under the FOIA with respect to the sufficiency of its searches in response to the FOIA Request.

For its part, Plaintiff advances two main arguments regarding the adequacy of ICE's search with respect to Parts 1-3, 5, 6-7, 8, and 9.[3]

On one hand, Plaintiff complains that ICE read its nine-part FOIA Request *too* broadly and thus used "overbroad search methods" which "have frequently resulted in significant numbers of irrelevant and duplicative documents." Dkt. 112 at 10. (ICE previously raised its concern about the broadness of the Request. *See* Dkt. 44 (Motion for Judgment on the Pleadings).) At no point did Plaintiff engage in narrowing of its Request. Instead, it repeatedly asked ICE to conduct further and additional searches, as explained below, while being non-committal as to whether it would forgo processing of certain requests long past the Court ordered deadline to advise ICE of its position. *See generally* Dkt. 103 at 5-6. Moreover, and in direct contradiction to Plaintiff's argument, ICE was required to interpret the request broadly. Plaintiff argued this very point previously in this litigation. *See* Dkt. 50 at 21 (citing *New Orleans Workers' Ctr. for Radical Just.* 373 F. Supp. 3d at 34)). Moreover, courts have held that a search is not reasonable if the agency itself interprets the scope of the request too narrowly. *See Pub. Emps. for Env't Resp. v. U.S. Int'l Boundary & Water Comm'n*, 842 F. Supp. 2d 219, 225 (D.D.C. 2012). Similarly, courts have found searches inadequate if the agency uses search terms that are too narrow and do not include "obvious synonyms and logical variations." *Jud. Watch, Inc. v. DOJ*, 373 F. Supp. 3d 120, 125 (D.D.C. 2019).

On the other hand, Plaintiff seeks summary judgment in its favor on the ground that ICE has failed to follow obvious leads. In support, Plaintiff cites only its own speculative statements that particular categories of documents were allegedly overlooked

---

[3]    Plaintiff does not challenge the sufficiency of ICE's search with respect to Part 4 of the Request as it offers no arguments to the contrary in its motion. *See* Dkt. 112.

and are "relevant" to its nine-part Request. But whether a document is relevant to a FOIA request is not the yardstick with which to measure the adequacy of an agency's search. *See, e.g., SafeCard,* 926 F.2d at 1201.

Taken together, the common theme running through Plaintiff's motion is that, because certain records were not produced or searches not run, the entirety of ICE's searches were insufficient. The Ninth Circuit has rejected such arguments. *See Hamdan v. U.S. Dep't of Justice*, 797 F.3d 759, 771 (9th Cir. 2015) ("But in a case we cited approvingly in *Lahr*, the Eighth Circuit rejected a FOIA requester's challenge that the State Department had conducted an inadequate search because the requester had repeatedly identified certain documents that were not located or released to him but were referenced in records that the State Department *did* release." (citing *Miller v. U.S. Dep't of State*, 779 F.2d 1378, 1384–85 (8th Cir. 1985) ("The fact that a document once existed does not mean that it now exists ... [and] the Department is not required ... to account for documents which the requester has in some way identified if it has made a diligent search for those documents in the places in which they might be expected to be found.")).

Plaintiff's arguments do not hold water and ICE's searches here were sufficient under the FOIA as explained in the Pineiro Declaration and below.

## A.    Parts 1-3

Parts 1-3 of the FOIA Request seeks documents related to the hospitalization, death, decisions regarding custody of four named individuals (Teka Gulema; Johana Medina Leon; Jose Ibarra Bucio; and/or Martin Vargas Arellano), as well as any related reports of investigation. *See* Dkt. 24-1 at 5-6.

ICE's search for records responsive to Parts 1-3 encompassed: (1) previous litigation files requesting records of the deceased individuals, (2) the Los Angeles Field Office, (3) the Office of Professional Responsibility ("OPR") External Reviews and Analysis Unit ("ERAU"), (4) the New Orleans Field Office Director, (5) the New Orleans Field Office Acting Deputy Field Office Director, (6) the New Orleans Field

9

Office Contracting Officer Representative, (7) a New Orleans Field Office Detention and Deportation Officer, (8) a New Orleans Field Office Supervisory Detention and Deportation Officer, (9) an Enforcement and Removals Operations IHSC Investigations Unit Program Manager, (10) a Field Medical Coordinator, (11) four Los Angeles Field Office Supervisory Deportation and Detention Officers, and (12) the Acting Field Office Director in the Los Angeles Field Office. *See* Pineiro Decl., ¶ 19.

