JOSEPH T. MCNALLY
Acting United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, Complex and Defensive Litigation Section
JOSEPH W. TURSI (Cal. Bar No. 300063)
JASON K. AXE (Cal, Bar No. 187101)
Assistant United States Attorneys
        Federal Building, Suite 7516
        300 North Los Angeles Street
        Los Angeles, California 90012
        Telephone: (213) 894-3989 | 8790
        Facsimile: (213) 894-7819
        E-mail: Joseph.Tursi@usdoj.gov
                Jason.Axe@usdoj.gov

Attorneys for Defendant U.S.
Immigration and Customs Enforcement

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF SOUTHERN CALIFORNIA, | No. 2:22-cv-04760-SHK |
| Plaintiff, | **DECLARATION OF FERNANDO PINEIRO** |
| v. | |
| UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, et al., | Honorable Shashi H. Kewalramani United States Magistrate Judge |
| Defendants. | |

I, Fernando Pineiro, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.     I am the FOIA Director of the U.S. Immigration and Customs Enforcement ("ICE") Freedom of Information Act Office (the "ICE FOIA Office"). The ICE FOIA Office is responsible for processing and responding to all Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and Privacy Act, 5 U.S.C. § 552a (the Privacy Act), requests received at ICE. I have held this position since August 14, 2022, and I am the ICE official immediately responsible for supervising ICE responses to requests for records under the FOIA, the Privacy Act, and other applicable records access statutes and regulations. Prior to this position, I was the Deputy FOIA Officer of the ICE FOIA Office from December 29, 2013, to August 13, 2022, and prior to that I was the FOIA Officer for three years at the Office for Civil Rights and Civil Liberties ("CRCL") at the U.S. Department of Homeland Security ("DHS"). The ICE FOIA office mailing address is 500 12th Street, S.W., STOP 5009, Washington, D.C. 20536-5009.

2.     As the FOIA Director, my official duties and responsibilities include the general management, oversight, and supervision of the ICE FOIA Office regarding the processing of FOIA and Privacy Act requests received at ICE. In connection with my official duties and responsibilities, I am familiar with ICE's procedures for responding to requests for information pursuant to the FOIA and the Privacy Act.

3.     I make this declaration in my official capacity in support of Defendant ICE's Motion for Summary Judgment in the above-captioned action and based on my personal knowledge, my review of records kept by ICE in the ordinary course of business, and information provided to me by other ICE employees in the course of my official duties.

## I.     PROCEDURAL HISTORY OF THE PLAINTIFF'S FOIA REQUEST AND THE INSTANT LITIGATION

4.     Plaintiff American Civil Liberties Union Foundation of Southern California ("Plaintiff" or "ACLU of SoCal") submitted a FOIA request, dated April 29, 2022 (the "Request"), by email on May 2, 2022, to the U.S. Immigration and Customs

Enforcement ("ICE"), the Department of Homeland Security Office of Inspector General ("DHS OIG"), and the Department of Homeland Security Privacy Office ("DHS PRIV"). The nine-part Request specifically sought:

1. Any and all documents, without limitation to date, including any communications, investigatory reports, and any and all exhibits, appendices, or attachments thereto, relating to the hospitalization, death, decision to release from custody, or release from custody of the following individuals: Teka Gulema; Johana Medina Leon; Jose Ibarra Bucio; and/or Martin Vargas Arellano.

2. Any and all DHS OIG reports of investigation that are identified in any of the records responsive to Request #1. This includes any and all exhibits, appendices, or attachments to the DHS OIG reports of investigation.

3. Any and all ICE OPR reports of investigation that are identified in any of the records responsive to Request #1. This includes any and all exhibits, appendices, or attachments to the DHS OPR reports of investigation.

4. Any and all documents and communications, including ICE and IHSC directives, policies, procedures, protocols, or trainings that contain guidance, instructions, or standards about the release from custody of (a) hospitalized detainees; (b) detainees who at the time of release were patients in the care of external healthcare providers or facilities. Detainees specified in (a) and (b) above shall include those being treated for COVID-19 during their hospitalization or treatment at external healthcare providers or facilities.

5. Spreadsheets, emails, documents, communications, databases, lists, and other data compilations in the possession of ICE Leadership, ICE Enforcement and Removal Operations, ICE Health Services Corps, and ICE Office of Professional Responsibility that identify detainees who were released from custody while (a) hospitalized (including for COVID-19 treatment); (b) in the full-time care of external healthcare providers or facilities (including for COVID-19 treatment), or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility. Requested materials include, but are not limited to, dates of hospitalization of detainees, dates of hospital or external care facility discharge, name of treated detainees' detention facilities, and reasons for detainees' hospitalization or external medical care. These materials should further include Medical Transfer Summary documents from DHS's her

System and Alien Medical Records System, and any versions of the
Significant Detainee Illness Spreadsheet that identify detainees who were
released from custody while (a) hospitalized (including for COVID-19
treatment); (b) in the care of external healthcare providers or facilities
(including for COVID-19 treatment); or (c) released from custody
immediately prior to transfer to an emergency room, hospital, or external
care facility.

6. Spreadsheets, emails, significant incident reports (SIRs), significant event
notification reports (SENs), or documents created by DHS OIG or ICE OPR
that mention the release from custody of (a) hospitalized detainees; (b)
detainees who at the time of release were patients in the care of external
healthcare providers or facilities; or (c) detainees released from custody
immediately prior to transfer to an emergency room, hospital, or external
care facility.

7. Spreadsheets, emails, SIRs, SENs, or documents created by DHS OIG or
ICE OPR that mention the death of any detainee who had been previously
released from custody while (a) hospitalized; or (b) a patient in the care of
an external healthcare provider or facility; or (c) released from custody
immediately prior to transfer to an emergency room, hospital, or external
care facility.

