# EXHIBIT A



# United States Department of Justice

## United States Attorney's Office
## Central District of California

---

*JOSEPH W. TURSI*
*JASON K. AXE*
*Assistant United States Attorney*
*Phone: (213) 894-3989/8790*
*E-mail: Joseph.Tursi@usdoj.gov*
*Jason.Axe@usdoj.gov*

*Federal Building*
*300 N. Los Angeles Street, Suite 7516*
*Los Angeles, California 90012*

December 11, 2024

**VIA E-MAIL**

Laboni A. Hoq
Hoq Law, APC
P.O. Box 753
South Pasadena, CA 91030

      Re:    ACLU of SoCal v. ICE, et al.
               C.D.CA Case No. 2:22-cv-04760-SHK

Dear Ms. Hoq:

      Please allow the following to respond to the matters raised in your November 21, 2024 correspondence, as well as issues discussed at the December 4, 2024 Status Conference, and your email of December 4, 2024.

**ICE**

      Plaintiff has now requested that ICE provide a revised page count of responsive documents for Part 4. Specifically, Plaintiff asks that a revised page count suppress email attachments, and that it exclude copies of the following ICE detention standards: (1) National Detention Standards (NDS); (2) 2008 Operations Manual ICE Performance-Based National Detention Standards; (3) 2011 Operations Manual ICE Performance-Based National Detention Standards (revised 2016); (4) 2019 National Detention Standards for Non-Dedicated Facilities (2019); and (5) Family Residential Standards.

      As an initial matter, upon review, ICE has determined that the page count previously communicated was not accurate. Rather, the supplemental search of its Office of Regulatory Affairs and Policy ("ORAP") located approximately 1,730 pages of potentially responsive documents. Please note, the document hit counts reported in ICE's November 22, 2024 Supplemental Response are accurate. *See* Dkt. 105 at 6. Excluding the five categories of detention standards results in approximately 1,641 pages of potentially responsive documents.

      With respect to your inquiry over searched custodians, ICE did not search *only* emails. Rather, in addition to emails, ICE searched the ICE Policy Manual/ICE Intranet and the ORAP Shared drive.

      In light of the above, ICE anticipates it will finish processing Plaintiff's FOIA request by January 2025.

Laboni A. Hoq, Esq.
RE: ACLU of SoCal v. ICE
December 11, 2024
Page 2

**CRCL**

    **A. CMS Search Results**

In your December 4, 2024 email you advised that, for the CMS search results, Plaintiff has agreed to eliminate the search terms "National Qualified Representative Program" and "NQRP." After eliminating those terms and further filtering, this resulted in 112 documents (1,495 pages) marked "responsive" or "referral."

Breaking that down further, there were 43 documents (339 pages) that were marked "responsive" that contain only CRCL equities. The records marked "referral" total 69 documents (1,156 pages) and contain either some CRCL equities and another component's, or another component's equities in its entirety. For records that have another component's equities, they will need to be referred to that other component for processing.

Plaintiff also requested that CRCL process the remaining CMS documents within the next 30-60 days. CRCL can agree to 60 days in which it will process its own records and refer the other records to the appropriate component(s). CRCL has no control over when the referred components will process the records and thus cannot agree to a specific processing time with respect to referred documents.

    **B. OCIO Search Results**

As it has throughout, CRCL is amenable to Plaintiff providing a refined set of search terms after the CMS records production is complete.

With respect to Plaintiff's proposal that CRCL agree to provide, within two weeks, available information on the size and any other relevant details about the scope of a further search with the refined set of search terms, CRCL cannot agree. That is because, the timeline depends on when Plaintiff provides the refined set and agency capacity at that time.

**Processing of Documents Referred by CRCL to ICE and DHS OIG**

To date, CRCL has referred 243 pages to DHS OIG for direct reply and 19 pages to ICE for direct reply. *See* CRCL November 1, 2024 Correspondence. DHS OIG anticipates producing records by December 20, 2024. With respect to ICE, it will produce the records referred to it by January 21, 2025, at the latest.

