1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9                    CENTRAL DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF SOUTHERN CALIFORNIA,<br><br>                      Plaintiff,<br><br>            v.<br><br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,<br><br>                      Defendants. | Case No: 2:22-cv-04760-SHK<br><br><br>**ORDER ON PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT** |

## I.    INTRODUCTION

Plaintiff American Civil Liberties Union Foundation of Southern California ("ACLU" or "Plaintiff") and Defendant United States Immigration and Customs Enforcement ("ICE" or "Defendant") cross move for partial summary judgment on the adequacy of ICE's search for documents in response to certain parts ("Parts") of Plaintiff's Freedom of Information Act ("FOIA") request ("Request").  The Request, generally, sought documents related to ICE's alleged practice of releasing from its custody hospitalized, detained immigrants facing imminent death.  Plaintiff seeks these documents to shed light on whether ICE failed to adequately

report the number of detained migrants who have died while in ICE custody in an attempt to avoid accountability for those deaths. ICE claims to have adequately responded to all disputed Parts of Plaintiff's FOIA Request, producing over 20,000 pages of documents to Plaintiff. ICE argues that it has met its burden under FOIA to demonstrate the adequacy of its search through a declaration submitted by the ICE FOIA Director Fernando Pineiro.

After careful review of the parties' cross motions for partial summary judgment ("MSJ"), Electronic Case Filing Numbers ("ECF Nos.") 112, Pl.'s MSJ; ECF No. 113, Defs.' MSJ, and relevant attachments to those MSJs, the Court: (1) **GRANTS** Plaintiff's MSJ as to Parts 1-3, a portion of Parts 5 and 9, Parts 6-8 and a portion of Part 9; (2) **DENIES** Defendants' MSJ as to the same; and (3) **GRANTS** Defendants' MSJ as to Part 4, and portions of Parts 5 and 9.

## II.   BACKGROUND

### A.   Procedural History

On April 29, 2022, Plaintiff filed the operative First Amended Complaint ("FAC") seeking relief under FOIA, 5 U.S.C. § 552. ECF No. 24, FAC. In the FAC, Plaintiff alleges that it submitted a FOIA Request to Defendants on April 29, 2020, "seeking records relating to Defendants' treatment of hospitalized detainees and detainees released from custody prior to death." Id. at 17. Specifically, Plaintiff's Request was divided into nine Parts, as further detailed below, and for Parts 2 through 9, "sought all responsive records from January 1, 2016 to the present." Id. at 17-20 (internal quotation marks omitted). Defendants failed to "produce[] any records in response to the Request[,]" prompting Plaintiff to bring the instant case. Id. Plaintiff seeks various forms of declaratory and injunctive relief including an order requiring Defendants to produce information responsive to the Request. Id. at 24-25.

On October 18, 2022, Defendants United States Department of Homeland Security ("DHS"), DHS's Office of Inspector General ("DHS OIG"), and ICE

(collectively, "Defendants") filed their Answer ("Answer") to Plaintiff's FAC. ECF No. 26, Answer.

On November 23, 2022, DHS OIG began its first production of documents requested by Plaintiff, which continued until August 2, 2024, when DHS OIG made its final production.  ECF No. 80-2 at ¶ 9.  On December 8, 2022, after receiving consent from both parties, this matter was reassigned to the undersigned Magistrate Judge for all further proceedings.  ECF No. 34.

On July 5, 2023, Defendants filed a Motion for Judgment on the Pleadings ("MJOP").  ECF No. 44, MJOP.  On July 25, 2023, Plaintiff filed its Opposition to Defendants' MJOP ("MJOP Opp'n"), and on August 4, 2023, Defendants filed a Reply in support of the MJOP ("MJOP Reply").  ECF No. 50, MJOP Opp'n; ECF No. 51, MJOP Reply.  On August 29, 2024, the Court denied ("MJOP Order") Defendant's MJOP.  ECF No. 54, MJOP Order.

In the first half of 2024, the parties filed and fully briefed their first round of cross motions for summary judgment.  ECF Nos. 66, 79, 80, 81, and 82.  For its part, Plaintiff challenged several withholdings and redactions in DHS OIG's productions of documents.  ECF No. 66 at 16-18.  Plaintiff also argued that Defendants failed to adequately search for some records requested.  Id. Defendants argued that the challenged withholdings and redactions were permitted under FOIA Exemptions 5, 6, and 7(C) and that their search was reasonably calculated to uncover all responsive records.  ECF No. 79 at 11-30.

On July 8, 2024, the Court issued an order ("MSJ Order") on the parties' cross motions for summary judgment, which: (1) ordered Defendants to produce documents withheld under Exemption 5 for in camera review; (2) ordered Defendants to produce documents withheld under Exemptions 6 and 7(C); and (3) granted Plaintiff's MSJ as to the adequacy of Defendants' search for certain documents.  ECF No. 87, MSJ Order at 36.

/ / /

On August 5, 2024, DHS OIG filed a Motion for Reconsideration ("Mot. for Recons.") of the Court's MSJ Order.  ECF No. 95, Mot. for Recons.  The parties fully briefed the Motion for Reconsideration, ECF Nos. 96 and 97, and on September 30, 2024, the Court denied DHS OIG's Motion for Reconsideration, ECF No. 100.

On February 26, 2025, Plaintiff filed its MSJ ("Plaintiff's MSJ" or "Pl.'s MSJ"), along with its Statement of Uncontroverted Facts ("Pl.'s SUF"), Declaration of Eunice Cho ("Cho Decl."), and Declaration of Kyle Virgien ("Virgien Decl.").  ECF No. 112, Pl.'s MSJ; ECF No. 112-1, Pl.'s SUF; ECF No. 112-3-4, Cho Decl.; ECF No. 112-5-6, Virgien Decl.  On March 19, 2025, ICE filed its MSJ ("ICE's MSJ"), along with a Declaration of Fernando Pineiro ("Pineiro Decl."), Statement of Uncontroverted Facts ("ICE's SUF"), and Response to Pl.'s SUF ("ICE's SGDMF").  ECF No. 113, ICE's MSJ; ECF No. 113-1, Pineiro Decl.; ECF No. 113-2, ICE's SUF; ECF No. 113-3, ICE's SGDMF.  On April 9, 2025, Plaintiff filed its Reply in support of its MSJ ("Pl.'s Reply"), along with its Statement of Genuine Disputes of Material Fact ("Pl.'s SGDMF") and Response to ICE's SGDMF ("Pl.'s Response to ICE's SGDMF").  ECF No. 114, Pl.'s Reply; ECF No. 114-1, Pl.'s SGDMF; ECF No. 114-2, Pl.'s Response to ICE's SGDMF.  On April 23, 2025, ICE filed its Reply in support of its MSJ ("ICE's Reply") and its Response to Pl.'s SGDMF ("ICE's Response to Pl.'s SGDMF").  ECF No. 115, ICE's Reply; ECF No. 116, ICE's Response to Pl.'s SGDMF.