Additionally, ICE searched for responsive records within the court file of one of the individuals named in the request: *Martin Vargas v. DHS, ICE* (Central District of California Case No. 22-cv-00287; ICE FOIA Tracking Number: 2022-ICLI-00031). *See* Pineiro Decl., ¶ 20. In addition, the Los Angeles and New Orleans Field Offices of ICE's Enforcement and Removal Operations ("ERO") were also searched. *Id.* ¶¶ 21-22. ERO manages all aspects of the immigration enforcement process and the four decedents had been detained at detention facilities in one of those areas of responsibility. *Id.* ERO personnel conducted at least eleven separate searches in August 2022, and records were found and processed. *Id.* ¶ 22(a)-(k). In addition, after conferring with Plaintiff, ICE agreed to a subsequent search of the former Los Angeles Field Office Director's email in October 2024 and used the terms requested by Plaintiff to identify additional records.[4] *Id.* ¶ 22 (l). The Office of Professional Responsibility ("OPR"), which is the ICE component that conducts Detainee Death Reviews ("DDRs"), also conducted searches in August 2021 and July 2022, but no records were located. *Id.* ¶¶ 23-26. Finally, in August 2022, a search of ERO ICE Health Services Corp ("IHSC"), which administers a detention health system and coordinates the off-site care also located documents that were processed. ¶¶ 27-28.

Plaintiff claims that ICE's search here was not sufficient because certain records, which Plaintiff believes exist and would be responsive, were not produced. *See* Dkt. 112

---

[4]    Although over 20,000 pages were identified in this search, Plaintiff waived production of all but 6 Significant Event Notification ("SEN") emails. *See* Pineiro Decl., ¶ 22.

at 15-17. But again, that is not the appropriate lens to view whether a search was sufficient under the FOIA. Indeed, "the adequacy of a search is judged 'not by the fruits of the search, but by the appropriateness of the methods used to carry out the search.'" *Transgender Law Center,* 46 F.4th at 780 (quoting *Iturralde v. Comptroller of Currency,* 315 F.3d 311, 315 (D.C. Cir. 2003)). To that end, "an agency is not required to account for documents which the requester has in some way identified if it has made a diligent search for those documents in the places in which they might be expected to be found…." *Id.* at 781 (citations omitted); *see also Lahr,* 569 F.3d at 988 ("[T]he failure to produce or identify a few isolated documents cannot by itself prove the searches inadequate.")

The Pineiro Declaration makes clear that ICE's search with respect to Parts 1-3 has been diligent and sufficient. *See* Pineiro Decl., ¶¶ 19-29.

## B.    Part 4

Part 4 of the FOIA Request seeks documents related to policies and procedures about the release from ICE custody of hospitalized detainees and detainees who, at the time of release, were patients in the care of external healthcare providers or facilities as well as those being treated for COVID-19. *See* Dkt. 24-1 at 6.

In response, the agency searched ERO IHSC, the Office of Regulatory Affairs and Policy ("ORAP"), emails of former ICE Directors and emails of three individuals from the ICE Office of the Director. *See* Pineiro Decl., ¶ 30. ICE's search also encompassed an August 2022 search for the Electronic Policy Development System for the search terms: transfer, discharge, covid-19, illness and medical care, which resulted in 27 pages being found, processed, and produced. *Id.*, ¶ 32. At Plaintiff's request, ICE also searched the emails of ICE Director Tae Johnson, Assistant Director of Policy Deborah Fleischaker and Assistant Director for Regulatory Affairs and Policy Scott Shuchart in July 2023. *Id.*, ¶ 33. This search resulted in approximately 530,000 documents. *Id.* Plaintiff then requested that the search be run in two separate parts, with the first part seeking the following terms and Boolean connectors: directive or policy or policies or

11

protocol or procedure or training or guidance or instruction or standard) AND (custody or death or died or deceased or decedent or discharge or surgery or specialist or COVID-19 or hospital or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal). *Id.*, ¶ 34. The results of that search were then searched with the following terms: (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision"). *Id.* This resulted in approximately 142,000 documents. Plaintiff ultimately decided not to pursue production of these documents. *Id.*