8. Any and all documents, communications, and other records, including
databases, spreadsheets, lists, and other data compilations, that identify
detainees who were hospitalized or transferred from detention for off-site
medical care due to COVID-19, and were subsequently released from
custody while hospitalized, or detainees who were released from custody
immediately prior to transfer to an emergency room, hospital, or external
care facility to receive treatment for COVID-19. Requested information
includes, but is not limited to, dates of hospitalization, detention facility,
medical condition/reason for hospitalization or treatment, name and location
of hospital, date of return to detention (if any), date of release from custody
or issuance of order of recognizance (if any), and/or reason for release from
custody.

9. Bills, invoices, charges, or records of payment that reflect payments
made for healthcare for any detainee who was released from custody while
(a) hospitalized; or (b) a patient in the care of an external healthcare
provider or facility, and communications about such bills, invoices,
charged, or records of payment.

3

5.      On May 16, 2022, the ICE FOIA Office sent Plaintiff a letter acknowledging receipt of the FOIA request. It was assigned tracking number 2022-ICFO-16321.

6.      Plaintiff filed its initial Complaint on July 12, 2022 [Dkt. 1] and its First Amended Complaint on October 4, 2022 [Dkt. 24].

7.      Defendant ICE issued interim production responses monthly from November 2022 through February 2025.

8.      This declaration provides a description of ICE's search in response to Plaintiff's FOIA request.

## II.    ICE'S STANDARD PROCEDURE FOR INITIATING SEARCHES IN RESPONSE TO FOIA REQUESTS.

9.      When the ICE FOIA Office receives a FOIA request, the intake staff evaluates it to determine if it is a proper FOIA request per DHS FOIA regulation 6 C.F.R. § 5.3. Generally, a FOIA request is considered proper and in compliance with DHS regulations if it reasonably describes the records sought and the records are under the purview of ICE.

10.     Proper FOIA requests are entered into a database known as Secure Release and assigned a case tracking number. Based upon the requestor's description of the records being sought and ICE FOIA's knowledge of the various program offices' missions, the ICE FOIA Office identifies the program office(s) likely to possess responsive records and tasks the appropriate program office(s) to conduct the necessary searches.

11.     ICE records are maintained by leadership offices and/or within ICE directorates, including but not limited to, the Office of Public Affairs ("OPA"), the Office of Enforcement and Removal Operations ("ERO"), the Office of Professional Responsibility ("OPR") and the ICE FOIA Office. The program offices are typically staffed with a designated point of contact ("POC") who is the primary person responsible for communications between that program office and the ICE FOIA Office. Each POC is

a person with detailed knowledge about the operations of his/her respective program office.

12.    Upon receipt of a proper FOIA request, the ICE FOIA Office will identify which program offices, based upon their experience and knowledge of ICE's program offices, within ICE are reasonably likely to possess records responsive to that request, if any, and task the relevant program offices with searches. Once the ICE FOIA Office determines the appropriate program offices for a given request, it provides the POCs within each of those program offices with a copy of the FOIA request and instructs them to conduct a search for responsive records. The POCs then review the FOIA request, along with any case-specific instructions that may have been provided and, based on their experience and knowledge of their program office practices and activities, forward the request and instructions to the individual employee(s) or component office(s) within the program office that they believe are reasonably likely to have responsive records, if any. In conformity with the ICE FOIA Office's instructions, the individuals and component offices are directed to conduct searches of their file systems, including both paper files and electronic files, which in their judgment, based on their knowledge of the manner in which they routinely keep records, would most likely be the files to contain responsive documents. Once those searches are completed, the individuals and component offices provide any potentially responsive records to their program office's POC, who in turn, provides the records to the ICE FOIA Office for processing. The ICE FOIA Office then reviews the collected records for responsiveness and the application of appropriate FOIA Exemptions.

13.    ICE employees maintain records in several ways. ICE program offices use various systems to maintain records, such as investigative files, records regarding the operation of ICE programs, and administrative records. ICE employees may store electronic records on their individual computer hard drives or their program office's shared drive (if the office uses one). The determination of whether or not these electronic locations must be searched in response to a particular FOIA tasking, as well as how to

conduct searches, is necessarily based on the manner in which the employee maintains his/her files.

14.    Additionally, all ICE employees have access to e-mail. ICE uses the Microsoft Outlook e-mail system. Each ICE employee stores his/her files in the way that works best for that particular employee. ICE employees use various methods to store their Microsoft Outlook e-mail files - some archive their files monthly, without separating by subject; others archive their e-mail by topic or by program; still others may create PST files of their emails and store them on their hard drive or shared drive.

15.    Records received by the ICE FOIA Office from the program office POCs are assigned to a FOIA processor who determines whether or not the records are responsive to the FOIA request. If the records are responsive, the FOIA processor will redact information pursuant to the FOIA or Privacy Act, as appropriate, while simultaneously ensuring that all reasonably segregated non-exempt information is released.

16.    Frequently, the ICE FOIA Office must coordinate between multiple program offices to ensure the program office records are properly redacted and information is correctly segregated. Once the ICE FOIA Office completes its coordination efforts and all responsive records have been processed, the ICE FOIA Office releases the responsive records to the requestor.

III.    **DESCRIPTION OF PROGRAM OFFICES TASKED WITH SEARCHING FOR RECORDS IN RESPONSE TO PLAINTIFF'S FOIA REQUESTS**

17.    ICE is the principal investigative arm of DHS and the second largest investigative agency in the federal government. Created in 2003 through a merger of the investigative and interior enforcement elements of the U.S. Customs Service and the Immigration and Naturalization Service, ICE now employs more than 20,000 people in offices in every state and in 48 foreign countries.