Laboni A. Hoq, Esq.
RE: ACLU of SoCal v. ICE
December 11, 2024
Page 3


Respectfully,

E. MARTIN ESTRADA
United States Attorney

/s/ *Joseph W. Tursi*

JOSEPH W. TURSI
Assistant United States Attorney

cc:   Hon. Shashi H. Kewalramani (by Chambers Email)
      Ms. Eunice Cho (by email)
      Ms. Eva Bitran (by email)
      Mr. Kyle Virgien (by email)

# EXHIBIT B

| | |
|---|---|
| From: | (b)(6) |
| To: | (b)(6),(b)(7)(C); ERO CRCL; (b)(6),(b)(7)(C) |
| | (b)(6),(b)(7)(C) |
| Cc: | Salvano-Dunn, Dana; (b)(6) |
| Subject: | CRCL Investigation at the Adelanto ICE Processing Center |
| Date: | Monday, August 16, 2021 12:14:20 PM |

ICE Colleagues,

As you are aware, CRCL recently conducted a virtual onsite investigation into the conditions of detention at the Adelanto ICE Processing Center in Adelanto, CA from July 12-16, 2021. In an effort to allow ICE to more quickly respond to the concerns we identified, CRCL is sending you a brief, informal summary of issues identified by our subject matter experts. The information below represents many, but not all, of the issues that will be included in our forthcoming formal expert recommendations memo.

During our virtual onsite, CRCL identified the following issues:

**Mental Health**

1. Medical record reviews revealed that historical information obtained during mental health evaluations was often minimal. The Behavioral Health Supervisor reported that staff attempted to obtain signed releases of information, allowing them to request confidential historical information; however, detainees often refused to sign the "release of information" (ROI). When detainees refused to sign the forms, staff had been instructed to document their refusals in the medical record. A review of several medical records did not reveal such documentation. (b)(5)

   (b)(5)

2. A medical record review and staff interviews revealed diagnostic and treatment uncertainties. On one specific case, some staff rendered a rule out psychotic disorder while others rendered a rule out personality disorder. These disagreements were reportedly resolved during weekly treatment team meetings; however, medical records continued to display diagnostic uncertainty. (b)(5)

   (b)(5)

3. Statistical reports and medical records revealed seriously mentally ill detainees were often inappropriately placed in segregation and/or psychological observation in the infirmary. Segregation and psychological observation cannot be substituted for long-term inpatient residential treatment. (b)(5)

   (b)(5)

4. Medical records revealed seriously mentally ill detainees, who required structured therapeutic and non-therapeutic activities, were often only receiving health and wellness checks, weekly rounds and/or supportive counseling. (b)(5)

   (b)(5)

5. Staff interviews, policy and procedure reviews, and medical record reviews revealed that detainees were rarely referred to an external mental health acute care facility. Despite having a policy and procedure which addressed transferring detainees whose mental health needs exceeded the capabilities of Adelanto (Mental Health Screening and Evaluation, OPS-300-05), detainees who needed long-term inpatient psychiatric care were unable to access such care. The disciplinary housing unit continued to be used to observe and ensure that seriously mentally ill detainees were safe, rather than transferring them to a mental health unit where they could receive a higher level of mental health care. This practice was illustrated by a psychiatric progress note, which stated a detainee could be treated as an outpatient but could not be moved to the general population because he had problems with GP officers; consequently, he would have to either move to disciplinary housing or to a psychological observation cell in the infirmary. (b)(5)

   (b)(5)

6. Psychiatry Leadership: CRCL's 2015 and 2017 investigations reported that the lack of psychiatric leadership/oversight was a significant finding, contributing to substandard care. Interviews during the current virtual onsite revealed this issue continued to be a problem. Both staff psychiatrists stated they clinically reported to a corporate regional psychiatrist. They did not have any on-site psychiatric leadership/oversight and they had minimal contact with their regional clinical supervisor. They reported their most recent contact was two to three months ago. (b)(5)