On May 7, 2025, the Court held a hearing ("MSJ Hearing") on the parties' cross motions for summary judgment and took the matter under submission.  ECF No. 119.

**B.    FOIA Request**

On April 29, 2022, Plaintiff submitted its FOIA Request to Defendants, seeking, generally:

4

any and all records that were prepared, received, transmitted,
collected, and/or maintained by [ICE] or [DHS] that describe, refer, or
relate to the release of hospitalized detainees from custody prior to
their death; any records related to release of individual detainees once
hospitalized; and any records related to the death of such detainees
after their release from custody, including any communications or
investigations.

ECF No. 24-1, Request at 3-4.  In response, "Defendant ICE issued interim

production responses monthly from November 2022 through February 2025."

ECF No. 113-1, Pineiro Decl. at 5.  In the end, ICE located "a total of 53,426 pages

of potentially responsive records . . . along with 911 pages of records referred to

ICE from other departments." Id. at 22.  "Of those 53,426 pages, 21,153 pages and

an Excel spreadsheet were determined to be responsive and produced to the

Plaintiff." Id.

## C.    **Parties' Arguments**

### 1.    Parts 1-3

In Parts 1-3 of the Request, Plaintiff seeks the following records:

(1)    Any and all documents, without limitation to date, including
any communications, investigatory reports, and any and all
exhibits, appendices, or attachments thereto, relating to the
hospitalization, death, decision to release from custody, or
release from custody of the following individuals[: Teka
Gulema, Johana Medina Leon, Jose Ibarra Bucio, and Martin
Vargas Arellano.]

(2)    Any and all DHS OIG reports of investigation that are
identified in any of the records responsive to Request #1. This
includes any and all exhibits, appendices, or attachments to the
DHS OIG reports of investigation.

(3)    Any and all DHS OIG reports of investigation that are
identified in any of the records responsive to Request #1. This
includes any and all exhibits, appendices, or attachments to the
DHS OIG reports of investigation.

ECF No. 24-1, Request at 3-4.  In response to Parts 1-3, ICE searched the

following:

(1) previous litigation files requesting records of the deceased
individuals, (2) the Los Angeles Field Office, (3) the Office of
Professional Responsibility ("OPR") External Reviews and Analysis
Unit ("ERAU"), (4) the New Orleans Field Office Director, (5) the
New Orleans Field Office Acting Deputy Field Office Director, (6)
the New Orleans Field Office Contracting Officer Representative, (7)
a New Orleans Field Office Detention and Deportation Officer, (8) a
New Orleans Field Office Supervisory Detention and Deportation
Officer, (9) an Enforcement and Removals Operations IHSC
Investigations Unit Program Manager, (10) a Field Medical
Coordinator, (11) four Los Angeles Field Officer Supervisory
Deportation and Detention Officers, and (12) the Acting Field Office
Director in the Los Angeles Field Office.

ECF No. 113-1, Pineiro Decl. at 8.  ICE further details the searches that were

conducted in response to Parts 1-3 in the Pineiro Declaration, which will be

discussed below as needed.  See ECF No. 113-1, Pineiro Decl. at 8-12.

a.    Plaintiff's Motion

In its MSJ, Plaintiff argues that "ICE failed to follow obvious leads and

conduct a search for two categories of highly relevant records[:]" (1) "records

related to a directive sent from ICE Headquarters to ICE Enforcement and

Removal Operations' ('ERO') Adelanto Field Office to draft a Detainee Death

Notice for detainee Martin Vargas Arellano in the days before his impending

death, and the Adelanto Field Office's response"; and (2) "records related to ICE's

response to [DHS Office of Civil Rights and Civil Liberties' ("CRCL")] findings

regarding its failure to conduct a Detainee Death Review for Mr. Vargas

Arellano."  ECF No. 112, Pl.'s MSJ at 15.

First, "ICE produced an email chain dated March 4, 2021, discussing an ICE

headquarters directive to the Adelanto Field Office to prepare a death notification

for Mr. Vargas Arellano."  Id.  However, "ICE has failed to produce any such

document, or any other correspondence related to whether a notification was

completed, and if not, why."  Id.  The March 4, 2021 email chain produced by ICE

contains redacted names of the senders and recipients "who would likely have this

highly responsive information." Id. at 15-16.  "Defendants should be ordered to disclose the senders and recipients of this email chain, and allow the parties to meet and confer about what subset of them should be searched for documents related to ICE's compliance with appropriate policies and practices related to terminally ill detainees." Id. at 16.

Second, "CRCL recently produced documents related to its July 12-16, 2021 investigation into a complaint about Mr. Vargas Arellano's hospitalization and deathbed release, which included CRCL's findings and recommendations to ICE." Id. (citation omitted).  "These documents are replete with leads for further searches ICE should have conducted to meet its search obligations[,]" including a CRCL memo issued to 13 ICE headquarters staff "laying out its policy recommendations in response to the complaint related to Mr. Vargas Arellano," and requesting a response from ICE.  Id. (citation omitted).  "ICE should be required to search some subset of ICE officials identified on this memo for responsive records, and as a starting point Plaintiff asks that the Court order a search of Corey Price, ICE's Executive Associate Director of Enforcement and Removal Operations."  Id. Similarly, an email produced by CRCL indicated that CRCL was preparing a formal expert recommendations memo to send to ICE.  Id. at 16-17 (citation omitted).  ICE should have searched for and produced "information regarding the preparation of an 'expert recommendation memo,'" but did not.  Id. at 17 (citation omitted).

Accordingly, Plaintiff requests that "ICE conduct a further search for documents to locate and produce the documents discussed above," and "search each of the ICE officials referenced above to locate further responsive records." Id. (internal citations omitted).  Plaintiff proposes specific search parameters that could be utilized by ICE to conduct the further searches.  Id.

/ / /

/ / /

1                                    b.        ICE's MSJ

2              Plaintiff's argument that ICE's search in response to Parts 1-3 was not

3       sufficient "because certain records, which Plaintiff believes exist and would be

4       responsive, were not produced[,]" is misplaced because "the adequacy of a search

5       is judged 'not by the fruits of the search, but by the appropriateness of the methods

6       used to carry out the search.'"  ECF No. 113, ICE's MSJ at 17-18 (quoting

7       Transgender L. Ctr. v. Immigr. & Customs Enf't, 46 F.4th 771, 780 (9th Cir.

8       2022)).  "[A]n agency is not required to account for documents which the requester

9       has in some way identified if it has made a diligent search for those documents in

10      the places in which they might be expected to be found . . . ."  Id. at 18 (quoting

11      Transgender L. Ctr., 46 F.4th at 781) (internal quotation marks omitted).  ICE

12      argues that the search it conducted in response to Parts 1-3, which is detailed

13      extensively in the Pineiro Declaration, was "diligent and sufficient."  Id. (citing

14      ECF No. 113-1, Pineiro Decl. at 8-12).

15                                   c.        Plaintiff's Reply

16             ICE "failed to follow up on 'positive indications of overlooked materials,'

17      and 'leads that emerge[d]' in its initial searches."  ECF No. 114, Pl.'s MSJ Reply

18      at 7 (alteration in original) (quoting Transgender L. Ctr., 46 F.4th at 780 (internal

19      quotation marks omitted)).  The Pineiro Declaration "does not explain why ICE

20      failed to follow 'new leads and indications of overlooked material.'"  Id. at 8

21      (quoting Transgender L. Ctr., 46 F.4th at 781).  The Pineiro Declaration merely

22      states that because it searched two individuals on the March 4, 2021 email chain,

23      "'[t]here is no reason to believe [the ICE headquarters DDO] . . . would have any

24      additional information,' and further searches 'would likely turn up duplicative

25      records.'"  Id. at 9 (alterations in original) (quoting ECF No. 113-1, Pineiro Decl.