ICE also tasked the Office of Regulatory Affairs and Policy ("ORAP") with a search for records responsive to part 4 of the Request. *Id.*, ¶ 35. This included a December 2023 search by a policy subject matter expert who searched the ICE Policy Manual, the ICE intranet, her desktop, hard drive, shared drive and Outlook folders. *Id.* The search resulted in 16 pages of records found, which were processed and produced. *Id.*

Additionally, in October 2024, at the request of Plaintiff, ORAP conducted a second search where a policy subject matter expert searched the ICE Policy Manual, the ICE intranet, her desktop, hard drive, shared drive, and Outlook folders for the terms: 11003.4, critical condition, hospice, death, intensive care, terminal, life support, ICE and release. *Id.*, ¶ 38. No records were found. *Id.*

After again conferring with Plaintiff, it was agreed that ICE would request that ORAP conduct a third search of agreed upon search terms. On October 11, 2024, ORAP was asked to search for the following search terms: death, life support, critical condition, intensive care, ICU and hospice. *Id.*, ¶ 39. The time period for the search was January 1, 2016 through the present. *Id.* ORAP was also asked to provide ICE Directive 11003.4. *Id.* As a result of this search, three documents which totaled over 1,700 pages. *Id.* The records were processed and produced along with ICE Directive 11003.4. *Id.*

As set forth above and in the Pineiro Declaration, ICE's search for records responsive to Part 4 was sufficient. *See id.,* ¶¶ 30-39.

## C.    Part 5

Part 5 of the FOIA Request seeks documents in possession of ICE Leadership, ERO, IHSC, and ORAP that identify detainees released from custody while hospitalized, in full-time care of external healthcare providers or facilities, or released from custody immediately prior to transfer to an emergency room, hospital, or external care facility. Dkt. 24-1 at 6.

ICE's search for records responsive to Part 5 included ERO IHSC and OPR based on the experience and knowledge of ICE's practices and activities, and discussions between the parties. Pineiro Decl., ¶ 40.

OPR reported that it did not collect significant incident reports ("SIRs") or significant event notifications ("SENs") but instead only maintains death reports and case notes for detainees who die *in* ICE custody. *Id.*, ¶ 41. That is because once a detainee is transferred out of ICE custody, then it is not within OPR's scope to do a detainee death review. *Id.* However, if a detainee is transferred to an external health care provider but still in ICE custody, then OPR would have records. *Id.*

In August 2023, the Assistant Director of IHSC conducted a search of his desktop, shared drive, and Outlook folders for agreed upon terms and then, after obtaining search results, entered and searched specific Boolean connectors at Plaintiff's request. *Id.*, ¶¶ 42-13. This search resulted in 551 pages, which were processed and produced. *Id.*, ¶ 44.

In November 2023, ICE FOIA sent an email to the Deputy Chief of Staff of IHSC inquiring whether she was aware of the existence of a spreadsheet or list of some sort that identifies detainees who were released from custody while (a) hospitalized (including for COVID-19 treatment); (b) in the full-time care of external healthcare providers or facilities (including for COVID-19 treatment), or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility.

1    She reported that IHSC does not maintain such a list. *Id.*, ¶ 45. For its part, the ERO

2    Information Disclosure Unit noted that potentially responsive records could only be

3    discovered through the creation of a list of detainees. *Id.*, ¶ 46.

4          Plaintiff further requested that ICE search for records related to the Significant

5    Detainee Illness ("SDI") meetings and list. To that end, Plaintiff's challenge to the

6    sufficiency of ICE's search with respect to part 5 is pointed at ICE's SDI meetings and

7    list. In Plaintiff's view, "ICE's refusal to search for and produce records related to the

8    SDI list and SDI meetings is unreasonable." Dkt. 112 at 20. But as ICE has explained

9    repeatedly to Plaintiff, this request is burdensome as there are 233 IHSC employees who

10   participated in the SDI process from 2016 to present. Pineiro Decl., ¶ 47; *see also* Dkt.

11   74 at 3-4 (same). The number of ICE employees that were part of the Medical Case

12   Management Unit from 2016 to present is 376. *Id.* Plaintiff claims that it proposed a way

13   to narrow what they sought but this is not accurate. *See* Dkt. 112 at 19 (citing Dkt. 112-4

14   at 50-51). Rather, Plaintiff's proposal was for ICE to "conduct a search of ICE

15   (including IHSC, ICE ERO Field Operations, and OPLA) staff who participate in SDI

16   meetings, as well as *any* custodian who possesses the SDI list." Dkt. 112-4 at 50-51

17   (emphasis added). But, as noted above, that list includes hundreds of individuals. Thus,

18   Plaintiff's demand that ICE conduct such a search is unreasonably burdensome. Courts

19   have held that agencies are not required to conduct wide-ranging, "unreasonably

20   burdensome" searches for records. *See, e.g.*, *AFGE v. Dep't of Com.*, 907 F.2d 203, 209

21   (D.C. Cir. 1990) ("An agency need not honor a request that requires 'an unreasonably

22   burdensome search.'" (quoting *Goland v. CIA*, 607 F.2d 339, 353 (D.C. Cir. 1978))).