18.    After reviewing the Request, and based on the information sought in the

Request, the experience and knowledge of ICE's practices and activities and discussions with the Plaintiff, the ICE FOIA Office determined that because of the subject matter of the Request, OPR, various subcomponents of ERO, the Office of Regulatory Affairs and Policy ("ORAP"), and Homeland Security Investigations Joint Intelligence Operations Center ("JIOC") were the program offices likely to have responsive records (if such records existed). The ICE FOIA Office also agreed to search the emails of former ICE Directors at Plaintiff's request. Therefore, based on their subject matter expertise and knowledge of the agency record systems, the ICE FOIA Office instructed these program offices to conduct a comprehensive search for records and to provide all potentially responsive records located during that search to the ICE FOIA Office for review and processing. Accordingly, and based on the information described below, all locations likely to contain records responsive to the Request (to the extent that they exist within ICE's custody) were searched.

### Subparts 1 Through 3

19.     Based on the information sought in the Request, and discussions between the parties, with respect to subparts 1 through 3 of the Request, ICE searched the following: (1) previous litigation files requesting records of the deceased individuals, (2) the Los Angeles Field Office, (3) the Office of Professional Responsibility ("OPR") External Reviews and Analysis Unit ("ERAU"), (4) the New Orleans Field Office Director, (5) the New Orleans Field Office Acting Deputy Field Office Director, (6) the New Orleans Field Office Contracting Officer Representative, (7) a New Orleans Field Office Detention and Deportation Officer, (8) a New Orleans Field Office Supervisory Detention and Deportation Officer, (9) an Enforcement and Removals Operations IHSC Investigations Unit Program Manager, (10) a Field Medical Coordinator, (11) four Los Angeles Field Office Supervisory Deportation and Detention Officers, and (12) the Acting Field Office Director in the Los Angeles Field Office. The results of those searches are set forth below.

20.     The first search that was undertaken was for responsive records within the

file of *Martin Vargas v. DHS, ICE* (Central District of California Case No. 22-cv-00287;
ICE FOIA Tracking Number: 2022-ICLI-00031). Within that case file, 2,444 pages of
responsive records were found and produced. The same 2,444 pages of records were
produced in the instant matter.

21.    The Office of Enforcement and Removal Operations ("ERO") was also
searched. ERO manages all aspects of the immigration enforcement process, including
the identification, arrest, detention and removal of aliens who are subject to removal or
are unlawfully present in the U.S. ERO maintains 25 field offices across the nation.

22.    The Los Angeles Field Office and the New Orleans Field Office of ERO
were searched due to the four decedents being detained at detention facilities in one of
those areas of responsibility. As a result, the following individuals conducted searches:

a)    On August 15, 2022, a Supervisory Detention and Deportation Officer in
the New Orleans Field Office conducted a search of his desktop, hard drive, shared drive
and Outlook folders for the terms: Teka and Gulema. Records were found and processed.

b)    On August 16, 2022, the Acting Field Office Director from the Los Angeles
Field Office conducted a search of his desktop, hard drive, shared drive and Outlook
folders for the terms: release and Vargas, release and death, release and hospital, release
and Ibarra, Ibarra Bucio and Vargas Arellano. Records were found and processed.

c)    On August 16, 2022, a Supervisory Detention and Deportation Officer in
the Los Angeles Field Office searched his desktop, hard drive, shared drive and Outlook
folders for the terms: Arellano, Vargas Arellano, 205718808, 808 and Jose Ibarra Bucio.
Records were found and processed.

d)    On August 19, 2022, a Supervisory Detention and Deportation Officer in
the New Orleans Field Office conducted a search of his desktop, hard drive, shared drive
and Outlook folders for the terms: Teka, Gulema and Teka Gulema. Records were found
and processed.

e)    On August 22, 2022, the Acting Field Office Director from the Los Angeles
Field Office, searched his desktop, hard drive, shared drive and Outlook folders for the

terms "Vargas-Arellano, Martin" and "Ibarra-Bucio, Jose." Records were found and processed.

f)      On August 22, 2022 a Supervisory Detention and Deportation Officer in the Los Angeles Field Office searched his desktop, hard drive, shared drive and Outlook folders for the terms: Teka Gulema, Johana Medina Leon, Jose Ibarra Bucio and Martin Vargas Arellano. Records were found and processed.

g)      On August 22, 2022, a Supervisory Detention and Deportation Officer from the Los Angeles Field Office searched his Outlook folders for the terms: Arellano, Jose Ibarra Bucio, SEN, SIR, Bucio and Martin Vargas Arellano. Records were found and processed.

h)      On August 23, 2022, a Supervisory Detention and Deportation Officer from the Los Angeles Field Office searched her Outlook folders using the terms: Arellano, Ibarra Bucio, Arellano-Vargas and Ibarra. Records were found and processed.

i)      On August 24, 2022, the Acting Deputy Field Office Director in the New Orleans Field Office conducted a search of his desktop, hard drive, shared drive and Outlook folders for the term: Gulema. Records were found and processed.

j)      On August 24, 2022, the Contracting Officer Representative in the New Orleans Field Office ran a search of his desktop, hard drive, shared drive and Outlook folders for the term: Teka Gulema. Records were found and processed.

k)      On August 26, 2022, a Field Medical Coordinator in the New Orleans Field Office conducted a search of his desktop, hard drive, shared drive and Outlook folders for the terms: Teka Gulema and 028021556. Records were found and processed.

l)      After conferring with Plaintiff, ICE agreed to obtain the emails of the former Los Angeles Field Office Director for the time period of June 30, 2015 through March 30, 2016. In October 2024, at Plaintiff's request, these emails were searched for the following terms:

"Headquarters Removal and International Operations" or "HQRIO" and "Gulema."