   (b)(5)

7. Continuity of care for detainees returning from a higher level of care: A review of CRCL's 2017 mental health expert's report on Adelanto revealed inadequate follow-up when detainees returned from outside facilities. The Behavior Health Supervisor reported this finding had been corrected, noting any clinician who changed the treatment protocol provided by the external facility would have to justify their change. Record reviews revealed a modification of treatment following a detainee's return from an external facility, without a documented rationale for the change. Additionally, the discharge summary and recommendations could not be found in the electronic medical record. (b)(5)

   (b)(5)

8. Continuous quality improvement: Staff interviews and document reviews revealed that the mental health program was not actively involved with the continuous quality improvement program. Interviews and document reviews revealed the Behavioral Health Supervisor was not on the CQI Committee, and the mental health staff were not participating in any CQI studies or quality improvement plans. The facility CQI Committee Meeting Minutes revealed an active CQI program, which was conducting

several quarterly mental health studies to include completion of psychotropic medication consents, mental health treatment updates, suicide watch rounds, utilization of the Columbia Suicide Severity Rating Scale, and critical clinical events. The committee also developed and implemented improvement plans involving suicide watch rounds and utilization of the Columbia Suicide Severity Rating Scale, with no apparent input from mental health; however, the Behavior Health Supervisor was identified as the "responsible person" for the improvement plan which addressed the utilization of the Columbia Suicide Severity Rating Scale. The improvement plan's completion target date was August 30, 2021. (b)(5)

(b)(5)

9. During the virtual onsite orientation tour of Adelanto, staff reported that the custody supervisor was the only person who carried a cut-down tool. An additional cut-down tool was available in a locked box in the medical area. (b)(5)

(b)(5)

10. Suicide prevention and intervention program: A review of policies and procedures revealed a need for policy clarification. A procedural inconsistency was identified between WellPath's Suicide Prevention and Intervention Program dated January 30, 2019, and the Suicide Prevention Policy Revisions for GEO Sites and Review of Post Watch Follow-Up Requirements dated January 2020. The Wellpath policy, which was used to train staff on February 20, 2020, noted only Qualified Behavior Health Professionals (QBHPs), who had been assessed by the Regional Behavior Health Manager, could discontinue a constant/staggered suicide watch; however, the revision entitled Suicide Prevention Policy Revision, dated January 2020 noted the Suicide Prevention Committee required notification and approval prior to a suicide watch discontinuation, (b)(5)

(b)(5)

11. During the virtual onsite tour, Adelanto staff reported the infirmary had four mental health observation cells, two suicide watch cells which were suicide resistant, and two mental health observation cells which were not suicide resistant. A review of suicide watch admission data from June 2021 through May 2021 revealed an average of six suicide watch admissions per month, in contrast to a monthly average of 31 admissions between June 2020 through January 2021. With an average length of stay of at least a few days, the 2020 findings indicated that suicidal detainees had to be placed on suicide watch in non-suicide resistant cells, with a dedicated observer providing continuous observation. (b)(5)

(b)(5)

12. A review of the medical and mental health 2020 Policy and Procedure Manual/Training Roster indicated that suicide prevention training consisted of reading the suicide prevention policy and signing the attendance roster. Additionally, the roster revealed that neither psychiatrist acknowledged reading the Suicide Prevention and Intervention Policy. The 2011 PBNDS revision in 2016 reduced the required annual suicide prevention training from eight hours to two hours. It did not replace the training with

staff reading the suicide prevention policy. Additionally, the training was required for all staff, especially psychiatry who needed to stay updated on suicide prevention policies and procedures. (b)(5)

(b)(5)