26      at 12).  "This speculation about what an additional search 'would likely' turn up

27      falls well short of ICE's burden[.]"  Id. (internal citations omitted).  Further, the

28      Pineiro Declaration "provides no justification for ICE's failure to search the email

                                               8

of ICE headquarters official Corey Price[,]" nor "does it mention, let alone explain, why it failed to search for the 'expert recommendations' CRCL shared with Mr. Price and other ICE officials[.]"  Id.

ICE's citation to the Ninth Circuit's holding that "an agency is not required to account for documents which the requester has in some way identified if it has made a diligent search for those documents in the places in which they might be expected to be found[,]" Transgender L. Ctr., 46 F.4th at 781, is inapposite because here, ICE failed to search for documents in places in which responsive documents are expected to be found, as identified by Plaintiff, and, moreover, "the leads Plaintiff identified are not to a single document, but rather a key set of documents at the core of Plaintiff's FOIA request[,]" ECF No. 114, Pl.'s MSJ Reply at 10. Further, in Iturralde v. Comptroller of Currency, the DC Circuit Court states, "[i]n certain circumstances, a court may place significant weight on the fact that a records search failed to turn up a particular document in analyzing the adequacy of a records search."  315 F.3d 311, 315 (D.C. Cir. 2003) (citation omitted).

### d.    ICE's Reply

Plaintiff's argument regarding the sufficiency of ICE's search presupposes the existence of the "death notification" identified by Plaintiff or correspondence explaining why it does not exist, but "[i]t is just as likely that no such records exist."  ECF No. 115, ICE's Reply at 9.  "Indeed, '[t]he failure to produce or identify a few isolated documents cannot by itself prove the searches inadequate.'"  Id. (alteration in original) (quoting Lahr v. Nat'l Transp. Safety Bd., 569 F.3d 964, 988 (9th Cir. 2009)).  Plaintiff further speculates that a search of two ICE headquarters officials would have discovered unproduced, responsive documents, "[b]ut the Pineiro Declaration explains why that is not so."  Id. (citing ECF No. 113-1, Pineiro Decl. at 12).

/ / /

/ / /

### 2.    Part 5

In Part 5 of the Request, Plaintiff seeks the following records from January 1, 2016, to April 29, 2022:

> Spreadsheets, emails, documents, communications, databases, lists, and other data compilations in the possession of ICE Leadership, ICE Enforcement and Removal Operations, ICE Health Service Corps, and ICE Office of Professional Responsibility that identify detainees who were released from custody while (a) hospitalized (including for COVID-19 treatment); (b) in the full-time care of external healthcare providers or facilities (including for COVID-19 treatment), or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility. Requested materials include, but are not limited to, dates of hospitalization of detainees, dates of hospital or external care facility discharge, name of treated detainees' detention facilities, and reasons for detainees' hospitalization or external medical care. These materials should further include Medical Transfer Summary documents from DHS's eHR System and Alien Medical Records System, and any versions of the Significant Detainee Illness Spreadsheet that identify detainees who were released from custody while (a) hospitalized (including for COVID-19 treatment); (b) in the care of external healthcare providers or facilities (including for COVID-19 treatment); or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility.

ECF No. 24-1, Request at 6.  In response to Part 5, ICE produced 551 pages from a search conducted by Stewart Smith, Assistant Director of IHSC, using agreed upon search terms and Boolean connectors.  ECF No. 113-1, Pineiro Decl. at 14-15.

### a.    Plaintiff's Motion

"Plaintiff has repeatedly requested that ICE conduct a search for records related to ICE's Significant Detainee Illness ('SDI') meetings and list, which are likely to be highly relevant to Plaintiff's Request."  ECF No. 112, Pl.'s MSJ at 18. "Participants in the SDI meetings possess the authority to determine the release of detainees with significant medical conditions."  Id. at 20.  "Defendants, however, have wholly refused to conduct a search for records related to SDI meetings and list."  Id. at 19.  While "Defendants argue that Plaintiff's request for SDI-related

10

records is overbroad," "Defendants have categorically refused to consider

Plaintiff's proposals to narrow the scope of the search[.]" Id.  Plaintiff requests

that ICE "search for and produce copies of SDI lists, as well as emails, agendas,

and notes regarding from SDI meetings." Id. at 20.  "Plaintiff suggests that ICE

conduct a search of records belonging to Dr. Ada Rivera, Deputy Medical Director,

IHSC; and staff from ICE's ERO Field Operations who regularly participate in the

SDI meeting." Id.

### b.    ICE's MSJ

Plaintiff's request for SDI-related records "is burdensome as there are 233

IHSC employees who participated in the SDI process from 2016 to present." ECF

No. 113, ICE's MSJ at 21 (citations omitted).  "The number of ICE employees that

were part of the Medical Case Management Unit from 2016 to present is 376." Id.

(citations omitted).  Plaintiff's proposal to narrow the scope of the search still

"includes [the same] hundreds of individuals[]" as their initial proposal. Id.

"Thus, Plaintiff's demand that ICE conduct such a search is unreasonably

burdensome." Id. at 21.

### c.    Plaintiff's Reply

"[T]he government cannot avoid a search on a claim that it would be 'unduly

burdensome' where it 'has not reviewed any portion of this search.'" ECF No.

114, Pl.'s Reply at 12 (quoting Mattachine Soc'y of Washington, D.C. v. United

States Dep't of Just., 267 F. Supp. 3d 218, 226 (D.D.C. 2017)).  "Plaintiff has

never suggested that ICE conduct a search of the 'hundreds of individuals' who

participated in 'the SDI process.'" Id. (quoting ECF No. 113, ICE's MSJ at 21).

Plaintiff proposes narrowing the search to "records of Dr. Ada Rivera and staff

from ICE's ERO Field Operations who regularly participate in the SDI meeting[.]"

Id. at 13.

/ / /

/ / /

11

d.    ICE's MSJ

"Plaintiff claims that ICE was somehow obligated to accept its proposal to conduct an additional search of specific custodians with respect to Part 5.  But the Pineiro Declaration explains why such is not feasible – because the 'list includes hundreds of individuals and is overly burdensome.'"  ECF No. 115, ICE's Reply (quoting ECF No. 113-1, Pineiro Decl. at 15-16).