23         ICE's search for records responsive to Part 5 was thus adequate as explained

24   above and in the Pineiro Declaration. *See* Pineiro Decl., ¶¶ 40-47.

25       **D.**    **Parts 6-7**

26         As relevant here, Parts 6-7 of the FOIA Request seeks documents, including SIRs,

27   SENs, or other documents created by ICE OPR that mention the death or release from

28   custody of hospitalized detainees, detainees who at the time of release were patients in

the care of external healthcare providers, or detainees released from custody immediately prior to transfer to an emergency room, hospital, or external care facility. *See* Dkt. 24-1 at 6-7.

In response to Parts 6 and 7, ICE searched OPR, ERO IHSC, HSI Joint Intelligence Operations Center ("JIOC"), ERO Custody Management, and ERO Field Operations based on the experience and knowledge of ICE's practices and activities, and discussions between the parties. Pineiro Decl., ¶¶ 48 & 62.

In August 2023 a Section Chief at OPR conducted a search of her desktop, hard drive and shared drive, as well as her Outlook folders using the terms agreed upon by the Plaintiff that did not return any responsive records other than ICE Directive 11003.5, which was produced. *Id.*, ¶ 49. Additionally, also in August 2023, a Management and Program Analyst with OPR conducted a search of the Office of Detention Oversight Inspection Modernization System ("ODO IMS"), as well as his desktop, shared drive, hard drive and Outlook folders using the search terms agreed upon by the Plaintiff. *Id.*, ¶ 50. This search did not return any responsive records. *Id.*

The Unit Chief for OPR ICE Inspections sent an email in August 2023 explaining that while the term "death" was searched and was identified in several records within the system, when associated with the specific requests in Parts 6 and 7, there were no responsive records as the scope of ODO inspections does not extend to released detainees. *Id.*, ¶ 66.

In December 2023, OPR was again tasked to search for records responsive to Part 6 of the Request and responded that they had no responsive records because the individuals noted in the Request did not die in ICE custody. *Id.*, ¶ 55.

In January 2024, the Chief of IHSC's Investigations Unit conducted a search of her shared drive and Outlook folders but did not find any records. *Id.*, ¶ 56. Also in January 2024, a Managed Care Coordinator with ERO IHSC conducted a search of Excel spreadsheets in her shared drive as well as a search of her Outlook folders. Records were found and processed. *Id.*, ¶ 57.

15

The ICE FOIA Office also tasked the Custody Programs Division with conducting a search for records responsive to Part 6. *Id.*, ¶ 58. It did so because the Custody Programs Division is a subset of the Custody Management Division, which provides policy and oversight of those in ICE custody and manages ICE detention operations. *Id.* The Custody Programs Division develops and promotes best practices in civil detention and enforcement initiatives by providing policy support, facilitating the implementation of applicable ICE directives, and expanding ERO's capacity to manage special populations. *Id.* To that end, in January 2024, the Acting Deputy Assistant Director of the ERO Custody Programs Division conducted a search of his desktop, shared drive and hard drive. *Id.* The Acting Director noted that Custody Management does not manage SIRs or SENs and deferred to Field Operations. *Id.*

The ERO Field Operations Division provides guidance to and coordination among ICE ERO's 25 field offices across the nation. *Id.*, ¶ 60. They oversee, direct and coordinate all ERO Field Operations activities throughout the nation's field offices and sub-offices. *Id.* In January 2024, a Mission Support Specialist with ERO Field Operations reviewed the Request and in mid-January 2024, provided an email stating that Field Operations does not maintain data in relation to the Request. *Id.*, ¶ 61.

Plaintiff complains that ICE's search was not sufficient as they charge that ICE has refused to require JIOC to search. Dkt. 112 at 22. That is not accurate nor is its characterization of the agency's position as "Kafkaesque" well-taken. *Id.* Rather, it evinces a fundamental misunderstanding of how the JIOC operated.