"Post Order Custody Review" or "POCR" and "Gulema."

"ICE Health Service Corps," or "IHSC," and "Gulema."

"HQ ERO Domestic Operations"

This search resulted in over 20,000 pages. Plaintiff agreed to waive production of all but 6 Significant Event Notification (SEN) emails that were included in the search results from the time period of November 19, 2015 through November 30, 2015, which equated to approximately 1,185 pages. Plaintiff also agreed to waive production of approximately 25,000 pages of records pertaining to Mr. Gulema.

23.    The ICE FOIA Office also determined that OPR might be in possession of potentially responsive records. OPR is responsible for investigating allegations of employee misconduct impartially, independently, and thoroughly. OPR prepares comprehensive reports of investigation for judicial or management action. OPR inspects and reviews ICE offices, operations and processes in order to provide executive management with an independent review of the agency's organizational health and assess the effectiveness and efficiency of the overall ICE mission.

24.    The OPR ERAU conducts Detainee Death Reviews (DDRs), which are independent, objective examinations of the facts and circumstances surrounding the detention and death of an individual in ICE custody to determine whether the agency and detention facility complied with detention standards related to the individual's health, safety, and security.

25.    On August 19, 2021, the Section Chief from the OPR ERAU conducted a search of his desktop, hard drive, shared drive and Outlook folders for the terms: Teka Gulema, Johana Medina Leon, Jose Ibarra Bucio, Martin Vargas Arellano, Etowah County Detention Center, Otero County Processing Center, Adelanto ICE Processing Center, Riverview Medical Center, Del Sol Medical Center, Loma Linda University Medical Center, and St. Jude Medical Center. No responsive records were found.

26.    On July 21, 2022, OPR was again tasked with conducting a search. No responsive records were found.

27. It was determined that the ERO ICE Health Services Corp (IHSC) might also be in possession of responsive records. The IHSC administers a detention health system that provides direct healthcare in ICE-owned facilities. IHSC also oversees non-IHSC facilities' compliance with national detention standards and the coordination of off-site care through medical referrals.

28. On August 12, 2022, an ERO IHSC Investigations Unit Program Manager conducted a search of her Outlook folders for the names of all four decedents (Teka Gulema; Johana Medina Leon; Jose Ibarra Bucio; and Martin Vargas Arellano). Records were found and processed.

29. Plaintiff now requests that the individuals on a March 4, 2021 email chain be required to search for the terms "Vargas Arellano" or "Vargas-Arellano" or "Martin w/5 Vargas or Martin w/5 Arellano or "A205718808" or "205-718-808" or "205 718 808." However, all but two of the individuals on the March 4, 2021 email chain have already run searches using Mr. Vargas' name and alien number and have found records that were processed and produced. There is no reason to believe the two detention and deportation officers on the email chain who did not run searches would have any additional information. Their searches would likely turn up duplicative records.

### **Subpart 4**

30. Based on the information sought in the Request, its experience and knowledge of ICE's practices and activities, and discussions between the parties, with respect to subpart 4, the ICE FOIA Office searched ERO IHSC, the Office of Regulatory Affairs and Policy (ORAP), emails of former ICE Directors and emails of three individuals from the ICE Office of the Director.

31. As noted above, the ERO IHSC administers a detention health system that provides direct healthcare in ICE-owned facilities.

32. On August 16, 2022, a health policy administrator with ERO IHSC searched the Electronic Policy Development System for the search terms: transfer, discharge, covid-19, illness and medical care. The search resulted in 27 pages being

found, which were processed and produced.

33.     On July 18, 2023, at Plaintiff's request, ICE obtained the emails of ICE Director Tae Johnson, Assistant Director of Policy Deborah Fleischaker and Assistant Director for Regulatory Affairs and Policy Scott Shuchart for the following search terms: (1) Directive; (2) Policy; (3) Protocol; (4) Procedure; (5) Training; (6) Guidance; (7) Instruction; (8) Standard; (9) Death; (10) "offsite referral"; (11) "emergency room"; (12) "emergency department"; (13) "life support"; (14) Coma; (15) Ventilator; (16) "intensive care"; (17) Hospice; (18) palliative; and (19) release.

34.     The search of the director emails resulted in approximately 530,000 documents. Plaintiff then requested that the search be run in two separate parts, with the first part seeking the following terms and Boolean connectors: directive or policy or policies or protocol or procedure or training or guidance or instruction or standard) AND (custody or death or died or deceased or decedent or discharge or surgery or specialist or COVID-19 or hospital or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal). The results of that search were then searched with the following terms: (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision"). This resulted in approximately 142,000 documents. Plaintiff ultimately decided not to pursue production of these documents.

35.     Upon reviewing the Request and based on its experience and knowledge of ORAP's practices and activities, the ICE FOIA Office tasked the Office of Regulatory Affairs and Policy (ORAP) with a search for records responsive to part 4 of the Request.

36.     ORAP collaborates with internal and external stakeholders to identify, develop and effectively communicate ICE's strategic and organizational policies; regulations and regulatory processes; and operational requirements.

37.     On December 6, 2023, a policy subject matter expert with ORAP searched

12

the ICE Policy Manual, the ICE intranet, her desktop, hard drive, shared drive and
Outlook folders for the terms: hospital, health, release, Covid-19, accommodation and
detainee treatment. The search resulted in 16 pages of records found, which were
processed and produced.