### Medical Care

13. One of the detainees noted in the Retention Memo was released from custody a short time after being transferred to an outside hospital. He died in the hospital a few days later. No DDR was done. From a Quality Assurance/Quality Improvement perspective, not doing a DDR for patients who die shortly after release from custody who are hospitalized and subsequently die is a missed opportunity to improve the care provided and reduce liability. (b)(5)

(b)(5)

14. Outside referrals for specialist care are generally not completed. This issue was evaluated by the CQI Committee who documented the poor completion rates of outside specialist appointments, and there were clearly many problems, including- delays in approvals for outside visits (although review of the June and July approvals suggest relatively short, generally less than a week approval, however, that occurred during a very low census period), prolonged times in scheduling outside visits (many detainees were released before their appointment time arrived), visits cancelled due to the pandemic- which upon re-evaluation were deemed lower priority, and finally patient refusal. (b)(5)

15. Many patients refused to be taken to outside appointments. In fact, in June and July 2021, 90% and 75% respectively, were the proportion of visits missed because the detainee refused the visit (as opposed to scheduling or another reason). When asked, most detainees reported that they had to quarantine, generally alone, for 14 days, sometimes in circumstances that were problematic, for example under bright lights that interfered with sleep. One detainee, with a history of mental illness, specifically stated that he would be unable to sleep adequately for those 14 day and he knew that his mental illness would become decompensated. (b)(5)

(b)(5)

16. There were allegations of staff not wearing masks and many rumors about what was going on in the facility. (b)(5)

(b)(5)

### Conditions of Detention

17. An ICE safe release policy is needed regarding notification of legal counsel or emergency contact when a detainee is hospitalized and released from ICE custody. (b)(5)

**(b)(5)**

18. **(b)(5)**

19. Use of Force: Adelanto did not complete a UOF incident report for an incident that involved ICE personnel and Adelanto's medical staff who responded to medically evaluate the detainee. **(b)(5)**

    **(b)(5)**

20. Special Management Unit (Segregation)- One detainee was housed in segregation for an extended period (over 210 days) due to a lack of transfer to another facility that could address the detainee's mental health and custody needs. **(b)(5)**

    **(b)(5)**

21. Staff Detainee Communication: Some ICE Detention Officers are not adhering to posted schedules in housing units or alternatively providing timely telephonic contact which prevents detainees from contacting their Detention Officers (DOs). **(b)(5)**

    **(b)(5)**

22. Staff Detainee Communication: A review of detainee ICE requests identified deficiencies in the responses. Some ICE responses to detainee requests were vague, illegible, and do not address the requests. **(b)(5)**

    **(b)(5)**

23. Language Access: Language Access for LEP detainees continues to be problem at this facility and does not conform to DHS Language Access policy and multiple PBNDS standards. **(b)(5)**

    **(b)(5)**

**(b)(5)**

24. Religious Services: Adelanto does not provide religious services due to COVID-19 which is a violation of the PBNDS. **(b)(5)**

    **(b)(5)**

25. Grievances/Staff complaint: Numerous male and Female detainees made serious allegations including disrespectful treatment, harassment, and retaliation by the Grievance Officer for filing grievances. Similar complaints have been raised by detainees during past CRCL investigations. Detainees complained the Grievance Officer tries to dissuade detainees from filing grievances and in some cases refuses to accept certain grievances and lacks objectivity. The reported actions are in violation of the PBNDS, Grievance System. **(b)(5)**

    **(b)(5)**

26. Disability Identification, Assessment and Accommodation: The Adelanto Disability Access Coordinator (DAC) (non-medical) does not log detainee disability requests for assistance or actions taken to address detainee's disability needs, so there is no formal record of any non-medical detainee accommodation that may have been requested or provided. **(b)(5)**

    **(b)(5)**

27. Suicide Prevention and Intervention: Adelanto only has two suicide resistance cells for a contracted capacity of 1940 beds which is not sufficient for a facility of that size. **(b)(5)**