### 3.    Parts 6-7

In Parts 6-7 of the Request, Plaintiff seeks the following records from January 1, 2016 to April 29, 2022:

> (6)    Spreadsheets, emails, significant incident reports (SIRs), significant event notification reports (SENs), or documents created by DHS OIG or ICE OPR that mention the release from custody of (a) hospitalized detainees; (b) detainees who at the time of release were patients in the care of external healthcare providers or facilities; or (c) detainees released from custody immediately prior to transfer to an emergency room, hospital, or external care facility.
>
> (7)    Spreadsheets, emails, SIRs, SENs, or documents created by DHS OIG or ICE OPR that mention the death of any detainee who had been previously released from custody while (a) hospitalized; or (b) a patient in the care of an external healthcare provider or facility; or (c) released from custody immediately prior to transfer to an emergency room, hospital, or external care facility.

ECF No. 24-1, Request at 6-7.  In response to Parts 6-7, ICE searched the following: OPR, ERO IHSC, Joint Intelligence Operations Center ("JIOC"), ERO Custody Management, and ERO Filed Operations.  See ECF No. 113-1, Pineiro Decl. at 16, 18.  OPR conducted multiple searches in response to Parts 6 and 7 and the only responsive record found was ICE Directive 11003.5, which was produced.  Id. at 18-19.  JIOC responded it was "not the owner of the data points requested and it deferred the request to ERO Custody Management and ERO IHSC."  Id. at 17, 19.  ERO IHSC conducted searches which produced no responsive records.  Id.

ERO Custody Programs and ERO Filed Operations stated that they "do not

maintain data in relation to the [R]equest." Id. at 18, 20.

a.    Plaintiff's MSJ

When ERO stated that it cannot search for a SIR without a date, event,

location or alien number, Plaintiff requested that ICE direct JOIC to conduct

searches in response to Parts 6 and 7.  ECF No. 112, Plaintiff's MSJ at 21.  JIOC

then "deferred to ERO because the data points requested do not originate with

JOIC[,]" but ERO had just stated it could not conduct the search.  Id. at 22.  "ICE's

Kafkaesque position that they cannot search the only location where these records

are searchable does not square with their obligations under FOIA."  Id.  "ICE has

since claimed that the daily reports drafted by JOIC are not in a searchable

format[,]" but that "threadbare excuse strains credulity[.]"  Id. (citations and

internal quotation marks omitted).  JOIC should be ordered to "timely conduct a

search for records responsive to Parts 6 and 7[.]"  Id. at 23.

b.    ICE's MSJ

ICE did not refuse to conduct searches in response to Parts 6 and 7, instead,

Plaintiff tasked JIOC with conducting the search and JIOC deferred that search to

ERO, who could not perform the search without specific identifying information.

ECF No. 113, ICE's MSJ at 23-24.  Further, the summaries Plaintiff suggest JIOC

search "are not stored in one place[]" and in order to search them, "someone would

have to go in and check search terms for each individual day."  Id. at 24 (citations

omitted).

c.    Plaintiff's Reply

"ICE states that it identified JIOC among 'the program offices likely to have

responsive records (if such records existed),' and that it 'tasked the JIOC to

conduct a search for documents responsive to [Parts] 6 and 7[.]'"  ECF No. 114,

Pl.'s Reply at 14 (internal citations omitted) (quoting ECF No. 113-2, ICE's SUF

and ECF No. 113, ICE's MSJ  (internal quotation marks omitted)).  "But JIOC (an

ICE division) 'deferred its tasking' (or in plain terms, did not conduct the search), 'because the information it receives originates with ERO' (another ICE division)." Id. at 14-15 (quoting ECF No. 113, ICE's MSJ at 24 (internal citations omitted)). "ICE then falls back on its excuse that ERO cannot search records without individual identifying information—but never explains why ERO did not instruct JIOC to conduct a search of its summaries, using the agreed-upon search terms, and review the responsive records for production." Id. at 15 (citation omitted). Further, ICE's argument that it would have to check summaries from each individual day is "conclusory and unsupported with any specific information." Id. ICE could run the daily summaries through Relativity to run the search without the burden of looking through each summary by hand. Id.

### d.     ICE's Reply

"[T]he summaries Plaintiff seeks are not stored in one place but are moved from emails to the Daily Enforcement Activity Report ('DEAR') system for which there is one DEAR for every 24-hour period." ECF No. 115, ICE's MSJ at 11. "To search the DEAR system, ICE would need to go in and check search terms for each individual day to see if such is responsive." Id. "Bearing in mind that the FOIA Request seeks records spanning nine-years, this necessarily means that a search would require the manual pulling and review of 3,285 reports to determine if such is responsive." Id. "As ICE also addressed in [its MSJ], the DEAR system does not keep track of when individuals are released from custody." Id. Plaintiff's Request regarding Parts 6 and 7 would be "'unreasonably burdensome[,]'" id. (quoting Am. Fed. of Gov't Emp. v. Dep't of Commerce, 907 F.2d 203, 209 (D.C. Cir. 1990)), and would require ICE to conduct a search "'not compatible with [its] own document retrieval systems[,]'" id. (quoting People for Am. Way Found. v. U.S. Dep't of Just., 451 F. Supp. 2d 6, 14 (D. D.C. 2006) (internal quotation marks omitted)).

/ / /

14

### 4.    Part 8

In Part 8 of the Request, Plaintiff seeks the following records from January 1, 2016, to April 29, 2022:

> Any and all documents, communications, and other records, including databases, spreadsheets, lists, and other data compilations, that identify detainees who were hospitalized or transferred from detention for off-site medical care due to COVID-19, and were subsequently released from custody while hospitalized, or detainees who were released from custody immediately prior to transfer to an emergency room, hospital, or external care facility to receive treatment for COVID-19. Requested information includes, but is not limited to, dates of hospitalization, detention facility, medical condition/reason for hospitalization or treatment, name and location of hospital, date of return to detention (if any), date of release from custody or issuance of order of recognizance (if any), and/or reason for release from custody.

ECF No. 24-1, Request at 7.  In response to Part 8, ICE searched ERO IHSC and produced "[a]pproximately 1,711 pages" of responsive documents.  ECF No. 113-1, Pineiro Decl. at 20.