As explained in the Pineiro Declaration, in December 2023, ICE tasked the JIOC "to conduct a search for documents responsive to Subparts 6 and 7." Pineiro Decl., ¶ 67; *see also* Dkt. 74 at 5 ("That search was tasked…."). This is much different than refusing to search.

In response to the tasking, "JIOC responded that it was not the owner of the data points requested and it deferred the request to ERO Custody Management and ERO IHSC." *Id.* ICE addressed Plaintiff's arguments regarding a search of the JIOC a year

16

ago. *See* Dkt. 74 at 5. As explained then,

> after reviewing the search, JIOC deferred its tasking (as they are authorized to do within their discretion) to the Office of Enforcement and Removal Operations (ERO). JIOC deferred the search because the information it receives originates with ERO. As for ERO, it cannot search for SIRs or SENs that fall within Plaintiff's request unless ERO is provided with a name or some type of identifying information. Even if JIOC were to conduct a search for such SIRs and SENs, they too would need identifying information. Without identifying information, neither JIOC nor ERO would be able to find documents that mention the release from custody of (a) hospitalized detainees; (b) detainees who at the time of release were patients in the care of external healthcare providers or facilities; or (c) detainees released from custody immediately prior to transfer to an emergency room, hospital, or external care facility.
> *Id.*; *see also* Dkt. 74-1.

Moreover, summaries are not stored in one place. Pineiro Decl., ¶ 53. They are moved from emails to the Daily Enforcement Activity Report ("DEAR") system. *Id.* There is one DEAR for every 24-hour period. *Id.* In order to search this system, someone would have to go in and check search terms for each individual day. *Id.* Additionally, the system does not keep track of when individuals are released from custody. *Id.*

To this end, requiring JIOC to search for records it says it does not have would be futile such that no search is required. *See, e.g., Whitaker v. Dep't of Com.*, 970 F.3d 200, 207 (2d Cir. 2020) ("[W]here the Government's declarations establish that a search would be futile, the reasonable search required by FOIA may be no search at all.'" (quoting *MacLeod v. DHS*, 2017 WL 4220398, at *11 (D.D.C. Sept. 21, 2017))).

As explained above and in the Pineiro Declaration, ¶¶ 48-70, ICE's search for records responsive to Parts 6 and 7 was adequate.

### E.    Part 8

Part 8 of the FOIA Request seeks documents related to those that identify detainees who were hospitalized or transferred from detention for off-site medical care due to COVID-19, and were subsequently released from custody while hospitalized, or detainees who were released from custody immediately prior to transfer to an emergency room, hospital, or external care facility to receive treatment for COVID-19. Dkt. 24-1 at

17

7.

With respect to Part 8, ICE searched ERO IHSC based the experience and knowledge of ICE's practices and activities, and discussions between the parties. Pineiro Decl., ¶ 71. On August 21, 2023, Dr. Stewart Smith, Assistant Director of IHSC, conducted a search of his desktop, hard drive, shared drive, and Outlook folder using search terms agreed upon with the Plaintiff. *Id.*, ¶ 72. Once search results were obtained, Plaintiff's requested Boolean connectors were used. *Id.*, ¶ 73. Approximately 1,711 pages were found, processed, and produced. *Id.*

Plaintiff now claims that ICE should search for documents located within the *Fraihat v. ICE* litigation. Dkt. 112 at 23-24. Aside from the fact that the Plaintiff did not request these documents in the original FOIA request, the Office of the Principal Legal Advisor ("OPLA") at ICE continues to litigate the *Fraihat* case and has done so since the beginning of the pandemic. Pineiro Decl., ¶ 74. OPLA has not been responsible for tracking hospitalizations or releases of detainees. *Id.* To the extent such records *might* exist, OPLA has no way of searching for such records and they would have no way of knowing if a detainee had been released while hospitalized with COVID. *Id.* The only way to find out which detainees were released would be to cross compare with ERO records, but this is not required under the FOIA. *See Hall & Assocs. v. EPA,* 83 F. Supp. 3d 92, 102 (D.D.C. 2015) ("an agency is not required to 'answer questions disguised as a FOIA request,' . . . nor conduct research in response to a FOIA request.") (citations omitted). Lastly, OPLA noted that most of the reporting and discovery required under *Fraihat* was done under protective order. Pineiro Decl., ¶ 74.