38.    On October 15, 2024, at the request of Plaintiff, ORAP conducted a second
search where a policy subject matter expert searched the ICE Policy Manual, the ICE
intranet, her desktop, hard drive, shared drive, and Outlook folders for the terms:
11003.4, critical condition, hospice, death, intensive care, terminal, life support, ICE and
release. No records were found.

39.    After conferring with Plaintiff, it was agreed that ICE would request that
ORAP conduct a third search of agreed upon search terms. On October 11, 2024, ORAP
was asked to search for the following search terms: death, life support, critical condition,
intensive care, ICU and hospice. The time period for the search was January 1, 2016
through the present. ORAP was also asked to provide ICE Directive 11003.4. As a result
of this search, three documents which totaled over 1,700 pages. The records were
processed and produced. ICE Directive 11003.4 was also produced.

### Subpart 5

40.    Based on the information sought in the Request, the experience and
knowledge of ICE's practices and activities, and discussions between the parties, with
respect to subpart 5, the ICE FOIA Office tasked ERO IHSC and OPR to conduct
searches.

41.    OPR noted that they do not collect SIRs or SENs. OPR maintains death
reports and case notes only for detainees who die in ICE custody. If a detainee is
transferred to a hospital and released from custody and they die there, OPR would not
have records on this. Once a detainee is transferred out of ICE custody, then it is not
within OPR's scope to do a detainee death review. If a detainee is transferred to an
external health care provider but still in ICE custody, then OPR would have records.

42.    On August 21, 2023, the Assistant Director of the ICE Health Services

13

Corps conducted a search of his desktop, shared drive, hard drive, and Outlook folders for the following agreed upon terms: (1) Death; (2) Died; (3) Deceased; (4) Ambulance; (5) Emergency; (6) "offsite referral"; (7) "life support"; (8) Coma; (9) Ventilator; (10) "intensive care"; (11) "critical condition"; (12) Hospice; (13) Palliative; and (14) Release.

43.    Once the search results were obtained, the following Boolean connectors were entered and searched at Plaintiff's request: (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian) AND (custody or death or died or deceased or surgery or specialist or COVID-19 or hospital! or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal.)

44.    The search resulted in 551 pages, which were processed and produced.

45.    On November 17, 2023, an email was sent to the Deputy Chief of Staff of IHSC inquiring as to whether she was aware of the existence of a spreadsheet or list of some sort that identifies detainees who were released from custody while (a) hospitalized (including for COVID-19 treatment); (b) in the full-time care of external healthcare providers or facilities (including for COVID-19 treatment), or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility. She indicated that IHSC does not maintain this type of document.

46.    The ERO Information Disclosure Unit previously noted that possible records could only be discovered through the creation of a list of detainees.  IHSC cannot create a list for the purposes of FOIA to then find FOIA records, in an attempt to satisfy the Plaintiff's curiosity

47.    Plaintiff further requested that ICE search for records related to the Significant Detainee Illness ("SDI") meetings and list. ICE previously informed Plaintiff that this request is burdensome as there are 233 IHSC employees who participated in the

SDI process from 2016 to present. The number of ICE employees that were part of the Medical Case Management Unit from 2016 to present is 376. Plaintiff's request to narrow states "we proposed a compromise that Defendants limit the search to staff who participate in the weekly SDI meeting, and any custodian who possesses the SDI list." However, as noted above, that list includes hundreds of individuals and is overly burdensome.

### Subpart 6

48.     Based on the information sought in the Request, the experience and knowledge of ICE's practices and activities, and discussions between the parties, with respect to subpart 6, ICE searched OPR, ERO IHSC, HSI Joint Intelligence Operations Center ("JIOC"), ERO Custody Management and ERO Field Operations.

49.     On August 8, 2023, a Section Chief at OPR conducted a search of her desktop, hard drive and shared drive, as well as her Outlook folders using the terms agreed upon by the Plaintiff, which included: death, died, deceased, coma, ventilator, ambulance, emergency, intensive care, critical condition, offsite referral, life support, hospice, palliative and release. No responsive records were found except for ICE Directive 11003.5. This directive was produced.

50.     On August 8, 2023, a Management and Program Analyst with OPR conducted a search of the Office of Detention Oversight Inspection Modernization System ("ODO IMS"), as well as his desktop, shared drive, hard drive and Outlook folders using the search terms agreed upon by the Plaintiff, which included: death, died, deceased, coma, ventilator, ambulance, emergency, intensive care, critical condition, offsite referral, life support, hospice, palliative and release. No responsive records were found.

51.     The Unit Chief for OPR ICE Inspections sent an email on August 10, 2023 explaining that while the term "death" was searched and was identified in several records within the system, when associated with the specific requests in Subparts 6 and 7, there were no responsive records as the scope of ODO inspections does not extend to released

detainees.

52.    The Plaintiff requested that the Joint Intelligence Operations Center
("JIOC") conduct a search for responsive records. JIOC coordinates information sharing
and situational awareness. JIOC Watch Officers go into the SEN database to identify
SENs that meet reporting threshold. Once a SEN has been identified as meeting
reporting threshold, the JIOC Watch Officer then transposes the SEN write up into an
executive summary for their daily reporting products that are distributed to DHS, ICE,
ERO, and HSI leadership.

53.    The summaries are not stored in one place. They are moved from emails to
the Daily Enforcement Activity Report ("DEAR") system. There is one DEAR for every
24-hour period. In order to search this system, someone would have to go in and check
search terms for each individual day. Additionally, the system does not keep track of
when individuals are released from custody.

54.    On December 6, 2023, JIOC was tasked to conduct a search for documents
responsive to Subparts 6 and 7.  JIOC responded that it was not the owner of the data
points requested and it deferred the request to ERO Custody Management and ERO
IHSC.