    **(b)(5)**

28. COVID-19: Detainees reported during interviews that some ICE and Adelanto staff, and detainees do not wear face masks in a manner consistent with the manufacturer's specifications and the Center for Disease Control (CDC) Guidelines to prevent the spread of COVID-19. It appears some staff and detainees are experiencing mask fatigue which is not uncommon in a detention setting. **(b)(5)**

    **(b)(5)**

(b)(5)

### Environmental Health & Safety

29. During interviews, detainees stated that the dayrooms, bathrooms, and shower areas are cleaned and disinfected by officers three times per week and Adelanto staff confirmed that the areas are cleaned and disinfected three times per week, by employee "clean teams". The current schedule of thrice weekly cleaning and disinfection does not comply with the PBNDS 2011 Environmental Health and Safety standard requirements and is not adequate to ensure sanitation and hygiene in communal living areas.

(b)(5)

30. A detainee stated that feces was occasionally observed in the showers and another detainee stated that he had picked up the feces of others off of the shower floor using paper towels, while wearing disposable gloves provided to him specifically for this purpose, because the officers threw paper towels on top of it and stated that they were not going to do it. Feces may be contaminated with blood, and therefore requires proper clean-up due to the risk of the transmission of bloodborne pathogens. (b)(5)

(b)(5)

31. Small birds, approximately 3" in size, are entering the east housing unit dormitories through the exterior doors when they are left open during outdoor recreation time. The birds perch on the fixtures and overhead piping in the dormitory style housing units; however, the high ceilings create an impediment when trying to clean the bird

droppings. (b)(5)



(b)(5)

32. Although opinions about food are personal and subjective, the detainee's statements during interviews combined with numerous grievances related to food indicate that the detainee's attitude toward and opinion of the food is a serious concern. While the food surveys are certainly a good practice and can generate useful information for the food service department, they may also be hurting detainee morale and hence facility morale if the detainees do not understand how the information is used or if they do not see or perceive changes to the menu or food, as was stated during detainee interviews.

(b)(5)

33. During interviews, detainees reported that occasionally their laundry is damp or wet, rather than dry, when it returns from the laundry. Adelanto staff confirmed that this can happen when detainees "overstuff" their laundry bags. Net or mesh laundry bags should be loosely filled and tied off at the end of the bag, not tied off tightly in the middle of the bag, thereby creating a tight ball of laundry that inhibits the cleaning and disinfection of the laundering process as the hot water, detergent, and bleach cannot penetrate the tightly packed laundry, and the water that is absorbed during washing cannot be adequately dried by the heat from the dryer. (b)(5)

(b)(5)

34. Detainees report that they were aware of postings in their housing units regarding Covid-19; however, they are infrequently updated, if at all. Since limited outside information is available to detainees, unease and misinformation regarding Covid-19 can easily spread in a detention facility, thus, detainee education is needed. (b)(5)

(b)(5)



CRCL does not require a formal response to this email. Instead, we will send ICE the formal expert recommendations memo in accordance with our usual process. At that time, CRCL will ask ICE to respond, indicating concurrence or non-concurrence with each recommendation and noting any actions taken to implement the recommendations. Please let us know if you have any questions.

Thank you.

(b)(6)

(b)(6)
Senior Policy Advisor
Office for Civil Rights and Civil Liberties
Department of Homeland Security
(b)(6)

This message may contain information that is confidential, deliberative, law enforcement sensitive and/or otherwise protected from public disclosure. If it has been sent to you in error, please reply immediately to advise the sender of the error and then destroy this message, any copies of this message and any printout of this message. If you are not the intended recipient of the message, any unauthorized dissemination, distribution or copying of the material in this message, and any attachments to the message, is strictly forbidden. This document is for INTERNAL GOVERNMENT USE ONLY and may be exempt from disclosure under the Freedom of Information Act, 5 U.S.C. §§ 552(b)(5),(b)(6), and/or (b)(7).