### a.    Plaintiff's MSJ

Plaintiff requests that ICE search "'[s]preadsheets regarding hospitalization or release compiled for or utilized in Fraihat v. ICE, 5:19-cv-1546' (C.D. Cal.)—a case involving COVID protections across ICE's entire detention network that would have swept in information responsive to this request."  ECF No. 112, Pl.'s MSJ at 24.  "The Fraihat Compliance System is the only place where ICE kept key responsive data[,]" according to ICE policies and a 2021 deposition of an ICE employee who stated, "'the only place where we were actually capturing hospitalization [data] is on the Fraihat [spreadsheets].'"  Id. (alterations in original) (citations omitted).  "ICE argues that ICE need not search its Fraihat records because Plaintiff's request did not use the word 'Fraihat.'  But there is no such exception to an agency's search obligations."  Id. at 25.  "Accordingly, Plaintiff requests that the Court order ICE to timely conduct a search for records responsive

1  to Part 8 from records compiled for <u>Fraihat v. ICE</u>, No. 5:19-cv-1546 (C.D. Cal.),

2  using the search methodology ICE already used to search records of Dr. Stewart

3  Smith for this Part." <u>Id.</u> (citation omitted).

4                          b.      ICE's MSJ

5      "Aside from the fact that the Plaintiff did not request these documents in the

6  original FOIA request, the Office of the Principal Legal Advisor ('OPLA') at ICE

7  continues to litigate the <u>Fraihat</u> case and has done so since the beginning of the

8  pandemic."  ECF No. 113, ICE's MSJ at 25 (citation omitted).  "To the extent such

9  records might exist, OPLA has no way of searching for such records and they

10 would have no way of knowing if a detainee had been released while hospitalized

11 with COVID." <u>Id.</u>  "The only way to find out which detainees were released

12 would be to cross compare with ERO records, but this is not required under the

13 FOIA." <u>Id.</u> (citation omitted).

14                         c.      Plaintiff's Reply

15     ICE need not "'cross compare' [<u>Fraihat</u>] hospitalization records with release

16 records to go through the documents line-by-line and remove the nonresponsive

17 information from them."  ECF No. 114, Pl.'s Reply at 17.  "[T]his additional

18 filtering is unnecessary, negating the burden [ICE] claims." <u>Id.</u>  Instead, "ICE

19 needs only to conduct this search [of the <u>Fraihat</u> records] and produce the

20 documents it obtains (subject to exemptions).  It need not further filter within these

21 documents." <u>Id.</u>

22                         d.      ICE's Reply

23     ICE reiterates that the only way to determine which records related to the

24 <u>Fraihat</u> litigation are responsive is to "cross compare with ERO records but this is

25 not required under the FOIA."  ECF No. 115, ICE's Reply at 12 (citations

26 omitted).  "ERO does not maintain a list of individuals who were released during

27 hospitalization with COVID and ERO IHSC has already run several searches in

28

                                      16

this case.  Lastly, OPLA noted that most of the reporting and discovery required under Fraihat was done under protective order."  Id. (citation omitted).

### 5.    Part 9

In Part 9, Plaintiff seeks the following records from January 1, 2016 to April 29, 2022:

> Bills, invoices, charges, or records of payment that reflect payments made for healthcare for any detainee who was released from custody while (a) hospitalized; or (b) a patient in the care of an external healthcare provider or facility, and communications about such bills, invoices, charges, or records of payment[.]

ECF No. 24-1, Request at 7.  In response, ICE searched the following: ERO IHSC, the IHSC Resource Management Unit ("RMU"), and the IHSC Health Plain Management Unit ("HPMU").  ECF No. 113-1, Pineiro Decl. at 21.  "[A] health informaticist with ERO IHSC conducted a search of Sharepoint and eClinicalWorks for the alien numbers and referral authorizations numbers of the four decedents [identified in Part 1 of the Request].  A spreadsheet was found, processed, and produced."  Id.  RMU stated it did not possess the information requested as "they are not involved in billing[.]"  Id.  When tasked to conduct the search, HPMU responded that "they cannot search for the information sought in [Part] 9 without specific names."  Id. at 22.  HPMU recommended tasking the Regional Health Service Administrator ("HAS") [sic] and the Regional Field Medical Coordinator ("FMC"), but after the searched caused both of their systems to crash, "it was determined that they would not be able to identify information responsive to [Part] 9 without searching for specific names."  Id.

### a.    Plaintiff's MSJ

The spreadsheet produced by HPMU is insufficient as a response to Part 9 because "Part 9 is not limited to the four specific people named in Parts 1-3. Instead, through this request Plaintiff seeks to use billing records to learn who, beyond those four specific people, has been released while hospitalized."  ECF No.

17

112, Pl.'s MSJ at 26.  ICE's claim that it cannot search for the requested

information without having specific names to search for is "unsupported" and

"falls well short of ICE's burden 'to show that it has undertaken all reasonable

measures to uncover all relevant documents.'"  Id. at 28 (quoting Transgender L.

Ctr., 46 F.4th at 780).

### b.    ICE's MSJ

"[A]s ICE has explained, it cannot search for or locate bills without names

of individual detainees.  There is no generalized list of detainees from which it may

assemble a list of names and then conduct searches."  ECF No. 113, ICE's MSJ at

27.  "Rather, in order to run such a search, ICE needs the names of specific

detainees, which, other than the four decedents identified in the Request, Plaintiff

has never provided.  Nor is ICE required under the FOIA to create such a list and

then conduct searches."  Id. (citation omitted).

### c.    Plaintiff's Reply

Plaintiff acknowledges that ICE claims to be unable to run the search

initially requested by Plaintiff.  ECF No. 114, Pl.'s Reply at 18.  "Plaintiff

therefore seeks the following relief:"

> (1)    Within two weeks of the Court's order, ICE should search the
>        nine people it has identified as "most likely to possess
>        responsive records,"  using each of the fifteen search terms
>        identified in its November 2, 2023 search proposal, and should
>        provide a hit count for each search term (or should state if any
>        term resulted in so many hits that it, alone, caused a technical
>        problem) . . . .
>
> (2)    Within two weeks of the Court's order, ICE should provide a
>        declaration stating whether it can query its claims database to
>        produce a spreadsheet of all claims involving the Procedure
>        Codes 99291, A0427, A0431, and A0433— four codes related
>        to high-level emergency transport to hospitals . . . .
>
> (3)    The parties should meet and confer, and within two weeks of
>        the court's order should provide a joint statement to the Court
>        setting out either an agreed search or their separate positions on
>        what search is appropriate for this Part.

1  Id. at 19 (internal citations and quotation marks omitted).

2                              d.      ICE's Reply

3        "[W]ithout the names or alien numbers [ICE] could not find any additional

4  information in response to [P]art 9 other than what it had with respect to the four

5  decedents named in the FOIA request."  ECF No. 115, ICE's Reply at 13.  ICE

6  attempted to search several different sources but with respect to HMPU, Plaintiff's

7  proposes searched caused a systems crash.  Id.  Even then, ICE "explored whether

8  there was a way forward[.]"  Id.  "Accordingly, ICE has met its burden of

9  conducting an adequate search with respect to Part 9 of the FOIA Request."  Id.

10                      **III.    STANDARD OF REVIEW**

11        FOIA's core purpose is to inform citizens about "what their government is

12  up to."  DOJ v. Reporters Comm. For Freedom of Press, 489 U.S. 749, 773 (1989).