Moreover, ICE represented that "*if* documents pertaining to *Fraihat* appear in the responsive records, then they will be produced. ICE will not search for "*Fraihat* records" simply because Plaintiff chose to add this request on later. *See Miller v. Casey*, 730 F.2d 773, 777 (D.C. Cir. 1984) (emphasizing that agency is required to read FOIA request as drafted, "not as either [an] agency official or [requester] might wish it was drafted")[.]" *See* Dkt. 112-4 at 74.

As explained above and in the Pineiro Declaration, ¶¶ 70-74, ICE's search for records responsive to Parts 8 was adequate.

**F.    Part 9**

Part 9 of the FOIA Request seeks documents related to those reflecting payments made for the healthcare for any detainee who was released from custody while hospitalized or a patient in the care of an external healthcare provider or facility, and communications about such bills, invoices, charges, or records of payment. Dkt. 24-1 at 7.

In response to Part 9, and based on the experience and knowledge of ICE's practices and activities, and discussions between the parties, ICE searched ERO IHSC, the IHSC Resource Management Unit ("RMU") and the IHSC Health Plan Management Unit ("HPMU"). Pineiro Decl., ¶ 75.

In August 2022, a health informaticist with ERO IHSC conducted a search of Sharepoint and eClinicalWorks for the alien numbers and referral authorization numbers of the four decedents identified in the FOIA request. *Id.*, ¶ 76. A spreadsheet was found and produced. *Id.*

After being tasked to search and provided specific terms, the HPMU reported that it could not "search for the information sought in subpart 9 without specific names." *Id.*, ¶ 80. It recommended tasking the Regional Health Service Administrator ("HSA") and the Regional Field Medical Coordinator ("FMC"). *Id.* These units were tasked on November 2023, and just one individual stated that they had over 16,000 emails. *Id.* While the FMCs and HSAs were separately tasked with running a search agreed to by the parties in November 2023, *see* Dkt. 112-4 at 75, both the FMCs and HSAs stated that such a search was too broad and overburdened their systems, causing them to crash. *Id.* The issue was discussed with the FMCs and HSAs and on January 3, 2024, and it was determined that they would not be able to identify information responsive to subpart 9 without searching for specific names. *Id.* Nonetheless, as the HPMU had the names of the four decedents identified in the Request, they were able to provide an Excel

19

1    spreadsheet with claims information for all 4 decedents. *Id.*, ¶ 81. That spreadsheet was

2    processed. *Id.*

3        Plaintiff complains that ICE's search with respect to Part 9 was not sufficient

4    because it alleges certain custodians were not searched. *See* Dkt. 112 at 27. But as ICE

5    has explained, it cannot search for or locate bills without names of individual detainees.

6    There is no generalized list of detainees from which it may assemble a list of names and

7    then conduct searches. Rather, in order to run such a search, ICE needs the names of

8    specific detainees, which, other than the four decedents identified in the Request,

9    Plaintiff has never provided. Nor is ICE required under the FOIA to create such a list and

10    then conduct searches. *See Inst. for Just. v. Internal Revenue Serv.*, 941 F.3d 567, 569

11    (D.C. Cir. 2019) ("FOIA imposes no duty on agencies to create new records in response

12    to FOIA requests."); *see also Ctr. for Investigative Reporting v. U.S. Dep't of Just.*, 14

13    F.4th 916, 937 (9th Cir. 2021).

14        As explained above and in the Pineiro Declaration, ICE's search was sufficient for

15    Part 9. *See also* Pineiro Decl., ¶¶ 75-81.

16    **V.    CONCLUSION**

17        For the reasons discussed above, Defendant ICE requests that the Court grant this

18    motion and enter judgment in its favor and deny Plaintiff's Motion (Dkt. No. 112).

19

20

21

22

23

24

25

26

27

28

Dated: March 19, 2025

Respectfully submitted,

JOSEPH T. MCNALLY
Acting United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section

/s/ *Joseph W. Tursi*
JOSEPH W. TURSI
JASON K. AXE
Assistant United States Attorneys

Attorneys for Defendant U.S. Immigration and Customs Enforcement

## **CERTIFICATE OF COMPLIANCE WITH L.R. 11-6.2**

The undersigned, counsel of record for Defendant, certifies that the memorandum of points and authorities contains 6,954 words, which complies with the word limit of L.R. 11-6.1.

Dated: March 19, 2025

/s/ *Joseph W. Tursi*
JOSEPH W. TURSI
Assistant United States Attorney