55.    On December 6, 2023, OPR was again tasked to search for records
responsive to subpart 6 of the Request. On December 11, 2023, OPR responded that they
had no responsive records as the individuals noted in the Request did not die in ICE
custody.

56.    On January 3, 2024, the Chief of IHSC's Investigations Unit conducted a
search of her shared drive and Outlook folders for the terms: hospitalized, external
healthcare, release, transfer, death, emergency room and external care. No records were
found.

57.    On January 4, 2024, a Managed Care Coordinator with ERO IHSC
conducted a search of Excel spreadsheets in her shared drive for the terms: release,
hospital, emergency room, long-term, facility and rehab. She also conducted a search of

her Outlook folders for the terms: UPTS, hospital, release, emergency room, facility and rehab. Records were found and processed.

58.    Based on the information sought in the Request and the experience and knowledge of ICE's practices and activities, the ICE FOIA Office tasked the Custody Programs Division with conducting a search. The Custody Programs Division is a subset of the Custody Management Division, which provides policy and oversight of those in ICE custody and manages ICE detention operations. The Custody Programs Division develops and promotes best practices in civil detention and enforcement initiatives by providing policy support, facilitating the implementation of applicable ICE directives, and expanding ERO's capacity to manage special populations.

59.    On January 4, 2024, the Acting Deputy Assistant Director of the ERO Custody Programs Division conducted a search of his desktop, shared drive and hard drive using the search term: detainee death directive. The Acting Director also noted that Custody Management does not manage SIRs or SENs and deferred to Field Operations.

60.    The ERO Field Operations Division provides guidance to and coordination among ICE ERO's 25 field offices across the nation. They oversee, direct and coordinate all ERO Field Operations activities throughout the nation's field offices and sub-offices.

61.    On January 4, 2024, a Mission Support Specialist with ERO Field Operations reviewed the Request and on January 17, 2024, an email was sent stating that field operations does not maintain data in relation to the request.

**Subpart 7**

62.    Based on the information sought in the Request, the experience and knowledge of ICE's practices and activities, and discussions between the parties, with respect to subpart 7, ICE searched OPR, ERO IHSC, HSI JIOC, ERO Custody Management and ERO Field Operations.

63.    On August 8, 2023, a Section Chief at OPR conducted a search of her desktop, hard drive and shared drive, as well as her Outlook folders using the terms agreed upon by the Plaintiff, which included: death, died, deceased, coma, ventilator,

ambulance, emergency, intensive care, critical condition, offsite referral, life support, hospice, palliative and release. No responsive records were found except for ICE Directive 11003.5. This directive was produced.

64.     OPR further noted that they maintain death reports and case notes only for detainees who die in ICE custody. If a detainee is transferred to a hospital and released from custody and they die there, OPR would have records on the patient. Once a detainee is transferred out of ICE custody, then it is not within OPR's scope to conduct a detainee death review.

65.     On August 8, 2023, a Management and Program Analyst with OPR conducted a search of the Office of Detention Oversight Inspection Modernization System ("ODO IMS"), as well as his desktop, shared drive, hard drive, and Outlook folders using the search terms agreed upon by the Plaintiff, which included: death, died, deceased, coma, ventilator, ambulance, emergency, intensive care, critical condition, offsite referral, life support, hospice, palliative and release. No responsive records were found.

66.     The Unit Chief for OPR ICE Inspections sent an email on August 10, 2023 explaining that while the term "death" was searched and was identified in several records within the system, when associated with the specific requests in Subparts 6 and 7, there were no responsive records as the scope of ODO inspections does not extend to released detainees.

67.     On December 6, 2023, the Joint Intelligence Operations Center ("JIOC") was tasked to conduct a search for documents responsive to Subparts 6 and 7. JIOC responded that it was not the owner of the data points requested and it deferred the request to ERO Custody Management and ERO IHSC.

68.     On January 3, 2024, the Chief of IHSC's Investigations Unit conducted a search of her shared drive, and Outlook folders for the terms: hospitalized, external healthcare, release, transfer, death, emergency room and external care. No records were found.

69.    On January 4, 2024, a Mission Support Specialist with ERO Field Operations reviewed the request and on January 17, 2024, an email was sent stating that field operations does not maintain data in relation to the request.

70.    On January 17, 2024, ERO Custody Management responded that they do not manage SIRs or SENs and deferred to Field Operations. Custody Management did, however, provide ICE Directive 11003.5, which was produced to Plaintiff.

### Subpart 8

71.    Based on the information sought in the Request, the experience and knowledge of ICE's practices and activities, and discussions between the parties, with respect to subpart 8, ICE searched ERO IHSC.

72.    On August 21, 2023, Dr. Stewart Smith, Assistant Director of IHSC, conducted a search of his desktop, hard drive, shared drive, and Outlook folder using search terms agreed upon with the Plaintiff: (1) Ambulance; (2) 911; (3) Emergency; (4) "offsite referral"; (5) "life support"; (6) Coma; (7) Ventilator; (8) "intensive care"; (9) "critical condition"; (10) "poor outcome"; (11) Hospice; (12) Palliative; (13) Death; (14) Died; and (15) Deceased.

73.    Once the search results were obtained, the following Boolean connectors were used, as requested by Plaintiff: (detainee or custody) AND (death or died or deceased or surgery or specialist or COVID19 or hospital! or ambulance or "emergency room" or "emergency department" or "emergency services" or "poor outcome" or "life support" or "offsite referral" or coma or unconscious or ventilator or "intensive care" or "medical observation" or ICU or "critical condition" or hospice or palliative or fatal) AND (release or transfer or benefits or parole or "alternative detention" or discharge or OSUP or "order of supervision" or humanitarian or "order of recognizance"). Approximately 1,711 pages were found, processed, and produced.