13  FOIA "ensure[s] an informed citizenry, vital to the functioning of a democratic

14  society, needed to check against corruption and to hold the governors accountable

15  to the governed."  John Doe Agency v. John Doe Corp., 493 U.S. 146, 152 (1989).

16        "In response to a FOIA request, government agencies must conduct a

17  reasonable search to find documents responsive to the request."  Hamdan v. DOJ,

18  797 F.3d 759, 770 (9th Cir. 2015) (citing Lahr v. Nat'l Transp. Safety Bd., 569

19  F.3d 964, 973 (9th Cir. 2009)).  FOIA contemplates "full agency disclosure unless

20  information is exempted under clearly delineated statutory language."  Reporters

21  Comm., 489 U.S. at 753 (internal quotation marks and citation omitted).

22        FOIA cases are typically resolved on motions for summary judgment.

23  Yonemoto v. Dep't of Veterans Affs., 686 F.3d 681, 688 (9th Cir. 2012), overruled

24  on other grounds by Animal Legal Def. Fund v. FDA, 836 F.3d 987 (9th Cir.

25  2016).  Summary judgment is appropriate when the "movant shows that there is no

26  genuine dispute as to any material fact and the movant is entitled to judgment as a

27  matter of law."  Fed. R. Civ. P. 56(a).

28  / / /

On a motion for summary judgment, agencies must demonstrate the
adequacy of their search in response to a FOIA request "beyond material doubt."
Transgender L. Ctr., 46 F.4th at 779 (internal quotation marks omitted) (collecting
cases). "Demonstrating adequacy 'beyond material doubt' is, to be sure, a heavy
burden, but such a burden appropriately reflects the purpose and policy of FOIA,
including transparency, public access, and an informed citizenry." Id. (citations
omitted). "Requiring the Government to meet the 'beyond material doubt'
standard ensures that the 'adequacy of an agency's search for requested documents
is judged by a standard of reasonableness.'" Id. at 780 (quoting Miller v. Dep't of
State, 779 F.2d 1378, 1383 (8th Cir. 1985)). The "beyond a material doubt"
standard "require[es] an agency to show that it has undertaken all reasonable
measures to uncover all relevant documents[,]" and "prevent[s] agencies from
blithely asserting adequacy without backing up such an assertion." Id.

"The adequacy of the agency's search is judged by a standard of
reasonableness, construing the facts in the light most favorable to the requestor."
Citizens Comm'n on Hum. Rights v. State Dept., 45 F.3d 1325, 1328 (9th Cir.
1995) (citing Zemansky v. EPA, 767 F.2d 569, 571 (9th Cir. 1985)). "An agency
can demonstrate the adequacy of its search through 'reasonably detailed,
nonconclusory affidavits submitted in good faith.'" Transgender L. Ctr., 46 F.4th
at 780 (quoting Hamdan, 797 F.3d at 770). Agencies must "appropriately respond
to 'positive indications of overlooked materials[,]'" id. (quoting Hamdan, 797 F.3d
at 771), and have a "duty to follow 'obvious leads,'" id. (quoting Valencia-Lucena
v. U.S. Coast Guard, 180 F.3d 321, 325 (D.C. Cir. 1999)). "Ultimately, the
adequacy of a search is judged 'not by the fruits of the search, but by the
appropriateness of the methods used to carry out the search.'" Id. (quoting
Iturralde, 315 F.3d at 315).

/ / /

/ / /

20

1
2

# IV.    DISCUSSION

## A.    Disputed "Facts"

As a preliminary matter, there are a few facts in each party's SUF which the other party apparently disputes.  See ECF No. 113-3, ICE's SGDMF; ECF No. 114-1, Pl.'s SGDMF.  The Court does not find any of these disputed "facts" to be genuine issues of material facts sufficient to preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) ("By its very terms, [the summary judgment] standard provides that the mere existences of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  (emphasis in the original)).  As further explained below, all the disputed "facts" are immaterial to the adjudication of summary judgment because the Court does not rely on them in deciding whether ICE's searches in response to the Request were adequate.  Anderson, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will preclude the entry of summary judgment.").

First, ICE contends that Plaintiff's summary of ICE's proposed search in response to Part 9 and the parties' agreement regarding the same, as stated in Plaintiff's SUMF, "misstates the search and omits the Boolean connectors."  ECF No. 113-3, ICE's SGDMF at 4-5.  However, Plaintiff's characterization of the search is not material to the Court's determination of whether ICE's search was adequate because the Court relies on the Pineiro Declaration for its understanding of the search that occurred.

Second, the parties dispute when Plaintiff submitted the Request.  Id. at 2; ECF No. 114-1, Pl.'s SGDMF at 3.  The date the Request was submitted is immaterial to the Court's analysis.  None of the relevant issues turn on timeliness.

/ / /

/ / /

21

Third, Plaintiff argues that ICE's summary of Plaintiff's Request is inaccurate.  Id.  However, ICE's summary of Plaintiff's Request is immaterial because the Court relies on the Request itself to determine its substance.

Finally, Plaintiff disputes ICE's claim that it conducted a "comprehensive search" in "[a]ll locations likely to contain records responsive to the Request[,]" id. at 9-13, but such dispute does not preclude summary judgment because ICE's claims about the adequacy of its search are not facts, but legal conclusions and the Court does not rely on them when deciding if ICE's searches were adequate.

Thus, none of the parties' purportedly disputed facts preclude summary judgment.

**B.    Parts 1-3**

Plaintiff argues that ICE's search in response to Parts 1-3 was inadequate because ICE did not follow the following two leads that appeared during its search: (1) "an email chain dated March 4, 2021, discussing an ICE headquarters directive to the Adelanto Field Office to prepare a death notification for Mr. Vargas Arellano"; and (2) CRCL's formal expert recommendations memo and "ICE's response to CRCL's recommendations[.]"  ECF No. 112, Pl.'s MSJ at 15-17.  ICE responds that the "failure to produce or identify a few isolated documents cannot by itself prove the searches inadequate."  ECF No. 113, ICE's MSJ at 18 (citation and internal quotation marks omitted).

Here, ICE fails to carry its "heavy burden" of demonstrating adequacy "beyond material doubt" because ICE does not provide an adequate justification for why it failed to follow the leads identified by Plaintiff.  Transgender L. Ctr., 46 F.4th at 779.  Contrary to the authority ICE cites in its MSJ, Plaintiff here does not argue that ICE's search is inadequate because ICE failed to produce "'a few isolated documents[.]'"  ECF No. 113, ICE's MSJ at 18 (quoting Lahr, 569 F.3d at 988).  Instead, Plaintiff identifies "new leads and indications of overlooked material[]" that appeared during ICE's search.  Transgender L. Ctr., 46 F.4th at

22

781.  These leads constituted "places in which [responsive documents] might be expected to be found[.]"  Id. (citation and internal quotation marks omitted).  Despite being alerted to these leads by Plaintiff, ICE failed to satisfy its "duty to follow [these] obvious leads[.]"  Id.  While ICE is correct that "the adequacy of a search is judged not by the fruits of the search, but by the appropriateness of the methods used to carry out the search[,]" id. at 780 (citation and internal quotation marks omitted), ICE's failure to follow the leads identified by Plaintiff constitutes a deficiency in the appropriateness of the ICE's search methods.  If ICE had followed the identified leads and still not found any responsive documents, ICE's search would have been adequate, even though it failed to produce fruits.  But where, as here, new leads generated during the search indicated to ICE that other locations and custodians were likely to possess responsive records, ICE had a "duty to follow [those] obvious leads," and "undertake[] all reasonable measures to uncover [those] relevant documents."  Id. (citation and internal quotation omitted).