74.    Plaintiff claims that ICE should search for documents located within the *Fraihat v. ICE* litigation. Aside from the fact that the Plaintiff did not request these documents in the original FOIA request, the Office of the Principal Legal Advisor

(OPLA) at ICE continues to litigate the *Fraihat* case and has done so since the beginning of the pandemic. OPLA has not been responsible for tracking hospitalizations or releases of detainees. To the extent such records *might* exist, OPLA has no way of searching for such records and they would have no way of knowing if a detainee had been released while hospitalized with COVID.  The only way to find out which detainees were released would be to cross compare with ERO records but this is not required under the FOIA. ERO does not maintain a list of individuals who were released during hospitalization with COVID and ERO IHSC has already run several searches in this case. Lastly, OPLA noted that most of the reporting and discovery required under *Fraihat* was done under protective order. *See Fraihat v. ICE*, C.D. CA Case No. 19-cv-1546-JGB-SHKx, Dkt. 154 (Stipulated Protective Order).

### **Subpart 9**

75.    Based on the information sought in the Request, the experience and knowledge of ICE's practices and activities, and discussions between the parties, with respect to subpart 9, ICE searched ERO IHSC, the IHSC Resource Management Unit ("RMU") and the IHSC Health Plan Management Unit ("HPMU").

76.    On August 22, 2022, a health informaticist with ERO IHSC conducted a search of Sharepoint and eClinicalWorks for the alien numbers and referral authorization numbers of the four decedents. A spreadsheet was found, processed, and produced.

77.    On August 7, 2023, ICE tasked the IHSC RMU to search. The IHSC RMU is responsible for managing the resources allocated to provide healthcare to detained individuals.

78.    The IHSC RMU was tasked with searching for the following terms: (1) Death; (2) Died; (3) Deceased; (4) Ambulance; (5) Emergency; (6) Hospital; (7) "offsite referral;" (8) "life support;" (9) coma; (10) ventilator; (11) "intensive care;" (12) "Critical condition;" (13) hospice; (14) palliative; and (15) release.

79.    On August 14, 2023, the RMU responded that they are not involved in billing and they recommended tasking the IHSC HPMU. The HPMU oversees the

20

approval of referrals to receive care outside of the ICE health care system.

80.    The HPMU was tasked and responded that they cannot search for the information sought in subpart 9 without specific names. They recommended tasking the Regional Health Service Administrator ("HAS") and the Regional Field Medical Coordinator ("FMC"). These units were tasked on November 14, 2023, and just one individual stated that they had over 16,000 emails. While the FMCs and HSAs were separately tasked with running a search agreed to by the parties in November 2023, *see* Dkt. 112-4 at 75, both the FMCs and HSAs stated that such a search was too broad and causing their systems to crash. The issue was discussed with the FMCs and HSAs and on January 3, 2024, it was determined that they would not be able to identify information responsive to subpart 9 without searching for specific names.

81.    Since the HPMU had the names of the four decedents, they were able to provide an Excel spreadsheet with claims information for all 4 decedents. That spreadsheet was processed.

## IV.    RECORDS PROCESSED

82.    Based on the above searches, a total of 53,426 pages of potentially responsive records were located, along with 911 pages of records referred to ICE from other departments. Of those 53,426 pages, 21,153 pages and an Excel spreadsheet were determined to be responsive and produced to the Plaintiff.

83.    Regarding the records that were produced to Plaintiff, a line-by-line review was conducted to identify information exempt from disclosure or for which a discretionary waiver of exemption could be applied. Based on this review, ICE released all reasonably segregable portions of records responsive to Plaintiff's Request.

84.    On November 17, 2022, ICE issued its first interim response to the Plaintiff. The response states that the ICE FOIA Office reviewed 2,769 pages of potentially responsive records. Of the 2,769 pages, 2,444 pages were released in full or in part; 26 pages were deemed non-responsive; and 299 pages were duplicates.

85.    On December 20, 2022, ICE issued its second interim response. In that

response, the ICE FOIA Office reviewed 500 pages of potentially responsive records. Of the 500 pages, 456 pages were released in full or in part; 15 pages were deemed non-responsive; and 29 pages were duplicates.

86.    On January 19, 2023, ICE issued its third interim response. In that response, the ICE FOIA Office reviewed 500 pages of potentially responsive records. Of the 500 pages, 481 pages were released in full or in part; 16 pages were deemed non-responsive; and 3 pages were duplicates.

87.    On February 22, 2023, ICE issued its fourth interim response. In that response, the ICE FOIA Office reviewed 1,001 pages of potentially responsive records. Of the 1,001 pages, 688 pages were released in full or in part and 313 pages were duplicates.

88.    On March 10, 2023, ICE issued its fifth interim response. In that response, the ICE FOIA Office reviewed 1,009 pages of potentially responsive records. Of the 1,009 pages, 728 pages were released in full or in part; 6 pages were deemed non-responsive; and 275 pages were duplicates.

89.    On April 12, 2023, ICE issued its sixth interim response. In that response, the ICE FOIA Office reviewed 1,007 pages of potentially responsive records. Of the 1,007 pages, 442 pages were released in full or in part and, 565 pages were duplicates.

90.    On May 22, 2023, ICE issued its seventh interim response. In that response, the ICE FOIA Office reviewed 1,091 pages of potentially responsive records. Of the 1,091 pages, 664 pages were released in full or in part and 427 pages were duplicates.