Further, the Pineiro Declaration does not adequately justify ICE's refusal to follow the identified leads.  The Pineiro Declaration claims that "all but two of the individuals on the March 4, 2021 email chain have already run searches using Mr. Vargas' name and alien number and have found records that were processed and produced[,]" and therefore, search of the two individuals not yet searched "would likely turn up duplicative records."  ECF No. 113-1, Pineiro Decl. at 12.  This singular, unsupported assumption about whether the two unsearched individuals possessed responsive records is insufficient to carry ICE's "heavy burden" of demonstrating adequacy.  Transgender L. Ctr., 46 F.4th at 780.  ICE cannot "blithely assert[] adequacy without backing up such an assertion."  Id.  The other lead identified by Plaintiff – CRCL's formal expert recommendations memo and ICE's response to CRCL's recommendations – is completely unaddressed in the Pineiro Declaration or elsewhere.  More is required under the heavy burden imposed on ICE by FOIA.

1  Accordingly, Plaintiff's MSJ as to Parts 1-3 is GRANTED and ICE is

2  ordered to conduct searches of the two leads as outlined by Plaintiff in its MSJ.

3  See ECF No. 112, Pl.'s MSJ at 15-17.  **Within twenty-one days** of this Order

4  issuing, the parties are to meet and confer regarding the date by which ICE will

5  conduct these searches.  If the parties cannot agree, the parties can submit a further

6  request for the Court to consider the steps proposed by either party and seek further

7  appropriate relief.

8  **C.    Part 4**

9  In its MSJ, ICE briefed the adequacy of its search in response to Part 4, ECF

10  No. 113, ICE's MSJ at 18-20, however, Plaintiff does not discuss Part 4 in its MSJ.

11  During the MSJ Hearing, Plaintiff represented to the Court that it does not contest

12  the adequacy of ICE's response to Part 4.  See ECF No. 119.  Thus, the Court

13  GRANTS ICE's MSJ as to Part 4.

14  **D.    Part 5**

15  The parties are well aware of the standard, it is the application of that

16  standard for the current area of inquiry that is in dispute.  Defendants have

17  identified the issues that preclude a search to be conducted in a reasonable manner,

18  i.e. "possible records could only be discovered through the creation of a list of

19  detainees," ECF No. 113-1, Pineiro Decl. at 14, and the SDI list "includes

20  hundreds of individuals that is overly burdensome," id. at 15.  Plaintiff has

21  proposed a manner in which a search may be limited by searching the "records of

22  Ada Rivera and staff from ICE's ERO Field Operations who regularly participate

23  in the SDI meeting[.]"  ECF No. 114, Pl.'s Reply at 12.

24  The search of Dr. Rivera's records appears to be a reasonable location to

25  search based on the information provided by Plaintiff and there is no indication this

26  was done to obtain the relevant information.  This search cannot be construed as

27  overburdensome without additional information being presented by Defendants.

28  The "ICE's ERO Field Operations who regularly participate in the SDI meeting"

24

limitation, however, does not appear to narrow or limit the search and without more information, it is difficult to see how such a search could be required as a reasonable search in light of the information provided by Defendants.  Therefore, Plaintiff's MSJ to search Dr. Rivera's records is GRANTED but the search of the other individuals is DENIED.

### E.    Parts 6-7

Plaintiff argues that ICE failed to meet its burden in response to Parts 6 and 7 when it did not require JOIC to conduct a search for SIR reports.  ECF No. 112, Pl.'s MSJ at 22.  ICE responds that: (1) it tasked JIOC with conducting a search in response to Parts 6 and 7; (2) JIOC deferred the search to ERO; (3) ERO cannot conduct the search without a date, event, location, or alien number; and (4) even if JIOC had not deferred the search, it would be unduly burdensome for JIOC to conduct the search.  ECF No. 113, ICE's MSJ at 23-24.

Here, the Court finds that ICE fails to carry its "heavy burden" of demonstrating adequacy "beyond a material doubt" because it did not follow up with JIOC after ERO stated it was unable to conduct the search, nor did it adequately explain this lack of follow up.  Transgender L. Ctr., 46 F.4th at 779. ICE does not claim, in any of its filings, that it cannot order JIOC to conduct a search, nor does ICE explain to the Court why ordering JIOC to conduct a search would be unreasonable.  At the very least, ICE could have gone back to JIOC and explained that ERO was unable to conduct the search deferred to ERO by JIOC and that, therefore, JIOC was the only ICE division that could produce the responsive records.  It is not clear to the Court that such an explanation would have fallen on deaf ears.  ICE's acceptance of ERO's inability to conduct the search referred to it by JIOC's search deferral without following up with JOIC in any way fails to satisfy ICE's duty to "undertake[] all reasonable measures" in responding to a valid FOIA request.  Id. at 780.

/ / /

More fundamentally, as a policy matter, an agency cannot be said to have satisfied its burden under FOIA when a division within that agency, able to conduct a valid search, defers the search to another division, which is unable to conduct that search.  While the Court does not doubt ICE's good faith effort in this case, holding that a doomed-to-fail deferral satisfies an agency's burden under FOIA would open a loophole ripe for abuse.  An agency looking to skirt its obligations under FOIA could task a division likely to possess responsive information with conducting the search; that division could then defer its tasking to another division unable to conduct the search; then, having hit an artificial "dead-end," the agency could claim it had satisfied its duty under FOIA, when, in reality, the agency effectively failed to search the one place likely to possess responsive records.  Such a process would be a "search" in name only and would frustrate "the purpose and policy of FOIA, including transparency, public access, and an informed citizenry."  Transgender L. Ctr., 46 F.4th at 779 (citations omitted).  Thus, the Court finds that ICE fails to satisfy its burden under FOIA and should order JIOC to conduct the search with which it was originally tasked.