91.    On June 20, 2023, ICE issues its eighth interim response. In that response, the ICE FOIA Office reviewed 1,052 pages of potentially responsive records. Of the 1,052 pages, 1,033 pages were released in full or in part and 19 pages were duplicates.

92.    On July 19, 2023, ICE issued its ninth interim response. In that response, the

ICE FOIA Office reviewed 1,080 pages of potentially responsive records. Of the 1,080 pages, 516 pages were released in full or in part; 40 pages were deemed non-responsive;

1  and 524 pages were duplicates.

2  93.    On August 18, 2023, ICE issued its tenth interim response. In that response,

3  the ICE FOIA Office reviewed 1,000 pages of potentially responsive records. Of the

4  1,000 pages, 900 pages were released in full or in part; 5 pages were deemed non-

5  responsive; and 95 pages were duplicates.

6  94.    On September 21, 2023, ICE issued its eleventh interim response. In that

7  response, the ICE FOIA Office reviewed 1,004 pages of potentially responsive records.

8  Of the 1,004 pages, 985 pages were released in full or in part; 4 pages were deemed non-

9  responsive; and 15 pages were duplicates.

10  95.    On October 18, 2023, ICE issued its twelfth interim response. In that

11  response, the ICE FOIA Office reviewed 1,028 pages of potentially responsive records.

12  Of the 1,028 pages, all pages were released in full or in part.

13  96.    On November 17, 2023, ICE issued its thirteenth interim response. In that

14  response, the ICE FOIA Office reviewed 1,605 pages of potentially responsive records.

15  Of the 1,605 pages, 730 pages were released in full or in part and 875 pages were

16  duplicates.

17  97.    On December 20, 2023, ICE issued its fourteenth interim response. In that

18  response, the ICE FOIA Office reviewed 1,013 pages of potentially responsive records.

19  Of the 1,013 pages, all pages were released in full or in part.

20  98.    On January 20, 2024, ICE issued its fifteenth interim response. In that

21  response, the ICE FOIA Office reviewed 1,125 pages of potentially responsive records.

22  Of the 1,125 pages, 184 pages were released in full or in part and 941 pages were

23  duplicates.

24  99.    On February 21, 2024, ICE issued its sixteenth interim response. In that

25  response, the ICE FOIA Office reviewed 1,033 pages of potentially responsive records.

26  Of the 1,033 pages, 810 pages were released in full or in part; 181 pages were deemed

27  non-responsive; and 42 pages were duplicates.

28  100.    On February 28, 2024, ICE made a supplemental production of 16 pages

that had previously been marked as non-responsive.

101.   On March 21, 2024, ICE issued its seventeenth interim response. In that response, the ICE FOIA Office reviewed 3,000 pages of potentially responsive records. Of the 3,000 pages, all were released in full or in part.

102.   On April 19, 2024, ICE issued its eighteenth interim response. In that response, the ICE FOIA Office reviewed 1,748 pages of potentially responsive records and 17 Excel documents (amounting to 1,854 printable pages), for a total of 3,602 pages. Of the 3,602 pages, 293 pages were released in full or in part; 3,046 pages were deemed non-responsive; and 263 pages were duplicates.

103.   On May 21, 2024, ICE issued its nineteenth interim response. In that response, the ICE FOIA Office reviewed 3,004 pages of potentially responsive records. Of the 3,004 pages, 2,433 pages were released in full or in part and 571 pages were deemed non-responsive.

104.   On June 13, 2024, ICE issued its twentieth interim response. In that response, the ICE FOIA Office reviewed 3,003 pages of potentially responsive records. Of the 3,003 pages, 851 pages were released in full or in part and 2,152 were duplicates.

105.   On July 20, 2024, ICE issued its twenty-first interim response. In that response, the ICE FOIA Office reviewed 3,220 pages of potentially responsive records. Of the 3,220 pages, 142 pages were released in full or in part and 3,078 were duplicates.

106.   August 16, 2024, ICE issued its twenty-second interim response. In that response, the ICE FOIA Office reviewed 4,428 pages of potentially responsive records. Of the 4,428 pages, 36 pages were released in full or in part and 4,392 were duplicates.

107.   On September 19, 2024, ICE issued its twenty-third interim response. In that response, the ICE FOIA Office reviewed 3,066 pages of potentially responsive records. Of the 3,066 pages, 43 pages were released in full or in part and 3,023 pages were duplicates.

108.   On October 21, 2024, ICE issued its twenty-fourth interim response. In that response, the ICE FOIA Office reviewed 3,042 pages of potentially responsive records.

Of the 3,042 pages, 52 pages were released in full or in part and 2,990 were duplicates.

109.   On November 20, 2024, ICE issued its twenty-fifth interim response. In that response, the ICE FOIA Office reviewed 3,112 pages of potentially responsive records. Of the 3,112 pages, 269 pages were released in full or in part and 2,843 pages were duplicates.

110.   On December 17, 2024, ICE issued its twenty-sixth interim response. In that response, the ICE FOIA Office reviewed 3,324 pages of potentially responsive records. Of the 3,324 pages, 52 pages were released in full or in part and 3,272 pages were duplicates.

111.   On January 28, 2025, ICE issued its twenty-seventh interim response. In that response, the ICE FOIA Office reviewed 2,792 pages of potentially responsive records. Of the 2,792 pages, 9 pages were released in full or in part; 2,187 pages were deemed non-responsive; and 594 pages were duplicates.

I declare under penalty of perjury of the laws of the United States of America that the forgoing is true and correct to the best of my knowledge and belief.

Executed on March ___, 2025, at Washington, D.C.

FERNANDO
PINEIRO JR

Digitally signed by
FERNANDO PINEIRO JR
Date: 2025.03.19
14:13:12 -04'00'

FERNANDO PINEIRO