ICE argues that JIOC cannot conduct the search anyway because to do so, JIOC would have to go through the "unreasonably burdensome" process of "manual[ly] pulling and review[ing] 3,285 reports to determine if such is responsive."  ECF No. 115, ICE's Reply at 11 (citations and internal quotation marks omitted).  However, in its Reply, Plaintiff suggests that ICE do what it has done at other points in this case: "collect a broad number of responsive documents and then run a search in Relativity of those collected documents[.]"  ECF No. 114, Pl.'s Reply at 15.  Despite being filed fourteen days before ICE's Reply, Plaintiff's suggestion that ICE use Relativity is not addressed in ICE's Reply.  Thus, the Court does not know whether Plaintiff's suggestion is feasible or how burdensome it would be on ICE.  At the very least, Plaintiff raises a valid question, existing before either Reply, about whether ICE "has undertaken all reasonable measures to

1    uncover all relevant documents." Transgender L. Ctr., 46 F.4th at 780. Because

2    ICE failed to undertake or address the reasonable measure proposed by Plaintiff,

3    ICE has failed to carry its heavy burden to demonstrate the adequacy of its search.

4    If using Relativity does not mitigate the burden identified by ICE in its MSJ, then

5    ICE must take Plaintiff up on its offer "to confer with Defendants' technical staff

6    to determine an efficient solution." ECF No. 114, Pl.'s Reply. As such, Plaintiff's

7    MSJ as to Parts 6-7 is GRANTED.

8         **F.    Part 8**

9         In Part 8, Plaintiff requests spreadsheets regarding hospitalization from the

10   Fraihat Compliance System. ECF No. 112, Pl.'s MSJ at 24. ICE argues that: (1)

11   Plaintiff did not mention these documents in the Request; and (2) the Fraihat

12   spreadsheet would not indicate who was released while hospitalized and thus, the

13   only way to produce responsive information would be to cross compare with ERO

14   records. ECF No. 113, ICE's MSJ at 25.

15        Here, the Court finds that by failing to search the Fraihat spreadsheet, ICE

16   failed to carry its burden under FOIA. First, the Fraihat spreadsheet is reasonably

17   likely to contain information responsive to Part 8 of the Request. Part 8 seeks, in

18   part, "spreadsheets" that "identify detainees who were hospitalized or transferred

19   from detention for off-site medical care due to COVID- 19, and were subsequently

20   released from custody while hospitalized[.]" ECF No. 24-1, Request at 7. The

21   Fraihat spreadsheet tracks information on detainees with COVID risk factors—

22   including if the detainee "has been hospitalized or deported[.]" See Fraihat v. U.S.

23   Immigr. & Customs Enf't, No. EDCV 19-1546 JGB (SHKx), 2020 WL 2758553,

24   at *6 (C.D. Cal. May 15, 2020). Thus, the Fraihat spreadsheet will "identify

25   detainees who were hospitalized or transferred from detention for off-site medical

26   care due to COVID-19[,]" as requested by Plaintiff. ECF No. 24-1, Request at 7.

27   Indeed, an ICE employee deposed in another case stated that the "the only place

28   where we were actually capturing the hospitalization [data] is on the Fraihat

27

[spreadsheets]."  ECF No. 112, Pl.'s MSJ at 14 (alterations in original) (citations and internal quotations omitted).  Plaintiff need not use the word "Fraihat" in its Request for the <u>Fraihat</u> spreadsheet to be included in ICE's search.  The burden is on ICE to search locations reasonably likely to produce records responsive to Part 8.  <u>See</u> <u>Transgender L. Ctr.</u>, 46 F.4th at 780.  The <u>Fraihat</u> spreadsheet is one such location.  By failing to search it, ICE fails to carry its burden under FOIA.

However, ICE contends that producing responsive information from the <u>Fraihat</u> spreadsheet would require an additional, unreasonably burdensome step: cross comparing hospitalization records in the <u>Fraihat</u> spreadsheet with ERO detainee release records.  ECF No. 113, ICE's MSJ at 25.  Indeed, Part 8 seeks information about detainees who were hospitalized with COVID "<u>and were subsequently released from custody while hospitalized</u>," ECF No. 24-1, Request at 7, while the <u>Fraihat</u> spreadsheet tracks only hospitalization records, not release records.  Thus, to produce records of detainees who were hospitalized with COVID <u>and</u> released, the information from the <u>Fraihat</u> spreadsheet needs to be cross compared with release records from ERO.  ECF No. 113, ICE's MSJ at 25.  However, ICE does not explain what such cross comparing would entail or how burdensome it would be.  ICE's singular statement in the Pineiro Declaration that cross comparing "is not required under FOIA[]" is insufficient to satisfy ICE's heavy burden under FOIA.  ECF No. 113-1, Pineiro Decl. at 21.  Further, as Plaintiff argues, ICE does not need to cross compare the <u>Fraihat</u> spreadsheet with ERO records; Plaintiff offers to do that.  ECF No. 114, Pl.'s Reply at 17.  ICE can simply produce information regarding detainees hospitalized for COVID-19 from the <u>Fraihat</u> spreadsheet and let Plaintiff cross compare with ERO records, thus "negating the burden [ICE] claims."  <u>Id.</u>

Accordingly, ICE fails to carry its heavy burden of demonstrating the adequacy of its search in response to Part 8.  As such, Plaintiff's MSJ as to Part 8 is GRANTED.  The Court orders ICE to conduct the search of the <u>Fraihat</u>

spreadsheet as described by Plaintiff and allow Plaintiff to cross compare the responsive information with ERO release records.

### G.    Part 9

The attempts to search for the billing and payment materials sought in this part must be "judged by a standard of reasonableness, " <u>Transgender L. Ctr.</u>, 46 F.4th at 780, and Defendants stated that "they would not be able to identify information responsive to subpart 9 without searching for specific names," ECF No. 113-1, Pineiro Decl. at 21. Plaintiffs provided a mechanism to proceed in their reply, though it is unclear whether this resolves the basic issue of whether any search could be reasonably conducted without the names of the individuals.

Based on the record before this Court, it is difficult to fashion a mechanism that would not account for the requirement that Defendant has set out as to what is necessary to accomplish this search. On the other hand, there are the Procedure Codes that Plaintiffs identified (99291, A0427, A0431, and A0433), which would allow Defendant to search a system for potentially relevant materials that would allow Plaintiffs to then narrow down the data to the relevant information. Consequently, Plaintiff's MSJ is GRANTED to the extent that Defendants will be Ordered to search the relevant database for charges associated with Procedure Codes 99291, A0427, A0431, and A0433 and to give an update regarding that search **within 30 days** from the date of the is Order, including any issues that may arise from conducting such a search. Defendants' MSJ is GRANTED in all other respects to subpart 9.

### V.    CONCLUSION

For the reasons stated above, the Court:

1) **GRANTS** Plaintiff's MSJ as to Parts 1-3, the portions of Parts 5 and 9 identified previously, and Parts 6-8;

2) **DENIES** Defendants' MSJ as to the same;

3) **GRANTS** Defendants' MSJ as to Part 4, the portion of Parts 5 identified previously, and a portion of Part 9 not involving a search of the systems for materials containing Procedure Codes 99291, A0427, A0431, and A0433; and

4) **ORDERS** the parties to meet and confer **within 30 days** of the date of this Order on a timeline for production of these materials.

DATED:  08/15/2025

_____

HONORABLE SHASHI H. KEWALRAMANI
United States Magistrate Judge